# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| KIMBERLY Y. LAFAVE, et al. | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-1605 (CMH/JFA) |
| | ) | |
| THE COUNTY OF FAIRFAX, VIRGINIA, | ) | |
| and KEVIN DAVIS, in his Official Capacity | ) | |
| as Chief of Police | ) | |
| | ) | |
| *Defendants* | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**INTRODUCTION** .................................................................................................. 1

**FACTS AND PROCEDURAL HISTORY** ............................................................ 1

**ARGUMENT** ......................................................................................................... 4

I.   Legal Standard ................................................................................................ 4

II.  Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Second Amendment Claims ...................................................................................... 5

    A.  *Bruen*'s Methodology ......................................................................... 5

        i.  Text, history, and tradition framework ..................................... 5

        ii.  Time period ............................................................................... 6

        iii. Understanding the historical record ........................................ 8

    B.  The Parks Restriction is Constitutional under *Bruen* ......................... 9

        i.  The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places ........................................... 9

            1.  Prohibitions on firearms in parks in the Reconstruction era and later establish the constitutionality of the Parks Restriction .......................... 10

            2.  Founding-era regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction ................................. 12

        ii.  At a minimum, Plaintiffs are not entitled to a preliminary injunction on their facial challenge because they cannot establish that the Parks Restriction lacks a plainly legitimate sweep ............................................................. 17

        iii. Decisions upholding laws similar to the Parks Restriction are correct ........... 20

    C.  The Events Restriction is Constitutional under *Bruen* ......................... 23

III. Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Due Process Claim ................................................................................................. 25

IV. The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs ..................... 28

**CONCLUSION** ....................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ................................................................. 4, 17, 19

*Antonyuk v. Chiumento*,
--- F.4th ----, No. 22-2908, 2023 WL 8518003 (2d Cir. Dec. 8, 2023) ............................ passim

*Antonyuk v. Hochul*,
639 F. Supp. 3d 232 (N.D.N.Y. 2022) .................................................. 20, 25

*Bridgeville Rifle & Pistol Club v. Small*,
176 A.3d 632 (Del. 2017) ...................................................................... 22

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................. 24

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
704 S.E.2d 365 (Va. 2011) .............................................................. 22, 23

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................................... 7, 16

*Fusaro v. Howard*,
19 F.4th 357 (4th Cir. 2021) ........................................................... 27, 28

*Goldstein v. Hochul*,
No. 1:22-cv-08300, 2023 WL 4236164 (S.D.N.Y. June 28, 2023), *appeal docketed*, No. 23-
995 (2d Cir. July 6, 2023) ..................................................................... 25

*In re Revel AC, Inc.*,
802 F.3d 558 (3d Cir. 2015) ................................................................. 21

*Kipke v. Moore*,
Nos. 1:23-cv-01293, 1:23-cv-01295 (consol.), 2023 WL 6381503
(D. Md. Sept. 29, 2023) ................................................................. passim

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) (en banc) ................................................ 28

*Koons v. Att'y Gen. of N.J.*,
No. 23-1900, Dkt. 29 (3d Cir. June 20, 2023) ....................................... 21

*Koons v. Platkin*,
Nos. 1:22-cv-07463, 1:22-cv-07464 (consol.), 2023 WL 3478604 (D.N.J. May 16, 2023),
*appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023) ............................... 20, 21, 24

*LaFave v. Cnty. of Fairfax*,
No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct.
June 23, 2023) ................................................................. 3, 10, 22, 27

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) (en banc) ..................................................... 4

*Martin v. Lloyd*,
  700 F.3d 132 (4th Cir. 2012) ........................................................................... 27, 28

*Maryland Shall Issue, Inc. v. Moore*,
  86 F.4th 1038 (4th Cir. 2023), *pet'n for reh'g en banc filed*, No. 21-2017 (Dec. 5, 2023) ........ 7

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................................ 30

*May v. Bonta*,
  No. 8:23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023), *appeals docketed*,
  Nos. 23-4354, 23-4356 (9th Cir. Dec. 22, 2023) ................................................... 21

*May v. Bonta*,
  No. 23-4354, Dkt. 10.1 (9th Cir. Dec. 30, 2023) ................................................... 21

*Md. Shall Issue, Inc. v. Hogan*,
  353 F. Supp. 3d 400 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020) ................. 26

*Md. Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) ....................................................................... 26, 27

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
  No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719
  (4th Cir. July 10, 2023) ............................................................................. passim

*Miranda v. Garland*,
  34 F.4th 348 (4th Cir. 2022) ............................................................................ 30

*Morris v. U.S. Army Corps of Eng'rs*,
  60 F. Supp. 3d 1120 (D. Idaho 2014) ................................................................. 22

*N. Va. Hemp & Agric., LLC v. Virginia*,
  No. 1:23-cv-1177, 2023 WL 7130853 (E.D. Va. Oct. 30, 2023) ............................. 29

*Nat'l Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL
  4542153 (July 14, 2023) .................................................................................. 7

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...................................................................................... passim

*Oregon Firearms Fed'n, Inc. v. Kotek*,
  No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023) ................................ 5

*People v. Chairez*,
  104 N.E.3d 1158 (Ill. 2018) ............................................................................. 25

*Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *rev'd on reh'g en banc*, 824 F.3d
  919 (9th Cir. 2016) ........................................................................................ 22

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
  872 F.2d 75 (4th Cir. 1989) ............................................................................. 29

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ............................................................................. 4

*Roswell v. Mayor & City Council of Balt.*,
No. 23-1567, 2023 WL 8728503 (4th Cir. Dec. 19, 2023) (per curiam) (unpub.) ............ 29, 30

*Siegel v. Platkin*,
653 F. Supp. 3d 136 (D.N.J. 2023) ........................................................................................ 21

*Solomon v. Cook County Bd. of Comm'rs.*,
559 F. Supp. 3d 675 (N.D. Ill. 2021) ..................................................................................... 22

*Speech First, Inc. v. Sands*,
No. 7:21-cv-00203, 2021 WL 4315459 (W.D. Va. Sept. 21, 2022), *aff'd*, 69 F.4th 184 (4th
Cir. 2023), *pet'n for cert. filed*, No. 23-156 (U.S. Aug. 14, 2023) .......................................... 26

*State v. Huntly*,
25 N.C. 418 (1843) ................................................................................................................ 13

*Stinnie v. Holcomb*,
77 F.4th 200 (4th Cir. 2023) (en banc) .................................................................................. 28

*Tanner v. City of Va. Beach*,
674 S.E.2d 848 (Va. 2009) .................................................................................................... 28

*United States v. Allam*,
No. 1:23-cr-00010, 2023 WL 5846534 (E.D. Tex. June 14, 2023) ....................................... 24

*United States v. Hager*,
721 F.3d 167 (4th Cir. 2013) ................................................................................................. 28

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ................................................................................................. 22

*United States v. Masciandaro*,
648 F. Supp. 2d 779 (E.D. Va. 2009) ............................................................................... 22, 23

*United States v. Walter*,
No. 3:20-cr-00039, 2023 WL 3020321 (D.V.I. Apr. 20, 2023) ............................................ 24

*Wag More Dogs Liab. Corp. v. Cozart*,
680 F.3d 359 (4th Cir. 2012) ................................................................................................. 27

*We the Patriots, Inc. v. Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*, No. 23-2166
(10th Cir. Oct. 20, 2023) .................................................................................................... 6, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................................................... 4

*Wolford v. Lopez*,
No. 1:23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023), *appeal docketed*, No. 23-
16164 (9th Cir. Sept. 8, 2023) ............................................................................................... 21

## Statutes and Rules

1741 N.J. Laws 101 ................................................................................................................ 15

1786 Va. Acts 35, ch. 49 .................................................................................................... 13, 14

1869-70 Tenn. Pub. Acts 23-24, ch. 22 ............................................................... 13

1870 Tex. Gen. Laws 63, ch. 46 ........................................................................ 13

1883 Mo. Sess. Laws 76 .................................................................................. 13

1893 Or. Laws 79............................................................................................ 16

2 Edw. 3, 258, ch. 3 (1328)......................................................................... 13, 14

2 *Laws of New-York from The Year 1691, to 1773, Inclusive* 441-42 (Hugh Gaine ed., 1774) ... 15

*Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61, ch. 3 (F. Martin Ed. 1792) ........................................................... 13

Fairfax County Code § 6-2-1 ..................................................................... passim

II *Digest of the Laws of Texas* 1321-22 (George Paschal, 4th ed. 1874).................... 15

III *Statutes at Large of Pennsylvania from 1682 to 1801* 254-55 (Clarence M. Busch ed., 1896) ................................................................................................ 15

R.H. Clark, *The Code of the State of Georgia* 818 (1873)..................................... 13

W.A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893).......................................... 13

