# FILINDRA DECLARATION

# EXHIBIT 3

# TECHNOLOGY, TRADITION, AND "THE TERROR OF THE PEOPLE"

## Darrell A.H. Miller,[*] Alexandra Filindra[**] & Noah Kaplan[***]

(forthcoming NOTRE DAME LAW REVIEW)

## I.   Introduction

To date, the deadliest mass shooting in America began at 10:05 pm on October 1, 2017 when a 64-year-old gambler and businessman, equipped with over twenty high-powered semiautomatic rifles, opened fire on a public concert from his hotel room on the thirty-second floor of the Mandalay Bay Hotel in Las Vegas, Nevada.

Singer Jason Aldean was just thirty minutes into his set at the Route 91 Harvest country music festival when the bullets began to tear into the 22,000 assembled spectators. Some of the concertgoers thought the rapid crackle of gunfire was part of the show—until people began to drop. Police on the ground frantically radioed to each other, confused both as to the location and the number of shooters.[1]

Terrified citizens leapt over barriers and bleeding bodies, then scurried under vehicles in the parking lot in a frantic search for cover. One mother threw herself over her four-year-old to shield her from the bullets.[2] Others fashioned makeshift gurneys from fencing to try to ferry the wounded to safety.[3] A few tried to grab shotguns from unlocked squad cars, as if they would have been effective in repelling the fire raining down from over 1,000 feet above.[4] One survivor

[*] Melvin G. Shimm Professor of Law, Duke Law School.

[**] Associate Professor, Political Science and Psychology, University of Illinois—Chicago.

[***] Clinical Assistant Professor of Political Science, University of Illinois—Chicago. Our thanks to Joseph Blocher, Jake Charles, Eric Ruben, and Andrew Willinger who reviewed drafts of this article. Thanks also to the workshop participants at Northwestern University, Pritzker School of Law for their engagement and suggestions for revision. Thanks to Sydney Colopy for her great research assistance.

[1] Matthew Gafni, *'It's Coming Out the Window!': Listen to Chaotic Las Vegas Shooting Police Tapes*, THE EAST BAY TIMES (October 2, 2017, 2:59 PM), https://www.eastbaytimes.com/2017/10/02/audio-listen-to-chaos-fear-on-police-radio-traffic-recordings-from-las-vegas-shooting/.

[2] Ashley May, *Las Vegas Shooting: Mom Shielded 4-Year-Old Daughter as Gunman Fired Into the Crowd*, USA TODAY (Oct. 3, 2017, 3:37 PM), https://www.usatoday.com/story/news/nation-now/2017/10/03/las-vegas-shooting-mom-shielded-4-year-old-daughter-gunman-fired-into-crowd/728166001/.

[3] Eliott C. McLaughlin, *Las Vegas Concertgoers Say Gunfire 'Went On and On and On,'* CNN (Oct. 2, 2017, 4:45 PM), https://www.cnn.com/2017/10/02/us/las-vegas-concert-shooting-scene/index.html.

[4] Matthew Gafni, *'It's Coming Out the Window!': Listen to Chaotic Las Vegas Shooting Police Tapes*, THE EAST BAY TIMES (October 2, 2017, 2:59 PM), https://www.eastbaytimes.com/2017/10/02/audio-listen-to-chaos-fear-on-police-radio-traffic-recordings-from-las-vegas-shooting/; *see also Note In Las Vegas Gunman's Hotel Room included Details of Bullet Trajectory*, 60 MINUTES (October 7, 2017, 5:33 PM), https://www.cbsnews.com/news/las-vegas-gunman-stephen-paddock-note-hotel-room-details-of-bullet-trajectory/.

Electronic copy available at: https://ssrn.com/abstract=4521030

reported afterward: "The gunfire never ended, it seemed like it went on and on and on."[5]

Once the firing stopped fifteen minutes later, 58 individuals had been murdered and over 800 injured—over half from gunshots and shrapnel, the others from the stampede.[6]  Police found the shooter dead in his room from a self-inflicted gunshot wound.  Some of the rifles he used had been outfitted with bump stocks, allowing the weapon to fire as many as 90 rounds in 10 seconds.[7]  It's estimated that, before he killed himself, the shooter fired over 1,000 rounds into the crowd.[8]  Both federal and state investigators have never been able to isolate a motive for the shooting.

In the six years since Las Vegas, there's been 2600 additional mass shootings,[9] including mass murders in Southerland Springs, Texas; Virginia Beach, Virginia; Thousand Oaks, California; Parkland, Florida; Uvalde, Texas; Highland Park, Illinois; Monterey Park, California; East Lansing, Michigan; Nashville, Tennessee; and Allen, Texas.  We are currently on track to have more mass shootings than days this year.[10]  The pace is so relentless that some journalists now refer to a "mass shooting" beat to cover the latest act of mayhem.[11]

Hospital beds and burials do not adequately capture the full costs of gun violence in America; survivors pay a psychological toll for years afterward.[12]  Nor

---

[5] Eliott C. McLaughlin, *Las Vegas Concertgoers Say Gunfire 'Went On and On and On,'* CNN (Oct. 2, 2017, 4:45 PM), https://www.cnn.com/2017/10/02/us/las-vegas-concert-shooting-scene/index.html.

[6] *Las Vegas Shooting Victims Reach $735m Settlement from MGM Resorts,* BBC (Oct. 3, 2019), https://www.bbc.com/news/world-us-canada-49926469.

[7] Larry Buchanan et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster,* N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/interactive/2017/10/02/us/vegas-guns.html.

[8] Joseph Lombardo, *LVMPD Preliminary Investigative Report of the 1 October Mass Casualty Shooting,* LAS VEGAS METROPOLITAN POLICE DEPARTMENT (Aug. 3, 2018), https://www.lvmpd.com/en-us/Documents/1-October-FIT-Criminal-Investigative-Report-FINAL_080318.pdf.

[9] GUN VIOLENCE ARCHIVE https://www.gunviolencearchive.org/ (last visited July 25, 2023) (defining a mass shooting as "a minimum of four victims shot, either injured or killed, not including any shooter who may also have been killed or injured in the incident").

[10] *See* Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows,* ABC NEWS (May 8, 2023, 7:24 AM), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874.

[11] Greg Sargent, *A New Type of Reporter Emerges: The 'Mass Shooting Correspondent,'* WASH. POST (Nov. 25, 2022, 7:00 AM), https://www.washingtonpost.com/opinions/2022/11/25/mass-shooting-journalism-new-correspondent/.

[12] Ariel J. Romero, Note, *"Some Days It's Tough Just Getting' Up": How the Current Civil and Criminal Legal Remedies Fail to Protect Mass Shooting Victims,* 24 Chap. L. Rev. 529, 552 (2021) ("In the aftermath of a mass shooting, victims are coming to grips with their new realities: dealing with trauma, grief, depression, PTSD, anxiety, sleep issues, somatic complaints, cognitive issues, suicidal ideation, survivor's guilt, and tending to their physical injuries."). Ariel Romero was herself a survivor of the Las Vegas shooting. *See id.* at 529; *see also* Amy Novotney, *What Happens to the Survivors,* AM. PSYCH. ASS'N MONITOR ON PSYCH. (2018), https://www.apa.org/monitor/2018/09/survivors ("The National Center for PTSD estimates that 28 percent of people who have witnessed a mass shooting develop post-traumatic stress disorder . . . and about a third develop acute stress disorder."); *cf.* Thomas Griffith & Nancy Staudt, *Taxing Guns,* 95 S. CAL. L. REV. 73, 93 (2021) ("Experts estimate that taxpayers incur more than $2.3 billion annually due to gun violence. If we include all the indirect and direct costs . . . the total medical, legal, and social costs associated with gun violence in the United States exceed $100 billion.").

Electronic copy available at: https://ssrn.com/abstract=4521030

do these estimates price in the costs to those not directly affected; people who have stopped going to church, to parades, to the movies or to the grocery store for fear that they will be the next victim.[13]

Recent polling confirms the effect unmitigated gun violence is having on American wellbeing and sense of public life.[14] In a survey published in 2023, eighty-four percent of U.S. adults report taking "at least one precaution to protect themselves or their families from the possibility of gun violence"; including 35% who said they've avoided large public gatherings "including music festivals, or crowded bars and clubs"; 23% who have avoided public transportation; 20% who have "changed or considered changing" their child's school; and 15% who have "avoided attending religious services, cultural events or celebrations."[15] A Harvard Youth Poll the same year found that 40 percent of young Americans said they feared being a victim of gun violence or a mass shooting, and close to one third had, in the previous two weeks, "[w]orried about a potential mass shooting when in a public space (such as school/university, mall, office, theater, etc.)."[16]

These numbers are not anomalies. Four years ago, the American Psychological Association reported that nearly one third of all adults "feel they cannot go anywhere without worrying about being a victim of a mass shooting" and an equal number of them "say fear prevents them from going to certain places or events."[17] Approximately a quarter of respondents in the survey admitted to having "chang[ed] how they live their lives because of fear of a mass shooting."[18]

Even as the crisis of American gun violence has grown more acute, the Supreme Court has reconfigured the legal space that policymakers must negotiate to achieve political solutions. On June 23, 2022, the Supreme Court returned to the Second Amendment after a decade-long absence. In *New York State Rifle & Pistol Association, Inc. v. Bruen,*[19] the Court overturned the approach that lower

---

[13] *Cf.* City of Chicago v. Morales, 527 U.S. 41, 115 (1999) (Thomas, J., dissenting) ("There is only about maybe one or two percent of the people in the city causing these problems maybe, but it's keeping 98 percent of us in our houses and off the streets and afraid to shop." (quoting Transcript of Chicago resident Susan Mary Jackson)).

[14] Cary Wu, *How Does Gun Violence Affect Americans' Trust in Each Other?*, 91 SOC. SCI. RSCH. 1, 3 (2020) (showing that "higher percentages of nonfatal and fatal gun violence victims lead to lower levels of trust both across and within the U.S." and that producing study to show that "America's gun violence affects not only just those killed, injured, or present during gunfire, but it can also sabotage the social and psychological well-being of all Americans").

[15] Shannon Schumacher et al., *Americans' Experience With Gun-Related Violence, Injuries and Deaths,* KFF (Apr. 11, 2023), https://www.kff.org/report-section/americans-experiences-with-gun-related-violence-injuries-and-deaths-findings/. These forms of social withdrawal are more pronounced in Black and Hispanic communities. More than half (55%) of Black adults have taken these precautions as have about four in ten Hispanic adults (43%).

[16] Harvard Kennedy School: Institute of Politics, *Survey of Young Americans' Attitudes toward Politics and Public Service 45th Edition, March 13-22,* 2023, https://iop.harvard.edu/sites/default/files/2023-05/Harvard%20IOP%20Youth%20Poll%20Spring%202023%20Toplines.pdf.

[17] *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events,* AM. PSYCH. ASS'N (Aug. 15, 2019), https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting. When asked about the places they most fear being shot, adults specified "a public event (53%), mall (50%), school or university (42%) or movie theater (38%)." *Id.*

[18] *Id.*

[19] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022).

