**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **KIMBERLY Y. LAFAVE, et al.**      ) | |
|                                ) | |

**KIMBERLY Y. LAFAVE, et al.** )

    *Plaintiffs* )

**v.** )        **Case No. 1:23-cv-01605-WBP**

**THE COUNTY OF FAIRFAX, VIRGINIA,**
**and KEVIN DAVIS, in his Official Capacity**
**as Chief of Police** )

    *Defendants* )

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................. 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS** ................................... 2

**ARGUMENT** ..................................................................................................... 12

   I.   Legal Standard ............................................................................................ 12

   II.  The Ordinance Is Constitutional Under the Second Amendment..................... 13

        A.   *Bruen*'s Methodology.......................................................................... 14

           i.   Text, history, and tradition framework ................................. 14

           ii.   Time period........................................................................... 15

           iii. Understanding the historical record ..................................... 18

        B.   The Parks Restriction is Constitutional Under *Bruen* ............................. 19

           i.   Plaintiffs have not established that the Second Amendment's text protects carrying guns in County parks ............................................................................... 19

           ii.   The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places ............................................. 20

                 1.   There is a robust historical tradition of prohibiting firearms in parks ...... 21

                 2.   Founding-era regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction ................................................... 26

           iii. Decisions upholding laws similar to the Parks Restriction are correct................. 31

        C.   The Events Restriction is Constitutional under *Bruen* ............................. 32

        III. The Ordinance Does Not Violate Due Process................................................. 34

   **CONCLUSION** .................................................................................. 38

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) ................................................................. 13, 24

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................... 12

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024) ..... *passim*

*Antonyuk v. Hochul*,
   639 F. Supp. 3d 232 (N.D.N.Y. 2022) ........................................ 32, 34

*Bandy v. City of Salem*,
   59 F.4th 705 (4th Cir. 2023) ............................................................. 13

*Beck v. McDonald*,
   848 F.3d 262 (4th Cir. 2017) ............................................................. 35

*Bhattacharya v. Murray*,
   93 F.4th 675 (4th Cir. 2024) ............................................................. 12

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ........................................................ 25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .......................................................................... 13

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
   704 S.E.2d 365 (Va. 2011) ................................................................ 33

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................... 17, 18, 30

*Fusaro v. Howard*,
   19 F.4th 357 (4th Cir. 2021) ............................................................. 36

*Gonyo v. D.S.*,
   No. 2023-796, 2024 WL 296876 (N.Y. Sup. Ct. Jan. 19, 2024) ........... 30

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) .......................................................................... 14

*Kipke v. Moore*,
   Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept. 29, 2023)
   ................................................................................. 16, 24, 26, 32

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) (en banc) ............................................ 37

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023)... 25

*LaFave v. Cnty. of Fairfax*,
 No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June 23, 2023)
 ............................................................................................................................ 6, 22, 36

*Lara v. Commissioner Pennsylvania State Police*,
 91 F.4th 122 (3d Cir. 2024) ................................................................................. 17

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)............................................................................................. 35

*Martin v. Lloyd*,
 700 F.3d 132 (4th Cir. 2012) .......................................................................... 36, 37

*May v. Bonta*,
 No. 8:23-cv-01696, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023), *appeal docketed*, No. 23-
 4354 (9th Cir. Dec. 22, 2023) ............................................................................. 32

*McCullen v. Coakley*,
 573 U.S. 464 (2014)............................................................................................. 15

*Md. Shall Issue, Inc. v. Hogan*,
 353 F. Supp. 3d 400 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020) ............... 35

*Md. Shall Issue, Inc. v. Hogan*,
 971 F.3d 199 (4th Cir. 2020) .......................................................................... 35, 36

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
 680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023)
 .................................................................................................................. 16, 32, 34

*Mintz v. Chiumento*,
 No. 1:23-cv-00795, 2024 WL 1361047 (N.D.N.Y. Mar. 20, 2024)........................ 31

*Moore v. Madigan*,
 702 F.3d 933 (7th Cir. 2012) ............................................................................... 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022)..........................................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
 804 F.3d 242 (2d Cir. 2015) ................................................................................ 37

*Nat'l Rifle Ass'n v. Bondi*,
 61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL
 4542153 (July 14, 2023) ...................................................................................... 17

*Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund*,
 718 F.2d 628 (4th Cir. 1983) ............................................................................... 37

*Rupp v. Bonta*,
 No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024), *appeal docketed*, No. 24-
 2583 (9th Cir. Apr. 24, 2024) .............................................................................. 17

*State v. Huntly*,
 25 N.C. 418 (1843) .............................................................................................. 27

*Tanner v. City of Va. Beach*,
  674 S.E.2d 848 (Va. 2009) ........................................................................... 36

*United States v. Allam*,
  677 F. Supp. 3d 545 (E.D. Tex. 2023), *appeal docketed*, No. 24-40065 ................ 34

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ............................................................... 20, 25

*United States v. Hager*,
  721 F.3d 167 (4th Cir. 2013) ...................................................................... 36

*United States v. Perez-Garcia*,
  96 F.4th 1166 (9th Cir. 2024) ................................................................. 19, 26

*United States v. Reyna*,
  No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), *appeal docketed*, No. 23-
  1231 (7th Cir. Feb. 7, 2023) ...................................................................... 20

*United States v. Walter*,
  No. 3:20-cr-00039, 2023 WL 3020321 (D.V.I. Apr. 20, 2023) .............................. 34

*United States v. Williams*,
  553 U.S. 285 (2008) ................................................................................. 36

*Wag More Dogs Liab. Corp. v. Cozart*,
  680 F.3d 359 (4th Cir. 2012) ...................................................................... 36

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ................................................................................. 13

*We the Patriots, Inc. v. Grisham*,
  No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*, No. 23-2166
  (10th Cir. Oct. 20, 2023) ...................................................................... 16, 32

## Statutes and Rules

1741 N.J. Laws 101 ....................................................................................... 29

1786 Va. Acts 35, ch. 49 ........................................................................... 27, 28

1869-70 Tenn. Pub. Acts 23-24, ch. 22 ........................................................... 27

1870 Tex. Gen. Laws 63, ch. 46 ..................................................................... 27

1883 Mo. Sess. Laws 76 ............................................................................... 27

1893 Or. Laws 79 ....................................................................................... 29

2 Edw. 3, 258, ch. 3 (1328) ...................................................................... 27, 28

2 *Laws of New-York from The Year 1691, to 1773, Inclusive* 441-42 (Hugh Gaine ed., 1774) ... 29

*Collection of Statutes of the Parliament of England in Force in the State of North Carolina*
  60–61, ch. 3 (F. Martin Ed. 1792) ............................................................. 27

Fairfax County Code § 6-2-1 ................................................................... *passim*

Fed. R. Civ. P. 56(a) ................................................................................................ 12

II *Digest of the Laws of Texas* 1321-22 (George Paschal, 4th ed. 1874) .................................... 29

III *Statutes at Large of Pennsylvania from 1682 to 1801* 254-55 (Clarence M. Busch ed., 1896) ........................................................................................................................ 29

R.H. Clark, *The Code of the State of Georgia* 818 (1873) ............................................................ 27

W.A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893) ...................................................................... 27

## Other Authorities

1 Serjeant William Hawkins, *A Treatise of the Pleas of the Crown* (1716) ................................. 28

Fairfax County, *Facilities and Locations*, https://www.fairfaxcounty.gov/topics/facilities-and-locations ........................................................................................................................... 4

*September 15, 2020 Board of Supervisors Meeting, available at* https://video.fairfaxcounty.gov/player/clip/1822 (video recording) ................................... 2, 29

Stephen T. Mather, *Progress in the Development of the National Parks* (U.S. Dep't of Interior 1916) ...................................................................................................................... 23

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) .......................................................................................................... 17

## INTRODUCTION

Fairfax County parks welcome over 12 million people every year, including millions of children. Public events take place on County property, including protests and political events where emotions can run high. In September 2020, the Fairfax County Board of Supervisors voted to adopt an ordinance that prohibits firearms in County parks and at or adjacent to County-permitted events or events requiring a permit. This law has now protected County residents and visitors from the dangers of gun violence in parks and at public events for over three and a half years.

Plaintiffs spent much of those years challenging the County's ordinance in state court, under the Virginia Constitution. After the state courts denied their motion for summary judgment, denied their motion for a preliminary injunction, and dismissed their petition to review the latter loss as untimely, Plaintiffs—on the eve of trial—moved for a voluntary nonsuit, completely abandoning their case. They have now turned to federal court, filing essentially the same case under the U.S. Constitution. Here, they argue that the County's restriction on firearms in parks violates their rights under the Second Amendment and that the restriction on firearms at public events violates both the Second Amendment and the Due Process Clause of the Fourteenth Amendment. Their federal claims are just as meritless as their abandoned state claims. The robust history of restricting guns in parks, gathering places, and other analogous places stretching back centuries establishes that the County's restrictions sit comfortably within this nation's historical tradition of firearms regulation. As for their due process claims, Plaintiffs have neither established that they have standing nor that the County's restrictions are impermissibly vague.

