**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **KIMBERLY Y. LAFAVE, et al.**<br><br>***Plaintiffs***<br><br>**v.**<br><br>**THE COUNTY OF FAIRFAX, VIRGINIA, and KEVIN DAVIS, in his Official Capacity as Chief of Police**<br><br>***Defendants*** | ) | **Case No. 1:23-cv-1605 (CMH/JFA)** |

**EXPERT REPORT OF PROF. TERENCE YOUNG**

I, Terence Young, state as follows:

**Background**

1. Since fall 2020, I am Emeritus Professor of Geography in the Department of Geography & Anthropology, California State Polytechnic University, Pomona.

2. I was an Assistant, Associate, and full Professor of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona between fall 2002 and spring 2020. During the same period, I was also an adjunct in the university's Regenerative Studies program. Before fall 2002, I held academic positions as a geographer at California State University, Long Beach, University of Southern California, UCLA, Clemson University, George Washington University, and Mary Washington University. In 1996-1997, I was Acting Director of Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC.

3. I earned a Bachelor of Arts in Anthropology at UC Berkeley (1973), a Master of Arts in Geography at UCLA (1987), and a Ph.D. in Geography at UCLA (1991).[1]

4. As a scholar, I have studied the history and historical geography of the American park movement, including from its earliest years, the meanings, purposes, developments, designs, and usages of various types of protected areas since I began work on my doctoral degree in fall 1987. In my professional capacity, I authored award-winning scholarly books, book chapters, and journal articles concerning American protected areas and the American park movement. These publications have been cited by authors in multiple disciplines, including history, geography, anthropology, natural resources management, and more.

5. I am aware of this lawsuit, have reviewed the Complaint ("Complaint") filed by Kimberly LaFave, Glenn M. Taubman, and Robert Holzhauer ("Plaintiffs") in this matter, and am familiar with the claims and allegations of the Complaint. I have also been provided copies of the Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated January 5, 2024; the other Declarations submitted in support of that Memorandum, without attachments (Declarations of Anders Sleight, Alexandra Filindra, Kara Fitzgibbon, Major Dalton Becker, and Sara Baldwin); and the Court's Order denying Plaintiffs' Motion for Preliminary Injunction, dated January 24, 2024.

6. I am being compensated for services performed in the above-entitled case at an hourly rate of $200 for reviewing materials and preparing reports; and $400 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

[1] I have not been deposed or testified at trial in any case within the past four years. For a full CV, please see Exhibit 1 to this Report.

7. The opinions in this Report are based upon a combination of my professional training, research, and work experiences in my various academic roles; and, from personally reviewing relevant documents, rules, regulations, and historical sources of information regarding the public parks and forests, including those referenced in the attached list of citations or in this report. Any information I obtained from those outside sources is consistent with my own understanding.

**Overview of Opinions**

8. America's tradition of public parks was launched in the 1850s. Prior to that era, privately owned taverns and similar establishments had popular gardens while most publicly owned open spaces were utilitarian rather than ornamental spots for sociability and relaxation. The American park movement emerged from the idea that American urban society was flawed and that parks could repair and reform it. Specifically, urban parks would foster a healthier, wealthier, more democratic, and less criminal urban society. Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society. In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited.

9. Near the end of the nineteenth century, a rationalistic ideology joined the earlier Romantic one. The new ideology emphasized such active recreation in parks as baseball and bicycling because these were also thought to lead to a healthier, wealthier, more democratic and less criminal society. However, the new ideology did not eliminate the passive contemplation of

natural scenery. Instead, urban parks were re-designed to provide separate spaces for both active play and for quiet contemplation. These two uses of public urban parks continue to this day, each with its own spaces.

10. In the late nineteenth and early twentieth centuries, America's natural national parks were also created to protect landscapes of natural scenery. Like their urban counterparts, they were romantic places for quiet and passive contemplation in order to improve urban society. Later, national parks also became places for active recreation, but it was never as important as in the urban parks. Today's national parks remain places for the contemplation of natural scenery and, to a lesser degree, for active play.

11. At roughly the same time that national parks were being created, state parks appeared. Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play. They remain so to this day.

**Growth of the 19th Century Parks Movement**

**Urban Parks**

12. The development of the American park system and the park movement evolved over decades and centuries in response to existing societal concerns and circumstances.

13. During the colonial era and into the early American Republic, public spaces were created in some settlements, for instance the pre-planned squares of Savannah, Georgia and Philadelphia, Pennsylvania, but the best known of these are the "greens" or "commons" of southern New England. Today, the remnants of these once larger spaces may be manicured with lawns and ornamental plants, but such elements are relatively recent additions. As early as 1961, the colonial legal historian, John D. Cushing, wrote about the origins and evolution of these

spaces because "there are few …aspects of New England culture and history about which so much misinformation prevails." Dismissing the notion that the current appearance, purpose, and use of a place like the Boston Common tells us about their origins, he stated instead that "the idea that any common laid out either in the seventeenth or early eighteenth centuries was designed as an ornamental center for the community… [is] absurd" (Cushing, 1961, 86). Instead, they were multi-purpose utilitarian spaces until the mid-nineteenth century. At the beginning, a settlement's town common included a Puritan house of worship called a "meetinghouse," which is why in earlier times these spaces were called "meetinghouse lots." The open space surrounding the meetinghouse often contained the "close" or paddock for assembling and temporarily holding town livestock before the animals were led to the much larger common pasturage outside the settlement. The meetinghouse lot usually also contained a town's cemetery or "burying ground." And, sometimes, if it was large enough, a site for a community's men to practice basic military exercises as an organized militia. In contrast to today, these were not individuals visiting a public park but an organized community activity for its common defense. According to historian John Stilgoe (1982, 19-20), "Every town insisted that its men drill once every three months at least, on 'muster day'; and it provided that its [meetinghouse] lot be used as a parade ground, where all men and boys of military age lined up for weapons inspection, close order drill, and lessons in advanced tactics by experienced officers." As support for such militia training, meetinghouse lots could contain a "magazine" for storing gunpowder and other supplies as well as a "gunhouse" for cannon and such (Cushing 1961, 91).

14. Meetinghouse lots usually shrank in area over the decades as portions were re-purposed, sold, given away, and appropriated for roads. Furthermore, additional uses were found

for what did remain of a given lot through the eighteenth century and into the nineteenth. By the middle of the eighteenth century, for example, innkeepers throughout this region knew that it was profitable to locate their taverns and any outdoor spaces nearby, adjacent to, or even upon the meetinghouse lot (Stilgoe, 22). In 1770, Salem, Massachusetts built a workhouse on its meetinghouse lot and, in 1782, Newburyport, Massachusetts ordered smallpox victims transported "to the pest house in the common pasture" in the town center. Newburyport repeated this order in 1788 and again in 1803 (Stilgoe, 20). It was during the nineteenth century that these spaces began to be called "the green" (Stilgoe, 20).

15. Beyond a green's meetinghouse, graveyard, and other structures, the lot was generally neglected. According to Cushing (1961, 92), "Generally speaking, most commons were barren, unsightly plots from the earliest days until well after 1835. Brush, stumps, stones, rubbish, dead trees and stagnant pools, swarming in summer with disease-carrying insects, typified a great many meetinghouse lots for centuries." They were not analogs to today's public parks nor were they their predecessors except in the sense that some of these utilitarian spaces, most famously the Boston Common, survived long enough to be adaptively re-used as community parks.

16. A different approach was taken in Savannah, Georgia when that colonial-era town was laid out in 1733. Each "ward" of residents surrounded a civic square of approximately two acres. While today these squares are ornamented with plants, walks, fountains, and the like, they, like New England's greens, initially served several utilitarian purposes. The principal instigator of the town, James Oglethorpe, wrote that each square would be "reserved for a Market place, and for exercising the Inhabitants" (quoted in Wilson, 2012, 86). It would also provide a place for public gatherings as well as be a parade ground for militia training and for

defense. "The town," explains Thomas D. Wilson, historian of Savannah's plan, was "organized into militia units that together formed a battalion. Units of the battalion would train in civic squares placed at regular intervals in the town and would form in those squares to defend against attack" (Wilson, 2012, 71). The situation began to change during the early nineteenth century. In 1808, one visitor described the squares as "each …has a pump in the centre [for fire fighting], surrounded by a small plantation of trees," but it was not until the 1830s that the squares were developed with railings, walks, and lawns, (De Vorsey, 2012, 97). Savannah's plan led to similar squares in the Georgia towns of New Ebenezer, Sunbury, and Brunswick, but that was it. They were neither widespread nor abundant in number like the greens of New England. According to Architectural Historian Turpin C. Bannister (1961, 62), "the promoters of later colonial and early republican new towns were so eager to exploit their land for maximum profit that the most generous felt expansively prodigal if he contributed a small central plaza for a market."

17. The situation in Philadelphia, Pennsylvania was analogous to that of Savannah. Pennsylvania's proprietor, William Penn, included five public squares of either eight or ten acres in his 1682 plan for Philadelphia. Today, the remaining squares are popular public spaces that incorporate walks, fountains, lawns, flowers, and other ornamental features. The path to these features, however, was a twisted one. According to landscape architect, Anne Beamish (2021, 11), these publicly-owned sites were originally laid out and planned as formal public spaces, but "the squares were not used as such until the nineteenth century" because Philadelphia's population was small and could not support them and the city included many popular, privately owned taverns and inns with adjacent gardens (Beamish, 2021, 11). The largest square, Centre Square (now the site of City Hall), was mostly used for horse racing, militia training, and as the

site for the city gallows until the very end of the eighteenth century when it was chosen to be the location for a new water pumping station. Like Centre Square, the other four squares "were not used for public pleasure and 'were completely without charm'" (Beamish, 2021, 12). Northeast (now Franklin) Square, for instance, included a city magazine for storing gunpowder and as a place for selling hay, straw, and lime. Southeast (now Washington) Square was designated a "burial ground for strangers, or potter's field" in 1706 (quoted in Beamish, 2021, 12) And, even though the city ordered the cemetery removed for public improvements in 1795, it was still renting out the square for grazing in 1813 (Beamish, 2021, 12). Again, these activities were mostly utilitarian in character.

18. New York, New York was different than Savannah and Philadelphia in that it did not include an identified series of public squares in its original planning. Instead, many of its public spaces, like the greens of New England, emerged as adaptive re-uses of pre-existing sites. Beamish (2021, 2) points to three specific spaces where New Yorkers "experimented with leisure activities and socializing and where the demand for [later, publicly owned] recreational spaces developed" – The Battery, The Bowling Green, and The Fields. Also like New England, Savannah, and Philadelphia, the early uses of these spaces were utilitarian rather than recreational. The Battery, for example was a defensive military site with cannon. The Bowling Green was the site of a marketplace and the city's first public well. And, The Fields was an animal grazing area that also enclosed a "magazine" (Beamish, 2021). Moreover, when The Bowling Green became a leisure site, it was a privately operated space rather than a public one. The city rented the site to some local residents to run as a place of beauty, ornament, and recreation. The Battery did not begin to function as a meeting place for the wealthy until about 1802 and the Fields, which later became the site of today's City Hall, was re-named City Hall

Park during the building's construction (1803-1812). Neither The Battery nor The Fields inspired a direct wave of imitations elsewhere in the United States.

19. The small public spaces of southern New England, Savannah, Philadelphia, New York and elsewhere would only widely become urban greenspaces after the American public park movement arose with the appearance of Romanticism and urban expansion.

20. During the early American Republic, cities were necessarily compact, usually about three square miles in area, and densely built. Despite the resulting crowded conditions, most residents could readily retreat to relaxing rural areas nearby. However, as the national economy shifted and cities developed into primary engines of commerce, their populations and physical sizes necessarily grew. For example, from 1830 to 1860, the population of New Haven grew from 10,000 to 39,000, Boston from 61,000 to 178,000, Philadelphia from 80,000 to 566,000, and New York from 203,000 to 814,000.

21. The push for larger greenspaces in cities began in earnest in the pre-Civil War years as increasing numbers of Americans chose to live in cities. Early proponents of expanded urban greenspace drew upon the example of the recently popular "rural" cemeteries. America's earliest cemeteries were undesigned graveyards and churchyards. The first designed cemetery was New Haven's New Burying Ground of 1796, but it, unlike its successors, was gridded and rectilinear. In 1831, the Massachusetts Horticultural Society created the first of and prototype for the many subsequent "rural" cemeteries – Boston's Mount Auburn. These cemeteries, which were romantic in design, incorporated extensive tracts of suburban land with lawns, hills, woods, water features, and scenic vistas. By the mid-nineteenth century, these cemeteries were popular tourist attractions drawing thousands each year (Linden-Ward, 1989).

22. Rural cemeteries, however, inadequately addressed the societal concerns of the pre-Civil war era arising from increased urbanization because they were privately owned, did not permit full public access, and being suburban were inaccessible to many city dwellers due to their distance. Moreover, they were inaccessible to most working people. In the 1840s and 1850s, urban greenspace proponents applied the lessons of cemeteries when arguing for large publicly owned parks.

23. New York's 843-acre Central Park was the first to achieve this goal and was based on an 1858 design by Frederick Law Olmsted and Calvert Vaux. Unlike the small public spaces mentioned above, Central Park would stimulate a rapidly expanding and durable tradition of American parks. Before the Nineteenth Century ended, America's best-known urban parks had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's Balboa Park. The initiation and development of each park was unique, but they all occurred where supported by a significant portion of the population, were relatively large in area, generally over 500 acres, adopted the same design principles, and swiftly promulgated similar prohibitions concerning the carrying of firearms. They did so because they shared a common purpose – the improvement of American society (Schuyler, 1986; Young, 2004).

24. The creation of large urban parks began in the 1850s and in these rapidly growing cities for cultural reasons that go back to the early Republic – a national mistrust of and suspicion about urban life. Thomas Jefferson, for example, had argued in 1787's *Notes on the State of Virginia* that the ideal society would flourish where the economy was agricultural and the settlements small and dispersed. Invoking a geographic contrast, Jefferson promulgated a

valorized rural-urban imaginary that regarded the former as healthy and positive while casting the latter as damaging and negative. Farmers, he insisted, were the backbone of America. "Those who labor in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposite (sic) for substantial and genuine virtue." Manufacturing and cities, in contrast, were sources of vice. Drawing a particularly repulsive word picture, Jefferson suggested that "The mobs of great cities add just so much to the support of pure government, as sores do to the strength of the human body." The roots of the republican nation, urged Jefferson, lay in a rejection of urban life (Jefferson, 1829, 171-173; Young, 2022).

25. In the immediate pre-Civil War years, industrialization increased rapidly, surface transportation encouraged urban spreading, and cities grew in area and population numbers. This concentration of people accentuated social problems, making them more obvious to more people. Cities were increasingly perceived as socially degraded places in contrast to virtuous rural America. In line with this perception, cities were condemned as unhealthy, impoverished, undemocratic, and crime ridden. A range of solutions were proposed to remedy these urban vices (Boyer, 1978), including municipal parks. In a large park, urban residents could "retreat" from the city to be back in touch with nature, which would lead to social reform and improvement. Parks, proponents and supporters argued, would produce a virtuous society characterized by health, wealth, equality, and little crime (Young, 2004).

26. Park proponents believed that society's characteristics were strongly shaped by its physical environments. Urban environments of noise, traffic, pollution, crowding, and ugly buildings led to a vicious society while an urban park's "natural" environment would lead to a virtuous one. Urban vice did not occur because society was evil by nature but because its members were out of touch with nature, a principal source of goodness. In other words, publicly

owned urban parks were devices for social reform. They would succeed best where urban environments and urban ways of life were excluded from a greenspace (Young, 2004). For example, according to an 1867 Newark, New Jersey park report, a park was designed to produce "a certain [positive] effect upon the mind and the character of those who approach it" (Schuyler and Turner Censer, 1992, 211). Forty years later, Charles Mulford Robinson, made a similar link between society and its surroundings. A leader in the "City Beautiful" movement that sought visible expressions to Progressive Era reforms aimed at revitalizing public life and instilling civic awareness, Robinson argued for the creation of public flower beds, new parks, and street trees because "Social problems are to a large degree problems of the environment." Create parks where adults and children can find "brightness, entertainment, and fellowship without throwing them into temptation… and many of sociology's hardest problems will be solved" (Robinson, 1909, 245).

27. The foundation for the ideology of the early urban park proponents and supporters lies in Romanticism and the Romantic Movement. While the philosophy and movement had diverse expressions, it can be broadly recognized by a rejection of rationalism, a regard for history and a focus on perception and beauty, particularly that of nature. Moreover, the movement embraced the belief that a group of people's character or nationality grew organically and emerged over a long period of time. In addition, Romanticism contributed to the growth of democracies, to a belief in progress and to the more open societies that are common features of modern life (Barzun 1961). Romantic park supporters, like many contemporary artists and scientists (Novak 1995), saw nature as an interrelated world of mind, body, and being, an organic whole that included God, people, and the physical world. Social problems resulted from the physical disjunction that developed between nature and people in any city large enough to be

dominated by streets and buildings. Ignoring the benefits from urban life, they viewed the city as a dangerous environmental aberration that could lead to the dissolution of society. Parks were the necessary corrective because they brought nature, which was God's handiwork, balanced and inherently good, back into cities. As the minister Henry Ward Beecher enunciated in 1869, for "the multitude," natural beauty was a gift of God "without price." It could "confer pleasure and profit from merely the looking at it" (Beecher, 281-284).

28. As the Beecher quote suggests, nature in this era was approached as scenery, but it was not simple and unconsidered. Park designers and their supporters believed nature appeared best in parks as three landscape art categories or "genres": the "Beautiful" (also called the "Pastoral" by Frederick Law Olmsted), the "Picturesque," and the "Sublime." Each was yoked to a set of unique attributes. Smallness, roundness, smoothness, delicacy, and color best captured the Beautiful, making it the preferred genre for parks with extensive lawns or water features bordered by shrubs and trees. The Sublime countered the Beautiful, being linked to terror, obscurity, difficulty, power, vastness, majesty, and infinity, but it remained beyond the ability of urban park designers because their landscapes were too restricted to create it. However, it informed the selection of and lay behind the drive for the national parks discussed below. The Picturesque mediated the two extremes, expressing the pleasure gained by abrupt, unexpected, or rude forms and textures, as well as the roughness that could exist at any scale. Many large urban parks incorporated picturesque elements as a stimulating contrast to beautiful ones, but picturesque rarely dominated (Novak, 1995; Young 2004).

29. And, like some landscape scene in a painting, municipal parks' "naturalistic" landscapes were intended to support only pastoral and picturesque activities. These large urban parks were places for "passive recreation," which meant sitting, strolling, slow horse riding, and

other quiet activities while contemplating the scenery. Activities that were fast moving, active, boisterous or worse, ran counter to a park's purpose. In support of these aesthetics, Parade Grounds were isolated from the park proper in both Olmsted and Vaux's Prospect Park and in Olmsted's unbuilt 1866 plan for San Francisco (Graff 1985; Young 2018). Places for military exercises and displays, Parade Grounds were spaces "for citizens to demonstrate their commitment to defense of their government" (Rosenzweig and Blackmar, 1992, 143). According to Olmsted (1990b, 532), these places may have been necessary, but they were not to conflict with "the safety or the quiet of those not interested in them." That is, a park's visitors. Consequently, Parade Grounds were closed off or moved away from a park proper. They were, argued Schuyler (1986, 131), "locations for functions that, while essential in a city, would be antithetical to the tranquility of a naturalistic landscape."

30. In addition to being informed by the same ideology and designed using the same three landscape genres, America's large urban parks embraced firearms prohibitions shortly after they came into existence. Again, the official prohibitions began with Central Park. In March 1858, one month before Central Park's Commissioners (Board of Commissioners, 1858, 166, **Exhibit 2**) awarded a plan for the new park, they voted seven to two to adopt their initial set of rules and regulations concerning it. Their attitude toward firearms in Central Park could not have been clearer. "All persons are forbidden …To carry fire-arms or to throw stones or other missiles within it." And, to be sure the public knew there were regulations, relates New York City archivist Cynthia S. Brenwall (2019, 26), the Commissioners had the regulations "posted in conspicuous locations that would be easily seen by all visitors."



(from Brenwall, 2019, 27). The public did not necessarily know how to behave in their new park so the commissioners adopted rules to prompt proper behavior and decorum. Aligned with these rules and regulations, and as a practical matter, they also created a force of Park Keepers in 1859 to control activities deemed inappropriate. "A woods shared by 'thousands' demanded a different kind of care than woods visited by a few," noted historian David Thacher before quoting the *New York Times* of February 21, 1859: "Nature in the neighborhood of large towns needs rules and regulations to enable her to do herself justice, just as certainly as in the country she does better without them" (Thacher, 2015, 591). Proponents and supporters of large urban parks understood that the heavy use of the nature in a park that would result from its being easily accessible, necessarily mandated rules and regulations to control and direct visitors in order to allow nature to reform society.

31. The Central Park Commissioners' prohibition on carrying firearms in their park, often using the same or nearly the same language, was embraced by authorities in the other large parks that rapidly appeared across the United States. The Central Park Commissioners reprinted

their prohibition exactly in 1861 (Board of Commissioners, 106, **Exhibit 3**). In 1866, as the development of Olmsted and Vaux's next park, Prospect Park, was getting underway, the Brooklyn Park Commissioners adopted the same language as their peers at Central Park: "All persons are forbidden… To carry firearms, or to throw stones or other missiles within the park" (Brooklyn Park Commissioners, 1873, 136, **Exhibit 4**). Two years later, 1868, the rules and regulations for Philadelphia's Fairmount Park included a similar prohibition: "No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stones or other missiles therein" (Laws of the General Assembly, 1868, 1088, **Exhibit 5**). In April 1870, the Commissioners of San Francisco's new Golden Gate Park were appointed and authorized to begin the park's development. Twenty-nine months later, in 1872, they adopted a prohibition similar to Central Park's: "Within the said grounds [i.e., Golden Gate and Buena Vista Parks] all persons are hereby forbidden …To carry and especially to discharge firearms" (Board of Supervisors, 1875, 887, **Exhibit 6**). The following year, 1873, the city of Chicago adopted a comparable prohibition for its "Parks and Public Grounds": "All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks" (Chicago, Illinois, 1873, 88, **Exhibit 7**). And, in 1874, the Buffalo, New York Park Commissioners adopted an ordinance corresponding to that of Central Park and its successors to date: "All persons are forbidden to carry fire-arms or fire at or shoot any bird or animal, or throw stones or missiles withing the several parks, approaches thereto or streets connecting the same" (Buffalo Park Commissioners, 1874, 24, **Exhibit 8**). For approximately another decade, similarly purposed, Romantically inspired, and scenically designed parks appeared in cities across the country and their commissioners or similar authorities adopted comparable prohibitions or fines: Hyde Park, Illinois in 1875 (President and Board of Trustees, 1876, 310, **Exhibit 9**),

Phoenixville, Pennsylvania in 1878 (Borough of Phoenixville, 1906, 135, **Exhibit 10**), Chicago reprinted its earlier prohibition in 1880 (Jamieson and Adams, 1881, 391, **Exhibit 11**), St. Louis in 1881 (Sullivan, 1881, 635, **Exhibit 12**) and then extended it to a new park in 1883 (MacAdam, 1883, 117, **Exhibit 13**), and Danville, Illinois in 1883 (Mann and Frazier, 1883, 83, **Exhibit 14**). This is not a coincidence. It is a firearms regulation tradition grounded in the purpose, form, and use of America's post-Central Park urban parks.

32. Beginning in the late 1880s, an increasing number of American urban park advocates and supporters embraced a new rationale for municipal parks, what I term "rationalistic" parks. American cities continued to be plagued by poverty, disease, undemocratic acts, and crime, but these new park proponents did not abandon the idea of urban social improvement through parks. Instead, they stepped back from the romantic idea that scenic park landscapes alone reformed society to also embrace a more Darwinian and mechanistic view of nature. As their perspective grew in importance, the value of nature contemplation somewhat retreated, and parks were re-imagined as favored settings for organized play and other leisure-time activities. Flower gardens, museums, baseball diamonds, and children's playgrounds became common park features as rationalistic park proponents pursued their formula for encouraging the good society. These advocates saw romantically designed parks as underdeveloped rather than mis-designed, so they did not seek to remove and replace the features of romantic-era parks. Instead, they wished to share the space of a large park by introducing the features they believed would reform society. In addition, municipal park authorities created parkways and numerous, generally small greenspaces throughout cities in order to bring the reforming abilities of parks into neighborhoods. Visitors would no longer have to travel long

distances to the large parks. These small parks utilized both romantic and rationalistic characteristics and were more tools in the effort to improve urban society (Young, 2004).

33. Despite the addition of a rationalistic ideology and new landscape layouts, urban park authorities continued for decades to publish new and re-promulgate established prohibitions on the carrying of firearms in them: Boston's Park Commissioners declared in 1886 that "it is forbidden: …To throw stones or other missiles; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties" (Boston, Massachusetts, 1888, 86, **Exhibit 15**). In 1887, the city of Reading, Pennsylvania announced that firearms would not be allowed in its new park, "Penn's Common": "No person shall carry firearms, or shoot in the common, or within fifty yards thereof" (Richards, 1897, 240, **Exhibit 16**). The following year, 1888, Saint Paul, Minnesota's Board of Park Commissioners published its Laws Relating to Parks, which included: "No person shall carry firearms or shoot birds in any Park or within fifty yards thereof" (Saint Paul, Minnesota, 1889, 689, **Exhibit 17**). Salt Lake City, Utah also published a similar prohibition concerning its park in 1888: "No person shall, within Liberty Park, …Carry or discharge firearms" (Salt Lake City, Utah, 1888, 248, **Exhibit 18**). And, in 1890, Trenton, New Jersey listed among its ordinances: "No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein" (Trenton, New Jersey, 1903, 390, **Exhibit 19**). In addition to the above prohibitions, the carrying of firearms was prohibited in the parks of: Berlin, Wisconsin (1890, 76, **Exhibit 20**) and Williamsport, Pennsylvania (1900, 141, **Exhibit 21**) in 1890; Grand Rapids, Michigan (Campbell, 1906, 163, **Exhibit 22**), Milwaukee, Wisconsin (Park Commissioners of the City, 1892, 32, **Exhibit 23**), and Springfield, Massachusetts (1897, 82, **Exhibit 24**) in 1891; Cincinnati, Ohio (Board of Park Commissioners, 1893, 28, **Exhibit 25**), Lynn, Massachusetts

(1892, 23, **Exhibit 26**), Peoria, Illinois (Slemons, Pinkney and Raum, 1892, 667, **Exhibit 27**), and Spokane, Washington (Connor, 1903, 316, **Exhibit 28**) in 1892; and, Pittsburgh, Pennsylvania (Thomson, 1897, 496, **Exhibit 29**) and Wilmington, Delaware (1893, 571, **Exhibit 30**) in 1893. Before the decade ended, comparable prohibitions were published, republished, amended, and/or extended to new urban parks in: Saint Paul, Minnesota (Giltinan, 1896, 208, **Exhibit 31**); Canton, Illinois (Chiperfield, 1895, 240, **Exhibit 32**); Detroit, Michigan (Local Acts, 1895, 596, **Exhibit 33**); Centralia, Illinois (Noleman and Bundy, 1896, 188, **Exhibit 34**); Indianapolis, Indiana (Brown and Thornton, 1904, 648, **Exhibit 35**); Rochester, New York (Board of Park Commissioners, 1898, 97-98, **Exhibit 36**); Wilmington, Delaware (Board of Park Commissioners, 1898, 24, **Exhibit 37**); Kansas City, Missouri (Rozelle and Thompson, 1898, 657, **Exhibit 38**); New Haven, Connecticut (1898, 293, **Exhibit 39**); and, Boulder, Colorado (Greene, 1899, 157, **Exhibit 40**). As the nineteenth turned to the twentieth century, more cities continued this tradition in their urban parks, including: Hartford, Connecticut (Henry, 1907, 493, **Exhibit 41**), New Bedford, Massachusetts (Board of Park Commissioners, 1902, 493, **Exhibit 42**), and Springfield, Illinois (Board of Trustees, 1902, 69, **Exhibit 43**) in 1902; Lowell, Massachusetts (Board of Park Commissioners, 1904, 58, **Exhibit 44**), New York City (1903, 600, **Exhibit 45**), Pasadena, California (1912, 29, **Exhibit 46**), and Troy, New York (1905, 375, **Exhibit 47**) in 1903; Houston, Texas (Roberts and Crawford, 1904, 358-59, **Exhibit 48**), Neligh, Nebraska (1906, 37, **Exhibit 49**), and Pueblo, Colorado (Highberger and Martin, 1908, 384, 386, **Exhibit 50**) in 1904; Harrisburg, Pennsylvania (Richards and Lamberton, 1906, 468, **Exhibit 51**), Haverhill, Massachusetts (Park Commissioners, 1907, Appendix A at 12, **Exhibit 52**), and Saginaw, Michigan (Common Council, 1905, 173, **Exhibit 53**) in 1905; Chicago Illinois (Padden, 1906, 40, **Exhibit 54**), Denver, Colorado (Varnum and Adams, 1906, 479, **Exhibit 55**),

and Los Angeles, California (Stevens and Delorey, 1921, 41-42, **Exhibit 56**) in 1906; Portland, Oregon (City Council, 1910, 483, **Exhibit 57**), Oil City, Pennsylvania (Speer, 1907, 121, **Exhibit 58**), Olean, New York (Hill, 1922, 26, **Exhibit 59**), and Seattle, Washington (Gleason, 1908, 221, **Exhibit 60**) in 1907; Kansas City, Missouri (Turpin, Kingsley, and Shannon, 1909, 846, **Exhibit 61**), Memphis, Tennessee (Hughey, 1909, 659, **Exhibit 62**), Oakland, California (City Council, 1909, 15, **Exhibit 63**) and Paducah, Kentucky (Puryear, 1909, 489, **Exhibit 64**) in 1909; Jacksonville, Illinois (Morrisey and Gregory, 1910, 113, **Exhibit 65**) and Staunton, Virginia (1910, 115, **Exhibit 66**) in 1910; Colorado Springs, Colorado (Sherwin, Prince, and Bennett, 1923, 450, **Exhibit 67**) in 1911; New York City (Cosby, 1926, 389, **Exhibit 68**) and Oakland, California (Davie, 1918, 119, **Exhibit 69**) in 1912; Grand Rapids, Michigan (1915, 208, **Exhibit 70**) and New Haven, Connecticut (1914, 438, **Exhibit 71**) in 1914; New York City in 1916 (1916, 7, **Exhibit 72**); Birmingham, Alabama (Anderton, 1917, 662, **Exhibit 73**) and Joplin, Missouri (McIndoe and Cameron, 1917, 552, **Exhibit 74**) in 1917; Salt Lake City, Utah (Gregory, Folland, and Smith, 1920, 474, **Exhibit 75**) in 1920; Burlington, Vermont (1921, 93, **Exhibit 76**) in 1921; and Chattanooga, Tennessee (Carden and Evans, 1922, 145, **Exhibit 77**) and Chicago, Illinois (Ettelson, 1922, 809, **Exhibit 78**) in 1922. As these many incidences indicate, prohibitions on carrying firearms in urban parks was considered fundamental to the purpose and function of these spaces – urban social reform.