## Other Authorities

1 Serjeant William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ................. 14

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. 2023). ........................................................................................... 26

ACLED & Everytown for Gun Safety Support Fund, *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, https://tinyurl.com/52skt496 (Aug. 23, 2021) ............. 30

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................................................... 21

John J. Donohue *et al.*, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198 (2019) ........................................................................................ 30

N.Y. Park Ass'n, *More Public Parks!* (1882).................................................. 19

*Parktakes* (Winter 2024)............................................................................ 19

Paul M. Reeping, et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118 (2023), https://bit.ly/3Rwvwqd 30

Stephen T. Mather, *Progress in the Development of the National Parks* (U.S. Dep't of Interior 1916)............................................................................................ 12

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ..................................................................................... 7

U.S. Census Bureau, *2020 Census Urban Areas FAQs* 2 (updated Feb. 2023), *available at* http://tinyurl.com/4rtaanme ................................................................................... 18

U.S. Census Bureau, *QuickFacts: Fairfax County, Virginia*, *available at* http://tinyurl.com/bp7ku443 ................................................................................... 18

## INTRODUCTION

Plaintiffs request a preliminary injunction to block enforcement of a Fairfax County ordinance that has protected County residents and visitors from the dangers of gun violence in parks and at public events since September 2020. Plaintiffs spent much of the intervening three-plus years challenging the County's ordinance in state court, under the Virginia Constitution. After the state courts denied their motion for summary judgment, denied their motion for a preliminary injunction, and dismissed their petition to review the latter loss as untimely, Plaintiffs—on the eve of trial—moved for a voluntary nonsuit, completely abandoning their case. They now present essentially the same case under the U.S. Constitution. Their federal claims are just as meritless as their abandoned state claims. Plaintiffs are not entitled to a preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

### A. The Ordinance

On September 16, 2020, the Fairfax County Board of Supervisors adopted Fairfax County Code § 6-2-1 (the "Ordinance"), Sleight Decl. Ex. (hereafter "Ex.") 1, regulating possession and carrying of firearms at certain sensitive public locations within the County. The Ordinance restricts firearms in "any public park owned or operated by the County" or by an authority or entity created or controlled by the County, *see* § 6-2-1(A)(2) (the "Parks Restriction"), and in any public place "that is open to the public and is being used by or is adjacent to a County-permitted event or an event that would otherwise require a County permit," *see* § 6-2-1(A)(4) (the "Events Restriction").

The Ordinance requires the County to provide notice of its restrictions at all entrances to parks and places being used by or adjacent to a permitted event or an event that would otherwise require a permit. *See* § 6-2-1(D)(1). In addition, in a Command Staff Memorandum ("CSM"), the County has adopted an official enforcement policy under which no enforcement will take place without notice. Becker Decl. Ex. C. The CSM requires permanent signage providing notice of the

Ordinance to be posted in areas, such as parks, where the Ordinance always applies. *Id.* at 1. In areas that frequently host County-permitted events, "permanent folding signs" must be posted and "unfolded to display the notice while the event takes place." *Id.* In other areas where events take place, the policy provides for "temporary signage" to be "posted at entrances or other appropriate place of ingress and egress for the duration of the event." *Id.* at 1-2. Under the policy, "[o]fficers may <u>not</u> enforce the provisions of this ordinance unless first confirming that signs providing this notification are properly posted. Whenever possible, officers should attempt to educate suspected violators about the ordinance and seek voluntary compliance prior to placing charges." *Id.* at 1.

The parks to which the Ordinance applies are cherished green spaces in Fairfax County's highly populous environment. County parks receive between 12 and 16 million visitors each year; children under 18 make up about a quarter of those visitors. Baldwin Decl. ¶5. Over 100,000 under-18s participated in registered events in FY2022, as did over 83,000 in FY2023, including making up the large majority of the 43,000 registrants for 1,372 summer camps. *Id.* ¶¶10-11. In 2023, over 47,000 students participated in 830 school field trips, and schools separately used the parks for youth activities like sports. *Id.* ¶¶18-19. The Fairfax County Parks Authority ("FCPA") runs three preschools on its property. *Id.* ¶21. Large gatherings also take place in the parks, including an Earth Day celebration (5,000-8,000 attendees) and a 4-H Fair (over 10,000), as well as—among many others—youth and adult sports events, church services and related gatherings, fundraising events, preschool performances, protests, and election-related activities. *Id.* ¶¶13-15. Scouts use the parks for their programs, including camping, hiking, and volunteering. *Id.* ¶17.

**B. Prior Virginia State Constitutional Challenge**

On January 29, 2021, Plaintiffs filed a complaint in the Circuit Court of Fairfax County, Virginia, alleging that the Parks Restriction and the Events Restriction infringe their rights to keep

and bear arms and to due process under the Virginia Constitution. Ex. 2 (State Compl.) ¶¶ 45-46.[1] The parties undertook discovery,[2] and in April 2022, Plaintiffs moved for summary judgment. After receiving both initial briefing and supplemental briefing on the impact of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the court, in November 2022, denied Plaintiffs' motion and set the case for trial.

Undaunted, on January 27, 2023—nearly two years after filing suit—Plaintiffs moved for a preliminary injunction. The court denied the motion, applying principles announced in *Bruen* and ruling that "ample historical basis exists for the prohibition of firearms in public parks and at public events." *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023) (Ex. 14).[3] On September 7, 2023, while the County was fully engaged in preparing for the trial that was set to begin on September 18, Plaintiffs announced they were abandoning their case, and the court granted Plaintiffs' nonsuit the next day. Ex. 17.

## C. Present Federal Constitutional Challenge

On November 22, 2023, the same three individual Plaintiffs filed their Complaint in this Court, now challenging the Ordinance under the Second and Fourteenth Amendments to the U.S. Constitution. Dkt. 1 ¶1. There is no apparent reason why Plaintiffs could not have raised these challenges in their 2021 lawsuit; their decision not to do so appears to have been a tactical one.

Plaintiffs now allege that the Parks Restriction infringes their right to bear arms under the Second Amendment, *id.* ¶¶ 42-46, that the Events Restriction infringes their Second Amendment right to the extent it prohibits weapons in an area "adjacent to" a covered event, *id.* ¶¶ 47-51, and

---

[1] The parties' subsequent summary judgment filings (Exs. 3-9) and preliminary injunction filings (Exs. 10-12) and the respective decisions (Exs. 13, 14) are exhibited for reference.

[2] The NRA, originally the fourth plaintiff, withdrew via partial voluntary nonsuit. *See* Ex. 15.

[3] The Virginia Supreme Court dismissed Plaintiffs' petition for review as untimely. *See* Ex. 16.

that the terms "adjacent to" and "an event that would otherwise require a permit" are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment, *id.* ¶¶ 52-59. Except for its reliance on federal rather than state constitutional provisions, the Complaint is substantially the same as the one filed nearly three years ago in state court.

In their Memorandum, Plaintiffs LaFave and Holzhauer assert that they each previously carried a concealed handgun in County parks and would continue to do so but for the Ordinance. Pl. Mem. 6-7. All three Plaintiffs claim that they previously carried firearms in public places in the County and continue to do so, but that they are unaware whether such places are being used by or adjacent to a permitted event or an event that would otherwise require a permit. *Id.* at 7-8. Plaintiffs do not allege that the Ordinance has been enforced against them and cite no instances of its enforcement against others. Nevertheless, they argue that the enactment and enforcement of the Ordinance threatens them with irreparable harm. *Id.* at 8.

## ARGUMENT

### I.   Legal Standard

A preliminary injunction is an "extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and one that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). Plaintiffs must demonstrate "that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors relief; and 4) the relief is in the public interest." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). Plaintiffs mounting a facial challenge to a law "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citations omitted).

II.     **Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Second Amendment Claims**

The following sections set out the methodological principles *Bruen* established (Part II.A), then show that, under those principles, Plaintiffs are not likely to succeed on the merits of their challenge either to the Parks Restriction (Part II.B) or the Events Restriction (Part II.C).

A.  ***Bruen*'s Methodology**

i.  **Text, history, and tradition framework**

In *Bruen*, the Supreme Court rejected the two-step Second Amendment analysis the lower federal courts had previously applied, *see* 597 U.S. at 18-19 (describing analysis), in favor of a framework that focuses on text and historical tradition. A court must first ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, the court moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.*[4] To guide courts in conducting the historical analysis, *Bruen* stressed that a modern firearms regulation need not be a "dead ringer for historical precursors" and will pass constitutional muster so long as it is "analogous enough" to historical restrictions. *Id.* at 30. Put differently, *Bruen* makes clear that governments are not required to identify a "historical *twin*," only a "well-established and representative historical *analogue*." *Id.* In applying this analogical approach, courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-defense" and the burden is "comparably justified." *Id.* at 29. In other words, courts should consider "how and why" a regulation burdens the right to self-defense. *Id. Bruen* also instructs courts to "use analogies to …

---

[4] The burden at the textual step is on Plaintiffs, *see Bruen*, 597 U.S. at 17, 44 n.11 (indicating that presumption that Constitution protects plaintiff's conduct arises *after* ("when" or "because") the textual step is satisfied), while the burden at the historical step is on the government, *see id.* at 19.

historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30.