Electronic copy available at: https://ssrn.com/abstract=4521030

courts had used to decide Second Amendment disputes, and mandated a new text, history, tradition, and analogy-only approach to Second Amendment cases. As the Court said in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." To defend the law, "the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate the regulation is consistent with this Nation's historical tradition of firearm regulation."[20]

No longer can policymakers rely on empirical data alone to carry their litigation burden. Now such data must conform to a still-emerging "historical tradition of firearm regulation" to meet constitutional muster. Researchers, legislators, and judges are still trying to sort out what it all means. Some despair that that reams of data, careful experiments, and rigorous statistical analyses no longer have any relevance to the gun debate.[21] Others are less gloomy, but are bewildered how to evaluate the constitutionality of laws designed to keep firearms off commercial airliners, or out of the hands of domestic abusers, within the new parameters the Court has set.[22]

We think that those that claim *Bruen* signals the end of empirically-grounded innovative policy solutions to our gun violence epidemic badly misread the opinion. As Justice Brett Kavanaugh in his concurrence assured us: "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."[23] Especially when policymakers confront "unprecedented social concerns or dramatic technological changes"[24] *Bruen* permits lawmakers to respond with more than the specific regulatory tools of the past. In those cases, judicial officers who review these policies must employ "a more nuanced approach" to the historical record and the tradition that represents.[25]

Empirical studies can still inform meaningful gun policy, but the boundaries that make such studies legally significant are now set by *Bruen*'s text, history and analogy approach. To put it another way, the framework of constitutional rights has always channeled the manner law makes use of empirical data. It is just that now, in the Second Amendment context, those channels are shaped not so much by government interests and notions of fit, but by historical analogs and purpose.

---

[20] *Id.* at 2126.

[21] Chip Brownlee and Jennifer Mascia, *SCOTUS Says People Have a Right to Carry Guns in Public*, THE TRACE (June 23, 2022), https://www.thetrace.org/2022/06/supreme-court-ruling-bruen-new-york/ ("With today's ruling, the six conservative SCOTUS justices are saying that modern-day gun problems are irrelevant when deciding the constitutionality of a law."); Mark Joseph Stern, *Clarence Thomas' Maximalist Second Amendment Ruling Is a Nightmare for Gun Control*, SLATE (June 23, 2022), https://slate.com/news-and-politics/2022/06/supreme-court-new-york-concealed-carry-law-gun-control-bruen.html ("[C]ourts may no longer rely on empirical evidence in upholding gun control laws.").

[22] *Cf.* United States v. Bullock, No. 18-CR-165, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022) ("This Court is not a trained historian. The Justices of the Supreme Court, distinguished as they may be, are not trained historians. We lack both the methodological and substantive knowledge that historians possess.").

[23] *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).

[24] *Id.* at 2132.

[25] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4521030

This article proceeds as follows: Part II discusses the *Bruen* test and its focus on text, history, tradition, and analogs. It argues that *Bruen*, properly read, still allows plenty of options to address modern problems and the risks of modern technology. Part III explores the history of regulation to prevent public terror: in particular, the crime of affray, prohibitions on dangerous and unusual weapons, and the concept of sensitive places. All these regulations share a common feature—the maintenance of public peace and prevention of public fear. Part IV explains how the potential for public terror in the modern era must be understood in relation to the profoundly different technological and social environment in which we currently live. Simply put, reduction of public terror remains a longstanding regulatory object; but the modern capacity for armed individuals to terrorize has so increased as to be different in kind. Part V supplies an original survey experiment to measure the "chilling" effect—the fear—caused by guns in American public life. Part VI links contemporary data on public fear with Part II, and discusses how the "nuanced approach" to analogy endorsed by *Bruen* makes this research relevant to contemporary questions about the right to keep and bear arms. Part VII discusses how judicial selection of a level of generality for historical analogs, such as public terror, cannot come from within the analogical method itself, and offers some guideposts for choosing a level of generality. Part VIII concludes.

## II.   *Bruen* and the Text, History, Tradition and Analogy Approach

In June of 2022, the Supreme Court decided its first major Second Amendment case in over a decade. Two plaintiffs, Brandon Koch and Robert Nash, along with a National Rifle Association affiliate called the New York State Rifle and Pistol Association, filed suit to challenge New York's concealed carry permitting legislation. Some version of New York's law had been in place for nearly a century, and the modern regulation required applicants to demonstrate some need for an unrestricted concealed carry permit different from the self-defense needs of any other individual. New York's law wasn't alone. At one time, over half the states in the nation had some version of New York's "may-issue" law or prohibited concealed carry altogether. However, successful lobbying by gun rights groups over the past thirty-five years had completely reversed the regulatory landscape, so that by 2022, "may issue" jurisdictions like New York were a minority.

In a 6-3 decision authored by Justice Clarence Thomas, the majority struck down New York's permitting law.   But the majority did more than that.   It rejected the analytical approach that lower courts had used since the Court minted the federal right to keep and bear arms in 2008 with *District of Columbia v. Heller*.

*Heller* was the first Supreme Court case in the Second Amendment's 200-year history to hold that the right to keep and bear arms protects a right to keep them for personal purposes—like self-defense—unrelated to membership in an organized militia. Lower courts with crowded dockets and compulsory jurisdiction soon converged on a two-step framework for deciding the Second Amendment issues the Court had left unresolved in *Heller*. Following guidance from the Court itself, the lower courts nearly universally adopted a two-part

Electronic copy available at: https://ssrn.com/abstract=4521030

framework modeled on First Amendment doctrine.[26] The first step of this framework was largely categorical and asked whether the activity or regulation implicated the Second Amendment at all. Convicted felons in possession of firearms and firearms in sensitive places, like schools, were often decided at this step. If the history was unclear, the second step of the framework employed a fairly conventional tailoring approach to decide whether the regulation passed constitutional muster. This second step was typically where governments introduced empirical studies to prove their regulations met the requisite "fit" with the stated governmental interest.[27]

There were detractors of this two-step approach who understood *Heller* to forbid any kind of weighing of interests, even in the form of the conventional tiers of scrutiny. They argued that *Heller* had prescribed a text, history, and tradition-only approach to Second Amendment questions[28]—one more akin to that deployed in Seventh Amendment cases.[29] The *Bruen* majority endorsed this text and tradition centered framework. "Despite the popularity of this two-step approach, it is one step too many,"[30] Justice Thomas wrote. "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."[31] Instead, Justice Thomas argued "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[32]

The Court reiterated the new test this way:

> In keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

---

[26] *See* United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010) ("Given *Heller's* focus on "core" Second Amendment conduct and the ⟦Supreme⟧ Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); United States v. Marzzarella, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("We think ⟦*Heller's* invocation of First Amendment principles⟧ implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.").

[27] *See e.g.*, Kolbe v. Hogan, 849 F.3d 114, 133 (4th Cir. 2017), *abrogated in part by* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022); United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), *abrogated in part by* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022).

[28] *See, e.g.*, United States v. McGinnis, 956 F.3d 747, 761 (5th Cir. 2020) (Duncan, J., concurring) ("I write separately to reiterate the view that we should retire this ⟦two-part⟧ framework in favor of an approach focused on the Second Amendment's text and history."); Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 703 (6th Cir. 2016) (Batchelder, J., concurring in part); Heller v. District of Columbia, 670 F.3d 1244, 1271, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (*Heller II*).

[29] The Seventh Amendment right to trial by jury in civil cases requires what the Court itself has deemed a "historical" test. *See* Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852, 872 (2013) (discussing the Seventh Amendment historical test); *see also* Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996) (using this nomenclature).

[30] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2127 (2022).

[31] *Id.*

[32] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4521030

protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.[33]

However, the majority recognized that just as the Second Amendment covers modern arms with no historical equivalent, there are modern regulations that also have no historical equal. In those cases, the courts are to reason by analogy. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[34] Relevantly similar, to the Court, includes "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[35] Analogs need not be a "dead ringer," but "well-established and representative."[36] Particularly where a regulation responds to "unprecedented societal concerns or dramatic technological changes" courts may apply "a more nuanced approach" to the analogical process.[37] This approach ensures, as Justice Brett Kavanaugh wrote, that the "Second Amendment 'is neither a regulatory straightjacket nor a regulatory blank check'";[38] that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."[39]

## III.    Traditional Regulation to Reduce Public Terror

Weapon regulation long has been about preventing death and injury. But just as importantly, it has been about maintaining public peace and reducing public fear.[40] Regulations to preserve the peace are older than the republic, and go back to classical antiquity. Solon of Athens was reported to have fined those who walked about the streets of the city with a sword and armor, unless "in case of exigency."[41] Edward III enacted the Statute of Northampton, which stated:

[N]o man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor

---

[33] *Id.* at 2126.

[34] *Id.* at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)).

[35] *Id.* at 2133.

[36] *Id.*

[37] *Id.* at 2132.

[38] *Id.* at 2162 (Kavanaugh, J., concurring) (quoting majority).

[39] *Id.* (Kavanaugh, J., concurring).

[40] For an extended discussion, see Joseph Blocher & Reva Siegel, *Guided by History: Protecting the Public Sphere From Weapons Threats Under* Bruen, 98 N.Y.U. L. REV. __, at 8 (forthcoming 2023) (purpose of historical weapons restrictions is "to protect the public peace and thus the freedom of all people to participate in democratic community without terror and intimidation").

[41] 1 JOHN POTTER, THE ANTIQUITIES OF GREECE 182 (2d ed. 1706).

Electronic copy available at: https://ssrn.com/abstract=4521030

bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.[42]

Lawmakers and legal writers invoked this statute throughout the Tudor and early Stuart period.[43]  In 1602, Elizabeth I issued a writ to "Guardians of the King's peace and the Sheriff of Essex" to arrest "William Fitzwilliam esq." for having violated the "Statute of King Edw. III. against carrying arms against the peace."[44] John Bond's *A Compleat Guide for Justices of the Peace* instructed that "Persons with offensive Weapons in Fairs, Markets or elsewhere in Affray of the King's People, may be arrested by the Sheriff, or other the King's Officers."[45] Robert Gardiner's contemporaneous *Compleat Constable* authorized the seizure and disarmament of those who "Ride or go Armed offensively . . . in fairs or Markets or elsewhere, by Day or by Night in Affray of Her Majesty's Subjects, and Breach of the Peace; or wear or carry any Daggers, Guns or Pistols Charged" and to carry such a person before a justice "to give Surety to keep the Peace."[46]

Going armed to the terror of the people was of such gravity that it would have been a crime even without a specific statutory prohibition. As the King's Bench in *Sir John Knight's Case* stated, bearing arms *in terrorem populi*: "is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects."[47]  William Blackstone cited the Statute of Northampton in his *Commentaries* for the proposition that "the offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."[48] This regulation crossed the Atlantic, and was enacted alongside rights to keep and bear arms in multiple jurisdictions[49]

---

[42] Statute of Northampton, 2 Edw. 3 c. 3 (1328).

[43] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 Clev. St. L. Rev. 373, 384 (2016) [hereinafter Charles, *Faces, Take Two*]

[44]  https://discovery.nationalarchives.gov.uk/details/r/c79f7b72-f282-4f1c-8bce-e8d7bcea01ae. For more on this enforcement history, see Jonah Skolnik, *Observations Regarding the Interpretation and Legacy of the Statute of Northampton in Anglo-American Legal History*, SECOND THOUGHTS BLOG (Sept. 17, 2021), https://firearmslaw.duke.edu/2021/09/observations-regarding-the-interpretation-and-legacy-of-the-statute-of-northampton-in-anglo-american-legal-history/#_ftnref5 ("We can see based on these enforcement and jurisprudential documents that the historical and socio-legal context of the Statute of Northampton suggests that the Statute's enforceability was wide-ranging across an array of different types of armed force and intentions.").