In January, the Honorable Claude M. Hilton denied Plaintiffs' request for a preliminary injunction, and Plaintiffs did not appeal. We respectfully submit that Defendants are now entitled to summary judgment on all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Ordinance

1. On September 16, 2020, the Fairfax County Board of Supervisors adopted Fairfax County Code § 6-2-1 (the "Ordinance"), Sleight Decl. Ex. (hereafter "Ex.") 1, regulating possession and carrying of firearms at certain sensitive public locations within the County. *See id.*

2. The Ordinance restricts firearms in "any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County," *see* § 6-2-1(A)(2) (the "Parks Restriction"), and in any public place "that is open to the public and is being used by or is adjacent to a County-permitted event or an event that would otherwise require a County permit," *see* § 6-2-1(A)(4) (the "Events Restriction").

3. The board package that the Board of Supervisors considered when voting on the ordinance explained that "[a]ppropriate signage must be posted in order to enforce the prohibition." Ex. 34 at 622.

4. Testimony at the Board's hearing emphasized that requirement. Deputy County Executive David M. Rohrer reiterated that "appropriate signage must be posted to enforce the prohibition." *See September 15, 2020 Board of Supervisors Meeting*, at 7:48:33-36, *available at* https://video.fairfaxcounty.gov/player/clip/1822 (video recording) ("Rohrer Testimony"). He emphasized that "any prohibition and enforcement must be within the posted signs for a building, an area, or a permitted event, so that there is reasonable warning to persons." *Id.* at 7:48:42-55.

5. In accord with these statements, the Ordinance requires that "[n]otice of this ordinance *shall be posted*" at entrances to the places it applies, including public parks and places being used by or adjacent to a permitted event or an event that would otherwise require a permit. *See* § 6-2-1(D)(1) (emphasis added).

6.      In addition, official enforcement policy mandates that no enforcement will take place without notice. Deputy Chief Dalton Becker of the Fairfax County Police Department ("FCPD") initially communicated this "no sign, no enforcement" policy to officers in a training video, which he shared with all officers and staff of the FCPD by email on September 25, 2020. Becker Decl. ¶¶ 8-11 & Ex. A.

7.      The video instructed officers to first confirm "proper signage and notification of the Ordinance at the site." *Id.* ¶ 14. Then, if an officer encounters someone with a firearm and "verifies there is proper signage," he or she should "first seek voluntary compliance" with the Ordinance before "initiating any citation or arrest." *Id.* ¶ 15. Sworn officers and officers in training were required to review the training video and acknowledge their understanding of its contents. *Id.* ¶¶ 12-13.

8.      The FCPD subsequently issued a Command Staff Memorandum ("CSM") setting out the official enforcement policy. *See id.* ¶ 16 & Ex. C. The CSM requires permanent signage providing notice of the Ordinance to be posted in areas, such as parks, where the Ordinance always applies. *Id.* Ex. C at 1. In areas that frequently host County-permitted events, "permanent folding signs" must be posted and "unfolded to display the notice while the event takes place." *Id.* In other areas where events take place, the policy provides for "temporary signage" to be "posted at entrances or other appropriate place of ingress and egress for the duration of the event." *Id.* at 1-2. For the Ordinance to apply, the signs must be "clearly posted at entrances or other avenues of ingress or egress" and must "specifically provide notification that firearms, ammunition, components, or a combination thereof are strictly prohibited." *Id.* at 1.

9.      The CSM states that "[o]fficers may <u>not</u> enforce the provisions of this ordinance unless first confirming that signs providing this notification are properly posted. Whenever

3

possible, officers should attempt to educate suspected violators about the ordinance and seek voluntary compliance prior to placing charges." *Id.*

10.     Based on the CSM and the FCPD training video, FCPD officers are trained to first verify that an event is subject to the Ordinance (through confirmation of proper Ordinance signage at the event) before initiating any Ordinance education or enforcement. Becker Decl. ¶ 24.

11.     Events that take place within Fairfax County on property that is not controlled or owned by Fairfax County are not subject to the Ordinance. *Id.* ¶ 25. This includes public roadways, which are instead controlled by the Virginia Department of Transportation. *Id.*; *see also id.* ¶ 26 (explaining, for example, that a 5K race on a public roadway would not be subject to the Ordinance).

12.     The County has a website with links for permits for events subject to the Ordinance. *See* https://www.fairfaxcounty.gov/topics/facilities-and-locations. The expandable categories under the heading "Facility Use Information and Applications" show the six areas where and authorities from which permits for events can be sought: (1) the Government Center (the County's main governmental campus); (2) Fairfax County Public Library; (3) Fairfax County Park Authority; (4) Neighborhood and Community Services (for "Community Centers" and "Field and Gym Use"); (5) Governmental Centers (*i.e.*, smaller, regional centers); and (6) under "All Other Facility Use Requests," a "Request to Utilize a County Facility or Property." *See id*.

**B.  Fairfax County and its Parks**

13.     Fairfax County is an urban-suburban area. *See* Dkt. 26-1 (Reply in Supp. of Pls.' Mot. for Prelim. Inj.) at 15.

14.     County parks receive between 12 and 16 million visitors each year; children make up about a quarter of those visitors. Baldwin Decl. ¶ 5.

15.     Over 100,000 individuals under the age of 18 participated in registered events in Fiscal Year (FY) 2022, as did over 83,000 in FY 2023, including making up the large majority of the 43,000 registrants for 1,372 summer camps. *Id.* ¶¶ 11-12.

16.     In FY 2023, over 47,000 students participated in 830 school field trips to parks, and schools separately used the parks for youth activities like sports. *Id.* ¶¶ 19-20.

17.     The Fairfax County Parks Authority ("FCPA") runs three preschools on its property. *Id.* ¶ 22.

18.     Scouts use the parks for their programs, including camping, hiking, and volunteering. *Id.* ¶ 18.

19.     The FCPA offers several popular amusements within County parks that are enjoyed by thousands of families and children, including minigolf, a carousel, and train rides. *Id.* ¶ 7.

20.     Large gatherings also take place in the parks, including an Earth Day celebration (5,000-8,000 attendees) and a 4-H Fair (over 10,000 attendees), as well as—among many others—youth and adult sports events, church services and related gatherings, fundraising events, preschool performances, protests, and election-related activities. *Id.* ¶ 16.

21.     The FCPA has an annual budget of over $83 million for FY 2024. The FCPA expects to generate over $50 million in revenue towards its budget from its various programs and offerings.  This represents about 60% of all revenue necessary to operate the FCPA each year. *Id.* ¶ 30.

22.     The FCPA operates eight golf courses, which together generated over $16 million in FY 2023. The FCPA competes with the private sector for golf-course customers as well as for other revenue-generating customers. *Id.* ¶ 31.

23.     The smallest FCPA park is Farrington Park at 0.1 acres. The largest is Huntley Meadows Park at 1,558 acres. *Id.* ¶ 6.

### C. Prior Virginia State Constitutional Challenge

24.     On January 29, 2021, Plaintiffs filed a complaint in the Circuit Court of Fairfax County, Virginia, alleging that the Parks Restriction and the Events Restriction infringe their rights to keep and bear arms and to due process under the Virginia Constitution. Ex. 2 (State Compl.) ¶¶ 42-59.[1]

25.     The National Rifle Association of America, Inc. ("NRA"), originally the fourth plaintiff in the state challenge, withdrew via partial voluntary nonsuit. *See* Ex. 15.

26.     The parties undertook discovery, and in April 2022, Plaintiffs moved for summary judgment. After receiving both initial briefing and supplemental briefing on the impact of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the court, in November 2022, denied Plaintiffs' motion and set the case for trial. *See* Ex. 13.

27.     Undaunted, on January 27, 2023—nearly two years after filing suit—Plaintiffs moved for a preliminary injunction. *See* Ex. 10. The court denied the motion, applying principles announced in *Bruen* and ruling that "ample historical basis exists for the prohibition of firearms in public parks and at public events." *LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at *17 (Fairfax Cnty. Cir. Ct. June 23, 2023) (Ex. 14). The Virginia Supreme Court dismissed Plaintiffs' petition for review as untimely. *See* Ex. 16.

---

[1] The parties' subsequent summary judgment filings (Exs. 3-9) and preliminary injunction filings (Exs. 10-12) and the respective decisions (Exs. 13, 14) are exhibited for reference.

28.     On September 7, 2023, just eleven days before the start of trial, Plaintiffs announced they were abandoning their case, and the court granted Plaintiffs' nonsuit the next day. Ex. 17.

**D.  Present Federal Constitutional Challenge**

29.     On November 22, 2023, the same three individual Plaintiffs filed their Complaint in this Court, now challenging the Ordinance under the Second and Fourteenth Amendments to the U.S. Constitution. Compl. (Dkt. 1) ¶ 1. Their challenge is a facial one. *See id.* ¶¶ 42-59; *id.* at 12-13 (Prayer for Relief ¶¶ 1-3).

30.     Plaintiffs allege that the Parks Restriction infringes their right to bear arms under the Second Amendment, *id.* ¶¶ 42-46, that the Events Restriction infringes their Second Amendment right to the extent it prohibits weapons in an area "adjacent to" a covered event, *id.* ¶¶ 47-51, and that the terms "is adjacent to" and "an event that would otherwise require a permit" are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment, *id.* ¶¶ 52-59.

31.     Except for its reliance on federal rather than state constitutional provisions, the Complaint is substantially the same as the one filed nearly three years ago in state court. *Compare* Compl. *with* Ex. 2.