34. Today, the romantic and rationalistic ideals still thrive in America's urban parks.

35. At no point did my research reveal any historical evidence that supported the carrying firearms for self-defense in urban parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of urban parks as promoted by those ideals.

**National Parks**

36. The emergence and development of America's national parks followed an ideological arc quite similar to urban parks and for much the same purpose – the improvement of American society. Like urban parks, national park advocates and supporters initially embraced Romanticism. The creation of American national parks and state parks (see below) began in 1864 when President Lincoln signed legislation ceding approximately 38,000 acres of federal land to the state of California as the Yosemite Valley and Mariposa Big Tree Grove park for the "public use, resort, and recreation; [and] inalienable for all time" (Dilsaver, 2016a, 4; Alfred Runte. 1990. Yosemite: The Embattled Wilderness (Lincoln: University of Nebraska Press, 3). Frederick Law Olmsted, who lived in California at the time, was appointed a commissioner on the new park's board and supervised the creation of the report for its administration. In addition to this "skillful" plan for the park's administration, "he advocated a policy of establishing national parks across the nation and laid the foundation for our current national park system" (Freeman, 1989, 172).

37. For Olmsted, the creation of national parks was not a gift but a duty. "It is the main duty of government, if it is not the sole duty of government, to provide means of protection for all its citizens in the pursuit of happiness" (Olmsted, 1990a, 502). Where Romantic urban parks had employed the Beautiful and the Picturesque, California's Yosemite Park improved society through a blend of the Beautiful and the Sublime. The new park was, argued Olmsted, a "union of the deepest sublimity with the deepest beauty of nature, not in one feature or another, not in one part or one scene or another, not any landscape that can be framed by itself, but all around and wherever the visitor goes, constitutes the Yo Semite the greatest glory of nature" (Olmsted, 1990a, 500). Immersed in the park's natural beauty, visitors were improved through

passive interaction with the scenery. "[T]he enjoyment of scenery," stated Olmsted, "employs the mind without fatigue and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influence of the mind over the body, gives the effect of refreshing rest and reinvigoration to the whole system" (Olmsted, 1990a, 504). Consequently, Olmsted thought the principal duty of the park's commissioners was "to give every advantage practicable to the mass of the people to benefit by that which is peculiar to this ground" (Olmsted, 1990a, 506). At the same time, he cautioned that constraints had to be applied to the "mass" of visitors in order for the park to benefit society both in the present and in the future. "[I]t should be remembered that in permitting the sacrifice of anything that would be of the slightest value to future visitors to the convenience, bad taste, playfulness, carelessness, or wanton destructiveness of present visitors, we probably yield in each case the interest of uncounted millions to the selfishness of a few individuals" (Olmsted, 1990a, 507). Finally, he pointed to the uniqueness that had "caused Congress to treat [Yosemite Valley and Mariposa Big Tree Grove] differently from other parts of the public domain" and to that which would guide the creation of subsequent national parks. "This peculiarity consists wholly in its natural scenery" (Olmsted, 1990a, 506).

38. Less than a decade after the creation of the Yosemite park, the first, officially designated "national park" was created in 1872: Yellowstone. A large, protected area of approximately 2.2 million acres, its origin lay in the Romantic path of scenery identified by Olmsted. "Yellowstone's awesome natural phenomena had inspired a political phenomenon" (Sellars, 1997, 7). In the authorizing act, the park was "hereby reserved and withdrawn from settlement, occupancy or sale … and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people." Placed under the Interior Secretary, the act directed the Secretary "to make and publish such rules and regulations as he may deem necessary

or proper for the care and management of the same." Among these, the Secretary "shall provide against the wanton destruction of the fish and game found within said park" and he "generally shall be authorized to take all such measures as shall be necessary or proper to fully carry out the objects and purposes of this act" (Dilsaver, 2016b, 20-21). At least as early as 1894, the Superintendent of Yellowstone promulgated a firearms regulation stating that "Firearms will only be permitted in the park on written permission from the superintendent thereof. On arrival at the first station of the Park guard parties having firearms will turn them over to the sergeant in charge of the station, taking his receipt for them. They will be returned to the owners on leaving the park" (Report of the Secretary of the Interior, Vol III. 1894. Washington, DC: Government Printing Office, 662, **Exhibit 79**). A similar rule was established for Sequoia National Park in 1890, prohibiting the "carry[ing] into or having in the park any fire-arms … without a license in writing signed by the Secretary [of the Interior] or superintendent of the park." (Report of the Secretary of the Interior, 1890, CLXII, **Exhibit 80**).

39. In 1875, three years after the creation of Yellowstone, America's second national park was created: Mackinac National Park in Michigan. At approximately 821 acres, Mackinac was smaller than either Yosemite or Yellowstone, but like them, it was "set apart as a National public park, or grounds, for health, comfort, and pleasure [and] for the benefit and enjoyment of the people" (Kelton, 1882, 17). Its 1882 "Rules and Regulations" included an explicit prohibition on firearms that clearly recalled the simple, declarative prohibitions in numerous urban public parks – "No person shall carry or discharge fire-arms in the park" (Kelton, 1882, 22, **Exhibit 81**).

40. In 1897, a Report of the Secretary of the Interior made clear that there were already rules against carrying firearms in Yosemite National Park (park created in 1890)—and

that they were strictly enforced. The Secretary wrote: "All the firearms are taken from their owners at Wawona and Crocker's, the two principal entrances to the park, and patrols take all the firearms found in possession of tourists and campers who have entered the park by unguarded routes. … The game in the park has increased in numbers and the deer and other animals show less fear of human beings than they have in past years; the result, no doubt, of the rigid enforcement of the rules against carrying firearms in the park." (Annual Reports of the Department of the Interior for the Fiscal Year ended June 30, 1897, LXXXIV-LXXXV, **Exhibit 82**).

41. Over the next 40 years, Congress and the President designated (and sometimes transferred) numerous natural preserves under federal jurisdiction, including Sequoia, Yosemite, Mount Rainier, Glacier, and Rocky Mountain National Parks. Like the original Yosemite cession and Yellowstone National Park, these subsequent parks were large, relatively distant from most of America's population because they were out west while the people were back east, and "preserved largely for their aesthetic qualities," which like urban parks, were thought to improve society (Mackintosh, 2005, 14).

42. The rationalistic rationale began to inform national park features and usage toward the end of the Nineteenth and the beginning of the Twentieth Centuries. As the public, which increasingly lived in America's cities, came to expect urban parks to be both scenic and places for museums, bicycling, and other forms of active play, they also came to see county, state, and national parks as serving the same purpose. Consequently, Interior Secretary Franklin K. Lane (Dilsaver, 2016c, 37) instructed Stephen T. Mather that "All outdoor sports which may be maintained consistently with the observation of the safeguards thrown around the national parks by law will be heartily endorsed and aided wherever possible. Mountain climbing,

horseback riding, walking, motoring, swimming, boating, and fishing will ever be the favorite sports. Wintersports will be developed in the parks that are accessible throughout the year." In contrast, however, "Hunting will not be permitted in any national park."

43. Prior to 1936, each national park had its own set of rules and regulations. In 2008, the National Park Service conducted a historical survey of firearms regulations within those rules. In addition to the regulations noted above, the survey found prohibitions on carrying firearms in eighteen national parks and all national monuments. (Firearms Regulations in the National Parks 1897-1936 (2008), **Exhibit 83**). In 1936, the National Park Service adopted a uniform code: "Firearms, explosives, traps, seines, and nets are prohibited within the parks and monuments, except upon written permission of the superintendent or custodian" (Federal Register, June 27, 1936, 791, **Exhibit 84**).

44. The American Civic Association (ACA), a private, eastern-based organization that had originated in the nineteenth century and promoted the creation of all parks as social reforming devices, incorporated all types of parks—municipal, county, state, and national—in their reform agenda because they believed that any given park comprised the local expression of a more durable concept, that all parks were socially impactful when they shared three important features: nature, scenery, and play, which when combined properly, created the ideal of the park. According to the ACA's president, J. Horace McFarland (1912, 3), this park performed a valuable social function; it "act[s] immediately and favorably on the health and the orderliness of the community, and consequently increase[s] materially the average of individual efficiency. In other words, they pay dividends in humanity." That is, such parks at every geographic scale reformed a rapidly urbanizing America. National parks, like urban parks, would foster a virtuous

society characterized by health and wealth. The ACA further claimed that national parks would foster democracy and patriotism among Americans (Young, 1996).

45. Today, the same rationales applicable to urban parks guide the public's expectations and inform the actions of national park proponents and supporters.

46. Again, at no point in my research did I discover any evidence of historical support for the carrying of firearms for self-defense in national parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of national parks as promoted by those ideals.

**State Parks**

47. America's state parks today appear in every state and in types that vary from state to state and sometimes even within a single state. The history of their designation and development reveals a halting and uneven pattern, but it nonetheless followed the same ideological arc that guided the unfolding of urban and national parks, and for much the same purpose – the improvement of society. Like national park advocates and supporters, state park activists thought striking scenic places would lead to a society that was healthier, wealthier, more democratic and more socially coherent.

48. As noted above, the first state and national park was Yosemite valley and grove (Engbeck, 1980). But before California returned it to the federal government in 1906 for inclusion in Yosemite National Park, the valley and grove had inspired such scenic state parks as Big Basin in California, Palisades and Watkins Glen in New York, and Mount Mitchell in North Carolina, as well as "sites uniquely worth preserving" in Connecticut, Indiana, Iowa, and Wisconsin (Cutler, 1989, 195). Most state parks, however, did not appear until the Twentieth Century when, as J. Horace McFarland (1910, 9) noted, they came to be seen as the logical

extension between city or county parks and national parks. "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a location or opportunity too large for local or municipal control may as properly be controlled by the state." During the first quarter of the Twentieth Century, state parks came to incorporate both romantic and rationalistic features as people increasingly saw them as places for the passive admiration of the scenery and for play. Nevertheless, state parks were not common.

49. After the 1921 conference the pace of state park creation increased. Park proponents kept recommending new sites for designation, but they often did so to the new National Park Service. The Park Service recognized that many of these recommendations had merit, but they did not rise to the level of national significance so instead of just rejecting the recommendations, it organized the National Conference on Parks to facilitate the designation of these sites protected by the states. The conference transformed the state park movement, stimulating more widespread interest in their creation.

50. Furthermore, the National Park Service developed a plan during the Great Depression to create "a healthier and happier citizenry by developing a nationwide system of state parks. The goal was to 'cure the ills of society' by constructing a park within fifty to one hundred miles" of the American populace. And, since a rationalistic park ideology was premier by the 1930s, "one of the primary principles of the plan was to place recreational parks within the reach of every citizen" (Smith, 2013, 207). Working with the Civilian Conservation Corps (the "CCC"), the Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942.

51. The CCC was instrumental in the development of Virginia's state parks. Virginia had established a State Commission on Conservation and Development in 1926. Like urban and

national parks, the Virginia State Commission was authorized to acquire, preserve, develop, and maintain areas "of scenic beauty, recreational utility, historical interest, remarkable phenomena, or other unusual features …for the use, observation, education, health, and pleasure of the people" (Reut et al., 2012, 10). The Commission's initial primary concern was the creation of Shenandoah National Park, but by 1933, when the CCC was authorized, its staff had completed preliminary plans for a state park system, initially including six parks. With CCC contributing, all six parks opened in 1936.

52. As in the national parks, many states prohibited firearms in their parks. By 1935, at least eleven states—Connecticut (Board of Control, 1918, 31, **Exhibit 85**), Indiana (General Assembly, 1927, 98, **Exhibit 86;** Department of Conservation, 1927, 181, **Exhibit 87**), Kansas (Forestry, Fish and Game Commission, 1930, 23, **Exhibit 88**), Maryland (Board of Forestry, 1917, 61, **Exhibit 89**; 1927, 1176, **Exhibit 90**), Michigan (Department of Conservation, 1928, 57, **Exhibit 91**), Minnesota (Secretary of State, 1901, 396-97, **Exhibit 92;** 1905, 620, **Exhibit 93**), New Jersey (1935, 305, **Exhibit 94**), North Carolina (1922, 54, **Exhibit 95;** Digest II, 1936, 284, **Exhibit 96**), South Dakota (1929, 32, **Exhibit 97**), Washington (Torrey, 1926, 247, **Exhibit 98**; Nelson, 1928, 278, **Exhibit 99**), and Wisconsin (Conservation Department, 1933, 23, **Exhibit 100**)—prohibited carrying firearms in at least some of their state parks, as did the District of Columbia (1908, 85, **Exhibit 101**).

53. In 1936, a National Park Service publication identified additional rules prohibiting the possession or carrying of firearms in state parks in Virginia (**Exhibit 102**), as well as in Alabama (**Exhibit 103**), California (**Exhibit 104**), Florida (**Exhibit 105**), New York (**Exhibits 106-114**), Ohio (**Exhibit 115**), and Rhode Island (**Exhibit 116**) (all available in *Digest of Laws Relating to State Parks*, Vols I-III (1936)).

54. Today, the same rationales applicable to urban and national parks guide the public's expectations and inform the actions of state park proponents and supporters.

55. For the third time, at no point in my research did I discover any evidence of historical support for the carrying of firearms for self-defense in state parks. Such encouragement would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of state parks as promoted by those ideals.

56. I reserve the opportunity to supplement this Report to reflect any additional research or context that may be necessary as this case proceeds.

Signed: Feb. 26, 2024

Terence Young

**Citations**

- Anderton, Henry L. 1917. The Code of City of Birmingham Alabama. (**Exhibit 73**)
- Bannister, Turpin C. 1961. "Oglethorpe's Sources for the Savannah Plan" Journal of the Society of Architectural Historians 20(2): 47-62.
- Barzun, Jacques. 1961. Classic, Romantic and Modern, 2nd Ed., Boston: Little, Brown & Co.
- Beamish, Anne. 2021. "Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia" Landscape Journal 40(2): 1-17.
- Beecher, Henry Ward. 1869. Eyes and Ears, Boston: Fields, Osgood, and Co.
- Berlin, Wisconsin. 1890. The Municipal Code of Berlin Comprising the Charter and the General Ordinances of the City Codified and Revised, Berlin: Courant Steam Print. (**Exhibit 20**)
- Board of Aldermen. 1903. Proceedings of the Board of Aldermen of the City of New York from October 6 to December 28, 1903. (**Exhibit 45**)
- Board of Commissioners. 1858. Minutes of the Proceedings of the Board of Commissioners of the Central Park, for the Year Ending April 30, 1858, New York: Wm. C. Bryant & Co. (**Exhibit 2**)
- Board of Commissioners. 1861. Fourth Annual Report of the Board of Commissioners of the Central Park, New York: Wm. C. Bryant & Co. (**Exhibit 3**)
- Board of Forestry. 1917. Report of the Maryland State Board of Forestry for 1916 and 1917. (**Exhibit 89**)

- Board of Park Commissioners. 1893. Annual Report of the Board of Park Commissioners for the Year Ending December 31, 1892, Cincinnati: The Commercial Gazette Job Print. (**Exhibit 25**)
- Board of Park Commissioners. 1898. Report of the Board of Park Commissioners of the City of Rochester, N.Y., 1888 to 1898, Rochester: Union and Advertiser Press. (**Exhibit 36**)
- Board of Park Commissioners. 1898. Report of the Board of Park Commissioners, of Wilmington, Del. For the Year Ending December 31st, 1897, Wilmington: The John M. Rogers Press. (**Exhibit 37**)
- Board of Park Commissioners. 1902. Sixth Annual Report of the Department of Parks of the City of New Bedford, Mass.: The A.E. Coffin Press City Printers. (**Exhibit 42**)
- Board of Park Commissioners. 1904. First Annual Report of the Department of Parks of the City of Lowell, Massachusetts: Butterfield Printing Company. (**Exhibit 44**)
- Board of Control. 1918. Report of the State Park Commissioner to the Governor for the Two Fiscal Years ended September 30, 1918: The Wilson H. Lee Co. (**Exhibit 85**)
- Board of Supervisors. 1875. San Francisco Municipal Reports for the Fiscal Year 1874-5, Ending June 30, 1875, San Francisco: Spaulding & Barto, Printers. (**Exhibit 6**)
- Board of Trustees of the Pleasure Driveway and Park District of Springfield, Illinois. 1902. Annual Report of the Board of Trustees of the Pleasure Driveway and Park District of Springfield, Illinois: Phillips Bros. Printers. (**Exhibit 43**)
- Borough of Phoenixville. 1906. A Digest of the Ordinances of Town Council of the Borough of Phoenixville, Phoenixville: "The Daily Republican" Printers. (**Exhibit 10**)

- Boston, Massachusetts, Department of Parks. 1888. Thirteenth Annual Report of the Board of Commissioners for the Year 1887, Boston: Printed for the Department.
- Boyer, Paul. 1978. Urban Masses and Moral Order in America, 1820-1920, Cambridge: Harvard University Press. (**Exhibit 15**)
- Burlington, Vermont. 1921. Revised Ordinances of 1921: Free Press Printing Company. (**Exhibit 76**)
- Brooklyn Park Commissioners. 1873. "Seventh Annual Report of the Commissioners of Prospect Park, 1867" in Annual Reports of the Brooklyn Park Commissioners, 1861-1873, Brooklyn: Brooklyn Park Commissioners. (**Exhibit 4**)
- Brown, Edgar A. and William W. Thornton, coll. and annot. 1904. The General Ordinances of the City of Indianapolis, Indianapolis: Wm. B. Burford, Printer and Binder. (**Exhibit 35**)
- Buffalo Park Commissioners. 1874. Fourth Annual Report of the Buffalo Park Commissioners, Buffalo: Warren, Johnson & Co., Printers. (**Exhibit 8**)
- Campbell, Colin P., comp. and index. 1906. Compiled Ordinances of the City of Grand Rapids, Containing all Ordinances Passed by the Common Council, of the City of Grand Rapids, in force September 1, 1906, Grand Rapids: Common Council. (**Exhibit 22**)
- Carden, Frank S. and Ruth Durant Evans. 1922. Digest of the Charter and Ordinances of the City of Chattanooga in Force on January 1st, 1922, Also Containing State Laws Incorporating and Relating to Said City, Franchises Granted by Said City and a Digest of the Bonded Indebtedness Thereof: Long-Johnson Printing Company. (**Exhibit 77**)
- Chicago, Illinois. 1873. Laws and Ordinances Governing the City of Chicago, Chicago: Murray F. Tuley. (**Exhibit 7**)

- Chiperfield, B.M., 1895. Revised Ordinances of the City of Canton, Illinois, Revised 1894-1895, Canton: Daily Register Press. (**Exhibit 32**)
- City Council of Oakland, California. 1909. General Municipal Ordinances of the City of Oakland in Effect November 1, 1909. (**Exhibit 63**)
- City Council of Portland, Oregon. 1910. General Ordinances of the City of Portland, Oregon in Force April 15, 1910. (**Exhibit 57**)
- City of Pasadena, California. 1912. Ordinances of the City of Pasadena, California, Vol. 1. (**Exhibit 46**)
- Commissioners of the District of Columbia. 1908. Annual Report of the Commissioners of the District of Columbia Year Ended June 30, 1908: Washington Government Printing Office. (**Exhibit 101**)
- Common Council, City of Saginaw. 1905. Charter of the City of Saginaw, Michigan, with Amendments Thereto, and the Acts of the Legislature Relating to or Affecting the City of Saginaw: Wm. K. McIntyre. (**Exhibit 53**)
- Connor, E.O., rev., comp. and cod. 1903. Municipal Code of the City of Spokane, Washington, Spokane: The Inland Printing Company. (**Exhibit 28**)
- Cosby, Arthur F. 1926. New Code of Ordinances of the City of New York, Including the Sanitary Code, the Building Code and Park Regulations Adopted June 20, 1916, with All Amendments to January 1, 1926 and Complete Index to Whole: The Banks Law Publishing Co. (**Exhibit 68**)
- Cushing, John D. 1961. "Town Commons of New England, 1640-1840" Old-Time New England 51(3): 86-94.

- Cutler, Phoebe. 1989. "State Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 194-199.
- Davie, John L. 1918. City of Oakland, General Municipal Ordinances in Effect January 1, 1918: Oakland Enquirer Publishing Co. (**Exhibit 69**)
- Department of Conservation, State of Indiana. 1927. Indiana Conservation Laws: Wm. B. Burford. (**Exhibit 87**)
- Department of Conservation, State of Michigan. 1928. Fourth Biennial Report 1927-1928: The Department of Conservation State of Michigan. Franklin DeKleine Co., State Printers. (**Exhibit 91**)
- Department of the Interior. Annual Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1897, Report of the Secretary of the Interior, Report of the Commissioner of the General Land Office: Government Printing Office. (**Exhibit 82**)
- Department of Parks. 1916. Ordinances, Rules and Regulations of the Department of Parks of the City of New York: JJ Little & Ives Co. (**Exhibit 72**)
- De Vorsey, Louis. 2012. "The Origins and Appreciation of Savannah, Georgia's Historic City Squares" Southeastern Geographer 52(1): 90-99.
- Dilsaver, Lary M. 2016a. "An Act Authorizing a Grant to the State of California of the 'Yo-Semite Valley,' and of the land Embracing the 'Mariposa Big Tree Grove." Approved June 30, 1864 (13 Stat. 325)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 4-5.
- Dilsaver, Lary M. 2016b. "An Act to Set Apart a Certain Tract of Land Lying Near the Headwaters of the Yellowstone River as a Public Park, Approved March 1, 1872 (17 Stat.

32)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 20-21.

- Dilsaver, Lary M. 2016c. "Secretary Lane's Letter on National Park Management, May 13, 1918" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 35-39.
- Engbeck Jr., Joseph H. 1980. State Parks of California, from 1864 to the Present, Portland: C.H. Belding.
- Ettelson, Samuel A. 1922. The Chicago Municipal Code of 1922, Containing the General Ordinances of the City in Force November 22, 1922, and Repealing Former General Ordinances with Certain Exceptions: T.H. Flood & Co. (**Exhibit 78**)
- Forestry, Fish and Game Commission. 1930. Third Biennial Report of the Forestry, Fish and Game Commission of the State of Kansas for the Period Ending June 30, 1930: Kansas State Printing Plant. (**Exhibit 88**)
- Ferguson, Raymond M. and Frank E. Shaw. 1915. Compiled Ordinances of the City of Grand Rapids Containing All Ordinances Passed by the Common Council of the City of Grand Rapids in force June 1, 1915. (**Exhibit 70**)
- Freeman, Raymond L. 1989. "National Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 172-175.
- Giltinan, John A., comp. 1896. General Ordinances and Private Ordinance of a Public Nature of The City of St. Paul, Ramsey County, Minnesota, Up to and Including December 31st, 1895, St. Paul: Pioneer Press Co. (**Exhibit 31**)
- Gleason, Charles S. 1908. The Charter of the City of Seattle Adopted at the General Election March 3, 1896 as Amended in 1900, 1902, 1904, 1906, and 1908 and the

Ordinances of the City of Seattle from December 1,1869, to November 1, 1907: Lowman & Hanford Stationery. (**Exhibit 60**)

- Graff, M.M. 1985. Central Park-Prospect Park: A New Perspective, New York: Greensward Foundation.
- Greene, Oscar F.A., comp. 1899. Revised Ordinances of the City of Boulder, Boulder: Printed by Ricketts & Kerr, at the News Office. (**Exhibit 40**)
- Gregory, W.H., William H. Folland, and Horace H. Smith. 1920. Revised Ordinances of Salt Lake City, Utah 1920: Arrow Press. (**Exhibit 75**)
- Highberger, D.A. and John A. Martin. 1908. Ordinances of the City of Pueblo Comprising All the Ordinances of a General and Permanent Nature in Force to April 1st, 1908, and down to and Including Ordinance No. 769 Together with the Articles of Consolidation of the Pueblos. (**Exhibit 50**)
- Hill, Richmond C. 1922. Ordinances of the City of Olean as Amended to September 1922: Olean Print Company. (**Exhibit 59**)
- Hughey, H. Douglass. 1909. A Digest of the Laws, Ordinances and Contracts of the City of Memphis: Containing All Laws, Ordinances and Contracts Passed and Entered into up to and Including June 30th, 1909: Press of S.C. Toof & Co. (**Exhibit 62**)
- Jamieson, Egbert and Francis Adams. 1881. Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised, Chicago: Beach, Barnard & Co., Legal Printers. (**Exhibit 11**)
- Jefferson, Thomas. 1829 (1787). Notes on the State of Virginia, Boston: Wells & Lilly.
- Kelton, Dwight H. 1882. Annals of Fort Mackinac: Fergus Printing Co. (**Exhibit 81**)

- Landrum, Ney. 2004. The State Park Movement in America: A Critical Review, Columbia: University of Missouri Press.
- Laws of the General Assembly of the State of Pennsylvania Passed at the Session of 1868, Harrisburg: Singerly & Myers. (**Exhibit 5**)
- Linden-Ward, Blanche. 1989. "Cemeteries" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 120-125.
- Local Acts of the Legislature of the State of Michigan Passed at the Regular Session of 1895. 1895, Lansing: Robert Smith & Co. State Printers and Binders. (**Exhibit 33**)
- Lynn, Massachusetts. 1892. Third Annual Report of the Park Commissioners of the City of Lynn, For the Year Ending December 20, 1891, Lynn: Whitten & Cass, Printers. (**Exhibit 26**)
- Mackintosh, Barry. 2005. The National Parks: Shaping the System, Rev. Ed., Harpers Ferry: Harpers Ferry Center.
- Mann, Calhoun & Frazier, Rev. & Arrang. 1883. The Revised Ordinances of the City of Danville, Danville, IL: Bowman & Freese, Book and Job Printers. (**Exhibit 14**)
- MacAdam, David H. 1883. Tower Grove Park of the City of St. Louis, Review of its Origin and History, Plan of Improvement, Ornamental Features, Etc., with Illustrations. Prepared by Order of the Board of Commissioners, St. Louis: R.P. Studley & Co., Printers. (**Exhibit 13**)
- McIndoe, Hugh and E.F. Cameron. 1917. The Joplin Code of 1917, Containing All the General Ordinances of the City, Except Ordinances Numbered 4487 and 5941 (Specifying in Detail the Regulations Relating to Street Improvements and Street Excavations, Respectively), Including Public Utility Franchise Ordinances in Force

January 30, 1817; Also the Charter Act of 1913, Applying to Cities of the Second Class in Missouri in Force on Said Date; Also Certain Material Provisions of the Constitution and Statutes of the State of Missouri Applicable to Cities of the Second Class; Also a Brief Historical Sketch of the Municipal Incorporation of Joplin; Also a Direction in 1873 to the Present Time; Also Information in Relation to the Owneship of Real Estate by the City of Joplin: The Joplin Printing Co. (**Exhibit 74**)

- McFarland, J. Horace. 1910. "Are State Parks Worth While?" typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.
- McFarland, J. Horace. 1912. "Are National Parks Worth While?" typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.
- Morrisey, William M. and Frederick L. Gregory. 1910. Ordinances Governing the City of Jacksonville of the State of Illinois: Courier Print. (**Exhibit 65**)
- National Park Service. 2008. Firearms Regulations in the National Parks 1897-1936. (**Exhibit 83**)
- Neligh, Nebraska. 1906. The Ordinances of the City of Neligh, Nebraska Comprising All Ordinances of a General Nature Passed June 16, 1906, or Prior Thereto. (**Exhibit 49**)
- Nelson, Beatrice Ward. 1928. State Recreation: Parks, Forests and Game Preserves. (**Exhibit 99**)
- New Haven, Connecticut. 1898. Ordinances of the City of New Haven Together with Legislative Acts Affecting Said City, Revised to February 1, 1898, New Haven: Press of the Price, Lee & Adkins Co. (**Exhibit 39**)

- New Haven, Connecticut. 1914. Charter and Ordinances of the City of New Haven, Conn. and Special Acts Revised to January, 1914: Press of Samuel Z. Field. (**Exhibit 71**)
- Novak, Barbara. 1995. Nature and Culture: American Landscape and Painting, 1825-1875, Rev. Ed., New York: Oxford.
- Noleman, Frank F. and William F. Bundy, rev. and codif. 1896. The Centralia City Code, Centralia: Centralia Daily Sentinel – T.L. Joy & Co. (**Exhibit 34**)
- Olmsted, Frederick Law. 1990a (1865). "Preliminary Report upon the Yosemite and Big Tree Grove" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 488-516.
- Olmsted, Frederick Law. 1990b (1865). "Preliminary Report in Regard to a Plan of Public Pleasure Grounds for the City of San Francisco" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 518-546.
- Padden, Edward J. 1906. Amendments to the Revised Municipal Code of Chicago of 1905 and New General Ordinances Passed by the City Council of the City of Chicago Between March 30, 1905, and December 31, 1906. (**Exhibit 54**)
- Park Commissioners of the City of Milwaukee. 1892. First Annual Report of the Park Commissioners of the City of Milwaukee, Milwaukee: Ed. Keogh, Printer. (**Exhibit 23**)
- Park Commissioners of the City of Haverhill, Massachusetts. 1907. Annual Report of the Park Commissioners of the City of Haverhill, Massachusetts for the Year Ending December 31, 1906: The Chase Press. (**Exhibit 52**)