*Bruen* recognized that "cases implicating unprecedented societal concerns … may require a more nuanced approach" to the historical inquiry. *Id.* at 27. Thus, firearms prohibitions concerning societal conditions that did not exist at the founding—which include parks like the County's, *see infra* pp. 10-12—demand a more expansive approach to historical analogy. *See Antonyuk v. Chiumento*, --- F.4th ----, No. 22-2908, 2023 WL 8518003, at *61 n.78 (2d Cir. Dec. 8, 2023) ("Though the historical analogues here are 'relatively simple to draw,' the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*.").

## ii. Time period

While *Bruen* expressly left open the question whether the most important time period for the historical analysis is 1791 (when the Second Amendment was first adopted as a constraint on the federal government) or 1868 (when the Fourteenth Amendment made it applicable to state and local governments), *see* 597 U.S. at 37-38, the clear weight of authority favors the view that the period around 1868 is key, at least as to states and localities. Multiple courts have held that 1868 is at least as important as, if not more important than, 1791. *See Antonyuk*, 2023 WL 8518003, at *15 ("Because the [challenged law] is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis.").[5] Focusing on 1868 is also the view

---

[5] *See also Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) ("[H]istorical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states[.]"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that Reconstruction-era sources "are more probative" than founding-era sources), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023). The recent panel decision in *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023), *pet'n for reh'g en banc filed*,

more consistent with originalist theory.[6] When asked by Justice Thomas about the correct time period during oral argument in *Bruen*, counsel for New York's NRA affiliate responded with the Reconstruction era.[7]

Even if 1791 were the most relevant focus, *District of Columbia v. Heller*, 554 U.S. 570 (2008), instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," *id.* at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, even if this Court were to focus on the founding era and find the evidence from that period indeterminate, it should recognize that later evidence of regulatory authority settles the meaning of the Second Amendment right and demonstrates that the Ordinance is constitutional.[8]

---

No. 21-2017, Dkt. 60 (Dec. 5, 2023), is not to the contrary. The only historical analogs the state presented were founding-era, so those were all the panel discussed. *See id.* at 1047-48.

[6] "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 n.9 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023) (citation omitted). Although the panel decision has been vacated, its reasoning and authorities on this point are robust. *See id.* at 1322-24, 1322 n.9 (citing, among other authorities, federal appellate decisions and scholarship by Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo).

[7] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[8] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to focus on the founding era. For instance, if a regulation passed

Here, the copious 19th- and early-20th-century laws the County presents, *see infra* Part II.B.i.1, do not contradict any earlier evidence. To the contrary, those laws reflect and confirm limitations on the right to keep and bear arms that existed in the founding and earlier periods. *See infra* Part II.B.i.2. Plaintiffs present no treatises, caselaw, or other evidence to establish that, in any era, the public understanding of the right forbade the government to prohibit guns in parks or at public events. As in *Bruen*, therefore, the answer is the same in both key periods—and throughout American history: the Second Amendment permits the County to prohibit guns in sensitive places like parks and events.

### iii.   Understanding the historical record

The discussion of historical laws in *Bruen* and *Antonyuk* yields two further principles to guide this Court's analysis. *First*, even a small number of historical laws can be sufficient to carry a government's burden to show consistency with historical tradition, so long as there is not "countervailing historical evidence." *Antonyuk*, 2023 WL 8518003, at *14. As *Antonyuk* explained, *Bruen*'s conclusion that history supported prohibiting guns in legislative assemblies, courthouses, and polling places relied on sources that identified only one or two founding-era laws. *See id*. "Thus, depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Id. Second*, "[r]easoning from historical silence is … risky," because "[l]egislatures past and present have not generally legislated to their constitutional limits."

---

in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time, and there is no separate evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era understanding of the right. Thus, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right also reflects the founding-era understanding. Such a presumption reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

*Id.* at *13. For example, "lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning." *Id.* Thus, "'novelty does not mean unconstitutionality[,]' … even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Id.* (citation omitted).

### B. The Parks Restriction is Constitutional Under *Bruen*

As the following sections show, the longstanding tradition of prohibiting firearms in parks and analogous places demonstrates that the Parks Restriction is constitutional (Part II.B.i). At the very least, the Parks Restriction has a plainly legitimate sweep (Part II.B.ii). Persuasive decisions from the Second Circuit and multiple district courts confirm these conclusions (Part II.B.iii).

### i. The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places

History soundly defeats Plaintiffs' claims. Once public parks emerged as communal spaces for repose and relaxation in the nineteenth century, scores of laws, ordinances, and rules prohibited guns in these new parks. To date, the County has located well over a hundred such prohibitions, typically enacted at or soon after the time of a park's creation—first in New York, for its new Central Park, then in other cities, and then, as they were created, in national and state parks. Even though *Bruen* requires only analogous laws, these laws are historical *twins* to the Parks Restriction—simple regulations, unambiguously prohibiting the possession or carry of firearms in parks. And because the Reconstruction era is the key period for this Court's inquiry, *see supra* Part II.A.ii, these laws alone establish that the Parks Restriction is constitutional under *Bruen*.

Even if this Court wishes to look further back in history, the County's case remains strong. In the time before modern-style parks emerged, there were of course no firearms prohibitions in such parks; the Court must therefore engage in a "more nuanced inquiry" into analogous regulations. That inquiry reveals that the tradition of restricting firearms in places analogous to

9

parks stretches back centuries in our nation's history, taking various regulatory forms over time. *See infra* Part II.B.i.2. Together, these laws constitute an unbroken line of authority establishing that prohibitions on firearms in parks—city and suburban parks, state parks, and national parks— is consistent with our nation's historical tradition of firearm regulation.

### 1. Prohibitions on firearms in parks in the Reconstruction era and later establish the constitutionality of the Parks Restriction

Parks as we understand them today did not exist in the founding era. Early green spaces, such as town commons or greens, served very different societal functions from today's parks. Boston Common, for example, was primarily used for common grazing and activities like militia training for two centuries. *See Antonyuk*, 2023 WL 8518003, at *63. As Professor Terence Young explains, places like the Common "were multi-purpose utilitarian spaces until the mid-nineteenth century." Young Decl. ¶13.[9] The "rise of public parks as municipal institutions" occurred "over the latter half of the 19th century," *Antonyuk*, 2023 WL 8518003, at *61, "following the success of New York's Central Park," *id.* (cleaned up); *see also LaFave*, 2023 Va. Cir. LEXIS 203, at *17 (Ex. 14) ("Parks in the modern sense did not come into being until the mid-19th century[.]").

When parks that resemble the County's parks finally emerged, beginning in the 1850s, governments swiftly prohibited guns there. Given Central Park's position as the paradigm of the new parks movement, it is particularly significant that its original 1858 rules forbade "[a]ll persons" to "carry fire-arms." Young Decl. ¶30.[10] Similar prohibitions followed as other cities and towns established parks. In 1866, Brooklyn's Prospect Park rules declared that "[a]ll persons are

---

[9] Prof. Young, Emeritus Professor of Geography in the Department of Geography & Anthropology, California State Polytechnic University, Pomona, is an award-winning scholar of the history and historical geography of the American park movement. *See id.* ¶¶1-4.

[10] Prof. Young's declaration attaches copies of the historical laws as exhibits. For the Court's convenience, the County is also providing a table, prepared by counsel, excerpting key language from each historical regulation and (where available) providing links to sources where the original regulations may be found. *See* Ex. 18 ("Parks Table").

forbidden … [t]o carry firearms." *Id.* ¶31. In 1868, the Pennsylvania legislature decreed that "[n]o person shall carry fire arms" in the newly created Fairmount Park in Philadelphia "or within fifty yards thereof." *Id*. In the 1870s, similar prohibitions appeared in San Francisco, Chicago, Buffalo, Hyde Park, Ill., and Phoenixville, Penn. *Id.* Prohibitions were enacted in six more cities in the 1880s, 21 more in the 1890s, another 21 in the 1900s, and more throughout the 1910s and 1920s. *See* Parks Table, Ex. 18.[11]

The late 19th century also saw the first national parks—and, at or soon after the time of their creation, firearms prohibitions in those parks. Yellowstone National Park, established in 1872, broadly prohibited carrying firearms in the park as early as 1894. Young Decl. ¶38. Most of Michigan's Mackinac Island was made a "National public park" in 1875, and its park rules— approved no later than 1882—stated that "[n]o person shall carry … fire-arms in the park." *Id.* ¶39. Sequoia National Park, established in 1890, prohibited carrying firearms in the park that same year. *See id.* ¶38. Yosemite National Park, also established in 1890, prohibited firearms no later than 1894. *See id*. ¶40. The cycle of park creation and firearms prohibition repeated as Congress created new parks through the 1930s, until, in 1936, the National Park Service adopted a prohibition applicable to all national parks and monuments. *Id.* ¶43.