[45] *See* Charles, *Faces, Take Two*, *supra* note 43, at 391 (quoting JAMES BOND, A COMPLEAT GUIDE FOR JUSTICES OF PEACE 42 (3d ed., London 1707)).

[46] ROBERT GARDINER, THE COMPLEAT CONSTABLE 18 (1708).

[47] Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB).

[48] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *149.

[49] Charles, *Faces, Take Two*, *supra* note 43, at 379 ("The Statute of Northampton was of such importance that its tenets survived for over 500 years, with states such as Massachusetts, North Carolina, and Virginia recognizing it after the ratification of the Constitution").

8

Electronic copy available at: https://ssrn.com/abstract=4521030

including North Carolina,[50] Virginia,[51] Tennessee,[52] Massachusetts[53] and Maine.[54]

Just as importantly, government officials had a duty to regulate arms in order to preserve the public peace. The Statute of Northampton granted local magistrates "power to execute this act" and permitted investigations and sanctions on local officials who did *not* enforce the law, contrary to their duty.[55]  Guidance to local justices of the peace from the 17th to 18th century routinely included injunctions to enforce arms regulations in order to preserve the public peace.[56]  Massachusetts' regulation, for instance, authorized arrest of "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[57]  Indeed, some regulations were written as to actually criminalize official non-enforcement of these laws.[58]

---

[50] 1792 N.C. Laws 60, ch. 3.  North Carolina's version of the Statute of Northampton is remarkable for essentially being verbatim, right down to the mention of the monarch.

[51] 1786 Va. Acts 33.

[52] 1801 Tenn. Pub. Acts 260, ch. 22 § 6.

[53] 1795 Mass. Acts 436, ch. 2.

[54] 1821 Me. Laws 285, ch. 73 § 1.

[55] Statute of Northampton, 2 Edw. 3 c. 3 (1328) ("And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.").

[56] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 19 (2017) ("Legal commentators, both in popular justice of the peace manuals and learned treatises, treated the Statute of Northampton as a foundational principle for enforcing the peace.") (citing, inter alia, GILES JACOB, A LAW GRAMMAR; OR RUDIMENTS OF THE LAW 426 (1744); J.P. GENT, A NEW GUIDE FOR CONSTABLES, HEAD-BOROUGHS, TYTHINGMEN, CHURCHWARDENS 13 (1705), JOSEPH KEBLE, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR EASIER PERFORMANCE OF THEIR DUTY 147, 224 (1683).

[57] Charles, *Faces, Take Two*, supra 49, at 380 (quoting 2 THE PERPETUAL LAWS, OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION TO THE SECOND SESSION OF THE GENERAL COURT, IN 1798 259 (Worcester, Isaiah Thomas 1799)).

[58] See Arizona Territory Revised Statutes, Title 11, § 383 (1901) (approved March 6, 1891) ("[A]ny peace officer who shall fail, neglect or refuse to arrest any such person on his own knowledge of the violation of said section, or upon the information from some credible person, or who shall appoint any person a deputy, not intended to be used in regular service, but as a mere pretext for the purpose of carrying a concealed weapon, shall be guilty of a misdemeanor."); An Act to Preserve the Public Peace and Prevent Crime, No. 96, §§ 5-6 (April 1, 1881), reprinted in ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS 192 (1881) (specifying criminal penalties for, inter alia "non-feasance in office" for justices of the peace and officials who do not enforce weapons laws); Ordinances of the City of Nashville, Ch. 74, § 3 (Dec. 26, 1873) reprinted in ORDINANCES OF THE CITY OF NASHVILLE 232-33 (1875) ("That every police officer who may refuse or neglect to immediately arrest every such person seen with or known to be carrying such deadly weapons, shall be deemed guilty of duty, and upon conviction thereof, shall be dismissed from service"); City of Houston Revised Ordinances § 773 (Nov. 9, 1913), reprinted in REVISED CODE OF ORDINANCES OF THE CITY OF HOUSTON 267 (1914) ("[A]ny police officer of the City of Houston . . . who shall fail or refuse to arrest any person or persons thus unlawfully carrying any of the above mentioned weapons shall be deemed guilty of an offense and as a punishment shall be dismissed from the Police Department of the City of Houston, and shall not be permitted thereafter to serve as a police officer of said city.")*see also* Garner v. State, 50 Tex. Crim. 364, 366, 97 S.W. 98, 100 (1906) ("From this article [Article 342, Pen. Code 1895] it will be seen that it is the duty of the sheriff to arrest a person without warrant, found or reported by

9

Electronic copy available at: https://ssrn.com/abstract=4521030

No less than Justice Thomas, dissenting in *City of Chicago v. Morales*,[59] has recognized this traditional peacekeeping duty of law enforcement. "Police officers are not, and have never been, simply enforcers of the criminal law.     [T]hey have long been vested with the responsibility for preserving the public peace."[60] Part of their "traditional functions" has been to suppress affrays and to keep the public roads, sidewalks, parks and other places free and open to the public.[61] To constrain this peacekeeping function, out of concern that they may abuse their discretion, according to Justice Thomas, would elevate the rights of the intimidator over the rights of the intimidated.[62]

Although the regulations that Justice Thomas endorsed in *Morales* targeted people—suspected gang members—there's ample history of regulation of public armament for precisely the same purpose—prevention of public fear. Regulations to prevent affrays, prohibitions on "dangerous and unusual weapons," and restricting firearms from "sensitive places" share as a common denominator—their "why"[63]—maintenance of the public peace.[64]

### A. Affray

Affray at common law was defined as: "a public offense to the terror of the king's subjects . . . so called because it affrighteth and maketh men afraid."[65] Indeed, the very word "affray" is derived from a French word meaning "to frighten."[66]   The actual elements of affray were a product of the     "complex, context-bound judgment that defined common law jurisprudence."[67] One version of affray involved an actual violent encounter between "two or more persons in a public place, to the terror of the people."[68]   It was such an

---

some credible person to him as carrying a pistol, and it is then his duty to carry such person before the nearest justice of the peace for trial.").

[59] City of Chicago v. Morales, 527 U.S. 41 (1999).

[60] *Id.* at 106.

[61] *Id.* (Thomas, J., dissenting) (quoting, *inter alia*, J. CROCKER, DUTIES OF SHERIFFS, CORONERS AND CONSTABLES § 48, p. 33 (2d ed. Rev.1871)).

[62] *Id.* at 115 (Thomas, J., dissenting) ("By focusing exclusively on the imagined 'rights' of the [suspected gang members], the Court today has denied our most vulnerable citizens . . . 'freedom of movement.'").

[63] *Bruen*, 142 S. Ct. at 2132 (discussing the metrics for analogies as "how and why the regulations burden a law-abiding citizen's right self-defense").

[64] *See* Blocher & Siegel, supra note 40, at 8.

[65] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 11 (Woodbridge, N.J., 1764).

[66] ROBERT SULLIVAN, A DICTIONARY OF DERIVATIONS 30 (9th ed. 1860).

[67] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 501 (2004).

[68] McClellan v. State, 53 Ala. 640 (1875); Cash v. State, 2 Tenn. 198, 199 (1813) ("[V]iolence . . . committed in a public place, and to the terror of the people . . . is called an affray."); Commonwealth v. Simmons, 29 Ky. 614, 615 (1831) (Affray is "is the fighting of two or more persons, in some public place, to the terror of others"); *see also* 4 BLACKSTONE, supra note 48, at *145 (defining affray as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects").

Electronic copy available at: https://ssrn.com/abstract=4521030

obvious "nuisance to the public"[69] that its prohibition didn't require a statutory enactment, but was "a common-law crime of ancient vintage."[70]

Another version of affray did not require actual violence, but the threat of violence occasioned when a person entered public areas with dangerous and unusual armament or offensive weapons in such a way as to cause terror to the people. This was the type of affray identified in 1764, in the justice of the peace manual *Conductor Generalis*: "[I]t seems certain, that in some cases there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and usual weapons, in such a manner as will naturally cause a terror to the people."[71]

There's a long tradition of government adopting controls to prevent both of these types of affray. In the early Tudor period, Henry VII restricted unlawful assemblies in public places because of "the practice for the gentry, who were on bad terms with each other, to go to market at the head of bands of armed retainers."[72] At common law, those who feared attack were supposed "to seek out a justice of the peace and bind the threatening individual with a peace bond."[73]

In an era without a professionalized police force, these peace bonds were a method to prevent breaches of the peace, and could reduce the impulse of individuals to arm themselves preemptively in case of a sudden armed confrontation.[74] Those who armed themselves preemptively could be held over by the authorities and post a bond to ensure that they themselves were not likely to break the peace.[75]

These ex-ante controls to maintain the public peace traveled, sometimes unchanged, to American shores. The colonists adopted regulations on public carry patterned on, or indeed a direct transcription of, the Statute of

---

[69] *Simmons*, 29 Ky. at 615.

[70] Commonwealth v. Nee, 985 N.E.2d 118, 121 (App. Ct. Mass. 2013).

[71] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 11 (1764). James Wilson said something similar, *see* Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1363 (2009) ("[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people.") (quoting 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (BIRD WILSON ed., PHILADELPHIA, BRONSON AND CHAUNCEY 1804)); *see also* ROBERT GARDINER, THE COMPLEAT CONSTABLE 18 (1708).

[72] 2 JAMES F. STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 385 n.9 (London, R. Clay, Sons, & Taylor 1883). Stephen remarked that this law was common sense, as the alternative would be that "assembled bands would probably fight and certainly make peaceable people fear they would fight." *Id.*

[73] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868*, 83 LAW & CONTEMP. PROBS. 73, 82 (2020).

[74] *See id.* at 83 ("Taken together, these broad powers of enforcing the peace were the foundation for community-based law enforcement in an era before the rise of modern police forces.").

[75] *Id.* ("Any justice of the peace or constable had the power to detain, disarm, or imprison individuals traveling armed and then have the offender bound over to the peace."). *See also* Queen v. Soley, (1701), 88 Eng. Rep. 935, 937 (QB) ("If three come out of an ale-house and go armed, it is a riot. Though a man may ride with arms, yet he cannot take two with him to defend himself even though his life is threatened; for he is in the protection of the law, which is sufficient for his defence."). For a discussion of the issuing of "peace warrants," see LAURA EDWARDS: THE PEOPLE AND THEIR PEACE (2009).

11

Electronic copy available at: https://ssrn.com/abstract=4521030

Northampton's prohibitions on going armed to the terror of the people.[76] James Davis, an early American printer in North Carolina and himself a justice of the peace,[77] wrote in his 1774 treatise that justices of the peace "upon their own View, or upon Complaint" to arrest "any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, or among any great Concourse of the People."[78] The 1764 *Conductor Generalis* identified affray to include arming oneself with dangerous and unusual weapons, even without a physical altercation; but also restated the common exception that the prohibition did not apply to those actually summoned to enforce the law, as to suppress a riot, or by those whose stature or custom would demonstrate were no risk of breaching the peace or terrorizing the people.[79]

As weapons became more lethal and concealable in the nineteenth century, and as the signs of imminent peace-breaching became more difficult to discern, the demand for regulation to prevent deadly affrays became more urgent, especially in certain areas of the country.[80] A writer in the South Carolina *Edgefield Advertisor* in 1844 wrote: "It is not characteristic of brave nations to carry concealed weapons, nor is it . . . indicative of brave men. Concealed weapons are the insignia of the footpad, the burglar, and the mercenary bravo, and by the man unconscious of wrong and fearless of danger they never should be worn."[81] The Virginia *Martinsburg Gazette* reprinted with approval the sentiment that "public opinion and law" should "put down" the "abominable and murderous practice of carrying deadly weapons," and especially concealed weapons which should be "*prima facie* evidence of indiscriminate design on human life."[82] A Wisconsin newspaper observed that "there may be licentiousness, but no practical freedom" in an environment where "the pistol, the dirk and the bowie knife leap out upon the slightest provocation"; it lamented that "[s]o long as rowdies are allowed to go about armed, so long the rein of ruffianism will last."[83] These pleas did not go unheard, as several states expressly reserved the authority to regulate the

---

[76] Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 NW. U. L. REV. 139, 167 (2021).