32.     In declarations filed with their Complaint, Plaintiffs LaFave and Holzhauer asserted that they each previously carried a concealed handgun in County parks and would continue to do so but for the Ordinance. Dkt. 1-2 ¶¶ 3-4 (LaFave); Dkt. 1-4 ¶¶ 3-4 (Holzhauer). All three Plaintiffs asserted that they previously carried firearms in public places in the County and continue to do so, but that they are unaware whether such places are being used by or are adjacent to a permitted event or an event that would otherwise require a permit. Dkt. 1-2 ¶ 5 (LaFave); Dkt. 1-3 ¶ 4

(Taubman); Dkt. 1-4 ¶ 5 (Holzhauer). Plaintiffs did not allege that the Ordinance had been enforced against them and cited no instances of its enforcement against others.

33.　　Plaintiffs moved for a preliminary injunction. *See* Dkt. 2.

34.　　Judge Hilton heard argument on Plaintiffs' motion on January 19, 2024, and denied it from the bench. *See* Dkts. 30 (minute entry), 33 (Order), 38 (preliminary injunction hearing transcript, hereafter "Tr."). He observed that Plaintiffs had already spent three years litigating their challenges to the Ordinance. *See* Tr. 11:19-12:3, 12:8-11, 27:5-18, 22-24. He also emphasized that the area to which the challenged sections of the Ordinance applies are very limited, saying that it applies "to very narrow pieces of property" and "otherwise, [Plaintiffs' rights] [a]re not being affected." Tr. 27:19-22.

### E. Expert Evidence

35.　　Pursuant to the Court's Scheduling Order, Dkt. 37, and the parties' Joint Discovery Plan, Dkt. 36, on February 28, 2024, Defendants provided to Plaintiffs the expert reports of Professor Terence Young, an expert in the history of development of parks in the United States; Professor Alexandra Filindra, an expert in survey methodology and analysis who designed and analyzed a survey regarding attitudes to the presence of firearms in certain locations in Fairfax County; and Kara Fitzgibbon, PhD, Director of the University of Virginia's Center for Survey Research, whose Center conducted the survey Professor Filindra designed. *See* Young Report;[2] Filindra Report;[3] Fitzgibbon Report.[4]

---

[2] Professor Young's Report, dated February 26, 2024, is filed as Attachment A to his Declaration, dated April 24, 2024, in which he affirms the content of his Report. Bookmarks have been added to the PDF versions of all three experts' reports for the Court's convenience.

[3] Professor Filindra's Report, dated February 27, 2024, is filed as Attachment A to her Declaration, dated April 24, 2024, in which she affirms the content of her Report.

[4] Dr. Fitzgibbon's Report, dated February 28, 2024, is filed as Attachment A to her Declaration, dated April 23, 2024, in which she affirms the content of her Report.

36.      America's tradition of public parks began in the 1850s in response to the Romantic idea that contemplating parks' natural scenery could improve viewer's minds and bodies, and ultimately, society.[5] Young Report ¶¶ 8, 24. Prior to that era, privately owned taverns and similar establishments had popular gardens while most publicly owned spaces were utilitarian rather than ornamental spots for sociability and relaxation. *Id.* ¶ 8. In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited. *Id.*

37.      In the late nineteenth and early twentieth centuries, America's national parks were also created to protect landscapes of natural scenery. *Id.* ¶ 10. At roughly the same time, state parks appeared. Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play. *Id.* ¶ 11.

38.      Early green spaces like Boston Common were multi-purpose utilitarian spaces until the mid-nineteenth century. *Id.* ¶ 13. They served multiple functions, including providing temporary grazing land for livestock, housing a town's cemetery, and serving as a practice ground for the local militia. *Id.* They were not analogs to today's public parks nor were they their predecessors except in the sense that some of these utilitarian spaces, most famously the Boston Common, survived long enough to be adaptively re-used as community parks. *Id.* ¶ 15.

39.      America's large urban parks embraced firearms prohibitions shortly after they came into existence. The official prohibitions began with Central Park, in 1858. *Id.* ¶ 30. The

---

[5] Historical facts may be legislative rather than adjudicative facts and may involve matters more properly considered pure issues of law (such as the existence and content of a historical law). Inclusion of any item in this Statement of Undisputed Material Facts does not constitute a position or concession as to these categorizations.

Central Park Commissioners' prohibition on carrying firearms in their park was embraced by authorities in the other large parks that rapidly appeared across the United States, including in Brooklyn, Philadelphia, San Francisco, Chicago, and Buffalo. *Id.* ¶ 31.

40.     To date, research has revealed well over one hundred historical laws prohibiting firearms in federal, state, and local parks. *Id.* Exs. 2-116; *id.* ¶¶ 30-31, 33, 38-40, 43, 52-53; Young Decl. Attachment B.

41.     Historical evidence does not support the carrying of firearms for self-defense in urban parks, national parks, or state parks. Young Report ¶¶ 35, 46, 55.

42.     The County contracted with the Center for Survey Research at the University of Virginia to administer the Fairfax Community Survey 2022 (the "Survey"). Filindra Report ¶ 11 & Ex. 2 at 3; Fitzgibbon Report ¶ 12.

43.     The purpose of the Survey was to determine area residents' use and anticipated use of Fairfax County public parks and other public spaces, preferences related to firearms in these spaces, and perceptions of safety in these spaces. Filindra Report ¶ 12 & Ex. 2 at 3; Fitzgibbon Report ¶ 12.

44.     Survey respondents were asked their perceptions of safety for five different types of parks: (1) parks with amenities for families and children (*e.g.*, playground, picnic pavilions, organized activities for children); (2) parks that offer outdoor, water-based recreation for adults and children (*e.g.*, fishing and boating); (3) parks that offer golf-related activities (golf parks); (4) parks that offer camping; (5) parks that have unpaved trails and no basic amenities such as toilets. Respondents were also asked about perceptions of safety at open-air fairs and markets, including farmers' markets, and political protests if firearms were allowed in such locales. Filindra Report ¶ 21 & Ex. 2 at 3.

45. The Survey results lead to several key conclusions and findings that are statistically valid, reliable, and can be extended to the general population of the area. *Id.* ¶ 23 & Ex. 2 at 7; Fitzgibbon Report ¶ 46.

46. First, area residents' opinions are very consistent across all types of public spaces included in the survey. Overall, respondents had similar attitudes regarding (1) guns in more highly frequented parks (*e.g.*, parks with amenities for children) (2) less frequented parks (*e.g.*, camping parks and remote parks) and (3) open-air markets. Filindra Report ¶ 23 & Ex. 2 at 7.

47. Second*,* the potential presence of guns in parks and markets induces feelings of less safety among most people in the local population (they declare that if guns were allowed in such locales, they would feel "less safe"), and may drive people to visit such spaces less frequently. *Id.* ¶ 23 & Ex. 2 at 7.

48. Third, two key considerations underly such feelings of heightened insecurity and hesitancy to visit these spaces if guns are allowed: (1) many people expect that crime will increase because of the presence of guns in such public spaces; (2) people fear that confrontations with others in a park or a market may escalate if guns are allowed there. *Id.* ¶ 23 & Ex. 2 at 7.

49. Fourth, there are differences in the strength of these attitudes between people from gun-owning households and those from non-gun-owning households, but the attitudes of both groups trend in the same direction. Specifically, very large proportions (and often almost all) of people who live in non-gun-owning households express insecurity and hesitancy when told that guns may be allowed in the specified locales. Importantly, a plurality (and often a majority) of people from gun-owning households share these views as well. The response patterns among

those from gun-owning households are in the same direction as for those from non-gun-owning households but not as strong. *Id.* ¶ 23 & Ex. 2 at 7.

50.      The Survey also included a series of four survey experiments aimed at determining whether the presence of firearms in public parks, at open-air markets, and at political protests in Fairfax County would produce "chilling effects," *i.e.*, a decline in the use of these resources. *Id.* ¶¶ 25-27 & Ex. 2 at 51-68.

51.      All four experiments produced chilling effects. These effects were very large in the experiments that referenced parks for children and open-air markets. Chilling effects were also sizeable in the two experiments that referenced political protests. *Id.* ¶ 28 & Ex. 2 at 51-68.

52.      Analyses from a forthcoming journal article using national data provides very similar experimental results as to the chilling effects from the presence of firearms in public parks, at open-air markets, and at political protests. *Id.* ¶ 30 & Ex. 2 at 69, Ex. 3 at 20-30.

53.      The deadline for rebuttal expert disclosures was March 27, 2024. *See* Dkts. 36, 37. Plaintiffs did not disclose any experts.

## ARGUMENT

### I.   Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only when it has the potential to "affect the outcome the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A "dispute" over a material fact is "'genuine' if the evidence presented would allow a reasonable factfinder to find for the nonmovant." *Bhattacharya v. Murray*, 93 F.4th 675, 687 (4th Cir. 2024). Once the moving party has met their burden, "the nonmoving party must then go beyond the pleadings and affidavits and show that

there are 'specific facts showing that there is a genuine issue for trial.'" *Bandy v. City of Salem*, 59 F.4th 705, 709-10 (4th Cir. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Because Plaintiffs are mounting a facial challenge, they "must 'establish that no set of circumstances exists under which the law would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citations omitted and alteration adopted). Facial challenges are "disfavored for several reasons," including that they require courts to "formulate a rule of constitutional law broader than is required by the precise facts [presented]" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (citations omitted).