- President and Board of Trustees of the Village of Hyde Park. 1876. Laws and Ordinances Governing the Village of Hyde Park, Hyde Park: Consider H. Willett. (**Exhibit 9**)
- Puryear, E.H. 1910. Constitution, Charter and Revision of the Ordinances and Municipal Laws of the City of Paducah, Kentucky, under the Charter Act of March 19, 1894, and Amendments Thererto: Billings Printing Co. (**Exhibit 64**)
- Richards, Louis, comp. 1897. A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, In Force April 1, 1897, Reading, PA: Eagle Book Print. (**Exhibit 16**)
- Richards, Louis and James M. Lamberton. 1906. A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Harrisburg, Pennsylvania, in Force August 1, A. D. 1906: Soney & Sage. (**Exhibit 51**)
- Roberts and Crawford. 1904. Charter and Revised Code of Ordinances of the City of Houston, Harris County, Texas, to October 31, 1904: W.H. Coyle & Co. (**Exhibit 48**)
- Robinson, Charles Mulford. 1909. Modern Civic Art; or, The City Made Beautiful, 3rd Ed., New York: G.P. Putnam's Sons.
- Rosenzweig, Roy and Elizabeth Blackmar. 1992. The Park and the People: A History of Central Park, Ithaca: Cornell University Press.
- Rozelle, Frank F. and George R. Thompson, comp., arrang., annot., and index. 1898. Charter of Revised Ordinances of Kansas City, 1898, Kansas City: Lawton & Burnap, Printers and Stationers. (**Exhibit 38**)
- Saint Paul, Minnesota. 1889. Annual Reports of the City Officers and City Boards of the City of Saint Paul, For the Fiscal Year Ending December 31, 1888. (**Exhibit 17**)

- Salt Lake City, Utah. 1888. The Revised Ordinances of Salt Lake City, With the City Charter and Amendments Thereto, February 14, 1888, Salt Lake City: Star Printing Company. (**Exhibit 18**)
- Schuyler, David. 1986. The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America, Baltimore: The Johns Hopkins University Press.
- Schuyler, David and Censer, Jane Turner, Eds. 1992. The Papers of Frederick Law Olmsted, Volume VI: The Years of Olmsted, Vaux & Company, 1865-1874, Baltimore: The Johns Hopkins University Press.
- Schortemeier, Frederick E. 1927. Laws of the State of Indiana Passed at the Seventy-fifth Regular Session of the General Assembly Begun on the Sixth Day of January, A.D. 1927: Wm. B. Burford, Contractor for State Printing and Binding. (**Exhibit 86**)
- Secretary of the Interior. 1890. Report of the Secretary of the Interior Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Third Session of the Fifty-First Congress: Washington Government Printing Office. (**Exhibit 80**)
- Secretary of the Interior. 1894. Report of the Secretary of the Interior Being Part of the Message and Documents Communicated to the Two Houses of Congress at the Beginning of the Third Session of the Fifty-Third Congress: Washington Government Printing Office. (**Exhibit 79**)
- Secretary of State. 1901. General Laws of the State of Minnesota Passed During the Thirty-Second Session of the State Legislature Commencing January Eighth, One Thousand Nine Hundred and One: McGill-Warner Co. (**Exhibit 92**)

- Secretary of State. 1905. General Laws of the State of Minnesota Passed During the Thirty-Fourth Session of the State Legislature Commencing January Third, One Thousand Nine Hundred and Five: Harrison & Smith Co. (**Exhibit 93**)
- Sellars, Richard West. 1997. Preserving Nature in the National Parks, A History, New Haven: Yale University Press.
- Sherwin, F.L., W.B. Price, and J.L. Bennett. 1923. The Code of Colorado Springs 1922 Comprising Article XX of the Constitution of the State of Colorado the Charter as Amended, General Ordinances of the City, Excepting Ordinances Fixing Salaries, Concerning the Dedication and Vacation of Streets and Alleys, Concerning the Annexation of Colorado City, and Ordinances Granting Franchises: Out West Prtg. & Staty. Co. (**Exhibit 67**)
- Slemmons, Wilbert I, Israel C. Pinkney, and Daniel F. Raum, rev. and edit. 1892. Laws and Ordinances of the City of Peoria, Illinois, Peoria: J.W. Franks & Sons, Printers and Binders. (**Exhibit 27**)
- Smith, Henry F. 1907. Municipal Register of the City of Hartford Containing a List of the Officers of the City Government and Its Various Departments; Also, Message of the Mayor and the Annual Reports of the Several Department for the Year 1906-07; Ordinances of the City, Etc.: The Smith-Linsley Co. (**Exhibit 41**)
- Smith, Langdon. 2013. "Democratizing Nature Through State Park Development" Historical Geography 41: 207-223.
- Speer, Peter M. 1907. A Digest of the Ordinances and Principal Resolutions for the Government of the City of Oil City in Venango County, Pennsylvania, in Force January 1st, 1907: Derrick Publishing Company. (**Exhibit 58**)

- Springfield, Massachusetts. 1897. Park Commissioners' Report, Springfield: Springfield Printing and Binding Co. (**Exhibit 24**)
- State of Maryland. 1927. Laws of the State of Maryland, Made and Passed at the Session of the General Assembly Made and Held and the City of Annapolis of the Fifth Day of January, 1927, and Ending on the Fourth Day of April, 1927. King Bros., Inc., State Printers. (**Exhibit 90**)
- State of New Jersey. 1935. Acts of the One Hundred and Fifty-ninth Legislature of the State of New Jersey and Ninety-first Under the New Constitution: MacCrellish & Quigley Co. (**Exhibit 94**)
- State of North Carolina. 1922. Public Laws and Resolutions Enacted by the Extra Session of the General Assembly of 1921 Begun and Held in the City of Raleigh on Tuesday, the Sixth Day of December, A.D. 1921: Mitchell Printing Company, State Printers. (**Exhibit 95**)
- State of South Dakota. 1929. The Laws Passed at the Twenty-First Session of the Legislature of the State of South Dakota: State Publishing Company. (**Exhibit 97**)
- Staunton, Virginia. 1910. The Code of the City of Staunton, Virginia Containing the Charter and General Laws and Ordinances: Shultz Printing Co. (**Exhibit 66**)
- Stevens, Jess E. and E. H. Delorey. 1921. Penal Ordinances of the City of Los Angeles, Containing All Penal Ordinances in Force on June 14, 1921, Ending with Ordinance No. 42021: Parker & Stone Co. (**Exhibit 56**)
- Stilgoe, John R. 1982. "Town Common and Village Green In New England: 1620-1981" in On Common Ground: Caring for Shared Land from Town Common to Urban Park, RF Fleming and LA Halderman, Eds. Harvard, MA: The Harvard Common Press, 7-36.

- Sullivan, M.J. 1881. The Revised Ordinance of the City of St. Louis, St. Louis: Times Printing House. (**Exhibit 12**)
- Thacher, D. 2015. "Olmsted's police" Law and History Review 33(3): 577-620.
- Thomson, W.W. prep. 1897. A Digest of the Acts of Assembly Relating to, And the General Ordinances of the City of Pittsburgh From 1804 to Jan. 1, 1897, Pittsburgh: W.T. Nicholson Sons, Printers and Binders. (**Exhibit 29**)
- Torrey, Raymond H. 1926. State Parks and Recreational Uses of State Forests in the United States. (**Exhibit 98**)
- Trenton, New Jersey, Common Council. 1903. Charter and Ordinances; Also Certain Acts of the Legislature Relating to Municipal Departments, Trenton: The John L Murphy Publishing Co., Printers. (**Exhibit 19**)
- Troy, New York. 1905. Municipal Ordinances of the City of Troy: Troy Times Art Press.
- Turpin, Rees, George Kingsley, and Charles L. Shannon. 1909. (**Exhibit 47**)
- Charter and Revised Ordinances of Kansas City: Vernon Law Book Company. (**Exhibit 61**)
- Varnum, Charles W. and J. Frank Adams. 1906. The Municipal Code of the City and County of Denver Approved April 12, 1906, Containing Also Article XX of the Constitution of Colorado, the Charter Adopted March 29, 1904, Liquor Ordinances of Annexed Towns and Cities: The Smith-Brooks Company. (**Exhibit 55**)
- Vetter, Roy A. 1936. Digest of Laws Relating to State Parks, Volumes I-III. (**Exhibits 96** (North Carolina); **102** (Virginia); **103** (Alabama); **104** (California); **105** (Florida); **106-114** (New York); **115** (Ohio); **116** (Rhode Island))

- Williamsport, Pennsylvania. 1900. A Digest of the Laws and Ordinances For the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania In Force August 1, 1900, Part III, Newark, NJ: Soney and Sage. (**Exhibit 21**)
- Wilmington, Delaware. 1893. The Charter of the City of Wilmington As Amended to May 6th, 1893; Acts of the General Assembly Relating to the City, Including the Session of 1893; and Ordinances, and Rules and Regulations of Departments of the City Government, As Amended and in Force September 1st, 1893, Wilmington: Diamond Printing Company. (**Exhibit 30**)
- Wilson, Thomas D. 2012. The Oglethorpe Plan: Enlightenment Design in Savannah and Beyond, Charlottesville: University of Virginia Press.
- Wisconsin Conservation Department. 1933. Wisconsin State Parks. (**Exhibit 100**)
- Young, Terence. 1996. "Social Reform Through Parks: The American Civic Association's Program for a Better America" Journal of Historical Geography 22(4): 460-472.
- Young, Terence. 2004. Building San Francisco's Parks, 1850-1930, Baltimore: The Johns Hopkins University Press.
- Young, Terence. 2018. "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in The American Environment Revisited, Geoffrey L. Buckley and Yolonda Youngs, Eds. Lanham: Rowman & Littlefield, 145-160.
- Young, Terence. 2022. "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790.
- 1 Fed. Reg. 668, 674 (June 27, 1936) (**Exhibit 84**)

# EXHIBIT 1

FFXCO_12679

# CURRICULUM VITAE

Terence George Young
672 Warwick Street
Cambria, CA 93428
626-716-5927 (cell)
tgyoung@cpp.edu
https://www.cpp.edu/faculty/tgyoung/

**Ph.D.** - University of California, Los Angeles, 1991 (Cultural-Historical Geography)

**POSITIONS HELD**

Academic

**2020 – present** – Professor Emeritus of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona, California 91768

**2002 – 2021** – Assistant to Full Professor of Geography, Department of Geography & Anthropology (and Adjunct Professor, Lyle Center for Regenerative Studies through 2013), California State Polytechnic University, Pomona, California 91768

Consultations

**Forthcoming** – Declaration on the history and ideology of American parks in relation to firearms regulation in Clayton Palmer v. Rhode Island Department of Environmental Management, in Rhode Island Superior Court, Providence, for Attorney General's Office

– Expert Statement on the history and ideology of American parks in relation to firearms regulation in Stephen L. Hughes, et al. v. Bill Lee & Jonathan Skrmetti, in Chancery Court, Gibson County, Tennessee, for Attorney General's Office, Nashville, TN

**2023** – Declaration on the history and ideology of American parks in relation to firearms regulation in LaFave v. County of Fairfax, VA, US District Court for the Eastern District of Virginia, Alexandria Division, for Office of the County Attorney, Fairfax, Virginia

– Declaration on the history and ideology of American parks in relation to firearms regulation in Reno May, et al., v. Robert Bonta, US District Court for the Central District of California, for Attorney General's Office, Los Angeles, CA

– Declaration on the history and ideology of American parks in relation to firearms regulation in Jason Wolford, Alison Wolford, Atom Kasprzycki, Hawaii Firearms Coalition v. Anne E. Lopez, US District Court for the District of Hawaii, for Attorney General's Office, Honolulu, HI

– Declaration on the history and ideology of American parks in relation to firearms regulation in David J. Nastri v. Katie Dykes, US District Court for the District of Connecticut, for Attorney General's Office, Hartford, CT

**PUBLICATIONS**

Periodicals – Peer Reviewed

**In Submission** – "Diffusing Conservation to Post-Colonial Africa" *Geographical Review*

**2022** – "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

**2021** – "From Competition to Cooperation: A History of Canada-US National Park Relations" *Environment and History* 27(4): 607-634 (co-authored with Alan MacEachern and Lary Dilsaver)

**2018** – "E.P. Meinecke and the Development of the Modern Auto Campground" *IdeAs - Idées d'Amériques* 12(Automne/Hiver): https://journals.openedition.org/ideas/3502

**2011** – "Collecting and Diffusing 'the World's Best Thought': International Cooperation by the National Park Service" *The George Wright Forum* 28(3): 269-278 (co-authored with Lary Dilsaver)

**2010** – "On Camping and Its Equipment" *Environmental History* 15(1, January 2010): 120-128

**2009** – "'A Contradiction in Democratic Government': W.J. Trent, Jr. and the Struggle for Non-Segregated National Park Campgrounds" *Environmental History* 14(4, October 2009): 651-682

**2007** – "U.S. Parks and Protected Areas: Origins, Meanings and Management" *Historical Geography* 35: 5-9 (co-authored with Lary Dilsaver)

Periodicals – Non-peer Reviewed
**2020** – "Pandemics & Public Lands" *National Parks Traveler* (August 26): https://www.nationalparkstraveler.org/2020/08/essay-pandemics-public-lands
**2018** – "Murray's Rush: The Adirondack Beginning of American Camping" *NY Archives Magazine* 18(1): 11-17
– "Why Americans Invented the RV" in *What It Means to be American*: *A Conversation Hosted by the Smithsonian and Arizona State University* (September 4). Available at: http://www.zocalopublicsquare.org/2018/09/04/americans-invented-rv/ideas/essay/
**2017** – "The Religious Roots of America's Love for Camping" *What It Means to be American*: *A Conversation Hosted by the Smithsonian and Arizona State University* (October 12). Available at: http://www.whatitmeanstobeamerican.org/encounters/the-religious-roots-of-americas-love-for-camping/
**2014** – "The End of Camping: Coming Home to the City" *BOOM: A Journal of California* 4(3): 70-75
– "'Green and Shady Camps': E.P. Meinecke and the Restoration of America's Public Campgrounds" *The George Wright Forum* 31(1): 69-76
**2008** – "Four Visions of Nature in American Protected Areas" *Past Place* 16(2, Spring/Summer): 8-10 (Newsletter of the Historical Geography Specialty Group, Association of American Geographers)

Periodical – Special Issue Edited
**2007** – "US Parks and Protected Areas" for *Historical Geography* 35: 5-213 (co-edited with Lary Dilsaver)

Books – Authored
**2017** – *Heading Out: A History of American Camping*, Cornell University Press (Winner of the American Association of Geographers' J.B. Jackson Prize for 2018; Winner of the Western History Association's Hal K. Rothman Prize for 2018)
**2004 –** *Building San Francisco's Parks: 1850-1930,* The Johns Hopkins University Press

Books – Edited
**2002 -** *The Landscapes of Theme Parks: Antecedents and Variations*, Terence Young and Robert Riley, eds., Dumbarton Oaks Library and Research Center Press

Book Chapters
**2018** – "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in *The American Environment Revisited: Environmental Historical Geographies of the U.S.* (Lanham: Rowman & Littlefield), 145-160
**2014** – "The Passionate Geographer" in *North American Odyssey: Historical Geographies for the Twenty-first Century* (Lanham: Rowman & Littlefield), 315
**2008** – "Urban Parks, Leisure and the Good Society" in *Loisir et Liberté en Amérique du Nord*, P. Lagayette, Editor (Paris: Université Paris-Sorbonne, Paris IV), 59-71

Book Reviews:
**2021** – *Camping Grounds: Public Nature in American Life from the Civil War to the Occupy Movement* by Phoebe S.K. Young for H-Environment, URL: https://www.h-net.org/reviews/showrev.php?id=56824
**2018** – *On the Trail: A History of American Hiking* by Silas Chamberlin for *Agricultural History* 92(3): 439-440
**2017** – *Trout Culture: How Fly Fishing Forever Changed the Rocky Mountain West* by Jen Corrinne Brown for *Environmental History* 22: 180-182
**2015** – *Inventing Stanley Park: An Environmental History* by Sean Kheraj for *Pacific Historical Review* 84: 97-98
**2014 –** *Vacationland: Tourism and Environment in the Colorado High Country* by William Philpott for *Environmental History* 19: 589-590
**2013** – *Observation Points: The Visual Poetics of National Parks* by Thomas Patin, Ed. for *Journal of Historical Geography* 42: 220

**PODCASTS**

**2021** – "William Coffin Coleman and The History of the Coleman Company" on The RV Atlas, June 25, available at: https://thervatlas.com/podcast/william-coffin-coleman-and-the-history-of-the-coleman-company/

**2020** – "Pandemics & the National Parks" on National Parks Traveler, August 23, available at: https://www.nationalparkstraveler.org/podcast/2020-08-23-national-parks-traveler-episode-80-pandemics-and-national-parks

**2019** – "Heading Out: A History of American Camping" on Writing Westward Podcast, March 8, available at: http://reddcenter.byu.edu/Blogs/redd-center-blog/Post/writing-westward-podcast-episode-007---terenc

**2017** – "Heading Out: The History of Camping" on The Art of Manliness, August 3, available at: http://www.artofmanliness.com/2017/08/03/podcast-327-heading-history-camping/

**AWARDS & GRANTS**

Awards

**2023 –** California State University Emeritus and Retired Faculty & Staff Association, Research Grant of $600.00 for travel to Washington, DC. Title: "The African Student Program, 1961-1969."

**–** Brigham Young University, The Redd Center, John Topham and Susan Redd Butler Off-Campus Faculty Research Award of $2,000.00 for travel to Washington, DC and Amherst, MA. Title: "'To Learn the Value of Conservation': Diffusing America's Protected-Area Methods to Post-Colonial Africa, 1961-1974."

**2018** – J.B. Jackson Prize from the American Association of Geographers for *Heading Out: A History of American Camping* published by Cornell University Press

- Hal K. Rothman Prize from the Western History Association for *Heading Out: A History of American Camping* published by Cornell University Press

**2013 –** Association of American Geographers, Research Grant of $1,000.00 for travel to Washington, DC and Yellowstone National Park. Title: "US National Park Service Cooperation with Canada and In Africa."

**2008 – 2018 –** US National Park Service, Park History Program, Washington, DC – Volunteers in Parks Program – $4,600.00 and continuing for travel and research expenses. Titles: "International Cooperation and the National Park Service" and "Yosemite State Park and the US National Parks"

**2008-2009** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Grant of $4,736.00 for one course release to compose a scholarly article for a journal *Environmental History*. Title: "The Smooth Way to Rough It: Pilgrimage, McDonaldization and the Evolution of Camping Equipment."

**PRESENTATIONS**

Papers:

**2023** – Annual Meeting of the Association of Pacific Coast Geographers, Ventura, CA, October 20: "Diffusing Conservation to Post-Colonial Africa"

– Annual Meeting of the American Association of Geographers, Denver, CO, March 24: "Diffusing America's 'Effective Methods' to Africa"

**2022** – Annual Meeting of the Association of Pacific Coast Geographers, Bellingham, WA, October 7: "'To Learn the Value of Conservation and Preservation': Diffusing America's Approach to Protected Areas through the African Student Program, 1961-1965"

– Annual Meeting of the European Society for Environmental History, Bristol, UK, July 4: "'Nature is not something optional': Essentialism and the History of American Urban Greening" (presented via Zoom)

– Annual Meeting of the American Society for Environmental History, Eugene, OR, March 26: "An Appreciation for Conservation and Wildlife Management": The National Park Service's African Student Program, 1961-1965"

– Annual Meeting of the American Association of Geographers, New York, NY, February 25: "The Potential African Leaders of Tomorrow": The National Park Service's African Student Program, 1961-1965 (presented via Zoom)

**2021** – Annual Meeting of the American Association of Geographers, Seattle, WA, April 8: "Essential Nature: Biophilia and the Greening of American Cities" (presented via Zoom)

**2019** – Annual Meeting of the Western History Association, Las Vegas, Nevada, Friday, October 18: "'To Keep in Touch with the Real America': The Wally Byam Foundation's Trailer-Camping Program of

National Discovery and Re-Discovery"
**2018** – Annual meeting of the American Association of Geographers, New Orleans, LA, April 10: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"
– Annual meeting of the American Society for Environmental History, Riverside, CA, March 17: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"
**2017** – Annual meeting of the Association of Pacific Coast Geographers, Chico, CA, October 27: "'The Most Elaborate and Valuable Apparatus': Transnational Politics and the Linking of Canadian and American Park Agencies"
– Annual meeting of the American Association of Geographers, Boston, MA, April 7: Roundtable in honor of Nicholas Entrikin
– Annual meeting of the American Association of Geographers, Boston, MA, April 7: "For what did Lavoy Finicum die?"
– Biennial meeting of the George Wright Society, Norfolk, VA, April 3: "Yosemite and the Origins of America's National Parks"
**2016** – Annual meeting of the Association of Pacific Coast Geographers, Portland, OR, October 7: "Yosemite and the Origins of America's National Parks"
– Annual meeting of the American Association of Geographers, San Francisco, CA, April 1: "*In Media Res*: California as National Park-State Park Intersection"
**2015** – Annual meeting of the Association of Pacific Coast Geographers, Palm Springs, CA, October 23: "Christian Nationalism and the Antimodern Origins of the Pacific Crest Trail"
– Triennial meeting of the International Conference of Historical Geographers, London, United Kingdom, July 6: "Frederick Law Olmsted's Abandoned San Francisco Park Plan"
– Biennial meeting of the George Wright Society, Oakland, CA, March 30: "Renewing Our Faith and Ideals: Christian Nationalism and the Origins of the Pacific Crest Trail"
– Annual meeting of the American Society for Environmental History, Washington, DC, March 21: "'An Outstanding Feature of Our Relations': The Melding of Canadian and US Park Management after World War II"
**2013** – Annual meeting of the Association of American Geographers, Los Angeles, CA, April 9: "'To Think and Feel and Become Sanctified': Camping as American Pilgrimage"
– Biennial meeting of the George Wright Society, Denver, CO, March 11: "'The Illusion of Wildness' in America's Automobile Campgrounds"

Invited Lectures & colloquia:
**2022** – "Camping in America: Its 19th Century Beginning," Torrance Public Library, Torrance, CA, August 5
**2020** – Keynote Speaker – "Outdoor Imaginaries: Camping in Modern America," Tourist Imaginaries and Mobility in the United States Conference, American Studies Program, University of Versailles Saint-Quentin-en-Yvelines, Versailles, France, February 6
**2019** – "'Roughing It Smoothly': American Autocamping in the Early Twentieth Century," Ohio University, Athens, OH, November 5
– "Modernity & Nature in America," Dumbarton Oaks Graduate Seminar, Washington, DC, May 21
– "Heading Out: To Walk in the Woods" at the Huntington Westerners, Pasadena, CA, May 4
**2018** – "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Montana State University, November 1
– "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Idaho State University, October 30
– "To Feel at Home in the Wild: E.P. Meinecke's Modern Autocampground" at Dumbarton Oaks, Washington, DC, October 17
– "Heading Out: To Walk in the Woods" at the Historical Society of Crescenta Valley, La Crescenta, CA, August 20
– "Heading Out: To Walk in the Woods" at the Pasadena Museum of History's At Home Series, May 22
– "Three California Connections" at Flintridge Bookstore, La Canada-Flintridge, CA, March 22
**2017** – "Values, Conflicts and America's Protected Lands" at Department of Geography and Environmental Studies, California State University San Bernardino, November 16 (for Geography

Awareness Week)

– "The Value of Parks" in the District Planning and Compliance Course, California State Parks at the California Citrus Historic State Park, Riverside, CA, October 9

– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" at the Kelly Adirondack Center, Union College, Schenectady, NY, August 9

– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" for the public lecture series of the Adirondack Experience, Blue Mountain Lake, NY, August 7

– "Smoothing Out the Roughness: The Evolution of Camping Gear," National Museum of American History, Smithsonian Institution, Washington, DC, August 1

**2014** – "Swept Up in 'Murray's Rush': The Adirondack Beginnings of Camping in America" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 28

**GRADUATE STUDENTS**

Ph.D. Committees

Robert Dye, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

Kathleen Mengak, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

M.A./M.S./M.L.A. Committees

Angelica Rocha, Regenerative Studies Program, California State Polytechnic University – Pomona (Co-chair of committee) (MS awarded 2019)

Norma Saldana, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2019)

Crystal Weintrub, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2014)

Rachel Boldt (nee Camp), Regenerative Studies Program, California State Polytechnic University – Pomona (Chair of committee) (MS awarded 2012)

April Garbat, Department of Landscape Architecture, California Polytechnic State University – Pomona (MLA awarded 2011)

Jacob Feldman, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2011)

Martin Hogue, Department of Landscape Architecture, University of Toronto (MLA degree awarded 2010)

Leslie Johnson, Department of Art, California State University – Long Beach (MA degree awarded 2007)

Doug Kent, Regenerative Studies Program, California State Polytechnic University – Pomona (MS degree awarded 2006)

Keith Miller, Department of Geography, California State University – Long Beach (MA degree awarded 2003)

Manuscripts and proposals reviewed for:

*Agricultural History, Association of Pacific Coast Geographers Yearbook, California History,* Center for American Places/University of Chicago Press, *cultural geographies, Ecumene, Environmental History, Gender, Place and Culture, Geographical Review, GeoJournal, Historical Geography, Journal of Cultural Geography, Journal of Historical Geography, Journal of Planning History, Journal of Urban Design, Land Use Policy, Landscape Journal, Landscape Research,* Louisiana State University Press, National Science Foundation, *Pacific Historical Review, Park Stewardship Forum, Philosophy and Geography, Society and Space, Studies in the History of Gardens and Designed Landscapes,* US National Park Service, University of Georgia Press, University of Massachusetts Press, University of Virginia Press, *Western Historical Quarterly*

**PROFESSIONAL SERVICE**

Memberships

American Society for Environmental History, American Association of Geographers, Association of Pacific Coast Geographers, European Society for Environmental History, George Wright Society

Community Work

**2021-present** – Advisory Member, Publications Committee, George Wright Society
**2022-present** – Secretary, Association of Pacific Coast Geographers
**2023-2024** – Chair, Protected Areas Specialty Group, American Association of Geographers
**2020-2023** – Vice Chair, Protected Areas Specialty Group, American Association of Geographers
**2013-2017** – Member, Editorial Board, *Environmental History*
**2013-2014** – Local Arrangements Committee for American Society for Environmental History's 2014 annual meeting in San Francisco, CA

# EXHIBIT 2

FFXCO_12686

MINUTES OF PROCEEDINGS

OF THE

# BOARD OF COMMISSIONERS

OF THE

# CENTRAL PARK,

FOR THE

YEAR ENDING APRIL 30, 1858.

NEW YORK:
WM. C. BRYANT & CO., PRINTERS, 41 NASSAU ST., COR. LIBERTY.

1858.

Digitized by Google

## TUESDAY, MARCH 16, 1858.

REGULAR MEETING—3 P. M.

PRESENT:

| | |
|---|---|
| Commissioner Gray, | Commissioner Fields, |
| " Dillon, | " Green, |
| " Russell, | " Strong, |
| " Butterworth, | " Hogg. |
| " Hutchins, | |

On motion, the reading of the minutes of the previous meeting was dispensed with.

On motion of Mr. BUTTERWORTH, it was

*Resolved*, That the Annual Report of this Board to the Common Council, dated January 30, 1858, be printed as one of the documents of this Board.

As follows:

*Ayes*—Messrs Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

On motion of Mr. DILLON, the ordinances recommended by the Superintendent were adopted, as follows:

"Be it ordained by the Commissioners of the Central Park:

All persons are forbidden

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats or swine into the Park.

To carry fire-arms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the Park;

Or to converse with, or in any way hinder those engaged in its construction.

Digitized by Google

All persons offending against these ordinances shall be deemed guilty of misdemeanor, and be punished, on conviction before the Mayor, Recorder, or any magistrate of the city of New York. by a fine not exceeding fifty dollars; and, in default of payment, by imprisonment not exceeding thirty days."

Visitors may obtain all necessary information and directions from the police.

The business offices and the police station of the Park are on Fifth avenue at Seventy-ninth street."

Mr. Dillon also moved the adoption of the following:

*Ordered*, That the Superintendent cause these ordinances to be posted on the Park, in such number and manner as he may deem advisable.

*Ordered*, That it be published for ten days in the Daily Times, Tribune, Sun, and Staats Zeitung.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

A communication from the Chief Engineer, submitting a report on " A Comprehensive Plan of Drainage " of the Park, accompanied by a map of the same, was received.

Mr. Dillon moved that the report be printed and referred to the Committee on Draining and Sewerage.

Which was carried, as follows:

*Ayes*—Messrs. Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

A report from the Chief Engineer, announcing the completion of the sectional and drainage maps of the Park, and the discharge of all persons directly employed by him, was referred to the Executive Committee.

A communication from the same, as to a plan for receiving within the limits of the Park the waste water from the present and new reservoirs, was also referred to the Executive Committee.

A communication from Thomas F. Webb, as to furnishing blasting powder for the Park, was also referred to the same committee.

Digitized by Google

The following communication was received from A. W. Craven, Esq., of the Croton Aqueduct Board, and on motion of Mr. Dillon ordered to be engrossed in the minutes of the Board:

CROTON AQUEDUCT DEPARTMENT,
Engineer's Office, March 2d, 1858.

Gentlemen,—I beg leave to acknowledge the receipt of a note from your Board, through Mr. Hart, dated February 16th, and to apologise for not replying to it more promptly.

The questions asked, and the answers thereto, are as follows:

"1st. What is the height of the Reservoir on the line of Fifth avenue at 41st street, excluding the railing?"

The top of the wall, exclusive of the railing, and also exclusive of the projections at the corners and over the gateway, is 119 feet above mean tide and 39 feet above the curb of Forty-first street. The height of water when the Reservoir is full is four feet below this level, or 115 feet above mean tide.

"2d. Will the top of the wall of the new Reservoir be on a level with the top of that now built in Seventy-ninth street?"

These heights are intended to be precisely the same.

"3d. Could not the height of the wall be reduced in the Reservoir now built and in the new one, and if so, how much, and yet answer all the purposes of the Reservoir?"

The height of water in these Reservoirs could not be reduced without greatly impairing the efficiency of our water distribution throughout the city, and the height of the wall could not be reduced with safety without a corresponding reduction in the high-water level.

I have the honor to be, very respectfully,
Your obedient servant,
A. W. CRAVEN,
Chief Engineer.

To the Commissioners of the Central Park, New York.

The monthly report of the Superintendent was read and ordered on file.

A petition of Norman Ewen, late Surveyor and Engineer of the third division Central Park Survey, to be allowed his pay,

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 58 of 197 PageID# 2150

at the rate of $1500 per annum, from May 1st to November 13th, 1857, was read and referred to the Auditing Committee.

Mr. FIELDS moved to take up the special order, being the election to fill the vacancy caused by the resignation of Mr. Cooley, in pursuance of the notice given by Mr. Strong, at the meeting of February 16, 1858.

The ayes and nays being called for upon the motion, it was carried, as follows:

*Ayes*—Messrs. Dillon, Russell, Gray, Hutchins, Fields, Green, Strong, Hogg—8.

*Nay*—Mr. Butterworth—1.