States also began establishing state parks—and prohibiting guns in those parks. As Prof. Young explains, these laws appeared as early as 1901 (in Minnesota), and by 1936, at least 17

---

[11] To take one example in each of 25 states and the District of Columbia, firearms were prohibited in parks in New York, N.Y. (1858), Philadelphia, Penn. (1868), San Francisco, Calif. (1872), Chicago, Ill. (1873), St. Louis, Mo. (1881), Boston, Mass. (1886), Salt Lake City, Utah (1888), Trenton, N.J. (1890), Grand Rapids, Mich. (1891), Milwaukee, Wis. (1891), Spokane, Wash. (1892), Cincinnati, Ohio (1892), Wilmington, Del. (1893), St. Paul, Minn. (1894), Indianapolis, Ind. (1896), New Haven, Conn. (1898), Boulder, Colo. (1899), Houston, Tex. (1904), Neligh, Neb. (1904), Washington, D.C. (1907), Portland, Or. (1907), Memphis, Tenn. (1909), Paducah, Ky. (1909), Staunton, Va. (1910), Birmingham, Ala. (1917), and Burlington, Vt. (1921). *See id.*

states and the District of Columbia prohibited firearms in at least some of their parks. *See* Young Decl. ¶¶52-53. Virginia opened its first state parks in 1936 and prohibited guns in those parks the same year. *See* Young Decl. ¶¶51, 53.

These national and state park prohibitions refute Plaintiffs' claim that firearms "plainly may not be banned" in parks with "vast, mostly wooded lands." Pl. Mem. 11. In 1894, when Yellowstone's regulations prohibited firearms, the park covered over 2.1 million acres[12]—more than 8 times the entire size of Fairfax County. Soon after, regulations prohibited firearms in Yosemite's over 700,000 acres and in Glacier National Park's almost one million acres. These regulations put beyond doubt that the generations that established national parks saw no constitutional problem with prohibiting guns in *genuinely* vast expanses of the great outdoors.[13]

### 2. Founding-era regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction

As explained above, the most relevant focus for this Court's analysis is the period beginning around 1868. *See supra* Part II.A.ii. But even if this Court were to focus on the founding era, it should still conclude that the Parks Restriction is consistent with historical tradition. The absence of modern-style parks in that era means that there were not specific restrictions on firearms in parks then.[14] Accordingly, under *Bruen*, this Court must engage in a "more nuanced analysis" in looking to analogous historical principles. 597 U.S. at 27.

---

[12] *See* Stephen T. Mather, *Progress in the Development of the National Parks* 28 (U.S. Dep't of Interior 1916) (reporting areas of national parks, in square miles, including: 3,348 for Yellowstone; 1,125 for Yosemite; and 1,534 for Glacier); Young Decl. Ex. 83 (including Glacier prohibition).

[13] *See* Pls. Mem. Supp. Prelim. Inj., *Novotny v. Moore*, No. 1:23-cv-01295 (D. Md. May 24, 2023), Dkt. 24-1 (Maryland state park system covers 142,433 acres and state forest has 214,000 acres); *Kipke*, 2023 WL 6381503, at *10 (approving Maryland's prohibition on firearms in state parks).

[14] *Cf. Kipke*, 2023 WL 6381503, at *10 ("[R]ural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment, and thus the Court will not infer a lack of regulation from the absence of laws governing rural state parks at that time.").

Four strands of founding-era laws establish principles justifying the Parks Restriction: (a) laws protecting gathering-places and public forums; (b) laws prohibiting going armed in public with the effect of terrifying people; (c) laws prohibiting carrying firearms on privately-owned, enclosed or developed land (absent express permission from the property owner); and (d) the long-accepted tradition of prohibiting firearms in schools. We discuss each in turn.

a. **Prohibitions on guns in gathering places and public forums.** The Parks Restriction is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 2023 WL 8518003, at *59. These types of restrictions extend back to the 1328 Statute of Northampton in England, which stated that "no Man great nor small" shall "go or ride armed … in Fairs [or] Markets." 2 Edw. 3, 258, ch. 3 (1328), Ex. 19. In the founding era, at least two states—including Virginia—observed similar laws prohibiting going armed in fairs or markets.[15] Thus, "medieval law survived to become our Founders' law." *Antonyuk*, 2023 WL 8518003, at *59 (quoting *Bruen*, 597 U.S. at 35).[16]

Connecting that tradition to the eight, late-19th-century municipal parks prohibitions New York presented, *see id.* at *61, *Antonyuk* observed that those city laws "were apparently accepted

---

[15] *See* 1786 Va. Acts 35, ch. 49 ("no man, great nor small" shall "go, nor ride armed … in fairs or markets"), Ex. 20; *Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61, ch. 3 (F. Martin Ed. 1792) (similar), Ex. 21; *see also State v. Huntly*, 25 N.C. 418, 420-23 (1843).

[16] Firearms restrictions in places of public assembly or gathering became increasingly common in the latter half of the 19th century. *See, e.g.*, 1869-70 Tenn. Pub. Acts 23-24, ch. 22 (prohibiting weapons in "any fair, race course, or other public assembly of the people"), Ex. 22; 1870 Tex. Gen. Laws 63, ch. 46 (prohibiting weapons in any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen"), Ex. 23; 1883 Mo. Sess. Laws 76, Ex. 24; R.H. Clark, *The Code of the State of Georgia* 818 (1873), Ex. 25; W.A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893), Ex. 26.

13

without any constitutional objection by anyone," *id.*, and concluded that, together, this "wealth of evidence" of a "longstanding tradition of regulating firearms in places that serve as public forums" satisfied *Bruen*'s historical requirement, at least as applied to "urban parks," *id.* at *62-65. Compared with New York's law, it held the historical laws similarly burdened the right to carry, and for a similar reason, "maintaining order in often-crowded public squares." *Id.* at *63.[17] The same is true for the Parks Restriction: it promotes public order and safety in heavily trafficked parks that are widely used for public gatherings. *See supra* p. 2.

      **b.**      **Prohibitions on going armed "to the terror" of the people.** Early English law and founding-era American laws also prohibited going armed in circumstances where doing so was likely to cause fear or terror. In addition to prohibiting going armed in specific places, the Statute of Northampton prohibited "go[ing] []or rid[ing] armed" *anywhere*. *See* 2 Edw. 3, 258, ch. 3 (1328). But by the late 17th and early 18th century, according to *Bruen*, this part of the statute was understood only to prohibit public carry of weapons when "accompanied with such Circumstances as are apt to terrify the People."[18] Summarizing Virginia's 1786 statute, along with statutes from Massachusetts (1795) and Tennessee (1801), *Bruen* explained that they "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 50.

      *Bruen* concluded that New York could not rely on this well-established historical tradition to justify its challenged law because it "d[id] not offer any evidence showing that, in the early 18th

---

[17] Although *Antonyuk* expressed skepticism about applying that rationale to "rural parks," its dictum is based on a much smaller set of historical laws and arguments than the County presents here, and is in any event irrelevant to urban-suburban Fairfax County. *See infra* Part II.B.iii.

[18] *Bruen*, 597 U.S. at 45 (quoting 1 Serjeant William Hawkins, *A Treatise of the Pleas of the Crown* 136 (1716)). In the same period, *Bruen* explained, the colonies of Massachusetts (in 1692) and New Hampshire (in 1699) enacted statutes codifying that prohibition. *See* 597 U.S. at 46. Then, in the founding era, Virginia made the "terror" principle express, prohibiting going armed "in terror of the country." 1786 Va. Acts 35, ch. 49.

century or after, the mere public carrying of a handgun would terrify people." *Id.* at 45. Here, by contrast, the tradition robustly supports the Parks Restriction because the County has provided substantial evidence that carrying firearms in County parks would "spread[] 'fear' or 'terror' among the people" of Fairfax County. *Id.* at 50; *see* Filindra Decl. ¶¶ 23-24, 34-36 (concluding, based on scientific survey of area residents, that the potential presence of guns in Fairfax County parks "induces feelings of less safety among most people in the local population ... and may drive people to visit such spaces less frequently").[19] The analogy is straightforward: the historical laws prohibited carrying firearms in particular places to prevent the presence of weapons in those places from spreading fear and terror among the population. The Parks Restriction imposes a comparable restriction and is justified on the same grounds.

c.   **Prohibitions on carrying firearms in privately-owned landscapes absent express permission from the owner**. The third strand of founding-era laws that support the Parks Restriction are those that made carrying firearms presumptively illegal on certain outdoor private properties. In 1721, Pennsylvania prohibited "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation[.]" III *Statutes at Large of Pennsylvania from 1682 to 1801* 254-55 (Clarence M. Busch ed., 1896), Ex. 27. New Jersey and New York had similar prohibitions,[20] and others continued to be enacted in the 19th century.[21]

---

[19] Prof. Alexandra Filindra, Associate Professor in Political Science at the University of Illinois-Chicago, developed the survey questions and analyzed the survey data. The Center for Survey Research at the University of Virginia administered the survey.