[77] Robert N. Elliott, Jr., *Davis, James*, NCPEDIA (1986), https://www.ncpedia.org/biography/davis-james.

[78] JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (1774).

[79] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 12 (1764).

[80] For a discussion of the regional variation on the topic of public carry in general, and concealed carry in particular, see generally Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. FORUM 121 (2015).

[81] *Carrying Concealed Weapons*, EDGEFIELD ADVERTISER (Edgefield, S.C. Oct. 15, 1840).

[82] *Carrying Deadly Weapons*, MARTINSBURG GAZETTE (Martinsburg, Va.  Aug. 24, 1843.).

[83] *Carrying Weapons*, WISCONSIN HERALD AND GRANT COUNTY ADVERTISER (Lancaster, Wis. Dec. 11, 1845).

Electronic copy available at: https://ssrn.com/abstract=4521030

carrying of weapons in their state constitutions,[84] and passed corresponding legislation.[85]

## B.  Dangerous and/or Unusual Weapons[86]

Just as traditional as prohibitions on affray are regulations (including outright prohibition) of going armed with "dangerous and unusual weapons," a regulation that sometimes merged with restrictions on going armed "offensively."[87] William Hawkins considered the wearing of "dangerous and unusual weapons" a type of affray, even without violence because it "will naturally cause a terror to the people."[88]

In 1689, New Jersey prohibited the carrying of "any pocket pistol, skeins, stilettoes, daggers or dirks, or other unusual or unlawful weapons."[89] This colonial regulation was apparently in response to public outcry against the practice of a few who were putting the rest of the colony "in great fear."[90] New Hampshire had a similar regulation, in 1699, permitting the arrest of "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches."[91]  Massachusetts passed a regulation in 1795 permitting the arrest of

---

[84] *See, e.g.,* COLO. CONST. art. II, § 13 (1876) ("The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons."); FLA. CONST. art. I, § 20 (1883) ("The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the State shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."); GA. CONST. art. I, § I, para. 8 (1877) (similar); KY. CONST. § 1 (1850); TENN. CONST. art. I, § 26; MONT. CONST. art. II, § 12

[85] *See e.g.,* 1870 Va. Acts 510 ("If a person habitually carry about his person, hid from common observation, any pistol, dirk, bowie knife, or any weapon of the like kind, he shall be fined fifty dollars, and imprisoned for not more than twelve months in the county or corporation jail. The informer shall have half of such fine."); 1870 S.C. Laws 403 ("They may cause to be arrested all affrayers, rioters, disturbers and breakers of the peace, and all who go armed offensively, to the the terror of the people, and such as utter menaces or threatening speeches, or otherwise dangerous and disorderly persons."); 1872 Wis. Sess. Laws 17 ("If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor . . .").

[86] Historical documents use both formulations.  *See* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND \*149 ("dangerous or unusual"); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 55 n.110 (2012) (comparing HARRY TOULMIN, THE MAGISTRATE'S ASSISTANT 5 (1807) ("dangerous and unusual") with JOHN HAYWOOD, THE DUTY AND AUTHORITY OF JUSTICES OF THE PEACE, IN THE STATE OF TENNESSEE 176 (1810) ("dangerous or unusual")).

[87] WILLIAM LAMBARDE, EIRENARCHA: OR THE OFFICE OF THE JUSTICES OF THE PEACE, IN TWO BOOKES (1588).

[88] 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716).

[89] 1686 N.J. Laws, ch. 9, reprinted in AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289 (2d ed. 1881).

[90] *Id.*

[91] 1699 N.H. Laws 1.

Electronic copy available at: https://ssrn.com/abstract=4521030

all who "ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth" pending sureties against breach of the peace.[92]

An unappreciated aspect of these prohibitions is that one of their purposes seems to be to prevent a norm cascade that leads to a sub-optimal equilibrium,[93] wherein everyone feeling anxious about being insufficiently armed, arms himself with ever more powerful weapons to counter the threat.[94]

The need for authorities to arrest these "small arms races"[95] is implicit in the record from the sixteenth century to the modern day. William Lambarde, in his 1588 justice of the peace manual recognized the affray caused "without word or blow given: as if a man shall shew himself furnished with armour or weapon, which is not usually worne and borne" because such behavior "will strike a feare onto others that *be not armed as he is.*"[96] Joseph Keble in his influential *An Assistance to the Justice of the Peace for the Easier Performance of Their Duty* reiterated this concern, almost verbatim, a century later.[97] So did John Ward, in 1769, who described the crime of affray as including the circumstance of a man furnishing himself with "armour or weapons not usually worn" because "it may strike a fear into others unarmed."[98]

This same concern with a fear-induced race to the bottom motivated writers in the 19th century to seek strong regulation of the practice of public arms-bearing. A writer in the Baltimore *American Republican and Daily Clipper* wrote that "the peaceable citizen wears no dirk, or other dangerous weapon, and hence is unprepared to resist the assault of an armed ruffian; but should no restraint be imposed upon the carrying of deadly weapons, all members will have to arm in self-defense."[99] Another writer in the *Richmond Daily Whig* wrote similarly, wondering after the acquittal of two for the killing of an unarmed assailant: "Will it not be necessary that everyone should . . . carry concealed weapons so that he may protect his life if, after getting into a difficulty . . . he should find his adversary

---

[92] 1795 Mass. Acts 436, ch. 2.

[93] A norm cascade "occur[s] when societies experience rapid shifts toward new norms." Cass R. Sunstein, *Social Norms and Social Roles*, 96 COLUM. L. REV. 903, 912 (1996).

[94] This fear of being outgunned has had an undeniable racial cast to it in American history. When the Ku Klux Klan was prosecuted for terrorism in 1871, their defense counsel argued: "[A]rms had been placed . . . in the hands of the colored race, and they were divided into companies; arms of the best kind, arms against which no squirrel gun would be any protection whatever." PROCEEDINGS IN THE KU KLUX TRIALS AT COLUMBIA, S.C. IN THE UNITED STATES CIRCUIT COURT, NOVEMBER TERM, 1871, at 425 (Ben Pitman & Louis Freeland Post eds., 1872). *See also* Minority Report, REPORT OF THE JOINT SELECT COMMITTEE TO INQUIRE INTO THE CONDITION OF AFFAIRS IN THE LATE INSURRECTIONARY States, H.R. Rep. No. 42-41, pt. 1, at 439 (1872) (lamenting that Whites were denied ability to form militias, but African Americans "parade in State or Federal uniform, armed cap-a-pie with the most approved weapons").

[95] Guha Krishnamurthi & Peter N. Salib, *Small Arms Races*, 6/3/2022 U. CHI. L. REV. ONLINE 1 (2022).

[96] 2 WILLIAM LAMBARDE, EIRENARCHA: OR THE OFFICE OF THE JUSTICES OF THE PEACE, IN TWO BOOKES, 135 (1588) (emphasis added).

[97] JOSEPH KEBLE, AN ASSISTANCE TO THE JUSTICE OF THE PEACE FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (1683).

[98] 1 JOHN WARD, THE LAW OF JUSTICE OF PEACE AND PARISH OFFICER 6-7 (1769).

[99] *Deadly Weapons*, AMERICAN REPUBLICAN AND DAILY CLIPPER BALTIMORE (Baltimore, Md. Dec. 16, 1846).

Electronic copy available at: https://ssrn.com/abstract=4521030

armed[.]"[100]  Yet another writer, in Mississippi, ventured that it would be better to ban all pistols, than to tolerate unregulated reciprocal arming.[101]

In a recent article, Professors Guha Krishnamurthi and Peter N. Salib have recognized the particular risk modern weaponry creates with these these "small arms races."[102]  As they model it:

> It is much better to shoot than be shot. And it is very cheap to prepare oneself to shoot first, should the need arise. [In these circumstances] response to a mere probability of being shot is to increase readiness, decrease caution, and thereby make oneself more threatening. Thus, the deadly chain of escalation is triggered.[103]

Legal regimes that fail to place some breaks on this slide—at the very least by offering ex-ante guarantees that arms-bearing persons are trustworthy and peaceable—set up a classic game-theoretical problem, one that "[p]romotes small arms races essentially everywhere: public streets, sports stadiums, bars, and more."[104]  The consequence curtails public liberty, causing persons to avoid going into public areas, or risking escalation by reciprocal arming.[105]

Hence, regulating offensive, dangerous, or unusual weapons is historically justified, not just because unregulated arms-bearing violates social norms, but also because it can help stem the kind of deleterious norm cascade these writers imagine, wherein each person feels he must effectively counter an armed other,[106] or else avoid public places entirely.

## C.  Sensitive Places

Both Justice Thomas in his majority opinion (and Justice Kavanaugh, in his concurrence) reiterated that guns could be restricted from "sensitive places." As Justice Thomas wrote:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether

---

[100] *The Result of Recent Trials for Murder*, RICHMOND DAILY WHIG (Richmond, Va. Nov. 11, 1854).

[101] W.L.C. Hunnicut, *Pistols—Let Them Be Abolished*, THE CLARION (Jackson, Miss. Jan. 23, 1884) ("[Pistols] are dastardly weapons, made for concealment and murder. Yet no man ought to be blamed for having one so long as any other man may have one. Let them be abolished, so that no man can have one.").

[102] Guha Krishnamurthi & Peter N. Salib, *Small Arms Races*, 6/3/2022 U. CHI. L. REV. ONLINE 1 (2022).

[103] *Id.*

[104] *Id.* at 8

[105] Noah Levine, Note, *The Spirit of Gun Laws*, 18 DUKE J. CONST. L. & PUB. POL'Y SIDEBAR 241, 262 (2023).

[106] JOSEPH KEBLE, AN ASSISTANCE TO THE JUSTICE OF THE PEACE FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (1683) (the crime of affray occurs without violence where "a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon other that be not armed as he is."); *see also* Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727, 1834 (2012) (quoting same).

15

Electronic copy available at: https://ssrn.com/abstract=4521030

prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. . . . We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new and analogous sensitive places* are constitutionally permissible.[107]

The majority did not offer a rationale for why these places are sensitive, nor did it offer a comprehensive list of presumptively sensitive places. Lower courts prior to *Bruen* have only offered the elliptical postulate that it's due to "the people found there" or the "activities that take place there."[108] However, a unifying feature of sensitive places doctrine may be found in thinking of them as necessary to maintain an infrastructure for expression, assembly, participatory democracy, and social life that is free of intimidation and fear.[109] Much as we understand parks, sidewalks, thoroughfares, meeting halls, markets and other public spaces as essential for the flourishing of social life, the free exchange of ideas, and the fostering of public debate essential to a self-governing society,[110] so we can understand both ancient and new forms of sensitive places as demanding protection to serve these functions.[111]

Such a theory of sensitive places would be well established. Starting with the Statute of Northampton, persons were prohibited from carrying guns into "fairs or markets" as well as "in presence of the justices or other ministers."[112] North Carolina adopted a verbatim prohibition.[113] A nearly identical regulation appeared in 1786 in Virginia, prohibiting anyone from going armed "in fairs or markets" or "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms."[114]

---

[107] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2133 (2022).  The Court did insist, however, that there are geographical limits to "sensitive place" designations, rejecting that the "the island of Manhattan" could not be designated sensitive "simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134.