Under these standards, summary judgment is warranted for Defendants on all of Plaintiffs' claims. Defendants have presented three expert reports, declarations from FCPD Deputy Chief Becker and Fairfax County Parks Authority Deputy Director Sara Baldwin, and well over one hundred historical laws analogous to the Ordinance. To date, Plaintiffs have offered only conjecture, unsupported argument, and their own self-serving declarations. Applying the relevant legal principles to the undisputed material facts, Plaintiffs cannot prevail on their challenges to the Ordinance, and summary judgment for Defendants is warranted.

## II.   The Ordinance Is Constitutional Under the Second Amendment

The following sections set out the methodological principles *Bruen* established (Part II.A), and then show that, under those principles, the Parks Restriction (Part II.B) and Events Restriction (Part II.C) are valid under the Second Amendment.

## A. *Bruen*'s Methodology

### i. Text, history, and tradition framework

In *Bruen*, the Supreme Court rejected the two-step Second Amendment analysis the lower federal courts had previously applied, *see* 597 U.S. at 18-19 (describing analysis), in favor of a framework that focuses on text and historical tradition. A court must first ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. The burden to satisfy this initial, textual inquiry is on the party challenging a law.[6] If they succeed, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To guide courts in conducting the historical analysis, *Bruen* stressed that a modern firearms regulation need not be a "dead ringer for historical precursors" and will pass constitutional muster so long as it is "analogous enough" to historical restrictions. *Id.* at 30. Put differently, *Bruen* makes clear that governments are not required to identify a "historical *twin*," only a "well-established and representative historical *analogue*." *Id.* In applying this analogical approach, courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-defense" and the burden is "comparably justified." *Id.* at 29. In other words, courts should consider "how and why" a regulation burdens the right to self-defense. *Id.* *Bruen* also instructs courts to "use analogies to … historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30.

---

[6] *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 24, 44 n.11; *cf. Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) ("[A] plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]").

*Bruen* recognized that "cases implicating unprecedented societal concerns … may require a more nuanced approach" to the historical inquiry. *Id.* at 27. If a societal condition did not exist in the time period a court is examining, then self-evidently there will be no historical firearms laws addressing that condition in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them." (citation omitted)). Thus, firearms prohibitions concerning societal conditions that did not exist at the founding— which include parks like the County's, *see infra* pp. 21-22—demand a more expansive approach to historical analogy. *See Antonyuk v. Chiumento*, 89 F.4th 271, 359 n.78 (2d Cir. 2023) ("Though the historical analogues here are 'relatively simple to draw,' the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*."), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024).

### ii. Time period

*Bruen* recognized an "ongoing scholarly debate" on whether the most important time period for the historical analysis is 1791 (when the Second Amendment was first adopted as a constraint on the federal government) or 1868 (when the Fourteenth Amendment made it applicable to state and local governments). 597 U.S. at 37-38. The Court, however, expressly left open that question because, in *Bruen*, the relevant public understanding of the right to keep and bear arms was the same in both periods. *Id.* at 38. Here too, this Court need not resolve that question to enter summary judgment in Defendants' favor. The copious 19th- and early-20th-century laws Defendants present, *see infra* Part II.B.ii.1, do not contradict any earlier evidence. To the contrary, those laws reflect and confirm limitations on the right to keep and bear arms that existed in the founding and earlier periods. *See infra* Part II.B.ii.2. Plaintiffs present no treatises, caselaw, or other evidence to establish that, in any era, the public understanding of the right forbade the government to prohibit guns in parks or at public events. As in *Bruen*, therefore, the answer is the

same in both key periods—and throughout American history: the Second Amendment permits the County to prohibit guns in sensitive places like parks and events.

Nevertheless, if this Court chooses to address the issue, it should hold that the Reconstruction era is the primary focus of the historical analysis. Even in leaving the time-period question open, *Bruen* gave strong indications that Reconstruction was the correct focus. These indications have led to a host of persuasive opinions in cases against states and localities concluding that 1868 is at least as important as, if not more important than, 1791. *See Antonyuk*, 89 F.4th at 304 ("Because the [challenged law] is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."); *id.* at 318 n.27 ("[E]vidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era regarding the Second Amendment itself."); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 582 (D. Md. 2023) ("*MSI*") ("[H]istorical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states[.]"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *MSI*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00773, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *MSI* that Reconstruction-era sources "are more probative" than founding-era sources), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023); *Rupp v. Bonta*, No. 8:17-cv-00746, 2024 WL 1142061, at *9, 31-32 (C.D. Cal. Mar. 15, 2024) (concluding that "ratification of the Fourteenth Amendment is

the operative period from which to discern the public understanding of the Second Amendment"), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024).[7]

Focusing on 1868 is also the view consistent with originalist theory. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 n.9 (11th Cir. 2023) (citation omitted) (concluding that Reconstruction era is more relevant than founding when state law is at issue), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023).[8] When asked by Justice Thomas about the correct time period during oral argument in *Bruen*, counsel for New York's NRA affiliate responded with the Reconstruction era.[9]

Even if 1791 were the most relevant focus, *District of Columbia v. Heller*, 554 U.S. 570 (2008), instructs that "examination of a variety of legal and other sources to determine *the public*

---

[7] This Court should not follow the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024). Instead of engaging with originalist principles, *see infra* p. 17, the Third Circuit based its decision to focus on the founding era on the "general assumption" in several Supreme Court cases cited by *Bruen*. *See Lara*, 91 F.4th at 133-34 (citing *Bruen*, 597 U.S. at 37). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38. At the very least, because it relied on an "assumption" and cannot be squared with originalist principles, *Lara* is not persuasive. *See Rupp*, 2024 WL 1142061, at *32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and … the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning").

[8] Although the panel decision has been vacated, its reasoning and authorities on this point are robust. *Bondi*, 61 F.4th at 1322-24, 1322 n.9 (citing, among other authorities, federal appellate decisions and scholarship by Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also Antonyuk*, 89 F.4th at 305 (finding *Bondi* persuasive on this point).

[9] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

*understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," *id.* at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, even if this Court were to focus on the founding era and find the evidence from that period indeterminate, it should recognize that later evidence of regulatory authority settles the meaning of the Second Amendment right and demonstrates that the Ordinance is constitutional.[10]

### iii.   Understanding the historical record

The discussion of historical laws in *Bruen* and subsequent appellate decisions yields three further principles to guide this Court's analysis. *First*, even a small number of historical laws can be sufficient to carry a government's burden to show consistency with historical tradition, so long as there is not "countervailing historical evidence." *Antonyuk*, 89 F.4th at 303. As *Antonyuk* explained, *Bruen*'s conclusion that history supported prohibiting guns in legislative assemblies, courthouses, and polling places relied on sources that identified only one or two founding-era laws.

---

[10] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to focus on the founding era. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time, and there is no separate evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era understanding of the right. Thus, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right also reflects the founding-era understanding. Such a presumption reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

*See id*. at 303-04. "Thus, depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Id.* at 304. *Second*, "[r]easoning from historical silence is ... risky," because "[l]egislatures past and present have not generally legislated to their constitutional limits." *Id.* at 301. For example, "lawmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning." *Id.* at 301-02. Thus, "'novelty does not mean unconstitutionality[,]' ... even if the problems faced by past generations could be described, at a high level of generality, as similar to the problems we face today." *Id.* at 302 (citation omitted). *Third*, historical evidence should be examined "as a whole" to ascertain "whether it establishes a tradition of permissible regulation." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). A contrary "divide-and-conquer approach"—*i.e.*, one that "isolate[s] each historical precursor and asks if it differs from the challenged regulation in some way"—would contravene *Bruen*'s admonition that the government need not "identify a 'historical twin.'" *Id.* (citation omitted).

### B.  The Parks Restriction is Constitutional Under *Bruen*

Plaintiffs have not carried their initial burden of establishing that the conduct in which they seek to engage falls within the Second Amendment's text (Part II.B.i). Even if they had, the longstanding tradition of prohibiting firearms in parks and analogous places demonstrates that the Parks Restriction is constitutional (Part II.B.ii). Persuasive decisions from the Second Circuit and multiple district courts confirm that conclusion (Part II.B.iii).

### i.  Plaintiffs have not established that the Second Amendment's text protects carrying guns in County parks

Plaintiffs must establish at *Bruen*'s first step that the Second Amendment's text protects their proposed conduct—carrying guns in County parks (and at or adjacent to covered events) *specifically*, not just carrying guns in public *generally*. *See, e.g.*, *United States v. Reyna*, No. 3:21-

cr-00041, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("[T]he regulated conduct must be defined specifically enough that it can [be] meaningfully compare[d] to the Second Amendment's plain text—a plain text that is more complex than mere possession." ), *appeal docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023). As Judge Hilton observed, the Ordinance applies only to "very narrow pieces of property," and "otherwise, [Plaintiffs' rights] *[a]re not being affected*." Tr. 27:19-22 (emphasis added). To satisfy their textual burden, therefore, Plaintiffs must establish that the prohibition on carrying *in those very narrow areas* constitutes infringement of their right to keep and bear arms. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) (Posner, J.) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places[.]"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (Griffith, J.) (quoting same). The Ordinance stands in stark contrast to the law struck down in *Bruen*—a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 597 U.S. at 60. Thus, unlike in *Bruen*, Plaintiffs' textual burden is not just to establish that the Second Amendment's text protects carrying outside the home, but that it protects carrying in County parks and at or adjacent to covered events. They have not met that burden.