Mr. RUSSELL offered the following:

*Resolved*, That it is inexpedient at the present meeting to go into an election, to fill the vacancy in the Board occasioned by the resignation of Mr. Cooley.

Lost.

Mr. FIELDS moved that the Board now go into ballot.

Carried, as follows:

*Ayes*—Messrs. Dillon, Gray, Hutchins, Fields, Green, Strong, Hogg—7.

*Nays*—Messrs. Russell, Butterworth—2.

The Chair appointed as tellers Messrs. Green and Butterworth.

The Board then proceeded to ballot, with the following result:

For August Belmont.................. 7
" George Bancroft..... ............. 1
Blank ........................... 1

On motion of Mr. RUSSELL, the election of Mr. Belmont was declared unanimous.

On motion of Mr. HUTCHINS, the Vice-President was requested to communicate to Mr. Belmont his election to the Board.

Mr. STRONG moved that when the Board adjourn it be to Tuesday next at 1 o'clock.—Carried.

On motion of Mr. RUSSELL, the Clerk was directed to prepare a calendar of unfinished business for the use of the Board, at each stated meeting.

The Board then adjourned.

Digitized by Google

FFXCO_12691

# EXHIBIT 3

FFXCO_12692

# FOURTH ANNUAL REPORT

OF THE

# BOARD OF COMMISSIONERS

OF THE

# CENTRAL PARK.

JANUARY, 1861.

NEW YORK:
WM. C. BRYANT & CO., PRINTERS, 41 NASSAU STREET, CORNER LIBERTY.

1861.

Digitized by Google

Original from
HARVARD UNIVERSITY

# INDEX.

| | PAGE |
|---|---|
| Commissioners of the Central Park........................ | 3 |
| Annual Report........................................ | 5 |
| Summary of Treasurer's Account........................ | 25 |
| Map of the Central Park, showing the progress of the work up to January 1st, 1861.................................. | 28 |
| Act authorizing the taking of the land for the Central Park...... | 29 |
| Opinion of Mitchell, J., relative to the taking of the land for the Central Park.................................. | 32 |
| Opinion of Harris, J., relative to the taking of the land for the Central Park.................................. | 36 |
| Several Acts respecting the Central Park...... 45, 50, 54, 58, 59, | 123 |
| Report of Senate Special Committee, on affairs, condition, and progress of the Central Park.... .................. | 61 |
| Ordinances of the Central Park.......................... | 106 |
| Description " " " .......................... | 110 |

Digitized by Google

Original from HARVARD UNIVERSITY

# APPENDIX.

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park. All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal


Original from
HARVARD UNIVERSITY

other than geese, of two dollars and the expenses of keeping. and for geese twenty-five cents and the expenses of keeping; the expenses of keeping to be reckoned as follows:

For each horse, dog, or head of neat stock, fifty cents per day.

For each goat, swine, or sheep, twenty cents per day.

For each goose, five cents per day.

These charges shall be paid to the property clerk of the Board, and the money thus collected shall by him be handed over, within one week, to the treasurer of the Board.

If, within one month after the sale of any impounded animals, their former owner shall appear and claim the same, the treasurer shall, after deducting the full amount of the charges provided for above, pay over to him the proceeds of their sale; otherwise the amount shall be added to the funds of the Board.

No animal shall travel on any part of the Central Park, except upon the "ride," or equestrian road, at a rate exceeding seven miles per hour. Persons on horseback shall not travel on the "ride," or equestrian road, at a rate exceeding ten miles per hour.

No vehicle shall be permitted on the "ride," or equestrian road, the same being devoted exclusively to equestrians; nor shall any vehicle, horse, or animal of burden, go upon any part of the Central Park except upon the "drive" and other carriage and transverse roads, and upon such places as are appropriated for carriages at rest.

No animal or vehicle shall be permitted to stand upon the "drive" or carriage roads of the Central Park, or any part thereof, to the obstruction of the way, or to the inconvenience of travel, nor shall any person upon the Central Park solicit or invite passengers.

No hackney coach, carriage, or other vehicle for hire, shall stand upon any part of the Central Park for the purpose of taking in any other passengers or persons than those carried to the Park by said coach, carriage, or vehicle.

No person shall expose any article or thing for sale upon the Central Park, except previously licensed by the Board of Commissioners of the Central Park, nor shall any hawking or peddling be allowed on the Central Park.

Digitized by Google

Original from HARVARD UNIVERSITY

No omnibus or express wagon, with or without passengers, nor any cart, dray, wagon, truck, or other vehicle carrying goods, merchandise, manure, soil, or other articles, or solely used for the carriage of goods, merchandise, manure, or other articles, shall be allowed to enter any part of the Central Park except upon the transverse roads.

No threatening, abusive, insulting, or indecent language shall be allowed on the Central Park, whereby a breach of the peace may be occasioned.

No person shall be allowed to tell fortunes or play at any game of chance at, or with any table or instrument of gaming, nor to do any obscene or indecent act whatever on the Central Park.

In case of an emergency, where life or property are endangered, all persons, if required so to by the Superintendent, or any of his assistants, shall remove from the portion of the Central Park specified by the Superintendent or his assistants, and remain off the same till permission is given to return.

The Central Park shall be open daily to the public during the months of December, January, and February, from seven o'clock in the morning until eight o'clock in the evening; during the months of March, April, May, June, October, and November, from six o'clock in the morning until nine o'clock in the evening; and during the months of July, August, and September, from five o'clock in the morning until eleven o'clock in the evening.

The Superintendent may direct that any of the entrances to the Park be closed at any time, and may, on special occasions, also direct that the Park, or any portion thereof, remain open at other times than those above specified.

No person, other than employees of the Board of Commissioners of the Central Park, shall enter or remain in the Central Park, except when it is open, as above provided.

No dog shall be allowed upon any portion of the Central Park, unless led by a chain or proper dog-string, not exceeding five feet in length, nor shall any person be allowed to lead any quadruped (except dogs) in the Central Park.

No person, except in the employ of the Board of Commissioners of the Central Park, shall bring upon the Central Park

Digitized by Google Original from HARVARD UNIVERSITY

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 65 of 197 PageID# 2157

any tree, shrub, plant, or flower, nor any newly plucked branch, or portion of a tree, shrub, plant, or flower.

No person shall bathe, or fish in, or go, or send any animal into any of the waters of the Park, nor disturb any of the fish, water-fowl, or other birds in the Park, nor throw, or place any article or thing in said waters.

No person shall fire, discharge, or set off in the Central Park, any rocket, cracker, torpedo, squib, balloon, snake, chaser, or double-header, nor any fireworks or thing under any other name, composed of the same or similar material, or of the same or similar character, as the fireworks above specified.

No person shall place or propel any invalid chairs or perambulators upon any portion of the Central Park, except upon the walks.

No person shall post or otherwise affix any bill, notice, or other paper, upon any structure or thing within the Central Park, nor upon any of the gates or enclosures thereof.

No person shall, without the consent of the Comptroller of the Park, play upon any musical instrument within the Central Park, nor shall any person take into, or carry or display in the Central Park, any flag, banner, target, or transparency.

No military or target company, or civic or other procession, shall be permitted to parade, drill, or perform upon the Central Park, any military or other evolutions or movements.

Original from HARVARD UNIVERSITY

FFXCO_12698

# EXHIBIT 4

FFXCO_12699

# ANNUAL REPORTS

OF THE

# BROOKLYN

# PARK COMMISSIONERS.

1861–1873.

REPRINTED
BY ORDER OF THE BOARD,
WITH SUCH ACTS OF THE LEGISLATURE
IN THEIR AMENDED FORM,
AS RELATE TO THE
BROOKLYN PARKS, AND THEIR MANAGEMENT.

JANUARY,
1873.

Generated on 2023-02-10 23:29 GMT / https://hdl.handle.net/2027/uc1.c070473596
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

SEVENTH ANNUAL REPORT

OF THE

# COMMISSIONERS OF PROSPECT PARK.

1867.

Generated on 2023-02-10 23:29 GMT / https://hdl.handle.net/2027/uc1.c070473596
Public Domain, Google-digitized / http://www.hathitrust.org/access use#pd-google

Original from
UNIVERSITY OF CALIFORNIA

# PARK ORDINANCE, No. 1.

The Commissioners of Prospect Park, in the city of Brooklyn, do ordain as follows:

ARTICLE I.—All persons are forbidden,

1. To take or carry away any sod, clay, turf, stone, sand, gravel, leaves, muck, peat, wood, or anything whatever belonging to the park, from any part of the land embraced within the boundaries of the park;

2. To climb upon, or in any way cut, injure, or deface any tree, shrub, building, fence, or other erection within the park;

3. To turn cattle, horses, goats, swine, or poultry of any description upon the park;

4. To carry firearms, or to throw stones or other missiles within the park;

5. To hinder or in any manner delay or interfere with men employed upon the park;

6. To expose any article or thing for sale, or engage in any picnic or game upon the park, except by permission derived from the Board of Commissioners;

7. To post or otherwise display any bill, notice, advertisement, or other paper or device upon any tree, structure, or other erection within the park, or upon any of its inclosures.

ARTICLE II.—Any person who shall violate or offend against any of the provisions of the foregoing article, shall be deemed guilty of a misdemeanor, and shall be punished on conviction, before any court of competent jurisdiction in the county of Kings, by a fine not exceeding fifty dollars, and in default of payment, by imprisonment not exceeding thirty days.

Generated on 2023-02-10 23:28 GMT / https://hdl.handle.net/2027/uc1.c070473596
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Original from
UNIVERSITY OF CALIFORNIA

# EXHIBIT 5

FFXCO_12703

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 71 of 197 PageID# 2163

# LAWS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF PENNSYLVANIA,

PASSED AT THE

## SESSION OF 1868,

In the Ninety-second Year of Independence.

## WITH AN APPENDIX.

BY AUTHORITY.

HARRISBURG:
SINGERLY & MYERS, STATE PRINTERS.
1868.

FFXCO_12704

No. 1019.

# A Supplement

To an act, entitled "An Act to incorporate the Farmers' Coal and Iron Company," approved the seventeenth day of April, Anno Domini one thousand eight hundred and sixty-six.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That said company shall have the power and authority to build a bridge across the Susquehanna river, so that the same may be a toll and railroad bridge, and charge and receive tolls for crossing the same.

Authorized to construct bridge.

SECTION 2. That it shall be lawful for any other chartered company to subscribe to the capital stock of this company or to loan the said company money.

Other corporations may subscribe to capital stock.

SECTION 3. That said company shall have the right to extend their railroad and branches, and cross at grade the tracks of any railroads now made or hereafter to be made, in such manner as to connect with any other railroads or to any landings on any canal or slack-water navigation.

May extend railroad, &c.

ELISHA W. DAVIS,
Speaker of the House of Representatives.

JAMES L. GRAHAM,
Speaker of the Senate.

APPROVED—The fourteenth day of April, Anno Domini one thousand eight hundred and sixty-eight.

JNO. W. GEARY.

---

No. 1020.

# A Supplement

To an act, entitled "An Act appropriating ground for public purposes in the city of Philadelphia," approved the twenty-sixth day of March, Anno Domini one thousand eight hundred and sixty-seven.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the boundaries of the Fairmount park, in the city of Philadelphia, shall be the following, to wit: Beginning at a point in the north-easterly line of property, owned and occu-

Boundaries of Fairmount park defined.

confirmed by the court, the valuation made shall be forthwith payable by the city of Philadelphia.

City to effect loans to make compensation for grounds taken, &c.

SECTION 11. The city of Philadelphia shall be authorized and required to raise, by loans from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount park, and for the laying out and construction thereof for public use, for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park, and shall also provide for the payment of the interest on all said loans and the usual sinking fund for the redemption thereof.

Commissioners to appoint officers, agents, &c.

SECTION 12. The said park commissioners shall from time to time appoint such officers, agents and subordinates as they may deem necessary for the purposes of this act and the act to which this is a supplement, and they shall prescribe the duties and the compensation to be paid them; and so much of the second section of the act to which this is a supplement, as requires that the secretary shall be chosen from the commissioners, be and the same is hereby repealed.

May acquire and sell lands situate in part within boundaries mentioned.

SECTION 13. It shall be lawful for said park commissioners to acquire title to the whole or any tract of land, part of which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the city of Philadelphia; and such part thereof as shall lie beyond or within the said park limits again to sell and convey in absolute fee simple to any purchaser or purchasers thereof by deeds, to be signed by the mayor under the seal of the city, to be affixed by direction of councils, either for cash or part cash, and part to be secured by bond and mortgage to the city, paying all cash into the city treasury: *Provided*, That the proceeds of such sales shall be paid into the sinking fund for the redemption of the loan created under the provisions of this act: *Provided also*, That no commissioner nor any officer under the park commission shall in any wise be directly or indirectly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion, if an officer, to be discharged by a majority of votes of the board of park commissioners, after an opportunity afforded of explanation and defence.

Proviso.

Proviso.

To make report to mayor annually.

SECTION 14. The said board of commissioners shall annually hereafter, in the month of December, make to the mayor of the city of Philadelphia a report of their proceedings and a statement of their expenditures for the preceding year.

May lease houses, &c., within park limits.

SECTION 15. The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases, to be signed by their president and secretary, and to collect the rents and pay them into the city treasury.

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 74 of 197 PageID# 2166

Buildings erected on grounds by boat clubs, &c., relative to.

SECTION 16. All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require.

Commissioners may accept property upon trusts.

SECTION 17. The said park commissioners shall have power to accept in the name and behalf of the city of Philadelphia devises, bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: *Provided*, Such trusts be satisfactory to the commission and compatible with the purposes of said park.

Proviso.

Debts to bind commissioners, how created.

SECTION 18. None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said board of commissioners, except by the express authority of the said commissioners at a meeting duly convened.

Management, &c., of park

SECTION 19. The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

May license laying down of passenger railways.

SECTION 20. That the said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the city treasury.

Rules and regulations.

SECTION 21. The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

I. No person shall turn cattle, goats, swine, horses or other animals loose into the park.

II. No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stons or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the park.

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

V. No one shall ride or drive therein upon any other than upon the avenues and roads.

VI. No coach or vehicle used for hire shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless, in either case, at points designated by the commission.

VII. No wagon or vehicle of burden or traffic shall pass through the park, except upon such road or avenue as shall be designated by the park commissioners for burden transportation.

VIII. No street railroad car shall come within the lines of the park without the license of the park commission.

IX. No person shall expose any article for sale within the park without the previous license of the park commission.

X. No person shall take ice from the Schuylkill within the park without the license of the said commission first had, upon such terms as they may think proper.

XI. No threatening, abusive, insulting or indecent language shall be allowed in the park.

XII. No gaming shall be allowed therein, nor any obscene or indecent act therein.

XIII. No person shall go in to bathe within the park.

XIV. No person shall fish or disturb the water-fowl in the pool or any pond, or birds in any part of the park, nor discharge any fire-works therein, nor affix any bills or notices therein.

XV. No person shall have any musical, theatrical or other entertainment therein without the license of the park commissioners.

XVI. No person shall enter or leave the park except by such gates or avenues as may be for such purpose arranged.

XVII. No gathering or meeting of any kind assembled through advertisement shall be permitted in the park without the previous permission of the commission, nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

XVIII. That no intoxicating liquors shall be allowed to be sold within said park.

**Penalty for violating rules and regulations.**

SECTION 22. Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said park commissioners for the government of said park, not inconsistent with this act or the laws and constitutions of this state and United States, the power to ordain which rules and regulations is hereby expressly given to said commissioners, shall be guilty of a misdemeanor, and shall pay such fine as may be prescribed by said park commissioners, not to exceed five dollars for each and every violation thereof, to be recovered before any alderman of said city, as debts of that amount are recoverable; which fines shall be paid into the city treasury: *Provided*, That if said park commissioners should license the taking of ice in said park, or the entry of any street railroad car therein, or articles for sale, or musical entertainments, it may be with such compensation as they may think proper, to be paid into city treasury: *And provided*, That any person violating any of said rules and regulations shall be further liable to the full extent of any damage by him or her committed, in trespass or other action; and any tenant or licensed party who shall violate the said rules, or any of them, or consent to or permit the same to be violated on his or her or their premises, shall forfeit his or her or their lease or license, and shall be liable to

**Proviso.**

**Proviso.**

69

be forthwith removed by a vote of the park commission; and every lease and license shall contain a clause making it cause of forfeiture thereof for the lessee or party licensed to violate or permit or suffer any violation of said rules and regulations, or any of them; it shall be the duty of the police appointed to duty in the park, without warrant, forthwith to arrest any offender against the preceding rules and regulations whom they may detect in the commission of such offence, and to take the person or persons so arrested forthwith before a magistrate having competent jurisdiction.

Profits realized, to be paid into city treasury.

SECTION 23. All rents, license, charges and fees, all fines, proceeds of all sales, except of lands purchased, and profits of whatsoever kind, to be collected, received or howsoever realized, shall be paid into the city treasury as a fund to be exclusively appropriated by councils for park purposes, under the direction of said commission: *Provided*, That moneys or property given or bequeathed to the park commissioners upon specified trusts shall be received and receipted for by their treasurer, and held and applied according to the trusts specified.

Proviso.

Councils may approve approaches to park.

SECTION 24. That the councils of the city of Philadelphia be and they are hereby authorized to widen and straighten any street laid upon the public plans of said city, as they may think requisite to improve the approaches to Fairmount park.

Act not to affect proceedings pending in court.

SECTION 25. That nothing in this act contained shall suspend or affect any proceeding pending in court under any existing law, but the same shall be proceeded in as if this act had not been passed

Damages, how ascertained, &c.

SECTION 26. The damages for ground and property taken for the purpose of this act shall be ascertained, adjusted and assessed in like manner as is prescribed by the act to which this is a supplement.

Commissioners to employ park force to maintain order.

SECTION 27. The said park commissioners shall employ, equip and pay a park force adequate to maintain good order therein and in all houses thereupon; which force shall be subject to the orders of the mayor upon any emergency, and so far as said force shall consist of others than the hands employed to labor in the park, it shall be appointed and controlled as the other police of the city.

City solicitor to appoint additional assistant.

SECTION 28. There shall be an additional assistant appointed by the city solicitor, whose duty it shall be, under the direction of the city solicitor, to attend to the assessments of damages, and to such other business of a legal nature connected with the park as said commissioners may require.

GEO. T. THORN,
Speaker of the House of Representatives *pro tem.*

JAMES L. GRAHAM,
Speaker of the Senate.

APPROVED—The fourteenth day of April, Anno Domini one thousand eight hundred and sixty-eight.

JNO. W. GEARY.

# EXHIBIT 6

FFXCO_12710



LITTAUER LIBRARY
LI 1E2C P

SAN FRANCISCO, Cal. —

# MUNICIPAL REPORTS

FOR THE

## FISCAL YEAR 1874-5, ENDING JUNE 30, 1875.

PUBLISHED BY ORDER OF THE

## BOARD OF SUPERVISORS.

SAN FRANCISCO:
SPAULDING & BARTO, PRINTERS, "SCIENTIFIC PRESS" JOB PRINTING OFFICE,
414 CLAY STREET.
1875.

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 79 of 197 PageID# 2171



four months, nor more than six months, or by both such fine or imprisonment; and one-half of any fine that may be collected for a violation of any of the provisions of this order, shall be paid to the persons making the complaint.

---

ORDER NO. 1,226.

PROHIBITING THE CARRYING OF CONCEALED DEADLY WEAPONS.

[Approved July 9, 1875.]

*The People of the City and County of San Francisco do ordain as follows:*

SECTION 1. It shall be unlawful for any person, not being a public officer or traveler, or not having a permit from the Police Commissioners of this City and County, to wear or carry, concealed, in this City and County, any pistol, dirk or other dangerous or deadly weapon.

Every person violating any of the provisions of this order shall be deemed guilty of a misdemeanor and punished accordingly. Such persons, and no others, shall be termed "travellers" within the meaning of this order, as may be actually engaged in making a journey at the time.

The Police Commissioners may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry concealed deadly weapons for his own protection.

NOTE.—General Orders, as amended, to November 1st, 1875.

---

## PARK COMMISSIONERS' ORDINANCES.

---

ORDINANCE No. 1.

[Adopted October 27th, 1870.]

*The Park Commissioners do ordain as follows:*

No person shall trespass on the grounds within the limits of the Avenue, Golden Gate and Buena Vista Parks.

No person shall cut or remove from said Avenue and Parks, any trees, shrubs, stakes, wood, turf, grass or soil.

It shall be the duty of the custodian of the Park to arrest all trespassers, and all parties violating this Ordinance.

Digitized by Google

FFXCO_12712

## ORDINANCE No. 2.

[Adopted September 24th, 1872.]

AN ORDINANCE TO PROVIDE FOR THE REGULATION AND GOVERNMENT OF THE AVENUE AND PUBLIC PARKS IN THE CITY AND COUNTY OF SAN FRANCISCO, IN CHARGE OF THE PARK COMMISSIONERS.

SECTION 1. The objects of this Ordinance are those grounds which are known as Golden Gate and Buena Vista Parks, and the Avenue leading to said Golden Gate Park, all particularly described in the first section of an Act of the Legislature of the State of California, entitled "An Act to provide for the improvement of Public Parks in the City of San Francisco," approved April 4th, 1870.

SEC. 2. Within the said grounds all persons are hereby forbidden:

1. To turn in or let loose any cattle, horses, goats, sheep, or swine.
2. To carry and especially to discharge firearms.
3. To cut, break, or in any way injure or deface any trees, shrubs, plants, buildings, fences, or structures of any kind.
4. To bathe in, or otherwise pollute the water of any pond, lake, or pool.
5. To chase, set snares for, catch, or destroy any rabbits, quails, or other wild quadrupeds or birds.
6. To make or kindle a fire of any kind.
7. To camp, lodge, or tarry over night.
8. To ride or drive any horse or other animal, with vehicle or without, elsewhere than on the roads or drives for such purposes provided.
9. To indulge in riotous, boisterous, or indecent conduct, or language.
10. To drive or ride at a furious speed.

SEC. 3. No dray, truck, wagon, cart, or other vehicle carrying, or if not carrying, employed regularly in carrying goods, merchandise, manure, soil, or other articles, shall be allowed to travel upon the drive of said avenue for any other purpose than to cross immediately at the regular street intersections, nor upon the drives of said parks. For the present the road now and heretofore commonly traveled to and from "The Central Macadamized Toll Road," is excepted from this rule. But all such vehicles shall be driven over the least worked portion of such excepted road as directed by the Superintendent or any of the Park police officers hereinafter mentioned, unless compelled to turn out in obedience to the "rule of the road," as hereinafter laid down.

The provisions of this subdivision shall also apply to light vehicles regularly driven for business purposes between the country beyond the parks and the city.

SEC. 4. The rule of the road for equestrians or vehicles meeting upon the avenue or park drives shall be: PASS TO THE RIGHT.

Digitized by Google

SEC. 5. There is hereby established a Pound, to be located within the Park limits, for the impounding of the animals mentioned in the first subdivision of section two of this ordinance, and of all strays found trespassing upon said grounds. All such animals shall be driven or carried to the Pound and there kept enclosed at a charge to their owners at the rate of one dollar per day or fraction of a day, for each animal so impounded. No animal thus in custody shall be released except on proof of property and on production of a receipt signed by the Secretary of the Board of Park Commissioners, countersigned by the Park Superintendent.

If unclaimed for three days, all such animals shall be impounded in the City Pound. [This Section amended by Ordinance No. 5.]

SEC. 6. All moneys accruing from the Pound charges aforesaid, and also from fines collected from offenders against any of the provisions of this ordinance, shall be placed in the "Park Improvement Fund," and duly accounted for. [This Section amended by Ordinance No. 5.]

SEC. 7. 1. When the number of participants in any picnic or other organized party, about to enter these grounds will exceed ten persons, they, or one of them, shall communicate their intention to the keeper of the gateway at which they enter, or to the keeper of the Stanyan street entrance, pending the appointment of keepers for the other gates.

2. Any company, society or organization of any kind, being desirous of resorting to these grounds in a body, the number of individuals in which will exceed twenty-five, for the purpose of picnicing; any military or other organized company desirous of parading within the same; any base ball, cricket, or sporting club desirous of using the grounds set aside for their peculiar purposes, shall at least one day prior to the proposed date of the excursion, report, or cause to be reported, such intention to the Secretary of the Park Commissioners, or to the Superintendent of the Parks and Avenues.

3. All waste material, scraps, litter or rubbish of any kind brought upon these grounds by such picnic or other parties, shall be promptly collected and removed by them or their employees. In the event of the non-observance of this regulation, the actual cost of thoroughly performing the necessary duty by the Park force shall be charged, and a bill for the same be presented to the representatives of the organization so offending.

4. The representatives of any such organized party which shall have resorted to these grounds will be held responsible for the damage done through any transgression of these ordinances by any member of the same, when the offending individual in person cannot be identified.

SEC. 8. The Superintendent of the Parks and Avenue is hereby instructed to enforce and cause to be enforced the provisions of this Ordinance.

SEC. 9. Power and authority are hereby given to the Park-Keeper, the Head Gardener, the Foreman and the Foreman Teamster, to arrest and detain and deliver to the proper authorities, or in their discretion eject from the

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 82 of 197 PageID# 2174

grounds, all persons wilfully or knowingly offending against the provisions of this Ordinance, or any other Ordinance hereafter to be passed by said Board for the regulation, use and government of said Parks and Avenue.

SEC. 10. The Superintendent is herby clothed with the powers enumerated in Section 9 of this Ordinance.

SEC. 11. Whenever it may be necessary to appoint assistant keepers, there shall be delivered to each of them a certificate of appointment, signed by a majority of said Board, sealed and attested by the Secretary. Said assistant keepers shall possess all the powers enumerated in Section 9 of this Ordinance, but shall exercise the same under the direction of the Superintendent, and report to him forthwith any action which they may take under the same.

SEC. 12. The Park Keeper, the Head Gardener, the Foreman Teamster, and such assistant keepers as may be appointed as aforesaid, shall constitute the Park Police, and shall provide themselves with a badge of office consisting of a metallic star, inscribed with the words "Park Police," and the initials of the words indicating their particular office. A roll number shall be added to the initials on the badges of the assistant keepers.

SEC. 13. The Secretary of said Board shall, within five days after the passage of this ordinance, make and certify an accurate copy of the same, and cause the same to be published, as required by law, for ten days, Sundays excepted, and this ordinance shall take effect fifteen days after its passage.

---

## ORDINANCE No. 3.

[Adopted May 23, 1873.]

SECTION 1. The object of this ordinance, is that ground known as the Golden Gate Park, as described in the first section of an Act of the Legislature of the State of California, entitled "An Act to provide for the improvement of Public Parks in the City of San Francisco," approved April 4th, 1870.

SEC. 2. All vehicles used regularly for business purposes in hauling material or produce over the roads in the said Park, shall rest upon tires at least three and one-half (3½) inches wide.

SEC. 3. All trucks or wagons, other than those fitted with steel springs, used regularly in transporting heavy loads of material of any description over the said roads, shall rest upon tires at least five (5) inches wide.

SEC. 4. The Secretary of said Board shall, within five days after the passage of this ordinance, make and certify an accurate copy of the same, and

Digitized by Google

FFXCO_12715

# EXHIBIT 7

FFXCO_12716

# LAWS

AND

# ORDINANCES

GOVERNING THE

# CITY OF CHICAGO.

[PUBLISHED BY AUTHORITY OF THE COMMON COUNCIL OF THE CITY.]

COMPILED AND ARRANGED BY
MURRAY F. TULEY,
Counsel to the Corporation.

CHICAGO:
PUBLISHED BY THE BULLETIN PRINTING COMPANY,
132, 134 & 136 MONROE STREET.
1873.

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 85 of 197 PageID# 2177

# CHAPTER 31.

## PARKS AND PUBLIC GROUNDS.

SECTION.
1. Names established.
2. What games are prohibited in—Penalty.
3. Duty of board of public works to superintend
4. Ingress and egress regulated.
5. Animals to be excluded.
6. Firearms, etc., prohibited in – Injury to shrubbery.
7. Hindering employes prohibited.
8. Speed in driving regulated.
9. Animals, etc., to keep on drives.
10. Obstruction of ways prohibited.
11. Hacks, etc., not to ply for hire.
12. Peddling in. prohibited.
13. Certain vehicles prohibited.
14. Fortune telling, gaming, indecency, etc., prohibited.
15. Power to close part of parks.

SECTION.
16. When parks to be open.
17. Right to open and close parks.
18. Conduct of visitors regulated.
19. Bathing, fishing, etc. in forbidden.
20. Fireworks prohibited.
21. Perambulators on walks.
22. Posting bills forbidden.
23. Processions, fire apparatus, etc. prohibited, when.
24. Funeral processions prohibited.
25. Fires prohibited.
26. To keep off grass, except when.
27. Power of police in.
28. Chapter applies to public squares.
29. Penal clause.
30. Use of grass grown.

**1.** NAMES ESTABLISHED.] *Rev. Ord.* 1866. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by Mr. J. Van Vechten in the year 1872.

**2.** GAMES IN PROHIBITED—PENALTY.] No person shall play at ball, cricket, or at any other game or play whatever, in any of the inclosed public parks or grounds in this city, under the penalty of five dollars for every offense.

**3.** BOARD OF PUBLIC WORKS—DUTY OF.] It shall be the duty of the board of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed, and improve the same according to plans approved by the common council. They shall likewise cause printed or written copies of the prohibitions of this chapter to be posted in the said grounds or parks.

**4.** WALLS AND FENCES.] *Ord. Jan.* 11, 1869. No person shall enter or leave any of the public parks of the city of Chicago, except by their gateways; no person shall climb or walk upon their walls or fences.

**5.** ANIMALS TO BE EXCLUDED.] Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

**6.** FIREARMS AND MISSILES PROHIBITED—PROTECTION OF SHRUBBERY.] All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of

Digitized by Google

FFXCO_12718

the buildings, fences, bridges, or other construction or property, within or upon any of the said parks.

**7.** HINDERING EMPLOYES.] No person shall converse with, or in any way hinder those engaged in their construction.

**8.** SPEED OF DRIVING.] No animal shall travel on any part of either of the said parks at a rate exceeding six miles per hour.

**9.** VEHICLES AND ANIMALS ON DRIVES.] No vehicle, or horse, or other animal shall be permitted on the foot walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse or animal of burden go upon any part of either of the parks, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

**10.** OBSTRUCTION OF WAYS.] No animal or vehicle shall be permitted to stand upon the drives or carriage roads of any of the public parks of the city, or any part thereof, to the obstruction of the way, or to the inconvenience of travel, nor shall any person solicit passengers within either of said parks.