[20] *See* 1741 N.J. Laws 101 (1722 law similar to Pennsylvania's), Ex. 28; 2 *Laws of New-York from The Year 1691, to 1773, Inclusive* 441-42 (Hugh Gaine ed., 1774) (1763 law, prohibiting "carry[ing] … any … Fire-arm … into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of New-York, … without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor"), Ex. 29.

[21] *See, e.g.*, II *Digest of the Laws of Texas* 1321-22 (George Paschal, 4th ed. 1874) (1866 law,

The Parks Restriction is analogous to these prohibitions. Their burdens are comparable, in that both create a default prohibition on carrying firearms in large outdoor spaces. Although the historical laws provided that receiving express permission from the owner would render the carrying of guns legal, the prohibition would remain effective unless and until the person wishing to carry located the owner and succeeded in obtaining that permission—which the owner had complete discretion to withhold. A person wishing to carry on those lands, therefore, could in no way be said to have had a *right* to do so. The justifications are also comparable. The historical laws reflected the proprietor's interest in keeping their property safe by prohibiting firearms (unless they expressly wished firearms to be present), just as the Ordinance reflects the County's interest in keeping its parks safe.[22]

> **d.   Prohibitions on guns in schools.** The final strand of support for the Parks Restriction is the well-accepted principle that the government may prohibit firearms in schools. *Heller* announced that its decision did not "cast doubt" on "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]" 554 U.S. at 626. *Bruen* reiterated *Heller*'s description of schools as "sensitive places." *See* 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring) (reproducing *Heller* passage in full). Although the Supreme Court has not clearly identified the historical tradition on which it based this conclusion,

---

prohibiting "carry[ing] firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of civil or military duty"), Ex. 30; 1893 Or. Laws 79 ("It shall be unlawful for any person, other than an officer on lawful business, being armed with a gun …, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."), Ex. 31.

[22] To be sure, several of the historical laws also reflect an interest in protecting wildlife and game. Although that may not be a central purpose of the Ordinance, *Bruen* asks only for *comparable* justifications, not *identical* justifications, *see* 597 U.S. at 29-30, and it cannot possibly have meant that an analogy would fail if the historical justification (protecting game) was *less important* than the modern justification (protecting the people of Fairfax County).

its place in Second Amendment doctrine is now firm. *See Antonyuk*, 2023 WL 8518003, at *43 n.56. And so, as *Bruen* instructs, courts can now analogize from the permissibility of prohibitions in schools to approve prohibitions in "*new* and analogous sensitive places." 597 U.S. at 30.

The Parks Restriction is analogous to historical restrictions on firearms in schools. These regulations place a "comparable burden" on the right to armed self-defense—they both prohibit carrying arms in discrete locations—and this burden is "comparably justified"—prohibitions in schools serve to protect a vulnerable population (children), and that is likewise a key justification for the Parks Restriction given children's extensive use of County Parks. *See supra* p. 2.

       **ii.  At a minimum, Plaintiffs are not entitled to a preliminary injunction on their facial challenge because they cannot establish that the Parks Restriction lacks a plainly legitimate sweep**

Plaintiffs have said their Reply will address the Second Circuit's decision in *Antonyuk*, implying that they intend to rely on dictum suggesting that *Antonyuk*'s analysis approving firearms restrictions in "urban parks" might not apply equally to "rural parks." *See* Dkt. 12. Presumably, Plaintiffs intend to argue that some of Fairfax County's parks are "rural parks" and that firearms may not be prohibited in "rural parks." Any such argument will be unavailing, for three reasons: the Second Circuit based that dictum on a very different set of arguments and historical laws than the County presents here; the County's parks are not rural parks; and, in any event, to win on their facial challenge, Plaintiffs must show that the Parks Restriction "lacks a plainly legitimate sweep," *Ams. for Prosperity Found.*, 141 S. Ct. at 2387, and even they cannot claim that all County parks are rural. We discuss each in turn.

*First*, the Second Circuit expressly based its dictum on the historical evidence New York presented, which is much less extensive than the County's.[23] New York presented just eight 19th-

_____

[23] *See Antonyuk*, 2023 WL 8518003, at *64 ("Although we doubt that the evidence presently in the record could set forth a well-established tradition of prohibiting firearm carriage in rural parks,

century parks restrictions, all from major cities, *see* 2023 WL 8518003, at *61, and none from national and state parks. Furthermore, *Antonyuk* rested on just one of the strands of earlier historical tradition the County presents—prohibitions on firearms in crowded places that serve as public forums.[24] *See id.* at *59. The County's case is that the Parks Restriction and the 19th- and early-20th-century laws that mirror it are also part of traditions, stretching back to the founding, of (a) prohibiting firearms in circumstances likely to cause fear, and (b) default prohibitions on carrying firearms on improved or enclosed privately-owned land.[25] The County's much more extensive case compels a different conclusion than the one *Antonyuk* suggested in dictum. Prohibiting guns in *any* park—city, county, state, or national—is constitutional.

*Second*, Fairfax County's parks are not "rural parks" because Fairfax County is not a rural county. It is an urban-suburban county, with a population density of 2,941.8 people per square mile—approximately *six times* the density at which the Census Bureau separated urban from rural areas in recent censuses.[26] Specific features of the County's parks also demonstrate that they fall within *Antonyuk*'s rationale for "urban parks." The largest County park is Huntley Meadows; its size (about 1,550 acres, Baldwin Decl. ¶6) falls between those of two of the quintessential "urban

---

we are mindful that this litigation is still in its early stages and that the State did not distinguish between rural and urban parks in its arguments to this Court or below.").

[24] Although *Antonyuk* notes that historical regulations on firearms "in areas frequented by children" were one of the analogies New York invoked, *see id.* at *59, it appears not to have reached that basis in concluding that enjoining the restriction was improper. *See id.* at *59-65.

[25] New York cited these laws in *Antonyuk* but only in support of an entirely separate private-property provision—not its parks prohibition. *See id.* at *83.

[26] *See* U.S. Census Bureau, *QuickFacts: Fairfax County, Virginia*, *available at* http://tinyurl.com/bp7ku443 (2020 population per square mile); U.S. Census Bureau, *2020 Census Urban Areas FAQs* 2 (updated Feb. 2023), *available at* http://tinyurl.com/4rtaanme (explaining that, in 2000 and 2010, Census Bureau used threshold of 1,000 people per square mile to delineate "[i]nitial urban core" and 500 people per square mile to delineate "[r]emainder of urban area"). Although the bureau switched to a metric based on housing unit density rather than population density for 2020, the metrics are "similar." *See id.*

parks" on whose historical firearms regulations the Second Circuit relied in approving New York's parks restriction: Central Park and Fairmount Park.[27] Fairfax residents and visitors—especially children—use Huntley Meadows extensively to gather for social, educational, recreational, and other purposes. For example, this winter's edition of the FCPA's programming magazine (*see* Baldwin Decl. ¶7) lists dozens of programs in Huntley Meadows, including outdoor art activities, stargazing, birding, and scientist-guided wildlife study.[28] And, more broadly, the myriad ways people use County parks, *see id.* at ¶¶6-23, establish that they fall squarely into *Antonyuk*'s concept of "urban parks." Accordingly, even if there were doubt that prohibiting guns in "rural parks" was constitutional, that would not help Plaintiffs establish a likelihood of success on the merits.

*Third*, Plaintiffs here have mounted a facial challenge to the Parks Restriction, and so they cannot prevail because the Ordinance has a plainly legitimate sweep. As *Antonyuk* explained, "[t]o mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks a plainly legitimate sweep." 2023 WL 8518003, at *23 (quoting *Ams. for Prosperity Found.*, 141 S. Ct. at 2387). Under that standard, *Antonyuk* concluded that the plaintiffs' challenge to New York's parks prohibition was unlikely to succeed, *even though* it was skeptical that New York had presented a sufficient case to justify its prohibition in "rural" parks. *See id.* at *64. Because New York's law had (at least) a plainly legitimate sweep in its application to urban parks, plaintiffs were not entitled to a preliminary injunction. *See id.* Here, there are many dozens of separate County parks, including Clemyjontri Park, an 18-acre space with playgrounds and picnic shelter serving families of all ages and notably

---

[27] *See* N.Y. Park Ass'n, *More Public Parks!* 7 (1882) (recording Central Park's size as 864 acres and Fairmount Park's as 2,791); *Antonyuk*, 2023 WL 8518003 at *56 n.69, *61.