[108] United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019) (internal quotation marks omitted).

[109] Blocher & Siegel, *supra* note 40, at ___.

[110] Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974) (identifying "open spaces, . . . meeting hall[s], park[s], street corner[s], or other public thoroughfare[s] as " the traditional settings where First Amendment values inalterably prevail").

[111] Van Bergen v. State of Minn., 59 F.3d 1541, 1553 (8th Cir. 1995) ("The classic public fora—streets and parks—are traditional gathering places in which public debate and exchange of views take place."); Demmon v. Loudoun Cnty. Pub. Sch., 342 F. Supp. 2d 474, 481 (E.D. Va. 2004) ("The classic public fora are public parks, streets, or meeting halls"). *Cf.* Richard W. Garnett, *Do Churches Matter? Towards an Institutional Understanding of the Religion Clauses*, 53 VILL. L. REV. 273, 274 (2008) ("[F]reedom of expression is not only enjoyed by and through, but also depends on the existence and flourishing of, certain institutions--newspapers, political parties, interest groups, libraries, expressive associations, universities and so on.").

[112] Statute of Northampton, 2 Edw. 3 c. 3 (1328).

[113] FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, 60-61 (Newbern 1792).

[114] An Act forbidding and punishing Affrays, 1786 Va. Laws 33, ch. 21.

16

Electronic copy available at: https://ssrn.com/abstract=4521030

Weapons have long been prohibited from areas of public commerce or celebration, like saloons, stores, ballrooms, festivals and other places of public congregation. In 1870, for instance, Texas prohibited carrying weapons in "a ballroom, social party or other social gathering composed of ladies and gentlemen."[115] The Oklahoma territory had a similar prohibition in the late 1800s, extending to anywhere "persons are assembled . . .    for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly."[116]  Missouri[117] and Arizona had a similar regulation.[118]

Since the early republic, government has regulated arms to maintain free and fair elections—both by way of locational restrictions on arms as well as temporal restrictions.  Delaware's 1776 constitution specifically prohibited militias from drilling during an election, or allowing any troops from coming within a mile of a polling place either twenty-four hours before or after an election.[119] Maryland delegates passed a similar regulation in 1776, prohibiting any person from "com[ing] armed" to the election and prohibiting militia musters on election day, so as not "to impede the freely and convenient carrying on such elections."[120]  New York's law of 1787 specified that "all elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment" and even provided for "treble damages to the party grieved."[121] These were not just founding-era measures; the 19th century saw numerous express protection of political gatherings, elections, and similar political processes from weaponry.[122] The  justification for these regulations was ensure that no one

---

[115] An Act Regulating The Right To Keep And Bear Arms, 1870 Tex. Gen. Laws 63, Chap. 46, § 1.

[116] Leander G. Pitman, THE STATUTES OF OKLAHOMA, 1890, at 495-96 (1891).

[117] Carrying Deadly Weapons, etc., Ch. 24, Art. 2, § 1274, THE REVISED STATUTES OF THE STATE OF MISSOURI, Vol. 1 (1879) (prohibiting weapons "in any school room or place where people are assembled for educational, literary or social purposes").

[118] Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16–17 (prohibiting weapons from a "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").

[119] DEL. CONST. art 28 (1776).

[120] PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND, HELD AT THE CITY OF ANNAPOLIS IN 1774, 1775 & 1776, at 185 (1836).

[121] Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345.

[122] See, e.g., Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336 ("[I]t shall not be lawful for any person in Kent, Queen Anne's or Montgomery counties to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy, or bludgeon   "); Ga. Code § 4528 (1873) ("No person in this State is permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to ... any election ground    "); 1895 Tex. Crim. Stat. 93 (carrying arms about elections) ("If any person ... shall carry any gun, pistol, bowieknife or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished    "); Terr. Okla. Stat. ch. 25, art. 47, § 7 (1890) (prohibiting firearms at any "political convention"); Act of Dec. 1, 1869, ch. 22, sec. 2, 1869 Tenn. Pub. Acts 108 (prohibiting dangerous weapons at elections); Act of Mar. 16, 1870, sec. 73, 1870 La. Acts 159 (prohibiting any "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration").

Electronic copy available at: https://ssrn.com/abstract=4521030

is deterred by fear from exercising the franchise in the first instance and that ballots are cast as matters of conscience and not from duress or intimidation.[123]

Educational institutions have similarly prevented arms from their environs, in order to protect the essential function of schools as free speech institutions. Harvard University banned guns in the seventeenth century,[124] as did the University of Virginia in its 1825 student rule book.[125] Mississippi imposed criminal penalties on professors of universities who permitted their students to carry concealed weapons.[126] Missouri, Texas, and the Oklahoma territory all prohibited firearms in not only schools but more broadly in places where people assemble for "educational, literary, or social purposes."[127]

In sum, whether through rules like affray, regulations on dangerous, unusual or offensive weapons, or prohibitions on firearms in sensitive places, the tradition of American weapon regulation is geared towards the preservation of the peace and the maintenance of political and public life free from fear.

## IV.   Terror and Technology

While the impulse to regulate weapons to preserve the public peace is old; the technological capacity to terrify the public with weapons is new. In 1791, when the Second Amendment was ratified, a trained soldier could fire approximately four rounds per minute.[128]   With a bump stock, an AR-15 can fire

---

[123] There's also a rich history of regulation of arms in places of public amusement and places of public education.

[124] Allen Rostron, *The Second Amendment on Campus*, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016) ("[N]oe students shall be suffered to have [a g]un in his or theire chambers or studies, or keeping for theire use anywhere else in the town.") (quoting a copy of the LAWS OF HARVARD COLLEGE 1655, at 10 (1876)).

[125] *Id.* at 257 ("No student shall, within the precincts of the University, introduce, keep, or use any spirituous or vinous liquors, keep or use weapons or arms of any kind or gun-powder.") (quoting ENACTMENTS BY THE RECTOR & VISITORS OF THE UNIVERSITY OF VIRGINIA FOR CONSTITUTING, GOVERNING AND CONDUCTING THAT INSTITUTION 9 (1825)).

[126] 1878 Miss. Laws 176.

[127] Act of Mar. 26, 1879, 1879 Mo. Laws 224 (carrying deadly weapons, etc.); Terr. Okla. Stat. ch 25, art. 47, § 7 (1890) (public buildings and gatherings) (prohibiting "any person, except a peace officer" from bearing any offensive or defensive weapon in "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes"); Act of Aug. 12, 1870, ch. 46, 1870 Tex. Gen. Laws 68. Missouri's law is noteworthy for two additional reasons: First a prosecutor in St. Aubert Missiour pledged to prosecute its prohibition "without regard to race, color or previous condition of servitude." *Legal Notes—Carrying Concealed Weapons*, Callaway Weekly Gazette (Fulton, Missouri Aug. 9, 1878). Second, the Missouri Supreme Court in *State v. Reando* upheld this "sensitive places" restriction against a state right to keep and bear arms challenge. *See On Carrying Concealed Weapons*, THE STATE JOURNAL (Jefferson City, Mo.), April, 12 1878.

[128] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. STATE L. REV. 1, 47 n.249 (2012) (citing James E. Hicks, *United States Military Shoulder Arms, 1795-1935*, 1 J. AM. MIL. HIST. FOUND. 23, 30 (1937)); David T. Hardy, *The Janus-Faced Second Amendment: Looking Backward to the Renaissance, Forward to the Enlightenment*, 18 GEO. J.L. & PUB. POL'Y 421, 449 (2020) (estimating "about three rounds per minute").

Electronic copy available at: https://ssrn.com/abstract=4521030

four hundred rounds a minute.[129]  The effective range of a flintlock circa 1791 was around 175 yards, and it was accurate to only about one hundred.[130]  A modern AR-15 has an effective range of 500 yards; and, if you don't care what you hit, a maximum range of 2800 yards.[131]  Early firearms "lost most of their kinetic energy" at around 50 yards;[132] at 100 yards, a modern assault rifle can still penetrate steel.[133]  It takes as little as four pounds of force to pull the trigger of a modern firearm half an inch,[134] about the same force it takes to open a bottle of beer.[135]  Half an inch between an ordinary day and a terrifying one.

At the same time the technology of weaponry has become exponentially more destructive, there's been an accelerating drive to relax, or even eliminate, the legal and social norms restraining public weaponry.  Over half of the states have now gone to a system of permitless carry, dispensing with any licensing or training whatsoever.  Those states that have gone to permitless carry frequently display a cavalier attitude towards conflict avoidance, de-escalation, or even the basic legal rules that govern lethal force in self-defense,[136] presumably on an assumption that private sellers, criminal law, and gun owner self-interest will provide adequate guidance.

Even when a public carry regime imposes rudimentary knowledge of safe-defense law, relying on ex-post criminal law to manage the problem is a vain hope.

---

[129] Ed Leefeldt, *Stephen Paddock Used a "Bump Stock" to Make His Guns Even Deadlier*, CBS NEWS (Oct. 4, 2017, 5:55 PM), https://www.cbsnews.com/news/bump-fire-stock-ar-15-stephen-paddock-guns-deadlier/.

[130] *Small Arms Across Three Wars*, AMERICAN BATTLEFIELD TRUST, https://www.battlefields.org/learn/articles/small-arms-across-three-wars (last visited July 20, 2023).

[131] U.S. ARMY SPECIAL FORCES HANDBOOK 116 (2008).

[132] Peter Krenn et al., *Material Culture and Military History: Test-Firing Early Modern Small Arms*, 42 MATERIAL HISTORY REVIEW 101 (1995); *see also id.* at 102 ("The data reveal that early guns were highly inaccurate and subject to very high drag on the bullets. As well, that the penetrating power of the bullets dropped off dramatically within a relatively short range.").

[133] *Id.* One hundred yards may be an underestimate: a brochure introduced during a hearing on the AR-15 before Congress boasted that "[a]t combat ranges (0-500 yards) the [AR-15] rifle will penetrate both helmet and liner; 13 to 14 1-inch pine boards; 10-gauge steel; or modern body armor." *See also Hearings & Report of the House Subcommittee of Special Investigations of the Committee*, 87th Cong. 2d sess. 1, 3604 (1962) (excerpt from Cooper-MacDonald, Inc. brochure).

[134] David E. Petzal, *Everything You Need To Know About Trigger Pull For Hunting Rifles*, FIELD & STREAM (Jan. 4, 2022 9:51 AM), https://www.fieldandstream.com/stage-craft-understanding-trigger-pull/ ("For a dangerous-game rifle, or a tactical rifle that will actually be shot tactically, 4 pounds."); NATIONAL INSTITUTE OF JUSTICE, BASELINE SPECIFICATIONS FOR LAW ENFORCEMENT SERVICE PISTOLS WITH SECURITY TECHNOLOGY 10 (2016) ("The trigger shall have a reset distance not to exceed 0.50 inches."); *Trigger Mechanics and Trigger Terminology*, GUN TWEAKS, https://www.guntweaks.com/trigger-mechanics.html (last visited July 20, 2023) ("Most triggers travel between 1/4" and 1/2" . . .).