### ii. The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places

Even if Plaintiffs had satisfied their textual burden, history soundly defeats their claims. Once public parks emerged as communal spaces for repose and relaxation in the nineteenth century, scores of laws, ordinances, and rules prohibited guns in these new parks. To date, Defendants have located well over a hundred such prohibitions, typically enacted at or soon after the time of a park's creation—first in New York, for its new Central Park, then in other cities, and then, as they were created, in national and state parks. Even though *Bruen* requires only analogous

20

laws, these laws are historical *twins* to the Parks Restriction—simple regulations, unambiguously prohibiting the possession or carry of firearms in parks. And because the Reconstruction era is the key period for this Court's inquiry, *see supra* Part II.A.ii, these laws alone establish that the Parks Restriction is constitutional under *Bruen*.

Even if this Court wishes to look further back in history, Defendants' case remains strong. In the time before modern-style parks emerged, there were of course no firearms prohibitions in such parks; the Court must therefore engage in a "more nuanced inquiry" into analogous regulations. That inquiry reveals that the tradition of restricting firearms in places analogous to parks stretches back centuries in our nation's history, taking various regulatory forms over time. *See infra* Part II.B.ii.2. Together, these laws constitute an unbroken line of authority establishing that prohibitions on firearms in parks—city and suburban parks, state parks, and national parks— is consistent with our nation's historical tradition of firearm regulation.

### 1. There is a robust historical tradition of prohibiting firearms in parks

Parks as we understand them today did not exist in the founding era. Early green spaces, such as town commons or greens, served very different societal functions from today's parks. Boston Common, for example, was primarily used for common grazing and activities like militia training for two centuries. *See Antonyuk*, 89 F.4th at 361. As Professor Terence Young explains, places like Boston Common "were multi-purpose utilitarian spaces until the mid-nineteenth century." Young Report ¶ 13.[11] The "rise of public parks as municipal institutions" occurred "over the latter half of the 19th century … following the success of New York's Central Park," *Antonyuk*,

---

[11] Professor Young, Emeritus Professor of Geography in the Department of Geography & Anthropology, California State Polytechnic University, Pomona, is an award-winning scholar of the history and historical geography of the American park movement. *See id.* ¶¶ 1-4.

89 F.4th at 359 (cleaned up); *see also LaFave*, 2023 Va. Cir. LEXIS 203, at *17 (Ex. 14) ("Parks in the modern sense did not come into being until the mid-19th century[.]").

When parks that resemble the County's parks finally emerged, beginning in the 1850s, governments swiftly prohibited guns there. Given Central Park's position as the paradigm of the new parks movement, it is particularly significant that its original 1858 rules forbade "[a]ll persons" to "carry fire-arms." Young Report ¶ 30.[12] Similar prohibitions followed as other cities and towns established parks. In 1866, Brooklyn's Prospect Park rules declared that "[a]ll persons are forbidden … [t]o carry firearms." *Id.* ¶ 31. In 1868, the Pennsylvania legislature decreed that "[n]o person shall carry fire arms" in the newly created Fairmount Park in Philadelphia "or within fifty yards thereof." *Id.* In the 1870s, similar prohibitions appeared in San Francisco, Chicago, Buffalo, Hyde Park, Ill., and Phoenixville, Pa. *Id.* Prohibitions were enacted in eight more cities in the 1880s, 21 more in the 1890s, another 26 in the 1900s, and more throughout the 1910s and 1920s. *See* Parks Table, Ex. 18.[13]

The late 19th century also saw the first national parks—and, at or soon after the time of their creation, firearms prohibitions in those parks. Yellowstone National Park, established in

---

[12] Professor Young's Report attached copies of historical laws as Exhibits 2 to 116. Attachment B to his Declaration dated April 24, 2024 contains 18 additional historical laws, numbered to fit within the ordering of the original Exhibits. For the Court's convenience, Defendants also provide a table, prepared by counsel, excerpting key language from each historical regulation and (where available) providing links to sources where the original regulations may be found. *See* Ex. 18 ("Parks Table").

[13] To take one example in each of 28 states and the District of Columbia, firearms were prohibited in parks in New York, N.Y. (1858), Philadelphia, Pa. (1868), San Francisco, Cal. (1872), Chicago, Ill. (1873), St. Louis, Mo. (1881), New Haven, Conn. (1882), Boston, Mass. (1886), St. Paul, Minn. (1888), Salt Lake City, Utah (1888), Trenton, N.J. (1890), Grand Rapids, Mich. (1891), Milwaukee, Wis. (1891), Spokane, Wash. (1892), Cincinnati, Ohio (1892), Wilmington, Del. (1893), Washington, D.C. (1895), Indianapolis, Ind. (1896), Omaha, Neb. (1898), Boulder, Colo. (1899), Houston, Tex. (1904), Baltimore, Md. (1904), Portland, Or. (1907), Parsons, Kan. (1907), Memphis, Tenn. (1909), Paducah, Ky. (1909), Staunton, Va. (1910), Burlington, Vt. (1910), Oklahoma City, Okla. (1913), and Birmingham, Ala. (1917). *See id.*

1872, broadly prohibited carrying firearms in the park as early as 1894. Young Report ¶ 38. Most of Michigan's Mackinac Island was made a "National public park" in 1875, and its park rules—approved no later than 1882—stated that "[n]o person shall carry … fire-arms in the park." *Id.* ¶ 39. Sequoia National Park, established in 1890, prohibited carrying firearms in the park that same year. *See id.* ¶ 38. Yosemite National Park, also established in 1890, prohibited firearms no later than 1894. *See id*. ¶ 40. The cycle of park creation and firearms prohibition repeated as Congress created new parks through the 1930s, until, in 1936, the National Park Service adopted a prohibition applicable to all national parks and monuments. *Id.* ¶ 43.

States and the District of Columbia also began establishing their own parks—and prohibiting guns in those parks. These laws appeared as early as 1895 in the District of Columbia and 1901 in Minnesota, and by 1936, at least 16 additional states prohibited firearms in at least some of their parks. *See id.* ¶¶ 52-53; Young Exs. 92, 100A. Virginia opened its first state parks in 1936 and prohibited guns in those parks the same year. *See* Young Report ¶¶ 51, 53.

These national and state park prohibitions refute Plaintiffs' claim that the allegedly "vast" acreage of County parks "does not constitute a sensitive place." Compl. ¶¶ 22, 45; *see also* Dkt. 2-1 at 11 (asserting that firearms "plainly may not be banned" in parks with "vast, mostly wooded lands"). To be clear, Plaintiffs are wrong as a descriptive matter; again, as Judge Hilton observed, the Ordinance applies only to "very narrow pieces of property." Tr. 27:21. But even if Plaintiffs' description were correct, history would still defeat their claim. In 1894, when Yellowstone's regulations prohibited firearms, the park covered over 2.1 million acres[14]—more than eight times

---

[14] *See* Stephen T. Mather, *Progress in the Development of the National Parks* 28 (U.S. Dep't of Interior 1916) (reporting areas of national parks, in square miles, including: 3,348 for Yellowstone; 1,125 for Yosemite; and 1,534 for Glacier); Young Ex. 83 (including Glacier prohibition).

the entire size of Fairfax County. Soon after, regulations prohibited firearms in Yosemite's over 700,000 acres and in Glacier National Park's almost one million acres. These regulations put beyond doubt that the generations that established national parks saw no constitutional problem with prohibiting guns in *genuinely* vast expanses of the great outdoors.[15]

Accordingly, this Court should reject any effort Plaintiffs might make in their own motion for summary judgment to assert that Fairfax County parks are too "vast" or "remote" for the Ordinance to fit within the historical tradition of firearms regulation.[16] Moreover, even if (contrary to fact) there were any merit to the argument that guns may not be prohibited in vast wilderness parks, and even if (contrary to fact) some County parks were vast and wild, Plaintiffs still would not be able to satisfy the demanding standard for a facial challenge. *See Ams. for Prosperity*, 141 S. Ct. at 2387 (establishing that plaintiffs mounting a facial challenge must show that law "lacks a plainly legitimate sweep"). There are many dozens of separate County parks, including Clemyjontri Park, a very popular small park with playground equipment designed to be accessible for children with special needs, and 0.1 acre Farrington Park, a playground for children aged 2-12. Baldwin Decl. ¶ 6. There are also eight golf courses within County parks, from which the County

---

[15] *See also Kipke*, 2023 WL 6381503, at *9-10 (approving Maryland's prohibition on firearms in state parks and state forests at preliminary injunction stage); Pls.' Mem. Supp. Prelim. Inj., *Novotny v. Moore*, No. 1:23-cv-01295 (D. Md. May 24, 2023), Dkt. 24-1 (Maryland state park system covers 142,433 acres and state forest has 214,000 acres).