**11.** HACKS, ETC., NOT TO PLY FOR HIRE.] No hackney coach, carriage, or other vehicle for hire, shall stand upon either of the parks of the city of Chicago for the purpose of taking in any other passengers, or persons, than those carried to the park by said coach, carriage or vehicle.

**12.** PEDDLING IS NOT ALLOWED.] No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the board of public works, nor shall any hawking or peddling be allowed therein.

**13.** PROHIBITED VEHICLES.] No omnibus or wagon with or without passengers, nor any cart, dray, wagon, truck or other vehicle carrying goods, merchandise, manure, soil or other article, or solely used for the carriage of goods, merchandise, manure or other articles, shall be allowed to enter any part of either of the said parks. This, however, does not apply to vehicles engaged in the construction of such parks, nor private family wagons.

**14.** BOISTEROUS LANGUAGE—FORTUNE TELLING—GAMING—INDECENCY.] No threatening, abusive, insulting or indecent language shall be allowed therein whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

**15.** POWER TO CLOSE PART OF PARKS.] In case of any emergency, where life or property is endangered, all persons, if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants, and remain off the same until permission is given to return.

**16.** PARKS—WHEN OPEN.] Lincoln park and Union park shall be open daily to the public during the months of December, January and February from seven o'clock in the morning until eleven o'clock in the evening; during the months of March, April, May, October and November from six o'clock in the morning until ten o'clock in the evening, and during the months of June, July, August and September, from five o'clock in the morning until eleven o'clock in the evening.

**17.** POWER TO OPEN AND CLOSE PARKS.] The superintendent may, for

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 87 of 197 PageID# 2179

cause, direct that any of the entrances to either of the said parks be closed at any time, and may, on special occasions, also direct that any of the said parks or any portion thereof, remain open at other times than those above specified.

**18.** DUTY OF VISITORS.] No person other than employes in the park shall enter or remain in it except when it is open as above specified. No person other than employes shall bring upon any of the public parks any tree, shrub or plant, nor any newly plucked branch or portion of a tree, shrub or plant.

**19.** BATHING, FISHING, ETC.] No person shall bathe or fish in, or go, or send, or ride any animal in any of the waters of either of the said public parks, or waters of Lake Michigan in front of any of said parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw, or place any article or thing in the waters within either of said parks.

**20.** FIREWORKS PROHIBITED.] No person shall fire, discharge or set off in any of said public parks any rocket, cracker, torpedo, squib, balloon, snake, chaser or double-header, nor any fireworks or thing under any other name, composed of the same or similar material, or of the same or similar character as the fireworks above specified.

**21.** PERAMBULATORS.] No person shall place or propel any invalid's chairs or perambulators upon any portion of said parks except upon the walks.

**22.** POSTING BILLS.] No person shall post or otherwise affix any bills, notice or other paper, upon any structure or thing within either of said parks, nor upon any of the gates or inclosures thereof.

**23.** MUSIC—FLAGS, ETC.—PROCESSIONS—FIRE APPARATUS.] No person shall, without the consent of the board of public works, play upon any musical instrument, nor shall any person take into, or carry or display in the said public parks, any flag, banner, target or transparency. No military or target company, civic or other, shall be permitted to parade, drill or perform therein any military or other evolutions or movements. No fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires, shall be allowed on any part of said parks, without the previous consent of the board of public works.

**24.** FUNERAL PROCESSIONS PROHIBITED.] No funeral procession or hearse or other vehicle carrying the body of a deceased person shall be allowed upon any part of a public park.

**25.** FIRES PROHIBITED.] No person other than employes shall light, make or use any fire thereon.

**26.** TO KEEP OFF GRASS.] No person on foot shall go upon the grass, lawn or turf of the parks, except when and where the word "common" is posted, by order of the board of public works, indicating that persons are at liberty at that time and place to go on the grass.

**27.** POLICE, POWER OF.] *Rev. Ord.* 1866. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof, when directed, and cause him to be committed for examination.

FFXCO_12720

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 88 of 197 PageID# 2180

**28.** APPLICATION TO SQUARES.] *Ord. Jan.* 11, 1869. The foregoing sections of this chapter, so far as applicable, shall apply to all the public squares of the city of Chicago.

**29.** PENALTY.] Any person who shall violate any or either of the provisions of this chapter, or any section, or clause, or any provision of any section thereof, or who shall neglect, or fail, or refuse to comply with any, or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars, nor more than one hundred dollars.

**30.** USE OF GRASS.] *Rev. Ord.* 1866. The fire marshal may cause any grass fit for hay, growing or grown upon any of the public parks or grounds, to be cut and cured, under the direction of the board of public works and appropriated for the use of the teams used by the fire department.

# CHAPTER 32.

## PAWNBROKERS.

SECTION.
1. To be licensed—Penalty.
2. Definition of the word pawnbroker.
3. How license obtained—Fee—Bond.
4. When license to expire.

SECTION.
5. Registration of licenses.
6. Pawnbroker's record—Penalty for not keeping.
7. Inspection of record—Penalty for refusing.
8. Dealing with minors prohibited—Penalty.

**1.** TO BE LICENSED—PENALTY.] *Rev. Ord.* 1866. No person or persons shall carry on or conduct the business or calling of a pawnbroker, within the city of Chicago, without having first obtained a license so to do, under a penalty of not less than twenty dollars nor more than one hundred dollars for each offense.

**2.** PAWNBROKER DEFINED.] Any person who loans money on deposit, or pledge of personal property, bonds, notes or other securities, or who deals in the purchasing of personal property or choses in action, on condition of selling the same back again at a stipulated price, is hereby defined and declared to be a pawnbroker.

**3.** LICENSE—HOW OBTAINED—FEE—BOND.] The mayor is hereby authorized to grant a pawnbroker's license to any person of good character who may apply therefor, on the following conditions: The person so applying shall first pay to the collector a sum of money in proportion to the sum of one hundred dollars per annum for the time such license shall be granted, and shall execute a bond to the city of Chicago in the sum of five hundred dollars conditioned that the said applicant will in every particular conform to the requirements of this chapter, and with the requirements or provisions of any ordinance hereafter to be passed concerning pawnbrokers, and thereupon the clerk shall issue a license in due form, under the corporate seal,

Digitized by Google

FFXCO_12721

# EXHIBIT 8

FFXCO_12722

# FOURTH ANNUAL REPORT

OF THE

# BUFFALO PARK

## *COMMISSIONERS.*

JANUARY, 1874.

BUFFALO:
WARREN, JOHNSON & CO., PRINTERS.
Office of the Daily Courier, 197 Main Street.

1874.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# COMMISSIONERS.

HIS HONOR THE MAYOR, *Ex-Officio.*

| | |
|---|---|
| PASCAL P. PRATT, | JOHN L. ALBERGER, |
| EDWARD BENNETT, | DENNIS BOWEN, |
| BRITAIN HOLMES, | JOHN GREINER, |
| COOLEY S. CHAPIN. | SHERMAN S. JEWETT, |
| EDWIN T. EVANS, | MICHAEL MESMER, |
| PATRICK SMITH, | DE WITT C. WEED. |

*President.*
PASCAL P. PRATT.

*Secretary and Treasurer.*
WILLIAM F. ROGERS.

*General Superintendent.*
WILLIAM McMILLAN.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# ORDINANCES

FOR THE USE, REGULATION, PROTECTION AND GOVERNMENT OF THE PARKS, APPROACHES THERETO AND STREETS CONNECTING THE SAME.

The Park Commissioners, appointed under and by virtue of the statute of the State of New York, entitled, "An act to authorize the selection and location of certain grounds for public parks in the City of Buffalo, and to provide for the maintenance and embellishment thereof," passed April 14, 1869, and the acts amendatory thereof, do hereby, in pursuance of the power conferred by said act, make and enact the following ordinances for the use, regulation, protection and government for the said park or parks, approaches thereto and streets connecting the same, to wit:

## CHAPTER I.

SECTION 1. All persons are forbidden to carry fire-arms or fire at or shoot any bird or animal, or throw stones or missiles within the several parks, approaches thereto or streets connecting the same.

§ 2. All persons are forbidden to climb, break, cut down, remove or in any way injure or deface the trees, plants, shrubs, flowers, turf, or any of the buildings, fences, bridges, or other constructions within the parks, or approaches thereto, or streets connecting the same.

§ 3. No person shall drive or ride any horse or team upon any of the parks, approaches thereto or streets connecting the same, at a rate of speed exceeding ten (10) miles per hour.

§ 4. No animal or vehicle shall be permitted to stand upon the drives or carriage roads of the parks or parkways, or any part thereof (except the concourses) to the obstruction of the way, or to the inconvenience of travel; nor shall any person solicit or invite passengers for hire therein.

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

§ 5. No cart, wagon, dray, truck or other vehicle carrying stone, brick, goods, merchandise, manure, soil, or other articles, or usually used for the carriage of stone, brick, merchandise, manure, or other articles, shall be allowed to enter or drive upon the parks, parkways, approaches thereto or streets connecting the same.

§ 6. No threatening, abusive, insulting, or indecent language shall be allowed upon the parks or parkways whereby a breach of the peace may be occasioned.

§ 7. No person, except in the employ of the Board of Park Commissioners, shall bring upon the parks or parkways any tree, shrub, plant or flower, nor any newly plucked branch or portion of a tree, shrub, plant or flower.

§ 8. No person shall fire, discharge or set off in the parks or parkways, approaches thereto or streets connecting the same, any rocket, cracker, torpedo, squib, balloon, snake, chaser, or double-header, nor any fireworks, or thing under any other name composed of the same or similar materials, or of the same or similar character as the fireworks above specified.

§ 9. No person shall post or otherwise affix any bill, notice or other paper upon any structure or thing within the parks or parkways, or upon any gates or enclosures thereof.

§ 10. No military or target company, or civic or other procession, shall be permitted to parade, drive or perform upon the parks, nor perform any military or other evolutions or movements therein, except by permission of the Committee on Grounds or the President of the Board of Park Commissioners.

§ 11. No fire engine, hook and ladder truck, hose cart or other machine on wheels, commonly used for the extinguishment of fires, shall be allowed on any part of the parks, without the previous consent of the Committee on Grounds or President of the Board of Park Commissioners.

§ 12. No funeral procession or hearse, or other vehicle or person carrying the body of a deceased person, shall be allowed on any part of the park or parkways.

§ 13. No person on foot shall go upon the grass, lawn or turf of the parks or parkways, except when and where the sign "Common" is posted, indicating that persons are at liberty at that time and place to go upon the grass.

§ 14. The drives shall be used only by persons in pleasure carriages or on horseback, the rides only by persons on horseback; animals to be used on either shall be well broken and constantly held

Digitized by Google

Original from UNIVERSITY OF MICHIGAN

in such control that they may be easily and quickly turned or stopped. They shall not be allowed to move at a rate of speed which shall be alarming or cause danger; and when any park-keeper or officer connected with the parks shall deem it necessary to safety, good order, or the general convenience, that the speed of an animal shall be checked, or that it should be stopped, or its course altered, and shall so direct, by gesture or otherwise, it shall be the duty of the rider or driver of such animal to follow such direction; and no horse or other beast of burden or draft shall be driven or suffered to stand anywhere except on the drives or rides, or concourse.

§ 15. No person shall play any music, nor offer or expose things for sale, nor post or display any sign, placard, flag, banner, target, transparency, advertisement, or device of business, nor solicit business or fares, nor beg, nor publicly solicit subscriptions, nor tell fortunes, nor play games of chance or with any table or instruments of gaming, nor make any oration or harangue, nor utter loud, threatening, abusive or indecent language, nor do any indecent or obscene act within the parks or parkways.

§ 16. By the term parks as mentioned herein is meant to include the grounds known as "The Park," "The Front," "The Parade," "Prospect Hill Parks," and the several "Circles" and "Places," as designated on the maps.

## CHAPTER II.

### IN RELATION TO ANIMALS RUNNING AT LARGE.

SECTION 1. No quadrupeds except those placed in the park by the Commissioners, and except dogs when controlled by a line of suitable strength, not more than six (6) feet in length, and horses and others used for pleasure travel, shall be driven or conducted into the parks or parkways or allowed to remain therein.

§ 2. Pounds shall be established at such points to be designated by the Committee on Grounds, for the impounding of horses, cattle, sheep, dogs, swine, geese and other animals found trespassing upon the parks, approaches thereto or streets connecting the same

§ 3. All animals named in the next preceding section, found at large on the parks or parkways, may be taken by any person or persons and driven or carried to one of said pounds and may be kept enclosed therein during five (5) days, at the end of which time, if not previously claimed and the amounts hereinafter mentioned paid to the Treasurer of said board, they may be sold at public auction, provided that two days previous notice of the sale thereof shall be conspicuously posted at the pound.



Digitized by Google

Original from UNIVERSITY OF MICHIGAN

# EXHIBIT 9

FFXCO_12728



# LAWS AND ORDINANCES

GOVERNING THE

# VILLAGE OF HYDE PARK

TOGETHER WITH ITS

## CHARTER AND GENERAL LAWS

AFFECTING MUNICIPAL CORPORATIONS; SPECIAL ORDINANCES AND CHARTERS UNDER WHICH CORPORATIONS HAVE VESTED RIGHTS IN THE VILLAGE. ALSO, SUMMARY OF DECISIONS OF THE SUPREME COURT RELATING TO MUNICIPAL CORPORATIONS, TAXATION AND ASSESSMENTS.

---

PRINTED AND PUBLISHED BY
AUTHORITY OF THE PRESIDENT AND BOARD OF TRUSTEES
OF THE VILLAGE OF HYDE PARK.

---

REVISED AND ARRANGED
BY CONSIDER H. WILLETT,
VILLAGE ATTORNEY.

HYDE PARK:
1876.

HAZLITT & REED
PRINTERS
CHICAGO
172 AND 174 CLARK STREET.

FEB 4 1915

FFXCO_12730

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 98 of 197 PageID# 2190

§ 2. The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned. Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereinafter enacted, and received by said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act.

§ 3. The ninth section of said act is hereby so amended that the words "during the current year," shall read "during the next succeeding year."

§ 4. That the twelfth section of said act be and the same is hereby amended so as to read as follows: The said commissioners, or either of them, may be removed from office by the judge of the circuit court of Cook county, upon the petition presented to him in term time, or in vacation, by one hundred freeholders of said towns of South Chicago, Hyde Park and Lake, if it shall appear after hearing proof before said judge, that the said commissioners, or either of them, have been guilty of misdemeanor or malfeasance in office under this act; and if the said judge shall remove any one or more of said commissioners from office for any cause before the expiration of their term of office, he is hereby authorized and empowered to fill the vacancy or vacancies thus created by appointing other commissioners in their place, who shall serve during the unexpired terms of the commissioners so removed.

§ 5. The commissioners to be appointed under said act are hereby vested with the same powers and duties as are conferred by said act in relation to lands designated for parks, over all streets running longitudinally along and adjoining any and all of the proposed parks, or strips of land designated in said original act, as are conferred by said act in relation to such parks and strips of land, as may be necessary to improve and keep in repair the same, in connection with the said parks or strips of land without obstructing the fences or other structures, free access to the said streets from existing roads and streets, and by owners of land abutting on the same.

§ 6. The elections held in the towns of South Chicago, Hyde Park and Lake, on the twenty-third day of March, A. D. 1869, under and by virtue of the eighteenth section of the act to which this is an amendment, are hereby legalized and confirmed, and said act shall be held and deemed to have been regularly and legally adopted by the legal voters of said towns, and shall remain in full force and effect, and shall be liberally construed in all courts, with a view to carry out and enforce the intent and meaning of the same.

§ 7. This act is hereby declared a public act, and shall take effect and be in force from and after its passage.

## SOUTH PARK ORDINANCES.

Whereas, by an act of the general assembly of the State of Illinois, entitled an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, it is provided as follows, to-wit:

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 99 of 197 PageID# 2191

"The said board shall have full and exclusive powers to govern, manage and direct said park; to lay out and regulate the same; to pass ordinances for the regulation and government thereof; to appoint such engineers, surveyors, clerks, and other officers, including a police force, as may be necessary; to define and prescribe their respective duties and authority; to fix the amount of their compensation; and, generally, in regard to said park, they shall possess all the powers and authority now by law conferred upon or possessed by the common council of the city of Chicago, in respect to public squares and places in said city."

*Therefore, be it ordained by the South Park Commissioners as follows:*

§ 1. The said park, which is under the management and direction of the South Park Commissioners, shall be, and the same is hereby designated, as the South Park.

§ 2. No person shall, without the consent of the superintendent, play at ball, cricket, or any other game or play whatever, in said park.

§ 3. No person shall climb or walk upon any wall or fence of said park.

§ 4. Cattle, horses, goats, swine, or other animals, or domestic fowls, shall not be turned into said park, or allowed to run at large therein.

§ 5. No dog or bitch, or domestic fowl, belonging to any officer or employee of said commissioners residing within the limits of said park, shall be permitted to run at large.

§ 6. All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park. All persons are forbidden to cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or property within or upon said park.

§ 7. No person shall converse with, or in any manner hinder those engaged in constructing or repairing said park.

§ 8. No animal shall be driven or ridden in said park, at a rate of speed exceeding eight miles per hour.

§ 9. No vehicle, or horse, or other animal, shall be permitted on the foot walks, the same being assigned exclusively to pedestrians; nor shall any vehicle, or horse or other animal of burden, go or be taken upon any part of said park, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

§ 10. No vehicles or animals shall be permitted to stand upon the drive or carriage roads of said park, or of any part thereof, to the obstruction of the way, or the inconvenience of travel; nor shall any person solicit passengers within said park without consent of the board.

§ 11. No person shall, within said park, expose for sale any article or thing, nor shall any hawking or peddling be allowed therein.

§ 12. No omnibus, wagon, cart, dray, truck, or other vehicle for carrying goods, merchandise, manure, or other articles, except such as are engaged in repairing or constructing said park, shall be allowed to enter the same.

§ 13. No language, abusive, insulting, obscene, or calculated to occasion a breach of the peace, shall be permitted in said park, nor shall persons tell fortunes, play at any game of chance, at any table or instrument, be drunk, or do any indecent acts therein.

§ 14. No person shall bathe or fish, or go or send, or ride any animals into the waters of said park, nor shall any person disturb any fish, fowl or other animals kept therein, or throw or place any article or thing into the waters or upon the grounds thereof.

§ 15. No person shall discharge, or set, or touch off, or enkindle, or operate any manner of fire, or fireworks in the said park.

§ 16. No person shall, in the said park, post or fix any notice or bill; nor shall such be posted or fixed on any tree, fence, or any place therein.

§ 17. No person shall, in the said park, play any musical instrument, nor carry or display any flags, banners, transparencies, or target.

§ 18. No band or company shall be permitted to parade, drill, or perform any movements, evolutions or ceremony in said park without the consent of the park commissioners.

§ 19. No funeral procession, or hearse carrying a deceased body, shall be in the said park permitted.

§ 20. No horse or other animal shall be permitted to go upon any grass or lawn, nor shall any person be permitted to go thereon except where the word "common" shall be posted to indicate the permission so to do.

§ 21. Any member of the South Park police shall have power to arrest, and commit for examination, any person who shall not, when directed, desist from any violation thereof.

§ 22. Any person who shall disobey, or neglect, fail, or refuse to comply with this ordinance, or any section thereof, except when otherwise herein provided, shall, on conviction thereof, pay a fine of not less than *five*, or more than one hundred dollars.

§ 23. The police force of said South Park Commissioners, shall consist of one captain, three sergeants, and such number of policemen as shall from time to time be appointed, and they shall hold their respective offices during the pleasure of the park commissioners. The captain of police shall have the general charge of the police force, subject to such rules and regulations as shall from time to time be established, and it shall be his duty to report to the commissioners, in writing, the delinquency of any member of the police force, and may suspend any such member, until such delinquency shall be acted upon by the commissioners.

§ 24. The several members of the police force, when on duty, shall devote their time and attention to discharge of the duties of their station according to the ordinance, rules, and regulations and directions of the superintendent, and it shall be their duty, to the best of their ability, to preserve order, peace, and quiet, and to enforce the laws and the ordinances of said commissioners, and they shall not engage in conversation with an employée of the park during working hours, except in the line of duty; they shall have power to arrest any persons in the park found in the act of violating any law or ordinance, or abetting and aiding in any such violation, and shall take all such persons so arrested, as follows, to-wit: when the offense is committed in that portion of the park situated in the town of Hyde Park, to some justice or magistrate in Hyde Park; when the offense is committed in that portion of the park situated in the town of Lake, to some justice or magistrate in said town of Lake; and when the offense

is committed in that portion of the park situated in the town of South Chicago, to some justice of the peace in said town of South Chicago.

§ 25. Whoever, in said park, shall resist any member of the police force in the discharge of his duty, or shall in any way interfere with, or hinder or prevent him from discharging his duty, as such member, or shall offer or endeavor to do so; and whoever shall in any manner assist any person in custody of any member of the police force to escape, or attempt to escape, from such custody, or shall rescue, or attempt to rescue, any person in custody, shall be fined not less than five dollars, or more than one hundred dollars.

§ 26. The superintendent, in cases of emergency, is hereby authorized and empowered to appoint special policemen, and such special policemen shall have the same power and authority of regular policemen, provided the appointment of such special policeman shall in no case continue for a period exceeding twenty-four hours.

§ 27. The sergeant of police shall perform the duties of the captain when the latter shall be absent from duty.

§ 28. The police force shall be uniformed as follows: Gray frock coat, pants and vest, and cap with brass buttons, and black cord on leg of the pants.

§ 29. Any person who shall falsely represent or personate any of the members of the police force, or who shall maliciously, with intent to deceive, use or imitate any of the signs, signals, or devices adopted and used by the police department, or shall wear in public the uniform adopted as the police uniform, after having been removed or suspended, shall be subject to a fine of not less than five dollars nor more than one hundred.

§ 30. These ordinances shall take effect and be in force from and after the 19th day of November, 1875.

# EXHIBIT 10

FFXCO_12735

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 103 of 197 PageID# 2195

Phoenixville, Pa.--Ordinances, etc.

# A DIGEST

OF THE

# ORDINANCES

OF

## TOWN COUNCIL

OF THE

## BOROUGH OF PHOENIXVILLE

TOGETHER WITH THE ACTS OF ASSEMBLY AND
DECREES OF COURT ESPECIALLY
RELATING TO PHOENIXVILLE

---

*Originally compiled by P. G. Carey, Esq.,*
*Revised by H. P. Waitneight, Esq., 1896, and*
*by Samuel A. Whitaker, Esq., 1906.*

---

PHOENIXVILLE, PA.
"THE DAILY REPUBLICAN" PRINT.
1906

Digitized by Google

FFXCO_12736

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 104 of 197 PageID# 2196

tered at large in the minute book, and said Council shall proceed to a reconsideration of such ordinance or resolution. If after such reconsideration two-thirds of all the members elected to said Council shall vote to pass such ordinance or resolution it shall become and be of as full force and effect as if said Chief Burgess had signed it; but in such cases the votes of the members of Council shall be determined by the yeas and nays, and the names of the members voting shall be entered on the minutes of said Council: *Provided,* That when the number of Councilmen is less than nine, a majority of Council and one vote more shall be required to pass an ordinance over the veto. If such ordinance or resolution shall not be returned by the Chief Burgess at the next regular meeting of said Council after the same shall have been presented to him, the same shall likewise become and be in as full force and effect as if he had signed it: *Provided,* That before any ordinance shall come into force and effect as aforesaid the same shall be recorded in the Borough ordinance book with the certificate of the secretary and be advertised as heretofore required by law.

To be presented to chief burgess

Veto and passage over

## PARADISE STREET.

Ord. 25 Feb. 1875

1. The width of * * * Paradise street from Nutts avenue to the Borough line * * * shall be * * * forty feet.

Ord. 26 Feb. 1877. § 4

2. Ordained * * * that Paradise street begin at a limestone in Nutts avenue, a corner of lands of Benjamin Moyer and Joseph Rapp, thence south thirty-two and one-half degrees west 508 feet six inches to an iron monument planted to indicate the centre of Pennsylvania avenue, thence the same course 250 feet to the centre of Chester avenue, thence the same course continued 250 feet to the centre of Columbia avenue, thence the same course continued 980 feet six inches to a spike at the Borough line.

## PARK ALLEY.

Ord. 28 Sept. 1874

Dedicated and accepted

1. Ordained, etc., that an alley twenty feet wide 150 feet east of Main street, dedicated by the Phoenix Iron Company to the use of the public, running in a parallel line with Main street from Washington avenue to Second ave-

Digitized by Google

FFXCO_12737

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 105 of 197 PageID# 2197

nue, be and the same is hereby accepted and ordered to be marked on the Borough plot.

Ord. 5 Aug., 1895

2. Park alley be and is hereby continued from Third avenue south to Fifth avenue, the centre line of said alley to be 190 feet east of the centre line of Main street, said alley to be twenty feet wide, or ten feet on each side of above described centre line.

Continued

Ord. 3 Aug., 1886

3. The owners of lots or lands bounding on and opposite the sidewalks along * * * both sides of Park alley from Washington avenue to Second avenue * * * are hereby required to put up curbstones at the edge of the sidewalks and to pave and gutter the said sidewalks under the direction of the Borough Surveyor and the Street Committee. * * *

Curb, pave and gutter

[If neglected after thirty days' notice Street Committee to have work done and file lien therefor. See Quick street § 4.]

## PARKS.

Ord. 2 July, 1878

1. The following rules and regulations shall be adopted for the government and protection of Reeves Park, in the Borough of Phoenixville:

SECTION I, PENAL.

Rules of Reeves' Park

1. No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged.

2. No person shall indulge in any threatening, abusive, insulting or indecent language in the park.

3. No person shall engage in gaming or commit any obscene or indecent act in the park.

4. No person shall carry fire-arms or shoot birds or throw stones or other missiles therein.

5. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, seats, fences, lamps or statuary in the park.

6. No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the park.

7. No person shall injure, deface or destroy any notices, rules or regulations posted, or in any other manner permanently fixed for the government of the park.

8. No person shall engage in any play at baseball,

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 106 of 197 PageID# 2198

cricket, shinny, football or any other games with ball and bat, except croquet, within the limits of the park.

Any person who shall violate any of said rules and regulations shall be guilty of a misdemeanor, and for each and every such offence shall pay the sum of five dollars, to be recovered before the Burgess or either of the Justices of the Peace of the Borough of Phoenixville, which fines shall be paid into the Borough treasury for park purposes.

SECTION 2, LICENSES.

1. No person shall expose any article for sale within the park without permission from the Town Council or its representative.

2. No person or persons shall have any musical, theatrical or other entertainments therein, nor shall any military or other parade or procession take place in the park without permission from the Town Council or its representative.

3. No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the park without permission from Council or its legal representative.

SECTION 3, PROHIBITIONS.

1. No gathering or meeting for political purposes, nor spirituous or malt liquors shall be allowed within the park under any circumstances.

N. B.—And we do hereby earnestly appeal to all peaceable, law-abiding citizens, entreating that in the exercise of their proprietary rights they will diligently co-operate in the enforcement of all lawful measures for the care and preservation of all things pertaining to Reeves Park. It is *your own property;* won't you take care of it?

## PARTY WALLS.

(See CHARTER § 7, VII.; BUILDINGS § 1 TO 4.)

## PAVEMENTS.

(See CHARTER § 7; BUILDINGS § 4, 5; FINES AND PENALTIES § 5, 6, 7, 19, 20.)

Act 20 April, 1905

1. All Boroughs are hereby authorized and empowered to direct and require the grading, paving, repaving and repairing of all sidewalks on the streets of the Borough,

FFXCO_12739



# EXHIBIT 11

FFXCO_12740

THE

# MUNICIPAL CODE

OF

# CHICAGO:

COMPRISING THE

LAWS OF ILLINOIS RELATING TO THE CITY OF CHICAGO,

AND THE

## ORDINANCES OF THE CITY COUNCIL;

CODIFIED AND REVISED

---

BY

EGBERT JAMIESON AND FRANCIS ADAMS.

---

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CHICAGO:
BEACH, BARNARD & CO., LEGAL PRINTERS.
1881.



Ovd83
C4d
881

FFXCO_12742

person who shall be convicted of any such breach shall be adjudged to pay a fine of not less than three dollars nor more than one hundred dollars.

1683. In every prosecution brought for a violation of any ordinance of the city of Chicago, where the offense charged is one punishable under the laws of the State of Illinois as a misdemeanor, the court or magistrate trying the cause may upon conviction in lieu of the fine imposed by the ordinance or in addition thereto, cause the offender to be imprisoned in the house of correction for a period not exceeding three months.

1684. All the printed books containing the revised ordinances shall be deposited with the city comptroller. He shall deliver one copy thereof to each officer of the city, and to such other persons as the city council may direct.

1685. The mayor shall have power to extend to or reciprocate courtesies of other cities, by presenting to them a copy of the revised ordinances bound at the expense of the city in such manner as to him may seem suitable.

## Article XLIII.

### *Parks and Public Grounds.*

1686. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by J. Van Vechten and Snyder in the year 1877.

1687. It shall be the duty of the commissioner of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed and improve the same according to plans approved by the city council. He shall likewise cause printed or written copies of prohibitions of this article to be posted in the said grounds or parks.

1688. No person shall enter or leave any of the public parks of the city of Chicago except by their gateways; no person shall climb or walk upon their walls or fences.

1689. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface

the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1691. No person shall converse with or in any way hinder those engaged in their construction.

1692. No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the commissioner of public works, nor shall any hawking or peddling be allowed therein.

1693. No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

1694. In case of any emergency where life or property is endangered, all persons if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants and remain off the same until permission is given to return.

1695. The commissioner of public works may direct that any of the entrances to the public parks be closed at any time.

1696. No person shall bathe or fish in, or go or send or ride any animal in any of the waters of either of the said public parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw or place any article or thing in the waters within either of said parks.

1697. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within either of said parks nor upon any of the gates or inclosures thereof.

1698. No person shall without the consent of the commissioner of public works, play upon any musical instrument nor shall any person take into or carry or display in the said public parks any flag, banner, target or transparency. No military or target company civic or other shall be permitted to parade, drill or perform therein any military or other evolutions or movements. Nor shall any fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires be allowed on any part of said parks without the previous consent of the commissioner of public works.

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 112 of 197 PageID# 2204

1699. No person other than employes shall light, make or use any fire thereon.

1700. No person shall go upon the grass, lawn or turf of the parks except when and where the word "common" is posted, indicating that persons are at liberty at that time and place to go on the grass.