[28] *Parktakes* 60, 81-87, 91-92 (Winter 2024), Ex. 32. Similar activities and events also take place in other County parks. *See id.*

children with special needs, with over 110,000 visitors in FY2023, and 0.1 acre Farrington Park, a playground for children aged 2-12. Baldwin Decl. ¶6. Plaintiffs can prove the Ordinance "lacks a plainly legitimate sweep" only by proving that prohibiting guns is unconstitutional even in parks like Clemyjontri and Farrington. That is something they have not attempted to, and cannot, do.[29]

### iii.  Decisions upholding laws similar to the Parks Restriction are correct

Cases decided since *Bruen* strongly support the Parks Restriction. *Antonyuk*, the only circuit court decision to date, held that the plaintiffs were not likely to succeed in their facial challenge to New York's prohibition on guns in parks. *See* 2023 WL 8518003, at \*58-65. Two district courts in Maryland upheld separate prohibitions on guns in parks—one in Montgomery County and the other statewide—at the preliminary injunction stage. *See Md. Shall Issue*, 2023 WL 4373260, at \*11-12; *Kipke*, 2023 WL 6381503, at \*9-10. A district court in New Mexico likewise upheld a prohibition on guns in parks in Albuquerque and the county in which it sits. *We the Patriots*, 2023 WL 6622042, at \*7-9. Each of these decisions carefully analyzed and properly applied *Bruen*'s methodology.

Plaintiffs cite three district court opinions that preliminarily enjoined restrictions on guns in parks, *see* Pl. Mem. 11-13, but they are not persuasive. *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), was vacated in relevant part by the Second Circuit because its application of *Bruen* was incorrect. *See Antonyuk*, 2023 WL 8518003, at \*58-64. *Koons v. Platkin*, Nos. 1:22-cv-07463 & 1:22-cv-07464 (consol.), 2023 WL 3478604 (D.N.J. May 16, 2023), incorrectly concluded that founding-era green spaces were "areas that today would be considered parks," *id.*

---

[29] Plaintiffs effectively concede that at least some of the County's parks are neither large nor remote when they allege that "[t]he parks *include* vast amounts of wooded acreage, *much of it* remote and isolated." Compl. ¶ 22 (emphasis added). Similarly, references in Plaintiffs' declarations to "remote areas" of County parks implicitly acknowledge that other parts of the parks are *not* remote. *See* Taubman Decl. ¶ 7; LaFave Decl. ¶ 3; Holzhauer Decl. ¶ 3.

at *83-84; *but see supra* p. 10, incorrectly disregarded 19th- and 20th-century parks restrictions, *see id.* at *84; *but see supra* Part II.A.ii, and relied on the misguided *Antonyuk* district court decision, *see id.* at *85.[30] Indeed, the Third Circuit has stayed the injunction pending appeal, *see Koons v. Att'y Gen. of N.J.*, No. 23-1900, Dkt. 29 (3d Cir. June 20, 2023)—indicating that the State "has made a strong showing that [it] is likely to succeed on the merits" of that appeal, *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (alteration in original). *Wolford v. Lopez*, No. 1:23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023), despite correctly observing that "parks around 1791 were not comparable to modern parks," *id.* at *21, then incorrectly concluded that the state's Reconstruction-era and later restrictions were insufficient in number and coverage, *see id.* at *21-24; *but see supra* Part II.A.iii, and relied on the vacated *Antonyuk* decision, *see id.* at *24. Plaintiffs may now seek to rely on *May v. Bonta*, No. 8:23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023), but that is even weaker: it rests primarily on the erroneous decisions in *Antonyuk* and *Koons*, *see id.* at *12, and the Ninth Circuit has administratively stayed the district court's injunction, *see* No. 23-4354, Dkt. 10.1 (9th Cir. Dec. 30, 2023).[31]

Oddly, Plaintiffs devote considerable space to arguing that pre-*Bruen* caselaw supports

---

[30] *Siegel v. Platkin*, 653 F. Supp. 3d 136 (D.N.J. 2023), which Plaintiffs mention in a footnote (*see* Pl. Mem. 12 n.6), was a temporary restraining order decision by the same district court judge.

[31] Plaintiffs give an outsized role to a journal article by two individuals frequently aligned with gun-rights litigants, claiming that *Bruen* "endorsed" it. *See* Pl. Mem. 10 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)). *Bruen* did not endorse that article; rather, it cited specific pages as one of two sources for the historical laws underlying its conclusion that legislative assemblies, polling places, and courthouses are sensitive places. *See* 597 U.S. at 30. Thus, Plaintiffs' suggestion, based on that article, that a place must be indoors and protected by metal detectors and guards to be sensitive, Pl. Mem. 10, deserves no credit—nor can it be reconciled with the fact that schools (including their playgrounds and fields) and polling places (which rarely feature guards or metal detectors, to avoid voter intimidation) are sensitive places. *See Kipke*, 2023 WL 6381503, at *6 ("[B]ecause *Bruen* conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless.").

their claims. *See* Pl. Mem. 13-15 (citing state court and district court decisions). They are mistaken.

Before *Bruen*, this Court would have looked to *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), for applicable principles.[32] There, the Fourth Circuit upheld a federal parks restriction under intermediate scrutiny—observing, among other things, that the government has a "substantial interest" in providing for the safety of those who use national parks, and that "Daingerfield Island is a national park area where large numbers of people, including children, congregate for recreation." *Id.* at 473. The County's Parks Restriction easily would have satisfied *Masciandaro*'s standard, and Plaintiffs' reliance on non-binding Virginia,[33] Delaware,[34] and out-of-circuit district court decisions[35] is baseless. To the extent that they concern the "sensitive

---

[32] *Masciandaro* rejected a challenge to a federal prohibition on possessing loaded firearms in motor vehicles in national park areas, brought by a defendant who had a gun in his car in a parking lot in Daingerfield Island, a national park area near Fairfax County. *See* 638 F.3d at 459-60. In the district court, Judge Ellis concluded that the government should prevail under *Heller*'s "sensitive places" doctrine as well as under intermediate scrutiny, observing that "National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities." *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009). The Fourth Circuit declined to decide the sensitive places issue and affirmed under intermediate scrutiny. *See* 638 F.3d at 473-74.

[33] *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365 (Va. 2011), *upheld* the challenged law—prohibiting guns on parts of George Mason's campus and "while attending sporting, entertainment, or educational events" on campus—under the Second Amendment and the state constitution. *See id.* at 367, 370. Plaintiffs claim that dictum suggests the Virginia Supreme Court would not have deemed parks sensitive places had that issue been presented, because parks are "open to the general public." Pl. Mot. 14 (quoting 704 S. E. 2d at 370). That argument has already failed in their state-court action. *See LaFave*, 2023 Va. Cir. LEXIS 203, at *18 (Ex. 14) ("[T]he *DiGiacinto* court left open the argument on that issue[.]"). In any event, any suggestion that a place "open to the general public" cannot be sensitive did not survive *Bruen*'s endorsement of courthouses and polling places as sensitive places. *See* 597 U.S. at 30.

[34] *Bridgeville Rifle & Pistol Club v. Small*, 176 A.3d 632 (Del. 2017), applied Delaware's constitutional right, which is "intentionally broader than the Second Amendment." *Id.* at 636.

[35] *Solomon v. Cook County Bd. of Comm'rs.*, 559 F. Supp. 3d 675 (N.D. Ill. 2021), held that the "record" Cook County presented failed to demonstrate that all of its forest preserve land was a "sensitive place," *id.* at 698, on a very different record than the County presents here. And *Morris v. U.S. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120 (D. Idaho 2014), premised its mistaken analysis on a panel decision that the Ninth Circuit subsequently overturned en banc. *See id.* at 1122-25 (citing *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014)).

places" doctrine, none is as persuasive or relevant as Judge Ellis's decision in this district in *Masciandaro*, 648 F. Supp. 2d at 790.

In sum, Plaintiffs have not carried their heavy burden to establish that they are likely to succeed on the merits of their Second Amendment challenge to the Parks Restriction.