[135] *Cf.* ALI JAMNIA, PRODUCT DESIGN & DEVELOPMENT FOR ENGINEERS 374 (2018) (stating it takes approximately 3 lbs. to twist open a bottle of soda).

[136] Kelly Drane, *The Truth About Permitless Carry*, GIFFORDS LAW CENTER (Feb. 8, 2023), https://giffords.org/lawcenter/report/the-truth-about-permitless-carry/ ("The 25 states with permitless carry laws require zero hours of training—or even require that a person has ever held a gun—to carry a loaded firearm in public."); Andrew Ozaki, *Nebraska Gun Rights Advocate Stresses Training After Permitless Concealed Carry Bill Passes*, KETV (Apr. 21, 2023 8:53 AM), https://www.ketv.com/article/nebraska-gun-rights-advocate-stresses-training-permitless-concealed-carry/43661443# (Nebraska's Firearm Owner's Association offering optional training on "basic gun handling . . . use of force and de-escalation").

19

Electronic copy available at: https://ssrn.com/abstract=4521030

Criminal prosecution—after the firing is over—is not designed to generate an optimal rule system for arms bearing.[137] There's just too much difficulty after the fact in determining who reasonably apprehended imminent bodily harm in circumstances where the difference between a mistake and a murder is half an inch. And the insufficiency of criminal law to manage the upstream effects of public weaponry doesn't factor in the numerous jurisdictions that have enacted increasingly muscular "stand your ground" laws.[138]

## V.  Measuring Terror—Estimating the "Chilling Effects" of Public Carry

The combination of technological innovation, relaxed legal and social regulation of public carry, and America's comparatively high rates of gun violence has a testable impact on social behavior. Two of us conducted a series of survey experiments to measure this effect at the level of public attitudes.[139]

We hypothesized that the presence of armed individuals in public spaces such as parks, fairs, or farmers markets may dampen people's willingness to visit such places—what we call "chilling effects."[140] Furthermore, we expect similar chilling effects to emerge for certain forms of political engagement such as participation in political protests, and even voting, if citizens are made aware that gun carry is allowed in such locations. Therefore, the presence of armed individuals in public spaces can have consequences both for economic interactions and for the citizens' ability to express their right to freedom of speech. These experiments do not measure actual behavior, but by inference, we expect a concordance between attitudes and behavior.

We set out to test the chilling effects hypothesis by fielding a series of six survey experiments as part of a nationally representative online survey conducted

---

[137] Joseph Blocher et al., *Pointing Guns*, 99 TEX. L. REV. 1173, 1188 (2021) ("[D]uring a confrontation, both defensive pointing of a firearm and threatening pointing of a firearm generate reasonable fear in those at whom the gun is pointed.").

[138] Jacob D. Charles, *Securing Gun Rights by Statute: The Right to Keep and Bear Arms Outside the Constitution*, 120 MICH. L. REV. 581, 642 n. 204 (2022) ("[S]ome of the new stand-your-ground laws, like Florida's, permit a person to use deadly force not just in response to an attack that threatens death or great bodily harm, but also to prevent property crimes."); Blocher et al., *supra* note 137, at 1186 ("Florida law . . . contains provisions that (1) create a presumption of the actor's reasonable belief in imminent harm if a person is unlawfully entering the actor's dwelling or vehicle, and (2) confusingly provide 'immunity' from prosecution to persons whom the police conclude after investigation acted in self-defense."). *See also* Mary Anne Franks, *Real Men Advance, Real Women Retreat: Stand Your Ground, Battered Women's Syndrome, and Violence As Male Privilege*, 68 U. MIAMI L. REV. 1099, 1106 (2014) (discussing these laws as representing "a significant departure from the long-held belief that the use of deadly force should not be used to protect mere property"). For a thorough analysis, see Eric Ruben, *Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023).

[139] Data files and related documentation are available at: Filindra, Alexandra, 2023, "TECHNOLOGY, TRADITION, AND "THE TERROR OF THE PEOPLE"-REPLICATION DATA", https://doi.org/10.7910/DVN/1CNBIS, Harvard Dataverse, V1, UNF:6:KyBeNDNaFX0kMGird/E+BA== [fileUNF]

[140] *See* New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964) (private libel litigation by public figures requires a heightened standard to prevent First Amendment chilling effects of common law liability); *see also* Snyder v. Phelps, 562 U.S. 443, 458 (2011) (verdict in civil suit for "outrageous" intentional infliction of emotional distress threatened the "breathing space" needed for First Amendment speech).

20

Electronic copy available at: https://ssrn.com/abstract=4521030

by the survey company YouGov. The survey was fielded in March 2023 and included 2,858 Americans including oversamples for African Americans and Hispanics to allow for subgroup analyses. The survey had an average length of 10 minutes. The data were weighted to match the demographics of the national population. The margin of error for the survey is ±2.7%.[141]

Respondents were randomly assigned to one of two conditions: one condition did not mention firearms, while the other condition included the prompt: "if guns are allowed in public spaces" (or similar tailored to the question). Therefore, the experimental condition makes firearms a salient concern, the way one would expect it to be when an individual observes openly armed people in public places. For each experiment, the dependent variable was coded as a dichotomous variable (0 or 1) and so was the treatment variable. We also coded dichotomous variables for gender, race (White or minority), and gun household. Our analyses present tests of proportions. The figures show percentages.[142]

## A. Study 1: Recommending to a friend with children to visit a local park

In this survey experiment, respondents were randomly assigned to a version of the question that reads: "How likely would you be to recommend to a friend who has children to spend time with them in a public park in your town?" or one that had the same phrasing but at the end added, "if guns are allowed in public spaces." Respondents could choose among five response options ranging from: "very likely, somewhat likely, neither, somewhat unlikely, very unlikely." To show proportions, we dichotomized this variable so that "very/somewhat likely" was coded as "1" and the other three options as "0". We opted to ask about

---

[141] This is YouGov's description of its method:

YouGov interviewed 2,073 national respondents, who were then matched down to a sample of 2000 to produce the National dataset. The respondents were matched to a sampling frame on gender, age, race, and education. This matched dataset was then combined with two oversamples of Black (431) and Hispanic (358) respondents to produce a national general population sample. In addition, three other datasets consisting of exclusively Black, Hispanic, or White respondents were created from all respondents. These datasets consisted of 701 Black respondents, 643 Hispanic respondents, and 1355 White respondents. The frames were constructed by using different subsets of a politically representative "modeled frame" of US adults, based upon the American Community Survey (ACS) public use microdata file, public voter file records, the 2020 Current Population Survey (CPS) Voting and Registration supplements, the 2020 National Election Pool (NEP) exit poll, and the 2020 CES surveys, including demographics and 2020 presidential vote. These datasets were weighted to the sampling frame using propensity scores. The matched cases and the frame were combined, and a logistic regression was estimated for inclusion in the frame. The propensity score function included age, gender, race/ethnicity (national only), years of education, region, and 2020 Presidential vote choice. The propensity scores were grouped into deciles of the estimated propensity score in the frame and post-stratified according to these deciles. The weights were then post-stratified on 2020 Presidential vote choice, and a four-way stratification of gender, age (4-categories), race (4-categories) (national only), and education (4-categories), to produce the 4 final weights.

[142] The dataset in Stata, along with the dofile (code), and the codebook will be publicly available at: https://dataverse.harvard.edu/.

Electronic copy available at: https://ssrn.com/abstract=4521030

recommending a local park to a friend rather than asking a direct usage question for two reasons. First, not everyone visits parks, therefore people's response to a direct usage question may reflect a variety of personal factors unrelated to the presence of firearms. Second, parks are often used by families with children but not every survey respondent is a parent of young children. Asking about a friend with kids allows us to include every respondent in the experiment.

Figure 1A shows the proportions of respondents who said "very/somewhat likely" to recommend a park to a friend with children in each of the two conditions. As the figure shows, 61% of people in the control condition said they would be "very/somewhat likely" to recommend a local park, while only 34% did so in the "guns" condition. This represents a decline or "chilling effect" of 27 percentage points and it is statistically significant (p<0.001). Figure 1B shows the effect of the gun treatment by status as a member of a gun-owning household. A total of 35% of respondents in our survey indicated that they live in a gun owning household which is not far from national estimates. According to the Pew Center, 42% of Americans live in gun owning households.[143] Among those who live in non-gun-owning households, 59% said they would be "very/somewhat likely" to recommend a local park to a friend with children, but this drops to 26% when the question includes the gun prompt. This is a chilling effect of 33 percentage points (p<0.001). Among those who live in gun-owning households, we also see a chilling effect, but it is more modest. Specifically, the decline is 13 percentage points (p<0.001).



---

[143] Katherine Schaffer, *Key Facts About Americans and Guns*, PEW RESEARCH CENTER (Sept. 13, 2021) https://www.pewresearch.org/short-reads/2021/09/13/key-facts-about-americans-and-guns/.

Electronic copy available at: https://ssrn.com/abstract=4521030

Figure 1C shows the difference in response patterns by gender. Among men, there is a chilling effect of 20 percentage points and among women it is even larger, at 32 percentage points (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 1D shows, among Whites, the decline from the control to the treatment condition is 27 percentage points, and among people of color it is 25 percentage points. For both groups, the chilling effect is statistically significant (p<0.001).

The results from this survey experiment suggest that when people are made aware that firearms may be carried into public spaces like a public park, they are significantly less willing to recommend public parks to others. Because such a recommendation flows from respondents' personal preferences, from these results we can also extrapolate that they themselves would also be less likely to visit public parks if firearm carry is allowed in such domains.

## B. Study 2. Safety of open-air and farmers markets

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "in your view, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets, in your town," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "very safe, somewhat safe, neither safe nor unsafe, somewhat unsafe, very unsafe." The analysis followed the same steps outlined for Study 1 above.

Figure 2A shows the proportions of respondents who said "very/somewhat safe" to shop at an open-air market or farmers market in each of the two conditions. As the figure shows, 79% of people in the control condition said it is "very/somewhat safe" to shop at an open-air market, while only 52% did so in the experimental condition. This represents a decline or "chilling effect" of 27 percentage points and it is statistically significant (p<0.001). Figure 2B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 76% said it is "very/somewhat safe" to shop at a farmers' market, but this drops to 43% when the question includes the gun prompt. This is a chilling effect of 33 percentage points (p<0.001). Among those who live in gun-owning households, we also see a chilling effect, but it is more modest. Specifically, the decline is 14 percentage points (p<0.001).

Electronic copy available at: https://ssrn.com/abstract=4521030



Figure 2C shows the difference in response patterns by gender. Among men, there is a chilling effect of 24 percentage points and among women it is even larger at 28 percentage points (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 2D shows, among Whites, the decline from the control to the treatment condition is 25 percentage points, and among people of color it is 29 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

From these results we can extrapolate that if many Americans across groups believe it to be unsafe to shop at an open-air or farmers' market when guns are allowed in such places, a substantial number of people will be reluctant to shop there if people are allowed to carry firearms at such places.

## C. Study 3. Encourage a friend to attend a political protest

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend is thinking of attending a political protest in your town about an issue that is very important to them and wants your opinion. Would you encourage or discourage your friend from attending," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from attending a protest. The analysis followed the same steps outlined for Study 1 above.