[16] This Court should likewise reject any effort Plaintiffs might make to characterize County parks as "rural parks" and to rely on dictum in *Antonyuk* regarding "rural parks." After Plaintiffs quoted a portion of that dictum in a Notice of Supplemental Authority, *see* Dkt. 12, Defendants set out three independent reasons why any reliance on it would be unavailing. Specifically, Defendants explained that (1) the Second Circuit based that dictum on the far smaller set of historical laws New York had presented, which included no state-park or national-park laws; (2) Fairfax County parks are not rural parks; and (3) even if (contrary to fact) *some* of the County's parks were rural, there is no possible way for Plaintiffs to establish that *all* are, which defeats a facial challenge. *See* Dkt. 18 at 17-20. Plaintiffs' Reply then made no mention of the "rural parks" dictum, and indeed *conceded* that Fairfax County "is an urban-suburban area." Dkt. 26-1 at 15. Thus, Plaintiffs are now even further foreclosed from relying on the "rural parks" dictum.

derives millions of dollars in revenue, competing for customers with private courses in the area. *See id.* ¶ 31. The Ordinance would "lack[] a plainly legitimate sweep" only if Plaintiffs succeeded in proving that prohibiting guns is unconstitutional even in parks like Clemyjontri and Farrington,[17] and on golf courses where the County acts as proprietor and market participant.[18] That is something they have not attempted to, and cannot, do.[19]

*      *      *

Altogether, research to date has identified *well over one hundred* historical laws prohibiting guns in parks. *See* Parks Table, Ex. 18. Not only were parks restrictions numerous, but research has not revealed *any* instance of a court invalidating them. In other words, they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk*, 89 F.4th at 359; *see also Bruen*, 597 U.S. at 30 (finding it "settled" that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). The Parks Restriction fits soundly within this well-established tradition.

---

[17] Even district courts that enjoined prohibitions on firearms in parks have nevertheless upheld prohibitions on firearms in playgrounds. *See, e.g.*, *Koons v. Platkin*, 673 F. Supp. 3d 515, 639 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023); *Antonyuk*, 639 F. Supp. 3d. at 324; *see also* Dkt. 2-1 at 10 (acknowledging that school "playgrounds and athletic fields" are sensitive places)

[18] *See Class*, 930 F.3d at 464 (reasoning, in upholding prohibition on firearms at federally-owned parking lot near the U.S. Capitol, that "the government—like private property owners—has the power to regulate conduct on its property"); *see also Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate.").

[19] Plaintiffs effectively concede that at least some of the County's parks are neither large nor remote when they allege that "[t]he parks *include* vast amounts of wooded acreage, *much of it* remote and isolated." Compl. ¶ 22 (emphasis added). Similarly, references in Plaintiffs' declarations to "remote areas" of County parks implicitly acknowledge that other parts of the parks are *not* remote. *See* Taubman Decl. ¶ 7; LaFave Decl. ¶ 3; Holzhauer Decl. ¶ 3.

### 2. Founding-era regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction

As explained above, the most relevant focus for this Court's analysis is the period beginning around 1868. *See supra* Part II.A.ii. But even if this Court were to focus on the founding era, it should still conclude that the Parks Restriction is consistent with historical tradition. The absence of modern-style parks in that era means that there were not specific restrictions on firearms in parks then. *Cf. Kipke*, 2023 WL 6381503, at *10 ("[R]ural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment, and thus the Court will not infer a lack of regulation from the absence of laws governing rural state parks at that time."). Accordingly, under *Bruen*, this Court must engage in a "more nuanced analysis" in looking to analogous historical principles. 597 U.S. at 27.

Four strands of founding-era laws establish principles justifying the Parks Restriction: (a) laws protecting gathering places and public forums; (b) laws prohibiting going armed in public with the effect of terrifying people; (c) laws prohibiting carrying firearms on privately-owned, enclosed or developed land (absent express permission from the property owner); and (d) the long-accepted tradition of prohibiting firearms in schools. Considered both individually and collectively, these strands of laws demonstrate that the Parks Restriction is rooted in historical tradition. *See Perez-Garcia*, 96 F.4th at 1191 (under *Bruen*, courts "examine the historical evidence as a whole"). We discuss each in turn.

**a. Prohibitions on guns in gathering places and public forums.** The Parks Restriction is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 89 F.4th at 356. These types of restrictions extend back to the 1328 Statute of Northampton in England, which stated that "no Man great nor

small" shall "go or ride armed … in Fairs [or] Markets." 2 Edw. 3, 258, ch. 3 (1328), Ex. 19. In the founding era, at least two states—including Virginia—observed similar laws prohibiting going armed in fairs or markets.[20] Thus, "medieval law survived to become our Founders' law." *Antonyuk*, 89 F.4th at 357 (quoting *Bruen*, 597 U.S. at 35).[21]

Connecting that tradition to the eight, late-19th-century municipal parks prohibitions New York presented, *see id.* at 359, *Antonyuk* observed that those city laws "were apparently accepted without any constitutional objection by anyone," *id.*, and concluded that, together, this "wealth of evidence" of a "longstanding tradition of regulating firearms in places that serve as public forums" satisfied *Bruen*'s historical requirement, at least as applied to "urban parks," *id.* at 360-63. Compared with New York's law, it held the historical laws similarly burdened the right to carry, and for a similar reason, "maintaining order in often-crowded public squares." *Id.* at 361.[22] The same is true for the Parks Restriction: it promotes public order and safety in heavily trafficked parks that are widely used for public gatherings. *See supra* pp. 4-6, 8-12.

---

[20] *See* 1786 Va. Acts 35, ch. 49 ("no man, great nor small" shall "go, nor ride armed … in fairs or markets"), Ex. 20; *Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61, ch. 3 (F. Martin Ed. 1792) (similar), Ex. 21; *see also State v. Huntly*, 25 N.C. 418, 420-23 (1843) (observing that statutory text also reflected common law).

[21] Firearms restrictions in places of public assembly or gathering became increasingly common in the latter half of the 19th century. *See, e.g.*, 1869-70 Tenn. Pub. Acts 23-24, ch. 22 (prohibiting weapons in "any fair, race course, or other public assembly of the people"), Ex. 22; 1870 Tex. Gen. Laws 63, ch. 46 (prohibiting weapons in any "place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen"), Ex. 23; 1883 Mo. Sess. Laws 76, Ex. 24; R.H. Clark, *The Code of the State of Georgia* 818 (1873), Ex. 25; W.A. McCartney et al., *Statutes of Oklahoma, 1893 Being a Compilation of All the Laws Now in Force in the Territory of Oklahoma* 504 (1893), Ex. 26.

[22] Although *Antonyuk* expressed skepticism about applying that rationale to "rural parks," it found it unnecessary to resolve the issue on a facial challenge and noted the litigation was still in its early stages. *See* 89 F.4th at 362-63. As explained above, *see supra* note 16, any effort Plaintiffs might make to rely on this dictum should be rejected.

  **b.**  **Prohibitions on going armed "to the terror" of the people.** Early English law and founding-era American laws also prohibited going armed in circumstances where doing so was likely to cause fear or terror. In addition to prohibiting going armed in specific places, the Statute of Northampton prohibited "go[ing] []or rid[ing] armed" *anywhere*. *See* 2 Edw. 3, 258, ch. 3 (1328). But by the late 17th and early 18th century, according to *Bruen*, this part of the statute was understood only to prohibit public carry of weapons when "accompanied with such Circumstances as are apt to terrify the People."[23] Summarizing Virginia's 1786 statute, along with statutes from Massachusetts (1795) and Tennessee (1801), *Bruen* explained that they "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 50.

  *Bruen* concluded that New York could not rely on this well-established historical tradition to justify its challenged law because it "d[id] not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people." *Id.* at 45. Here, by contrast, the tradition robustly supports the Parks Restriction because Defendants have provided substantial evidence that carrying firearms in County parks would "spread[] 'fear' or 'terror' among the people" of Fairfax County. *Id.* at 50; *see* Filindra Report ¶¶ 23-24, 31-33 (concluding, based on scientific survey of area residents, that the potential presence of guns in Fairfax County parks "induces feelings of less safety among most people in the local population ... and may drive people to visit such spaces less frequently");[24] *see also September 15, 2020 Board of Supervisors*

---

[23] *Bruen*, 597 U.S. at 45 (quoting 1 Serjeant William Hawkins, *A Treatise of the Pleas of the Crown* 136 (1716)). In the same period, *Bruen* explained, the colonies of Massachusetts (in 1692) and New Hampshire (in 1699) enacted statutes codifying that prohibition. *See* 597 U.S. at 46. Then, in the founding era, Virginia made the "terror" principle express, prohibiting going armed "in terror of the country." 1786 Va. Acts 35, ch. 49.

[24] Professor Alexandra Filindra, Associate Professor in Political Science at the University of Illinois-Chicago, developed the survey questions and analyzed the survey data. The Center for Survey Research at the University of Virginia administered the survey.

*Meeting*, at 13:22:00-57, *available at* https://video.fairfaxcounty.gov/player/clip/1822 (video recording) (statement of Chairman McKay) (explaining that there is "a lot of fear in this community about guns"). The analogy is straightforward: the historical laws prohibited carrying firearms in particular places to prevent the presence of weapons in those places from spreading fear and terror among the population. The Parks Restriction imposes a comparable restriction and is justified on the same grounds.

**c.     Prohibitions on carrying firearms in privately-owned landscapes absent express permission from the owner**. The third strand of founding-era laws that support the Parks Restriction are those that made carrying firearms presumptively illegal on certain outdoor private properties. In 1721, Pennsylvania prohibited "carry[ing] any gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation[.]" III *Statutes at Large of Pennsylvania from 1682 to 1801* 254-55 (Clarence M. Busch ed., 1896), Ex. 27. New Jersey and New York had similar prohibitions,[25] and others continued to be enacted in the 19th century.[26]

The Parks Restriction is analogous to these prohibitions. Their burdens are comparable, in that they each create a default prohibition on carrying firearms in large outdoor spaces. Although the historical laws provided that receiving express permission from the owner would render the

---

[25] *See* 1741 N.J. Laws 101 (1722 law similar to Pennsylvania's), Ex. 28; 2 *Laws of New-York from The Year 1691, to 1773, Inclusive* 441-42 (Hugh Gaine ed., 1774) (1763 law, prohibiting "carry[ing] … any … Fire-arm … into, upon, or through any Orchard, Garden, Corn-Field, or other inclosed Land whatsoever, within the City of New-York, … without Licence in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor"), Ex. 29.