1701. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof when directed, and cause him to be committed for examination.

1702. The foregoing sections of this article so far as applicable shall apply to all the public squares of the city of Chicago.

1703. Any person who shall violate any or either of the provisions of this or any section or clause or any provision of any section thereof, or who shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall on conviction pay a fine of not less than five dollars nor more than one hundred dollars.

## Article XLIV.

*Pawnbrokers and Loanbrokers or Keepers of Loan Offices.*

1704. The mayor may from time to time grant licenses to such persons as shall produce to him satisfactory evidence of their good character to exercise or carry on the business of a pawnbroker, or of a loanbroker or keeper of a loan office; and no person shall exercise or carry on the business of a pawnbroker, loanbroker or keeper of a loan office without being duly licensed, under the penalty of one hundred dollars for each day he or she shall exercise or carry on said business without such license.

1705. Any person who loans money on deposit or pledge of personal property or other valuable thing, or who deals in the purchasing of personal property or other valuable thing on condition of selling the same back again at a stipulated price, is hereby defined and declared to be a pawnbroker.

1706. Every person receiving such license shall pay therefor the sum of one hundred and fifty dollars for the use of the city.

1707. Every person so licensed shall at the time of receiving such license, enter with two sufficient sureties into a joint and several bond to the city of Chicago in the penalty of five hundred dollars, conditioned for the due observance of all such ordinances of the city council as may be passed or in force respecting pawnbrokers and loanbrokers or keepers of loan offices, at any time during the continuance of such license.

# EXHIBIT 12

FFXCO_12746

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 114 of 197 PageID# 2206

23

THE

# REVISED ORDINANCE

OF THE

## CITY OF ST. LOUIS,

TOGETHER WITH

THE CONSTITUTION OF THE UNITED STATES, CONSTITUTION OF THE STATE OF MISSOURI, THE SCHEME FOR THE SEPARATION OF THE GOVERNMENTS OF THE CITY AND COUNTY OF ST. LOUIS, THE CHARTER OF THE CITY, AND A DIGEST OF THE LAWS APPLICABLE TO THE CITY.

9155

---

M. J. SULLIVAN, REVISER.

---

ST. LOUIS:
TIMES PRINTING HOUSE, FIFTH AND CHESTNUT.
1881.

Generated on 2023-02-09 22:42 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google
Original from
NEW YORK PUBLIC LIBRARY

FFXCO_12747

## ARTICLE XI.

### PROTECTION OF BIRDS.

SECTION
1. Disturbance of birds or nests prohibited.
2. Penalty for disturbing same.
3. Throwing stones, wood, &c., prohibited.

SECTION
4. Penalty for throwing same.
5. Protection of all birds, except hawks, &c., intended.
6. Duty of police.

SECTION 1. All persons are forbidden to molest, injure or disturb in any way, any small bird in the city of St. Louis, or the nest, young or brood of any small bird in said city.

Birds, or nests not to be disturbed. Ord. 8436, sec. 1.

SEC. 2. If any person shall willfully injure, molest, take or disturb in any way, any small bird in the city of St. Louis, or the nest, eggs, young or brood of any such small bird, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall forfeit and pay to said city not less than five dollars for each bird so by him injured, molested, taken or disturbed, and not less than twenty dollars for each nest of eggs or brood of young of any such small bird in the city of St. Louis, so by him injured, molested taken or disturbed.

Penalty for disturbing birds or nests. Ibid. sec. 2.

SEC. 3. No person shall throw from his hand any fragment of stone, wood, metal or other missile capable of inflicting injury, in any street, alley, walk or park of the city of St. Louis, or use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile of stone, metal, wood or other substance capable of inflicting injury or annoyance.

Throwing stones, wood, &c., prohibited. Ibid. sec. 3.

SEC. 4. If any person shall throw from his hand, in any alley, street, walk or park of the city of St. Louis, any missile of wood, stone, metal or other substance, or sub-

Penalty. Ibid. sec. 4.

Generated on 2023-02-09 22:41 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 116 of 197 PageID# 2208

stances capable of inflicting injury or annoyance, or use or have in his possession, ready for use in any street, alley, walk or park of the city of St. Louis, any sling, air gun, cross bow and arrow, or other contrivance for ejecting, discharging or throwing any missile, pellet, fragment or bolt of stone, metal, wood or other substance, or substances capable of causing injury or annoyance, he shall be deemed guilty of a misdemeanor, and on conviction thereof, be punished by a fine of not less than one nor more than twenty dollars for each offense.

All birds to be protected, except hawks, &c. Ibid. sec. 5.

SEC. 5. The birds intended to be protected by this article shall be and are defined as all varieties of birds except hawks, vultures and owls.

Duty of police. Ibid. sec. 6.

SEC. 6. It is made the special duty of the police force of the city of St. Louis, to enforce the provisions of this article, and arrest and bring to trial, all offenders against the same; and any member of the police force conniving at any breach of the foregoing provisions, by failing to arrest or report the offender, shall, on conviction thereof, be subject to a fine of not less than five dollars.

Generated on 2023-02-09 22:41 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

FFXCO_12749

# EXHIBIT 13

FFXCO_12750

From Henry Shaw to
Doct. Asa Gray
Cambridge
April 1884

# TOWER GROVE PARK

— OF THE —

## CITY OF ST. LOUIS.

REVIEW OF ITS ORIGIN AND HISTORY, PLAN OF IMPROVEMENT, ORNAMENTAL FEATURES, ETC.

WITH ILLUSTRATIONS.

PREPARED BY ORDER OF THE BOARD OF COMMISSIONERS.

BY DAVID H. MACADAM.

1883:
R. P. STUDLEY & CO., PRINTERS.
ST. LOUIS, MO.

Digitized by Google

## RULES AND REGULATIONS.

In accordance with the authority conferred by the Act creating Tower Grove Park, the Board of Commissioners have adopted the following rules and regulations:

All persons are forbidden —

1. To enter or leave the park except by the gateways.

2. To climb the fences.

3. To turn cattle, horses, goats or swine into the park or the avenues surrounding the park.

4. To carry firearms or to throw stones or other missiles within it.

5. To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the park;

6. Or to converse with, or in any way hinder, those engaged on the work of the park.

7. A pound is hereby established within the Tower Grove Park for the impounding of horses, cattle, sheep, goats, dogs and swine found trespassing upon said park or the adjacent avenues. All such animals found at large may be taken by any person or persons and driven or carried to the pound, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided, that, within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound or vicinity.

Any person claiming property in such impounded animals before the day of sale, may recover the same, after suitable proof of his or her right thereto, upon payment for each animal of the sum of two dollars and the expenses of keeping; the expenses of keeping to be reckoned as follows:

For each horse, dog, or head of neat stock, sixty cents per day;

For each goat, swine, or sheep, twenty-five cents per day.

These charges shall be paid to the chief park keeper of Tower Grove Park, and the money thus collected shall by him be handed over within one week to the comptroller of the board.

If within one month after the sale of any impounded animals their former owner shall appear and claim the same, the treasurer shall, after deducting the full amount of the charges provided for above, pay over to him the proceeds of their sale; otherwise the amount shall be added to the funds of the board.

8. No animal shall travel on any part of the Tower Grove Park, except upon the drive or carriage road, at a rate exceeding six miles per hour. Persons on horseback shall not travel on the drive or equestrian road at a rate exceeding seven miles per hour.

9. No vehicle or riding shall be permitted on the walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse, or burden, go

Digitized by Google

upon any part of the park except upon the "drive," and upon such places as are appropriated for carriages at rest.

10. No animal or vehicle shall be permitted to stand upon the "drive" or carriage roads of the park, or any part thereof, to the obstruction of the way or to the inconvenience of travel, nor shall any person upon the park solicit or invite passengers.

11. No hackney coach, carriage, or other vehicle for hire, shall stand upon any part of the park for the purpose of taking in any other passengers or persons than those carried to the park by said coach, carriage, or vehicle, unless invited by the persons having said vehicle.

12. No person shall expose any article or thing for sale upon the park except previously licensed by the Board of Commissioners of Tower Grove Park, nor shall any hawking or peddling be allowed on the park.

13. No omnibus or express wagon, with or without passengers, nor any cart, dray, wagon, truck, or other vehicle carrying goods, merchandise, manure, soil or other article, or solely used for the carriage of goods, merchandise, manure, or other articles, shall be allowed to enter any part of Tower Grove Park, or any vehicle carrying more than six persons.

14. No threatening, abusive, insulting or indecent language shall be allowed on the park whereby a breach of the peace may be occasioned.

15. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do any obscene or indecent act whatever in Tower Grove Park.

16. Tower Grove Park shall be open daily to the public during the months of December, January and February from seven o'clock in the morning until half an hour after sunset in the evening; during the months of March, April, May, June, October, and November, from six in the morning until half an hour after sunset, and during the months of July, August, and September, from five in the morning until half an hour after sunset in the evening.

17. The comptroller or superintendent may direct that the park or any of the entrances to the park be closed at any time, and may, on special occasions, also direct that the park or any portion thereof remain open at other times than those specified.

18. No person other than employees of the Board of Commissioners of Tower Grove Park shall enter or remain in the park except when it is open as above provided.

19. No person, except in the employ of the Board of Commissioners of the Tower Grove Park, shall bring upon the Tower Grove Park any tree, shrub, plant, or flower, nor any newly plucked branch or portion of a tree, shrub, plant, or flower.

20. No person shall fire, discharge or set off in Tower Grove Park any rocket, cracker, torpedo, squib, balloon, snake, chaser, or double-header, nor any fireworks or thing under any other name composed of the same or similar material, or of the same or similar character, as the fireworks above specified, except with consent of Board of Commissioners or comptroller.

21. No person shall place or propel any invalid chairs, perambulators,

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 121 of 197 PageID# 2213

bicycles or velocipedes upon any portion of the Tower Grove Park except upon the walks.

22. No person shall post or otherwise affix any bill or notice, in paper or paint, upon any structure or thing within the park, nor upon any of the gates or surrounding avenues.

23. No person shall without the consent of the comptroller of the park play upon any musical instrument within Tower Grove Park, nor shall any person take into or carry or display in the park any flag, banner, target, or transparency.

24. No military or target company, or civic or other procession, shall be permitted to parade, drill or perform upon the park any military or other evolutions or movements without the written consent of the comptroller.

25. No fire-engine, hook or ladder, cart, hose, truck, or other machine on wheels commonly used for the extinguishing of fire, shall be allowed on any part of Tower Grove Park without the previous consent of the comptroller of the park.

26. No funeral procession or hearse, or other vehicle or person carrying the body of a deceased person, shall be allowed on any part of Tower Grove Park.

27. No person, except in the employ of the Board of Commissioners of Tower Grove Park, shall light, make or use any fire upon the Tower Grove Park.

Digitized by Google

FFXCO_12754

# EXHIBIT 14

FFXCO_12755

# THE REVISED ORDINANCES OF THE CITY OF DANVILLE.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

REVISED AND ARRANGED BY

MANN, CALHOUN & FRAZIER.

DANVILLE, ILL.:
BOWMAN & FREESE, BOOK AND JOB PRINTERS.
1883.

# CHAPTER XIX.

## PARKS.

SECTION.
1. Committee on public grounds, etc. to have charge.
2. Entering Parks, etc.—Climbing on fences.
3. Turning animals into park, etc.
4. Firearms—Shooting—fire works prohibited.
5. Injury to trees, grass, buildings.
6. Selling, hawking, peddling, etc. forbidden.
7. Bathing, fishing, etc. prohibited.

SECTION.
8. Abusive, profane language, etc. prohibited.
9. Gaming, etc. prohibited.
10. Intoxicated persons, indecent or unlawful acts.
11. Fires in parks forbidden.
12. Carriages on turf, etc.— hitching horses to trees, etc.
13. Throwing stones, rubbish, etc. in parks.
14. Posting bills, etc. forbidden.

COMMITTEE ON PUBLIC GROUNDS, ETC., TO HAVE CHARGE OF PARKS.] § 1. It shall be the duty of the committee on Public Grounds and Buildings to superintend all inclosed public grounds or parks in said city, and keep the fences thereof in repair, the walks in order, the trees properly trimmed, and to improve the same according to plans approved by the city council.

PENALTY FOR LEAVING PARK EXCEPT AT GATEWAYS—CLIMBING ON FENCE, ETC.] § 2. Whoever shall enter or leave any of the public parks of this city except by their gateways, or shall walk or climb upon any of the fences inclosing, or in the same, shall be fined not less than one dollar nor more than ten dollars for each offense.

TURNING ANIMALS INTO PARK PROHIBITED.] § 3. Whoever shall turn any cattle, horses, goats, swine or other animals into any park of said city, or permit the same, or any of them, to run therein, shall be fined not less than three dollars, nor more than fifty dollars, for each offense.

FIRE-ARMS AND FIRE-WORKS FORBIDDEN.] § 4. Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them; or whoever shall shoot, fire or discharge any kind of fire-works therein, shall be fined not less than one dollar nor more than one hundred dollars, for each offense.

INJURY TO TREES, GRASS, BUILDINGS, ETC.] § 5. Whoever shall cut, break or injure in any way any tree, shrub or plant, in any such park; or shall cut, tramp, or injure in any way the turf or grass therein, or shall walk or lie upon the grass at any place where placards are posted directing persons to keep off, or not to walk upon the same; or shall cut, mark, deface or in any way injure any of the buildings, fences, bridges, or other constructions, or property of any kind, in any such park, shall be fined not less than one dollar, nor more than one hundred dollars for each offense.

SELLING, HAWKING OR PEDDLING FORBIDDEN.] § 6. Whoever shall sell, or offer to sell, any article or thing, in any such park, or shall hawk or peddle any article or thing therein, or attempt so to do, shall be fined not less than three dollars, nor more than one hundred dollars.

BATHING—FISHING, ETC., PROHIBITED.] § 7. Whoever shall bathe, fish in, or ride or drive any animal in the waters of any such park, or throw any rubbish or garbage or other thing into any stream or waters of such park, shall be fined not less than three dollars, nor more than ten dollars.

ABUSIVE LANGUAGE, ETC.] § 8. Whoever shall use any threatening, abusive, insulting, profane, or indecent language in any part of any such park, shall be fined not less than three dollars, nor more than one hundred dollars.

GAMING, ETC., PROHIBITED.] § 9. Whoever shall gamble for money or other valuable thing, or anything representing or intended to represent money, or other thing of value, or shall play at any game of chance, or at or with any table, instrument or device of gaming, in any part of any such park, shall be fined not less than five dollars, nor more than two hundred dollars for each offense.

INTOXICATED PERSONS—INDECENT OR UNLAWFUL ACTS.] § 10. Whoever shall be found in any such park in an intoxicated condition, or shall resort to such park for any indecent, or unlawful purpose; or shall be guilty of any indecent, obscene, vulgar, improper or unlawful act while there, shall be fined not less than five dollars, nor more than two hundred dollars.

FIRES IN PARK PROHIBITED.] § 11. Whoever, except employees, or laborers in such park, shall light or make any fire in said parks, shall be fined not less than three dollars, nor more than one hundred dollars.

DRIVING CARRIAGES, ETC., ON TURF—HITCHING HORSES TO TREES.] § 12. Whoever shall drive any carriage or vehicle of any kind, or any horse or other animal upon the grass, lawn or turf, of any such park, or shall hitch a horse to any of the shrubs or trees therein, shall be fined not less than one dollar, nor more than fifty dollars for each offense.

THROWING STONES, RUBBISH, ETC., IN PARKS.] § 13. Whoever shall throw any stones into, or in such parks, or shall throw or place any rubbish or garbage of any kind therein, or shall leave or place any bottle, cans, paper, or scraps of any kind therein, shall be fined not less one dollar, nor more than twenty-five dollars for each offense.

POSTING BILLS, ETC., FORBIDDEN.] § 14. Whoever shall post, or otherwise affix any bills, notice or other paper, upon any fence, tree, bridge, building or other structure therein, shall be fined not less than three dollars.

# EXHIBIT 15

FFXCO_12759

City of Boston.

DEPARTMENT OF PARKS.

# THIRTEENTH ANNUAL REPORT

OF THE

# BOARD OF COMMISSIONERS

FOR THE

# YEAR 1887.

PRINTED FOR THE DEPARTMENT.
1888.

Digitized by Google

## PARK ORDINANCES.

IN BOARD OF PARK COMMISSIONERS, Aug. 20, 1886.

*Voted*, That the following rules, under the title of Ordinances, be adopted for the use and government of the Public Parks. *Provided, however*, that said rules shall not invalidate any pending prosecution or procedure, or any liability of any person for breach of any previous rule.

The Board of Park Commissioners of the City of Boston, by virtue of its authority to make rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with the prior consent of the Board, it is forbidden: —

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush, plant or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree, bush or plant, or portion thereof.

3. To throw stones or other missiles; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties; to discharge or carry fire-crackers, torpedoes, or fire-works; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer or expose for sale, any goods or wares; to post or display signs, placards, flags, or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to make orations, harangues or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals, to pass over or stray upon the Park lands; provided that this shall not apply to

those used for pleasure travel when on the ways or places provided and open for the purpose, or to dogs when closely led by a cord or chain not more than six feet long.

5. To drive any wagon, cart, dray, truck or other vehicle for carrying merchandise or other articles, or any hearse or funeral procession.

6. To move in military or civic parades, drills or processions.

7. To play ball or other games or sports, except on grounds provided therefor.

8. To engage in conversation with men at work, or to obstruct, hinder, or embarrass their movements.

9. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police, or other agents of the Commissioners, and to refuse to assist them when required.

Any person wilfully doing either of the things above forbidden shall be punished by fine not exceeding twenty dollars.

*Voted*, That compliance with the foregoing regulations is a condition of the use of these premises.

*Voted*, That notices in the following form be posted on the Public Parks in addition to the foregoing ordinances and vote.

Pending operations for forming a Public Park on this property, it is open to be used by all persons, in an orderly way, but with due regard to the Ordinances and Regulations hereinafter recited.

All persons entering upon the Park property are hereby warned to avoid newly prepared ground and localities where works are in progress, and to promptly regard all warnings and directions of officers or other agents of the Commissioners.

# EXHIBIT 16

FFXCO_12763

# A DIGEST

OF THE

# LAWS AND ORDINANCES

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

# CITY OF READING, PENNSYLVANIA,

IN FORCE APRIL 1, 1897.

[PUBLISHED BY AUTHORITY OF THE CITY COUNCILS.]

COMPILED BY LOUIS RICHARDS.

READING, PA.:
EAGLE BOOK PRINT, 542 PENN STREET
1897.

Digitized by Google

COPYRIGHT BY
LOUIS RICHARDS
1897.

THE NEW YORK
PUBLIC LIBRARY
39795
ASTOR, LENOX AND
TILDEN FOUNDATIONS.
1897.

Digitized by Google

be and the same are hereby repealed so far as the same affects this ordinance.

9 March 1891.

7. From and after the passage of this resolution, it shall be the duty of the city clerk to send to the residences of all members of councils, previous to the meetings of councils, printed copies of the calendar and ordinances which are to receive consideration at each meeting.

30 Sept. 1885. J. 1885-86, App. 379.

To furnish calendars, etc., in advance of meetings.

8. From and beginning with the first day of April, A. D. 1894, the compensation to be paid the assistant in city clerk's office shall be and is hereby fixed at eight hundred and forty dollars per annum, payable as the salaries of other officials are payable.

13 Mar. 1894 § 1. J. 1893-94, App. 643.

Salary of assistant.

# City Park.

I. PENN'S COMMON AND COMMON COMMISSIONERS.

1. Public commons dedicated to the public by the title of "Penn's Common."
2. City districted for the election of common commissioners. Qualifications of commissioners.
3. Commissioners to be elected by councils. First election. Succeeding elections. Minority vote. Term. Organization. Election to be valid if held within sixty days after first Monday of September.
4. Vacancies, how filled. Minority representation. Removal of commissioners. Oath.
5. Common to be under control of commissioners. Appropriations by councils.
6. Plan of improvements.
7. Powers of commissioners. To employ superintendent and laborers. To purchase materials. Estimates to be submitted to councils. When mayor to give casting vote. Creation of debts and obligations. Councils to make appropriations therefor. No contracts to be made unless in pursuance of appropriation.
8. Meetings. Rules and Regulations.
9. Employment of police.
10. Interpretation of former ordinance relative to districts for election of commissioners.
11. City clerk to be secretary of board. Salary.
12. Mineral Spring property transferred to common commissioners for park purposes. Proviso.
13. Occupancy by Mount Penn Gravity and City Passenger Railway Companies.
14. Commissioners empowered to acquire driveway to connect with Egelman property. Damages.
15. Right of way granted to Mount Penn Gravity Railroad Company.
16. Conditions.
17. Purpose.
18. Mode of payment of employees of park and water departments. Pay rolls to be certified by superintendent.
19. How warrants to be drawn and moneys disbursed.

II. PARK RULES AND REGULATIONS.

20. Limit of speed. Driving confined to roads. Vehicles of burden. Entrance and exit. Coaches for hire. Threatening language, etc. Gaming and obscenity. Firearms, etc. Disturbance of fish, birds or animals. Fireworks. Placards. Injury to trees, shrubbery, statuary, etc. Dead animals, etc. Animals at large. Impounding and disposition of estrays. Tearing down notices. Leading of horses. Fakirs. Musical entertainments, etc. Parades or funeral processions. Public meetings. Games of sport.
21. Penalty.

## I. "Penn's Common" and Common Commissioners.

1. That the tract of land situated at the head of Penn street, in the city of Reading, commonly known as the "Public Commons," which in a recent suit by the city of Reading against the county of Berks, was adjudged and decreed by the Supreme Court of Pennsylvania to belong to the city of Reading, be laid out, improved and maintained forever as a public common for the health, benefit and enjoyment of the inhabitants of said city, and shall hereafter be known and designated by the name of "Penn's Common."

28 Sept. 1887 § 1. J. 1887-88, App. 312.

Public commons dedicated to the public by the title of "Penn's Common."

2. The city of Reading is hereby divided into four districts for the election of common commissioners in manner following, to wit: That portion of the city lying east of Sixth street and south of Penn street shall compose one district; that portion of the city lying west of Sixth street and south of Penn street shall compose one district; that portion of the city lying west of Sixth street and north of Penn street shall compose one district; and that portion of the city lying east of Sixth street and north of Penn street shall compose one district,[1] which districts shall be numbered one, two, three and

Id. § 2.

City districted for the election of common commissioners.

[1] See *infra* 10.

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 134 of 197 PageID# 2226

law authorizing cities of this commonwealth to acquire by purchase, or otherwise, private property for public park purposes.[1]

2 April 1896.

15. That the Mount Penn Gravity Railroad Company be and is hereby granted the right to occupy a portion of the northeast section of Penn's Common with their railroad and station appurtenances, and also the right to cross the Mineral Spring property of the city of Reading with their railroad track.

7 May 1889 § 1. J. 1889-90, App. 266.

Right of way granted to Mount Penn Gravity R. R. Company.

16. That the right to occupy Penn's Common is granted subject to the control and management of the common commissioners, and the right to cross the Mineral Spring property is granted subject to the control and management of the water commissioners.

Id. § 2.

Conditions.

17. That the rights herein are granted to the said railroad company for the purpose of constructing, maintaining and operating a gravity railroad, and shall continue during the corporate existence of the said company.

Id. § 3.

Purpose.

18. The employees of the water and park departments shall and are hereby directed to be paid semi-monthly, by pay roll, to be approved by the proper departments or committees; said pay roll to contain name of person, kind and time of service, rate per day, amount due, and a receipt to be signed by the person receiving the amount set opposite his name, and shall be prepared and certified by the superintendent of each of said departments to the city clerk and city controller.

5 Feb. 1894 § 2. J. 1893-94, App. 632.

Mode of payment of employees of park and water departments.

Pay rolls to be certified by superintendent.

19. Upon presentation to the city clerk of pay rolls properly certified and approved as beforementioned, the city clerk shall and he is hereby directed to draw warrants as follows: * * * * * * For the park department, "to the order of the superintendent."

Id. § 3.

How warrants to be drawn and moneys disbursed.

Said officials to dispose of the money in the manner indicated on the pay roll, and to be responsible for the proper disbursement of the same.[2]

### II. Park Rules and Regulations.

20. That the following rules and regulations be and are hereby established as the rules and regulations for the government and protection of Penn's Common, viz.:

30 Dec. 1887 § 1. J. 1887-88, App. 339.

(1) No person shall drive or ride in Penn's Common at a rate exceeding seven miles an hour.

Limit of speed.

(2) No one shall ride or drive therein, upon any part of the common, than upon the avenues and roads.

Driving confined to roads.

(3) No vehicle of burden or traffic shall pass through the common.

Vehicles of burden.

(4) No person shall enter or leave the common except by such gates or avenues as may be for such purposes arranged.

Entrance and exit.

(5) No coach or vehicle used for hire shall stand upon any part of the common for the purposes of hire.

Coaches for hire.

(6) No person shall indulge in any threatening, abusive, insulting or indecent language in the common.

Threatening language, etc.

[1] See the ordinance of October 1, 1889 (Jour. 1889-90, App. 294), forever exempting from being paved a triangular piece of ground at the intersection of Centre Avenue, Third and Windsor Streets, 108 feet on Third and 51 feet on Windsor Street, deeded by the owners to citizens of the vicinity for conversion into a park: "*Provided*, That it be sodded and laid out with walks of proper width, and that it be improved and beautified and kept as a park."

[2] By the resolution of May 14, 1889, the common commissioners were requested to see that all persons employed at the park are residents and taxpayers of the city, and to give such as are willing to earn off their taxes preference when they apply for work. Jour. 1889-90, App. 333.

Digitized by Google

FFXCO_12767

30 Dec. 1887.

**Gaming and obscenity.** (7) No person shall engage in any gaming, nor commit any obscene or indecent act in the common.

**Firearms, etc.** (8) No person shall carry firearms, or shoot in the common, or within fifty yards thereof, or throw stones or other missiles therein.

**Disturbance of fish, birds or animals.** **Fireworks.** **Placards.** (9) No person shall disturb the fish or water fowl in the pool or pond, or birds in any part of the common, or annoy, strike, injure, maim or kill any animal kept by direction of the commissioners, either running at large or confined in a close, nor discharge any fireworks, nor affix any bills or notices therein.

**Injury to trees, shrubbery, statuary, etc.** (10) No person shall cut, break, or in any wise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges, structures or statuary, or foul any fountains or springs within the common.

**Dead animals, etc.** (11) No person shall throw any dead animal or offensive matter or substance of any kind within the boundaries of Penn's Common.

**Animals at large.** **Impounding and disposition of estrays.** (12) No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the common. Nor shall they be permitted in or around the common, unless accompanied by the owner; and whether accompanied by the owner or not, if any of said animals are found running at large in and about the said common, it shall be lawful for, and the park watchman or any of his assistants shall have full power and authority to impound them, or any of them, and if the said animals or any of them are not called for by their respective owners within forty-eight hours after the impounding of the same, it shall be lawful for the city authorities to sell and dispose of the said animals or kill the same.[1]

**Tearing down notices.** (13) No person shall injure, deface or destroy any notices, rules or regulations for the government of the common, posted or in any other manner permanently fixed by order or permission of the commissioners of Penn's Common, within the limits of the same.

**Leading of horses.** (14) No person shall be permitted to bring or lead horses within the limits of Penn's Common, or a horse that is not harnessed and attached to a vehicle, or mounted by an equestrian.

**Fakirs.** (15) No person shall expose any article for sale within the common, without the previous license of the commissioners.

**Musical entertainments, etc. Parades or funeral processions.** (16) No person shall have any musical, theatrical or other entertainment therein, nor shall any military or other parade or procession, or funeral, take place in or pass through the limits of the common, without the license of the common commissioners.

**Public meetings.** (17) No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the common without the previous permission of the commissioners.

**Games of sport.** (18) No person shall engage in any play at base ball, cricket, shinney, foot ball, croquet, or at any other games with ball and bat, nor shall [any] foot race or horse race be permitted within the limits of the common, except on such grounds only as shall be specially designated for such purpose.

[1] This rule amended as above by ordinance of June 26, 1895, Jour. 1895-96, App. 549.

Digitized by Google

21. Any person who shall violate any of said rules and regulations shall be guilty of a misdemeanor, and for each and every such offence shall pay the sum of five dollars, to be recovered before any alderman of the city of Reading, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for common purposes.[1]

30 Dec. 1887 § 2.
Penalty.

[1] These rules are supplemented by a series of additional regulations adopted by the board of park commissioners, June 14, 1895, prescribing the duties of the superintendent, gardener and park police.

# Clerks of Councils.

1. Election of clerk of select council.
2. Term.
3. Duties.
4. Salary.
5. Repeal.
6. Duties of clerk of common council.

1. That the office of clerk of select council be and the same is hereby established. Said clerk of select council to be elected on the day fixed for the organization of council, or as soon thereafter as practicable; a majority of the votes cast shall be necessary for an election.

9 Mar. 1891 § 1. J. 1890-91, App. 352.
Election of clerk of select council.

2. The term of office of the said clerk shall be one year, or until his successor shall have been duly elected and qualified.

Id. § 2.
Term.

3. That it shall be the duty of the said clerk to keep a regular and accurate journal of the acts and proceedings of the said branch and prepare the same for printing, together with a calendar of unfinished business at each stated meeting; he shall also act as clerk of councils in joint convention.

Id. § 3.
Duties.

4. That the salary of the clerk of select council shall be three hundred dollars per annum, payable as the salaries of other city officials are payable.[1]

Id. § 4.
Salary.

5. That the ordinance, entitled "An ordinance defining the duties and fixing the bond and salary of the clerk of select council," approved by the mayor December 24th, 1875, and any other ordinance or ordinances, or part of ordinance or ordinances conflicting with the provisions of this ordinance, be and the same are hereby repealed so far as the same affects this ordinance.

Id. § 5.
Repeal.

6. It shall be the duty of the clerk of the common council to keep a regular and accurate journal of the proceedings of said branch and prepare the same for printing, together with a calendar of unfinished business at each stated meeting.[2]

31 Dec. 1875 § 1. J. 1875-76, App. 247.
Duties of clerk of common council.

[1] By Section 4 of the act of March 21, 1865, creating the Reading Water Board (*ante*, p. 186), the clerk of select council is *ex-officio* secretary of that body. His annual salary in that capacity is three hundred and sixty dollars.

[2] The annual salary of the clerk of common council remains at two hundred and fifty dollars, as fixed by the salary ordinance of February 17, 1877, (Jour. 1876-77, App. 183), those of all other officers therein named having been changed by subsequent legislation.