### C.  The Events Restriction is Constitutional under *Bruen*

Plaintiffs' Second Amendment challenge to the Events Restriction likewise fails. That restriction also sits comfortably within this nation's historical tradition of firearm regulation. It is relevantly similar to the "public assembly," "public gathering," and "to the terror of the people" laws cited above. *See supra* Part II.B.i.2.a-b; Filindra Decl. ¶¶ 25-30, 34-42 (concluding, based on survey of area residents, that the potential presence of guns at open-air farmers' markets and political protests in Fairfax County (events that would typically require a County permit), "produces 'chilling effects,' that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe").  In addition, the restriction is analogous to historical laws restricting guns at gathering places that implicate heightened tensions or political activity: election grounds and legislative meetings. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133 (confirming constitutionality of prohibitions on firearms at "legislative assemblies" and "polling places"); *Antonyuk*, 2023 WL 8518003, at *59 (noting the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond").[36]

Plaintiffs' only objection appears to be to the prohibition on guns "at 'an event that would otherwise require a permit' or adjacent area thereto." *See* Pl. Mem. 15-16.[37] This portion of the

---

[36] *See also DiGiacinto*, 704 S.E.2d at 370 (holding that prohibition of weapons at "campus *events*" does not violate Second Amendment or equivalent Virginia right (emphasis added)).

[37] As noted, *see supra* p. 3, the Complaint seems to limit Plaintiffs' Second Amendment claim

Events Restriction violates the Second Amendment, Plaintiffs contend, because uncertainty about its scope "chills [their] exercise of the right to bear arms and leaves them vulnerable to arrest for inadvertent violations." *Id.* at 15. But, as discussed below in connection with Plaintiffs' similar vagueness challenge, the Ordinance's notice requirement and the County's "no sign, no enforcement" policy fully address any purported fear of "inadvertent violations" and any plausible claim of "chill." *See infra* Part III; § 6-2-1(D)(1); Becker Decl. ¶¶ 10-23 & Ex. C; *see also, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (noting that "allegations of a subjective chill" or "self-inflicted injuries" do not suffice to establish standing).[38] Moreover, even if including areas "adjacent to" an event could be characterized as a "buffer zone," prohibiting guns within "buffer zones" is also consistent with historical tradition. *See, e.g.*, *Md. Shall Issue*, 2023 WL 4373260, at *13 (noting historical tradition supporting "buffer zones"); *United States v. Allam*, No. 1:23-cr-00010, 2023 WL 5846534, at *23 (E.D. Tex. June 14, 2023) (same).[39]

Neither of the two cases Plaintiffs point to (Pl. Mem. 15-16) alters this analysis.[40] The

---

even further, to just the areas "adjacent to" a covered event. Either way, Plaintiffs' request for preliminary injunctive relief on this claim fails for the reasons discussed.

[38] Plaintiffs' declarations, in fact, belie any argument that uncertainty about where the Events Restriction applies somehow "chills" them from carrying guns in particular locations. *See* LaFave Decl. ¶ 5 (stating that she "continue[s] to "possess[], carr[y], and transport[] firearms ... on the public streets, roads, alleys, sidewalks, public rights-of-way, and other places that are open to the public in Fairfax County" just as she did "[b]efore the Ordinance's enactment" when "unaware that such places are being used by or are adjacent to a permitted event or an event that would otherwise require a permit"); Taubman Decl. ¶ 4 (same); Holzhauer ¶ 5 (same).

[39] *United States v. Walter*, No. 3:20-cr-00039, 2023 WL 3020321, *7 (D.V.I. Apr. 20, 2023); Parks Table, Ex. 18, rows 5, 16-17, 19, 29 (prohibitions in Philadelphia, Pittsburgh, Reading, PA, Trenton, NJ, and St. Paul, MN, including prohibitions within 50 or 100 yards of the parks).

[40] Nor does the decision in *Kipke*, 2023 WL 6381503, at *15-16, to preliminarily enjoin Maryland's restriction on firearms within 1,000 feet of a public demonstration support a different conclusion. For this portion of its ruling, *Kipke* relied on the reasoning in *Koons* that New Jersey's similar restriction was likely unconstitutional given that "six out of the thirteen original colonies required their citizens to go armed when attending [religious services] or public assemblies." *See id.* at *16; *Koons*, 2023 WL 3478604, at*73. These early compelled-carry laws were "rooted in racial supremacy" and a collective militia-readiness rationale, and thus "deserve little or no weight in the

district court decision in *Antonyuk* was vacated in all relevant respects by the Second Circuit because of its incorrect application of *Bruen*. *See Antonyuk*, 2023 WL 8518003, at *12-16, *39-78.[41] And, in any event, the Ordinance's notice requirement and the County's "no sign, no enforcement" policy answer the *Antonyuk* district court's concerns about "vague regulation[s]." 639 F. Supp. 3d at 339. That same requirement and policy also distinguish the Ordinance from the law at issue in *People v. Chairez*, where the court noted that "the most troubling aspect [of the law] is the lack of any notification where the 1000-foot restriction zone starts and where it could end." 104 N.E.3d 1158, 1176 (Ill. 2018). Here, by contrast, Plaintiffs are subject to penalties only if the event or area at issue is marked by appropriate signage. *See infra* Part III.

## III.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Due Process Claim

Plaintiffs claim that a portion of the Events Restriction—that which applies to "an event that would otherwise require a County permit," or to an area "adjacent" to such an event—is unconstitutionally vague. *See* Pl. Mem. 16-17; Compl. ¶¶ 52-59.[42] Here, too, they have failed to demonstrate any likelihood of success on this claim, and their motion should thus be denied.

---

[Second Amendment] analysis." *Goldstein v. Hochul*, No. 1:22-cv-08300, 2023 WL 4236164, at *14 (S.D.N.Y. June 28, 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023); *see also supra* p. 21 (Third Circuit has stayed *Koons* injunction).

[41] The *Antonyuk* district court's injunction against New York's prohibition at "any gathering of individuals to collectively express their constitutional rights to protest or assemble" was vacated by the Second Circuit on justiciability grounds that apply equally here. *See* 2023 WL 8518003, at *76-78 (plaintiffs did not demonstrate that they had attended any covered "gathering" while armed, were dissuaded from doing so, or had plans to do so in the future). Further, while the Second Circuit did not reach the merits of this part of New York's law, its recognition of a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places," *id.* at *59, supports the constitutionality of that law, and of the Events Restriction. (Notably, the district court had itself previously approved this part of New York's law in denying a motion for a temporary restraining order. *See* 635 F. Supp. 3d 111, 143 (N.D.N.Y. 2022).)

[42] Plaintiffs' motion raises no due process challenge to the aspect of the Events Restriction that applies to County-permitted events or areas adjacent to County-permitted events. And, even if it had, it would fail for the same reasons.

## A.    Plaintiffs Lack Standing to Bring Their Vagueness Claim

As an initial matter, Plaintiffs lack standing to bring their vagueness claim because they have not shown any credible threat of prosecution. Plaintiffs have provided no evidence (or even allegations) of "fears of [County] prosecution" that are "actual and well-founded enough to establish that the [the Events Restriction] will be enforced against them," as required for Article III standing in a pre-enforcement facial challenge. *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2020) (cleaned up).[43] Plaintiffs assert that they possess, carry, and transport firearms in public areas without knowledge of whether these areas are being used by events that would otherwise require a permit, or are adjacent to such areas. LaFave Decl. ¶ 5; Taubman Decl. ¶ 4; Holzhauer ¶ 5; *see* Compl. ¶ 39. But they have "offered no evidence to support a credible threat of prosecution" for such conduct—such as that the County has enforced or threatened enforcement in such areas when there is no notice of the prohibitions. *Md. Shall Issue*, 971 F.3d at 218 (finding no pre-enforcement standing where government "has not threatened prosecution for the supposedly proscribed conduct" and "plaintiffs have offered no evidence of the law having been enforced as they fear"). Without more, Plaintiffs' "generalized fears and concerns" are insufficient to establish standing. *Id.*; *see also Md. Shall Issue, Inc. v. Hogan*, 353 F. Supp. 3d 400, 419 (D. Md. 2018) (dismissing pre-enforcement facial vagueness challenge on standing grounds where "[p]laintiffs do not allege any facts suggesting a 'credible threat' that the [law] will be enforced in accordance with [p]laintiffs' broad reading"), *aff'd*, 963 F.3d 356 (4th Cir. 2020).

---

[43] Plaintiffs have the burden to demonstrate standing for each of their claims, and, at the preliminary-injunction stage, they "must make a 'clear showing' of [their] injury-in-fact," *Speech First, Inc. v. Sands*, No. 7:21-cv-00203, 2021 WL 4315459, at *6 (W.D. Va. Sept. 21, 2022), *aff'd*, 69 F.4th 184 (4th Cir. 2023), *pet'n for cert. filed*, No. 23-156 (U.S. Aug. 14, 2023), through "[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers," 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. 2023).