Here, it is important to note that even though protesting government action is a fundamental right of American citizenship, not all citizens are comfortable with this form of political participation. This means that at baseline

24

Electronic copy available at: https://ssrn.com/abstract=4521030

the proportion of people who would encourage a friend to attend a protest is far lower than the proportion of people who would recommend a friend to visit a local park. Therefore, we start out with a much smaller proportion of positive responses (i.e., encourage) and therefore it is more difficult to detect chilling effects. As a result, this question is a hard test for establishing chilling effects.

Figure 3A shows the proportions of respondents who said "strongly/somewhat encourage" the friend to attend a protest in each of the two conditions. As the figure shows, 37% of people in the control condition said they would "strongly/somewhat encourage" a friend to attend a protest, while only 24% did so in the experimental condition. This represents a decline or "chilling effect" of 13 percentage points and it is statistically significant (p<0.001). Figure 3B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 38% said they would "strongly/somewhat encourage" a friend to attend a protest, but this drops to 20% when the question includes the gun prompt. This is a chilling effect of 18 percentage points (p<0.001). Among those who live in gun-owning households, we do not see a statistically significant chilling effect as the difference between the two conditions is only -3 percentage points.



Figure 3C shows the difference in response patterns by gender. Among men, there is a chilling effect of 10 percentage points and among women it is even larger at 15 percentage points. Within each group, the chilling effect is statistically significant (p<0.01). The chilling effects persist for both White Americans and people of color. As Figure 3D shows, among Whites, the decline from the control to the treatment condition is 10 percentage points, and among people of color it

Electronic copy available at: https://ssrn.com/abstract=4521030

is 16 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

As we noted in Study 1, we opted to ask the question about a friend because not everyone is interested to attend political protests or is politically active in any way. If we restricted our sample to only those who are politically engaged, we would not capture the general population. Furthermore, research suggests that when people are asked to advise or recommend an action to third parties, they typically draw from what they would do in a similar situation. As a result, it is safe to extrapolate from these results that Americans will be significantly less likely to exercise their first amendment rights to protest government if people are allowed to bring firearms to such events. This is consistent with the results of another study conducted in 2021.[144] The results show that except for members of gun households, the presence of firearms at protests is likely to produce sizeable chilling effects.

### D. Study 4. Encourage a friend to attend a political protest and carry a sign

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend has decided to attend a political protest in your town about an issue that is very important to them and wants your opinion about whether they should bring a sign or flag. Would you encourage or discourage your friend from bringing a sign or flag," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from carrying a sign or flag to a protest. The analysis followed the same steps outlined for Study 1 above.

The purpose of this experiment was to make it even more difficult to find chilling effects. Carrying a sign at a protest can make the person a target since the sign makes clear their positions. We already know that many Americans are ambivalent about participation in protests, but we expect that the added risk of carrying a sign should suppress willingness to encourage the friend in the control condition. Given that relatively few people are likely to say they would encourage their friend to protest with a sign, because of the added risk, this is a hard case for finding chilling effects.

Figure 4A shows the proportions of respondents who said "strongly/somewhat encourage" the friend to carry a sign to a protest in each of the two conditions. As the figure shows, 31% of people in the control condition said they would "strongly/somewhat encourage" a friend to attend a protest with a sign, while only 22% did so in the experimental condition. This represents a decline or "chilling effect" of 9 percentage points and it is statistically significant (p<0.001). Figure 4B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 31% said they would "strongly/somewhat encourage" a friend to attend a protest, but this drops

---

[144] Alexandra Filindra, *Americans Do Not Want Guns at Protests, This Research Shows*, WASH. POST (Nov. 21, 2021) https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/.

Electronic copy available at: https://ssrn.com/abstract=4521030

to 19% when the question includes the gun prompt. This is a chilling effect of 12 percentage points (p<0.001). As expected, given the results of Study 3, among those who live in gun-owning households, we do not see a statistically significant chilling effect as the difference between the two conditions is only -2 percentage points.



Figure 4C shows the difference in response patterns by gender. Among men, there is a chilling effect of 4 percentage points which is not statistically significant, and among women it is larger at 13 percentage points and statistically significant. The chilling effects persist for both White Americans and people of color. As Figure 4D shows, among Whites, the decline from the control to the treatment condition is 8 percentage points, and among people of color it is 10 percentage points. Within each group, the chilling effect is statistically significant (p<0.01).

Our results show that even in this "hard test" situation where the scenario involves high risk and therefore most people are unlikely to encourage a friend to carry a sign at a protest, the likely presence of firearms at protests produces chilling effects overall and for most subgroups except for men and members of gun-owning households.

### E.  Study 5: Safe to vote if guns are allowed in election centers

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "how safe do you think it will be for you to vote in person in the next presidential election," while the other half read the same question but with the phrase "if guns are allowed in election centers," added to the end of the question. The response options were "very safe, somewhat safe, neither

Electronic copy available at: https://ssrn.com/abstract=4521030

safe nor unsafe, somewhat unsafe, very unsafe" for the respondent to cast a vote. The analysis followed the same steps outlined for Study 1 above.

The purpose of this experiment was to move beyond the low participation context of protests to the much more prevalent exercise of the right to vote. The right to vote is foundational to democratic politics and any practice that discourages people from exercising it is normatively concerning. We opted to frame the question around the next presidential election both because it is the next major election on the calendar and because participation in presidential elections is significantly higher than in midterm elections or primaries.

Figure 5A shows the proportions of respondents who said "very/somewhat safe" the friend to vote in each of the two conditions. As the figure shows, 79% of people in the control condition said they would feel "very/somewhat safe" to vote in person in the next presidential election, while only 43% did so in the experimental condition. This represents a decline or "chilling effect" of 36 percentage points and it is statistically significant (p<0.001). Figure 5B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 77% said they would feel "very/somewhat safe" to vote in person, but this drops to 34% when the question includes the gun prompt. This is a chilling effect of 43 percentage points (p<0.001). The chilling effect among members of gun-owning households is also sizeable: when told that guns may be present at election booths, perceptions of safety of voting declines by 22 percentage points among this group (p<0.001).



Figure 5: Dif. in Proportions -- Safe to Vote in Person

Figure 5C shows the difference in response patterns by gender. Among men, there is a chilling effect of 30 percentage points and among women it is larger

Electronic copy available at: https://ssrn.com/abstract=4521030

at 41 percentage points. Within group differences are statistically significant for both groups (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 5D shows, among Whites, the decline from the control to the treatment condition is 36 percentage points, and among people of color it is 35 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

### F. Study 6. Safe to vote using a ballot collection box if armed groups are allowed to patrol near such boxes

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "how safe do you think it will be for you to vote by dropping off your ballot in a ballot collection box in the next presidential election," while the other half read the same question but with the phrase "if people who are armed are allowed to patrol around such collection boxes," added to the end of the question. This question was motivated by an incident that took place in Arizona during the 2022 midterm election.[145] The response options were "very safe, somewhat safe, neither safe nor unsafe, somewhat unsafe, very unsafe" for the respondent to cast a vote in a collection box. The analysis followed the same steps outlined for Study 1 above.

Figure 6A shows the proportions of respondents who said "very/somewhat safe" to use the ballot collection box in each of the two conditions. As the figure shows, 70% of people in the control condition said they would feel "very/somewhat safe" to vote using a ballot collection box in the next presidential election, while only 42% did so in the experimental condition. This represents a decline or "chilling effect" of 28 percentage points and it is statistically significant (p<0.001). Figure 6B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 72% said they would feel "very/somewhat safe" to vote using the ballot collection box, but this drops to 35% when the question includes the gun prompt. This is a chilling effect of 37 percentage points (p<0.001). The chilling effect among members of gun-owning households is smaller but significant at 8 percentage points (p<0.05).

---

[145] Terry Tang, *Judge Orders Armed Group Away From Arizona Ballot Drop Boxes*, AP NEWS (Nov. 1, 2022 10:05 PM), https://apnews.com/article/2022-midterm-elections-arizona-phoenix-5353cfd0774727e6dd03bdbf48c12211. *See also* Arizona All. for Retired Americans v. Clean Elections USA, No. CV-22-01823, 2022 WL 15678694, at *1 (D. Ariz. Oct. 28, 2022), opinion vacated, appeal dismissed, No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023) (noting that in 2022 there were armed and masked "observers" wearing body armor at Mesa, Arizona drop box, but finding no remedy complaint with First Amendment).

29

Electronic copy available at: https://ssrn.com/abstract=4521030



Figure 6C shows the difference in response patterns by gender. Among men, there is a chilling effect of 26 percentage points and among women it is somewhat larger at 29 percentage points. Within group differences are statistically significant for both groups (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 6D shows, among Whites, the decline from the control to the treatment condition is 24 percentage points, and among people of color it is 32 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).[146]

The importance of these experiments is that they document that making the presence of firearms salient to people can change their attitudes about engaging in social and political activities than bring them into contact with large numbers of strangers. Although we do not measure behavior, we can infer that when individuals are directly confronted with the presence of openly armed individuals in public spaces, the firearms will be a salient influence on their behavior as well.[147]

## VI.    Analogs, Empirics, and the "Nuanced Approach"

---

[146] *See generally* Alexandra Filindra, *Americans Do Not Want Guns at Protests, This Research Shows*, WASH. POST (Nov. 21, 2021), https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/.

[147] It is also true that other factors may induce fear and dissuade people from engaging in similar activities. For example, people may not want to visit a local park if they are told that it is frequented by drug addicts or gang members. The goal of these experiments is not to determine the *relative* chilling effects of open gun carry, but to establish that chilling effects should be expected to occur. Future work can isolate the chilling effects of open gun carry relative to other factors that can produce affray.

Electronic copy available at: https://ssrn.com/abstract=4521030

Neither the Second Amendment nor *Bruen* render policymakers incapable of addressing the public fear caused by modern firearms and firearm violence. Nor does *Bruen* render irrelevant the type of experimental evidence we've summarized in part V. As mentioned above, the *Bruen* majority recognizes that a process of examining analogs to modern societal and technical challenges will require a "more nuanced approach" to tradition. That "nuanced approach" implicates changing the level of generality at which historical regulations are examined when compared to modern technology and modern problems.

As one district court judge wrote, "[c]omparisons to historical antecedents that share only broad commonalities may be most compelling in cases involving regulations that were 'unimaginable at the founding' or that involve 'unprecedented societal concerns.'"[148] In these cases, "courts may properly weigh evidence of such historical antecedents against the other available evidence in any given case."[149] To do otherwise would to be strike down regulations simply because "they 'happened [not] to exist in the founding era,'"[150] and contradict *Bruen*'s own injunction that "'the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'"[151]

For example, since the 1990s federal law has taken guns out of the hands of those convicted of domestic violence[152] or those under a domestic violence restraining orders.[153] One will search in vain for any specific Founding-era regulation that resembles this kind of law. Far more likely, one will find laws that ignore, sanction or even *immunize* the physical battery of household members.[154] Nevertheless, there is ample historical tradition of keeping firearms out of the hands of those deemed intemperate or dangerous. At that level of generality, a prohibition such as that in U.S.C. § 922(g)(8) is perfectly compatible with longstanding American traditions.[155] In this context, rather than a clumsy and offensive attempt to suggest that categorical disarmament of Native Americans, African-Americans, or Catholics is akin to disarmament of domestic abusers, a court may reason that the "why" of these historical regulations was to prevent dangerous people from possessing arms and that empirical data—rather than bigotry—can furnish evidence of who, in fact, is dangerous.