[26] *See, e.g.*, II *Digest of the Laws of Texas* 1321-22 (George Paschal, 4th ed. 1874) (1866 law, prohibiting "carry[ing] firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of civil or military duty"), Ex. 30; 1893 Or. Laws 79 ("It shall be unlawful for any person, other than an officer on lawful business, being armed with a gun …, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof."), Ex. 31.

carrying of guns legal, the prohibition would remain effective unless and until the person wishing

to carry located the owner and succeeded in obtaining that permission—which the owner had

complete discretion to withhold. A person wishing to carry on those lands, therefore, could in no

way be said to have had a *right* to do so. The justifications are also comparable. The historical laws

reflected the proprietor's interest in keeping their lands safe by prohibiting firearms (unless they

expressly wished firearms to be present), just as the Ordinance reflects the County's interest in

keeping its parklands safe.[27]

> **d.   Prohibitions on guns in schools.** The final strand of support for the Parks

Restriction is the well-accepted principle that the government may prohibit firearms in schools.

*Heller* announced that its decision did not "cast doubt" on "longstanding" "laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings[.]" 554 U.S. at

626. *Bruen* reiterated *Heller*'s description of schools as "sensitive places." *See* 597 U.S. at 30; *see

also id.* at 81 (Kavanaugh, J., concurring) (reproducing *Heller* passage in full); Compl. ¶¶ 23, 45,

49 (recognizing schools as an established sensitive place). Although the Supreme Court has not

clearly identified the historical tradition on which it based this conclusion, its place in Second

Amendment doctrine is now firm. *See Antonyuk*, 89 F.4th at 339 n.56. And so, as *Bruen* instructs,

courts can now analogize from the permissibility of prohibitions in schools to approve prohibitions

in "*new* and analogous sensitive places." 597 U.S. at 30.

---

[27] To be sure, several of the historical laws also reflect an interest in protecting wildlife and game. Although that may not be a central purpose of the Ordinance, *Bruen* asks only for *comparable* justifications, not *identical* justifications, *see* 597 U.S. at 29-30, and it cannot possibly have meant that an analogy would fail if the historical justification (protecting game) was *less important* than the modern justification (protecting the people of Fairfax County). *See Gonyo v. D.S.*, No. 2023-796, 2024 WL 296876, at *19 (N.Y. Sup. Ct. Jan. 19, 2024) (noting that if "the Second Amendment right can be constitutionally limited based on a danger of … the unauthorized taking of an animal," it "must certainly tolerate a restriction on a much more *severe* danger of future behavior—the threat of serious injury to a human being").

The Parks Restriction is analogous to historical restrictions on firearms in schools. These regulations place a "comparable burden" on the right to armed self-defense—they both prohibit carrying arms in discrete locations—and this burden is "comparably justified"—prohibitions in schools serve to protect a vulnerable population (children), and that is likewise a key justification for the Parks Restriction given children's extensive use of County Parks. *See supra* pp. 4-5.[28]

### iii.   Decisions upholding laws similar to the Parks Restriction are correct

In addition to its strong historical pedigree, the Parks Restriction is supported by several cases decided since *Bruen*. *Antonyuk*, the only circuit court decision on the issue to date, held that the plaintiffs were not likely to succeed in their facial challenge to New York's prohibition on guns in parks. *See* 89 F.4th at 356-63 ("Whether [New York's statutory] prohibition on firearms in urban parks is consistent with this Nation's tradition is a straightforward inquiry. It is obvious that [the statute] burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State, many of which specifically applied to urban public parks."). Two district courts in Maryland upheld separate prohibitions on guns in parks at the preliminary injunction stage. In *MSI*, the district court upheld Montgomery County's prohibition, finding that "numerous local governments similarly situated to Montgomery County, in states all over the United States, prohibited firearms in parks," and concluding that these laws "demonstrate that there is 'historical precedent' from before, during, and after the ratification of

---

[28] *Antonyuk* relied on similar reasoning to uphold a prohibition on firearms at zoos. *See* 89 F.4th at 363-64. It did not address whether this analogy would extend to parks because it had already deemed parks restrictions consistent with the tradition of prohibiting guns in public-gathering places. *Id.* at 361 n.84; *see also Mintz v. Chiumento*, No. 1:23-cv-00795, 2024 WL 1361047, at *17 (N.D.N.Y. Mar. 20, 2024) (using similar reasoning to uphold a prohibition on firearms at summer camps and noting same justification applies to restrictions on firearms in parks).

the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks." 680 F. Supp. 3d at 585-86 (quoting *Bruen*, 597 U.S. at 27). In *Kipke*, a different judge upheld Maryland's statewide prohibition on guns in state parks and forests, likewise finding that the prohibition "imposes the same burden" and is "comparably justified" when compared to historical prohibitions on firearms in parks. 2023 WL 6381503, at *10. A district court in New Mexico likewise refused to preliminarily enjoin a prohibition on guns in parks in Albuquerque and the county in which it sits. *We the Patriots*, 2023 WL 6622042, at *7-9. Each of these decisions carefully analyzed and properly applied *Bruen*'s methodology.[29]

*      *      *

In sum, the Parks Restriction is valid under the Second Amendment, and thus summary judgment for Defendants is warranted on this claim.

### C.   The Events Restriction is Constitutional under *Bruen*

Plaintiffs' Second Amendment challenge to the Events Restriction likewise fails. To begin with, just as with the Parks Restriction, Plaintiffs have not demonstrated that the Second Amendment's text covers the specific conduct that they wish to engage in and claim that the Events Restriction prohibits. *See supra* Part II.B.i. Even if they had, the Events Restriction also sits comfortably within this nation's historical tradition of firearm regulation. It is relevantly similar to the "public assembly," "public gathering," and "to the terror of the people" laws cited above.

---

[29] A handful of district courts since *Bruen* have granted preliminary injunctions against prohibitions on firearms in parks, but those decisions are not persuasive. *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), for example, was vacated in relevant part by the Second Circuit because its application of *Bruen* was incorrect. *See Antonyuk*, 89 F.4th at 355-63. Other district courts that ruled against parks prohibitions relied on the *Antonyuk* district court's faulty reasoning or on other decisions that invoked that faulty reasoning, and all are currently on appeal. *See, e.g.*, *May v. Bonta*, No. 8:23-cv-01696, 2023 WL 8946212, at *12 (C.D. Cal. Dec. 20, 2023), *appeal docketed*, No. 23-4354 (9th Cir. Dec. 22, 2023).

*See supra* Part II.B.ii.2.a-b; Filindra Report ¶¶ 25-30, 34-42 (concluding, based on survey of area residents, that the potential presence of guns at open-air farmers' markets and political protests in Fairfax County (events that would typically require a County permit if held on County property), "produces 'chilling effects,' that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe"). In addition, the restriction is analogous to historical laws restricting guns at gathering places that implicate heightened tensions or political activity: election grounds and legislative meetings. *See, e.g.*, *Bruen*, 597 U.S. at 30 (confirming constitutionality of prohibitions on firearms at "legislative assemblies" and "polling places"); *Antonyuk*, 89 F.4th at 356 (noting the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond").[30]

Plaintiffs appear to limit their objection to the prohibition on guns in the areas "adjacent to" a permitted event or an event that requires a permit. *See* Compl. ¶¶ 47-51. They assert that "[a]n area adjacent to an event does not constitute a sensitive place," *id.* ¶ 49, but they have made no effort to connect that assertion to *Bruen*'s analogical analysis. And under that analysis, the justification for prohibiting firearms in an area adjacent to an event is plainly "comparable to" the justification for the historical laws identified above, such as those prohibiting carrying "to the terror of the people" or prohibiting firearms at places that implicate heightened tensions. Moreover, even if Plaintiffs could somehow establish that an area adjacent to an event was not itself sensitive despite these historical analogies, there is also a robust historical tradition of prohibiting firearms not only within an area of particular sensitivity, but around it. *See, e.g.*, *MSI*, 680 F. Supp. 3d at

---

[30] *See also DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (holding that prohibition of weapons at "campus *events*" does not violate Second Amendment or equivalent Virginia right (emphasis added)).

589 (noting historical tradition supporting so-called "buffer zones"); *United States v. Allam*, 677 F. Supp. 3d 545, 576-78 (E.D. Tex. 2023) (same), *appeal docketed*, No. 24-40065 (5th Cir. Feb. 1, 2024); *United States v. Walter*, No. 3:20-cr-00039, 2023 WL 3020321, at *7 (D.V.I. Apr. 20, 2023); Parks Table, Ex. 18, rows 5, 16-17, 19, 29 (prohibitions in Philadelphia, Pittsburgh, Reading, PA, Trenton, NJ, and St. Paul, MN, including prohibitions within 50 or 100 yards of the parks).[31] Accordingly, the Plaintiffs' Second Amendment challenge to the Events Restriction fails, and summary judgment for Defendants is warranted.

## III.   The Ordinance Does Not Violate Due Process

Plaintiffs claim that the portion of the Events Restriction applying to "an event that would otherwise require a County permit," or to an area "adjacent" to such an event, is unconstitutionally vague. *See* Compl. ¶¶ 52-59.[32] Defendants are entitled to summary judgment both because Plaintiffs lack standing and because their claim fails on the merits.