Digitized by Google

# EXHIBIT 17

FFXCO_12770

# ANNUAL REPORTS

OF THE

# CITY OFFICERS AND CITY BOARDS

OF THE

# CITY OF SAINT PAUL,

FOR THE FISCAL YEAR ENDING DECEMBER 31, 1888.

GLOBE JOB OFFICE.
D. RAMALEY & SON, PRINTERS.
1889.

Digitized by Google

# INDEX TO REPORTS.

| | PAGE. |
|---|---|
| City Comptroller's Report | 1 |
| City Treasurer's Report | 195 |
| City Clerk's Report | 217 |
| Chief of Police's Report | 223 |
| Police Patrol Telegraph, Report of | 239 |
| Board of Fire Commissioners, Report of | 245 |
| Chief Engineer's Report | 281 |
| Superintendent of Fire Alarm Telegraph, Report of | 298 |
| Veterinary Surgeon's Report | 303 |
| Board of Water Commissioners, Report of | 307 |
| Secretary's Report | 313 |
| Superintendent's Report | 340 |
| Engineer's Report | 393 |
| Attorney's Report | 394 |
| Treasurer's Report | 395 |
| Commissioner of Health's Report | 401 |
| Building Inspector's Report | 427 |
| St. Paul Work House, Report of | 483 |
| Board of Control, Report of | 503 |
| City and County Physician's Report | 515 |
| Board of Public Works, Report of | 531 |
| City Engineer's Report | 549 |
| Assistant Engineer's Report (Sewers and Sidewalks) | 558 |
| Assistant Engineer's Report (Office Work) | 565 |
| Assistant Engineer's Report (Bridges) | 578 |
| Board of Education, Report of | 587 |
| Superintendent of School's Report | 605 |
| Treasurer's Report | 609 |
| Comptroller's Report | 611 |
| Board of Park Commissioners, Report of | 671 |
| Superintendent of Parks, Report of | 585 |
| Appendix | 690 |
| Addresses by H. W. S. Cleveland | 690 |
| Laws Relating to Parks | 698 |
| Flora of Como Park | 707 |
| Municipal Court, Report of | 731 |
| Corporation Attorney's Report | 737 |
| Public Library, Report of | 769 |

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 140 of 197 PageID# 2232

# REPORT OF SUPERINTENDENT OF PARKS.

***William A. Van Slyke, President of the Board of Park Commissioners:***

SIR: The following report for the year ending February 28, 1889, is respectfully submitted:

Improvements during the year were confined to Como Park, for which the state legislature two years ago made provision by authorizing the issuance of bonds to the extent of $25,000 for the two years.

All the smaller public parks and squares are still cared for by the Council Committee on Parks, and not by the Board of Park Commissioners. At Como the improvements in progress during the previous year were by reason of intense cold and deep snow, suspended on the 6th of January, 1888, and not resumed till the 14th day of the following March.

Inmates of the city work house, which is temporarily located on the southwest forty acres of Como Park, re-opened the gravelly ridges near the west shore of the lake, and with the aid of hired teams, filled and reclaimed about two acres of unsightly low ground that was formerly a part of the lake, but lately became exposed as the lake water receded.

By cutting back the gravelly ridge, more width was made for the shore drive, while the additional ground obtained by the filling from the ridge was specially desirable in that vicinity, it being near the principal park entrance, where space for important planting was needed.

As soon as frost had left the ground the working force was increased by hired laborers and more teams.

The several drives that had been partly graded the year before, were completed, and a connecting drive was made across the field opposite the workhouse. A carriage concourse 160 feet in diameter, on the highest point in the park and commanding extensive views in different directions, was graded and surfaced.

Loam and soil for surfacing the borders of the drives and the spaces graded, were taken from the field opposite the work house, and a small portion of that field was graded, but no attempt was made at extensive lawn grading.

In some previous year a gravel pit had been opened near the northwest corner of the park, for material to repair county roads. Upon examination the quality of this gravel was found good for surfacing park drives, and considerable quantity was made use of for that purpose in the latter part of 1887.

This work of surfacing the drives was resumed as early in the season of 1888 as the condition of the roads would admit, and was extended over all the drives that had been graded. An iron road roller weighing 3,000 pounds, about three feet in length and made of three similar sections or short drums, mounted loosely on a revolving shaft, was kept continuously at work, compacting first the road bed and then the gravel surfacing.

Digitized by Google

## RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS OF THE CITY OF SAINT PAUL.

1. No person shall drive or ride in any Park in the City of Saint Paul at a rate exceeding seven (7) miles per hour.

2. No person shall ride or drive upon any other part of any Park than the avenues and roads.

3. No coach or vehicle used for hire shall stand upon any part of any Park for the purpose of hire, unless licensed by the Board of Park Commissioners.

4. No person shall indulge in any threatening or abusive, insulting or indecent language in any Park.

5. No person shall engage in any gaming nor commit any obscene or indecent act in any Park.

6. No person shall carry firearms or shoot birds in any Park or within fifty yards thereof, or throw stones or other missiles therein.

7. No person shall disturb the fish or water fowl in any pool or pond or birds in any part of any Park, or annoy, strike, injure, maim or kill any animal kept by direction of the Board of Park Commissioners, either running at large or confined in a close; nor discharge any fireworks, nor affix any bills or notices therein.

8. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountain, well or spring within any Park.

9. No person shall throw any dead animal or offensive matter, or substance of any kind into any lake, stream or pool, within the limits of any Park.

10. No person shall go in to bathe within the limits of any Park.

11. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in any Park, nor shall any animals be permitted to run at large therein.

12. No person shall injure, deface or destroy any notices, rules or regulations for the government of any Park, posted or in any other way fixed by order or permission of the Board of Park Commissioners within the limits of any Park.

13. Complaints against any employe of any Park may be made at the office of the Superintendent of Parks.

14 No person shall use any Park drive for business purposes, or for the transportation of farm products, dirt or any like material, or for the passage of teams employed for such purposes.

Any person who shall violate any of the foregoing rules and regulations shall be guilty of a misdemeanor, and for each and every offense shall be fined not less than the sum of Five Dollars ($5), nor more than Fifty Dollars ($50), which sum shall be paid into the city treasury for park purposes.

JOHN D. ESTABROOK,
Superintendent.

Digitized by Google

# APPENDIX.

## ADDRESS DELIVERED BY H. W. S. CLEVELAND, ESQ., TO BOARD OF PARK COMMISSIONERS FOR IMPROVEMENT OF VACANT SQUARES IN THE CITY, OCTOBER 13, 1888.

*Mr. President and Gentlemen of the Park Commission:*

I have made a cursory examination of some of the vacant spaces within the city limits which have been reserved for ornamental improvement, as well as some smaller tracts, which, though not available as places of recreation, are susceptible by judicious treatment of adding greatly to the beauty and attractive interest of the general aspect of the city. I am not prepared to give any detailed plan of arrangements for any particular point, but it has occurred to me that a general statement of the object in view and the principles to be observed in its attainment could not fail to possess interest and facilitate the progress of the future work.

The present system of arrangement of the small parks and public squares in almost every city involves an incongruity which is obviously the result of a want of due consideration of the object of their creation. A moment's consideration of the circumstances of their existence will make my meaning clear. Suppose the case of a single block in a densely peopled quarter reserved as a park. The area it comprises is of enormous value, which might at any moment be realized by placing it on the market. That value, then, is the price we pay for its preservation as a place of recreation and rest—a refreshing change from the endless piles of brick and stone, where the weary worker may be cheered by the sight of trees and grass and flowers, where women and children may find refuge from the din and turmoil on the streets and escape the rushing crowds for a little quiet enjoyment of the beauty of nature. From our proverbial character as a race who are very careful to get their money's worth in a bargain, it might be supposed we should see to it that in paying such a price for a place of rest we should be very exacting in our demand that it should be adapted to its object and so arranged as to offer every possible facility for relief and refreshment by contrast with its surroundings. But what in reality do we see. Almost without exception the arrangement would seem to indicate that the primary object for which all that area is kept open is to afford a short cut across for those who would otherwise be obliged to go round the outside of the square. Two paths cross it diagonally, sometimes with an effort at some kind of artificial decoration in a circular space at the point where the paths intersect each other. Every pedestrian who is hurrying to and from his business avails himself of the opportunity afforded to thus save time and steps. The paths become simply thoroughfares for the rushing

Digitized by Google



# EXHIBIT 18

FFXCO_12776

[PUBLISHED BY AUTHORITY.]

# THE REVISED ORDINANCES OF SALT LAKE CITY,

M

Ordinances, etc.

WITH THE

# CITY CHARTER AND AMENDMENTS THERETO.

---

FEBRUARY 14, 1888.

---

SALT LAKE CITY, UTAH:
PRINTED BY THE STAR PRINTING COMPANY.
1888.

# CHAPTER XXVII.

## OF LIBERTY PARK.

1. Mayor to control Park and appoint Keepers. Keepers given police powers.
2. When gates to be closed.
3. Drays, trucks, etc., not to travel upon drives.
4. Rate of speed. Racing prohibited.
5. Vending in Park prohibited.
6. Injuring property. Disturbance. Animals trespassing, etc. Firearms.
7. Rule in meeting vehicles.
8. Associations, etc., to get permit.
9. Penalty.

SECTION 1. The Mayor shall have the control and charge of Liberty Park, and shall have power to appoint one or more Park Keepers, whose duties shall be to have charge of the Park ,under the Mayor's direction, and to see that the provisions of this chapter are carried into effect; and for that purpose they are hereby given police powers and authorized to arrest any person violating any of the provisions of this chapter.

Mayor to control Park and appoint Keepers.

Keepers given police powers.

SEC. 2. All the gates of Liberty Park shall be closed at nine o'clock each evening; and all travel on the roads of said Park, or other use of the grounds between nine o'clock P. M. and five o'clock A. M., shall be unlawful except by permission of the Mayor.

When gates to be closed.

SEC. 3. No dray, truck, wagon, cart or other vehicle carrying, or if not carrying, employed regularly in carrying goods, merchandise, manure, soil or other article of commerce or trade, shall be allowed to travel upon the drives of said Park.

Drays, trucks, etc., not to travel upon drives.

SEC. 4 All persons are hereby prohibited from riding or driving upon the roads within said

Rate of speed.

Park at a rate of speed exceeding eight miles per hour, and it shall be unlawful for two or more persons to engage in racing with animals in said Park except by consent of the Keeper thereof.

Racing prohibited.

Vending in Park prohibited.

SEC. 5. No person shall vend or sell, or offer to vend or sell any article or thing whatever within said Park without the consent of the City Council.

Injuring property.

SEC. 6. No person shall, within Liberty Park, cut, break, or in any way injure or deface any trees, shrubs, plants, buildings, fences or property of any kind; or indulge in noisy, boisterous, riotous, or indecent behavior, or use any boisterous or offensive language; or, except authorized by the Mayor: 1—Let loose any cattle, horses, goats, sheep or swine. 2—Drive a herd of said animals through the grounds. 3—Carry or discharge firearms. 4—Camp, lodge or tarry over night. 5—Ride or drive any horse or other animal, with or without vehicle, elsewhere than on the roads or drives for such purposes provided. 6—Catch or kill any birds or fish of any kind.

Disturbance.

Animals trespassing, etc.

Firearms.

Rule in meeting vehicles.

SEC. 7. All persons in riding or driving in said Park, when meeting other animals or vehicles, shall pass to the right.

Associations, etc., to get permit.

SEC. 8. When any company or association of persons exceeding fifty in number desire to resort to the Park for any lawful purpose, they, or one representing them, shall first get the permission of the Mayor.

Penalty.

SEC. 9. Any person violating any of the provisions of this chapter shall, upon conviction, be liable to a fine of not to exceed fifty dollars.

# EXHIBIT 19

FFXCO_12780

CITY OF TRENTON,

NEW JERSEY.

# CHARTER AND ORDINANCES;

ALSO CERTAIN

ACTS OF THE LEGISLATURE RELATING

TO MUNICIPAL DEPARTMENTS,

AND

A TABLE OF CASES CITED IN THE FOOT NOTES.

Revised, Compiled and Published

BY ORDER OF THE COMMON COUNCIL.

TRENTON, N. J.:
THE JOHN L. MURPHY PUBLISHING CO., PRINTERS.
1903.

Digitized by Google

to the amount to be raised by taxes in said city; and said portion of the principal so raised shall be paid yearly to the sinking fund commission of the city of Trenton, to be used exclusively for the liquidation of said bonds; *provided, however,* that whenever the amount of moneys in the hands of said commission shall be sufficient for the redemption of said bonds, no further sums shall be raised by taxation.

When to take effect.

9. That this ordinance shall take effect immediately.

**An Ordinance providing for the government and protection of public parks and squares of the city of Trenton.**

Vol. 6, p. 181.

Approved June 26th, 1890.

*The Inhabitants of the City of Trenton do ordain:*

Rate of speed for driving or riding.

1. No one shall drive or ride in Cadwalader park at a rate exceeding seven miles an hour.

Driving, where allowed.

2. No one shall ride or drive in or upon any of the public squares of this city or upon any other part of said park than upon its avenues and roads.

What vehicles not allowed in park.

3. No vehicle of burden or traffic shall pass through said park.

How persons shall enter.

4. No person shall enter or leave said park or squares except by such gates or avenues as may be for such purpose arranged.

Wagons not to stand in park for hire.

5. No coach or vehicle used for hire shall stand upon any part of said park for the purpose of hire.

No threatening language to be used.

6. No person shall indulge in any threatening, abusive, insulting or indecent language in said park or squares.

No obscene act to be permitted.

7. No person shall engage in any gaming nor commit any obscene or indecent act in the said park or squares.

No person to carry firearms.

8. No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein.

No person to annoy any of the animals.

9. No person shall disturb the fish or water fowl in the pools, ponds or other waters, or birds in any part of said park or squares, or annoy, strike, injure, maim or kill any animal kept by direction of common council or the park committee thereof, either running at large or confined in a close, nor discharge any fireworks nor affix any bills therein.

Not to deface trees or buildings.

10. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the

Digitized by Google

outbuildings, fences, bridges, structures or statuary, or foul any fountains or springs within said park or squares.

Not to throw any offensive matter in water.

11. No person shall throw any dead animal or offensive matter or substance of any kind into any pool, pond or other waters within the boundaries of said park or squares.

Bathing prohibited.

12. No person shall go into bathe within said park.

No animals to go loose in park.

13. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in said park or squares.

Notices not to be defaced.

14. No person shall injure, deface or destroy any notices, rules or regulations for the government of the said park or squares, posted or in any other way permanently fixed by order or permission of the common council or the park committtee thereof, within the limits of the same.

Penalty.

15. That for each and every violation of any of the foregoing provisions of this ordinance the person or persons so violating shall forfeit and pay a fine of ten dollars, to be enforced and collected according to law.

**An Ordinance to name the Five Points "Monument Park."**

*The Inhabitants of the City of Trenton do ordain:*

Ordinance of June 28th, 1898, Sec. 1, Vol. 6, p. 411.

1. That the locality commonly known as the Five Points, being that portion of the city bounded and described by Pennington avenue on the north, Broad street on the east, the southerly line of the lands recently purchased by the city of Trenton for a public park, by an ordinance passed common council February twenty-first, one thousand eight hundred and ninety-three, entitled "An ordinance to authorize the purchase of lands for the purposes of a public park," on the south, and the line of North Warren street, on the west, shall be hereby designated and known as "Monument Park."

*Ib.*, § 2.

2. That all ordinances or parts of ordinances inconsistent herewith, be and the same are hereby repealed.

Digitized by Google

# EXHIBIT 20

FFXCO_12784

THE MUNICIPAL CODE

OF

# BERLIN

COMPRISING THE

# CHARTER

AND THE

# GENERAL ORDINANCES

OF THE CITY

## CODIFIED AND REVISED.

---

PUBLISHED BY AUTHORITY OF THE
COMMON COUNCIL

**COURANT STEAM PRINT,**
**BERLIN WIS.**
1890.

Dup
5/15/30
HS

Digitized by
INTERNET ARCHIVE

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

hundred feet of any building, and no person shall build any fire upon any lot or on any street and leave the same uncared for, under a penalty of three dollars for each offense.

SEC. 256. No pipe of any stove shall be put up in any house or other building in this City unless it is conducted into a chimney made of brick or stone, without first obtaining consent of the Fire Warden of the district in which said building is situated, nor shall any person at at any time set fire to any chimney for the purpose of cleaning the same, without first obtaining the consent of the said Fire Warden And it shall not be lawful to conduct any stovepipe through any partition, floor or wood-work of any building unless the same is securely fixedwith stone or brick-work, or in place thereof a tin or earthen tube or safe, so called, or other metallic fixture; and any person offending against any provision of this section shall forfeit as a penalty the sum of three dollars, and the further penalty of three dollars for every twenty-four hours that the violation shall continue after having been notified by the Fire Warden of the proper district to discontinue such violation.

SEC. 257. Every chimney hereafter erected within the limits of the City of Berlin shall be plastered on the inside with lime and sand morter at the time it is erected, under a penalty of twenty-five dollars. to be collected either of the person or persons for whom such chimney is built, or of the person or persons erecting the same.

ARTICLE VII.—FIRE ARMS, FIRE WORKS AND CANNONS.

SECTION 258. Any person who shall fire or discharge any gun, pistol, fowling piece, or other fire arm, within the limits of the City of Berlin except in the necessary defense of his person or property, shall pay a fine of not less than one dollar, nor more than ten dollars for each offense.

SEC. 259. Any person who shall sell, loan or furnish to any minor, any gun, pistol, fowling piece or other firearm within this City, shall pay a fine of not less than five dollars, nor more than twenty-five dollars for each such offense.

SEC. 260. Any person who shall fire, discharge or set off within the limits of the City of Berlin, any rocket, cracker, torpedo, squib or other fire works or thing containing any substance of explosive nature, shall pay a fine of not less than one dollar nor more than ten dollars for each such offense. Provided that the Mayor may by proclamation permit the use of fire works on the Fourth day of July and on such other days as he may deem proper.

SEC. 261. Any person who shall discharge, or fire off any cannon, or piece of artillery in any street, or avenue, alley, park or place,

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 154 of 197 PageID# 2246

within the corporate limits of this City, without a written permission from the Mayor, shall pay a fine of not less than ten dollars, nor more than thirty dollars for each such offense.

ARTICLE VIII.—PARKS AND PUBLIC GROUNDS.

SECTION 262. Neither cattle, horses, goats, or swine or other animals shall be turned by any person into any of the parks of this City.

SEC. 263. All persons are forbidden to carry fire arms, or to throw stones or other missils within anyone of the public parks o. this City. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any building, fences, monuments or other constructions or property, within or upon, any of the parks of this City.

SEC. 264. No person shall expose any article for sale upon any of the said parks nor shall any hawking or peddling be permitted therein.

SEC. 265. No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes, or play any game of chance at or with any table or instrument of gaming, nor to do any obscene or indecent act therein.

SEC. 266. No person other than employers shall light, make or use any fire therein.

SEC. 267. Any person who shall violate any, or either of the provisions of this article or any section or clause, or any provision of any section thereof, or who shall neglect, or fail, or refuse to comply with any or either of the requirements thereof, shall on conviction pay a fine of not less than five dollars nor more than thirty dollars.

ARTICLE IX.—STREETS.

SEC. 268. No person shall injure or tear up any pavement, side or cross walk, or any part thereof, dig any hole, ditch or drain in, or dig or remove any sod, stone, earth, sand or gravel from any street, alley, or public ground in the City of Berlin, without having first obtained permission from the Common Council, or unless done under lawful authority from the City of Berlin, under the penalty for each offense of not less than five dollars nor more than fifty dollars.

SEC. 269. Any person, company or corporation, who shall incumber or obstruct, or cause to be encumbered or obstructed any street, alley, public landing or other public place in said City, by placing therein or thereon, any building materials, or any article or thing whatsoever, without having first obtained written permission from the Mayor, shall be subject to a penalty of not less than five dollars, nor more than fifty dollars for each offense and further penalty of one dollar for each day such incumbrance or obstruction shall continue.

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

SEC. 270. The streets, alleys and sidewalks in the City of Berlin shall be kept free and clear from all obstructions, incumbrances and encroachments for the use of the public, and shall not be used or occupied in any other way than is provided in this article.

SEC. 271. The Mayor is hereby authorized to order any article or thing whatsoever which may incumber any street, alley, public landing wharf or pier, within said City to be removed, if such article or thing shall not be removed within six hours after notice to the owner or person in charge thereof to remove the same, or if the owner can not be found for the purpose of such notice, he shall cause the same to be removed to some suitable place, to be designated by the Mayor; and the owner of any article so removed, shall forfeit and pay a fine of not less than one dollar nor more than ten dollars for each such offense.

SEC. 272. No wagon, sleigh, sled, carriage, railway carriage, or vehicle of any kind or description, or any part of the same, without horses or other beasts of burden, shall be permitted to remain or stand, in any improved street in this City for more than one hour, except for the purpose of being repaired, and then only in front of the premises of the person so repairing, and within ten feet of the curbing or sidewalk. Any person who shall violate any provision of this section shall pay a fine of not more than ten dollars nor less than five dollars for each offense.

SEC. 273. Any person who shall erect or place any building, in whole, or in part, upon any street, alley, sidewalk or other public ground, within this City, shall pay a fine of not less than five dollars nor more than fifty dollars for each such offense, and all such buildings or parts of buildngs so erected or placed upon any street, alley, sidewalk or public ground are hereby declared to be a nuisance.

SEC. 274. Whenever, from any cause, any street or alley in this City shall be obstructed from a press of teams attached to vehicles loaded or otherwise, the Mayor, any Alderman, or Police officer, may give such directions in regard to removal of such vehicles or teams as in the opinion of such officer may be required by the public convenience. And any person or persons refusing to obey such directions shall pay a fine of not less than one dollar nor more than ten dollars for each such offense.

SEC. 275. Any contractor, or other person or persons causing any cart, wagon or other vehicle to be loaded and heaped up with manure, sand, earth, mud, clay, stones or rubbish, so that the contents, or any part thereof, shall be scattered in any street, avenue or other public place in the City, shall pay a fine of not less than one dollar nor more than five dollars for each offense.

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

# EXHIBIT 21

FFXCO_12789

# A DIGEST

OF THE

# Laws and Ordinances

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

CITY OF WILLIAMSPORT, PENNSYLVANIA, Ordinances, etc.

IN FORCE AUGUST 1, 1900.

PUBLISHED BY AUTHORITY OF THE CITY COUNCILS

IN THREE PARTS

By LOUIS RICHARDS and WILLIAM D. CROCKER, Esqs.

NEWARK, N. J.
SONEY & SAGE
1900

CC
Williamsport
3
1900

Copyright, 1900, by SONEY & SAGE.

Presented by
the Williamsport Mayor

# PART III.

## Ordinances and Resolutions

OF THE BOROUGH AND CITY OF

WILLIAMSPORT, PA.

Comp. by W. D. Crocker.

# Brandon Park.

I. ACCEPTANCE OF—1-6.
II. RULES AND REGULATIONS—7-9.

## I. Acceptance Of.

1. Whereas, A. Boyd Cummings, of the city of Philadelphia, has executed a deed of conveyance to the city of Williamsport for forty-three acres and thirty-nine perches of land situate in the Eighth ward of the city in trust for the purpose of a park for public uses, and to be known as "Brandon Park," and has placed said deed of conveyance in the hands of his counsel, Allen & Reading, for delivery to the city upon the passage by the councils of an ordinance accepting such conveyance and appointing a commission, and providing for the improvement, regulation and government of said park; therefore,

Ord. 358 C. C., March 20, 1889. O. B. 2, p. 332. Preamble.

2. That the deed of conveyance from the said A. Boyd Cummings to the city of Williamsport, in trust, of forty-three acres and thirty-nine perches of land situate in the Eighth ward of the said city for the purpose only of an open space or park for the use of the public forever, and to be called and known as Brandon Park, be and the same is hereby accepted by the city of Williamsport in accordance with the terms of said conveyance as will fully appear by the deed of conveyance for said lands bearing date the twenty-first day of February in the year of our Lord one thousand eight hundred and eighty-nine.

Id. § 1. Deed accepted.

3. That Robert P. Allen, Hugh H. Cummin, Lindsey Mahaffey, Oliver H. Reighard, J. Artley Beeber, Robert Neilson and the mayor of the city of Williamsport be and they are hereby appointed park commissioners to serve during good behavior without compensation, whose duty it shall be to prepare and report to councils a plan for the improvement, regulation and government of said Brandon Park, and to supervise the work of improvement of said park, and expend the moneys which may be appropriated from time to time by the city for such improvements, and of which said commission shall make report at least once in every year as to the progress of the improvements upon said park and the condition of the same to the city councils.

Id. § 2. Commissioners appointed. Duties of commissioners.

4. That no circuses, menageries, athletic games for exhibition, or any other kind of public exhibition shall ever be allowed upon said park.

Id. § 3. Exhibitions, etc., prohibited.

5. That the mayor of the city of Williamsport by and with the consent of the majority of the select council shall have authority to fill, upon the nomination only of the surviving members of the commission, all vacancies in said park com-

Id. § 4. Vacancies, how filled.

mission which may be occasioned by death, resignation or otherwise.

Id. § 5.
Pledge.

6. That the faith of the city of Williamsport be and the same is hereby pledged to the performance on the part of said city of the terms of the acceptance from the said A. Boyd Cummings of the conveyance of said Brandon Park in accordance with the foregoing ordinance.

Ord. 404 C. C., June 18, 1890, § 1. O. B. 2, p. 393.

### II. Rules and Regulations.

Regulations.

7. The following rules and regulations be and are hereby established as the rules and regulations for the government and protection of Brandon Park, viz.:

Driving regulated.

(1.) No person shall drive or ride in Brandon Park at a rate exceeding seven miles an hour.

(2.) No person shall ride or drive upon any part of the park, except on the avenues and roads.

Vehicles for traffic prohibited.

(3.) No vehicle of burden or traffic shall be permitted within said park, except when employed in the business of the park.

Bicycles in park.

(4.) No bicycles, tricycles or other vehicles of a similar nature, shall be driven at a greater speed than seven miles per hour in the park.

Law of road.

(5.) When carriages, bicycles, tricycles or equestrians meet, the parties respectively shall keep to the right as the law of the road.

Entrance and exit.

(6.) No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged.

Led horses.

(7.) No person shall bring or lead a horse or horses within the limits of the park not harnessed and attached to a vehicle, or mounted by an equestrian.

Animals at large.

(8.) No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the park.

Trees and shrubbery.
Fountains.
Ponds.

(9.) No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, flowers, fruit, turf or any of the buildings, fences, bridges, structures or statuary, or foul any fountains or springs within the park, or throw stones or rubbish of any kind into any lake or pond of the park, or bathe in the same.

Nuisances.

(10.) No person shall throw any dead animal or offensive matter or substance of any kind within the boundaries of the park.

Birds, fish, etc.

(11.) No person shall disturb the fish or water fowl in the pool or pond, or birds in any part of the park, or annoy, strike, injure, maim or kill any animal kept by direction of the commissioners, either running at large or confined.

Trees, protection of.

(12.) No person shall attach a swing to, fasten a horse to, or climb a tree in said park.

Notices.

(13.) No person shall injure, deface or destroy any notices, rules or regulations for the government of the park

posted or in any other manner permanently fixed by order or permission of the commissioners of the park, nor affix any bills or notices within the limits of the same. *Posting bills forbidden.*

(14.) No person shall expose any article for sale within the park. *Traffic prohibited.*

(15.) No person shall have any musical or other entertainment in the park, nor shall any parade or procession take place in or pass through the park, nor shall any picnic, gathering or public meeting of any kind be permitted therein without the previous permission of the commissioners. *Parades, etc., prohibited. Picnics prohibited.*

(16.) No person shall engage in any play at base ball, cricket, shinny, foot ball, croquet, or at any other athletic games within the limits of the park, except on such grounds only as shall be specially designated for such purposes by the park commissioners. *Games prohibited.*

(17.) No person shall introduce any spirituous, malt or brewed liquors into said park, either for his own use, to sell, or to give away, nor shall any intoxicated person enter or remain in said park. *Liquors prohibited.*

(18.) No person shall curse or swear or use threatening or abusive language, or fight or throw stones, or behave in a riotous or disorderly manner in said park. *Swearing. Disorderly conduct.*

(19.) No person shall indulge in any insulting or indecent language, or commit a nuisance in the park. *Nuisances.*

(20.) No person shall engage in playing cards or gambling in said park. *Gambling.*

(21.) No person shall carry fire-arms, or shoot in the park, or discharge any fire-works, or throw stones or missiles therein. *Firearms.*

8. Any person who shall violate any of said rules and regulations shall be liable to a fine of not less than five dollars nor more than fifty dollars, to be recovered before any alderman of the city of Williamsport, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for park purposes. *Id. § 2. Penalty.*

9. Packer street, where it passes through the park, is hereby abandoned as a public highway and declared to be a part of the park, subject to the rules and regulations adopted for its government and protection.[1] *Id. § 3. Packer Street vacated.*

[1] See "Streets—Vacation of."

## Bridges.

Almond Street, Bridge over McClure's Run, N. 1.
Center Street, Bridge over Grafius Run, 2.
Cherry Street, Bridge over Grafius Run, 7.
Elmira Street, Bridge over Grafius Run, 1.
Evaline Alley, Bridge over Grafius Run, 3.
High Street, Bridge over Grafius Run, 4-5.
Lycoming Creek Bridges, N 2.
Rural Avenue, bridge over Grafius Run, 6.

[1] On Dec. 9, 1889, a resolution passed common council for the construction of a bridge over the Run (McClures Run) on Almond Street near Wyoming Street; See C. C. M. B., p. 475. The resolution passed select council on Dec. 16, 1889; See S. C. M. B., p. 346. The resolution cannot be found, but the bridge was built. In the case of *Kennedy v. The City*, No. 385, Sept. T. 1897, the question arose as to whether the bridge had been built by the city or by Loyalsock Township.

# EXHIBIT 22

FFXCO_12796

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 164 of 197 PageID# 2256

Grand Rapids, Mich. Ordinances, etc.

# COMPILED ORDINANCES

c+

OF THE

# City of Grand Rapids

Containing all Ordinances passed by the Common Council, of the City of Grand Rapids, in force September 1, 1906

---

Compiled and Indexed
Under Authority of the Common Council
By
COLIN P. CAMPBELL. LL. M.

---

PUBLISHED BY AUTHORITY OF THE
COMMON COUNCIL

1907?