Rather than establishing a credible threat of prosecution, the evidence shows that the County expressly *precludes* enforcement of the Ordinance in the manner Plaintiffs say they fear. As the state court found in denying Plaintiffs' previous similar motion, the County has "adopted an official enforcement[] policy which prohibits enforcement of the [O]rdinance unless officers first ... confirm warning signage posted at any entrances or exits at qualifying locations, and … attempt to educate and seek voluntary compliance from violators." *LaFave*, 2023 Va. Cir. LEXIS 203, at *4-5 (Ex. 14); Becker Decl. ¶¶ 10-23 & Ex. C. The Fourth Circuit has relied on similar official guidance to find that other plaintiffs faced no credible threat of prosecution, and thus lacked standing to pursue their pre-enforcement facial vagueness challenge. *See Md. Shall Issue*, 971 F.3d at 218 (relying on State Police FAQ). This Court should do the same here.

**B.      The Events Restriction Is Not Void for Vagueness**

Even if Plaintiffs had standing, they cannot come close to meeting the "particularly demanding standard" applicable to this facial constitutional challenge. *Fusaro v. Howard*, 19 F.4th 357, 373 (4th Cir. 2021); *see Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (facial vagueness challenge "ineffective if the statute has a plainly legitimate sweep" (quotation marks omitted)). Under the Due Process Clause, a law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fusaro*, 19 F.4th at 371 (quotation marks omitted). A law lacking "precise guidance" or "mathematical certainty" is not unconstitutionally vague. *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) (quotation marks omitted). Moreover, a court will construe a challenged law, "if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *United States*

*v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quotation marks omitted).[44] In doing so, the court examines the law "as a whole," as well as "'any limiting construction that a state court or enforcement agency has proffered.'" *Martin*, 700 F.3d at 136 (citation omitted).

Plaintiffs cannot establish a likelihood of success on the merits of their vagueness claim. The Ordinance itself requires notice to be posted at entrances to events, § 6-2-1(D)(1), and, despite what Plaintiffs contend, *see* Pl. Mem. 4, this notice requirement is a precondition to enforcement. The CSM makes that clear, providing that the Ordinance applies and will be enforced only when appropriate signage is posted. Becker Decl. ¶¶ 16-23 & Ex. C; *see, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 148-49 (4th Cir. 2017) (en banc) (deferring to limiting constructions in Attorney General opinion and Maryland State Police advisory in rejecting vagueness challenge to state firearms law). Plaintiff LaFave, in fact, acknowledged in her state court deposition that the County's "no sign, no enforcement" policy resolves any vagueness concerns here. Ex. 33 (LaFave Dep. Tr. 90:5-91:9). Given that the Ordinance itself and the CSM establish that the County may only enforce the Ordinance when proper signage is in place, Plaintiffs' vagueness claims have no merit.

## IV.   The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs

Plaintiffs must affirmatively establish that they satisfy each of the preliminary injunction factors, *see Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th Cir. 2023) (en banc), but their Motion makes virtually no effort to carry their burden on irreparable harm, the balance of the equities, or the public interest. Instead, Plaintiffs assert that they have satisfied those factors because they have demonstrated a constitutional violation, and because "[t]he three district courts that found post-

---

[44] *See Tanner v. City of Va. Beach*, 674 S.E.2d 848, 852 (Va. 2009) (explaining that "if a statute or ordinance can be construed reasonably in a manner that will render its terms definite and sufficient, such an interpretation is required"); *Fusaro*, 19 F.4th at 371 n.12 (noting, in assessing due process vagueness challenge, that federal courts should apply statutory construction rules of highest state court when interpreting state statutes).

*Bruen* challenges to park bans likely to prevail on the merits" also found the other preliminary injunction factors were satisfied. *See* Pls.' Mem. 17-19.

Plaintiffs' analysis fails because they have not actually shown that they are likely to succeed on the merits, *see supra* Parts II-III. *See, e.g.*, *Md. Shall Issue*, 2023 WL 4373260, at *16 ("[T]he likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim."). And the three out-of-circuit district court cases Plaintiffs point to are poorly reasoned and should not be followed. *See supra* Part II.B.iii.

Moreover, where, as here, a plaintiff substantially delays moving for a preliminary injunction, courts routinely deny relief, noting that such a delay reflects a lack of irreparable harm. *See, e.g.*, *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction where plaintiffs waited nine months to seek injunction); *Roswell v. Mayor & City Council of Balt.*, No. 23-1567, 2023 WL 8728503, at *1 (4th Cir. Dec. 19, 2023) (per curiam) (unpub.) (affirming denial of preliminary injunction where plaintiff "had unduly delayed in seeking injunctive relief, further undermining any claim of irreparable harm and also tipping the balance of equities" to defendant); *N. Va. Hemp & Agric., LLC v. Virginia*, No. 1:23-cv-1177, 2023 WL 7130853, at *12 (E.D. Va. Oct. 30, 2023) (denying preliminary injunction where plaintiffs waited five months after enactment of law before suing to enjoin it).

Plaintiffs simply waited much too long—more than *three years* after the Ordinance went into effect—to bring this federal action and seek preliminary injunctive relief.[45] Their lack of diligence undermines any claim of irreparable harm. The irreparable harm to the County, by contrast, is clear: "Any time a [government] is enjoined by a court from effectuating statutes

---

[45] Although Plaintiffs may respond that they first sued in state court, they also delayed there, seeking a preliminary injunction almost two-and-a-half years after adoption of the Ordinance. And, after abandoning their state case, Plaintiffs waited eleven more weeks before filing in this Court.

enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).

The balance of the equities and the public interest also strongly favor the County.[46] Plaintiffs' delay, once more, undercuts their arguments. *See, e.g.*, *Roswell*, 2023 WL 8728503, at *1. And the public interest weighs heavily in the County's favor, as the County's duly enacted Ordinance is designed to reduce gun violence, increase public safety, reduce the intimidating and chilling effects from the presence of guns in sensitive places, and increase the public's use and enjoyment of parks and events—and empirical and social science evidence shows it is likely to do just that. *See, e.g.*, Filindra Decl. ¶¶ 23-42 (findings and analysis of survey showing the fear-inducing and chilling effects of guns in Fairfax County public parks and at specified public events).[47] Accordingly, "the County's interest in protecting public safety warrants permitting the [Parks Restriction and the Events Restriction] to remain in effect until a final determination is made on their constitutionality." *Md. Shall Issue*, 2023 WL 4373260, at *17.

## CONCLUSION

The Court should deny Plaintiffs' request for a preliminary injunction.

---

[46] These last two factors "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 348, 365 (4th Cir. 2022).

[47] *See also, e.g.*, Paul M. Reeping, et al., *The Effect of Gun-Free School Zones on Crimes Committed with a Firearm in Saint Louis, Missouri*, 100 J. Urban Health 1118, 1123 (2023), https://bit.ly/3Rwvwqd (finding a "statistically significant 13.7% fewer crimes committed with a firearm in gun-free school zones compared to gun-allowing zones"); John J. Donohue *et al.*, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Stud. 198, 200 (2019) (finding persistent increases in rates of violent assaults and violent crimes in states with most lenient concealed carry licensing laws); ACLED & Everytown for Gun Safety Support Fund, *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, https://tinyurl.com/52skt496 (Aug. 23, 2021) (finding that "[a]rmed demonstrations turn violent or destructive about 16% of the time, compared to less than 3% of the time for unarmed demonstrations").

Respectfully submitted,

Date: January 5, 2024

THE COUNTY OF FAIRFAX, VIRGINIA,
and the CHIEF OF POLICE, KEVIN DAVIS, in his
official capacity


By: */s/ Anders T. Sleight*
       Counsel

Douglas R. Kay, VSB No. 35468
Thomas W. Repczynski, VSB No. 39967
Anders T. Sleight, VSB No. 84458
OFFIT KURMAN, P.C.
8000 Towers Crescent Drive, Suite 1400
Tysons Corner, Virginia  22182
Telephone:  (703) 745-1800
Facsimile:  (703) 745-1835
dkay@offitkurman.com
trepczynski@offitkurman.com
Anders.sleight@offitkurman.com
*Co-Counsel for Defendants*

Daniel Robinson (VSB No. 78985)
John W. Burton (VSB No. 42223)
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
Telephone: (703) 324-2421
Facsimile: (703) 324-2665
Daniel.Robinson@fairfaxcounty.gov
John.Burton@fairfaxcounty.gov
*Co-Counsel for Defendants*

Janet Carter (*pro hac vice* pending)
William J. Taylor, Jr. (*pro hac vice* pending)
EVERYTOWN LAW
450 Lexington Avenue, P.O Box 4184
New York, New York 10163
Telephone: (646) 324-8174
jcarter@everytown.org
wtaylor@everytown.org
*Co-Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

Christopher M. Day
Earl N. "Trey" Mayfield, III
10521 Judicial Drive, Suite 200
Fairfax, VA 22030
(703) 268-5600
cmday@jurisday.com
tmayfield@jurisday.com

*/s/ Anders T. Sleight*
Anders T. Sleight

2