In a similar fashion, one can see that the purpose of regulations of affray, dangerous and unusual weapons, and weapons in sensitive places share as their

---

[148] United States v. Padgett, No. 21-cr-00107, 2023 WL 2986935, at *7 (D. Alaska Apr. 18, 2023)

[149] *Id.* (quoting *Bruen*, at ____).

[150] *Id.* (quoting *Bruen*, at ____).

[151] *Id.* (quoting *Bruen*, at ____).

[152] 28 U.S.C. § 922(g)(9).

[153] 28 U.S.C. § 922(g)(8).

[154] State v. Black, 60 N.C. 262, 267 (1864) ("[T]he law permits [the husband] to use towards his wife such a degree of force as is necessary to control an unruly temper and make her behave herself; and unless some permanent injury be inflicted, or there be an excess of violence"; *see generally* Reva B. Siegel, *"The Rule of Love": Wife Beating As Prerogative and Privacy*, 105 YALE L.J. 2117, 2122–25 (1996) (documenting how it wasn't until the 1870s in America that idea of a husband's right to "chastisement" began to formally fade); Camille Carey, *Domestic Violence Torts: Righting A Civil Wrong*, 62 U. KAN. L. REV. 695, 696 (2014) ("The common law doctrines of chastisement, coverture, and spousal immunity historically shielded abusers from tort liability for domestic violence").

[155] *But see* United States v. Rahimi, 61 F.4th 443, 461 (5th Cir. 2023) (striking down § 922(g)(8) on Second Amendment grounds), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023)

31

Electronic copy available at: https://ssrn.com/abstract=4521030

"why" the prevention of public fear and maintenance of public peace. Having identified a purpose for these regulations, empirical data can demonstrate—as we have attempted to do in part V—how contemporary problems, attitudes, or technology create the type of hazard that these historical regulations was designed to prevent.

In addition, the "nuanced approach" can help account for the vastly different technological environment we live in today compared to the 1700s. "Sensitive places" have long included places where officers of the government work or are present, or where the mechanisms of democracy, like elections and campaigning, take place, as well as other places of public commerce, amusement and congregation.

But regulations to protect these "sensitive places"—as, for example the location where a current or former President or other public official is speaking— must be attuned to the vastly more powerful nature of modern weapons. Designating the 100 yards surrounding an official address a "sensitive place," free from firearms, could fail its primary function if a modern rifle can fire 500 yards. Consequently, the "nuanced approach" could permit a regulatory buffer to protect these channels of democracy, even if the buffer's precise contours are calibrated by the empirical reality of modern armament, rather than by technological relics.[156]

## VII.   The "Nuanced Approach" and Levels of Generality

Of course, the foregoing discussion presumes that preventing fear and protection of public life and peace is the right level of generality to assess a historical analog. That proposition is not self-evident. *Bruen* recognizes that historical regulations must be construed at a higher level of generality given "dramatic" changes in modern technology and "unprecedented" problems with gun violence,[157] but it offers little guidance about the level of generality to select. It simply says that analogs are neither a regulatory "blank check" nor a "straightjacket,"[158] and that courts can look to the "why" and "how" of historical regulation.[159] But that's not answering the level of generality question so much as restating it.

The "why" of historical regulation could be understood at numerous levels of generality. A historical law to prevent persons from carrying firearms for hunting except during certain seasons, and not upon enclosed grounds, could be understood as designed to deter poaching; to protect private property; to prevent environmental damage; or to disrupt training for armed insurrection.[160]

---

[156] We recognize that there's spatial limits to this kind of "nuanced approach." As the Court mentioned, the entire isle of Manhattan cannot be designated "sensitive." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2134 (2022).

[157] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2134 (2022).

[158] *Id.* at ____.

[159] *Id.* at 2133.

[160] *Compare* VT. CONST. of 1777, ch. I, § 15. ("That the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands (not enclosed;) and, in like manner, to fish in all beatable and other waters, not private property, under proper regulations, to be hereafter made and provided by the General Assembly.") *with* 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *412 (speculating that purpose of British game laws was to prevent "popular insurrections and resistance to the government").

Electronic copy available at: https://ssrn.com/abstract=4521030

The "how" of a historical regulation could equally be understood at multiple levels of generality. A regulation on "Bowie knives" could be understood as regulation of one type of fixed-edge knife popular in the 19th century; a regulation of any knife of a certain length; a regulation on concealable edged weapons; or a regulation on any kind of concealable weapon.[161]

There's nothing internal to *Bruen* or its traditionalism that specifies, much less justifies, choosing a particular level of generality, under any approach, nuanced or not. Instead, one must justify a level of generality by reference to some other object or goal. We suggest a few below. None of these approaches are exclusionary; and some may reinforce the other.

## A. Equilibrium Adjustment

One way to choose a level of generality is by reference to what's sometimes called "equilibrium adjustment."[162] In these circumstances, courts must respond to changing social context or technology with "compensating adjustments"[163] to restore the distribution of rights and regulation to a stipulated status-quo-ante.[164] When done according to originalist methods, this exercise is simply an effort to recover the balance that was struck by American traditions at some point in the past.[165]

So, for example, as weapons become more lethal at longer ranges, to the extent they still remain covered as a Second Amendment "arm," the concept of a "sensitive place" must correspondingly become more supple. Otherwise, the traditional balance between the right to keep and bear arms and the need to protect polling places or public officials, for example, becomes unbalanced.

Similarly, to the extent that carrying firearms becomes more socially acceptable and constitutionally covered, modern analogs to sureties, training, virtue and other guarantees that the arms-bearer will keep the peace and not terrorize the people must be understood at a higher level of generality.[166]

---

[161] *Cf.* Joseph Blocher, *Bans*, 129 YALE L.J. 308, 312 (2019) ("The question of how to describe a law—whether as a ban, a regulation, or merely an incidental burden—surfaces throughout constitutional law. And yet the Constitution does not always identify the baseline or denominator against which that impact should be measured.").

[162] *See generally* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 HARV. L. REV. 476 (2011)

[163] *See generally* Ernest A. Young, *Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments*, 46 WM. & MARY L. REV. 1733 (2005).

[164] *See* Darrell A.H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 246-255 (2021) (discussing possibilities for describing the ex-ante position); *see also* Joseph Blocher & Eric Ruben, *Originalism By Analogy*, 133 YALE L. J. __(forthcoming 2023) (discussing "symmetrical levels of generality").

[165] *See* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2131 (2022) ("It is [the] balance—struck by the traditions of the American people—that demands our unqualified deference.").

[166] *See* Miller, *Second Amendment Equilibria*, supra note 164, at 259-60 ("[L]icenses that require a gun owner to demonstrate she has training, or that require periodic license review and renewal, or that require some indicia of virtue or judgment, are attempts to restore the prior set of conditions that permitted arms bearing only among those people unlikely to breach the peace or inflict unjustified violence").

Electronic copy available at: https://ssrn.com/abstract=4521030

Here again, once the purpose of these historical regulations is identified, modern empirical data can help confirm that contemporary regulations are structured to accomplish that traditional purpose.

## B. Institutional Capacity and Deference

Another way to address the level of generality issue is to recognize, as Judge Frank Easterbrook has, that to select a level of generality is to exercise power, one that may be better reposed in an another actor.[167] In such a situation, courts may choose levels of generality that are less judge-empowering and more deferential to the political branches. This selection would simply instantiate the proposition from Justice Scalia that the Court should select a level of generality for rights at the most specific level possible,[168] leaving sufficient room for democratically accountable political actors with access to empirical data to operate.

## C. Constitutional Conflict

Another way to select a level of generality is to manage conflicts between constitutional interests. The entire discussion of "sensitive places," recognizes that schools, elections, churches, and public parks are institutions providing public goods enabled by other kinds of constitutional rights, both state and federal.[169]

A "nuanced approach" to analogs after *Bruen* recognizes that the modern sports stadium may not strictly be a "fair," but that it serves a similar type of social and public purpose that can be empirically demonstrated. If the function of regulations on guns in "fairs and markets" is to preserve a space for social and expressive life and to enable that aspect of public life to proceed without terror, then it is important to establish empirically that unregulated public firearms are having a deleterious effect on public association and assembly in these spaces.

The challenge of adjudicating these kinds of rights trade-offs is what's often referred to as the "incommensurability" problem. By what unit do you measure one group's interest in free speech versus another group's interest in armed self-defense? As Justice Scalia once noted, judging incommensurate interests "is more like judging whether a particular line is longer than a particular rock is heavy."[170]

In this case, empirical research can measure the increase or reduction of interests on both sides of this equation. For example, data could establish that gun owners, who presumably possess arms for self-defense, may *also* experience "chill";

---

[167] Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 372 (1992) ("Unless it is possible to find an answer that adequately differentiates judicial from political action, the judge should allow political and private actors to proceed on their way      ").
[168] Michael H. v. Gerald D., 491 U.S. 110, 127 n.6 (1989) (Scalia, J., dissenting).
[169] For a full discussion, *see* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 466 (2019) ("[P]laces are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms.").
[170] Bendix Autolite Corp. v. Midwesco Enterprises, Inc., 486 U.S. 888, 897 (1988).

Electronic copy available at: https://ssrn.com/abstract=4521030

that data may help gauge the degree to which the exercise of one right inhibits the exercise of another. The object would be to provide a common unit with which to determine an optimal level of protection. Or, at the very least, ensure that entire costs or benefits of public arms bearing is accounted for and transparent.

## D. Reason-Giving

Finally, the role morality of judges exercising judicial review may guide the selection of a level of generality. The Hamiltonian chestnut is that the judicial branch only has judgment.[171] That's true, and in a society of over 330 million people, Supreme Court decisions by five individuals that govern the lives of all those people must be intelligible. Americans may understand that guns aren't permitted on commercial airliners because of the risk of injury; they may trust that this fits into a long tradition of restricting dangerous weapons from congested areas, like fairs and markets. They are perhaps less likely to accept that guns can be banned from planes because jet planes are the twenty-first century equivalent to a horse and carriage.[172]

Levels of generality that generate absurd or abstruse reasoning, or that sound untethered from any kind of lived experience of an average citizen, may degrade the already wavering confidence the American people have in the Supreme Court as a reason-giving institution of authority.[173]

## VIII.    Conclusion

There's no reason to believe that *Bruen* has consigned the Second Amendment to an empirically unmoored, untestable, fact-free future. Nor should we despair that the Second Amendment acts as an insuperable barrier to creative policy prescription designed to stanch America's exceptional gun violence problem.

We've argued here how historical regulations, understood at an appropriate level of generality, can provide space for the kind of innovative, testable empirical projects necessary to inform intelligible gun policies—policies that are popular, effective, and that can fit within the longstanding tradition of accommodating both gun regulation and gun rights in the United States.

---

[171] THE FEDERALIST NO. 78 (Alexander Hamilton).

[172] *Cf.* Frederick Schauer, *Deliberating About Deliberation*, 90 MICH. L. REV. 1187, 1199 (1992) ("Judges sometimes say 'it won't write,' meaning that there are some reasons that will not stand the test of public explanation.").

[173] Domenico Montanaro, *There's a Toxic Brew of Mistrust Toward U.S. Institutions. It's Got Real Consequences*, NPR MORNING EDITION (May 3, 2023 5:01 AM) (reporting that 62% of survey participants had "not very much or no confidence in the Supreme Court").

Electronic copy available at: https://ssrn.com/abstract=4521030