### A.   Plaintiffs Lack Standing to Bring Their Vagueness Claim

As an initial matter, Plaintiffs lack standing to bring their vagueness claim because they have not shown any credible threat of prosecution. Plaintiffs have provided no evidence (or even

---

[31] In addition, the *Antonyuk* district court's injunction against New York's prohibition at "any gathering of individuals to collectively express their constitutional rights to protest or assemble" was vacated by the Second Circuit on justiciability grounds that apply equally here. *See* 89 F.4th at 376-79 (plaintiffs did not demonstrate that they had attended any covered "gathering" while armed, were dissuaded from doing so, or had plans to do so in the future). Further, while the Second Circuit did not reach the merits of this part of New York's law, its recognition of a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places," *id.* at 356, supports the constitutionality of that law, and of the Events Restriction. (Notably, the district court had itself previously approved this part of New York's law in denying a motion for a temporary restraining order. *See* 635 F. Supp. 3d 111, 143 (N.D.N.Y. 2022).)

[32] Plaintiffs do not raise a due process challenge to the aspect of the Events Restriction that applies to County-permitted events or areas adjacent to County-permitted events. *See* Compl. ¶¶ 52-59. But if even Plaintiffs had challenged the Events Restriction in its entirety, their challenge would fail for the reasons set out in this Section.

allegations) of "fears of [County] prosecution" that are "actual and well-founded enough to establish that the [the Events Restriction] will be enforced against them," as required for Article III standing in a pre-enforcement facial challenge. *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2020) (cleaned up).[33] Plaintiffs assert that they possess, carry, and transport firearms in public areas without knowledge of whether these areas are being used by events that would otherwise require a permit, or are adjacent to such areas. LaFave Decl. ¶ 5; Taubman Decl. ¶ 4; Holzhauer ¶ 5; *see* Compl. ¶ 39. But they have "offered no evidence to support a credible threat of prosecution" for such conduct—such as that the County has enforced or threatened enforcement in such areas when there is no notice of the prohibitions. *Md. Shall Issue*, 971 F.3d at 218 (finding no pre-enforcement standing where government "has not threatened prosecution for the supposedly proscribed conduct" and "plaintiffs have offered no evidence of the law having been enforced as they fear"). Without more, Plaintiffs' "generalized fears and concerns" are insufficient to establish standing. *Id.*; *see also Md. Shall Issue, Inc. v. Hogan*, 353 F. Supp. 3d 400, 419 (D. Md. 2018) (dismissing pre-enforcement facial vagueness challenge on standing grounds where "[p]laintiffs do not allege any facts suggesting a 'credible threat' that the [law] will be enforced in accordance with [p]laintiffs' broad reading"), *aff'd*, 963 F.3d 356 (4th Cir. 2020).

Rather than establishing a credible threat of prosecution, the evidence shows that the County expressly *precludes* enforcement of the Ordinance in the manner Plaintiffs say they fear. As the state court found in denying Plaintiffs' previous similar motion, the County has "adopted an official enforcement[] policy which prohibits enforcement of the [O]rdinance unless officers

---

[33] Plaintiffs have the burden to demonstrate standing for each of their claims, and, at the summary judgment stage, they cannot rest on "mere allegations, but must set forth [their injury-in-fact] by affidavit or other evidence specific facts." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

first ... confirm warning signage posted at any entrances or exits at qualifying locations, and …
attempt to educate and seek voluntary compliance from violators." *LaFave*, 2023 Va. Cir. LEXIS
203, at *4-5 (Ex. 14); Becker Decl. ¶¶ 10-24 (describing police officers' training in this policy);
*id*. Ex. C (CSM provisions establishing policy). The Fourth Circuit has relied on similar official
guidance to find that other plaintiffs faced no credible threat of prosecution, and thus lacked
standing to pursue their pre-enforcement facial vagueness challenge. *See Md. Shall Issue*, 971 F.3d
at 218 (relying on State Police FAQ). This Court should do the same.

### B.      The Events Restriction Is Not Void for Vagueness

Even if Plaintiffs had standing, they cannot come close to meeting the "particularly
demanding standard" applicable to this facial constitutional challenge. *Fusaro v. Howard*, 19 F.4th
357, 373 (4th Cir. 2021); *see Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (explaining that
facial vagueness challenge must fail "if the statute has a plainly legitimate sweep" (quotation marks
omitted)). Under the Due Process Clause, a law is impermissibly vague only if it "fails to provide
a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it
authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553
U.S. 285, 304 (2008). A law lacking "precise guidance" or "mathematical certainty" is not
unconstitutionally vague. *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012)
(quotation marks omitted). Moreover, a court will construe a challenged law, "if fairly possible,
so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that
score." *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quotation marks omitted).[34] In

---

[34] Virginia law also embraces this constitutional avoidance principle. *See Tanner v. City of Va. Beach*, 674 S.E.2d 848, 852 (Va. 2009) (explaining that "if a statute or ordinance can be construed reasonably in a manner that will render its terms definite and sufficient, such an interpretation is required"); *see also Fusaro*, 19 F.4th at 371 n.12 (noting, in assessing due process

doing so, the court examines the law "as a whole," as well as "'any limiting construction that a state court or enforcement agency has proffered.'" *Martin*, 700 F.3d at 136 (citation omitted).

Under the undisputed facts of this case, Plaintiffs cannot establish a violation of due process. Contrary to their assertion, *see* Compl. ¶¶ 56-58, Plaintiffs do not need to guess whether a given event is subject to the Ordinance. They will know with complete certainty because the Ordinance and the CSM establish that the Events Restriction applies only when notice of the Ordinance is posted. The Ordinance itself makes this clear, by mandating that "[n]otice of this ordinance *shall be posted* … at all entrances or other appropriate places of ingress and egress to … any … place … that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a permit." § 6-2-1(D)(1)(iv) (emphasis added).[35] And the Command Staff Memorandum reinforces that requirement by instructing police officers that the Ordinance applies and can be enforced only where appropriate signage is posted. Becker Decl. ¶ 21 & Ex. C; *see, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 148-49 (4th Cir. 2017) (en banc) (deferring to limiting constructions in Attorney General opinion and Maryland State Police advisory in rejecting vagueness challenge to state firearms law). Accordingly, a person of ordinary intelligence knows precisely what is prohibited: carrying in locations where signs give notice of

_____

vagueness challenge, that federal courts should apply statutory construction rules of highest state court when interpreting state statutes).

[35] Even if there were any doubt about the clarity of this language, legislative history would eliminate it. *See Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund*, 718 F.2d 628, 643 (4th Cir. 1983) (relying in part on "the legislative history of the 1980 Act" in rejecting vagueness challenge); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 267 (2d Cir. 2015) (in assessing vagueness challenge to firearms regulation, stating that "[w]e review the statutory language within its context, relying if necessary on the canons of statutory construction and legislative history"). The package accompanying the Ordinance made clear to each member of the Board of Supervisors that "[a]ppropriate signage must be posted in order to enforce the prohibition," and Deputy County Executive Rohrer made the same statement in his testimony to the Board. *See* Ex. 34; Rohrer Testimony at 7:48:33-36.

the Ordinance and state that firearms are forbidden there. Plaintiff LaFave recognized as much when she acknowledged in her state court deposition that the County's "no sign, no enforcement" policy resolves any vagueness concerns. Ex. 33 (LaFave Dep. Tr. 90:5-91:9). Plaintiffs' due process claims have no merit.

## CONCLUSION

Defendants respectfully request that the Court grant their motion for summary judgment and enter final judgment in their favor.

Respectfully submitted,

Date: April 26, 2024

THE COUNTY OF FAIRFAX, VIRGINIA,
and the CHIEF OF POLICE, KEVIN DAVIS, in his
official capacity

By: */s/* Anders T. Sleight _____
*Counsel*

Douglas R. Kay, VSB No. 35468
Thomas W. Repczynski, VSB No. 39967
Anders T. Sleight, VSB No. 84458
OFFIT KURMAN, P.C.
8000 Towers Crescent Drive, Suite 1400
Tysons Corner, Virginia  22182
Telephone:  (703) 745-1800
Facsimile:  (703) 745-1835
dkay@offitkurman.com
trepczynski@offitkurman.com
Anders.sleight@offitkurman.com
*Co-Counsel for Defendants*

Daniel Robinson (VSB No. 78985)
John W. Burton (VSB No. 42223)
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
Telephone: (703) 324-2421
Facsimile: (703) 324-2665
Daniel.Robinson@fairfaxcounty.gov
John.Burton@fairfaxcounty.gov
*Co-Counsel for Defendants*

Janet Carter
William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue, P.O Box 4184
New York, New York 10163
Telephone: (646) 324-8174
jcarter@everytown.org
wtaylor@everytown.org
*Co-Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2024, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

> Stephen P. Halbrook
> 3925 Chain Bridge Road, Suite 403
> Fairfax, VA 22030
> (703) 352-7276
> protell@aol.com
>
>
> Christopher M. Day
> Earl N. "Trey" Mayfield, III
> 10521 Judicial Drive, Suite 200
> Fairfax, VA 22030
> (703) 268-5600
> cmday@jurisday.com
> tmayfield@jurisday.com

*/s/* Anders T. Sleight
Anders T. Sleight