The Public Lib
Jan 27 1912

FFXCO_12797

dollars and costs of prosecution, or by imprisonment at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, in the discretion of the court or magistrate before whom the conviction may be had, for a period of not less than five days, nor more than ninety days; and in case such court or magistrate shall only impose a fine and costs, the offender may be sentenced to be imprisoned at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, until the payment of such fine and costs, for a period of not less than five days nor more than ninety days.

### Repealing Clause.

Sec. 429 **(14)**. The following ordinances are hereby repealed, to-wit: An ordinance entitled "An Ordinance Relative to Public Lamps and Lamp Posts in the City of Grand Rapids," passed March 1, 1873;

Also an ordinance entitled, "An ordinance Relative to Public Parks and Places in the City of Grand Rapids," passed March 8, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Protection, Preservation and Use of Bridges Across Grand River in the City of Grand Rapids, belong to said city," passed June 21, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Preservation of Public Property of the City of Grand Rapids," passed March 1, 1873;

Also all other ordinances and parts of ordinances in anywise contravening the provisions of this ordinance.

**An Ordinance to Regulate the Use of the Public Parks of the City of Grand Rapids, and to Provide for the Preservation of Public Property Therein. Passed May 4, 1891. Amended June 20, 1892, and October 11, 1897.**

The Common Council of the City of Grand Rapids do ordain as follows:

### Parks—Injury to Trees, Etc.—Animals, Etc.—Handbills.

Sec. 430 **(1)**. No person shall break, cut, mutilate, injure,

SEC. 429. Record A of Ordinances, p. 143.
SECS. 430-435. Charter, Section 73.
SECS. 430-432. Record B of Ordinances, p. 130.

overturn, remove or carry away any tree, shrub, plant, flower, stone, or stone-work, bench, chair, seat, bower, stand, house, arbor, structure, fence or property, or anything whatsoever in, upon or belonging to any park, spuare or open space, in the City of Grand Rapids, or in any street, avenue, or highway in, adjoining to or around the same; nor shall any person climb up, or upon, any building, house, fence, table, seat or other structure in said park, place or square; nor shall any person kill, disturb, or molest any bird or bird's nest, or any fish or animal within, belonging to or being therein; nor shall any person paste or affix or inscribe any hand-bill, sign, poster, card, device or inscription to, upon or against any fence, tree, structure, or property of or on such park, place, square or highway, in or adjoining the same; nor shall any person disfigure or injure any sward, gravel, sand, turf or earth, or any tree, fence or structure therein, or adjoining thereto; nor shall any person fasten or hitch any animal to any tree, fence or structure in, or upon, the same, unless the same shall be designated and set apart for such purpose; nor shall any person ride or drive any animal or vehicle therein except upon the proper roadways, avenues and drives, and shall not drive therein at a speed exceeding eight miles per hour.

### Parks—Speeches in.

Sec. 431 (2). No person shall deliver any oration, address, speech, sermon or lecture therein unless he shall have first received permission from the Common Council of the City of Grand Rapids, or the Mayor or other lawful authority so to do; nor shall any public meeting be held therein unless leave is first obtained.

### Parks—Dogs in—Fire Arms.

Sec. 432 (3). No person shall allow or permit any domestic animal to go, be, or run at large within any such park, place or square; nor shall any person carry any rifle, gun, or other fire arm of any kind within any park of the City of Grand Rapids, and no dog shall be allowed therein except when fastened or led by a cord or string not exceeding six feet in length.

### Parks—Disorderly Language—Games—Handbills—Peddlers—Picnics in.

Sec. 433 (4). (As amended October 11, 1897.) No person shall

SEC 433. Record B of Ordinances, p. 448.

use any threatening, obscene, profane or indecent language in any such park, open place or square, or be guilty of any disorderly or indecent conduct; nor shall any person indulge in any games, acts or demeanor calculating or tending to mar or disturb the feelings or enjoyment of the visitors attending such parks, places or squares; nor shall any person or persons deposit any rubbish or refuse in or upon such park, place or square, except the same be deposited in waste baskets to be provided by the Committee on Parks; nor shall any person post, exhibit or distribute any advertisement, circular or hand bill therein; nor shall any peddler or petty dealer sell, or in any manner dispose of any article in or immediately adjoining any public park, place or square in said city, unless he shall first obtain express permission so to do from the Common Council of the City of Grand Rapids. Picnics and social parties may be allowed in such portions of said parks as shall be designated and set apart by the Park Committee of the Common Council of the City oif Grand Rapids from time to time.

### Hours When Parks Open to Public.

Sec. 434 **(5)**. (As amended June 20, 1892.) The three public parks belonging to said city and respectively named and known as the "John Ball Park," "Lincoln Park" and "Highland Park," shall be open to the public only between the hours of sunrise and 9 p. m. of each and every day, and it shall not be lawful for any person or persons, except the person and employes in charge of any such park, to enter therein before the hour above named for the opening of said park, or to remain therein after the hour above fixed for the closing thereof; Provided, however, That the Committee on Parks of the Common Council or Mayor of said city shall have the power, in their discretion, whenever special occasion may require it, to specially provide for all or any of said parks above named being opened at an earlier hour or closed at a later hour than the hours above designated.

Any person who shall violate any of the provisions or requirements of this section shall be liable to the punishment prescribed in Section 6 of this ordinance.

### Penalty.

Sec. 435 **(6)**. (As re-numbered June 20, 1892, and amended

SEC. 434. Record B of Ordinances, p 240. | SEC. 435. Record B of Ordinances, p. 240-448

October 11, 1897.) Any person or persons who shall violate any of the provisions or requirements of this ordinance, on conviction thereof, shall be punished by a fine of not less than two dollars nor more than one hundred dollars and costs of prosecution, or by imprisonment at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, workhouse or house or correction of said city, in the discretion of the court or magistrate before whom the conviction may be had, for a period of not less than two days nor more than ninety days; and in case such court or magistrate shall only impose a fine and costs, the offender may be sentenced to be imprisoned at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, workhouse or house of correction of said city, until the payment of such fine and costs, for a period of not less than two days nor more than ninety days.

**An Ordinance Relative to Cemeteries and the Protection Thereof and the Burial of the Dead in the City of Grand Rapids. Passed January 13, 1896.**

The Common Council of the City of Grand Rapids do ordain as follows:

### Public Cemeteries—What Are.

Sec. 436 (1). All cemeteries now owned or which may hereafter be acquired by the City of Grand Rapids, wherever situated, and all cemeteries now within the limits of said city, whether owned by said city or not, are hereby declared to be public burial grounds, and no person or persons, corporation, society or congregation shall establish or locate any other cemetery within the limits of said city.

### No Interments Except in Cemeteries.

Sec. 437 (2). No interment of the body of any person shall be made in any other place than within a cemetery devoted to that purpose.

### Cemeteries—Property in Not to be Injured.

Sec. 438 (3). No person or persons shall injure, cut or remove any trees, shrubbery, gate, fence, post or steps, standing, growing or being in and upon any cemetery or cemetery grounds belonging to said city.

---

SECS. 436-454. Charter, Section 73. Record B of Ordinances, p. 378.

# EXHIBIT 23

FFXCO_12802

FIRST

# ANNUAL REPORT

OF THE

# PARK COMMISSIONERS

OF THE

# CITY OF MILWAUKEE.

1892.

Withdrawn 1942

143002

MILWAUKEE:
ED. KEOGH, PRINTER, 386-388 BROADWAY.
1892.

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

711
M63
1897/72-1904/5
R.S. 352.7
Ref. 63b
ST. LOUIS
26
1907
Public Library
Withdrawn 1942
SCHWEICKART

COMMISSIONERS.

---

CHRISTIAN WAHL, PRESIDENT.

JOHN BENTLEY.

LOUIS AUER.

CALVIN E. LEWIS.

CHARLES MANEGOLD, JR.

---

CHAS. K. LUSH, SECRETARY.

Digitized by Google
Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

7. Neglect to treat all officers and other persons civilly and respectfully on all occasions.

8. Neglect to wear uniform while on duty according to regulations, or neglect to appear clean and tidy at all times.

9. Intoxication, disobedience, laziness or inattention to duty, lounging or sleeping while on duty, or any conduct unbecoming a police officer.

The following rules and regulations were adopted by the Park Commissioners of the City of Milwaukee, at the meeting of September 8th, 1891, in pursuance and by virtue of the power and authority contained in Chapter 488, of the Laws of 1889, and Chapter 179 of the Laws of 1891, amendatory thereof, and are published in accordance with the requirements contained in said Chapters:

SECTION 1. No person shall enter or leave the parks, except by the walks or drives.

SEC. 2. No animals shall be allowed loose in the parks.

SEC. 3. All persons are forbidden to carry fire-arms, or to throw stones or other missiles within the parks.

SEC. 4. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon the parks.

SEC. 5. No driving or riding shall be allowed on any part of the parks at a rate exceeding six miles per hour, except on such drives and at such times as may be designated by the Park Commissioners.

SEC. 6. No vehicle, horse or other animal shall go upon any part of the parks, except the carriage drives, and upon such

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 173 of 197 PageID# 2265

places as are appropriated for carriages at rest, or be permitted to stand upon the drives or any part thereof, to the obstruction of the way.

SEC. 7. No hackney coach, carriage or other vehicle for hire, shall stand upon any part of the parks for the purpose of soliciting or taking in any other passengers or persons than those carried to the parks by said coach, carriage or vehicle, unless licensed by the Park Commissioners.

SEC. 8. No person shall expose any article or thing for sale upon the parks, except such person shall have been previously licensed by the Board of Park Commissioners, nor shall any hawking or peddling be allowed thereon.

SEC. 9. No omnibus or wagon, with or without passengers, nor any cart, dray, wagon, truck or other vehicle carrying goods, merchandise, manure, soil or other articles or solely used for the carriage of goods, merchandise, manure or other articles, shall be allowed to enter any part of the parks. This, however, does not apply to vehicles engaged in the construction of the parks nor to private family wagons.

SEC. 10. No drunken, noisy, disorderly or publicly offensive person shall be allowed to remain in the parks, and no intoxicating or spirituous liquors shall be sold in the parks.

SEC. 11. No threatening, abusive, insulting or indecent language shall be allowed therein whereby a breach of the peace may be occasioned.

SEC. 12. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

FFXCO_12806

# EXHIBIT 24

FFXCO_12807



# Park   Commissioners'   Report,

## Springfield,  Massachusetts.

## 1897.

OHIO STATE
UNIVERSITY

Digitized by Google

PRESS OF
SPRINGFIELD PRINTING AND BINDING CO.
SPRINGFIELD, MASS.

OHIO STATE
UNIVERSITY

Digitized by Google

# PARK ORDINANCES.

SPRINGFIELD, MASS., May 2, 1891.

The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden: —

1. To cut, break, injure, deface, defile, or ill-use any building, fence, or other construction, or any tree, bush, plant, or turf, or any other thing or property of said city, or to have possession of any freshly plucked tree, bush, or plant, or part thereof.

2. To allow animals of any kind to pass over or stray upon the Park lands, provided this shall not apply to dogs when closely led by a cord or chain not more than six feet long.

3. To throw stones, balls, or other missiles; to discharge or carry firearms, fire-crackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To take birds, fish, or any live animal or birds' nest, or in any way interfere with cages, boxes, places, or inclosures for their protection.

5. To play ball or any other games in any Public Park except such portions thereof as may be set apart for that purpose.

6. To drive any carriage, cycle, cart, wheelbarrow, hand cart or horse, upon any Park except upon regular carriage roads, and no heavy teaming will be allowed whatsoever.

7. To drive or ride a horse or horses at a rate faster than eight miles an hour.

8. To drive or ride any horse or animal not well broken and under perfect control of the driver.

9. To ride a cycle at a rate faster than eight miles an hour.

10. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police or other agents of the Commissioners, and to refuse to assist them when required. Any person willfully doing either of the things above forbidden, shall be punished by fine not exceeding twenty dollars.

*Compliance with foregoing regulations is a condition of the use of these premises.*

DANIEL J. MARSH, *President,*
ORICK H. GREENLEAF,
JOHN E. TAYLOR,
EVERETT H. BARNEY,
WILLIAM F. CALLENDER, *Secretary,*
} *Park Commissioners.*

Digitized by Google

# EXHIBIT 25

FFXCO_12811

# ANNUAL REPORT

OF THE

# Board of Park Commissioners

FOR THE

YEAR ENDING DECEMBER 31, 1892.

---

CINCINNATI:
THE COMMERCIAL GAZETTE JOB PRINT.
1893.

Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

# RULES AND REGULATIONS

## FOR THE PROTECTION AND GOVERNMENT OF THE PARKS OF CINCINNATI, O.

**Adopted by the Board of Park Commissioners May 16, 1892.**

---

The Board of Park Commissioners, as authorized by law, do hereby establish the following rules for the protection and government of the parks of the city of Cincinnati:

1. The parks will be opened to the public daily, except when special occasion may require any of them to be closed. The hours for opening and closing the different parks to be determined from time to time by the Board of Park Commissioners.

2. Visitors may walk upon any part of the lawns except those from which they are warned by signs.

3. In case of an emergency, such as blasting, or in any other case where life and property are endangered, all persons, if required to do so by the superintendent or his assistants, shall remove from the portion of the grounds specified by him, and shall remain off the same until permission is given to return.

4. No public meeting and no public discussion or debate shall be held within the limits of the parks.

5. No person shall be permitted, unless by the consent of the Board of Park Commissioners, to engage in any picnic or games, to play upon any musical instrument, or to take into or display in the park any flag, banner, target, or transparency; nor shall any military or target company, civic or other procession, or detachment of a procession, be permitted to drill, parade, or perform therein; nor shall any club or party of tricycle or bicycle riders make runs on or have parades therein.

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 181 of 197 PageID# 2273

6. No person shall post or otherwise affix any bill, notice, or other paper upon any structure, tree, or any thing within the limits of the parks, or upon any gates or inclosure thereof, or distribute circulars, handbills, or petitions of any description within the parks.

7. No person or persons shall be permitted to play at any game of chance nor do any obscene or indecent act whatever within the limits of the parks.

8. All persons are forbidden to take or carry away any sod, clay, turf, stone, sand, gravel, leaves, muck, peat, wood, or any thing whatever belonging to the parks from any part of the land embraced within the boundaries of the parks.

9. All persons are forbidden to cut, break, or have in their possession while in the parks any part of a tree, shrub, or flower, or any turf, or in any way to deface the same, or any part of the buildings, fences, or other construction within the parks, or in any way to hinder or interfere with those engaged in its improvement or the animals kept therein.

10. No person shall expose any thing for sale in the parks unless previously permitted so to do by the Board of Park Commissioners, nor shall any hawking or peddling whatever be allowed therein. No person shall expose any thing for sale on the sidewalks bounding the parks.

11. All persons are forbidden to turn cattle, horses, goats, swine, poultry of any kind, or dogs upon the parks. Any such animal found in the parks shall be impounded by the superintendent. When the superintendent is satisfied as to the ownership, and the regular fine and fees are paid to him, he will deliver the animal to the owner.

12. No threatening, abusive, insulting, or indecent language or disorderly conduct of any kind shall be permitted within the parks.

13. No person shall bring into or discharge within the parks any firearms or other device by which birds or animals may be killed, injured, or frightened; no person shall throw stones or missiles within the parks.

14. No fireworks shall be brought into the parks except by consent of the Board of Park Commissioners.

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

FFXCO_12814

ce, or other
limits of the
ite circulars,

it any game
r within the

ay sod, clay,
r any thing
nd embraced

their posses-
ower, or any
the buildings,
way to hinder
r the animals

parks unless
ommissioners,
therein. No
alks bounding

, goats, swine,
animal found
it. When the
ne regular fine
ne owner.
t language or
n the parks.
the parks any
nay be killed,
nissiles within

t by consent

15. Dogs shall not be allowed within any portion of the parks unless led by a chain or cord not exceeding six feet in length, nor shall any person lead any other animal or animals within the parks or permit the same to run at large or stray therein, nor shall horses be exercised in the parks.

16. No person other than the employees of the parks shall bring upon the parks or have in his hand any tree, shrub, or plant, nor any newly-plucked branch of a tree, shrub, or plant.

17. No person other than the employees shall light or make or use any fire within the limits of the parks.

18. No animals, cycle, or vehicle shall be allowed to travel on any portion of the parks except the roads, and on the roads the speed shall not exceed six miles an hour. All animals and vehicles in motion shall keep to the right; and no animal shall be left within the parks without some one having charge of the same. No animal shall be hitched in the parks except at designated places.

19. No omnibus, express-wagon, either with or without passengers, no cart, dray, wagon, truck, stone or market-wagon, or other vehicles used solely for the transportation of goods, building material, merchandise, soil, manure, or other similar articles shall be allowed to enter any part of the grounds, except on such roads as may be designated for such purposes, nor shall such articles be transported through the parks.

20. No business vehicle shall enter or pass through the parks. No funeral procession or hearse shall be allowed upon any part of the parks, nor any vehicle carrying the body of a deceased person.

21. No animal, bicycle, tricycle, or vehicle shall be permitted to stand upon the drives or carriage-roads within the parks or any part thereof to the obstruction of the way or to the inconvenience of travel.

22. Bicycles, tricycles, carriages, and other vehicles usually carrying lamps must carry lamps, and keep them lighted at night.

23. No person or persons shall solicit or invite passengers for any hackney-coach, carriage, or other vehicle for hire within the limits of the parks.

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

24. When any policeman may deem it necessary or proper to do so, he may, in order to prevent the crowding of carriages or the appearance of a procession, temporarily detain or otherwise direct the movements of carriages or animals entering or being upon the parks.

25. Portions of the park may be set apart by the superintendent upon direction of the Board of Park Commissioners for ball, croquet, and other games.

26. Large bicycles and velocipedes will not be allowed in Lincoln, Washington, Garfield, or Hopkins parks.

27. On Sunday after 12 M. no vehicle or hoops of any description except baby-carriages will be allowed in Lincoln, Washington, Garfield, or Hopkins parks.

28. No person shall bathe or take fish or send or throw any animal or thing in or upon any of the waters in the parks, or in any manner disturb or annoy any water-fowl, singing or other bird, or animal appertaining to the parks, nor shall any boat or vessel be placed on said waters except by special permission from the Board of Park Commissioners, and no skating or sledding shall be allowed therein unless the officer in charge shall consider the ice to be in a suitable condition for that purpose.

29. All persons are forbidden to drive or ride within the parks a wild horse or mule, or any breaking-cart or other vehicle used in breaking horses.

30. No swings or hammocks shall be swung in the parks except on the posts erected by the Board of Park Commissioners for that purpose.

31. Whistles must not be sounded within the parks by visitors.

The above rules and regulations apply to all parks under the control of the Board of Park Commissioners, and extend to the sidewalks adjacent to said parks.

Digitized by Google    Original from NEW YORK PUBLIC LIBRARY

# EXHIBIT 26

FFXCO_12817

Parks. U.S.: Lynn.

# THIRD ANNUAL REPORT

OF THE

# PARK COMMISSIONERS

OF THE

# CITY OF LYNN

For the Year Ending December 20, 1891.

LYNN, MASS.:
WHITTEN & CASS, PRINTERS,
1892.

N. C.

Digitized by Google

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 186 of 197 PageID# 2278

## ORDINANCES.

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, except with the prior consent of the Board, it is forbidden:

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree or bush.

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the Police Force in the discharge of their duties; to discharge or carry firecrackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale, any goods or wares; to post or display signs, placards, flags, or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals to pass over or stray upon the Park lands, provided that this shall not apply to those used for pleasure travel when on the ways or places provided and open for the purpose.

5. To drive a horse or horses at a rate faster than eight miles an hour.

6. To ride a horse at a rate faster than ten miles an hour.

7. To drive or ride any animal not well broken and under perfect control of the driver.

8. To play ball or other games or sports, except on grounds provided therefor.

9. To engage in conversation with men at work, or to obstruct, hinder or embarrass their movements.

Digitized by Google

FFXCO_12819

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 187 of 197 PageID# 2279

10. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police, or other agents of the Commissioners, and to refuse to assist them when required.

Any person wilfully doing either of the things above forbidden shall be punished by fine not exceeding twenty dollars.

Compliance with the foregoing regulations is a condition of the use of these premises.

Digitized by Google

FFXCO_12820

# EXHIBIT 27

FFXCO_12821

# LAWS AND ORDINANCES

OF THE

# CITY OF PEORIA

ILLINOIS

REVISED AND EDITED BY

WILBERT I. SLEMMONS, ISRAEL C. PINKNEY

AND

DANIEL F. RAUM

AND

PUBLISHED BY AUTHORITY OF THE

# CITY COUNCIL

PEORIA
J. W. FRANKS & SONS, PRINTERS AND BINDERS
1892

Case 1:23-cv-01605-WBP Document 46-1 Filed 04/26/24 Page 190 of 197 PageID# 2282

mitigated by any provision of this ordinance, such provision may, by the consent of the party affected, be applied to any judgment pronounced after this ordinance takes effect.

## ARTICLE 35.

### PARKS AND PUBLIC GROUNDS.

Section.
1721. Parks and Public Grounds--Superintendence of.
1722. Entrance and Egress.
1723. Animals Prohibited.
1724. Fire-arms, Missiles, etc.--Injury to Property.
1725. Sales--Peddling and Hawking—Prohibited.
1726. Indecent Words or Act—Fortune Telling—Gaming.
1727. Bill Posting Forbidden.
1728. Grass Not to be Trodden—Except.
1729. Police- Arrest of Offenders.
1730. Penalty.

---

**1721. Parks and Public Grounds—Superintendence of.]** § 1. The commissioner of public works of the city of Peoria, shall have supervision and control of all public parks, public squares, and public grounds, in the city of Peoria, and shall appoint such park janitors as the city council may authorize, and shall keep the fences thereof in repair, the walks in order, and the trees properly trimmed, and improve the same according to the plans approved by the city council.

**1722. Entrance and Egress.]** § 2. No person shall enter or leave any of the public parks, public squares, or public grounds of the city of Peoria, except by their gateways; and no person shall climb, or walk upon their walls or fences.

**1723. Animals Prohibited.]** § 3. Neither cattle, horses, goats, swine, or other animals, shall be turned into, or allowed in any of the parks, public squares, or public grounds, of the city of Peoria, by any person.

**1724. Fire Arms, Missiles, Etc.—Injury to Property.]** § 4. All persons are forbidden to carry fire arms, or to throw stones, or other missiles, within any of the public parks, public squares, or public grounds, within said city. All persons

are forbidden to cut, break, or in any way injure, or deface, the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other property, within or upon any of the public grounds heretofore mentioned.

**1725. Sales, Peddling and Hawking Prohibited.]** § 5. No person shall expose any article or thing for sale upon any of said public parks, public squares or public grounds; nor shall any hawking, or peddling be allowed therein.

**1726. Indecent Words or Acts—Fortune Telling—Gaming.]** § 6. No threatening, abusive, insulting, or indecent language shall be allowed in any part of said public grounds, whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes, or play at any game of chance, or with any table or instrument of gaming, nor to do therein, any obscene or indecent act.

**1727. Bill Posting Forbidden.]** § 7. No person shall post, or otherwise affix, any bills, notice, or other paper upon any structure or thing, within any of the said public grounds, nor upon any of the gates or enclosures thereof.

**1728. Grass Not to be Trodden—Except.]** § 8. No person shall go upon the grass, lawn, or turf of the parks, except when and where the word "common" is posted; indicating that persons are at liberty, at that time and place, to go on the grass.

**1729. Police—Arrest of Offender.]** § 9. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof, when directed, and cause him to be committed for examination.

**1730. Penalty.]** § 10. Any person who shall violate any or either of the provisions, of any section, or clause of this chapter or article, or who shall neglect, or fail, or refuse, to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars, nor more than one hundred dollars.

# EXHIBIT 28

FFXCO_12825

# MUNICIPAL CODE

OF THE

# CITY OF SPOKANE

## WASHINGTON

TOGETHER WITH THE

# CITY CHARTER

AND AMENDMENTS, RULES OF THE CITY COUNCIL, AND LIST OF FRANCHISE ORDINANCES

---

REVISED, COMPILED AND CODIFIED BY
E. O. CONNOR
OF THE SPOKANE BAR

---

*PUBLISHED BY AUTHORITY OF CITY COUNCIL.*

---

SPOKANE, WASH.:
THE INLAND PRINTING COMPANY
1903

THE INLAND PRINTING COMPANY
*Inland Press*
SPOKANE, WASHINGTON

FEB 18 1918

wise injure or destroy the turf thereof, or who shall willfully cut down, lap, girdle, break, destroy, injure, or carry away any timber or tree whatsoever, being on land not owned or controlled by such person or persons, or who shall cut, break, destroy or in any manner injure any goods, wares, merchandise, or other personal property of another, or who shall wilfully or carelessly break, injure, deface or destroy, any house or building, or any part thereof, or fence, railing, or any part thereof, or any sign, tree-box, lamp, lamp-post, hydrant, or fire-plug, or any chain or lock attached thereto, or in or about the same, or any other property of the City of Spokane, or who shall daub, or cause to be daubed, any such property with paint or other substances; and any person or persons, who shall hitch, fasten, or cause or suffer to be hitched or fastened, any animal, under the control or in the service of such person or persons, to any ornamental, shade tree, plant or shrub, in or upon any street, avenue, alley, sidewalk, park, public square, or other public place in the City of Spokane, or to any case or tree-box around any such tree, plant or shrub, or suffers or permits any such animal to remain so hitched or fastened after knowing that such animal is so hitched or fastened, or who shall stop, hitch or fasten, or suffer or cause to be stopped, hitched or fastened, any such animal so near any such tree, plant, shrub, case or box, or any hydrant or fire-plug, that such animal can ordure, bite or injure, such tree, plant, shrub, case, box, hydrant, or fire-plug, or any person or persons who shall cause or suffer any animal under such person or persons control, to bite, or in any manner injure, any such tree, plant, shrub, case, box, hydrant or fire-plug, shall upon conviction for any such offense, be fined not more than fifty dollars nor less than ten dollars and pay the costs of prosecution, and be confined in the city jail until such fine and costs are paid; *provided*, nothing herein shall be so construed as to prevent the owner or owners, or agent, of the property along side thereof, from trimming any such tree, plant or shrub in a proper manner and at the proper time of the year for such trimming, or from repairing such case or tree-box whenever the same needs such repairs.

SEC. 2. This ordinance shall take effect and be in force ten days after its passage.

Passed the City Council March 5, 1895.

---

## ORDINANCE NO. A170.

AN ORDINANCE RELATING TO PARKS AND PUBLIC SQUARES OF THE CITY OF SPOKANE.

*The City of Spokane does ordain as follows:*

SECTION 1. The management and control of all public parks and public squares of the city is vested in the Park Commission.

SEC. 2. It shall be the duty of the Park Commission to keep the fences of all enclosed public grounds in repair, and also all sidewalks around said public grounds.

SEC. 3. No person shall enter or leave any of the public parks or other enclosed public grounds of the City of Spokane except by their gateway. No person shall climb or walk upon their walls or fences.

SEC. 4. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of said parks, public squares or public grounds by any person. All persons are forbidden to carry firearms or to throw stone or other missles within any one of the public parks or other public grounds of the city. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions or property within or upon any of the said parks or public grounds.

SEC. 5. No person shall expose any article or thing for sale upon any of said parks or other public grounds, except such person shall have been previously licensed by the Park Commission, nor shall any peddling or hawking be allowed therein.

SEC. 6. No threatening, abusive, insulting or indecent language shall be allowed in any parks or public grounds of the city whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or to play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

SEC. 7. The Park Commission may direct that any of the entrances to the public park be closed at any time.

SEC. 8. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any park or other public grounds of the city nor upon any of the gates or enclosures thereof.

SEC. 9. No person shall, without the consent of the Park Commission, play upon any musical instrument, nor shall any person take into or carry or display in said public parks any banner, target or transparency. No military or target company, civic or other, shall be permitted to parade, drill or perform therein any military or other evolution or movement. Nor shall any fire engine, hose cart or other machine on wheels, commonly used for the extinguishing of fire, be allowed on any part of said parks or other public grounds without the previous consent of the Park Commission, except in case of fire.

SEC. 10. No person other than employes shall light, make or use any fire in said parks or other public grounds.

SEC. 11. No person shall go upon any grass, lawn or turf of the parks or other public grounds, except when and where the word "Common" is posted; indicating that persons are at liberty at that time and place to go on the grass. The Park Commission shall cause printed or written copies of prohibitions of this ordinance to be posted in said parks or grounds.

SEC. 12. Any member of the city police shall have power to arrest any person who shall not desist from any violations of this ordinance when directed, and cause him to be committed for examination.

SEC. 13. Any person who shall violate any provisions of this ordi-

nance, or who shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars nor more than one hundred dollars, and the costs of prosecution.

SEC. 14. All ordinances and parts of ordinances in conflict herewith are hereby repealed.

SEC. 15. This ordinance shall take effect ten days after its passage.

Passed by the City Council March 11, 1892.

---

## ORDINANCE NO. 99.

AN ORDINANCE TO REGULATE SOLICITORS FOR HOTELS, BOARDING HOUSES, HACKS, OMNIBUSES AND OTHER VEHICLES.

*The City of Spokane Falls does ordain as follows:*

SECTION 1. No person shall solicit for a hotel, boarding house, hack, omnibus or other vehicle or for any other purpose whatever inside the depot of any railroad company within the City of Spokane Falls, nor upon the platform thereof, excepting three feet of said platform next to and abutting on the street, which space shall be designated by a line being placed upon said platform or painted by said railroad company thereon.

As amended by Ordinance No. 117, passed March 8, 1888.

SEC. 2. Any person acting as solicitor for a hotel, boarding house, hack, omnibus, or other vehicle, whether for himself or as agent for another, shall conduct his business in a quiet, orderly manner, and in an ordinary tone of voice, and shall not molest or intrude himself upon any passenger or other person or individual with him or his baggage, except as requested by the owner thereof.

SEC. 3. No person shall habitually lounge or stay in a railroad depot in the city without having and making known, when so requested by any policeman or civil magistrate, his business thereat, nor without having legitimate business or errand at such railroad depot.

SEC. 4. No person shall hitch his horse, mule or team to any truck, platform or lamp-post at said depot, or on the platform thereof.

SEC. 5. Any person violating any of the provisions of this ordinance shall, upon conviction thereof, be punished by a fine of not less than five dollars nor more than fifty dollars.

SEC. 6. This ordinance shall take effect and be in force from and after five days after its passage and publication.

Passed the City Council December 28, 1887.