# ATTACHMENT A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| KIMBERLY Y. LAFAVE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-1605 (CMH/JFA) |
| | ) | |
| THE COUNTY OF FAIRFAX, VIRGINIA, | ) | |
| and KEVIN DAVIS, in his Official Capacity | ) | |
| as Chief of Police, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## EXPERT REPORT OF ALEXANDRA FILINDRA, Ph.D.

I, Alexandra Filindra, Ph.D., state as follows:

**BACKGROUND**

1.      Since 2017, I have served as an Associate Professor in the Department of Political Science at the University of Illinois Chicago.

2.      I am Co-Principal of the firm Edgewater Research, LLC ("Edgewater), a public opinion consulting firm.

3.      From 2012–2017, I served as an Assistant Professor in the Department of Political Science at the University of Illinois Chicago.

4.      Over the course of my work with the University, I have served as Director of Graduate Studies (2015-2017); Partnering Scholar, Institute of Government and Public Affairs (2022-present); Affiliated faculty, Latin American and Latino Studies (2013-2023); Affiliated faculty, Department of Psychology, (2016-present); and as Faculty fellow, Honors Program, (2013-present).

FFXCO_12235

5.      During the years 2009-2012, I served as a Post-doctoral Research Associate at Brown University, RI, with the Center for the Study of Human Development (2011-2012), and, prior to that, with the Taubman Center for Public Policy & American Institutions (2009-2011).

6.      I earned a Bachelor of Arts in Political Science with a Minor in Economics from Bryn Mawr College in Bryn Mawr, Pennsylvania, and a Ph.D. in Political Science from Rutgers University in New Brunswick, New Jersey (2009).[1]

7.      As a scholar with more than ten years of industry experience and almost 15 years of academic experience, my work uses observational and experimental methods in the analysis of public opinion data, including studies of public opinion about gun policy.

8.      I am aware of this lawsuit, have reviewed and generally familiarized myself with the claims and allegations in the Complaint ("Complaint"), including request for preliminary injunction, filed by the Plaintiffs LaFave, Taubman, and Holzhauer ("Plaintiffs") in this matter.

9.      I am being compensated for services performed in the above-entitled case at an hourly rate of $175.00 for reviewing materials and preparing reports; and $200.00 per hour for depositions and court appearances. Fairfax County has previously paid the sum of $19,480.54 for expert services and expenses incurred since the inception of my involvement with the prior state court proceedings involving the County and the Plaintiffs dating back to 2022.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

10.     The opinions in this Report are based upon a combination of my professional training, research, and work experiences in my various academic roles; and, from personally

---

[1] I have not been deposed or testified at trial in any case within the past four years. For a full CV, including a comprehensive list of my Academic Publications, see Ex. 1 to this Report.

reviewing relevant documents, and analyzing survey results.  Any information I obtained from those outside sources is consistent with my own understanding.

**THE SURVEY**

11.      The County of Fairfax contracted with the Center for Survey Research ("CSR") at the University of Virginia ("UVA") to administer the Fairfax Community Survey 2022 ("Survey").

12.      The purpose of the survey was to determine area residents' use and anticipated use of various types of Fairfax County public parks, and other public spaces, preferences related to firearms in these spaces, and perceptions of safety in these spaces.

*Development, Design, Methodology.*

13.      Together with Dr. Noah J. Kaplan, I developed and drafted, and Fairfax County approved, the Survey, which included an experimental treatment design with a total of two treatment groups, and CSR was engaged separately by the County and relied upon to oversee and implement production, distribution, and data collection of the Survey.[2] [3]

14.      For my work, I rely on CSR's collection of the Survey responses which were collected following a mixed-mode, mail-forward design of households in and around Fairfax County. More specifically, address-based sampling (ABS) was used to draw a simple random sample from households across the following cities/counties: Arlington County, Fairfax County,

---

[2] The survey also included checks for survey order effects, also meant as attention checks, so there are four versions of the Survey instrument in total.
[3] *See generally* Fitzgibbons Report, *passim.*

Loudoun County, Prince William County, and the cities of Alexandria, Fairfax, Falls Church, Manassas, and Manassas Park. Selected households were contacted via a series of USPS mailings, including paper questionnaire packets, with a delayed web option and reminder phone calling to non-responding households. *See* Fitzgibbons Report, ¶¶13-15 & 20-22. I rely as well on CSR's distribution and allocation of the different versions of the Survey instrument, specifically CSR's randomized selection process utilized to determine who among the Survey participants received which version of the Survey instrument. CSR distributed the Survey across the randomly selected sample group, with one-half of all respondents (Groups 1-2) each receiving "a version of the questionnaire which asked about visiting parks and other outdoor spaces, in general," and the other half (Groups 3-4) each receiving "a version which asked respondents about visiting those same places "if people are allowed to carry guns in" these specific places. Allocation into one or the other treatment was done by random selection. *See id*. ¶¶15-16.

15.     Additionally, I rely as well on CSR's formatting and means and manner of distribution of the Survey instrument, explained and accepted to have been conducted by CSR as follows:

> CSR formatted each of the four versions of the questionnaire for paper distribution and programmed the [Survey] instruments into Qualtrics, an online survey platform, for web administration. The corresponding version of the paper questionnaire was mailed to each household based on their assigned treatment group. If a participant elected to complete the survey online, their assigned unique sample ID prompted the appropriate web version of the instrument that matched their randomly assigned treatment group. The questionnaire

FFXCO_12238

was available in both English and Spanish, with CSR performing the Spanish translation of the [Survey] instrument and contact materials.[4]

*See* Fitzgibbons Report, ¶¶18-19.

16.     The Survey launched on May 11, 2022, with the mailing of an advance letter to the ABS sample of 3,000 households. Data collection across all modes closed on September 13, 2022. The data collection followed a CSR-confidential protocol to facilitate targeted follow-up to non-respondents.

17.     A total of 457 survey responses were collected.

18.     *Margin of Error*.  The margin of error for the unweighted sample is approximately +/- 4.6 percent at the 95 percent level of confidence. This means that if the Survey were repeated with 100 different random samples, the results of the Survey would be within 4.6 percentage points of the population mean in 95 out of those 100 iterations of the survey.[5]  The data are weighted to reflect the demographic distribution of the relevant population.[6] As such, the results are representative of the opinions of the citizens of the area included in the Survey.

19.     Together with Dr. Noah J. Kaplan,[7] whom I engaged to assist me in the development of the questionnaire, data coding, and analysis, I analyzed the Survey data and, in

---

[4] A full copy of each of the four versions of the Survey questionnaire is presented at the end of the Study Report, included here as Exhibit 2.
[5] Respondents who answered "don't know/prefer not to say" or who did not fill out a question were excluded from the analysis for the specific question. Because of item non-response, the margin of error varies across questions (up to +/- 5.5 percent).
[6] The weighting approach used in this instance was determined and implemented by CRS. *See* Fitzgibbon Report, ¶¶39-44.
[7] Dr. Kaplan has a Ph.D. in Political Science from Columbia University and specializes in methodology, statistical analyses, and public opinion. He has decades of industry and academic experience in survey research and analysis, including studies of gun policy issues.

July 2023, produced a final "Study Report" through Edgewater, the public opinion consulting firm in which I am Co-Principal (the "Study Report").

20.    What follows below is a restatement of my key observational and experimental findings based on the Survey response data as set forth in the Study Report. My detailed observational and experimental findings are set forth in the full Study Report, a complete copy of which is included with this Report as Exhibit 2.[8]

**The Survey Results - Key Observational Findings**

21.    For the observational portion of the study, respondents were asked their perceptions of safety for five different types of parks: 1) parks with amenities for families and children (e.g., playground, picnic pavilions, organized activities for children); 2) parks that offer outdoor, water-based recreation for adults and children (e.g., fishing and boating); 3) parks that offer golf-related activities (golf parks); 4) parks that offer camping; 5) parks that have unpaved trails and no basic amenities such as toilets. Respondents were also asked about perceptions of safety at open-air fairs and markets, including farmers' markets, and political protests if firearms were allowed in such locales.

---

[8] As noted in the Study Report, *see* Ex. 2, Study Report pp. 69-71, the results, observations, and conclusions to be drawn from the Survey are consistent with those of a nationally representative survey administered by the survey company YouGov. This portion of the Study Report's comparative analysis draws from my recent work with Duke University Professor Darrell A. H. Miller and Dr. Kaplan in the forthcoming Notre Dame Law Review article analyzing the YouGov survey results and studying the "chilling" effect of public weaponry and the related regulatory efforts to protect the peace and to prevent "the terror of the people." *See* Miller, Darrell A. H., Filindra, Alexandra and Kaplan, Noah J., *Technology, Tradition, and 'The Terror of the People'* (July 25, 2023), Notre Dame Law Review, Forthcoming, Duke Law School Public Law & Legal Theory Series No. 2023-41, Available at SSRN: https://ssrn.com/abstract=4521030 ("Terror Technology Article").

22.    We analyzed the data for the overall sample and separately as to respondents who live in gun-owning households and people who live in non-gun-owning households.

<u>*Summary of Observational Findings*</u>

23.    The survey results lead to several key conclusions that can be extended to the general population of the area.[9]

a.    *First*, area residents' opinions are very consistent across all types of public spaces included in the survey. Analyses demonstrate that their attitudes about all locales are part of a single mental construct.[10] This means that there is no substantive difference (in terms of statistical significance) in how people respond to various questions and scenarios about the presence of guns in different types of parks and in open-air markets.  Overall, people have similar attitudes when it comes to 1) guns in more highly frequented parks (e.g., parks with amenities for children) 2) less frequented parks (e.g., camping parks and remote parks), and 3) open-air markets. Therefore, the location does not significantly change how the local population approaches the presence of guns in public spaces.

---

[9] Since only descriptive analyses and no direct group comparisons are discussed in the observational analyses section, no tests of statistical significance were necessary. The margin of error for each group varies by question based on the sample size (i.e., the number of people in each group who answered the specific question). *See* Ex. 2, Study Report, Survey Methodology, p. 3.

[10] A technique called factor analysis is used to determine the inter-relationships between the individual items within each battery (i.e., the different types of parks, for example when asked about whether the respondent would feel safe there if guns were allowed). The results of factor analyses performed for each question battery show that people's responses across items are very highly correlated. Furthermore, a statistical test of reliability called Cronbach's alpha confirms that these items could be reliably used as a single index because they are so highly correlated. This statistical test also demonstrates the cohesiveness in respondents' response patterns within batteries. *See id.* App. C Tables C1-C8, pp.77-80.

b.      *Second*, the potential presence of guns in parks and markets induces feelings of less safety among most people in the local population (they declare that if guns were allowed in such locales, they would feel "less safe"), and may drive people to visit such spaces less frequently.

c.      *Third*, two key considerations (that we measure based on the Survey) underly such feelings of heightened insecurity and hesitancy to visit these spaces if guns are allowed: 1) many people expect that crime will increase because of the presence of guns in such public spaces; 2) people fear that confrontations with others in a park or a market may escalate if guns are allowed there.

d.      *Fourth*, there are differences in the strength of these attitudes between people from gun-owning households and those from non-gun-owning households, but the attitudes of both groups trend in the same direction. Specifically, very large proportions (and often almost all) of people who live in non-gun-owning households express insecurity and hesitancy when told that guns may be allowed in the specified locales. Importantly, a plurality (and often a majority) of people from gun-owning households share these views as well. The response patterns among those from gun-owning households are in the same direction as for those from non-gun-owning households but not as strong.

Specific Observational Findings

24.      More specifically, the Survey results reflect the following:

a.      Approximately three-fourths of Survey respondents say that they would feel "a lot less/somewhat less safe" if guns are allowed in parks or open-air markets. *See* Ex. 2, Study Report, Observational Findings, Section A, pp. 12-16.

 i.      Specifically, more than two-thirds would feel less safe in parks with amenities for children (72%); waterparks (72%); golf parks (69%); camping parks (69%); remote parks (69%); and open-air markets (73%).

 ii.      The vast majority of those in non-gun-owning households and a plurality of those in gun-owning households express the same view.

b.      About three-fourths of respondents say they would feel "a lot less safe/somewhat less safe" if guns are allowed in public spaces and other people were armed in such domains. *See id.* Section B, pp. 17-21.

 i.      To be exact, 75% say they would feel less safe in parks with amenities for children; 74% in waterparks; 75% in golf parks; 73% in camping parks; 73% in remote parks; and 73% in open-air markets.

 ii.      Expectations of less safety are almost universal among participants who live in non-gun-owning households.

 iii.      A plurality of respondents from gun-owning households shares the same belief that they would feel less safe.

    c.      More than half of respondents say they would feel "a lot less safe/somewhat less safe" if guns are allowed and they themselves were the ones armed in these locales. *See id.* Section C, pp. 22-26.

        i.      In more specificity, 54% would feel less safe if they were armed at a park with amenities for children; 54% say they would feel less safe in a waterpark or a golf park; 52% say the same for a camping park or a remote park; and 54% would feel unsafe if they were armed at an open-air market.

        ii.      Between 68% and 72% of those from non-gun-owning households expect to feel less if they were the one armed at a park or market.

        iii.      Those from gun-owning households tend to be split: about a fourth say they would feel less safe if they were the one armed at a park or market; approximately a similar proportion say their feelings of safety would not be affected either way.

    d.      About two-thirds of residents say they would be "a lot/somewhat less likely" to visit a park or market if guns were allowed there. *See id.* Section D, pp. 27-31.

        i.      67% say they would be unlikely to visit a park with amenities for children; 62% say the same about waterparks; 65% about golf parks; 63% about camping parks; and 65% about remote parks.

        ii.      Similarly, 63% say they would be unlikely to visit an open-air or farmers' market if guns were allowed there.

iii.      About 8-in-10 among those from non-gun-owning households say they would be "very/somewhat unlikely" to visit the specified parks and markets if guns were allowed there.

iv.      A plurality of those from gun-owning households (between 43% and 45%) also say they would be unlikely to visit these parks and markets.

e.      About three-fourths of respondents who live in gun-owning households say they are "very/somewhat unlikely" to bring a gun to a park or open-air market if guns were allowed there. *See id.* Section E, pp. 32-35.

i.      Specifically, 64% say they are unlikely to bring a gun to a park with amenities for children and 65% to a waterpark; 66% are unlikely to bring a gun to a golf park; 52% say they are unlikely to bring a gun to a camping park; 54% would not bring a gun to a remote park; and 65% tell us they would not bring a gun to an open-air market.

ii.      A minority, between a fourth and a third, of those from gun-owning households say they would be "somewhat/very likely" to bring a gun to one of the specified public places.

f.      Four-in-five respondents say they would feel "very/somewhat unsafe" in a heated argument with someone at a park or open-air market if guns were allowed there. *See id.* Section F, pp. 36-40.

      i.      The vast majority, 81% would feel unsafe at a park with amenities for children; 80% say the same for a waterpark, a golf park, a camping park, a remote park, or an open-air market.

      ii.      This perception is near universal among those from non-gun-owning households.

      iii.      A clear majority of those from gun-owning households express the same apprehension.

      iv.      Fewer than a fifth among this group say they would feel "somewhat/very safe" under such circumstances.

    g.      The majority of respondents believe that crime in parks and open-air markets would "increase a lot/somewhat" if guns were allowed there, while about a third believe that crime would remain the same. *See id.* Section G, pp. 41-45.

      i.      To be exact, 52% say crime in parks with amenities for children would increase; 54% report the same for waterparks; 50% say crime would increase at golf parks and 51% that it would increase at camping parks; 52% believe it would increase at remote parks; and 54% say it would increase at open-air markets.

      ii.      Among those from non-gun-owning households, about two-thirds say that crime would increase across these public locales.

        iii.     Those from gun-owning households are about equally split: approximately a third say crime will increase and another third that it will stay the same.

    h.     Three-fourths of respondents report that if guns were allowed in public places and they themselves arrived armed at such a location, other people would feel "very/somewhat unsafe." *See id.*, Section H, pp. 46-50.

        i.     Specifically, 77% say others would feel unsafe in parks with amenities for children; 75% say the same for waterparks; 73% believe so for golf parks; 71% say others would feel unsafe at camping parks; 72% report the same sentiment for remote parks; and 75% say so about open-air markets.

        ii.     The vast majority of those from non-gun-owning households believe that others would feel unsafe if they, themselves, arrived armed at a public place such as those specified.

        iii.     Between two-thirds and half of those from gun-owning households agree that others would feel unsafe if they, themselves, were armed at a public park or market.

FFXCO_12247

**The Survey Results - Key Experimental Findings**

    <u>*Summary of Experimental Findings*</u>

    25.    In addition to observational items, the study included survey experiments the purpose of which was to determine whether and to what degree mention of "guns being allowed" in specified public spaces produces "chilling effects," that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe. Experiments validate and strengthen the results of observational analyses because they provide causal evidence.[11]

    26.    The Survey asked a series of four survey experiments meant to determine whether the presence of guns in specific locations (i.e., public parks, markets, and political protests) may produce "chilling effects." By "chilling effects," we mean a decline in the utilization of these resources. We measure "chilling effects" attitudinally, but because there is a correspondence between attitudes and actual behavior(Saris & Sniderman, 2004), we can extrapolate from people's attitudes to how they would behave under similar circumstances.

    27.    For each experiment, respondents were randomly assigned to either a "treatment group" which was asked about utilization "if people were allowed to carry guns in public places" or a "control" (a/k/a "placebo") group which did not see a mention of guns.  The only difference in the question wording was the phrase that mentioned guns.[12]

---

[11] For an explainer of survey experiments, see Exhibit 2, Study Report, Experimental Methods Explainer, pp. 4-6.

[12] For the exact wording of the questions included in the experiments, see Exhibit 2, Study Report, Experimental Analysis Table EX, p. 51. For the detailed results from the four experiments, see Exhibit 2, Study Report, Experimental Analysis, pp. 51-68.

28.     All four experiments produced "chilling effects." These effects were very large in the experiments that referenced parks for children and open-air markets. Chilling effects were also sizeable in the two experiments that referenced political protests.

29.     The chilling effects were especially large among those in non-gun-owning households. Among those from gun-owning households, we identified statistically significant chilling effects in the experiment referencing open-air markets (at conventional levels of statistical significance) and in the one referencing public parks (significant at conventional levels only in one-tailed analysis).[13] In the two experiments referencing protests, we report null results (no statistically significant difference between the control and experiment groups) for those from gun-owning households.

30.     Analyses from a forthcoming journal article using national data which are reproduced in the Study Report provides very similar experimental results. *See* Ex. 2, Study Report, Analyses with National Data, pp. 69-70; Ex. 3, Terror Technology Article, pp.20-30 Specifically, these analyses show statistically significant results consistent with chilling effects for all three groups (i.e., total population, non-gun-owning households, and gun-owning households) in the first two experiments (likelihood of recommending a local park to a friend with children; safety of open-air markets).  For the additional two experiments that related to political protests, we observe statistically significant chilling effects for the overall population and among those from non-gun-owning households. Among those from gun-owning households,

---

[13] For the meaning of "one-tailed testing" in this context, see Exhibit 2, Study Report, footnote 6.

the direction of the effect is consistent with expectations (a decline from control to treatment), but this difference is not statistically significant.

*Summary of Experimental Findings*

The survey experiments produced the following specific results:

**Experiment 1: Guns in Parks**

31.    The first experiment shows that area residents are less likely to recommend to a friend with children to visit a local park in Fairfax County if guns were allowed there. *See* Ex. 2, Study Report, Experiment 1, pp. 52-56). This difference is statistically significant at conventional levels ($p<0.05$). This means that the probability that this finding is the result of chance is less than 5%.[14] The data show a "chilling effect" of 53-percentage points.

32.    The difference is very large and statistically significant among those from non-gun-owning households ($p<0.05$).

33.    Among those from gun-owning households, the relationship is directionally the same, but the difference is significant only at $p<0.10$ ($p<0.05$, one-tailed). This means that the probability that that this finding is the result of chance is less than 10%.

**Experiment 2: Guns in Open-Air Markets**

34.    The second experiment shows that area residents are statistically significantly less likely to think that going shopping at a Fairfax County open-air or farmers' market is safe if guns were allowed there ($p<0.05$) (*See id.* Experiment 2, pp. 57-60). This means that the probability

---

[14] For more details on statistical significance, see Exhibit 2, Study Report, Statistical Significance, p. 4.

that this finding is the result of chance is less than 5%. The data indicate that the mention of guns

produces a 64-percentage points.

36. The difference is especially large among those in non-gun-owning households

(p<0.05).

36. Among those from gun-owning households, the difference between the control

and treatment conditions is also statistically significant at conventional levels (p<0.05).

**Experiment 3: Recommending Attending a Protest**

37. The third experiment shows that people are less likely to recommend to a friend to

attend a protest in Fairfax County if guns are allowed in public spaces (p<0.05) (*See id.*

Experiment 3, pp. 61-64). There is a 33-percentage point "chilling effect" in this scenario.

38. Among those in non-gun-owning households, there is a large and statistically

significant difference in the likelihood to recommend to a friend to attend a protest between the

control and treatment conditions (p<0.05).

39. The direction of the effect is the same for those from gun-owning households, but

the relationship is not statistically significant.

**Experiment 4: Recommending Carrying Sign at a Protest**

40. The final experiment shows that people are less likely to recommend to a friend to

bring a sign to a protest in Fairfax County if guns are allowed in public spaces. *See id.*

Experiment 4, pp. 65-68. The difference between the control and treatment conditions is

statistically significant (p<0.05). There is a "chilling effect" of 15-percentage points.

41.     Among those in non-gun-owning households, we observe a statistically significant difference between the control and treatment conditions (p<0.05).

42.     There is no statistically significant difference between the control and treatment conditions when it comes to those from gun-owning households.

*       *       *       *

43.     . I reserve the opportunity to supplement this Report to reflect any additional research or context that may be necessary as this case proceeds.

February 27, 2024                    _____

                                        Alexandra Filindra, Ph.D.

# FILINDRA REPORT

# EXHIBIT 1

**FFXCO_12253**

# Alexandra Filindra

University of Illinois Chicago
Department of Political Science (M/C 276), 1007 West Harrison Street
Chicago, IL 60607-7137
Personal website: https://alexandra-filindra.com/
Google Scholar profile: https://scholar.google.com/citations?user=0VV5BhsAAAAJ&hl=en

---

## ACADEMIC POSITIONS

**Associate Professor,** Department of Political Science, University of Illinois Chicago, 2017-present
**Assistant Professor,** Department of Political Science, University of Illinois Chicago, 2012-2017
  **Director of Graduate Studies,** 2015-2017
  **Affiliated faculty,** Institute of Government and Public Affairs, University of Illinois System, 2022-present
  **Affiliated faculty,** Latin American and Latino Studies, 2013-present
  **Affiliated faculty,** Department of Psychology, 2016-present
  **Faculty fellow,** Honors Program, 2013-present

**Post-doctoral Research Associate**, Brown University, RI, 2009-2012
  Center for the Study of Human Development, 2011-2012
  Taubman Center for Public Policy & American Institutions, 2009-2011

---

## OTHER WORK EXPERIENCE

**Senior Survey Manager,** Brand & Communications, Harris Interactive, Princeton, NJ, 2007-2010
**Senior Survey Researcher**, Online Survey Strategy & Panel Health Methodology, GfK Custom Research, Princeton, NJ, 2000-2007

---

## EDUCATION

**Rutgers University,** New Brunswick, NJ
Ph.D. in Political Science, 2009

**Bryn Mawr College,** Bryn Mawr, PA
B.A. in Political Science, Minor in Economics

**Centro de Estudios Hispanicos**, Madrid, Spain
Certificate in European Studies

---

## MONOGRAPHS & EDITED VOLUMES

Filindra, A. *Race, Rights, and Rifles: The Origins of the NRA and Contemporary Gun Culture* (The University of Chicago Press, 2023)
- Reviewed by Kirkus Book Reviews, received starred review (July 2023)
- Author-meets-critics, APSA Conference, 2023
- Author meets critics, Law and Society Conference, 2024
- Discussed on "the Majority Report" (October 2023)
- Featured on Public Radio's "The Morning Show" (September 2023);
- Featured on KERA's "Think with Krys Boyd" (October 2023)

Filindra A. (ed.) (2019) Special Issue on Conceptualization and Measurement in 50 State Models of Policy Outcomes in Racialized Domains. *Policy Studies Journal,* 47(3): 493-848

---

FFXCO_12254

## MONOGRAPHS IN PREPARATION

Filindra, A. and N.J. Kaplan, Guns *in America: Power, Groups, and Identities* (under contract)

Filindra, A. and L. Harbridge Yong, *Dying to Serve You: The Consequences of Incivility, Threats, and Violence Against America's Elected Officials and Staff* (manuscript in development, the University of Chicago Press has asked for a proposal)

Filindra, A. *The Other Civil Right: How Women and People of Color Have Engaged with Militarism as a Path to Citizenship*

---

## PEER-REVIEWED ARTICLES (WITH IMPACT FACTORS)
(*indicates student co-authors)

35.   Filindra, A., N. J. Kaplan, and A. Manning* (2023) "Who Buys the 'Big Lie'? White Political Grievance and Confidence in Electoral Outcomes," *Journal of Race, Ethnicity, and Politics,* doi:10.1017/rep.2023.33 (IF=2.20)

34.   Filindra A. (2023) "Legacies of Militarism: Theorizing the Political Origins and Consequences of Americans' Attachment to Guns," *The Forum*, https://www.degruyter.com/document/doi/10.1515/for-2023-2030/html

33.   Filindra A. and R. Nassar* (2023) "The Breadwinner and "the Other": Sexism, Immigrant Economic Threat, and Support for Immigration Restriction in American Public Opinion," *SN Social Sciences*, (forthcoming)

32.   Filindra A., L. Harbridge-Yong (2022) "How Do Partisans Navigate Intragroup Conflict? A Theory of Partisan Leadership Cues," *Political Behavior* 44: 1437-58 (IF=6.172)

31.   Bonilla, T., A. Filindra, and N. Lajevadi (2022) "How Source Cues Shape Evaluations of Group-Based Derogatory Political Messages," *Journal of Politics*, Vol 84(4): 1979-1996 (IF=2.65)

30.   Filindra, A. N. Kaplan, B. Buyuker* (2022) Beyond Performance: The Racial Antecedents of Whites' Mistrust of Government," *Political Behavior*, Vol. 44(2):961-79 (IF=6.172)

29.   Filindra, A. B. Buyuker,* N. Kaplan (2022) "Do Perceptions of Discrimination against the Ingroup Fuel White Americans' Mistrust in Government? Insights from the 2012-2020 ANES and a Framing Experiment," Symposium on White Identity*, Polity*, Vol. 55(1): 137-167 (IF=1.06)

28.   Filindra A., R. Nassar*, and B. Buyuker* (2022) "The conditional relationship between cultural and economic threats in white Americans' support for refugee relocation programs," *Social Science Quarterly*, Vol. 103 (3): 686-698 (IF=1.781)

27.   Filindra, A. and E.J. Fagan (2022) "Black, Immigrant, or Woman? The Implicit Influence of Kamala Harris' Vice-Presidential Nomination on Support for Biden in 2020," *Social Science Quarterly*, 103(4): 892– 906 (IF=1.781)

26.   Levin, I., A. Filindra, J. Kopstein (2022) "Validating and testing a measure of antisemitism on support for QAnon and vote intention for Trump in 2020," *Social Science Quarterly*, 103(4): 794– 809 (IF=1.176)

25.   Filindra, A. and M. Kolbe (2022) "Latinx identification with whiteness: What drives it, and what effects does it have on political preferences?" *Social Science Quarterly,* Vol. 103 (6): 1424-1439 (IF=1.781)

24.   Buyuker, B.,* A. Jadidi D'Urso,* A. Filindra, N. J. Kaplan (2021) "Race Politics Research and the American Presidency: Thinking About White Group Identities and Vote Choice in the Trump Era and Beyond," *Journal of Race, Ethnicity & Politics*, 6(3), 600-641 (IF=2.20)

23.   Filindra A., N.J. Kaplan, and B. Buyuker* (2021) "Racial Resentment or Modern Sexism? White Americans' Outgroup Attitudes as Predictors of Gun Ownership & NRA Membership," *Sociological Inquiry*, Vol 91(2):253-286 (IF=0.608)

22.   Filindra A., B. Buyuker*, and M. Tafolar* (2021) "National Migration Governance: Admissions & Immigration Control," in Jeannette Money and Sarah P. Lockhart (eds.), *Introduction to International Migration: Population Movements in the 21ˢᵗ Century*. New York: Routledge

FFXCO_12255

21.  Filindra, A., L. Collingwood, and N. J. Kaplan (2020) "Anxious about Social Violence: The Emotional Underpinnings of Americans' Support for Gun Control," *Social Science Quarterly* (online view), Vol 101(5), 2101-2120 (IF=1.781)

20.  Rhodes, S. L. Mann-Jackson, E. Song, M. Wolfson, A. Filindra, M. Hall (2020) "Laws and Policies Related to the Health of U.S. Immigrants: A Policy Scan," *Health Behavior and Policy Review*, 7(4):314-324

19.  Filindra, A. and A. Manatschal (2020) "Coping with a changing integration policy context: American state policies and their effects on immigrant political engagement," *Regional Studies,* Vol. 54(11): 1546-57(IF=4.672)

18.  Filindra, A. and S. W. Goodman (2019) "Issues in Conceptualization and Measurement of Racialized Policy: Insights from the U.S. and Comparative Literatures," *Policy Studies Journal*, Vol. 47(3): 498-516 (IF=5.141)

17.  Filindra, A. (2019) "Is Threat in the Eye of the Researcher? Immigration Policy and Measurement," *Policy Studies Journal*, Vol. 47(3): 517-543 (IF=5.141)
     *Received the best article award from the State Politics Section of the APSA (2019)*

16.  Trisler B.* and A. Filindra (2019) *The Effects of Propaganda on Marginal Members of Social Groups: The Case of Black Female Gun Enthusiasts*. Palo Alto, CA: DigIntel Labs
     http://www.iftf.org/fileadmin/user_upload/downloads/ourwork/IFTF_BlackWomenGunsEnthus_comp.prop_W_05.07.19.pdf

13.  Filindra A. and N. Kaplan (2017) "Self-Interest, Values, or Outgroup Attitudes? Testing Theories of Gun Policy Preferences among Blacks, Latinos, and Whites in America," *Social Science Quarterly,* Vol. 98(2): 413-28 (IF=1.781)

15.  Buyuker B.,* A. Jadidi-D'Urso,* and A. Filindra (2017) "Interethnic Contact and Impact on Attitudes," in S. Maisel (ed.) *Oxford Bibliographies in Political Science*. Oxford, UK: Oxford University Press

14.  Jacobsen, T.G., J.V. Isaksen, Filindra, A., J. Strabac (2016) "The Return of Prejudice in Europe's Regions: The Moderated Relationship between Group Threat and Economic Vulnerability," *Nationalism and Ethnic Politics,* Vol. 22(3): 249-277 (IF=1.07)

13.  Filindra, A. and N. Kaplan (2016) "Racial resentment and white gun policy preferences in contemporary America," *Political Behavior*, Vol. 38 (2): 255-275. (IF=6.172)
     *Received APSA Elections, Public Opinion, and Voting Behavior Section, Best Article Award (2016)*
     *Received the Lucius Barker award from the Midwest Political Science Association (2015)*
     *Received the best paper award from the Public Policy Section 2015 APSA Conference*

12.  Condon M., A. Filindra and A. Wichowsky (2016) "Immigrant Inclusion in the Safety Net: A Framework for Analysis and Effects on Educational Attainment," *Policy Studies Journal*, Vol. 44 (4):424-448 (IF=5.141)
     *Honorable mention, Migration and Citizenship Section, 2016 APSA Conference*

11.  Pearson-Merkowitz S., A. Filindra and J. Dyck (2016) *"*When Partisans and Minorities Interact: Interpersonal Contact, Partisanship and Public Opinion Preferences on Immigration Policy" *Social Science Quarterly*, Vol 97(2):311-324 (IF=1.781)

10.  Buckinx, B. and A. Filindra (2015) "The Case against Removal: Jus Noci and Harm in Deportation Practice," *Migration Studies*, Vol. 3(3):393-416 (IF=2.774)
     *Received the 2015 Best Article Award from Migration Studies (2016)*

9.   Filindra, A. (2014) "The Emergence of the 'Temporary Mexican': American Agriculture, the U.S. Congress and the 1920 Hearings on the "Temporary Admissions of Illiterate Mexicans," *Latin American Research Review*, Vol. 49 (3): 85-102 (IF=0.678)

8.   Filindra, A. (2013) "Immigrant Social Policy in the American States: Race Politics and State TANF and Medicaid Eligibility Rules for Legal Permanent Residents," *State Politics and Policy Quarterly*, Vol. 13 (1): 26-48 (IF=1.425)

7.   Filindra, A. and S. Pearson-Merkowitz (2013) "Stopping the Enforcement "Tide": Descriptive Representation, Latino Institutional Empowerment and State-Level Immigration Policy," (Research Note) *Politics & Policy* 41(December): 814-832 (IF=1.34)

6.   Filindra, A. and S. Pearson-Merkowitz (2013) "Together in Good Times and Bad? How Economic Triggers Condition the Effects of Social Interactions between Groups," *Social Science Quarterly,* 94(5 December):1328-1345 (IF=1.781)

5.  Filindra A. and M. Orr (2013) "Anxieties of a Peaceful Transition: Ethnic Competition and the Election of the First Latino Mayor in Providence, RI," *Urban Affairs Review,* Vol. 49 (1): 3-31 (IF=2.192)

4   Filindra, A. (2012) "Birthright citizenship and the children of undocumented immigrants: history and theory," in D. Tichenor and J. Ganz (eds.) *Debates on Immigration: Political and Legal Issues*. New York: Sage, pp. 75-83

3   Filindra, A. and J. Junn (2012) "Aliens and People of Color:  The Multidimensional Relationship of Immigration Policy and Racial Classification in the U.S.," in D. Tichenor and M. Rosenblum, eds. *Oxford Handbook of International Migration*. Oxford, UK: Oxford University Press, pp. 429-455

2.  Filindra, A. and M. Kovacs (2012) "Analyzing U.S. State Legislative Resolutions on Immigrants and Immigration: The Role of Immigration Federalism" *International Migration*, Vol. 50(4), pp. 33-50 (IF=0.773)

1.  Filindra, A., D. Blanding,* and C. Garcia Coll (2011) "The Power of Context: State –Level Immigration Policy and Differences in the Educational Performance of the Children of Immigrants," *Harvard Educational Review*, Fall 2011, Volume 81 (3):163-193 (IF=2.935)

---

## LAW REVIEW ARTICLES

1.  Miller, D. A. Filindra, N. J. Kaplan (2024) "Technology, Tradition, and 'The Terror of the People," *Notre Dame Law Review,* Vol. 99 (4) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4521030 (forthcoming) ** **Used in amicus brief by the United States Conference of Mayors in *Hanson v. District of Columbia* (2023)****

2.  Buckinx, B. and A Filindra (2013) "Removal and Harm Avoidance in U.S. Immigration Practice," *Kansas Journal of Law & Public Policy*, 22 (3): 379-390

3.  Tichenor, D. and A. Filindra (2013) "Raising Arizona v. United States: The Origins and Development of Immigration Federalism." *Lewis and Clark Law Review*, 16(4):1215-47

---

## OTHER ACADEMIC PUBLICATIONS

1.  Filindra A., A. Manning,* I. Pollert* and S. Tobon-Palma* (2021) *Guns, Political Violence, and American Democracy in Black and White*. Chicago, IL: University of Illinois at Chicago

2.  Tafolar, M.* and A. Filindra (2020) "Color Blindness," in Caliendo, Stephen M. and Charlton D. McIlwain, eds. *The Routledge Companion to Race and Ethnicity* (2nd ed.). New York: Routledge.

3.  Heffern-Ponicki, M.* and A. Filindra (2020) "Segregation," in Caliendo, Stephen M. and Charlton D. McIlwain, eds. *The Routledge Companion to Race and Ethnicity* (2nd ed.). New York: Routledge

4.  Filindra, A. (2019) "The English Only Movement," in Jessica Lavariega-Monforti (ed.) *Latinos in the American Political System: An Encyclopedia of Latinos as Voters, Candidates, and Office Holders.* Santa Barbara, CA: ABC Clio

5.  Filindra, A. and S. W. Goodman (2018) "Citizenship, Authoritarianism, and the Paradox of Liberal Democracy," *Migration and Citizenship*, 6(2): 2-5

6.  Goodman, S. W. and A. Filindra (2018) "Beyond Bearing Witness: Scholarship as Active Citizenship," *Migration and Citizenship*, 6(1): 2-3

7.  Filindra, A. and K. Sadiq (2017) "Citizenship and Migration Studies in the Era of Reactionary Populism," *Migration and Citizenship*, 5 (2): 2-3

8.  Filindra, A. (2015) "The E.U. Refugee Stress Test: Forced Migration and the Crisis in European Governance," *Migration and Citizenship*, 4(1): 33-36

9.  Filindra, A. (2014) "Detention Centers," in Anna Ochoa O'Leary (ed.) *Undocumented Immigrants in the United States: An Encyclopedia of their Experience*. Santa Barbara, CA: ABC Clio

10. Filindra, A and S. Pearson-Merkowitz (2014) *Immigrants and Immigration in the Ocean State: History, Demography, Public Opinion and Policy Responses*.  Kingston, RI: University of Rhode Island Urban Initiative

11. Filindra, A. (2013) "What to Make of the Golden Dawn? The Crisis of Welfare Capitalism, Immigration and the New Spring of the Extreme Right," *Migration and Citizenship*, 1(2):57-59

**FFXCO_12257**

12. Filindra, A. (2012) *The Myth of Self-Deportation*. Washington, DC: Immigration Policy Center (http://www.immigrationpolicy.org/sites/default/files/docs/filindra_-_self-deportation_042912.pdf)
13. Filindra, A. (2012) "Developments in American Immigration Policy," in M. Principe (ed.) *American Government, Policy and Law*. 3rd Edition. New York, NY: Kendall Hunt Publishing, pp. 81-95

## BOOK REVIEWS

1. Filindra, A. (2023) Review: Carlson, Jennifer D. (2023) *Merchants of the Right*. Princeton, NJ: Princeton University Press, *Journal of Race, Ethnicity, and Politics*
2. Filindra, A. (2022) Review: Lacombe, Matthew (2020) *Firepower*. Princeton, NJ: Princeton University Press, *Perspectives on Politics*
3. Filindra, A. (2020) Review: Jacobs, James B. and Zoe Fuhr (2019) *The Toughest Gun Control Law in the Nation: The Unfulfilled Promise of New York's SAFE Act*. New York: New York University Press, *Political Science Quarterly*
4. Filindra, A. (2017) Review: Carlson, Jennifer D. (2015) *Citizen-Protectors: The Everyday Politics of Guns in an Age of Decline*. New York: Oxford University Press, *Sociological Inquiry*
5. Filindra, A (2016) Review: Gulasekaram, P. and S. K. Ramakrishnan (2015) *The New Immigration Federalism*. New York: Cambridge University Press, Publius: *The Journal of Federalism*, Volume 47, Issue 2, Spring 2017, Page e5, https://doi.org/10.1093/publius/pjw033

## PAPERS UNDER REVIEW/WORKING PAPERS

1. Buyuker B., A. Filindra, A. Manatschal, E. Green, "Democratic Erosion or Resilience? Descriptive and Substantive Minority Representation and Majority Group Voters' Democratic Attitudes" (under review)
2. Filindra, A. and C. Burnett, "Who Should Control Education Policy? White Racial Attitudes and Hostility to Expertise" (under review)
3. Filindra, A., A. Manning, I. Pollert, "Does the "Race Card" Work in White Americans' Support for Spending on Black Schools?" (under review)
4. Buyuker B. and A. Filindra, "Democracy and the Other: Anti-Immigrant Attitudes and Support for Anti-Democratic Norms"
5. Filindra, A., N.J. Kaplan, and A. Manning, "White Grievance, Gun Ownership, and Gun Policy Preferences"
6. Filindra A., M. Gandenberger, B. Kolcak, A. Manatschal, "Who Is Allowed to Criticize the Government?"
7. Filindra A. and J. Kopstein, "Antisemitism and Support for Political Violence among Whites and Blacks in America"
8. Filindra A. and N. J. Kaplan, "Racial Prejudice, Sexism, and Gun Policy Preferences"
9. Filindra, A. and N.J. Kaplan, "What Does the Second Amendment Stand For? Racial Prejudice, Sexism and Beliefs about Gun Rights"
10. Filindra A., C. Burnett, M. Kettering, and B. Kolcak, "Spatial Determinants of Enactment of Second Amendment Sanctuary Ordinances"
11. Filindra, A. "Gun Rights Messages and Candidate Support among White and Black Americans"
12. Filindra, A., N.J. Kaplan, and J. Kopstein, "The Role of Antisemitism and Xenophobia in Shaping American Attitudes about the Middle East Conflict"
13. Filindra, A. "A Partisan Right to Harm?"
14. Filindra, A. "The Role of the Anti-Political Correctness Narrative in Weakening Social Egalitarian Norms"
15. Filindra A., "Did Second Amendment Sanctuary Laws Boost Republican Turnout?"
16. Filindra, A. "Racial Prejudice and Small Government Preferences among White Americans"
17. Hunt, S. A. Filindra, "Sexual Harassment and Violence among Political Scientists who Do Field Work"

## SURVEY METHODOLOGY WHITE PAPERS

1. Filindra, A. and M. Fallig (2007) The Role of Incentives in Online Research, GfK White Paper
2. Filindra, A. and M. Fallig (2007) Transitioning to Online Data Collection: What to Expect from the Web?, GfK White Paper
3. Filindra, A. and M. Fallig (2007) Mixing Data Collection Modes: Methodological Implications of Combining Web and Telephone Data Collection, GfK White Paper

FFXCO_12258

4.  Filindra, A. and M. Fallig (2007) The State of Online Data Collection: What Do We Know Today, GfK White Paper
5.  Winkel, F. and A. Filindra (2006) Handbook for Large and Complex Studies, GfK White Paper
6.  Barringer, K., A. Filindra and L. Lepping (2002) Methodology Report for the College Student Composition Study, Princeton University, February 2002
7.  Carroll, D. and A. Filindra (2001) Affordable Housing Organizations: Review of the Market, April 2001
8.  Berger, J. and A Filindra (2000) State and Regional Approaches to Energy Deregulation and the Provider of Last Resort, July 2000
9.  Barringer, K., K. Bray and A. Filindra (2000) A Survey of US Residents Assessing Perceptions of Appropriate Prison Sentences: Methodology Report, Vanderbilt University, September 2000

## EXTERNAL AND INTERNAL GRANTS

### *MAJOR EXTERNAL GRANTS*
1.  U.S. Department of Justice, "Diffused Domestic Terrorism against Elected Officials and Staff" (with L. Harbridge Yong and R. Littman) $751,000, 2023-2026
2.  Russell Sage Foundation, "Study of the Prevalence and Effects of Political Threats/Violence against Elected Officials," $73,000, 2022-2024
3.  Swiss National Science Foundation, "On the Move" Program (with A. Manatschal and E. Green), $200,000, 2022-2026
4.  Swiss National Science Foundation, "On the Move" Program (with A. Manatschal and E. Green), $135,000, 2018-2020
5.  Russell Sage Foundation, Immigration Laws in the States (with Pearson-Merkowitz, $133,000), 2015-17
6.  Pew Center for the States, Immigration Legislation in the States 1990-2013 ($94,000), 2013-16

### *OTHER EXTERNAL GRANTS*
7.  Dangerous Speech Project, Election Research Fellowship, ($10,000), 2024-2025
8.  American Political Science Association Centennial Center Grants, Threats against Elected Officials ($2,400), 2023-2024
9.  Electoral Integrity Project, Harvard University, Study of Violence Against Elected Officials (with L. Harbridge, $5,000), 2022-2023
10. Center for Effective Lawmaking, University of Virginia, Study of Violence Against Elected Officials ($1,000), 2022
11. Centers for Disease Control/Wake Forest Medical School, Immigration Laws in the States ($17,000), 2016-2017
**12.** European Union Studies Association, "Fortress Europe or E Pluribus Unum? Multilevel governance, migration and asylum in the EU," Conference development grant (with P. Kostadinova and D. Kelemen, $10,000), 2016
13. University of Rhode Island, Urban Initiative Grant (with S. Pearson-Merkowitz, $3,000), 2014
14. RTI Challenge (with S. Pearson-Merkowitz, $30,000 equivalent), 2012-2013
15. Gates Foundation Conference Development Grant (with C. Garcia Coll, $8,000), 2011
16. Rhode Island Foundation Grant, New England Immigration Survey, ($17,000), 2010-2011

### *MAJOR UNIVERSITY GRANTS*
17. Creative Activity Grant, UIC ($23,000), 2022-2023
18. Chancellor's Discovery Fund, UIC ($40,000), 2014-2015
19. Chicago Area Study, UIC (with N. Kaplan, $65,000), 2013-2014

### *OTHER UNIVERSITY GRANTS*
20. Institute for Social Research Seed Grant, Northwestern University (with L. Harbridge) ($4,500), 2022-2023
21. Committee on Social Science Research Grant, UIC ($5,000), 2021-2022
22. Institute for Social Research Seed Grant, Northwestern University (with L. Harbridge) ($4,000), 2018
23. Faculty Support Grant, Faculty Affairs Office ($1,000), 2017-2018
24. Chancellor's Undergraduate Research Award (for S. Kelley; $3,000), 2016-2017

**FFXCO_12259**

25. Office of the Dean of Liberal Arts and Sciences, matching grant for conference organization for "Fortress Europe or E Pluribus Unum? Multilevel governance, migration, and asylum in the EU," ($5,600), 2016
26. Office of Social Science Research Grant, UIC (with N. Kaplan, $8,500), 2015-2016
27. Office of Social Science Research Grant, UIC ($8,500), 2014-2015
28. IPCE Small Grant, UIC Political Science Department (with N. Kaplan, $2,000), 2014
29. IPCE Small Grant, UIC Political Science Department (with N. Kaplan, $6,000), 2013
30. Social Science Seed Grant, UIC ($5,500), 2012-2013
31. Salomon Course Enhancement Grant, Brown University ($1,000), Fall 2009, Fall 2010

## RESEARCH AWARDS
1. Best Article Award in State Politics, by State Politics and Policy Section of the APSA, 2020 (For "Is Threat in the Eye of the Researcher?" Published in *Policy Studies Journal*)
2. Best Article Award for Publication in *Political Behavior*, APSA Elections, Public Opinion, and Voting Behavior Section, 2017 (For "Racial resentment and white gun policy preferences in contemporary America")
3. Honorable mention, APSA Migration and Citizenship Section, 2016 (for "Immigrant Inclusion in the Safety Net")
4. Best Article Award, *Migration Studies*, 2015 (For "The Case Against Deportation")
5. Lucius Barker Best Paper Award, Midwest Political Science Association, 2015 (for "Racial resentment and white gun policy preferences in contemporary America")
6. Best Section Paper Award, APSA Public Policy Section, 2014 (for "White Identity and Gun Control Policy Preferences in Post-Civil Rights America")
7. Best Section Paper Award, APSA, Federalism Section, 2000 (for "Fiscal Federalism and the Politics of Intergovernmental Grants")

## OTHER HONORS & AWARDS
8. Distinguished Researcher of the Year Award, University of Illinois Chicago, 2023
9. LAS Dean's Award for Faculty Research in the Humanities, UIC ($2,000), 2013
10. Faculty Mentor Research Award, UIC (student: Aria Ekersley, $300), 2013
11. Finalist, Brown University Best Teacher Award, 2010

## FELLOWSHIPS & SCHOLARSHIPS
1. Public Voices Fellow, University of Illinois, 2023-2024
2. Research Fellowship, Institute for Research on Race and Public Policy, UIC, 2023-2024
3. Visiting Research Scholar, Bridgewater State University, 2022-2023
4. Visiting Research Fellowship, Center for the Study of Diversity and Democracy, Northwestern University, 2021-2022
5. Visiting Research Fellowship, Institute for Policy Research, Northwestern University, 2021-2022
6. Research Fellowship, Institute for Research on Race and Public Policy, UIC, 2018-2019
7. Research Fellowship, Institute for Research on Race and Public Policy, UIC, 2014-2015

## PRESS PUBLICATIONS
1. Filindra, A. (2023) "A Fatal Threat in Aging America: Firearms and Dementia," *The Messenger* (December 9, 2023), https://themessenger.com/opinion/aging-america-firearms-dementia-guns-suicide-accidental-death
2. Filindra, A. (2023) "Why segregation and racial gaps in education persist 70 years after the end of legal segregation: White resistance continues and remains a crucial obstacle to much-needed change," *The Hechinger Report*, (December 4, 2023), https://hechingerreport.org/opinion-why-segregation-and-racial-gaps-in-education-persist-70-years-after-the-end-of-legal-segregation/
3. Filindra, A. (2023) "The politics behind January 6 are as strong as ever," *The Progressive* (October 20, 2023), https://progressive.org/op-eds/the-politics-behind-january-6-are-as-strong-as-ever-filindra-20231020/
4. Filindra, A. (2022) «Ο Τραμπισμός Διαβρώνει τη Δημοκρατία στις ΗΠΑ», *The Liberal*, https://www.liberal.gr/world/o-trampismos-pligonei-ti-dimokratia-stis-ipa/467486 (August 27, 2022)
5. Filindra, A. (2022) «Οι Αποφάσεις που διαβρώνουν την Αμερικανική Δημοκρατία», *The Liberal*, https://www.liberal.gr/world/oi-apofaseis-pou-diabronoun-tin-amerikaniki-

FFXCO_12260

dimokratia/461369?fbclid=IwAR2UR_byAOJhGFxyc9Cpbvi_OQqevwaIFUxiKhgukINIx5YqaCZAcsOY8EM (July 19, 2022)

6.  Filindra, A. (2022) "Amid Successive Mass Shootings, America Is No Closer to Passing Gun Control Laws," Australian Outlook (Australian Institute of International Affairs), (June 15, 2022), https://www.internationalaffairs.org.au/australianoutlook/amid-successive-mass-shootings-america-is-no-closer-to-passing-gun-control-laws/

7.  Filindra, A. (2022) "What Fuels Mistrust in Government and Doubt About the Election?," *The Washington Post*, (January 31, 2022), https://www.washingtonpost.com/politics/2022/01/31/white-distrust-election-government/

8.  Filindra, A. (2021) "Americans do not want guns at protests, this research shows," *The Washington Post* (November 21, 2021) https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/

9.  Filindra, A., B. Buyuker, N. Kaplan (2021) "For racially biased conservative Whites, owning a gun is just part of being a good citizen," *The Washington Post*, (March 2021) https://www.washingtonpost.com/politics/2021/03/29/racially-biased-conservative-whites-owning-gun-is-just-part-being-good-citizen/

10. Filindra, A. (2018) "3D-Printed Guns Could Be a very Real Threat in the Future," *The Hill.com*, http://thehill.com/opinion/civil-rights/400420-3d-printed-guns-could-be-a-very-real-threat-in-the-future (August 2018)

11. Filindra, a. and L. Collingwood (2018) "How Anxiety Can lead to Greater Support for Gun Laws," LSE US Center, http://blogs.lse.ac.uk/usappblog/2018/03/08/in-the-wake-of-the-parkland-mass-shooting-the-publics-now-continual-anxiety-about-gun-crime-may-lead-to-a-greater-push-for-stricter-gun-laws/ (March, 2018)

12. Filindra, A. and L. Harbridge Yong (2017) "Why Aren't More Republicans Critical of Trump?: What Our Research has to Say," *The Washington Post*, https://www.washingtonpost.com/news/monkey-cage/wp/2017/08/02/why-havent-more-republicans-in-congress-criticized-trump-heres-what-our-research-found/?utm_term=.465d19a4f887 (August, 2017)

13. Filindra, A. (2017) "White Americans are much more likely to support gun rights than their non-white counterparts, but not because they want arms for self-protection," LSE American Politics blog, http://bit.ly/2phSkLX (April 2017)

14. Filindra, A(2016) "Why Americans Love Their Guns," https://blog.mpsanet.org/2016/12/13/why-white-americans-love-their-guns/ (December 2016)

15. Filindra A., A. Wichowsky, and M. Condon (2016) "Twenty Year's On: How Welfare Reform Affected the Children of Immigrants," *The Washington Post,* https://www.washingtonpost.com/news/monkey-cage/wp/2016/08/22/20-years-on-heres-how-welfare-reform-held-back-immigrants-children-in-some-states/ (August 22, 2016)

16. Filindra, A. (2016) "How Racial Prejudice Helps Drive Opposition to Gun Control," *The Washington Post*, (June 21, 2016) https://www.washingtonpost.com/news/monkey-cage/wp/2016/06/21/heres-the-surprising-reason-some-white-americans-oppose-gun-regulation/ (June 2016)

17. Condon, M., A. Filindra, A. Wichowsky (2016) "The effects of Latino exclusion from the welfare net," LSE US Centre, http://blogs.lse.ac.uk/usappblog/2016/03/14/excluding-latino-immigrant-families-from-the-social-safety-net-hurts-their-childrens-educational-outcomes-and-effects-spill-over-onto-latino-children-who-are-not-excluded/ (March 14, 2016)

18. Filindra, A. and D. Kelemen (2015) "Party on, Tsipras," *Foreign Affairs* https://www.foreignaffairs.com/articles/europe/2015-08-31/party-tsipras (August 31, 2015)

19. Filindra, A. (2015) "How did we get here and where exactly we are," Protagon.gr, July 4, 2015, http://www.protagon.gr/?i=protagon.el.anagnwstes&id=41910

20. Filindra, A. (2015) "Greece in Danger to End Up Like Puerto Rico," *Kathimerini*, June 29, 2015, http://www.kathimerini.gr/821405/opinion/epikairothta/politikh/h-ellada-kindyneyei-na-ginei-poyerto-riko

21. Filindra, A. (2015) "When Europe Threatens Our Clientelistic Democracy," *Kathimerini*, June 23, 2015, http://www.kathimerini.gr/820517/opinion/epikairothta/politikh/otan-h-eyrwph-apeilei-thn-pelateiakh-dhmokratia

22. Filindra, A. and S. Pearson-Merkowitz (2013) "We All Want More of Everything—Except Taxes: How Opinion Polling Constrains Washington", *Pacific Standard*, September 10, 2013,

FFXCO_12261

http://www.psmag.com/politics/opinion-political-polling-constrains-beltway-congress-senate-washington-65815/

23. Filindra, A. and D. Mintzopoulos (2012) "We and the immigrants.  We the immigrants," *Kathimerini*, November 8, 2012, http://news.kathimerini.gr/4dcgi/_w_articles_columns_2_08/11/2012_500945

24. Filindra, A. (2012) "The Faulty Logic of 'Self-Deportation," Immigration Professors Blog, January 31, 2012, http://lawprofessors.typepad.com/immigration/2012/01/guest-post-the-faulty-logic-of-self-deportation-by-alexandra-filindra.html

25. Filindra, A. (2009) "Carcieri debería desestimar la orden en contra de los ilegales," *America News en Espanol*, December 2009

26. Filindra, A. (2009)"Carcieri Should Repeal Immigration Executive Order," *Providence Journal*, December 8, 2009, (http://www.projo.com/opinion/contributors/content/CT_fil8_12-08-09_B6GMCDR_v18.3f88643.html)

27. Filindra, A. and D. Mintzopoulos (2008) "The Local Myths that Prevail," *Kathimerini*, November 24, 2008, (http://news.kathimerini.gr/4dcgi/_w_articles_columns_1_23/12/2008_297051)

## CONFERENCE PARTICIPATION

Paper presentations at: APSA: 2008, 2010-2012, 2014-2020, 2022-2023; MPSA: 2008-2010, 2013-2022-2023; SPSA: 2011, 2016, 2020; WPSA: 2010, 2011, 2013, 2019; State Politics and Policy Conference: 2008, 2011-2012, 2015-2017, 2022-2023; MAPOR Conference: 2012, 2013, 2017-2018, 2021. Various other regional and specialized workshops and conferences

## INVITED TALKS, OPINION ARTICLES, PRESS INTERVIEWS & PRESS MENTIONS

### Invited Talks

1. Invited talk, "Threats and Violence against Elected Officials," Oakton College, December 6, 2023
2. Invited talk, "Race, Rights, and Rifles," University of Oregon, January 16, 2024
3. Invited talk, "Race, Rights, and Rifles," University of Illinois Urbana Champaign, September 8, 2023
4. Invited talk, "Bearing the Burden: Implementing Domestic Violence Gun Laws," Brown University & University of Connecticut, May 24, 2023
5. Invited talk, "Political Violence in American Politics," Oakton College, February 23, 2023
6. Invited talk, "White Supremacy and Political Violence," Johns Hopkins University, February 9, 2023
7. Invited talk, "Race, Rights, and Rifles," Tulane University, February 2023
8. Invited talk, "Guns in America," Oakton College, October 20, 2022
9. Invited talk, "Descriptive and Substantive Representation and Whites' Support for Anti-Democratic Penalties," National Center of Competence in Research -The Migration-Mobility Nexus, University of Neuchatel, Switzerland, May 2022
10. Invited talk, "Race, Rights, and Rifles," James Madison University, October 2021
11. Invited talk, "Black Tradition at Arms," Columbia College Chicago, October 27, 2020
12. Invited talk, "Race, Rights, and Rifles: Gun Politics in America," Bridgewater State University, October 6, 2020
13. Invited talk, "Race, Rights, and Rifles: Gun Politics in America," IRRPP, September 25, 2020
14. Invited talk, special panel "Democracy in Hard Times," University of California-Irvine, April 17, 2020
15. Invited talk, "Race, Rights, and Rifles: Gun Politics in America," Center on Race and Social Problems, University of Pittsburgh, October 8, 2019
16. Invited talk, special panel on "Challenges and Alternatives to Liberalism," APSA Conference, Washington, DC, August 2019
17. Invited talk, special panel on "Democracy's Discontents," MAPOR Conference, Chicago, November 2018
18. Invited talk, "The Racial Micro-foundations of White Americans' Negative Attitudes toward Government," University of Michigan, September 2018
19. Invited talk, Roundtable on Immigrant Children Imprisonment at the U.S. Border, APSA Conference, August 2018
20. Invited talk, "Symposium on Global Immigration and Populism," Stanford University, June 2018

FFXCO_12262

21. Invited talk, "Race, Rights and Rifles: Gun Politics in America," University of California Riverside, February 2018
22. Invited talk, "Gun Politics is Racial Politics," *The Social Life of Guns Conference*, University of Rochester, April 2018
23. Invited talk, "Immigration in the Age of Trump," University of Illinois Springfield, March 2018
24. Invited talk, "Raging Against the Machine: Racial Prejudice, White Reactionary Movements and White Attitudes toward Government," University of Chicago, October 2017
25. Invited talk, "When Does it Pay to Derogate Minorities?," ICPSR Blalock Seminar Series, August 3, 2017
26. Invited talk, "Citizenship, Immigration and Race," Columbia College Chicago, April 2017
27. Invited talk, "Immigration under the Trump Administration," Loyola University, March 2017
28. Invited talk, "Race, Rights, and Rifles," University of Notre Dame, February 16, 2017
29. Invited talk, "Race, Rights and Rifles," Northwestern University, February 10, 2017
30. Invited talk, "Immigration and Inequality," University of Central Missouri, Kansas City, MO, April 1, 2016
31. Invited talk, "Race, Rights and Rifles," Purdue University, February 2016
32. Invited talk, "Greece and the European Union: A New Way or Parting of Ways?" University of Illinois at Chicago, Department of Mediterranean Studies, April 14, 2015
33. Invited talk, "Immigrant Inclusion in the Safety Net: A Framework for Analysis and Effects on Educational Attainment," University of Illinois at Chicago, Latin-American and Latino Studies, March 12, 2015
34. Invited talk, "A Call to Arms: Racial Resentment and Whites' Gun Policy Preferences," University of Illinois at Chicago, Department of Psychology, March 4, 2015
35. Invited talk, Debate on Immigration Reform, Kent College of Law, Chicago, IL, April 14, 2014, http://youtu.be/axKpbsNbP-A
36. Invited talk, "Racial Prejudice and the Gun Policy Attitudes of White Americans," University of Illinois at Urbana-Champagne, March 7, 2014
37. Invited talk, Perspectives on Immigration Reform Symposium, *Kansas Journal of Law & Public Policy,* University of Kansas, February 22, 2013
38. Invited talk, University of Illinois at Chicago, Conference on Greek Identity: The Glory and the Burden of Hellenism, November 9, 2013
39. Invited talk, William Paterson University, Panel on Europe and the Economic Crisis, April 12, 2012
40. Invited talk, William Paterson University, Panel on Immigration and Latinos in the United States, March 27, 2012
41. Invited talk, Worcester State University, Presentation on Citizenship Law and Eugenics, March 2, 2012
42. Invited participation, "Lessons from Europe," Jean Monet Workshop, Rutgers University, Sept. 29, 2011
43. Invited talk, Harvard Law School, Article V Constitutional Convention Conference, September 23-24, 2011, http://conconcon.org/
44. Invited participation, "Aging and America's Immigration Policy," As America Ages Conference, Brown University, Providence, RI, May 6, 2011
45. Invited talk on immigration issues, East Greenwich, RI Rotary Club, May 2011
46. Invited talk on immigration issues, Providence Rotary Club, April 4th, 2011
47. Invited talk on immigration at the Providence Education Counselors Association, March 2011
48. Invited talk about immigration policy, Immigration Forum, AMICA, Lincoln, RI, October 27, 2010

## Press Interviews

*Guest commentator for "Athens Calling"* (Greek National Radio); *the Canadian Press; The Political Guys; The Chicago Tribune; Chicago WGN CLTV "Politics Tonight"; Detroit Public Radio; Wisconsin Public Radio; WLUW 88.7 FM "The Logic Consortium"; Rhode Island WPRO 630; The Providence Journal; Rhode Island Channel 10 News; NPR's Code Switch; Chicago WTTW; CNN; Bloomberg News.*

## Press Mentions of My Research

1. Interview on my book, Race, Rights, and Rifles: https://think.kera.org/2023/11/16/wanting-a-gun-isnt-about-fear/ (November 2023)

2. The Washington Post, "When voting rights are at risk, what threatens and what protects them?" (December 30, 2022), https://www.washingtonpost.com/politics/2022/12/30/when-voting-rights-are-risk-what-threatens-what-protects-them/

3. Union of Concerned Scientists, "Now Mobilizing Against Gun Violence," (June 16, 2022), https://blog.ucsusa.org/derrick-jackson/now-mobilizing-against-gun-violence-scientists-and-public-health-professionals/

4. The Morning Win, "What sport shooters can teach us about America's love for guns, and how to make it stop killing us," (May 27, 2022) https://onlinelivenews247.blogspot.com/2022/05/what-sport-shooters-can-teach-us-about.html

5. Nouvelles du Monde, "Le gouverneur du Texas, Greg Abbott, dénonce les lois sur les armes à feu à Chicago, New York et Los Angeles, affirmant qu'elles ne sont "pas une vraie solution," (May 26, 2022) https://www.nouvelles-du-monde.com/le-gouverneur-du-texas-greg-abbott-denonce-les-lois-sur-les-armes-a-feu-a-chicago-new-york-et-los-angeles-affirmant-quelles-ne-sont-pas-une-vraie-solution/

6. USA Today, "In wake of Texas shooting, Greg Abbott points finger at Chicago, using tired GOP cliché," (May 26, 2022)  https://www.usatoday.com/story/opinion/columnist/2022/05/27/uvalde-texas-greg-abbott-guns-shooting-chicago-gun-control/9951864002/?gnt-cfr=1

7. CNN.com, "Fears of unlikely federal gun-control measures lead to raft of state laws," (November 5, 2021), https://www.cnn.com/2021/11/05/politics/gun-control-fears-state-second-amendment-laws-invs/index.html

8. The New York Times, "I fear that We Are Witnessing the End of American Democracy," https://www.nytimes.com/2020/08/26/opinion/trump-republican-convention-racism.html

9. Thetrace.com, 'The NRA's Unshakeable Support for the Police," https://www.thetrace.org/2020/07/the-nras-unshakable-support-for-police/

10. Fivethirtyeight.com, "GOP Politicians are Much More Resistant to Gun Control than GOP Voters Are," (2019) https://fivethirtyeight.com/features/gop-politicians-are-much-more-resistant-to-gun-control-than-gop-voters/

11. NBCNews.com, "Gun control debate can be complicated for Latinos, too," (April 9, 2018) https://www.nbcnews.com/news/latino/gun-control-debate-can-be-complicated-latinos-too-n861386

12. Scientific American, "Why Are White Men Stockpiling Guns?", https://blogs.scientificamerican.com/observations/why-are-white-men-stockpiling-guns/

13. Washington Post, "What Social Science Can Tell Us about Mass Shootings," (November 6, 2017) https://www.washingtonpost.com/news/monkey-cage/wp/2017/11/06/what-political-science-can-tell-us-about-mass-shootings/?utm_term=.436108da675a

14. Forscherin zu Waffenbesitz: «Waffen dienen weissen Männern als Symbol für Überlegenheit», http://www.watson.ch/International/Interview/868129494-Forscherin-zu-Waffenbesitz--%C2%ABWaffen-dienen-weissen-M%C3%A4nnern-als-Symbol-f%C3%BCr-%C3%9Cberlegenheit%C2%BB

15. Fivethirtyeight.org, "The Senate Seems More Willing to Push Back Against Trump Than the House–Why?" https://fivethirtyeight.com/features/the-senate-seems-more-willing-to-push-back-against-trump-than-the-house-why/

16. Therace.org, "Here is Why the NRA's Plan to make People Fear the 'Violent Left' May Backfire," https://www.thetrace.org/2017/08/nra-violent-left-backfire/

17. "How the Democrats can Avert Disaster in 2020", https://www.bloomberg.com/view/articles/2017-08-03/how-the-democrats-can-sidestep-disaster-in-2020

18. NATO Association of Canada, "Race and the Politics of Gins," (September 2, 2016), https://natoassociation.ca/race-and-the-politics-of-guns-part-ii/

19. Thetrace.org, "Why the NRA Stands Up for Some Black Gun Owners, But Not Others," https://www.thetrace.org/2016/07/nra-black-gun-owners-philando-castile/

20. Alternet.org,  "NRA's Offensive Hypocrisy," http://www.alternet.org/civil-liberties/when-will-nra-demand-justice-black-gun-owners-shot-police

21. Vox.com, "The obvious reason the NRA isn't commenting on the Philando Castile police shooting," http://www.vox.com/2016/7/7/12123040/philando-castile-nra-guns-police-shooting

22. Vox.com, "A Researcher Explains How Racial resentment Drives Opposition to Gun Control," http://www.vox.com/2016/4/13/11408528/guns-race-white-identity

FFXCO_12264

23. Washington Post, "White resentment is fueling opposition to gun control, researchers say," https://www.washingtonpost.com/news/wonk/wp/2016/04/04/white-resentment-is-fueling-opposition-to-gun-control-researchers-say/
24. USA Today, "Many Will not Self-Deport," http://www.usatoday.com/USCP/PNI/Editorial/2012-05-09-PNI0509opi-wed-edit-1-PNIBrd_ST_U.htm
25. The Arizona Republic, "Many Will Not Self-Deport," http://www.azcentral.com/arizonarepublic/opinions/articles/2012/05/08/20120508editorial0509-many-will-not-self-deport.html
26. The Center for American Progress, "The Facts on Immigration Today," http://cdn.americanprogress.org/wp-content/uploads/issues/2012/07/pdf/immigration_facts_final.pdf

## TEACHING EXPERIENCE

**Undergraduate courses taught**:  American Democracy & Political Violence, Gun Politics in America; Immigration Politics and Policy; Immigrant Detention and Deportation Policies; Comparative Public Policy; Politics of Identity in America; Political Behavior; Congressional Politics; State and Local Politics; Introduction to American Government; the American Presidency; Party Politics: Gun Politics in America

**Graduate courses taught**: Seminar in Public Policy; Seminar in American Politics; Public Policy and Policy Analysis in the Era of Globalization; American Institutions and Public Policy; Race, Ethnicity & Public Policy; Immigration Politics & Public Policy; Survey Research Methods; Politics of Identity in America; Them and Us: Nationalism, Race, and Ethnicity in Contemporary Politics

## ACTIVITIES AND AFFILIATIONS

### University Service Activities-University of Illinois Chicago
**Department:**
Director of Graduate Studies, 2015-2017
- Review and evaluation of the graduate program: changed sequence of courses; strengthened offerings; streamlined comprehensive exams; strengthened subfield organization and function; tightened requirements for independent studies.
- Development of graduate program handbook
- Curriculum review and development of new courses for the program
- Mentoring of incoming graduate students
- Develop program for faculty evaluation and mentorship of T.A.s and R.A.s
- Development of new concentrations in methods and in political psychology (on-going)
- Graduate admissions review and decision.
- Support students in job applications
Member, Graduate Prizes & Awards Committee, 2020
Member, Graduate Admissions Committee, 2015-2017
Member, Graduate Studies Committee, 2014-2018
Member, Political Science Department Advisory Committee, 2013-2018
Echols Award Committee, Best Undergraduate Paper in Political Science, 2015
Inceptor and Coordinator, Political Science brown bag lecture series, 2014-2015

### Graduate & Undergraduate Student Mentorship:
Faculty dissertation committee chair
- Mary Kettering, "Drivers and effects of state-level gun regulation," (Expected 2026)
- Andrea Manning, "Why Do White Women Vote Their Race Rather than Their Gender?" (Expected 2025)
- Eliska Schnabel, "What Explains the Emergence of Resistance to Mosques in Some Locales but Not Others?" (completed; tenure-track position Albion University, 2023)

FFXCO_12265

- Beyza Buyuker, "Inter-group Relations and Public Opinion Support for Anti-Democratic Policies," completed 2021 (Pre-doc research position, University of Neuchatel, Switzerland 2020-21; Post-doc position, Indiana University, 2021-2023)
- Eduardo Salinas, "The Role of Racial Prejudice in Shaping Latinos' Policy Preferences" (completed 2021, survey specialist, NORC)

Faculty dissertation committee member:

- Lindsay Novak (social psychology) "Expanding the understanding of identity motives for activism:
- The importance of personal motives," (expected, 2025)
- Paul Teas (social psychology), "Partisan or Principled? Explaining Political Differences in Attitudes About Undemocratic Policies," (expected, 2025)
- Mine Tafolar, "Do Voters Penalize Candidates for Not Keeping Promises? Evidence from the U.S. and Turkey" (expected, 2025)
- Isaac Pollert, "Policy Diffusion of Restrictive Election Legislation in the U.S. States" (completed 2022, Post-doc Penn State University)

Faculty supervisor on Master's theses:

Kyle Pinkerton (2020; federal government position); Andrea Manning (2020; PhD student UIC); Megan Moldenhauer (2018; survey research professional); Elham Shekari (2018); Amanda D'Urso (2017; PhD Northwestern University; Post-doc Dartmouth College; Assistant Professor Georgetown University); Ajara Chekirova (2015; Assistant professor, Lake Forrest College); Rita L. Nassar (2014; PhD Indiana University, 2021; financial sector); Alicia Race (2014; community organizer)

Faculty supervisor on independent studies:

- Hoda Albass (undergraduate), topic: Dangerous Speech and Guns in Campaign Ads, Spring 2024
- Noah Martinez (undergraduate), topic: Second Amendment sanctuary counties, Spring 2023
- Andrea Manning (grad student), topic: race and gender politics among white women, Fall 2019
- Amanda D'Urso (grad student), topic: immigration politics, Fall 2016
- Hank Knoll (grad student), topic: immigration politics, Fall 2012
- Aria Ekersley (undergraduate), topic: descriptive representation at the state level, Spring 2014

External faculty advisor on Ph.D. dissertations:

- Paul Teas, UIC Department of Psychology, 2023-present
- Umair Tarbhai, UIC School of Social Work, 2021-present
- Rita L. Nassar, Indiana University, 2017-2021
- Diana Salas y Coronado, University of Massachusetts—Boston, 2014-2017

**Committee Work:**

P&T Committee, for promotion to tenure for Dr. P. Kostadinova, 2018
Hiring committee, Clinical Associate professor in Urban Politics, Spring 2018
Chair, hiring committee, tenure track assistant professor, American Politics & Latinx Politics, Fall 2018
Hiring committee, Clinical Assistant professor in International Relations, Spring 2016
Hiring committee, Visiting Assistant professor in American Politics, Spring 2014

**College:**

Political Science Representative, DEI Committee, LAS, 2023-2024
Hiring Committee, LAS Dean Search, 2022-2023
Advisor, Honors College, 2017-present
Member, Committee on Social Science Research, 2021-present
Political Science Representative, Diversity Council, LAS, 2019-2020
IRB Evaluation, Focus Group member, Spring 2017
Hiring committee, immigration cluster, Spring 2014
Member, LAS Faculty Quorum Committee, 2012-2013

**University:**

Social Sciences Representative, University of Illinois Senate, 2015-2018
Reviewer, Chancellor's Grant Award program, Fall 2013, 2017

FFXCO_12266

## SERVICE TO THE PROFESSION

**Editor-in-Chief,** *Journal of Race, Ethnicity and Politics* (Cambridge University Press), August 2018-December 2022

**Editorial Board member,** *Politics, Groups & Identities,* 2016-2020; *Social Science Quarterly*, 2018-present

Executive Committee Member, Women, Gender, and Politics Research Section, APSA, 2022-2025

External reviewer for promotion, 2022-present

Section Council Member, APSA Public Policy Section, 2022-2025

Council Member, American Political Science Association, 2019-2022

Program organizer, Inter-group Attitudes Section, International Society of Political Psychology, 2021-2022

Advisory Committee Member, #MeTooPoliSci Project, NSF Advance Grant, 2019-2022

Member, APSA Council Membership and Professional Development Committee, 2019-2022

Co-President, Migration and Citizenship Section, APSA, 2016-2018

Council member, APSA Race, Ethnicity & Politics Section, 2017-2019

Council member, APSA Public Policy Section, 2017-2019

Committee, Elections, Public Opinion, and Voting Behavior Section Best Paper Award, APSA 2018

Committee, State Politics Section Best Dissertation Award, APSA, 2017

Program organizer, Public Policy section, 2017 MPSA Conference, 2016-2017

Executive Committee, APSA Migration and Citizenship Section, 2012-2015

APSA short course instructor, APSA Conference, Chicago, 2013

Discussant and/or Chair, American Political Science Association Conference, 2013, 2015-2018

Discussant and/or Chair, MPSA Conference, 2009-2010, 2013-2018

Coordinator, Immigration Research Workgroup, Rutgers University, 2007-2009

**Journal Reviewer:** *American Political Science Review, American Journal of Political Science, Journal of Politics, Perspectives in Politics, Political Behavior, Political Research Quarterly, Publius: The Journal of Federalism, State Politics and Policy Quarterly, Social Science Quarterly, American Politics Research, Urban Affairs Review, Migration Letters, Social Problems, International Migration Review, International Migration, Journal of Comparative Politics, Politics & Policy, Policy Studies Journal, Sociological Quarterly, Sociological Inquiry, Journal of Race Ethnicity and Politics, Political Science Quarterly, Journal of Immigrant and Refugee Studies, Research and Politics, Politics, Groups & Identities, Journal of Race Ethnicity and Politics, Comparative Politics, European Societies, International Interactions, Research & Politics, DuBois Review, Psychological Science, Personality & Social Psychology Bulletin*

**Book reviewer:** Routledge Press, MIT Press, Columbia University Press, New York University Press, Oxford University Press, University of Chicago Press.

**Grants Reviewer:** Social Sciences and Humanities Research Council of Canada, the U.S. National Science Foundation, TESS, Russell Sage Foundation, Fonds de la Recherche Scientifique (Belgium), Israel Science Foundation (Israel), MacArthur Foundation.

## REFERENCES

Alvin Tillery
Professor of Political Science & Africana Studies
Northwestern University
Alvin.Tillery@northwestern.edu

Daniel Kelemen
Professor of Political Science
Georgetown University
rk1230@georgetown.edu

Lisa Miller
Professor of Political Science
Rutgers University
miller@polisci.rutgers.edu

Laurel Harbridge Yong
Professor of Political Science
Northwestern University
l-harbridge@northwestern.edu

Shanna Pearson-Merkowitz
Professor of Public Policy
University of Maryland
spearson@umd.edu

Sara W. Goodman
Professor of Political Science
University of California Irvine
s.goodman@uci.edu

FFXCO_12268

# FILINDRA REPORT

# EXHIBIT 2

**FFXCO_12269**

July 2023
Prepared by Edgewater Research

# Fairfax County Survey

## Study Report

## Table of Contents

SURVEY PURPOSE ..................................................................................................................3

DEFINITIONS...........................................................................................................................3

SURVEY METHODOLOGY ......................................................................................................3

STATISTICAL SIGNIFICANCE................................................................................................4

EXPERIMENTAL METHODS EXPLAINER .............................................................................4

SUMMARY OF KEY OBSERVATIONAL FINDINGS..............................................................7

SUMMARY OF KEY EXPERIMENTAL FINDINGS.............................................................. 10

DETAILED OBSERVATIONAL FINDINGS........................................................................... 12

A.    Park/market safety if guns allowed. ................................................................................. 12

B.    Park/market safety if others are armed there .................................................................. 17

C.    Park/market safety if guns allowed and respondent is the one armed. ........................... 22

D.    Likelihood of visiting parks/markets if guns allowed there...............................................27

E.    Likelihood of bringing a gun to parks/markets if allowed.................................................32

F.    Feelings of safety in a heated argument at a park/market if guns allowed there ............ 36

G.    Expectations about crime if guns allowed in specified public spaces............................. 41

H.    How safe others may feel if respondent came armed to a park/market .......................... 46

EXPERIMENT ANALYSIS .................................................................................................... 51

FFXCO_12270

Experiment 1: Guns in Parks .................................................................................................... 52

Experiment 2: Guns in open-air markets .................................................................................. 57

Experiment 3: Recommend to a friend to attend a protest in Fairfax County ......................... 61

Experiment 4: Recommend to friend to carry a sign at protest in Fairfax County .................. 65

ANALYSES WITH NATIONAL DATA ....................................................................................... 69

APPENDIX A: ROBUSTNESS ANALYSES FOR THE EXPERIMENTS ...................................... 71

APPENDIX B:  PUBLIC SPACE USAGE ................................................................................... 76

APPENDIX C : FACTOR ANALYSES ........................................................................................ 77

APPENDIX D : SURVEY QUESTIONNAIRE ............................................................................ 81

APPENDIX E: STATA CODE .................................................................................................... 92

APPENDIX F: BIBLIOGRAPHICAL REFERENES .................................................................... 99

FFXCO_12271

## Survey Purpose

The County of Fairfax contracted with the Center for Survey Research (CSR) at the University of Virginia (UVA) to administer the Fairfax Community Survey 2022. The purpose of the survey was to determine area residents' use and anticipated use of Fairfax County public parks, perceptions of safety in these parks, and preferences related to firearms in these spaces.

Respondents were asked their perceptions of safety for five different types of parks: 1) parks with amenities for families and children (e.g., playground, picnic pavilions, organized activities for children); 2) parks that offer outdoor, water-based recreation for adults and children (e.g., fishing and boating); 3) parks that offer golf-related activities (golf parks); 4) parks that offer camping; 5) parks that have unpaved trails and no basic amenities such as toilets. Respondents were also asked about perceptions of safety at open-air fairs and markets, including farmers' markets, and political protests if firearms were allowed in such locales.

The data were analyzed, and the report prepared by Edgewater Research, LLC (Edgewater), a public opinion consulting firm.  Dr. Alexandra Filindra is the co-principal of the firm.  Dr. Noah J. Kaplan was engaged as a consultant, and he assisted in the development of the survey and the data coding and analysis. Dr. Filindra is a survey research expert with ten years of industry and more than a decade of academic experience. Her academic work uses observational and experimental methods in the analysis of public opinion data, including studies of public opinion about gun policy. Dr. Kaplan has a Ph.D. in Political Science from Columbia University and specializes in methodology, statistical analyses, and public opinion. He has decades of industry and academic experience in survey research and analysis, including studies of gun policy issues.

## Definitions

Many questions included in this study focus on particular types of public parks and markets. Here the full description of each locale is provided as mentioned in the survey along with the nomenclature followed in this report. We have condensed the descriptions in the report to facilitate reading.

- **Parks with amenities for children:** Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children).
- **Waterparks:** Parks that offer outdoor, water-based recreation for adults and children (e.g., fishing and boating).
- **Golf parks:** Parks that offer golf-related activities.
- **Camping parks:** Parks that offer camping.
- **Remote parks:** Parks that have unpaved trails and no basic amenities such as toilets.
- **Open-air markets:** Open-air fairs and markets, including farmers' markets.

## Survey Methodology

Survey responses were collected following a mixed-mode, mail-forward design of households in and around Fairfax County. More specifically, the address-based sample (ABS) was a simple random sample drawn from households across the following cities/counties: Arlington County, Fairfax County, Loudoun County, Prince William County, and the cities of Alexandria, Fairfax, Falls Church, Manassas, and Manassas Park. Selected households were contacted via a series of postal mailings, including paper questionnaire packets, with a delayed web option and reminder phone calling to non-responding households.

FFXCO_12272

The survey launched on May 11, 2022, with the mailing of an advance letter to the ABS sample of 3,000 households. Data collection, across all modes, closed on September 13, 2022. The data collection followed a confidential protocol to facilitate targeted follow-up to non-respondents.

A total of 457 survey responses were collected. The margin of error for the unweighted sample is approximately +/- 4.6 percent at the 95 percent level of confidence. This means that if the survey were repeated with 100 different random samples, the results of the survey would be within 4.6 percentage points of the population mean in 95 out of those 100 iterations of the survey. Respondents who answered "don't know/prefer not to say" or who did not fill out a question were excluded from the analysis for the specific question. Because of item non-response, the margin of error varies across questions (up to +/- 5.5 percent).

## Statistical Significance

Where appropriate, the report denotes whether differences between groups are statistically significant. Significance testing is used in the context of testing hypotheses, for example that two factors under study are related, that is they co-vary in a systematic and predicted way (e.g., when one increases, the other declines). The "null hypothesis" is that the two factors are not related, and the "alternative hypothesis" is that there is a relationship between the two. A probability estimate is the likelihood that the relationship observed in the data is the result of chance. The level of statistical significance or "p-value" is an estimate of how likely it is that the results occurred by random chance. The smaller the p-value, the less likely that the results occurred by chance. When the p-value is very low, one can reject the null hypothesis that the relationship found is the result of chance.

The industry standard level of statistical significance used in this report is $p < 0.05$. This means that the probability that the noted difference between two groups exists in the general population exceeds 95%. Conversely, $p < 0.05$ indicates that the probability that the two groups are no different in their response in the real world (in other words, that the observed difference between the two groups is an artifact of the sample) is less than 5%. For example, if a survey shows that 20% of men but 80% of women share a belief this means that women are more supportive of the policy than are men and if this finding is significant at $p < 0.05$ then we can reject the possibility that this difference occurred by chance only in our data but we would not find it if we surveyed the entire population of men and women in the country.

In the context of experiments, a statistically significant difference between the "control" (people who were not exposed to targeted information) and the "treatment" (people who received the targeted information) condition indicates that such attitudinal differences are present in the total population not an artifact of the sample. For an explainer of experimental methods, please see below.

## Experimental Methods Explainer

The survey includes a series of survey experiments. A survey experiment is a study where the researcher randomly assigns respondents to different versions of a question to measure differences in opinion that occur because of these assignment differences. This methodology is similar to that used in clinical trials for medications. In clinical trials, participants are randomly assigned to either a "control" (also known as "placebo") condition and they do not receive an active medication (for example they receive a sugar pill), or a "treatment" (also known as "experimental") condition and they receive the medication under study. The

FFXCO_12273

study participants are not aware of their assignments and therefore their behavior or attitudes cannot be in response to individual beliefs related to their assignment. Because participants are randomly (and "blindly") assigned to a group, the difference in disease response between the control and treatment groups is the result of exposure to the active agent.

For example, if in a clinical trial that tests the efficacy of a new blood pressure drug, participants in the placebo group have on average a blood pressure of 160 but those in the treatment group have a blood pressure of 140, the average difference (20 points) is *caused* by the medication. It is the medication that effected the observed decline in blood pressure. In this sense, experiments allow researchers to establish whether there is a *causal* relationship between two factors of interest by isolating other factors that can affect outcomes through random assignment. In this example, the researcher can dismiss the possibility that individual differences in genetics, weight management, age, gender, or level of exercise may explain the difference in average blood pressure between the two groups, because random assignment ensures that similar numbers of people with these characteristics have been assigned to both the placebo and the treatment group.

Another simple example is the one offered by the image below from the Capital Area Science and Engineering Fair (CASEF).[1] In this experiment, we planted ten high quality bean seeds each in two identical pots. The seeds that went to each pot were randomly selected so that bad seeds had an equal chance to be planted in either pot. We used the same quality dirt in both pots and the pots were placed next to each other, so they had the same sun exposure. The only thing that differed between the two pots is how much water they received. We watered one pot but not the other.  Our outcome factor (AKA variable) is how many beans sprouted. Not surprisingly, nine seeds sprouted in the pot that was watered and no seeds sprouted in the pot that was not watered. We can thus conclude that the amount of water *caused* the level of sprouting because all other factors that could influence seed development (e.g., sun exposure and pot size) were kept the same and the seeds were assigned randomly to each pot.



Similar expectations hold for survey experiments. First, people's opinions, attitudes, and behaviors are not absolute but rather context-dependent (Chong & Druckman, 2007; Druckman et al., 2011; Mutz, 2011). For example, what people consider acceptable attire is not absolute but tends to be different at the beach, the office, or the church. The same is true about other behaviors: people (and the law) tend to assess interpersonal violence differently if one uses violence for self-defense or intentionally harms another person. This means that when a researcher experimentally changes the context through random assignment (for

---

[1] https://www.casef.org/news/controlled-experiments

FFXCO_12274

example, asks about appropriate attire at the beach v. the church), the differences in response patterns between the two groups (i.e., the beach group and the church group) are attributed to this context difference in the question.

Second, people's attitudes toward related or similar contexts tend to be consistent and they tend to be stable over time. Also, there is general consistency between people's attitudes and behavior (Fazio, 1990; Saris & Sniderman, 2004). Continuing with the above example, people's beliefs about appropriate attire should be very similar if we ask about a public beach, a pool, a lake, or a river. Therefore, one would predict that people should consider a swimming suit but not a three-piece suit as proper attire at all these locations to the same degree (statistically speaking). Similarly, people will tend to have internally consistent beliefs about proper attire in a church, a chapel, or any other religious space (i.e., a swimming suit is not appropriate). Furthermore, we can expect concordance between these attitudes and individual behavior, meaning that if people say that a swimming suit is not appropriate in a church or a chapel, it is very unlikely that we will ever see them dressed this way in a religious space. These properties of public opinion and behavior allow researchers to extrapolate from people's attitudes to people's behavior in terms of *average* or *expected* trends (i.e., not everyone's attitudes and behaviors are fully consistent, but consistency is typical for the population on average).

FFXCO_12275

# Summary of Key Observational Findings

The survey results lead to several key conclusions that can be extended to the general population of the area.[2]

**First,** area residents' opinions are very consistent across all types of public spaces included in the survey. Analyses demonstrate that their attitudes about all locales are part of a single mental construct.[3] This means that there is no substantive difference (in terms of statistical significance) in how people respond to various questions and scenarios about the presence of guns in different types of parks and in open-air markets. Overall, people have similar attitudes when it comes to 1) guns in more highly frequented parks (e.g., parks with amenities for children) 2) less frequented parks (e.g., camping parks and remote parks) and 3) open-air markets. Therefore, the location does not significantly change how the local population approaches the presence of guns in public spaces.

**Second,** the potential presence of guns in parks and markets induces feelings of less safety among most people in the local population (they declare that if guns were allowed in such locales, they would feel "less safe"), and may drive people to visit such spaces less frequently.

**Third**, two key considerations (that we measure here) underly such feelings of heightened insecurity and hesitancy to visit these spaces if guns are allowed: 1) many people expect that crime will increase because of the presence of guns in such public spaces; 2) people fear that confrontations with others in a park or a market may escalate if guns are allowed there.

**Fourth,** there are differences in the strength of these attitudes between people from gun-owning households and those from non-gun-owning households, but the attitudes of both groups trend in the same direction. Specifically, very large proportions (and often almost all) of people who live in non-gun-owning households express insecurity and hesitancy when told that guns may be allowed in the specified locales. Importantly, a plurality (and often a majority) of people from gun-owning households share these views as well. The response patterns among those from gun-owning households are in the same direction as for those from non-gun-owning households but not as strong.

More specifically, the study shows that:

- **Approximately three-fourths of survey respondents say that they would feel "a lot less/somewhat less safe" if guns are allowed in parks or open-air markets (See Observational Findings, Section A, pp. 12-16).**

---

[2] Since only descriptive analyses and no direct group comparisons are discussed in the observational analyses section, no tests of statistical significance were necessary. The margin of error for each group varies by question based on the sample size (i.e., the number of people in each group who answered the specific question). For more information on the margin of error, please see the Survey Methodology Section, p. 3.

[3] A technique called factor analysis is used to determine the inter-relationships between the individual items within each battery (i.e., the different types of parks, for example when asked about whether the respondent may feel safe there if guns are allowed). The results of factor analyses performed for each question battery show that people's responses across items are very highly correlated. Furthermore, a statistical test of reliability called Cronbach's alpha confirms that these items could be reliably used as a single index because they are so highly correlated. This statistical test also demonstrates the cohesiveness in respondents' response patterns within batteries. Please see Appendix C Tables C1-C8, pp.77-80.

FFXCO_12276

- o Specifically: more than two-thirds would feel less safe in parks with amenities for children (72%); waterparks (72%); golf parks (69%); camping parks (69%); remote parks (69%); and open-air markets (73%).
- o The vast majority of those in non-gun-owning households and a plurality of those in gun-owning households express the same view.
- **About three-fourths of respondents say they would feel "a lot less safe/somewhat less safe" if guns are allowed in public spaces and other people were armed in such domains (See Observational Findings, Section B, pp. 17-21).**
  - o To be exact, 75% say they would feel less safe in parks with amenities for children; 74% in waterparks; 75% in golf parks; 73% in camping parks; 73% in remote parks; and 73% in open-air markets.
  - o Expectations of less safety are almost universal among participants who live in non-gun-owning households. A plurality of respondents from gun-owning households shares the same belief that they would feel less safe.
- **More than half of respondents say they would feel "a lot less safe/somewhat less safe" if guns are allowed and they themselves were the ones armed in these locales (See Observational Findings, Section C, pp. 22-26).**
  - o In more specificity, 54% would feel less safe if they were armed at a park with amenities for children; 54% say they would feel less safe in a waterpark or a golf park; 52% say the same for a camping park or a remote park; and 54% would feel unsafe if they were armed at an open-air market.
  - o Between 68% and 72% of those from non-gun-owning households expect to feel less if they were the one armed at a park or market.
  - o Those from gun-owning households tend to be split: about a fourth say they would feel less safe if they were the one armed at a park or market; approximately a similar proportion say their feelings of safety would not be affected either way.
- **About two-thirds of residents say they would be "a lot/somewhat less likely" to visit a park or market if guns were allowed there (See Observational Findings, Section D, pp. 27-31).**
  - o 67% say they would be unlikely to visit a park with amenities for children; 62% say the same about waterparks; 65% about golf parks; 63% about camping parks; and 65% about remote parks. Similarly, 63% say they would be unlikely to visit an open-air or farmers' market if guns were allowed there.
  - o About 8-in-10 among those from non-gun-owning households say they would be "very/somewhat unlikely" to visit the specified parks and markets if guns were allowed there.
  - o A plurality of those from gun-owning households (between 43% and 45%) also say they would be unlikely to visit these parks and markets.
- **About three-fourths of respondents who live in gun-owning households say they are "very/somewhat unlikely" to bring a gun to a park if guns were allowed there (See Observational Findings, Section E, pp. 32-35).**
  - o Specifically, 64% say they are unlikely to bring a gun to a park with amenities for children and 65% to a waterpark; 66% are unlikely to bring a gun to a golf park; 52% say they are unlikely to bring a gun to a camping park; 54% would not bring a gun to a remote park; and 65% tell us they would not bring a gun to an open-air market.
  - o A minority between a fourth and a third of those from gun-owning households say they would be "somewhat/very likely" to bring a gun to one of the specified public places.
- **Four-in-five respondents say they would feel "very/somewhat unsafe" in a heated argument with someone at a park if guns were allowed there (See Observational Findings, Section F, pp. 36-40).**

FFXCO_12277

- o The vast majority, 81% would feel unsafe at a park with amenities for children; 80% say the same for a waterpark, a golf park, a camping park, a remote park, or an open-air market.
  - o This perception is near universal among those from non-gun-owning households.
  - o A clear majority of those from gun-owning households express the same apprehension. Fewer than a fifth among this group say they would feel "somewhat/very safe" under such circumstances.
- **The majority of respondents believe that crime in parks would "increase a lot/somewhat" if guns were allowed there, while about a third believe that crime would remain the same (See Observational Findings, Section G, pp. 41-45).**
  - o To be exact, 52% say crime in parks with amenities for children would increase; 54% report the same for waterparks; 50% say crime would increase at golf parks and 51% that it would increase at camping parks; 52% believe it would increase at remote parks; and 54% say it would increase at open-air markets.
  - o Among those from non-gun-owning households, about two-thirds say that crime would increase across these public locales.
  - o Those from gun-owning households are about equally split: approximately a third say crime will increase and another third that it will stay the same.
- **Three-fourths of respondents report that if guns were allowed in public places and they themselves arrived armed at such a location, other people would feel "very/somewhat unsafe" (See Observational Findings, Section H, pp. 46-50).**
  - o Specifically, 77% say others would feel unsafe in parks with amenities for children; 75% say the same for waterparks; 73% believe so for golf parks; 71% say others would feel unsafe at camping parks; 72% report the same sentiment for remote parks; and 75% say so about open-air markets.
  - o The vast majority of those from non-gun-owning households believe that others would feel unsafe if they, themselves, arrived armed at a public place such as those specified.
  - o Between two-thirds and half of those from gun-owning households agree that others would feel unsafe if they, themselves, were armed at a public park or market.

FFXCO_12278

# Summary of Key Experimental Findings

In addition to observational items, the study included survey experiments the purpose of which was to determine whether and to what degree mention of "guns being allowed" in specified public spaces produces "chilling effects," that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe. Experiments validate and strengthen the results of observational analyses because they provide causal evidence. For an explainer of survey experiments, please see the "Experimental Methods Explainer" above (pp. 4-6).

This survey asked a series of four survey experiments meant to determine whether the presence of guns in specific locations (i.e., public parks, markets, and political protests) may produce "chilling effects." By "chilling effects," we mean a decline the utilization of these resources. We measure "chilling effects" attitudinally, but because there is a correspondence between attitudes and actual behavior (Saris & Sniderman, 2004), we can extrapolate from people's attitudes to how they would behave under similar circumstances.

For each experiment, respondents were randomly assigned to either a "treatment group" which was asked about utilization "if people were allowed to carry guns in public places" and a "control" (AKA "placebo") group which did not see a mention of guns. The only difference in the question wording was the phrase that mentioned guns. For the exact wording of the questions included in the experiments, please see Table EX in the Experimental Analysis Section, p. 51. Detailed results from the four experiments are in the Experimental Analysis Section (pp. 51-68).

All four experiments produced "chilling effects." These effects were very large in the experiments that referenced parks for children and open-air markets. Chilling effects were also sizeable in the two experiments that referenced political protests. Capturing large chilling effects in the context of political protests is especially important in statistical terms. This is because political participation among Americans is low (Schlozman et al., 2012; Verba et al., 1995) and far fewer people are willing to participate in protests under any circumstances than are likely to visit a park or an open-air market (i.e., non-political spaces). For example, in the experiments we conducted, 86% of respondents say they are likely to recommend to a friend with kids to visit a local park, but only 49% say they are likely to recommend to a friend to attend a local political protest. Therefore, the baseline from which we are expected to calculate "chilling effects" is substantially lower. When people's endorsement of a behavior (e.g., visit a park) is very high in the control case, there is a lot of room for a decline in the treatment case and therefore it is easier (in statistical terms) to detect significant "chilling effects" even with very small sample sizes.  However, when endorsement of a behavior in the control case is very low, there is little room for a decline in the treatment case, and since attitudes cannot go below zero (since our scales are between 0 and 1), we may face what is known as "floor effects." Statistically speaking, such a situation makes it difficult to detect chilling effects because very small chilling effects require very large sample sizes to be identified statistically.

The chilling effects were especially large among those in non-gun-owning households. Among those from gun-owning households, we identified statistically significant chilling effects in the experiment referencing open-air markets (at conventional levels of statistical significance) and in the one referencing public parks (significant at conventional levels only in one-tailed analysis).[4] In the two experiments referencing protests, we report null results (no statistically significant difference between the control and experiment groups) for those from gun-owning households.

---

[4] For the meaning of one-tailed testing, please see footnote 6.

FFXCO_12279

Analyses from a forthcoming journal article that uses national data which are reproduced here provides very similar experimental results (See the Analysis with National Data Section, pp. 69-70). Specifically, these analyses show statistically significant results consistent with chilling effects for all three groups (i.e., total population, non-gun-owning households, and gun-owning households) in the first two experiments (likelihood of recommending a local park to a friend with children; safety of open-air markets). For the additional two experiments that related to political protests, we observe statistically significant chilling effects for the overall population and among those from non-gun-owning households. Among those from gun-owning households, the direction of the effect is consistent with expectations (a decline from control to treatment), but this difference is not statistically significant.

The experiments produced the following specific results:

- The first experiment shows that area residents are less likely to recommend to a friend with children to visit a local park in Fairfax County if guns were allowed there (Experiment 1, pp. 52-56). This difference is statistically significant at conventional levels (p<0.05). This means that the probability that this finding is the result of chance is less than 5% (For more details on statistical significance, please see the section "Statistical Significance," above, p. 4). The data show a "chilling effect" of 53-percentage points.
  - The difference is very large and statistically significant among those from non-gun-owning households (p<0.05).
  - Among those from gun-owning households, the relationship is directionally the same, but the difference is significant only at p<0.10 (p<0.05, one-tailed). This means that the probability that that this finding is the result of chance is less than 10%.
- The second experiment shows that area residents are statistically significantly less likely to think that going shopping at a Fairfax County open-air or farmers' market is safe if guns were allowed there (p<0.05) (Experiment 2, pp. 57-60). This means that the probability that this finding is the result of chance is less than 5%. The data indicate that the mention of guns produces a 64-percentage points.
  - The difference is especially large among those in non-gun-owning households (p<0.05).
  - Among those from gun-owning households, the difference between the control and treatment conditions is also statistically significant at conventional levels (p<0.05).
- The third experiment shows that people are less likely to recommend to a friend to attend a protest in Fairfax County if guns are allowed in public spaces (p<0.05) (Experiment 3, pp. 61-64). There is a 33-percentage point "chilling effect" in this scenario.
  - Among those in non-gun-owning households, there is a large and statistically significant difference in the likelihood to recommend to a friend to attend a protest between the control and treatment conditions (p<0.05).
  - The direction of the effect is the same for those from gun-owning households, but the relationship is not statistically significant.
- The final experiment shows that people are less likely to recommend to a friend to bring a sign to a protest in Fairfax County if guns are allowed in public spaces (Experiment 4, pp. 65-68). The difference between the control and treatment conditions is statistically significant (p<0.05). There is a "chilling effect" of 15-percentage points.
  - Among those in non-gun-owning households, we observe a statistically significant difference between the control and treatment conditions (p<0.05).
  - There is no statistically significant difference between the control and treatment conditions when it comes to those from gun-owning households.

FFXCO_12280

# Detailed Observational Findings

The survey asked a series of questions that focused on perceptions of safety and desirability of various types of public spaces in Fairfax County if guns are allowed in such locales.[5]

## A. Park/market safety if guns allowed.

The first question asked: "If guns are allowed in the following public spaces in Fairfax County, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now?." Respondents were asked to evaluate the safety of the following types of public spaces: 1) parks with amenities for children; 2) waterparks; 3) golf parks; 4) camping parks; 5) remote parks; 6) open-air markets. See also "Definitions" on p.3.

When it comes to _parks with amenities for children_, almost three-fourths (72%) of residents said that allowing guns in public spaces would make such parks "a lot less/somewhat less" safe. More than six-in-ten people (61%) believe that parks with amenities for children will be a lot less safe if guns are allowed there. Only 12% of respondents think that allowing guns will make parks with amenities for children "somewhat/a lot" safer. Another 16% say that such parks would remain about equally safe (Figure A1).



Figure A1. Safety in Parks with Amenities for Children if Guns Allowed

- The perception that allowing guns will make parks with amenities for children less safe is especially prevalent among respondents from non-gun-owning households (88%). Only 3% in this group believe that allowing guns in such parks would make them safer (Table 1a).
- Most people from gun-owning households responded that allowing guns either reduces safety in parks with amenities for children or does not have any effect. Specifically, nearly half of the respondents from gun-owning households (47%) also believe that allowing guns in parks with amenities for children will make such spaces less safe, while 27% think the introduction of guns in such spaces will not affect the safety of the parks. Only a little over a fourth (26%) of respondents from gun owning households say that allowing guns in public spaces will make parks with amenities for children safer (Table 1a).

---

[5] Please note that due to rounding, numbers in the analyses may not add up exactly to 100%.

FFXCO_12281

People's perceptions of the safety of _waterparks_ if guns were to be allowed there follows a similar pattern. Almost three-fourths (72%) of residents believe that waterparks will be "a lot less/somewhat less" safe if guns are allowed there. A clear majority (59%) say that waterparks will be "a lot less" safe if guns are allowed there. Only 12% of respondents believe that allowing guns in public spaces will make waterparks "somewhat/a lot" safer and an additional 16% specify "about the same" (Figure A2).



Figure A2. Safety in Waterparks if Guns Allowed

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

- The vast majority of people in non-gun-owning households (89%) think that allowing guns in waterparks will make such spaces "a lot less/somewhat less" safe. Only 2% among this group think that allowing guns will enhance the safety of waterparks (Table 1a).
- A plurality of those from gun-owning households (45%) agree that allowing guns in waterparks will make such parks "a lot less/somewhat less" safe, while 28% believe that the potential presence of guns will not affect waterpark safety. This suggests that most people in this group believe that allowing guns either threatens or does not affect safety in waterparks. Only 28% of those in gun-owning households think that allowing guns in waterparks will make such parks safer (Table 1a).

More than two-thirds (69%) of respondents believe that allowing guns in public spaces would makes _golf parks_ "a lot less/somewhat less" safe. Another 20% think that allowing guns will not affect the safety of golf parks. Only a small minority (11%) believe that allowing guns will make golf parks safer (Figure A3).



Figure A3. Safety in Golf Parks if Guns Allowed

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

FFXCO_12282

- More than eight-in-ten (84%) of people in non-gun-owning households say that if guns are allowed, golf parks will be "a lot less/somewhat less" safe. Only 3% think that allowing guns will make golf parks safer (Table 1a).
- Most respondents from gun-owning households believe that allowing guns at golf clubs will either make such spaces less safe or will not affect safety. Specifically, more than four-in-ten (44%) of people in gun-owning households believe that if guns are allowed, golf parks will be "a lot less/somewhat less" safe. A third (33%) of this group say that allowing guns will not impact the safety of golf parks. Only 22% believe that allowing guns will improve the safety of golf parks (Table 1a).

| Table 1a. If guns are allowed in the following public spaces in Fairfax County, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now? | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
| | Total | Gun HH | Non-Gun HH | Total | Gun HH | Non-Gun HH | Total | Gun HH | Non-Gun HH |
| | (%) | (%) | (%) | (%) | (%) | (%) | (%) | (%) | (%) |
| **Top-2 Box** | **72** | **47** | **88** | **72** | **45** | **89** | **69** | **44** | **84** |
| A lot less safe | 61 | 34 | 79 | 59 | 31 | 78 | 58 | 32 | 77 |
| Somewhat less safe | 11 | 13 | 8 | 13 | 14 | 12 | 11 | 13 | 7 |
| About the same | 16 | 27 | 9 | 16 | 28 | 9 | 20 | 33 | 13 |
| Somewhat safer | 5 | 11 | 1 | 5 | 20 | 0 | 5 | 15 | 0 |
| A lot safer | 7 | 14 | 2 | 7 | 8 | 2 | 6 | 7 | 3 |
| **Bottom-2 Box** | **12** | **26** | **3** | **12** | **28** | **2** | **11** | **22** | **3** |

*Note: Percentages may not add up to 100% due to rounding.*

The study also asked about *camping parks*. Here, 69% of respondents say that allowing guns will make camping parks "a lot less/somewhat less" safe, and 15% expect no change in safety. Only 16% believe that allowing guns in camping parks will make such spaces "somewhat/a lot" safer (Figure A4).



FFXCO_12283

- Among those in non-gun-owning households, 85% believe that allowing guns in camping parks will make such spaces less safe. Only 4% in this group say that allowing guns in camping parks will make these parks safer (Table 1b).
- Two-thirds of those in gun owning households say that allowing guns will make camping parks either less safe (42%) or have no effect on safety (23%) in such spaces. Only about a third (35%) say that allowing guns will make camping parks safer (Table 1b).

We also asked about the impact of allowing guns on the perceived safety in _remote parks_, those that offer unpaved trails and no amenities (such as toilets). Overall, more than two-thirds (69%) of respondents think that allowing guns in such spaces will make them less safe. Another 17% say that the potential presence of guns will not affect safety. Only 13% of respondents believe that allowing guns will enhance safety (Figure A5).



Figure A5. Safety in Remote Parks if Guns Allowed

- A lot less/somewhat less safe ■ About the same ■ A lot/somewhat safer

- Among respondents in non-gun-owning households, the vast majority (87%) believe that remote parks will be less safe if guns are allowed. Only 2% believe that the potential presence of guns will add to safety in remote parks (Table 1b).
- Most people in gun-owning households indicate that the potential presence of guns in remote parks will either compromise safety or have no effect on it. Specifically, among this group, 42% believe that safety will decline if guns are allowed in remote parks and another 24% say that there will be no change in safety. One-third (34%) say that the safety of remote parks will increase if guns are allowed there (Table 1b).

Finally, we asked about the safety of _open-air markets_ if guns are allowed there. Almost three-fourths (73%) of respondents said that markets will be less safe is guns are allowed, while an additional 15% think that there will be no change in safety. Only 12% believe that safety will increase if guns are allowed in open-air markets (Figure A6).

FFXCO_12284



- Among people in non-gun-owning households, the vast majority (89%) think that open-air markets/ markets will be less safe if guns are allowed there; only 4% believe that safety will be increased with the potential presence of guns (Table 1b).
- Among those in gun-owning households, the vast majority believe that if guns are allowed in open-air markets safety will either be reduced (45%) or not be affected (32%). Less than a fourth (23%) say that if guns are allowed, such markets will be safer (Table 1b).

| | Camping parks | | | Remote parks | | | Open-air markets | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **69** | **42** | **85** | **69** | **42** | **87** | **73** | **45** | **89** |
| A lot less safe | 56 | 34 | 72 | 60 | 37 | 78 | 61 | 34 | 79 |
| Somewhat less safe | 13 | 8 | 13 | 9 | 5 | 9 | 11 | 11 | 10 |
| About the same | 15 | 23 | 11 | 17 | 24 | 11 | 15 | 32 | 7 |
| Somewhat safer | 6 | 11 | 2 | 4 | 14 | 0 | 6 | 16 | 2 |
| A lot safer | 10 | 23 | 2 | 10 | 20 | 2 | 6 | 7 | 2 |
| **Bottom-2 Box** | **16** | **35** | **4** | **13** | **34** | **2** | **12** | **23** | **4** |

Table 1b. If guns are allowed in the following public spaces in Fairfax County, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now?

*Note: Percentages may not add up to 100% due to rounding.*

FFXCO_12285

## B. Park/market safety if others are armed there.

A second question asked respondents the degree to which they would feel safe if guns were allowed in various public spaces and other people arrived armed in these locales. First, when it comes to _parks with amenities for children,_ three-fourths (75%) of survey participants say they would feel "a lot less/somewhat less" safe if others are armed in such parks. More than two-thirds (68%) say they would feel "a lot less safe" under such conditions. An additional 13% say they would feel equally safe if others are armed. Only 11% of all survey takers believe they would feel "somewhat/a lot" safer is others were armed in parks with amenities for children (Figure B1).



Figure B1. Safety in Parks with Amenities for Children if Guns Allowed & Others Were Armed

- A lot less/somewhat less safe  - About the same  - A lot/somewhat safer

- Among respondents in non-gun-owning households, 90% say they would feel less safe if guns were allowed and others are armed in parks with amenities for children. Only 4% say they would feel safer in such circumstances (Table 2a).
- Among respondents in gun-owning households, three-fourths say that they would either feel less safe (43%) or about as safe (32%) if guns were allowed in parks with amenities for children and other people were armed. Another 25% believe they would feel safer. Only 8% indicate they would feel "a lot safer" (Table 2a).

Similarly, three-fourths of respondents (74%) said that they would feel less safe (65% specify "a lot less safe") if guns were allowed _in waterparks_ and other people were armed in these parks. An additional 15% say they would feel equally safe and only 11% say they would feel safer if guns were allowed in waterparks and others were armed (Figure B2).

FFXCO_12286



- Among respondents who live in non-gun-owning households, 89% say they would feel less safe if others were armed in waterparks. Only 3% say they would feel safer in such an eventuality (Table 2a).
- A plurality of participants from gun-owning households (42%) say they would feel less safe and another 31% say they would feel about as safe if guns were allowed in waterparks and other people were armed there. About one-fourth (27%) say they would feel safer in such a scenario (Table 2a).

When it comes to feeling safe in _golf parks_ when other people may be armed, three-fourths (75%) of all residents say they would feel "a lot less/somewhat less" safe (63% mentioned "a lot less safe"). An additional 15% say they would feel equally safe. Only 11% say they would feel safer in a golf park if guns were allowed, and others were armed (Figure B3).



- As is the case with other types of parks, the vast majority of people in non-gun-owning households (89%) say that they would feel less safe if guns were allowed in golf parks and other people were armed. Only 3% say they would feel safer (Table 2a).
- The results for those in gun-owning households parallel, earlier findings. Specifically, 43% say they would feel less safe and 33% say they would feel as safe if guns were allowed in golf parks and others were

FFXCO_12287

armed. A fourth of respondents in this group say they would feel safer in such a scenario with only 8% indicate they would feel "a lot safer" (Table 2a).

| Table 2a. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if other people were armed in each of the following places? | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Parks w/amenities for children** | | | **Waterparks** | | | **Golf parks** | | |
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **75** | **43** | **90** | **74** | **42** | **89** | **75** | **43** | **89** |
| A lot less safe | 68 | 33 | 85 | 65 | 32 | 81 | 63 | 33 | 80 |
| Somewhat less safe | 8 | 10 | 5 | 9 | 9 | 8 | 11 | 9 | 9 |
| About the same | 13 | 32 | 6 | 15 | 31 | 8 | 15 | 33 | 8 |
| Somewhat safer | 5 | 17 | 2 | 6 | 19 | 1 | 5 | 17 | 2 |
| A lot safer | 6 | 8 | 2 | 6 | 8 | 2 | 5 | 8 | 1 |
| **Bottom-2 Box** | **11** | **25** | **4** | **11** | **27** | **3** | **11** | **25** | **3** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

When it comes to how safe they would feel in *camping parks* if guns are allowed and others were armed to such locales, three-fourths (73%) of respondents say they would feel less safe and 13% say they would feel equally safe. Only 14% say they would feel safer if guns are allowed in camping parks and others were armed (Figure B4).



Figure B4. Safety in Camping Parks if Guns Allowed & Others Were Armed

14%
13%
73%

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

- The vast majority of people from non-gun-owning households (88%) say they would feel less safe (76% say "a lot less safe") if guns were allowed at camping parks and others were armed. Only 6% say they would feel safer under such circumstances (Table 2b).
- Among participants from gun-owning households, a plurality (41%) say that they would feel less safe (and 33% say "a lot less" safe) if guns were allowed in camping parks and others were armed there, while an additional 25% say the presence of others with arms would not affect their sense of safety in a

FFXCO_12288

camping park. A third (33%) of this group say they would feel safer knowing that others were armed in a camping park (Table 2b).

When it comes to _remote parks_, about three-fourths of respondents (73%) say that they would feel less safe if guns were allowed in such spaces and others were armed there. An additional 13% say this would not alter their sense of safety in a remote park. Only 14% think that they would feel safer if others were armed in a remote park (Figure B5).



Figure B5. Safety in Remote Parks if Guns Allowed & Others Were Armed

14%

13%

73%

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

- Respondents from non-gun-owning households overwhelmingly say that they would feel less safe in a remote park if guns were allowed, and others were armed there (86%). Almost 8-in-10 say they would feel "a lot less safe" under such circumstances (79%). Only 5% say they would feel safer if others were armed in remote parks (Table 2b).
- A plurality of those from gun-owning households (42%) say they would feel less safe if others were armed in remote parks and another 25% expect no change in how they would feel. Only one-third (33%) of this group say they would feel safer in remote parks if guns were allowed, and others were armed (Table 2b).

When it comes to _open-air markets_, area residents have similar attitudes to the presence of other people being armed. Specifically, 73% say they would feel less safe under such conditions and 16% say their sense of safety would not be affected. Only one-tenth (11%) of respondents say they would feel safer at an open-air market if guns were allowed, and others were armed there (Figure B6).

FFXCO_12289



Figure B6. Safety in Open-Air Markets if Guns Allowed & Others Were Armed

- As is the case with other spaces, almost 9-in-10 people from non-gun-owning households (88%) say they would feel less safe if guns were allowed in open-air markets and other people came armed. Significantly, 82% say they would feel "a lot less safe." Only 3% say they would feel safer (Table 2b).
- Once again, a plurality (42%) of those from gun-owning households say they would feel less safe under such conditions, and an additional 34% indicate that their level of security would not be affected if others came armed at an open-air market. Only one-fourth (24%) say that they would feel safer (and only 7% say "a lot safer") if others came armed at an open-air market (Table 2b).

Table 2b. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if other people were armed in each of the following places?

|  | Camping parks | | | Remote parks | | | Open-air markets | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **73** | **41** | **88** | **73** | **42** | **86** | **73** | **42** | **88** |
| A lot less safe | 62 | 33 | 76 | 64 | 34 | 79 | 65 | 33 | 82 |
| Somewhat less safe | 11 | 8 | 11 | 10 | 9 | 7 | 8 | 9 | 6 |
| About the same | 13 | 25 | 7 | 13 | 25 | 9 | 16 | 34 | 9 |
| Somewhat safer | 8 | 22 | 4 | 7 | 22 | 2 | 6 | 17 | 2 |
| A lot safer | 7 | 11 | 2 | 7 | 12 | 2 | 6 | 7 | 1 |
| **Bottom-2 Box** | **14** | **33** | **6** | **14** | **33** | **5** | **11** | **24** | **3** |

*Note: Percentages may not add up to 100% due to rounding.*

FFXCO_12290

## C. Park/market safety if guns allowed and respondent is the one armed.

A third question asked survey participants how safe they would feel in specific public spaces, if guns were allowed there and they, themselves, were the one armed.  First, when it comes to *parks with amenities for children*, more than half of respondents (55%) say that they would feel less safe if they were armed at such a park. About a fourth of participants (24%) say bringing an arm would not affect their sense of safety at such a park, and another 22% say they would feel safer if they came armed at a park with amenities for children (Figure C1).



Figure C1. Safety in Parks with Amenities for Children if Guns Allowed & Respondent Came Armed

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

- Among respondents in non-gun-owning households, approximately three-fourths (72%) say they would feel less safe if they came armed at a park with amenities for children, while 19% say their safety would not be affected if they were the one armed. Only 9% say they would feel safer if they went armed to such a park (Table 3a).
- Most people from gun-owning households say that either they would feel less safe, or their safety would not be impacted if they came armed to a park with amenities for kids. Specifically, just over one-fourth (27%) say they would feel less safe and 36% say their safety would not change if they came armed at a park with amenities for kids. A little more than a third (38%) of this group say they would feel safer if they came armed to such a park (Table 3a).

Coming armed to *a waterpark* would make 54% of respondents feel less safe, while an additional 24% say they would feel about the same. Only about one-fifth (22%) say they would feel safer if they were armed at a waterpark (Figure C2).



Figure C2. Safety in Waterparks if Guns Allowed & Respondent Came Armed

■ A lot less/somewhat less safe   ■ About the same   ■ A lot/somewhat safer

FFXCO_12291

- Consistent with prior patterns, 70% of those in non-gun-owning households say they would feel less safe if they were the one armed at a waterpark (59% say they would feel "a lot less safe'), and 21% say their safety would be about the same. Only 9% say they would feel safer if they came armed at a waterpark (Table 3a).
- Most people from gun-owning households would either feel less safe (27%) or indifferent (32%). Four-in-ten say they would feel safer if they were the one armed at a waterpark (Table 3a).

When asked about their sense of safety *at a golf park*, if guns were allowed and they were the one armed there, 54% of respondents say they would feel less safe (45% say "a lot less safe") and an additional 24% indicate that their safety would not change. Only 21% say they would feel safer if they were armed at a golf park (Figure C3).



- Similarly, to prior questions, about three-fourths (71%) of those in non-gun-owning households say they would feel less safe if they were armed at golf park and another 20% say they would feel equally safe. Only 9% say they would feel safer if they came armed at a golf park (Table 3a).
- When it comes to golf parks, 27% of those in gun-owning households say they would feel less safe if they themselves were armed in such spaces; an additional 35% say their feelings of safety would not be affected if they were armed. Another 38% say they would feel safer at a golf park if they were armed themselves (Table 3a).

FFXCO_12292

Table 3a. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if you were the one armed in each of the following places?

| | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **55** | **27** | **72** | **54** | **27** | **70** | **54** | **27** | **71** |
| A lot less safe | 45 | 16 | 61 | 44 | 16 | 59 | 45 | 17 | 60 |
| Somewhat less safe | 10 | 10 | 11 | 10 | 11 | 11 | 10 | 11 | 11 |
| About the same | 24 | 36 | 19 | 24 | 32 | 21 | 24 | 35 | 20 |
| Somewhat safer | 9 | 16 | 4 | 9 | 18 | 4 | 8 | 16 | 4 |
| A lot safer | 13 | 22 | 6 | 13 | 22 | 6 | 13 | 22 | 6 |
| **Bottom-2 Box** | **22** | **38** | **9** | **22** | **40** | **9** | **21** | **38** | **9** |

*Note: Percentages may not add up to 100% due to rounding.*

A majority of survey participants (52%) say that they would feel less safe *at a camping park* if they themselves came armed; an additional 20% say that they would feel about the same. About a fourth (28%) say they would feel safer if they were themselves armed at a camping park (Figure C4).



Figure C4. Safety in Camping Parks if Guns Allowed & Respondent Came Armed

28%
20%
52%

■ A lot less/somewhat less safe  ■ About the same  ■ A lot/somewhat safer

- Among those in non-gun-owning households, 68% say they would feel less safe (59% say "a lot less safe") if they were the one armed at a camping park; another 19% say they would feel about as safe. Only 13% say they would feel safer if they were armed at a camping park (Table 3b).
- As we have seen, those from gun-owning households are more split: 25% say they would feel less safe and 27% say their safety would not change if they were the ones who were armed at a camping park. Another 23% say they would feel "somewhat safe" and 25% would feel "a lot safer" if they were the one armed at a camping park (Table 3b).

The pattern holds for *remote parks*, with 52% of all respondents saying that they would feel less safe if they were armed at such a locale and another 21% say this would not make any difference to their fee lings of safety. About one fourth (27%) say they would feel safer if they were the one armed at a remote park (Figure C5).

FFXCO_12293



- Even at remote parks, two-thirds (68%) of those in non-gun-owning households say they would feel less safe if they were the one armed, and another 20% say that being armed would not affect their sense of safety there. Only 12% say they would feel safer if they were themselves armed at a remote park (Table 3b).
- Those in gun-owning households are more divided: a majority say they would feel less safe (25%) or equally safe (28%) if they were armed at a remote park, while 47% say they would feel safer (Table 3b).

When it comes to personally being armed *at an open-air market*, most residents (54%) say they would feel less safe and an additional 23% say their feelings of safety would not be changed if they were themselves armed. A minority of about one-fourth (23%) say they would feel safer if they themselves were armed at an open-air market (Figure C6).



- 70% of those in non-gun-owning households say they would not feel safe being armed at an open-air market, and another 20% say their safety would be about the same. Only 10% believe they would feel safer if they were themselves armed at a market (Table 3b).
- Consistent with the established pattern, 28% of those from gun-owning households say that they would feel less safe if they were themselves armed at a market, and an additional 28% say their perceptions of safety would not be affected. About 4-in-10 (43%) in this group express that they would feel safer if they were themselves armed at an open-air market (Table 3b).

FFXCO_12294

Table 3b. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if you were the one armed in each of the following places?

| | Camping parks | | | Remote parks | | | Open-air markets | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **52** | **25** | **68** | **52** | **25** | **68** | **54** | **28** | **70** |
| A lot less safe | 44 | 17 | 59 | 43 | 17 | 57 | 43 | 16 | 58 |
| Somewhat less safe | 8 | 8 | 9 | 9 | 8 | 12 | 10 | 12 | 12 |
| About the same | 20 | 27 | 19 | 21 | 28 | 20 | 23 | 28 | 20 |
| Somewhat safer | 14 | 23 | 8 | 11 | 15 | 6 | 10 | 22 | 4 |
| A lot safer | 14 | 25 | 6 | 15 | 32 | 5 | 13 | 22 | 5 |
| **Bottom-2 Box** | **28** | **48** | **13** | **27** | **47** | **12** | **23** | **43** | **10** |

*Note: Percentages may not add up to 100% due to rounding.*

FFXCO_12295

## D. Likelihood of visiting parks/markets if guns allowed there.

The fourth question we analyze asks whether area residents would be more or less likely to visit the specified public spaces if guns were allowed there. First, when it comes _to parks with amenities for children_, two-thirds (67%) of respondents say they would be less likely to visit such parks, with 49% expressing that they would be "a lot less likely to visit." An additional 26% say they would be as likely to visit parks with amenities for children, thus the presence of guns there would not affect their decisions. Finally, only 7% say they would be more likely to visit such parks if guns were allowed there (Figure D1).



- Among those in non-gun-owning households, the vast majority (82%) say they would be less likely to visit parks with amenities for children if guns were allowed there, with 62% saying they would be "a lot less likely' to do so. Another 17% say their judgment would not be affected either way. Only 2% say they would be more likely to visit such parks if guns were allowed (Table 4a).
- Even among those in gun-owning households, almost half (46%) say they would be less likely to visit parks with amenities for children and about the same proportion (44%) say their decision would not be affected by the potential presence of guns. Only 10% say they would be more likely to visit such parks if guns were allowed (Table 4a).

When it comes _to waterparks_, we see a similar pattern with about two-thirds (64%) of all area residents saying that they would be less likely to visit if guns were allowed there, while 27% say they would be equally likely to visit either way. Only 8% express a higher likelihood to visit if guns are allowed in waterparks (Figure D2).

FFXCO_12296



Figure D2. Likely to Visit Waterparks if Guns Allowed There

- Consistent with findings above, 81% of respondents from non-gun-owning households say they would be less likely (61% say "a lot less likely") to visit waterparks if guns were allowed there. Another 17% say they would be about as likely as before. Only 2% say they would be more likely to visit waterparks if guns are allowed there (Table 4a).
- When it comes to those from gun-owning households, respondents are almost equally split between those who say they would be less likely to visit (45%) and those who say they would be equally likely to visit (42%) a waterpark if guns were allowed there. Only 12% of this group say they would be more likely to visit if guns were allowed at waterparks (Table 4a).

The pattern shows no divergence for _golf parks_. Specifically, about two-thirds (65%) of respondents say they would be less likely to visit a golf park if guns are allowed and 29% say they would be about as likely to visit. Only 7% say they would be more likely to visit if guns are allowed in golf parks (Figure D3).



Figure D3. Likely to Visit Golf Parks if Guns Allowed There

- Consistent with earlier findings, 79% of survey takers from non-gun-owning households say they would be less likely to visit golf parks if guns were allowed there; 60% are "a lot less likely" to do so. Another 20% say they would be equally likely to visit such parks (Table 4a).
- Those from gun-owning households are split: 45% say they would be less likely to visit and another 45% say they would not be affected. Only 10% say they would be more likely to visit if guns were allowed in golf parks (Table 4a).

FFXCO_12297

| | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|---|---|---|---|---|---|---|---|---|---|
| Q4a. If guns are allowed in the following public spaces in Fairfax County, do you think that you and your family will be a lot more likely to visit, somewhat more likely to visit, about the same, somewhat less likely to visit, a lot less likely to visit? | | | | | | | | | |
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **67** | **46** | **82** | **64** | **45** | **81** | **65** | **45** | **79** |
| A lot less likely to visit | 49 | 33 | 62 | 48 | 30 | 61 | 49 | 29 | 60 |
| Somewhat less likely to visit | 18 | 13 | 19 | 16 | 16 | 20 | 16 | 17 | 18 |
| About the same | 26 | 44 | 17 | 27 | 42 | 17 | 29 | 45 | 20 |
| Somewhat more likely to visit | 3 | 5 | 0 | 4 | 7 | 0 | 3 | 4 | 0 |
| A lot more likely to visit | 4 | 5 | 1 | 4 | 5 | 1 | 4 | 6 | 1 |
| **Bottom-2 Box** | **7** | **10** | **2** | **8** | **12** | **2** | **7** | **10** | **2** |
| Note: Percentages may not add up to 100% due to rounding. | | | | | | | | | |

When it comes *to camping parks*, the pattern remains the same. Specifically, 63% of the total say they would be less likely to visit camping parks if guns were allowed there, and 28% say they would be about as likely to visit. Only a small minority of 9% say they would be more likely to visit camping parks if guns were allowed there (Figure D4).



Figure D4. Likely to Visit Camping Parks if Guns Allowed There

- A lot less/somewhat less likely
- About the same
- A lot/somewhat more likely

- The pattern holds for respondents from non-gun-owning households as well. Specifically, 78% of this group say they would be less likely to visit a camping park if guns were allowed there, and a solid 62% say they would be "a lot less likely" to do so. An additional 20% say they would be about as likely to visit if guns are allowed in camping parks (Table 4b).
- Similarly, among respondents from gun-owning households, people are almost equally split between those who would be less likely to visit (43%) and those who would be about as likely to visit (40%). Even among this group, only 17% say they would be more likely to visit camping parks if guns were allowed there (Table 4b).

The findings are very similar when it comes *to remote parks*. As with other locales, about two-thirds (65%) of all respondents say they would be less likely to visit if guns were allowed there, and another 26% say allowing

FFXCO_12298

guns would not affect their decision to visit. Only 9% say they would be more likely to visit remote parks if guns were allowed there (Figure D5).



Figure D5. Likely to Visit Remote Parks if Guns Allowed There

- A lot less/somewhat less likely
- About the same
- A lot/somewhat more likely

- As we have seen with other parks, the great majority of people form non-gun-owning households (80%) express lesser likelihood to visit a remote park if guns are allowed and 18% say this would make no difference in their likelihood to visit (Table 4b).
- As with other parks, respondents from gun-owning households are almost equally split between those who would be less likely to visit (43%) and those who would not be affected (40%) if guns were allowed in remote parks. Only 17% say they would be more likely to visit if guns were allowed in remote parks (Table 4b).

Finally, when it comes to visiting *open-air markets*, 63% of all participants say they would be less likely to visit if guns were allowed, with 50% stating they would be "a lot less likely" to do so. Another 28% say they would be as likely to visit and only 8% say they would be more likely to visit such markets if guns were allowed there (Figure D6).



Figure D6. Likely to Visit Open-Air Markets if Guns Allowed There

- A lot less/somewhat less likely
- About the same
- A lot/somewhat more likely

- Similar results as with parks hold for those in non-gun-owning households. Specifically, 80% say they would be less likely to visit (62% say they would be "a lot less likely" to do so) if guns were allowed in open-air markets. An additional 19% say they would be as likely to visit such markets (Table 4b).

FFXCO_12299

- Among participants who live in gun-owning households, people are equally split between those who would be less likely to visit such markets if guns were allowed there (44%) and those who would not be affected (46%). Only 11% say they would be more likely to visit such a market if guns were allowed there (Table 4b.)

Q4b. If guns are allowed in the following public spaces in Fairfax County, do you think that you and your family will be a lot more likely to visit, somewhat more likely to visit, about the same, somewhat less likely to visit, a lot less likely to visit?

| | **Camping parks** | | | **Remote parks** | | | **Open-air markets** | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **63** | **43** | **78** | **65** | **43** | **80** | **63** | **44** | **80** |
| A lot less likely to visit | 49 | 29 | 62 | 51 | 27 | 66 | 50 | 30 | 62 |
| Somewhat less likely to visit | 14 | 14 | 16 | 14 | 16 | 14 | 14 | 14 | 17 |
| About the same | 28 | 40 | 20 | 26 | 40 | 18 | 28 | 46 | 19 |
| Somewhat more likely to visit | 6 | 11 | 1 | 4 | 11 | 1 | 5 | 5 | 1 |
| A lot more likely to visit | 4 | 5 | 1 | 5 | 6 | 1 | 4 | 5 | 1 |
| **Bottom-2 Box** | **9** | **17** | **2** | **9** | **17** | **2** | **8** | **11** | **2** |

*Note: Percentages may not add up to 100% due to rounding.*

FFXCO_12300

## E. Likelihood of bringing a gun to parks/markets if allowed.

Another question asked participants how likely they would be to bring a gun to a specified park or market if guns were allowed there. Although we collected data from the entire sample, this question is most relevant to people who live in gun-owning households and have access to firearms. For this reason, we focus our analysis to this group, although Tables 5a and 5b report results for the total sample and for non-gun-owning households as well.

When it comes to *parks with amenities for children*, about two-thirds (64%) of those in gun-owning households say they would be unlikely to bring a gun to such a park. Importantly, 55% say they would be "very unlikely" to do so. An additional 13% were noncommittal and only a minority of 22% say they would be more likely to do so (Figure E1).



Figure E1. Likely to Bring a Gun to a Park with Amenities for Children, if Guns Allowed There (Gun HHs only)

■ Very/somewhat unlikely    ■ Neither    ■ Very somewhat likely

Similarly, 65% of those in gun-owning households say they are unlikely to bring a gun to a *waterpark* if allowed to do so, and 12% say they would be neither. Only about a fourth (23%) said they would be likely to bring a gun to a waterpark if allowed (Figure E2).



Figure E2. Likely to Bring a Gun to a Waterpark, if Guns Allowed There (Gun HHs only)

■ Very/somewhat unlikely    ■ Neither    ■ Very somewhat likely

FFXCO_12301

The results are very similar when it comes to _golf parks_. Specifically, 66% of respondents from gun-owning households say they would be unlikely to bring a gun to a golf park if allowed, and 59% say they would be "very unlikely" to do so. An additional 11% are noncommittal, and only 23% say they would be likely to bring a gun to a golf park (Figure E3).



Figure E3. Likely to Bring a Gun to a Golf Park, if Guns Allowed There
(Gun HHs only)

■ Very/somewhat unlikely   ■ Neither   ■ Very somewhat likely

When it comes to _camping parks_, about half (52%) of those in gun-owning households say they are unlikely to bring a gun there if allowed, and 11% say they would be "neither likely nor unlikely." About a third of this group (37%) say they would be more likely to bring a gun at a camping park if allowed (Figure E4).



Figure E4. Likely to Bring a Gun to a Camping Park, if Guns Allowed There
(Gun HHs only)

■ Very/somewhat unlikely   ■ Neither   ■ Very somewhat likely

The pattern holds for _remote parks_. Specifically, a majority (54%) of respondents from gun-owning households say they are unlikely to bring guns to remote parks, with 42% saying they are "very unlikely" to do so. About one-tenth (9%) say "neither." Approximately one-third (37%) say they would be likely to bring a gun to a remote park if allowed, with only 14% saying they are "very likely" to do so (Figure E5).

FFXCO_12302



Figure E5. Likely to Bring a Gun to a Remote Park, if Guns Allowed There
(Gun HHs only)

About two-thirds (65%) of those in gun-owning households say they are unlikely to bring a gun to *an open-air market* if allowed to do so; 55% say they are "very unlikely" to bring a gun there. Another 12% say "neither." Only about a fifth (22%) of those from gun-owning households say they are likely to bring a gun to an open-air market (Figure E6).



Figure E6. Likely to Bring a Gun to an Open-Air Market, if Guns Allowed There
(Gun HHs only)

FFXCO_12303

Tables 5a & 5b, below, include detailed findings for all groups: the total survey population, those in gun-owning households, and those in non-gun-owning households.

Table 5a. If guns are allowed in the following public spaces in Fairfax County, how likely would you be to bring a gun to each of the following places?

|  | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **83** | **64** | **93** | **83** | **65** | **93** | **81** | **66** | **91** |
| Very unlikely | 79 | 55 | 92 | 79 | 54 | 92 | 78 | 59 | 90 |
| Somewhat unlikely | 4 | 10 | 2 | 4 | 11 | 2 | 3 | 7 | 2 |
| Neither | 7 | 13 | 4 | 6 | 12 | 4 | 8 | 11 | 6 |
| Somewhat likely | 5 | 17 | 1 | 5 | 18 | 1 | 5 | 18 | 1 |
| Very likely | 6 | 5 | 2 | 6 | 5 | 2 | 6 | 5 | 2 |
| **Bottom-2 Box** | **10** | **22** | **3** | **11** | **23** | **3** | **11** | **23** | **3** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

Table 5b. If guns are allowed in the following public spaces in Fairfax County, how likely would you be to bring a gun to each of the following places?

|  | Camping parks | | | Remote parks | | | Open-air markets | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **77** | **52** | **89** | **78** | **54** | **91** | **82** | **65** | **93** |
| Very unlikely | 71 | 43 | 84 | 73 | 42 | 88 | 77 | 55 | 89 |
| Somewhat unlikely | 6 | 9 | 5 | 5 | 11 | 3 | 5 | 11 | 4 |
| Neither | 7 | 11 | 6 | 6 | 9 | 6 | 7 | 12 | 4 |
| Somewhat likely | 9 | 25 | 3 | 8 | 24 | 1 | 5 | 15 | 1 |
| Very likely | 7 | 12 | 2 | 8 | 14 | 2 | 6 | 7 | 2 |
| **Bottom-2 Box** | **16** | **37** | **5** | **16** | **37** | **3** | **11** | **22** | **3** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

FFXCO_12304

## F. Feelings of safety in a heated argument at a park/market if guns allowed there.

Respondents were also asked how safe they would feel in a heated argument with someone in a park or open-air market if guns were allowed in that public space. First, when it comes to _parks with amenities for children_, four-in-five participants (81%) indicated that they would feel unsafe (74% said "very unsafe) in a heated argument in such a park if guns were allowed. An additional 10% were noncommittal (neither safe nor unsafe) and only one-tenth of the total population stated they would feel safer under such circumstances if guns were allowed there (Figure F1).



Figure F1. Feelings of Safety in Heated Argument in a Park with Amenities for Children if Guns Allowed There

- Very/somewhat unsafe    - Neither    - Very/somewhat safe

- Among respondents from households without guns, the expression of lack of safety was near universal. Specifically, 95% say they would feel unsafe (92% say "very unsafe") if they found themselves in a heated argument in a park with amenities for children and guns were allowed there. By contrast, only 3% of this group say they would feel safe under such circumstances (Table 6a).
- Feeling unsafe is the majority position even among those who come from gun-owning homes, as 54% say they would feel unsafe in a heated argument at a park with amenities for children if guns were allowed there. An additional 27% say their sense of safety would not change (neither safe nor unsafe). Only one-in-five (19%) say they would feel safer under such circumstances if guns were allowed.

A similar pattern holds for _waterparks_. Specifically, four-in-five residents (80%) say they would feel unsafe (75% express they would feel "very unsafe") if they found themselves in a heated argument in a waterpark and guns were allowed there. Only 10% say they would not be affected and another 10% say they would feel safer if they found themselves under such circumstances and guns were allowed (Figure F2).

FFXCO_12305



Figure F2. Feelings of Safety in Heated Argument in a Waterpark if Guns Allowed There

- Among people who live in households without guns, almost everyone (95%) say they would feel less safe in a waterpark under these circumstances (Table 6a).
- Even among those from gun-owning households, the majority (54%) say they would feel unsafe if they were involved in a heated argument at a waterpark when guns were allowed there. Only 19% say they would feel safe under such conditions and 27% say their feelings of safety would not be affected (neither safe nor unsafe) (Table 6a).

The picture is similar for _golf parks_. Here too, 80% of people say they would feel unsafe (75% say "very unsafe") if they engaged in a heated argument in a golf park if guns were allowed there. An additional 11% say their feelings of safety would not be affected (neither safe nor unsafe) and 9% believe they would feel safe under such conditions (Figure F3).



Figure F3. Feelings of Safety in Heated Argument in a Golf Park if Guns Allowed There

- As we have seen with other parks, almost everyone who comes from a non-gun-owning household (95%) says they would feel unsafe if they engaged in a heated argument in a golf park and guns were allowed there.  In fact, 92% say they would feel "very unsafe" in this scenario (Table 6a).
- Among those from gun-owning homes, most (55%) would also feel unsafe if they found themselves in a heated argument at a golf park and guns were allowed. A bit more than a fourth (28%) say their sense

FFXCO_12306

of safety would not change ("neither") and 18% assess they would feel safe under such conditions (Table 6a).

Table 6a. If guns are allowed in the following public spaces in Fairfax County, how safe or unsafe would you feel in a heated argument with someone while in a [location]:

|  | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|  | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
|---|---|---|---|---|---|---|---|---|---|
| **Top-2 Box** | **81** | **54** | **95** | **80** | **54** | **95** | **80** | **55** | **95** |
| Very unsafe | 74 | 41 | 92 | 75 | 41 | 92 | 75 | 44 | 92 |
| Somewhat unsafe | 7 | 13 | 3 | 5 | 13 | 3 | 5 | 11 | 3 |
| Neither | 10 | 27 | 2 | 10 | 27 | 2 | 11 | 28 | 3 |
| Somewhat safe | 4 | 7 | 2 | 4 | 7 | 2 | 3 | 6 | 1 |
| Very safe | 6 | 12 | 2 | 6 | 12 | 2 | 6 | 12 | 2 |
| **Bottom-2 Box** | **10** | **19** | **3** | **10** | **19** | **3** | **9** | **18** | **3** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

Responses about *camping parks* do not deviate from the existing pattern. To be exact, 80% of respondents say they would feel unsafe (74% state "very unsafe") if they found themselves in a heated argument at a camping park and guns were allowed there. One-tenth say they would be unaffected and another 10% say they would feel safe (Figure F4).



Figure F4. Feelings of Safety in Heated Argument in a Camping Park if Guns Allowed There

- Very/somewhat unsafe
- Neither
- Very/somewhat safe

- Consistent with earlier findings in this series, almost all who come from households without guns (95%) say they would feel unsafe in a heated argument with someone at a camping park if guns were allowed there. Importantly, 90% say they would feel "very unsafe" under such conditions (Table 6b).
- The pattern persists for those from gun-owning households, 55% of whom also say they would feel unsafe at a camping park under such circumstances, and an additional 27% say their safety would not be affected either way. Only 19% say they would feel safe in this scenario (Table 6b).

FFXCO_12307

When it comes to _remote parks that offer no amenities_, the pattern similarities persist. Specifically, 80% of respondents say they would feel unsafe in a heated argument with someone at a remote park if guns were allowed there. Approximately three-fourths (73%) assert they would feel "very unsafe." The rest are split between those who believe their safety would not be affected (11%) and those who would feel safe (9%) under such a scenario if guns were allowed (Figure F5).



Figure F5. Feelings of Safety in Heated Argument in a Remote Park if Guns Allowed There

- Among those from non-gun-owning households, 95% say they would feel unsafe if they found themselves in a heated argument at a remote park and guns were allowed there. Notably, 90% specify that they would feel "very unsafe" (Table 6b).
- As we have seen earlier, even among those from gun-owning homes, almost two-thirds (61%) express that they would feel unsafe if they found themselves in a heated argument at a remote park and guns were allowed there. One-fifth (20%) say their feelings of safety would not be impacted ("neither") and 19% say they would feel safe under such conditions (Table 6b).

Finally, a consistent pattern holds for perceptions of safety _in open-air markets_ in the context of a heated argument there. Specifically, 80% of all respondents say they would feel unsafe if they engaged in a heated argument at such a market if guns were allowed there. Importantly, 73% say they would feel "very unsafe" under such circumstances. About one-tenth (9%) say their perceptions of safety would not shift ("neither"). Only 10% say they would feel safe in a heated argument at a market if guns were allowed there (Figure F6).

FFXCO_12308



Figure F6. Feelings of Safety in Heated Argument in an Open-Air Market if Guns Allowed There

- As with other locales, almost all participants who live in non-gun-owning homes (95%) say they would feel unsafe at an open-air market if they were engaged in a heated argument and guns were allowed there. Significantly, 90% say they would feel "very unsafe" under such conditions (Table 6b).
- Among people who live in gun-owning homes, the majority (55%) say that they would also feel unsafe in such a scenario and 45% say they would feel "very unsafe." The rest are split between those who say their feelings of safety would not be affected (22%) and those who think they would feel safe (23%) under such circumstances.

Table 6b. If guns are allowed in the following public spaces in Fairfax County, how safe or unsafe would you feel in a heated argument with someone while in a [location]:

|  | **Camping parks** | | | **Remote parks** | | | **Open-air markets** | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **80** | **55** | **95** | **80** | **61** | **95** | **80** | **55** | **95** |
| Very unsafe | 74 | 41 | 90 | 73 | 42 | 90 | 73 | 45 | 90 |
| Somewhat unsafe | 6 | 13 | 4 | 7 | 19 | 5 | 7 | 10 | 5 |
| Neither | 10 | 27 | 2 | 11 | 20 | 2 | 9 | 22 | 2 |
| Somewhat safe | 4 | 7 | 2 | 4 | 7 | 2 | 4 | 10 | 1 |
| Very safe | 6 | 12 | 2 | 6 | 12 | 2 | 6 | 13 | 2 |
| **Bottom-2 Box** | **10** | **19** | **4** | **9** | **19** | **3** | **10** | **23** | **3** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

FFXCO_12309

## G. Expectations about crime if guns allowed in specified public spaces.

The next question asked respondents to express their expectations about the prevalence of crime in parks and markets if guns were to be allowed there. Specifically, the question asked, "If guns are allowed in the following public spaces in Fairfax County, do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot?"

First, when it comes to expectations about crime in _parks with amenities for children_, the majority of the population (52%) believe that crime will increase "a lot/somewhat" if guns are allowed there and another 32% say it would stay about the same. Only 16% say that they expect crime to decline (Figure G1).



Figure G1. Crime Expectations for Parks with Amenities for Children if Guns Allowed There

- 16%
- 52%
- 32%

■ Increase a lot/somewhat   ■ Stay the same   ■ Decrease a lot/somewhat

- Among those in non-gun-owning households, almost two-thirds (63%) expect crime to increase if guns are allowed in parks with amenities for kids, and another 33% say it will stay the same. Only 4% expect crime to decline if guns are allowed in these parks (Table 7a).
- Those in gun-owning households equally split among those who think that crime will increase (32%) is guns are allowed in parks with amenities for children, those who think it will stay the same (35%) and those who think crime will decline (33%) (Table 7a).

Results follow a similar trend when it comes to perceptions of crime _in waterparks_ if guns are allowed there. Specifically, 54% believe that crime will increase, 30% say that it will stay the same, and only 17% say it will decrease if guns are allowed in waterparks (Figure G2).

FFXCO_12310



- Among respondents from homes that do not include guns, 65% think that crime in waterparks will go up if guns are allowed there and an additional 30% say crime will stay the same. Only 5% think that crime will go down in waterparks if guns are allowed there (Table 7a).
- People from gun-owning households are evenly split in their expectations about crime in waterparks if guns are allowed there (Table 7a).

A similar trend emerges when it comes to _golf parks_. Specifically, half of all respondents (50%) say that crime will go up in golf parks if guns are allowed there and an additional 35% believe that crime will not be impacted. Only 15% say that crime will decline if guns are allowed in golf parks (Figure G3).



- Consistent with prior findings, three-fifths of participants from non-gun-owning homes (61%) expect crime to go up in golf parks if guns are allowed there, and an additional 35% say allowing guns will not affect crime in golf parks (Table 7a).
- Respondents from gun-owning households are yet again split: 33% think crime will increase, 37% say it will stay the same, and 29% say it will decrease if guns are allowed in golf parks (Table 7a).

FFXCO_12311

| | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **16** | **33** | **4** | **17** | **33** | **5** | **15** | **29** | **4** |
| Decrease a lot | 10 | 20 | 2 | 10 | 20 | 2 | 9 | 20 | 1 |
| Decrease somewhat | 6 | 14 | 2 | 6 | 13 | 3 | 6 | 10 | 3 |
| Stay the same | 32 | 35 | 33 | 30 | 32 | 30 | 35 | 37 | 35 |
| Increase somewhat | 28 | 26 | 33 | 30 | 29 | 35 | 28 | 28 | 34 |
| Increase a lot | 24 | 6 | 30 | 23 | 6 | 30 | 22 | 6 | 27 |
| **Bottom-2 Box** | **52** | **32** | **63** | **54** | **35** | **65** | **50** | **33** | **61** |

Table 7a. If guns are allowed in the following public spaces in Fairfax County, do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot?

*Note: Percentages may not add up to 100% due to rounding.*

Next, we analyze responses related to *camping parks*. In this case, a majority (51%) of all respondents say that they expect crime to increase if guns are allowed at camping parks, and an additional 30% believe that crime will stay the same. Only one-fifth (19%) suggest that crime will go down if guns are allowed in camping parks (Figure G4).



Figure G4. Crime Expectations for Camping Parks if Guns Allowed There

■ Increase a lot/somewhat   ■ Stay the same   ■ Decrease a lot/somewhat

- As far as people from non-gun-owning households are concerned, the observed pattern holds for camping parks. Specifically, almost two-thirds (63%) believe that crime will increase in these parks if guns are allowed there and 33% suggest that it will stay the same (Table 7b).
- When it comes to those who live in gun-owning households, they are once again split, with 37% believing that crime will go up, 24% saying that crime will remain the same, and 39% expecting crime to decline if guns are allowed in camping parks (Table 7b).

FFXCO_12312

A similar picture emerges when it comes to expectations about crime in more _remote parks_. Specifically, 52% indicate that crime would increase if guns were allowed in such parks, and 30% expect it to stay the same. Only 18% surmise that crime may decline if guns are allowed in remote parks (Figure G5).



Figure G5. Crime Expectations for Remote Parks if Guns Allowed There

■ Increase a lot/somewhat   ■ Stay the same   ■ Decrease a lot/somewhat

- The subgroup analysis shows similar results as with earlier items in this series. For example, two-thirds (65%) of those from non-gun-owning homes believe that crime will shoot up in remote parks if guns were to be allowed there and another 31% say crime will stay the same. Only 4% expect a decline in crime (Table 7b).
- Those in gun-owning households are once again split: 30% say crime will go up, 31% expect it to stay the same, and 39% think it will go down (Table 7b).

Finally, when it comes _to open-air markets_, the same pattern persists with the majority (54%) of respondents expecting crime to increase there if guns are allowed, and 29% envisioning it to stay the same. Only 16% think that crime will decline at open-air markets if guns are allowed there (Figure G6).



Figure G6. Crime Expectations for Open-Air Markets if Guns Allowed There

■ Increase a lot/somewhat   ■ Stay the same   ■ Decrease a lot/somewhat

FFXCO_12313

- As is the case with other locales, about two-thirds (64%) of those in non-gun-owning homes expect crime to rise in open-air markets if guns are allowed there, and another 30% say that crime will likely stay the same. Only 5% think that crime will decline if guns are allowed at open-air markets (Table 7b).
- Among respondents from gun-owning households we see a split once again. Specifically, 43% say that crime may increase if guns are allowed at open-air markets, 27% expect it will stay the same, and 31% think it will decline (Table 7b).

| Table 7b. If guns are allowed in the following public spaces in Fairfax County, do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot? | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Camping parks** | | | **Remote parks** | | | **Open-air markets** | | |
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **19** | **39** | **5** | **18** | **39** | **4** | **16** | **31** | **5** |
| Decrease a lot | 11 | 21 | 2 | 12 | 22 | 2 | 11 | 20 | 2 |
| Decrease somewhat | 7 | 18 | 2 | 6 | 17 | 2 | 6 | 11 | 3 |
| Stay the same | 30 | 24 | 33 | 30 | 31 | 31 | 29 | 27 | 30 |
| Increase somewhat | 27 | 27 | 33 | 27 | 21 | 35 | 29 | 34 | 33 |
| Increase a lot | 24 | 9 | 30 | 25 | 10 | 30 | 25 | 9 | 31 |
| **Bottom-2 Box** | **51** | **37** | **63** | **52** | **30** | **65** | **54** | **43** | **64** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

FFXCO_12314

## H. How safe others may feel if respondent came armed to a park/market.

A final series of questions asked respondents to imagine how others may feel if the respondent came armed to a specified park of open-air market. Specifically, the question asked: "If guns are allowed in the following public spaces in Fairfax County, how safe do you imagine other people would feel if you carried a gun in public spaces?"

First, three-in-four (77%) participants say they expect others to feel unsafe if the respondent came armed to *a park with amenities for children*. Importantly, 51% say they expect others to feel "very unsafe." One-tenth think that others' feelings of safety would not be affected and only 13% say that others may feel safe (Figure H1).



Figure H1. Others' Feelings of Safety if Respondent Was Armed at Park with Amenities for Children

- Among those from non-gun-owning households, 85% expect others to feel unsafe (59% say "very unsafe") if the respondent came armed at a park with amenities for children. Only 8% say that others would feel safe (Table 8a).
- Approximately two-thirds of those from gun-owning households (65%) echo the same sentiment. They expect that others would feel unsafe if the respondent arrived armed at a park with amenities for kids; 18% expect that others would not be affected. Fewer than one-fifth (18%) say that they expect others to feel safe if the respondent came armed at such a park (Table 8a).

Similar results hold for *waterparks*. Specifically, three-fourths (75%) of respondents say they expect others to feel unsafe at a waterpark if the respondent arrived there armed; an additional 12% say others' sense of safety should not be affected. Only 13% believe that others will feel safer in such a scenario (Figure H2).



- When it comes to respondents who come from non-gun-owning households, 83% believe that others would feel unsafe if the individual arrived armed at a waterpark; 9% say others' perceptions of safety would remain unaffected (Table 8a).
- Among those from gun-owning households, almost two-thirds (61%) agree that others may feel unsafe if the respondent came armed at a waterpark and 21% think that others' safety will not be affected. Even among this group, only 18% say that others will feel safe in this scenario (Table 8a).

Another type of park that we asked about in this series was *golf parks*. In this case, 73% of all respondents say that others would feel unsafe if the respondent came armed at a golf park, and 15% say others' safety would not be altered. Only 13% say that others would feel safe if the respondent were armed at a golf park (Figure H3).



- Among people from non-gun-owning households, 81% say that others would feel unsafe if the respondent came armed at a golf park; 11% say others' feelings of safety would not be impacted (Table 8a).
- Almost two-thirds (61%) of those from gun-owning households also believe that others would feel unsafe if the respondent came armed to a golf park, and 21% say that others' safety would not be affected. Only 18% among this group say that they expect others to feel safe under such a scenario (Table 8a).

FFXCO_12316

Table 8a. If guns are allowed in the following public spaces in Fairfax County, how safe do you imagine other people would feel if you carried a gun in public spaces?

| | Parks w/amenities for children | | | Waterparks | | | Golf parks | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **77** | **65** | **85** | **75** | **61** | **83** | **73** | **61** | **81** |
| Very unsafe | 51 | 32 | 59 | 48 | 27 | 58 | 46 | 27 | 56 |
| Somewhat unsafe | 26 | 32 | 26 | 28 | 34 | 25 | 27 | 35 | 25 |
| Neither | 10 | 18 | 7 | 12 | 21 | 9 | 15 | 21 | 11 |
| Somewhat safe | 5 | 8 | 3 | 5 | 8 | 3 | 5 | 9 | 3 |
| Very safe | 8 | 9 | 5 | 8 | 9 | 5 | 7 | 9 | 5 |
| **Bottom-2 Box** | **13** | **18** | **8** | **13** | **18** | **8** | **13** | **18** | **8** |

*Note: Percentages may not add up to 100% due to rounding.*

Residents were also asked the same question relative _to camping parks_ with similar results. Specifically, 71% of all area residents believe that others would feel unsafe (46% say "very unsafe") if the respondent carried a gun in a camping park, and an additional 15% say others' perceptions of safety would not be affected. Only 14% say that they imagine others feeling safe if the respondent arrived armed at a camping park (Figure H4).



Figure H4. Others' Feelings of Safety if Respondent Was Armed at a Camping Park

- 14%
- 15%
- 71%

Very/somewhat unsafe   Neither   Very/somewhat safe

- The subgroup findings follow patterns that we have seen earlier. Specifically, 83% of those who do not have a gun in their home say that they expect others to feel unsafe if the respondent came armed at a camping park (57% say "very unsafe") and 8% say that other people's sense of safety would not be affected by the respondent's gun carry (Table 8b).
- We also see the majority of people from gun-owning households (50%) agreeing that others would feel unsafe at a camping park if the respondent came armed, and 30% believe that others would not be affected in this scenario. Only one-fifth (21%) of this subgroup say that others may feel safe if the respondent came armed at a camping park (Table 8b).

FFXCO_12317

Even when it comes to _remote parks_, the pattern does not diverge. Specifically, about three-fourths (72%) of all residents say that others would feel unsafe (and 46% say "very unsafe") if the respondent carried a gun to such a park. Another 14% imagine that others' safety would not be affected either way and 15% say others would feel safe if the respondent came armed to a remote park (Figure H5).



Figure H5. Others' Feelings of Safety if Respondent Was Armed at a Remote Park

15% | 14% | 72%

■ Very/somewhat unsafe   ■ Neither   ■ Very/somewhat safe

- Among those from non-gun-owning households, 83% expect that others would feel unsafe (57% say "very unsafe") if they themselves carried a gun at a remote park. Only 9% say others would feel safe in this scenario (Table 8b).
- Those from gun-owning households are more varied in their expectations but even in this subgroup, 52% say that others would likely feel unsafe if the respondent came to a remote park armed. The remaining are split between those who think that others' sense of safety would be unaffected (26%) and those who think others would feel safe (22%) in this scenario (Table 8b).

Finally, when it comes _to open-air markets_, we observe similar findings. As is the case with other locales, here, three-fourths (75%) of all residents say they imagine others to feel unsafe if the respondent came to a market armed and 12% say they expect others' feelings of safety not to be affected. Only 13% say they expect others to feel safe if the respondent appears armed at a market (Figure H6).



Figure H6. Others' Feelings of Safety if Respondent Was Armed at an Open-Air Market

13% | 12% | 75%

■ Very/somewhat unsafe   ■ Neither   ■ Very/somewhat safe

FFXCO_12318

- As we have seen earlier, the vast majority of residents from non-gun-owning homes (83%) expect others to feel unsafe (61% say "very unsafe") if the respondent came armed at an open-air market. Only 8% in this group think that others would feel safe (Table 8b).
- Among those in gun-owning households, about two-thirds (65%) echo that others would likely feel unsafe in such a scenario, and only 18% expect others to feel safe. An additional 18% say that others would not feel any differently if the respondent carried a gun at an open-air market (Table 8b).

Table 8b. If guns are allowed in the following public spaces in Fairfax County, how safe do you imagine other people would feel if you carried a gun in public spaces?

| | Camping parks | | | Remote parks | | | Open-air markets | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) | Total (%) | Gun HH (%) | Non-Gun HH (%) |
| **Top-2 Box** | **71** | **50** | **83** | **72** | **52** | **83** | **75** | **65** | **83** |
| Very unsafe | 46 | 23 | 57 | 46 | 23 | 57 | 49 | 30 | 61 |
| Somewhat unsafe | 25 | 26 | 26 | 26 | 29 | 25 | 26 | 34 | 23 |
| Neither | 15 | 30 | 8 | 14 | 26 | 8 | 12 | 18 | 9 |
| Somewhat safe | 6 | 11 | 4 | 7 | 10 | 4 | 6 | 8 | 3 |
| Very safe | 8 | 9 | 5 | 8 | 11 | 5 | 7 | 9 | 5 |
| **Bottom-2 Box** | **14** | **21** | **10** | **15** | **22** | **9** | **13** | **18** | **8** |
| *Note: Percentages may not add up to 100% due to rounding.* | | | | | | | | | |

FFXCO_12319

# Experiment Analysis

The survey also included a series of survey experiments aimed at determining whether the presence of firearms in specific public locations would produce "chilling effects." By chilling effects, we mean a decline in utilization of these resources.  Respondents were asked the following set of questions prior to answering the questions discussed above.

For this portion of the study, we randomly split the respondents into a "control" (or "placebo") condition and a "treatment" condition.  The control condition asked people about aspects of utilization or safety without any mention of firearms. The treatment condition used the same language but added the specification "if people are allowed to carry guns in [locale]." Experiments of this type measure the shift in attitudes when the potential of the presence of firearms in the specific location is made explicit.  The exact wording of the two versions of the questions can be found in Table EX.  The analyses use weighted data. For a detailed explanation of experimental methods, please see the "Experimental Methods Explainer" on pp. 4-6 above. For details on the meaning of "statistical significance" which is denoted throughout this section, please see the "Statistical Significance" section, p.4.

| Table EX. Experimental Design Questions | |
|---|---|
| **VERSION A: Control (AKA "Placebo") Condition** | **VERSION B: Treatment Condition** |
| E1a. How likely would you be to recommend to a friend who has children to spend time with them in a public park in Fairfax County?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) | E1b. How likely would you be to recommend to a friend who has children to spend time with them in a public park in Fairfax County if people are allowed to carry guns in public parks?<br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) |
| E2a. In your view, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets in Fairfax County?<br><br>Very safe (1); Somewhat safe (2); Neither safe nor unsafe (3); Somewhat unsafe (4); Very unsafe (5) Don't know/Prefer not to say (6) | E2b. In your view, if people are allowed to carry guns in open-air fairs and markets, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets in Fairfax County?<br>Very safe (1); Somewhat safe (2); Neither safe nor unsafe (3); Somewhat unsafe (4); Very unsafe (5) Don't know/Prefer not to say (6) |
| E3a. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they attend the protest?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) | E3b. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they attend the protest? In their area, people are allowed to bring guns to protests.<br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5); Don't know/Prefer not to say (6) |
| E4a. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they bring a sign to the protest?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/prefer not to say (6) | E4b. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they bring a sign to the protest? In their area, people are allowed to bring guns to protests.<br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) |

## Experiment 1: Guns in Parks

We asked half the survey participants whether they would recommend to a friend with children to spend time at a park in Fairfax County. The other half received the same question but with the specification "if people are allowed to carry guns in public parks." We asked about a third party because not all respondents have children. People's responses should mirror their own attitudes and comfort level with visiting a park under either condition (see Experimental Methods Explainer, pp. 4-6). A test of means (see results of regression analysis in Table E1b), shows that those in the control condition are more likely to recommend to a friend to spend time at a local park, compared to those randomly assigned to the treatment condition which mentioned the scenario of guns allowed in public parks (Figure EX1a). This difference is statistically significant at conventional levels (p<0.05). This means that there is less than a 5% probability that the difference in means between the two groups is due to random chance (for an explainer on statistical significance, please see p. 4).



Figure EX1a. Recommend Fairfax County Park to a friend with Kids by Treatment
(All respondents)

Note: Data are weighted

- As shown in Figure EX1b, in the control condition (i.e., no guns mention), 78% of respondents say that they would be "very/somewhat likely" to recommend a Fairfax County Park to a friend with children. By contrast, only 25% of respondents in the treatment condition (i.e., mention of guns) which mentions that people may be allowed to carry firearms in the park, say they are "very/somewhat likely" to recommend a park to a friend with children. This is a decline, or "chilling effect," of 53 percentage points.

FFXCO_12321



- The same pattern persists in the subgroup analysis (Figure EX1c). Among those in non-gun-owning households, substantially fewer are likely to recommend a local park to a friend with children if guns were to be allowed there, compared to the control condition. This difference is statistically significant (p<0.05).
- As shown in Figure EX1c, among those in gun-owning households, the direction of the effect is the same; that is, the proportion of people who are willing to recommend a local park to a friend with children declines in the treatment condition, but this decline is statistically significant only at p<0.10. This means that there is less than a 10% probability that this difference is the result of chance. [6]

Figure EX1c. Recommend Fairfax County Park to a friend with Kids by Treatment & Gun HH Status



Note: Data are weighted

---

[6] In a one-tail test the relationship is statistically significant at conventional levels (p<0.05). Based on prior work in this area, the posited hypothesis is one-directional. Specifically, the hypothesis is that those in the treatment (i.e., mention of guns condition) should be less likely than those in the treatment condition (i.e., mention of guns) to recommend to a friend with children to visit a local park. As a result, a one-tailed test of significance is appropriate in this case. Filindra, A., Collingwood, L., & Kaplan, N. J. (2020). The Emotional Underpinnings of Americans' Support for Gun Control. *Social Science Quarterly*, *101*(5), 2101-2120 .

FFXCO_12322

- Specifically, among those in non-gun-owning households assigned to the control condition (that does not mention guns), 79% say they would be likely to recommend a local park to a friend with children. However, in the treatment condition, the proportion flips, with 85% now saying they would be unlikely to recommend a local park to such a friend (Figure EX1d).  Here, we observe a 65-percentage-point (ppt) "chilling effect" (from 79% to 14% declaring they are "likely" to recommend).
- The pattern is in the same general direction among those in gun-owning households. Two-thirds of those in the control condition (68%) say they would be likely to recommend a local park to a friend with kids, but in the control condition this proportion drops to 46% (a 22-ppt "chilling effect"). The proportion of those who say they are unlikely to recommend a park nearly doubles from 18% in the control to 34% in the treatment condition (Figure EX1d).



Figure EX1d. Likelihood to Recommend Park to Friend with Children (by Condition & Gun HH Status)

FFXCO_12323

Table EX1a shows the proportions for the entire five-point scale by treatment group and by gun household status.  It also included the weighted means for each group.

| Table EX1a. Recommend Fairfax County Park to friend with children by condition and gun HH status. | | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | | **Gun HH** | | **Non-Gun HH** | |
| | **Control** | **Treatment** | **Control** | **Treatment** | **Control** | **Treatment** |
| | (%) | (%) | (%) | (%) | (%) | (%) |
| **Top-2 Box** | **11** | **65** | **18** | **34** | **8** | **85** |
| Very unlikely | 5 | 54 | 8 | 33 | 3 | 71 |
| Somewhat unlikely | 6 | 10 | 10 | 1 | 5 | 14 |
| Neither | 11 | 11 | 13 | 19 | 14 | 1 |
| Somewhat likely | 37 | 3 | 38 | 9 | 36 | 2 |
| Very likely | 41 | 21 | 31 | 37 | 43 | 12 |
| **Bottom-2 Box** | **78** | **25** | **68** | **46** | **79** | **14** |
| *Mean* | *0.76* | *0.32*   *p<0.05* | *0.68* | *0.54*   *p<0.1* | *0.78* | *0.18*   *p<0.05* |
| *P-value is based on the difference in means and denotes statistical significance. Weighted means presented above.* | | | | | | |

FFXCO_12324

Table E1b shows bivariate regression analysis that confirm the descriptive results presented above. Regression analysis is used to predict the relationship between a factor of interest (in this case random assignment to a control or treatment group) and an outcome (such as an attitude or behavior). This analysis shows whether the difference in means between the control and treatment conditions is statistically significant at conventional levels for each of the three groups (i.e., total population, gun HHs, and non-gun HHs).[7]

| Table EX1b. Results of Bivariate Regression Analyses | | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | | **Gun HH** | | **Non-Gun HH** | |
| | b/se | | b/se | | b/se | |
| Treatment | -0.441 | *** | -0.143 | *(‡) | -0.599 | *** |
| | (0.03) | | (0.08) | | (0.04) | |
| Intercept | 0.759 | *** | 0.682 | *** | 0.775 | *** |
| | (0.02) | | (0.05) | | (0.03) | |
| N | 436 | | 97 | | 237 | |
| Adj R$^2$ | 0.286 | | 0.026 | | 0.507 | |
| F | 174.833 | | 3.584 | | 243.935 | |
| *Notes: Data are weighted. Robust standard errors in parentheses. \*\*\*p<0.001; \*\*p<0.05; \*p<0.1 (two-tailed); ‡p<0.05 (one-tailed)* | | | | | | |

---

[7] N refers to the total number of cases included in the model. The adj R$^2$ is known as the coefficient of determination or fit, and it shows how much of the variation in the data is predicted by the model. The adj R$^2$ ranges from 0 (the model does not explain any of the variation in the data), to 1 (the model explains all the variation in the data). The F-statistic predicts whether the model provides a better fit to the data than a model that contains no independent variables. The intercept is interpreted as the expected likelihood of recommending a park to a friend for those in the control group. The treatment variable shows the average response for those in the treatment group relative to the control. For example, in the first model, the number (-0.441) which is known as a "coefficient" tells us that on average those in the treatment group were 44ppts less likely to recommend a park to a friend with kids. The number in parentheses underneath the coefficient is the "standard error" which is an estimate of the uncertainty associated with the estimate. The stars next to the coefficient denote statistical significance. The conventional level of significance (p<0.05) is denoted with two stars. A more stringent level of statistical significance (p<0.01, which indicates that the probability that the observed relationship is due to chance is less than 1%) is denoted with three stars. A less stringent level of significance (p<0.10) is denoted with one star.

FFXCO_12325

## Experiment 2: Guns in open-air markets

We asked half the respondents how safe it was to go shopping at an open-air market in Fairfax County. The other half received the same question except it also include the words "if people are allowed to carry guns in open-air fairs and markets." A test of means (see results of regression analysis in Table E2b), shows that the average number of people in the control condition who say that Fairfax County open-air markets are safe is substantially higher than in the treatment (guns allowed) condition. This difference is statistically significant at conventional levels ($p < 0.05$). This means that there is less than a 5% probability that the difference in means between the two groups is due to random chance (for an explainer on statistical significance, please see p. 4). See Figure EX2a for the difference in means results.



**Figure EX2a. Open-Air Market Safety by Treatment**

**(All Respondents)**

Note: Data are weighted

In the control condition (i.e., no mention of guns), 86% of survey participants said that it is "very/somewhat safe" to shop in open-air markets in Fairfax County. However, only 22% of respondents in the treatment condition (i.e., guns are mentioned) say that shopping in open-air markets is "very/somewhat safe." This is a decline of 64-ppts (Figure EX2b).



Figure EX2b. Safety of Fairfax County Open-Air Markets, by Experiment Condition

**FFXCO_12326**

- As Figure EX2c shows, among those from non-gun-owning households, there is a steep decline in perceptions of safety of open-air markets in the treatment condition relative to the control. This difference is statistically significant at conventional ($p<0.05$) levels (see Table EX2b).
- As the right-hand panel of Figure EX2c shows, a similar albeit smaller decline is observable among respondents from gun-owning households. This decline is also statistically significant at conventional levels (see Table EX2b).



Figure EX2c. Open-Air Market Safety by Treatment & Gun HH Status

Note: Data are weighted

- As shown in Figure EX2d, among those from non-gun-owning households, the vast majority of those in the control condition (88%) evaluated Fairfax County open-air markets as safe. However, in the treatment condition (guns allowed), only 9% say that such markets would be safe. This is a chilling effect of 79-ppts.  As Table E2b shows, the mean difference between the two conditions is statistically significant at conventional levels ($p<0.05$).
- Furthermore, as the same figure shows, among those from gun-owning households, 89% in the control condition say that open-air markets in the County are "somewhat/very safe." However, in the treatment condition, only 49% offer the same response. This is a decline of 40-ppts, and it is statistically significant ($p<0.05$) (also Table E2b).

FFXCO_12327



Table EX2a shows the proportions for the entire five-point scale by treatment group and by gun household status. It also included the weighted means for each group.

| Table EX2a. Perceptions of Safety at Fairfax County Open-Air/Farmers' Markets by Condition & Gun HH Status | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Total** | | | **Gun HH** | | | **Non-Gun HH** | |
| | Control (%) | Treatment (%) | | Control (%) | Treatment (%) | | Control (%) | Treatment (%) |
| **Top-2 Box** | **4** | **68** | | **4** | **38** | | **3** | **88** |
| Very unsafe | 0 | 48 | | 0 | 24 | | 1 | 61 |
| Somewhat unsafe | 3 | 19 | | 4 | 14 | | 2 | 27 |
| Neither | 10 | 10 | | 7 | 13 | | 9 | 3 |
| Somewhat safe | 33 | 3 | | 39 | 8 | | 32 | 2 |
| Very safe | 53 | 19 | | 50 | 41 | | 57 | 7 |
| **Bottom-2 Box** | **86** | **22** | | **89** | **49** | | **88** | **9** |
| **Mean** | *0.84* | *0.31* | *p<0.05* | *0.84* | *0.57* | *p<0.05* | *0.85* | *0.17* | *p<0.05* |

*P-value is based on the difference in means and denotes statistical significance. Weighted means presented above.*

Table EX2b shows bivariate regression analysis that confirm the descriptive results presented above.  For more details on how to interpret these results, please see Footnote #7.

| Table EX2b. Results of Bivariate Regression Analyses | | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | | **Gun HH** | | **Non-Gun HH** | |
| | b/se | | b/se | | b/se | |
| Treatment | -0.526 | *** | -0.267 | *** | -0.687 | *** |
| | (0.03) | | (0.07) | | (0.03) | |
| Intercept | 0.837 | *** | 0.837 | *** | 0.853 | *** |
| | (0.02) | | (0.04) | | (0.02) | |
| N | 449 | | 97 | | 249 | |
| Adj R$^2$ | 0.418 | | 0.140 | | 0.672 | |
| F | 323.134 | | 16.611 | | 508.295 | |
| *Notes: Data are weighted. Robust standard errors in parentheses.* | | | | | | |
| *\*\*\*p<0.001; \*\*p<0.05; \*p<0.1 (two-tailed); ǂp<0.05 (one-tailed)* | | | | | | |

FFXCO_12329

## Experiment 3: Recommend to a friend to attend a protest in Fairfax County

We asked half the respondents (i.e., the control) how likely is it that they would recommend to a friend to attend a political protest in Fairfax County. The other half (i.e., the treatment) received the same question, but it also included the proviso "in their area, people are allowed to bring guns to protests." As with previous questions, the response options are: 1) very likely; 2) somewhat likely; 3) neither; 4) somewhat unlikely; 5) very unlikely. A test of means (see results of regression analysis in Table EX3b), shows that the average number of people in the control condition who say they would recommend that a friend attend a protest in Fairfax County is substantially higher than in the treatment (guns allowed) condition. This difference is statistically significant at conventional levels (p<0.05).



Figure EX3a. Likely to Recommend Going to a Protest by Treatment
(All respondents)

Note: Data are weighted

- In the control condition, 49% of respondents say they would be "very/somewhat likely" to recommend to the friend to attend a political protest in Fairfax County. However, only 16% of respondents offered the same response in the treatment condition. This is a decline of 33 ppts. The difference in the mean response between the two groups is statistically significant (p<0.05) (See Table EX3b).



FFXCO_12330

- As Figure EX3c shows, among those from non-gun-owning households, there is a steep decline in perceptions of safety of open-air markets in the treatment condition relative to the control. This difference is statistically significant at conventional ($p<0.05$) levels (see Table EX3b).
- As the right-hand panel of Figure EX3c shows, the trend among those in gun-owning households is also downward but the difference between the two groups does not reach conventional statistical significance levels ($p=0.165$).

Figure EX3c. Likely to Recommend Going to a Protest by Treatment & Gun HH Status



Note: Data are weighted

- As shown in Figure EX3d, among those from non-gun-owning households, about half (52%) say they would be likely to recommend to a friend to attend a political protest in Fairfax County. However, in the treatment condition (guns allowed), only 6% say the same. This is a chilling effect of 46 ppts.  As Table EX3b shows, the mean difference between the two conditions is statistically significant at conventional levels ($p<0.05$).
- Furthermore, as the same figure shows, among those from gun-owning households, 44% in the control condition say that they would recommend to a friend to attend a protest in the County. However, in the treatment condition, only 39% offer the same response. This decline of 5 ppts is consistent with what we have reported so far, but it does not reach statistical significance ($p=0.165$).

FFXCO_12331



Table EX3a shows the proportions for the entire five-point scale by treatment group and by gun household status.  It also included the weighted means for each group.

| Table EX3a. Recommend that a friend attends a protest in Fairfax County. | | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | | **Gun HH** | | **Non-Gun HH** | |
| | Control (%) | Treatment (%) | Control (%) | Treatment (%) | Control (%) | Treatment (%) |
| **Top-2 Box** | **21** | **67** | **21** | **44** | **20** | **82** |
| Very unlikely | 18 | 52 | 19 | 33 | 15 | 59 |
| Somewhat unlikely | 4 | 15 | 2 | 10 | 5 | 23 |
| Neither | 30 | 17 | 35 | 17 | 28 | 11 |
| Somewhat likely | 25 | 6 | 20 | 14 | 29 | 1 |
| Very likely | 24 | 10 | 24 | 26 | 23 | 5 |
| **Bottom-2 Box** | **49** | **16** | **44** | **39** | **52** | **6** |
| Mean | 0.58 | 0.27 p<0.05 | 0.57 | 0.47 p=0.165 | 0.60 | 0.18 p<0.05 |

*P-value is based on the difference in means and denotes statistical significance. Weighted means presented above.*

FFXCO_12332

Table EX3b shows bivariate regression analysis that confirm the descriptive results presented above. For more details on how to interpret these results, please see Footnote #7.

| Table EX3b. Results of Bivariate Regression Analyses | | | | | | |
|---|---|---|---|---|---|---|
| | **Total** | | **Gun HH** | | **Non-Gun HH** | |
| | b/se | | b/se | | b/se | |
| Treatment | -0.316 | *** | -0.102 | | -0.424 | *** |
| | (0.03) | | (0.07) | | (0.04) | |
| Intercept | 0.584 | *** | 0.572 | *** | 0.6 | *** |
| | (0.02) | | (0.05) | | (0.03) | |
| N | 430 | | 109 | | 239 | |
| Adj R$^2$ | 0.177 | | 0.009 | | 0.323 | |
| F | 93.562 | | 1.959 | | 114.559 | |
| *Notes: Data are weighted. Robust standard errors in parentheses. ***p<0.001; **p<0.05; *p<0.1 (two-tailed); †p<0.05 (one-tailed)* | | | | | | |

FFXCO_12333

## Experiment 4: Recommend to friend to carry a sign at protest in Fairfax County

Finally, we asked half of the respondents how likely they would be to recommend to a friend to bring a sign while attending a protest in Fairfax County (i.e., control group).  The other half received the same question, but it also included the proviso "in their area, people are allowed to bring guns to protests" (i.e., treatment group). We included this experiment because we expect that carrying a sign makes people's views visible to others which likely increases the level of risk that the individual assumes.  We expected that far fewer people in the control condition would be likely to recommend this to a friend (compared to the scenario that did not involve a sign, in experiment 3). This means that our starting base of the people likely to recommend to a friend to attend a protest will be quite low (as a reminder, 49% of people in the control condition in experiment #3 said they would recommend to a friend to go to a protest). If very few people are likely to recommend to a friend to attend a protest with a sign, it is likely that there may be little room to detect a statistically significant decline in the treatment (i.e., guns are mentioned) condition due to a floor effect.  Therefore, this is a "hard" test for the chilling-effects hypothesis: we have set up the experiment to make it difficult to detect a statistically significant decline. Therefore, if we do find a "chilling effect" that is strong evidence of how powerfully people are affected by the prospect of guns in a public space such as a protest (for additional information, please see the Summary of Experimental Findings, p. 10-11).

A difference in means test for the overall population shows that even in this scenario, people assigned to the control condition are more likely to recommend to a friend to engage in political protesting and bring a sign, than are those in the treatment (guns allowed) condition (Figure EX4a). This difference is statistically significant at conventional levels (p<0.05). (Also see Table EX4b).



**Figure EX4a. Likely to Recommend Bringing Sign to a Protest**
**(All Respondents)**

Note: Data are weighted

- In the control condition, respondents are almost equally split, and only 34% of respondents say they would be "very/somewhat likely" to recommend to the friend to carry a sign at the protest, which is substantially less than the 49% who were likely to recommend to the friend to attend the protest in the previous experiment (Figure EX4b).

FFXCO_12334

- In the treatment condition, only 19% of survey participants say they would be "very/somewhat likely" to recommend to the friend to carry a sign at the protest (Figure EX4b). This is a "chilling effect" of 15 ppts. The difference in the mean response between the control and treatment groups is statistically significant (p<0.05) (also see Table EX4b).
- Similarly, the proportion of people who are unlikely to recommend to a friend to bring a sign to a protest almost doubles from 34% in the control condition to 66% in the treatment (guns allowed) condition.



- As Figure EX4c shows, among those from non-gun-owning households, there is a marked decline in the treatment condition relative to the control in terms of the likelihood that the respondent would recommend to a friend to bring a sign to a protest. This difference is statistically significant at conventional (p<0.05) levels (see Table EX2b).
- As the right-hand panel of Figure EX4c shows, there is no difference in the likelihood to recommend to a friend to bring a sign to a protest among those who come from gun-owning households (p=0.438).



FFXCO_12335

- As shown in Figure EX4d, among those from non-gun-owning households, a third (33%) say they would be likely to recommend to a friend to attend a political protest in Fairfax County. However, in the treatment condition (guns allowed), only 7% say the same.  Conversely, in the control condition, 35% of this group say they would be unlikely to recommend that a friend carry a sign to a protest, but in the control condition this swells to 82%--an increase of 47 ppts. As Table EX4b shows, the mean difference between the two conditions is statistically significant at conventional levels (p<0.05).
- Among those in gun-owning households, we do not observe any decline in respondents' willingness to recommend to a friend to carry a sign to a protest between the control and treatment conditions. The difference in means between the two is not statistically significant (Table EX4b).



Figure EX4d. Likelihood to Recommend Bringing Sign to a Protest (by Condition & Gun HH Status)

FFXCO_12336

Table EX4a shows the proportions for the entire five-point scale by treatment group and by gun household status.  It also included the weighted means for each group.

| Table EX4a. Recommend that a friend bring a sign to a protest in Fairfax County. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Total** | | | **Gun HH** | | | **Non-Gun HH** | |
| | Control | Treatment | | Control | Treatment | | Control | Treatment |
| | (%) | (%) | | (%) | (%) | | (%) | (%) |
| **Top-2 Box** | **34** | **66** | | **34** | **34** | | **35** | **82** |
| Very unlikely | 27 | 47 | | 26 | 31 | | 27 | 56 |
| Somewhat unlikely | 7 | 19 | | 8 | 3 | | 8 | 27 |
| Neither | 31 | 16 | | 36 | 25 | | 33 | 10 |
| Somewhat likely | 18 | 5 | | 15 | 10 | | 17 | 1 |
| Very likely | 17 | 13 | | 15 | 31 | | 16 | 6 |
| **Bottom-2 Box** | **34** | **19** | | **30** | **41** | | **33** | **7** |
| **Mean** | *0.47* | *0.30* | *p<0.05* | *0.46* | *0.52* | *p=0.438* | *0.47* | *0.19* | *p<0.05* |
| *P-value is based on the difference in means and denotes statistical significance. Weighted means presented above.* | | | | | | | | |

Table EX4b shows bivariate regression analysis that confirm the descriptive results presented above. For an explainer on how to interpret this table, please see Footnote 7.

| Table EX4b. Results of Bivariate Regression Analyses | | | |
|---|---|---|---|
| | Total | Gun HH | Non-Gun HH |
| | b/se | b/se | b/se |
| Treatment | -0.177  *** | 0.056 | -0.279  *** |
| | (0.03) | (0.07) | (0.04) |
| Intercept | 0.474  *** | 0.463  *** | 0.467  *** |
| | (0.02) | (0.05) | (0.03) |
| N | 424 | 110 | 232 |
| Adj R$^2$ | 0.057 | -0.004 | 0.155 |
| F | 26.369 | 0.607 | 43.264 |
| *Notes: Data are weighted. Robust standard errors in parentheses.* | | | |
| *\*\*\*p<0.001; \*\*p<0.05; \*p<0.1 (two-tailed); †p<0.05 (one-tailed)* | | | |

# Analyses with National Data

In March 2023, a set of experiments mirroring the ones analyzed earlier, were included in a nationally representative survey administered by the survey company YouGov. These analyses are included in Miller D., A. Filindra and N. Kaplan (2023) "Technology, Tradition, and the "Terror of the People," *Notre Dame Law Review* (forthcoming).  The survey included 2,858 Americans from across the country, including 924 people from gun-owning households.  The survey had an average length of 10 minutes. The data were weighted to match the demographics of the national population. The margin of error for the survey is ±2.7%. We include these secondary analyses because of the large sample of respondents from gun-owning households which enhances the level of confidence in the experimental results.

In the first survey experiment, respondents were randomly assigned to a version of the question that reads: "How likely would you be to recommend to a friend who has children to spend time with them in a public park in your town?" or one that had the same phrasing but at the end added, "if guns are allowed in public spaces."[8] Respondents could choose among five response options ranging from: "very likely, somewhat likely, neither, somewhat unlikely, very unlikely." The results show a chilling effect among the overall population, those from non-gun-owning households, and those from gun-owning households (p<0.05).  Specifically, when it comes to those in gun owning households, we observe a drop from 64% to 51% among those who say it is "very/somewhat likely" to recommend (Figure 1B).

For the second experiment, half of the respondents were assigned to a version of the question that reads: "in your view, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets, in your town," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "very safe, somewhat safe, neither safe nor unsafe, somewhat unsafe, very unsafe." Once again, the results indicate statistically significant chilling effects for all groups (p<0.05). Specifically, among those in gun-owning households, there is a decline from 83% to 69% (14ppts) between the control and treatment conditions for those who say they deem such markets as "very/somewhat safe."

In the third survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend is thinking of attending a political protest in your town about an issue that is very important to them and wants your opinion. Would you encourage or discourage your friend from attending," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from attending a protest. In this experiment, we observe statistically significant chilling effects among the overall population and those who come from non-gun-owning households.  For those from gun owning households, the direction of effect is consistent with what was expected (a decline of 3ppts), but this difference is not statistically significant.

In the final survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend has decided to attend a political protest in your town about an issue that is very important to them and wants your opinion about whether they should bring a sign or flag.  Would you encourage or discourage

---

[8] The small wording differences between the Fairfax County survey and this national survey are not expected to substantively affect data patterns.

FFXCO_12338

your friend from bringing a sign or flag," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from carrying a sign or flag to a protest. Similar to the previous experiment, the results for the overall population and those form non-gun-owning households show statistically significant chilling effects ($p<0.05$). For those from gun-owning households, the direction of effect is consistent with expectations, but the 2-ppt decline is not statistically significant.

FFXCO_12339

# Appendix A: Robustness Analyses for the Experiments

A total of 108 of the 457 survey participants (24%) did not specify if their household owns one or more guns. Therefore, the distribution of respondents includes 251 who say their household does not own guns (55%), and 98 people who live in gun-owning households (21%). As a robustness test, we included this group in the analyses to see if their responses followed similar patterns.

Figure Appendix 1a (top left) shows the difference in means for all three groups for the first experiment which asks about recommend to a friend with children to visit a Fairfax County park. As the figure shows, the people for whom we do not have information on their gun ownership seem to respond to the experiment similarly to the non-gun-owning households. As is the case with the non-gun-owning group, with the unknown ownership group we see a statistically significant decline between the control and the experiment (AKA treatment) conditions.

We see a similar pattern in Figure Appendix 1b (top right) which shows the difference in means for the three groups in the second experiment which asked about how safe the respondent would feel going shopping at Fairfax County open-air markets. Among all three groups, on average, there is a statistically significant decline in perceived safety between the control and treatment conditions ($p < 0.05$). This decline is significant at conventional levels of statistical significance.

Figure Appendix 1c (bottom left) shows the results for each of the three groups for the third experiment which asks whether the respondent would recommend to a friend to go to a protest. The difference in means for the "gun status unknown" group is statistically significant at $p < 0.10$ ($p < 0.05$, one-tailed), and it reflects a decline from the control to the treatment condition—a pattern similar to the non-gun in the household group.

Finally, Figure Appendix 1d (bottom right) presents the results of means tests for each of the three groups for the fourth experiment which asks whether the respondent would recommend that a friend carry a sign at a protest. As with the previous experiments, here, we see a decline between the control and treatment groups for the "gun status unknown" group but this decline does not reach conventional levels of statistical significance ($p = 0.229$).

FFXCO_12340



Appendix Table A1, below, shows the results of bivariate regression models for this group of respondents ("gun status unknown"). For more details on how to interpret these results, please see Footnote #7.

**Appendix Table A1. Results of Bivariate Regression Analyses**

|  | Recommend Park | | Safe to shop Market | | Recommend protest | | Recommend carry sign to protest | |
|---|---|---|---|---|---|---|---|---|
|  | b/se | | b/se | | b/se | | b/se | |
| Treatment | -0.36 | *** | -0.365 | *** | -0.227 | * | -0.146 | |
|  | (0.08) | | (0.08) | | (0.12) | | (0.12) | |
| Intercept | 0.782 | *** | 0.768 | *** | 0.549 | *** | 0.501 | *** |
|  | (0.05) | | (0.05) | | (0.10) | | (0.10) | |
| N | 102 | | 103 | | 100 | | 100 | |
| Adj R² | 0.155 | | 0.17 | | 0.065 | | 0.021 | |
| F | 18.025 | | 18.706 | | 3.66 | | 1.468 | |

*Notes: Data are weighted. Robust standard errors in parentheses. \*\*\*p<0.001; \*\*p<0.05; \*p<0.1 (two-tailed); †p<0.05 (one-tailed)*

Appendix Table A2 shows the results of balance tests for the experiments. The tests indicate that only education and race are not balanced. As a result, we have specified multivariate regression models to ensure that the results hold even with demographic controls (See Appendix Table A3). At the table shows, for all four dependent variables, the treatment produces statistically significant results even after controlling for demographics.

FFXCO_12341

| Appendix Table A2. Experiment Balance Table | | | |
|---|---|---|---|
| | Control | Treatment | p-value |
| Male | 44% | 49% | 0.254 |
| College | 71% | 56% | **0.029** |
| Age | 46 | 49 | 0.212 |
| Income | 65% | 70% | 0.177 |
| White | 69% | 54% | **0.039** |
| Gun in home | 22% | 24% | 0.69 |

| Appendix Table A3: Multivariate Regression Analyses with Demographic Controls | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Recommend park | | Safe to shop market | | Recommend going to protest | | Recommend carry sign to protest |
| | b/se | | b/se | | b/se | | b/se |
| Treatment | -0.462 | *** | -0.594 | *** | -0.35 | *** | -0.189 | *** |
| | (0.05) | | (0.04) | | (0.05) | | (0.05) |
| Age (continuous) | -0.003 | ** | -0.004 | *** | -0.003 | ** | -0.004 | *** |
| | (0.00) | | (0.00) | | (0.00) | | (0.00) |
| Income (continuous) | 0.108 | | 0.192 | ** | 0.087 | | 0.007 |
| | (0.11) | | (0.09) | | (0.11) | | (0.11) |
| Gun in home | 0.10 | | 0.158 | ** | 0.06 | | 0.123 |
| | (0.07) | | (0.07) | | (0.08) | | (0.07) |
| Male | -0.001 | | -0.031 | | 0.002 | | -0.024 |
| | (0.05) | | (0.04) | | (0.05) | | (0.06) |
| College | -0.183 | ** | -0.147 | ** | -0.064 | | -0.005 |
| | (0.07) | | (0.06) | | (0.08) | | (0.08) |
| White | 0.139 | ** | 0.119 | ** | 0.071 | | 0.104 |
| | (0.06) | | (0.05) | | (0.06) | | (0.06) |
| Intercept | 0.831 | *** | 0.912 | *** | 0.658 | *** | 0.564 | *** |
| | (0.10) | | (0.10) | | (0.11) | | (0.11) |
| N | 297 | | 306 | | 293 | | 288 |
| Adj R$^2$ | 0.365 | | 0.593 | | 0.248 | | 0.132 |
| F | 19.512 | | 62.249 | | 10.967 | | 5.224 |

*Notes: Data are weighted. Robust standard errors in parentheses. ***p<0.001; **p<0.05; *p<0.1 (two-tailed); †p<0.05 (one-tailed)*

Appendix Table B4 shows that the effect of the treatment also holds among respondents from non-gun-owning households for all four experiments.

FFXCO_12342

| Appendix Table B4: Multivariate Regression Analyses with Demographic Controls (Non-gun HH) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Recommend Park | | Safe to shop market | | Recommend going to protest | | Recommend carry sign to protest |
| | b/se | | b/se | | b/se | | b/se |
| Treatment | -0.571 | *** | -0.698 | *** | -0.422 | *** | -0.271 | *** |
| | (0.05) | | (0.04) | | (0.05) | | (0.05) |
| Age (continuous) | -0.002 | | -0.003 | ** | -0.003 | * | -0.002 |
| | (0.00) | | (0.00) | | (0.00) | | (0.00) |
| Income (continuous) | 0.068 | | 0.18 | ** | -0.014 | | -0.053 |
| | (0.11) | | (0.09) | | (0.10) | | (0.11) |
| Male | 0.027 | | 0.027 | | 0.064 | | 0.06 |
| | (0.05) | | (0.04) | | (0.05) | | (0.05) |
| College | -0.073 | | -0.05 | | 0.05 | | 0.09 |
| | (0.06) | | (0.04) | | (0.06) | | (0.06) |
| White | 0.133 | ** | 0.115 | ** | 0.068 | | 0.126 | * |
| | (0.06) | | (0.05) | | (0.06) | | (0.06) |
| Intercept | 0.78 | *** | 0.824 | *** | 0.646 | *** | 0.459 | *** |
| | (0.10) | | (0.09) | | (0.12) | | (0.12) |
| N | 211 | | 220 | | 212 | | 207 |
| Adj R$^2$ | 0.502 | | 0.726 | | 0.376 | | 0.219 |
| F | 29.147 | | 121.436 | | 23.325 | | 11.59 |

*Notes: Data are weighted. Robust standard errors in parentheses. \*\*\*p<0.001; \*\*p<0.05; \*p<0.1 (two-tailed); †p<0.05 (one-tailed)*

FFXCO_12343

As Appendix Table B5 shows, when controls are included in the model, the direction of the coefficient for the treatment is consistent with expectations for three of the four experiments, but only in the question about safety in open-air markets is the treatment statistically significant at conventional levels.

| Appendix Table B5: Multivariate Regression Analyses with Demographic Controls (Gun HH) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Recommend Park | | Safe to shop market | | Recommend going to protest | | Recommend carry sign to protest |
| | b/se | | b/se | | b/se | | b/se |
| Treatment | -0.149 | | -0.294 | *** | -0.115 | | 0.022 |
| | (0.11) | | (0.09) | | (0.11) | | (0.11) |
| Age (continuous) | -0.006 | ** | -0.006 | ** | 0.00 | | -0.006 * |
| | (0.00) | | (0.00) | | (0.00) | | (0.00) |
| Income (continuous) | 0.11 | | 0.082 | | 0.424 | * | 0.208 |
| | (0.18) | | (0.17) | | (0.24) | | (0.26) |
| Male | -0.001 | | -0.127 | | -0.124 | | -0.152 |
| | (0.09) | | (0.08) | | (0.11) | | (0.12) |
| College | -0.458 | *** | -0.347 | *** | -0.306 | * | -0.141 |
| | (0.13) | | (0.12) | | (0.15) | | (0.16) |
| White | 0.205 | * | 0.188 | | 0.21 | | 0.10 |
| | (0.12) | | (0.11) | | (0.13) | | (0.13) |
| Intercept | 1.079 | *** | 1.249 | *** | 0.352 | | 0.688 ** |
| | (0.20) | | (0.21) | | (0.28) | | (0.33) |
| N | 86 | | 86 | | 81 | | 81 |
| Adj R² | 0.146 | | 0.283 | | 0.121 | | 0.074 |
| F | 3.978 | | 5.623 | | 2.299 | | 1.533 |
| Notes: Data are weighted. Robust standard errors in parentheses. ***$p<0.001$; **$p<0.05$; *$p<0.1$ (two-tailed); †$p<0.05$ (one-tailed) | | | | | | | |

FFXCO_12344

# Appendix B:  Public Space Usage

| Appendix Table B1a. Typical Park Usage Before Covid (All respondents) | | | | | |
|---|---|---|---|---|---|
| | Parks with amenities for children | Water parks | Golf parks | Camping parks | Remote parks |
| | (%) | (%) | (%) | (%) | (%) |
| Never use | 34 | 48 | 75 | 80 | 54 |
| **Use at least once a month** | **66** | **52** | **25** | **20** | **46** |
| | | | | | |
| Once a month | 31 | 35 | 16 | 17 | 23 |
| Once every other week | 11 | 6 | 3 | 1 | 7 |
| Once a week | 11 | 5 | 4 | 1 | 7 |
| Several days a week | 11 | 5 | 2 | 1 | 8 |
| Every day | 2 | 1 | 0 | 0 | 2 |
| *Note: data are weighted.* | | | | | |

| Appendix Table B1b. Typical Market Usage Before Covid (All Respondent) | |
|---|---|
| | Farmers' markets |
| Never | 35 |
| **At least once every other month** | **65** |
| Every other month | 21 |
| Once a month | 24 |
| Every other week | 10 |
| Every week | 10 |
| Note: Data are weighted. | |

FFXCO_12345

# Appendix C : Factor Analyses

**Appendix Table C1. If guns are allowed in the following public spaces in Fairfax County, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now?**

|  | Factor1 | Factor2 | Factor3 | Factor4 | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9816 | -0.0676 | -0.0508 | -0.0068 | 0.0293 |
| Waterparks | 0.9860 | -0.0572 | 0.0046 | -0.0152 | 0.0242 |
| Golf parks | 0.9631 | -0.0470 | 0.0681 | 0.0022 | 0.0656 |
| Camping parks | 0.9578 | 0.1260 | 0.0133 | -0.0050 | 0.0665 |
| Remote parks | 0.9676 | 0.1133 | -0.0216 | 0.0056 | 0.0505 |
| Open-air markets | 0.9782 | -0.0637 | -0.0124 | 0.0194 | 0.0385 |
|  |  |  |  |  |  |
| **Eigenvalue** | 5.6739 |  |  |  |  |
| **Explained variance** | 0.9984 |  |  |  |  |
| **Cronbach's alpha** | 0.988 |  |  |  |  |
| LR test: independent vs. saturated:  chi2(15) = 5404.94 Prob>chi2 = 0.0000 | | | | | |

**Appendix Table C2. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if other people were armed in each of the following places?**

|  | Factor1 | Factor2 | Factor3 |  | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9749 | -0.096 | 0.0362 |  | 0.0391 |
| Waterparks | 0.9875 | -0.0627 | -0.0017 |  | 0.021 |
| Golf parks | 0.9774 | -0.0486 | -0.043 |  | 0.0404 |
| Camping parks | 0.9703 | 0.1302 | 0.0063 |  | 0.0416 |
| Remote parks | 0.9725 | 0.1316 | 0.0032 |  | 0.037 |
| Open-air markets | 0.9858 | -0.0521 | -0.0009 |  | 0.0255 |
|  |  |  |  |  |  |
| **Eigenvalue** | 5.73979 |  |  |  |  |
| **Explained variance** | 0.9969 |  |  |  |  |
| **Cronbach's alpha** | 0.9912 |  |  |  |  |
| LR test: independent vs. saturated:  chi2(15) = 6046.91 Prob>chi2 = 0.0000 | | | | | |

FFXCO_12346

**Appendix Table C3. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if you were the one armed in each of the following places?**

| | Factor1 | Factor2 | Factor3 | | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9901 | -0.0687 | 0.0234 | | 0.0145 |
| Waterparks | 0.9947 | -0.0643 | 0.0141 | | 0.0063 |
| Golf parks | 0.9923 | -0.0768 | -0.0196 | | 0.009 |
| Camping parks | 0.9809 | 0.1326 | 0.0034 | | 0.0202 |
| Remote parks | 0.9829 | 0.1274 | -0.0026 | | 0.0177 |
| Open-air markets | 0.9909 | -0.0475 | -0.0187 | | 0.0156 |
| | | | | | |
| **Eigenvalue** | 5.8644 | | | | |
| **Explained variance** | 0.994 | | | | |
| **Cronbach's alpha** | 0.9961 | | | | |
| **LR test: independent vs. saturated:  chi2(15) = 6960.83 Prob>chi2 = 0.0000** | | | | | |

**Appendix Table C4. If guns are allowed in the following public spaces in Fairfax County, do you think that you and your family will be a lot more likely to visit, somewhat more likely to visit, about the same, somewhat less likely to visit, a lot less likely to visit?**

| | Factor1 | Factor2 | Factor3 | | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9816 | -0.0889 | 0.0106 | | 0.0285 |
| Waterparks | 0.9872 | -0.022 | -0.0214 | | 0.0244 |
| Golf parks | 0.9709 | -0.0105 | -0.0325 | | 0.0561 |
| Camping parks | 0.9774 | 0.1058 | -0.0105 | | 0.0334 |
| Remote parks | 0.9727 | 0.0676 | 0.0337 | | 0.0481 |
| Open-air markets | 0.9773 | -0.0512 | 0.0202 | | 0.0418 |
| | | | | | |
| **Eigenvalue** | 5.73758 | | | | |
| **Explained variance** | 1.0008 | | | | |
| **Cronbach's alpha** | 0.9918 | | | | |
| **LR test: independent vs. saturated:  chi2(15) = 5859.26 Prob>chi2 = 0.0000** | | | | | |

FFXCO_12347

**Appendix Table C5. If guns are allowed in the following public spaces in Fairfax County, how likely would you be to bring a gun to each of the following places?**

| | Factor1 | Factor2 | Factor3 | | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9824 | -0.1466 | 0.0347 | | 0.0122 |
| Waterparks | 0.9824 | -0.1253 | 0.0496 | | 0.0167 |
| Golf parks | 0.98 | -0.1486 | -0.0372 | | 0.0162 |
| Camping parks | 0.9387 | 0.2781 | 0.0055 | | 0.0415 |
| Remote parks | 0.9528 | 0.2507 | -0.0011 | | 0.0294 |
| Open-air markets | 0.9862 | -0.0883 | -0.0513 | | 0.017 |
| | | | | | |
| **Eigenvalue** | **5.65208** | | | | |
| **Explained variance** | **0.969** | | | | |
| **Cronbach's alpha** | **0.9867** | | | | |

**LR test: independent vs. saturated:  chi2(15) = 6465.72 Prob>chi2 = 0.0000**

**Appendix Table C6. If guns are allowed in the following public spaces in Fairfax County, how safe or unsafe would you feel in a heated argument with someone while in a [location]:**

| | Factor1 | Factor2 | Factor3 | Factor4 | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9881 | -0.0515 | 0.056 | 0.0011 | 0.0178 |
| Waterparks | 0.9941 | -0.0618 | 0.0061 | -0.0126 | 0.0077 |
| Golf parks | 0.992 | -0.0493 | -0.0437 | 0.0000 | 0.0116 |
| Camping parks | 0.9903 | 0.0816 | -0.0229 | -0.0101 | 0.0119 |
| Remote parks | 0.9846 | 0.1044 | 0.0243 | 0.0047 | 0.019 |
| Open-air markets | 0.9858 | -0.0228 | -0.0196 | 0.0171 | 0.0269 |
| | | | | | |
| **Eigenvalue** | 5.87088 | | | | |
| **Explained variance** | 0.9969 | | | | |
| **Cronbach's alpha** | 0.9964 | | | | |

**LR test: independent vs. saturated:  chi2(15) = 7610.60 Prob>chi2 = 0.0000**

FFXCO_12348

**Appendix Table C7. If guns are allowed in the following public spaces in Fairfax County, do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot?**

|  | Factor1 | Factor2 | Factor3 | Factor4 | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.9858 | -0.0705 |  |  | 0.0232 |
| Waterparks | 0.9877 | -0.069 |  |  | 0.0197 |
| Golf parks | 0.9772 | -0.0826 |  |  | 0.0383 |
| Camping parks | 0.9745 | 0.1215 |  |  | 0.0356 |
| Remote parks | 0.9773 | 0.1238 |  |  | 0.0296 |
| Open-air markets | 0.9796 | -0.0214 |  |  | 0.0399 |
|  |  |  |  |  |  |
| **Eigenvalue** | 5.76656 |  |  |  |  |
| **Explained variance** | 0.9979 |  |  |  |  |
| **Cronbach's alpha** | 0.9932 |  |  |  |  |
| LR test: independent vs. saturated:  chi2(15) = 5926.48 Prob>chi2 = 0.0000 |  |  |  |  |  |

**Appendix Table C8. If guns are allowed in the following public spaces in Fairfax County, how safe do you imagine other people would feel if you carried a gun in public spaces?**

|  | Factor1 | Factor2 | Factor3 | Factor4 | Uniqueness |
|---|---|---|---|---|---|
| Parks with amenities for children | 0.981 | -0.1031 | -0.0683 | -0.0012 | 0.0223 |
| Waterparks | 0.9886 | -0.0659 | -0.0068 | -0.0336 | 0.0171 |
| Golf parks | 0.9746 | -0.0675 | 0.0771 | 0.0002 | 0.0396 |
| Camping parks | 0.9728 | 0.1821 | 0.0172 | -0.0084 | 0.0202 |
| Remote parks | 0.9714 | 0.1762 | -0.0259 | 0.0148 | 0.0245 |
| Open-air markets | 0.9761 | -0.1191 | 0.0071 | 0.0287 | 0.0322 |
|  |  |  |  |  |  |
| **Eigenvalue** | 5.73229 |  |  |  |  |
| **Explained variance** | 0.986 |  |  |  |  |
| **Cronbach's alpha** | 0.9917 |  |  |  |  |
| LR test: independent vs. saturated:  chi2(15) = 5410.58 Prob>chi2 = 0.0000 |  |  |  |  |  |

FFXCO_12349

# Appendix D : Survey Questionnaire

**FAIRFAX COMMUNITY SURVEY**

There are many public parks in Fairfax County. These public parks include preserves, hiking and biking paths and trails, camp sites, picnic areas, dog parks, public gardens (including botanical gardens), athletic fields, tennis courts, public golf courses, skate parks, volleyball courts, swimming pools, boat launches and a marina, and public lakes and rivers.

Please know that when we ask about your use of **public parks**, we are asking about your use of any and all of the above **in Fairfax County**.

Q1. **Before Covid-19**, in a typical summer how often did you or your family use the following types of public parks in Fairfax County?

|  | Every day (1) | Several days a week (2) | Once a week (3) | Once every other week (4) | Once a month (5) | Never (6) | I prefer not to say (7) |
|---|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) |  |  |  |  |  |  |  |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) |  |  |  |  |  |  |  |
| Parks that offer golf-related activities |  |  |  |  |  |  |  |
| Parks that offer camping |  |  |  |  |  |  |  |
| Parks that have unpaved trails and no basic amenities such as toilets |  |  |  |  |  |  |  |

[HALF HERE AND HALF AFTER Q19] Q2. **This summer**, how often do you or your family expect to use the following types of public parks?

|  | Every day (1) | Several days a week (2) | Once a week (3) | Once every other week (4) | Once a month (5) | Never (6) | I prefer not to say (7) |
|---|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) |  |  |  |  |  |  |  |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) |  |  |  |  |  |  |  |
| Parks that offer golf-related activities |  |  |  |  |  |  |  |
| Parks that offer camping |  |  |  |  |  |  |  |
| Parks that have unpaved trails and no basic amenities such as toilets |  |  |  |  |  |  |  |

There are also several open-air fairs and markets, including farmers' markets, **in Fairfax County**.

**FFXCO_12350**

Q3. **Before Covid-19**, in a typical summer how often did you or your family visit open-air fairs and markets, including farmers' markets, in Fairfax County?
> Every week (1); Every other week (2); Once a month (3); Every other month (4); Never (5) I don't know/I prefer not to say (6)

[HALF HERE AND HALF AFTER Q19] Q4. **This summer**, how often do you or your family expect to visit open-air fairs and markets, including farmers' markets, in Fairfax County?
> Every week (1); Every other week (2); Once a month (3); Every other month (4); Never (5) I don't know/I prefer not to say (6)

Q5. Before Covid-19, in a typical year, how often did you participate in any in-person political meetings, rallies, demonstrations, speeches, fundraisers, or similar events in support of a particular issue, candidate or party?
Very often (1); Somewhat often (2); Not very often (3); Not at all often (4); Never (5) I don't know/I prefer not to say (6)

[HALF HERE AND HALF AFTER Q19] Q6. Between now and the 2022 midterm election in November, how likely are you to attend any in-person political meetings, rallies, demonstrations, speeches, fundraisers, or similar events in support of a particular issue, candidate or party?
> Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) I don't know/I prefer not to say (6)

| VERSION A | VERSION B |
|---|---|
| Q7a. How likely would you be to recommend to a friend who has children to spend time with them in a public park in Fairfax County?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) | Q7b. How likely would you be to recommend to a friend who has children to spend time with them in a public park in Fairfax County if people are allowed to carry guns in public parks?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/Prefer not to say (6) |
| Q8a. In your view, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets in Fairfax County?<br><br>Very safe (1); Somewhat safe (2); Neither safe nor unsafe (3); Somewhat unsafe (4); Very unsafe (5) | Q8b. In your view, if people are allowed to carry guns in open-air fairs and markets, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets in Fairfax County?<br><br>Very safe (1); Somewhat safe (2); Neither safe nor unsafe (3); Somewhat unsafe (4); Very unsafe (5) |
| Q9a. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they attend the protest?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/prefer not to say (6) | Q9b. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they attend the protest? In their area, people are allowed to bring guns to protests.<br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5); Don't know/prefer not to say (6) |
| Q10a. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they bring a sign to the protest?<br><br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/prefer not to say (6) | Q10b. A friend is thinking of attending a political protest in Fairfax County about an issue that is very important to them and wants your opinion. How likely are you to recommend that they bring a sign to the protest? In their area, people are allowed to bring guns to protests.<br>Very likely (1); Somewhat likely (2); Neither likely nor unlikely (3); Somewhat unlikely (4); Very unlikely (5) Don't know/prefer not to say (6) |

FFXCO_12351

Q11. In your view, how safe is it for you and your family to spend time in a public park in Fairfax County?
Very safe (1); Somewhat safe (2); Neither safe nor unsafe (3); Somewhat unsafe (4); Very unsafe (5) I don't know/I prefer not to say (6)

Q12. **If guns are allowed in the following public spaces in Fairfax County**, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now?

|  | A lot safer | Somewhat safer | About the same | Somewhat less safe | A lot less safe | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

FFXCO_12352

Q13. **If guns are allowed in the following public spaces in Fairfax County**, how safe would you feel if other people were armed in each of the following places?

| | A lot safer | Somewhat safer | About the same | Somewhat less safe | A lot less safe | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

Q14. **If guns are allowed in the following public spaces in Fairfax County**, how safe would you feel if you were the one armed in each of the following places?

| | A lot safer | Somewhat safer | About the same | Somewhat less safe | A lot less safe | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

FFXCO_12353

Q15. **If guns are allowed in the following public spaces in Fairfax County,** do you think that you and your family will be a lot more likely to visit, somewhat more likely to visit, about the same, somewhat less likely to visit, a lot less likely to visit?

| | A lot more likely | Somewhat more likely | About the same | Somewhat less likely | A lot less likely | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

Q16. **If guns are allowed in the following public spaces in Fairfax County,** how likely would you be to bring a gun to each of the following places?

| | Very likely | Somewhat likely | Neither | Somewhat unlikely | Very unlikely | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

FFXCO_12354

Q17. **If guns are allowed in the following public spaces in Fairfax County,** how safe or unsafe would you feel in a heated argument with someone while in a:

| | Very safe | Somewhat safe | Neither | Somewhat unsafe | Very unsafe | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fair or market, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meeting, rally or demonstration held outdoors | 1 | 2 | 3 | 4 | 5 | 6 |

Q18. **If guns are allowed in the following public spaces in Fairfax County,** do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot?

| | Increase a lot | Increase somewhat | Stay the same | Decrease somewhat | Decrease a lot | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

FFXCO_12355

Q19. **If guns are allowed in the following public spaces in Fairfax County,** how safe do you imagine other people would feel if you carried a gun in public spaces?

| | Very safe | Somewhat safe | Neither | Somewhat unsafe | Very unsafe | Don't know/Prefer not to say |
|---|---|---|---|---|---|---|
| Parks that offer outdoors amenities for families and children (e.g., playground, picnic pavilions, organized activities for children) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer outdoors, water-based recreation for adults and children (e.g., fishing and boating) | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer golf-related activities | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that offer camping | 1 | 2 | 3 | 4 | 5 | 6 |
| Parks that have unpaved trails and no basic amenities such as toilets | 1 | 2 | 3 | 4 | 5 | 6 |
| Open-air fairs and markets, including farmers' markets | 1 | 2 | 3 | 4 | 5 | 6 |
| Political meetings, rallies or demonstrations held in outdoor public places | 1 | 2 | 3 | 4 | 5 | 6 |

Q20. People have different beliefs about guns. For each of the following, please tell us if it is very true, somewhat true, neither true nor false, somewhat false, or very false.

| | Very true(1) | Somewhat true(2) | Neither (3) | Somewhat false (4) | Very false (5) | Don't know/Prefer not to say (6) |
|---|---|---|---|---|---|---|
| Gun owners should be required to take a gun safety training course | 1 | 2 | 3 | 4 | 5 | 6 |
| Having a gun at home makes you safer | 1 | 2 | 3 | 4 | 5 | 6 |
| Gun owners should be required to store their guns in a lock box, separate from ammunition | 1 | 2 | 3 | 4 | 5 | 6 |
| Public spaces are safer if people are allowed to carry guns | 1 | 2 | 3 | 4 | 5 | 6 |
| Arming ordinary citizens is an effective way to prevent mass shootings | 1 | 2 | 3 | 4 | 5 | 6 |
| Background checks should be performed for all gun sales | 1 | 2 | 3 | 4 | 5 | 6 |
| Women are less likely to be attacked if they carry a gun | 1 | 2 | 3 | 4 | 5 | 6 |
| Gun ownership is a sign of good citizenship | 1 | 2 | 3 | 4 | 5 | 6 |
| People own guns to protect themselves and others from crime | 1 | 2 | 3 | 4 | 5 | 6 |

FFXCO_12356

| | | | | | |
|---|---|---|---|---|---|
| I am very disturbed by the thought that I or my loved ones might be injured or killed because laws aren't strict enough | 1 | 2 | 3 | 4 | 5 | 6 |
| Government is so powerful that people need guns to protect themselves from it | 1 | 2 | 3 | 4 | 5 | 6 |
| When people keep a gun in their home, there is an increased risk that someone will be accidentally shot. | 1 | 2 | 3 | 4 | 5 | 6 |
| The more guns there are in our society, the less safe our society becomes | 1 | 2 | 3 | 4 | 5 | 6 |
| Fewer people commit violent crimes when private citizens are allowed to carry concealed handguns | 1 | 2 | 3 | 4 | 5 | 6 |
| I am very disturbed by the thought that gun laws might interfere with my ability to defend myself or my loved ones | 1 | 2 | 3 | 4 | 5 | 6 |

Q21. Please rank the following government guarantees in terms of their importance to you and your family.  (With 1 being most important, 2 being second most important and 3 being third most important, etc.).

_____Right to bear arms (1)
_____Right to vote (2)
_____Right to be free of discrimination (3)
_____Right to free speech (4)
_____Right to a fair trial (5)

Q22. How worried are you that you or a family member may become a victim of a serious crime? Would you say you are: Extremely worried (1); Very worried (2); Not very worried (3); Not at all worried (4) Don't know/prefer not to say (5)

Q23. Have you or a member of your household ever been the victim of a violent crime? Yes (1) No (2) Prefer not to say (3)

Q24. Have you ever encountered an openly-armed person, other than a law enforcement officer, in a public place? Yes (1) No (2) Don't know (3)
                    [IF Q24=YES:] Q25. How did this encounter make you feel?
Very safe (1); Somewhat safe (2); It did not affect me (3); Somewhat unsafe (4); Very unsafe (5) Don't know/prefer not to say (6)
Q26. How many guns do you or anyone else living in your household own? _____

[IF Q26=other than zero] Q27. Do you personally own a gun? (1) Yes (2) No (3) Prefer not to say

Q28 [IF Q27=YES]. Do you carry a concealed gun?  (1) Yes (2) No (3) Prefer not to say
Q29. [If Q27=YES]. Did you purchase a gun in the past 18 months? (1) Yes (2) No (3) Prefer not to say

Q30. Do you plan on purchasing a gun in the next 18 months? (1) Yes (2) No (3) Prefer not to say

Q32. [Q27=YES OR Q30=YES] What kind of gun do you own or plan to purchase? Please, select all that apply.

1) Handgun; 2) Shotgun; 3) Rifle; 4) Other 5) Prefer not to say

Q31. [IF Q27=YES] What is the primary reason why you own a gun?

1. Personal protection
2. Sports/hunting
3. Second Amendment right
4. Work
5. Protection from government
6. Inheritance or gift
7. Other[specify]_____
8. Prefer not to say

Q33. When you think about the National Rifle Association (NRA), how often do you say "we" instead of "they"?
Always (1); Often (2); Sometimes (3); Rarely (4) ; Never (5) Don't know/prefer not to say (6)

Q34. Do you think what happens to gun owners in this country will have something to do with what happens in your life?
All the time (1) Often (2) Sometimes (3) Never (4) Don't know/prefer not to say (5)

FFXCO_12357

Q35. Now, please think about your CHILDHOOD (before the age of 18). Did anyone in your household do the following things when you were growing up?

|  | Yes | No | Don't know/Prefer not to say |
|---|---|---|---|
| Keep a gun in the house | 1 | 2 | 3 |
| Teach you how to shoot a gun | 1 | 2 | 3 |
| Teach you how to clean a gun | 1 | 2 | 3 |
| Take you hunting | 1 | 2 | 3 |
| Take you to a gun show | 1 | 2 | 3 |

Q36. Over the past five years, do you think that economic opportunities in this region as a whole have increased a lot, increased somewhat, stayed the same, decreased somewhat, or decreased a lot?

Increased a lot (1); Increased somewhat (2); Stayed the same (3); Decreased somewhat (4); Decreased a lot (5)

Q37. So far as you and your family are concerned, how worried are you about your current financial situation?

Extremely worried (1); Very worried (2); Moderately worried (3); A little worried (4); Not at all worried (5)

Q38. For each of the following statements, please indicate if you think the statement is very true, somewhat true, neither true or false, somewhat false, or very false.

|  | Very true(1) | Somewhat true(2) | Neither (3) | Somewhat false (4) | Very false (5) | Don't know/Prefer not to say (6) |
|---|---|---|---|---|---|---|
| It's a mistake to ask society to help every person in need | 1 | 2 | 3 | 4 | 5 | 6 |
| The government interferes way too much in our everyday lives | 1 | 2 | 3 | 4 | 5 | 6 |
| Sometimes government needs to make laws to keep people from hurting themselves | 1 | 2 | 3 | 4 | 5 | 6 |

Q39. In American society, how much discrimination is there against each of the following groups? Is it a lot, some, a little, or none at all?

|  | A lot (1) | Some (2) | A little (3) | None at all (4) | Don't know/Prefer not to say (6) |
|---|---|---|---|---|---|
| Black people | 1 | 2 | 3 | 4 | 5 |
| Gun owners | 1 | 2 | 3 | 4 | 5 |
| Immigrants | 1 | 2 | 3 | 4 | 5 |
| Men | 1 | 2 | 3 | 4 | 5 |
| White people | 1 | 2 | 3 | 4 | 5 |
| Women | 1 | 2 | 3 | 4 | 5 |

FFXCO_12358

Q40. People do not have the same views about the role of men and women in the family and in society. For each of the following statements, please indicate if you think the statement is very true, somewhat true, neither true or false, somewhat false, or very false.

|  | Very true(1) | Somewhat true(2) | Neither (3) | Somewhat false (4) | Very false (5) | Don't know/Prefer not to say (6) |
|---|---|---|---|---|---|---|
| When women demand equality these days, they are actually seeking special favors | 1 | 2 | 3 | 4 | 5 | 6 |
| Women should be cherished and protected by men | 1 | 2 | 3 | 4 | 5 | 6 |
| A real man will never back down from a fight | 1 | 2 | 3 | 4 | 5 | 6 |

We have just a few final questions about you. As a reminder, all of your responses are completely confidential. These data are collected for statistical analysis purposes only.

Q41. What is your 5-digit zip code? _____

Q42. In what year were you born? _____

Q43. With which gender do you identify? (1) Man (2) Woman (3) Prefer to provide own description: _____(4) Prefer not to say

Q44. How do you describe yourself most of the time? (Please select one category)
American Indian or Alaskan Native
Asian or Asian American
Black or African American
Hispanic or Latina/o/x
Middle Eastern/North African
Native Hawaiian, or other Pacific Islander
White
Multiracial
Prefer not to say

Q45. How important to your identity is your racial heritage? Extremely important (1); Very important (2); Moderately important (3); Slightly important (4); Not at all important (5) Don't know/prefer not to say (6)

Q46. What is the highest level of education you have completed?
Less than high school diploma (1)
High school graduate/GED (2)
Some college but no degree (3)
Associate's Degree (AA) (4)
Bachelor's Degree (for example: BA, BS) (5)
Master's, Professional or Doctoral degree (for example: MA, MSW, MD, PhD) (6)

Prefer not to say (7)

Q47. Which of the following best describes you?
Employed full time (35 hours/week or more) (1)
Employed part time (2)
Looking for work (3)
Stay-at-home parent/homemaker (4)
Student (5)
Retired (6)
Disabled (7)
Other (specify) (8)
Prefer not to say (9)

Q48. What is your current marital status?
Married (1)
Divorced or Separated (2)
Widowed (3)
Cohabitating but not married (4)
Single never married (5)
Prefer not to say (6)

Q49. How many children under the age of 18 are there in your household? (Write "zero" if no children):

_____

Q50. Which of the following income categories most closely describes your total household income in 2021 before taxes, including wages and all other income? (We ask this question for classification purposes).
Less than $25,000 (1)
$25,000 - $49,999 (2)
$50,000 - $74,999 (3)
$75,000 - $99,999 (4)
$100,000-$149,999 (5)
$150,000-$199,999 (6)
$200,000 or more (7)
Don't know (8)
Prefer not to say (9)

FFXCO_12359

Q51. Do you currently live in Fairfax County? (1) Yes (2) No (3) Prefer not to say

Q52. [IF Q51=NO:] Where do you currently live? TOWN/CITY/COUNTY: _____ ; Prefer not to say

Q53. (IF Q51=YES]): How many years in total have you lived in Fairfax County?

1       Less than two years
2       2-5 years
3       6-10 years
4       11-20 years
5       More than 20 years
6       Not sure
7.      Prefer not to say

Q54. How important is religion in your life?
(1) Extremely important, (2) very important, (3) moderately important; (4) slightly important; (5) not at all important; Don't know/prefer not to say (6)

Q55. What is your present religion, if any?
1. Mainline Protestant 2. Evangelical Protestant 3. Roman Catholic 4. Other Christian 5. Jewish 6. Muslim 7. Buddhist 8. Hindu 9. Atheist 10. Agnostic 11. Something else 12. Nothing in particular 13. Prefer not to say

Q56. When it comes to politics, do you consider yourself to be:

         Strong Democrat (1)
         Democrat (2)
         Independent (3)
         Republican (4)
         Strong Republican (5)
         Something else (6)
         I don't know (7)
         Prefer not to say (8)

Q57. When it comes to politics, do you consider yourself to be:

         Very liberal (1)
         Somewhat liberal (2)
         Moderate (3)
         Somewhat conservative (4)
         Very conservative (5)
         I don't know (6)
         Prefer not to say (7)

FFXCO_12360

# Appendix E: Stata Code

```
gen wgt= poststratweight

recode Q43 (3=.) (4=.)
gen male=1 if Q43==1
replace male=0 if Q43==2
tab male Q43

recode Q44 (9=.)
gen white=1 if Q44==7
replace white=0 if Q44<7|Q44==8
tab white Q44

recode Q46 (7=3)
gen college=1 if Q46>4
replace college=0 if Q46<5
tab Q46 college

recode Q26 (12=.)
gen gunhome=0 if Q26==1
replace gunhome=1 if Q26>1
replace gunhome=. if Q26==.
tab Q26 gunhome

gen gunhome2=2 if gunhome==.
replace gunhome2=0 if gunhome==0
replace gunhome2=1 if gunhome==1
tab gunhome2

***imputed Non-response as midpoint

recode Q50 (11=5) (10=5)
gen income=(Q50-1)/8
tab Q50 income

**Corrected one erroneous date

recode Q42 (1885=1985)
gen agec=2022-Q42
replace agec=. if Q42==.
tab agec

*****Experiments-split sample***

**Treatment groups
destring , replace

gen treatment=.
replace    treatment=0 if    TreatmentGroup==1    |
TreatmentGroup==2
replace    treatment=1 if    TreatmentGroup==3    |
TreatmentGroup==4
tab treatment TreatmentGroup
label var treatment "Guns condotion=1"
```

```
***How likely would you be to recommend to a friend who
has children to spend time with them in a public park in
Fairfax County?***

recode Q7a (6=.)
recode Q7b (6=.)
gen  recommend=1 if Q7a==1 |Q7b==1
replace recommend=.75 if Q7a==2|Q7b==2
replace recommend=.5 if Q7a==3|Q7b==3
replace recommend=.25 if Q7a==4|Q7b==4
replace recommend=.0 if Q7a==5|Q7b==5
tab recommend

**Q8. In your view, how safe is it for you and your family to
go shopping in open-air fairs and markets, including farmers'
markets in Fairfax County

recode Q8a (6=.)
recode Q8b (6=.)
gen  safefair=1 if Q8a==1 |Q8b==1
replace safefair=.75 if Q8a==2|Q8b==2
replace safefair=.5 if Q8a==3|Q8b==3
replace safefair=.25 if Q8a==4|Q8b==4
replace safefair=.0 if Q8a==5|Q8b==5
tab safefair

*Q9a. A friend is thinking of attending a political protest in
Fairfax County about an issue that is very important to them
and wants your opinion. How likely are you to recommend
that they attend the protest?

recode Q9a (6=.)
recode Q9b (6=.)
gen  safeprotest=1 if Q9a==1 |Q9b==1
replace safeprotest=.75 if Q9a==2|Q9b==2
replace safeprotest=.5 if Q9a==3|Q9b==3
replace safeprotest=.25 if Q9a==4|Q9b==4
replace safeprotest=.0 if Q9a==5|Q9b==5
tab safeprotest

**Q10a. A friend is thinking of attending a political protest in
Fairfax County about an issue that is very important to them
and wants your opinion. How likely are you to recommend
that they bring a sign to the protest?

recode Q10a (6=.)
recode Q10b (6=.)
gen  signprotest=1 if Q10a==1 |Q10b==1
replace signprotest=.75 if Q10a==2|Q10b==2
replace signprotest=.5 if Q10a==3|Q10b==3
replace signprotest=.25 if Q10a==4|Q10b==4
replace signprotest=.0 if Q10a==5|Q10b==5
tab signprotest
```

FFXCO_12361

*Q12. If guns are allowed in the following public spaces in Fairfax County, do you think that each of the following will be a lot safer, somewhat safer, about the same, somewhat less safe, or a lot less safe than they are now?

recode Q12_1 (6=.)
recode Q12_2 (6=.)
recode Q12_3 (6=.)
recode Q12_4 (6=.)
recode Q12_5 (6=.)
recode Q12_6 (6=.)
recode Q12_7 (6=.)

gen familyparks=(5-Q12_1)/4
tab Q12_1 familyparks
gen waterparks=(5-Q12_2)/4
tab Q12_2 waterparks
gen golfparks=(5-Q12_3)/4
tab Q12_3 golfparks
gen camping =(5-Q12_4)/4
tab Q12_4 camping
gen unpaved=(5-Q12_5)/4
tab Q12_5 unpaved
gen markets=(5-Q12_6)/4
tab Q12_6 markets
gen rallies=(5-Q12_7)/4
tab Q12_7 rallies

tab familyparks [iw=wgt]
tab familyparks if gunhome==1 [iw=wgt]
tab familyparks if gunhome==0 [iw=wgt]
tab waterparks [iw=wgt]
tab waterparks if gunhome==1 [iw=wgt]
tab waterparks if gunhome==0 [iw=wgt]
tab golfparks [iw=wgt]
tab golfparks if gunhome==1 [iw=wgt]
tab golfparks if gunhome==0 [iw=wgt]
tab camping [iw=wgt]
tab camping if gunhome==1 [iw=wgt]
tab camping if gunhome==0 [iw=wgt]
tab unpaved [iw=wgt]
tab unpaved if gunhome==1 [iw=wgt]
tab unpaved if gunhome==0 [iw=wgt]
tab markets [iw=wgt]
tab markets if gunhome==1 [iw=wgt]
tab markets if gunhome==0 [iw=wgt]

**Q13. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if other people were armed in each of the following places?

recode Q13_1 (6=.)
recode Q13_2 (6=.)
recode Q13_3 (6=.)
recode Q13_4 (6=.)
recode Q13_5 (6=.)

recode Q13_6 (6=.)
recode Q13_7 (6=.)

gen familyparks2=(5-Q13_1)/4
tab Q13_1 familyparks2
gen waterparks2=(5-Q13_2)/4
tab Q13_2 waterparks2
gen golfparks2=(5-Q13_3)/4
tab Q13_3 golfparks2
gen camping2 =(5-Q13_4)/4
tab Q13_4 camping2
gen unpaved2=(5-Q13_5)/4
tab Q13_5 unpaved2
gen markets2=(5-Q13_6)/4
tab Q13_6 markets2
gen rallies2=(5-Q13_7)/4
tab Q13_7 rallies2

tab familyparks2 [iw=wgt]
tab familyparks2 if gunhome==1 [iw=wgt]
tab familyparks2 if gunhome==0 [iw=wgt]
tab waterparks2 [iw=wgt]
tab waterparks2 if gunhome==1 [iw=wgt]
tab waterparks2 if gunhome==0 [iw=wgt]
. tab golfparks2 [iw=wgt]
tab golfparks2 if gunhome==1 [iw=wgt]
tab golfparks2 if gunhome==0 [iw=wgt]
tab camping2 [iw=wgt]
tab camping2 if gunhome==1 [iw=wgt]
tab camping2 if gunhome==0 [iw=wgt]
tab unpaved2 [iw=wgt]
tab unpaved2 if gunhome==1 [iw=wgt]
tab unpaved2 if gunhome==0 [iw=wgt]
tab markets2 [iw=wgt]
tab markets2 if gunhome==1 [iw=wgt]
tab markets2 if gunhome==0 [iw=wgt]

*Q14. If guns are allowed in the following public spaces in Fairfax County, how safe would you feel if you were the one armed in each of the following places?

recode Q14_1 (6=.)
recode Q14_2 (6=.)
recode Q14_3 (6=.)
recode Q14_4 (6=.)
recode Q14_5 (6=.)
recode Q14_6 (6=.)
recode Q14_7 (6=.)

gen familyparks3=(5-Q14_1)/4
tab Q14_1 familyparks3
gen waterparks3=(5-Q14_2)/4
tab Q14_2 waterparks3
gen golfparks3=(5-Q14_3)/4
tab Q14_3 golfparks3
gen camping3 =(5-Q14_4)/4
tab Q14_4 camping3

FFXCO_12362

```
gen unpaved3=(5-Q14_5)/4
tab Q14_5 unpaved3
gen markets3=(5-Q14_6)/4
tab Q14_6 markets3
gen rallies3=(5-Q14_7)/4
tab Q14_7 rallies3

tab familyparks3 [iw=wgt]
tab familyparks3 if gunhome==1 [iw=wgt]
tab familyparks3 if gunhome==0 [iw=wgt]
tab waterparks3 [iw=wgt]
tab waterparks3 if gunhome==1 [iw=wgt]
tab waterparks3 if gunhome==0 [iw=wgt]
tab golfparks3 [iw=wgt]
tab golfparks3 if gunhome==1 [iw=wgt]
tab golfparks3 if gunhome==0 [iw=wgt]
tab camping3 [iw=wgt]
tab camping3 if gunhome==1 [iw=wgt]
tab camping3 if gunhome==0 [iw=wgt]
tab unpaved3 [iw=wgt]
tab unpaved3 if gunhome==1 [iw=wgt]
tab unpaved3 if gunhome==0 [iw=wgt]
tab markets3 [iw=wgt]
tab markets3 if gunhome==1 [iw=wgt]
tab markets3 if gunhome==0 [iw=wgt]
```

*Q15. If guns are allowed in the following public spaces in Fairfax County, do you think that you and your family will be a lot more likely to visit, somewhat more likely to visit, about the same, somewhat less likely to visit, a lot less likely to visit?

```
recode Q15_1 (6=.)
recode Q15_2 (6=.)
recode Q15_3 (6=.)
recode Q15_4 (6=.)
recode Q15_5 (6=.)
recode Q15_6 (6=.)
recode Q15_7 (6=.)

gen familyparks4=(5-Q15_1)/4
tab Q15_1 familyparks4
gen waterparks4=(5-Q15_2)/4
tab Q15_2 waterparks4
gen golfparks4=(5-Q15_3)/4
tab Q15_3 golfparks4
gen camping4 =(5-Q15_4)/4
tab Q15_4 camping4
gen unpaved4=(5-Q15_5)/4
tab Q15_5 unpaved4
gen markets4=(5-Q15_6)/4
tab Q15_6 markets4
gen rallies4=(5-Q15_7)/4
tab Q15_7 rallies4

tab familyparks4 [iw=wgt]
tab familyparks4 if gunhome==1 [iw=wgt]
```

```
tab familyparks4 if gunhome==0 [iw=wgt]
tab waterparks4 [iw=wgt]
tab waterparks4 if gunhome==1 [iw=wgt]
tab waterparks4 if gunhome==0 [iw=wgt]
tab golfparks4 [iw=wgt]
tab golfparks4 if gunhome==1 [iw=wgt]
tab golfparks4 if gunhome==0 [iw=wgt]
tab camping4 [iw=wgt]
tab camping4 if gunhome==1 [iw=wgt]
tab camping4 if gunhome==0 [iw=wgt]
tab unpaved4 [iw=wgt]
tab unpaved4 if gunhome==1 [iw=wgt]
tab unpaved4 if gunhome==0 [iw=wgt]
tab markets4 [iw=wgt]
tab markets4 if gunhome==1 [iw=wgt]
tab markets4 if gunhome==0 [iw=wgt]
```

**Q16. If guns are allowed in the following public spaces in Fairfax County, how likely would you be to bring a gun to each of the following places?

```
recode Q16_1 (6=.)
recode Q16_2 (6=.)
recode Q16_3 (6=.)
recode Q16_4 (6=.)
recode Q16_5 (6=.)
recode Q16_6 (6=.)
recode Q16_7 (6=.)

gen familyparks5=(5-Q16_1)/4
tab Q16_1 familyparks5
gen waterparks5=(5-Q16_2)/4
tab Q16_2 waterparks5
gen golfparks5=(5-Q16_3)/4
tab Q16_3 golfparks5
gen camping5 =(5-Q16_4)/4
tab Q16_4 camping5
gen unpaved5=(5-Q16_5)/4
tab Q16_5 unpaved5
gen markets5=(5-Q16_6)/4
tab Q16_6 markets5
gen rallies5=(5-Q16_7)/4
tab Q16_7 rallies5

tab familyparks5 [iw=wgt]
tab familyparks5 if gunhome==1 [iw=wgt]
tab familyparks5 if gunhome==0 [iw=wgt]
tab waterparks5 [iw=wgt]
tab waterparks5 if gunhome==1 [iw=wgt]
tab waterparks5 if gunhome==0 [iw=wgt]
tab golfparks5 [iw=wgt]
tab golfparks5 if gunhome==1 [iw=wgt]
tab golfparks5 if gunhome==0 [iw=wgt]
tab camping5 [iw=wgt]
tab camping5 if gunhome==1 [iw=wgt]
tab camping5 if gunhome==0 [iw=wgt]
tab unpaved5 [iw=wgt]
```

FFXCO_12363

tab unpaved5 if gunhome==1 [iw=wgt]
tab unpaved5 if gunhome==0 [iw=wgt]
tab markets5 [iw=wgt]
tab markets5 if gunhome==1 [iw=wgt]
tab markets5 if gunhome==0 [iw=wgt]

**Q17. If guns are allowed in the following public spaces in Fairfax County, how safe or unsafe would you feel in a heated argument with someone while in a:

recode Q17_1 (6=.)
recode Q17_2 (6=.)
recode Q17_3 (6=.)
recode Q17_4 (6=.)
recode Q17_5 (6=.)
recode Q17_6 (6=.)
recode Q17_7 (6=.)

gen familyparks6=(5-Q17_1)/4
tab Q17_1 familyparks6
gen waterparks6=(5-Q17_2)/4
tab Q17_2 waterparks6
gen golfparks6=(5-Q17_3)/4
tab Q17_3 golfparks6
gen camping6=(5-Q17_4)/4
tab Q17_4 camping6
gen unpaved6=(5-Q17_5)/4
tab Q17_5 unpaved6
gen markets6=(5-Q17_6)/4
tab Q17_6 markets6
gen rallies6=(5-Q17_7)/4
tab Q17_7 rallies6

tab familyparks6 [iw=wgt]
tab familyparks6 if gunhome==1 [iw=wgt]
tab familyparks6 if gunhome==0 [iw=wgt]
tab waterparks6 [iw=wgt]
tab waterparks6 if gunhome==1 [iw=wgt]
tab waterparks6 if gunhome==0 [iw=wgt]
tab golfparks6 [iw=wgt]
tab golfparks6 if gunhome==1 [iw=wgt]
tab golfparks6 if gunhome==0 [iw=wgt]
tab camping6 [iw=wgt]
tab camping6 if gunhome==1 [iw=wgt]
tab camping6 if gunhome==0 [iw=wgt]
tab unpaved6 [iw=wgt]
tab unpaved6 if gunhome==1 [iw=wgt]
tab unpaved6 if gunhome==0 [iw=wgt]
tab markets6 [iw=wgt]
tab markets6 if gunhome==1 [iw=wgt]
tab markets6 if gunhome==0 [iw=wgt]

**Q18. If guns are allowed in the following public spaces in Fairfax County, do you think that crime in such spaces will increase a lot, increase somewhat, stay the same, decrease somewhat, or decrease a lot?

recode Q18_1 (6=.)
recode Q18_2 (6=.)
recode Q18_3 (6=.)
recode Q18_4 (6=.)
recode Q18_5 (6=.)
recode Q18_6 (6=.)
recode Q18_7 (6=.)

gen familyparks7=(5-Q18_1)/4
tab Q18_1 familyparks7
gen waterparks7=(5-Q18_2)/4
tab Q18_2 waterparks7
gen golfparks7=(5-Q18_3)/4
tab Q18_3 golfparks7
gen camping7=(5-Q18_4)/4
tab Q18_4 camping7
gen unpaved7=(5-Q18_5)/4
tab Q18_5 unpaved7
gen markets7=(5-Q18_6)/4
tab Q18_6 markets7
gen rallies7=(5-Q18_7)/4
tab Q18_7 rallies7

tab familyparks7 [iw=wgt]
tab familyparks7 if gunhome==1 [iw=wgt]
tab familyparks7 if gunhome==0 [iw=wgt]
tab waterparks7 [iw=wgt]
tab waterparks7 if gunhome==1 [iw=wgt]
tab waterparks7 if gunhome==0 [iw=wgt]
tab golfparks7 [iw=wgt]
tab golfparks7 if gunhome==1 [iw=wgt]
tab golfparks7 if gunhome==0 [iw=wgt]
tab camping7 [iw=wgt]
tab camping7 if gunhome==1 [iw=wgt]
tab camping7 if gunhome==0 [iw=wgt]
tab unpaved7 [iw=wgt]
tab unpaved7 if gunhome==1 [iw=wgt]
tab unpaved7 if gunhome==0 [iw=wgt]
tab markets7 [iw=wgt]
tab markets7 if gunhome==1 [iw=wgt]
tab markets7 if gunhome==0 [iw=wgt]

*Q19. If guns are allowed in the following public spaces in Fairfax County, how safe do you imagine other people would feel if you carried a gun in public spaces?

recode Q19_1 (6=.)
recode Q19_2 (6=.)
recode Q19_3 (6=.)
recode Q19_4 (6=.)
recode Q19_5 (6=.)
recode Q19_6 (6=.)
recode Q19_7 (6=.)

gen familyparks8=(5-Q19_1)/4
tab Q19_1 familyparks8
gen waterparks8=(5-Q19_2)/4

FFXCO_12364

```
tab Q19_2 waterparks8
gen golfparks8=(5-Q19_3)/4
tab Q19_3 golfparks8
gen camping8=(5-Q19_4)/4
tab Q19_4 camping8
gen unpaved8=(5-Q19_5)/4
tab Q19_5 unpaved8
gen markets8=(5-Q19_6)/4
tab Q19_6 markets8
gen rallies8=(5-Q19_7)/4
tab Q19_7 rallies8

tab familyparks8 [iw=wgt]
tab familyparks8 if gunhome==1 [iw=wgt]
tab familyparks8 if gunhome==0 [iw=wgt]
tab waterparks8 [iw=wgt]
tab waterparks8 if gunhome==1 [iw=wgt]
tab waterparks8 if gunhome==0 [iw=wgt]
tab golfparks8 [iw=wgt]
tab golfparks8 if gunhome==1 [iw=wgt]
tab golfparks8 if gunhome==0 [iw=wgt]
tab camping8 [iw=wgt]
tab camping8 if gunhome==1 [iw=wgt]
tab camping8 if gunhome==0 [iw=wgt]
tab unpaved8 [iw=wgt]
tab unpaved8 if gunhome==1 [iw=wgt]
tab unpaved8 if gunhome==0 [iw=wgt]
tab markets8 [iw=wgt]
tab markets8 if gunhome==1 [iw=wgt]
tab markets8 if gunhome==0 [iw=wgt]


factor familyparks waterparks golfparks camping unpaved
markets
alpha familyparks waterparks golfparks camping unpaved
markets


factor familyparks2 waterparks2 golfparks2 camping2
unpaved2 markets2
alpha familyparks2 waterparks2 golfparks2 camping2
unpaved2 markets2

factor familyparks3 waterparks3 golfparks3 camping3
unpaved3 markets3
alpha familyparks3 waterparks3 golfparks3 camping3
unpaved3 markets3

factor familyparks4 waterparks4 golfparks4 camping4
unpaved4 markets4
alpha familyparks4 waterparks4 golfparks4 camping4
unpaved4 markets4

factor familyparks5 waterparks5 golfparks5 camping5
unpaved5 markets5
alpha familyparks5 waterparks5 golfparks5 camping5
unpaved5 markets5
```

```
factor familyparks6 waterparks6 golfparks6 camping6
unpaved6 markets6
alpha familyparks6 waterparks6 golfparks6 camping6
unpaved6 markets6

factor familyparks7 waterparks7 golfparks7 camping7
unpaved7 markets7
alpha familyparks7 waterparks7 golfparks7 camping7
unpaved7 markets7

factor familyparks8 waterparks8 golfparks8 camping8
unpaved8 markets8
alpha familyparks8 waterparks8 golfparks8 camping8
unpaved8 markets8
***********************************************************
**EXPERIMENT CROSS-TABS
***********************************************************
tab recommend if treatment==0 [iw=wgt]
tab recommend if treatment==1 [iw=wgt]
mean recommend if treatment==0 [iw=wgt]
mean recommend if treatment==1 [iw=wgt]
ttest recommend, by (treatment)
reg recommend i.treatment [w=wgt]

tab recommend if gunhome==1 & treatment==0 [iw=wgt]
tab recommend if gunhome==1 & treatment==1 [iw=wgt]
mean recommend if treatment==0 & gunhome==1 [iw=wgt]
mean recommend if treatment==1 & gunhome==1 [iw=wgt]
ttest recommend if gunhome==1, by (treatment)
reg recommend i.treatment if gunhome==1 [w=wgt]

tab recommend if gunhome==0 & treatment==0 [iw=wgt]
tab recommend if gunhome==0 & treatment==1 [iw=wgt]
mean recommend if treatment==0 & gunhome==0 [iw=wgt]
mean recommend if treatment==1 & gunhome==0 [iw=wgt]
ttest recommend if gunhome==0, by (treatment)
reg recommend i.treatment if gunhome==0 [w=wgt]

eststo: reg recommend i.treatment [w=wgt]
eststo: reg recommend i.treatment if gunhome==1 [w=wgt]
eststo: reg recommend i.treatment if gunhome==0 [w=wgt]
estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4 3)) cells("b(star  fmt(3))"
se(par(`"="("'*`)"'")fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear

tab safefair if treatment==0 [iw=wgt]
tab safefair if treatment==1 [iw=wgt]
mean safefair if treatment==0 [iw=wgt]
mean safefair if treatment==1 [iw=wgt]
ttest safefair, by (treatment)
reg safefair i.treatment [w=wgt]

tab safefair if gunhome==1 & treatment==0 [iw=wgt]
tab safefair if gunhome==1 & treatment==1 [iw=wgt]
```

FFXCO_12365

```
mean safefair if treatment==0 & gunhome==1 [iw=wgt]
mean safefair if treatment==1 & gunhome==1 [iw=wgt]
ttest safefair if gunhome==1, by (treatment)
reg safefair i.treatment if gunhome==1 [w=wgt]

tab safefair if gunhome==0 & treatment==0 [iw=wgt]
tab safefair if gunhome==0 & treatment==1 [iw=wgt]
mean safefair if treatment==0 & gunhome==0 [iw=wgt]
mean safefair if treatment==1 & gunhome==0 [iw=wgt]
ttest safefair if gunhome==0, by (treatment)
reg safefair i.treatment if gunhome==0 [w=wgt]

eststo: reg safefair i.treatment [w=wgt]
eststo: reg safefair i.treatment if gunhome==1 [w=wgt]
eststo: reg safefair i.treatment if gunhome==0 [w=wgt]
estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par("="("'"")"")fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear

tab safeprotest if treatment==0 [iw=wgt]
tab safeprotest if treatment==1 [iw=wgt]
mean safeprotest if treatment==0 [iw=wgt]
mean safeprotest if treatment==1 [iw=wgt]
ttest safeprotest, by (treatment)
reg safeprotest i.treatment [w=wgt]

tab safeprotest if gunhome==1 & treatment==0 [iw=wgt]
tab safeprotest if gunhome==1 & treatment==1 [iw=wgt]
mean safeprotest if treatment==0 & gunhome==1 [iw=wgt]
mean safeprotest if treatment==1 & gunhome==1 [iw=wgt]
ttest safeprotest if gunhome==1, by (treatment)
reg safeprotest i.treatment if gunhome==1 [w=wgt]

tab safeprotest if gunhome==0 & treatment==0 [iw=wgt]
tab safeprotest if gunhome==0 & treatment==1 [iw=wgt]
mean safeprotest if treatment==0 & gunhome==0 [iw=wgt]
mean safeprotest if treatment==1 & gunhome==0 [iw=wgt]
ttest safeprotest if gunhome==0, by (treatment)
reg safeprotest i.treatment if gunhome==0 [w=wgt]

eststo: reg safeprotest i.treatment [w=wgt]
eststo: reg safeprotest i.treatment if gunhome==1 [w=wgt]
eststo: reg safeprotest i.treatment if gunhome==0 [w=wgt]
estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par("="("'"")"")fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear

tab signprotest if treatment==0 [iw=wgt]
tab signprotest if treatment==1 [iw=wgt]
mean signprotest if treatment==0 [iw=wgt]
mean signprotest if treatment==1 [iw=wgt]
```

```
ttest signprotest, by (treatment)
reg signprotest i.treatment [w=wgt]

tab signprotest if gunhome==1 & treatment==0 [iw=wgt]
tab signprotest if gunhome==1 & treatment==1 [iw=wgt]
mean signprotest if treatment==0 & gunhome==1 [iw=wgt]
mean signprotest if treatment==1 & gunhome==1 [iw=wgt]
ttest signprotest if gunhome==1, by (treatment)
reg signprotest i.treatment if gunhome==1 [w=wgt]

tab signprotest if gunhome==0 & treatment==0 [iw=wgt]
tab signprotest if gunhome==0 & treatment==1 [iw=wgt]
mean signprotest if treatment==0 & gunhome==0 [iw=wgt]
mean signprotest if treatment==1 & gunhome==0 [iw=wgt]
ttest signprotest if gunhome==0, by (treatment)
reg signprotest i.treatment if gunhome==0 [w=wgt]

eststo: reg signprotest i.treatment [w=wgt]
eststo: reg signprotest i.treatment if gunhome==1 [w=wgt]
eststo: reg signprotest i.treatment if gunhome==0 [w=wgt]
estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par("="("'"")"")fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear

***Robustness analysis (gun status unknown)***

eststo:  reg  recommend  i.treatment  if  gunhome2==2
[pw=wgt]
eststo: reg safefair i.treatment if gunhome2==2 [pw=wgt]
eststo: reg signprotest i.treatment if gunhome2==2 [pw=wgt]

estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par("="("'"")"")fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear

***Appendix B

tab familyparks_use [iw=wgt]
tab waterparks_use [iw=wgt]
tab golf_use [iw=wgt]
tab camping_use [iw=wgt]
tab unpaved_use [iw=wgt]
tab markets_use [iw=wgt]

***Balance tables

tab male if treatment==0 [iw=wgt]
tab male if treatment==1 [iw=wgt]
mean agec if treatment==0 [iw=wgt]
mean agec if treatment==1 [iw=wgt]
```

FFXCO_12366

```
tab college if treatment==0 [iw=wgt]

tab college if treatment==1 [iw=wgt]
mean income if treatment==0 [iw=wgt]
mean income if treatment==1 [iw=wgt]
tab white if treatment==0 [iw=wgt]
tab white if treatment==1 [iw=wgt]
tab gunhome if treatment==0 [iw=wgt]
tab gunhome if treatment==1 [iw=wgt]


****multivariate regressions***

eststo: reg recommend i.treatment agec income gunhome
male college white [pw=wgt]
eststo: reg safefair i.treatment agec income gunhome male
college white [pw=wgt]
eststo: reg safeprotest i.treatment agec income gunhome
male college white [pw=wgt]
eststo: reg signprotest i.treatment agec income gunhome
male college white [pw=wgt]


estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par(`"="("'"')"'"')fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear


eststo: reg recommend i.treatment agec income male
college white if gunhome==0 [pw=wgt]
eststo: reg safefair i.treatment agec income male  college
white if gunhome==0 [pw=wgt]
eststo: reg safeprotest i.treatment agec income     male
college white if gunhome==0 [pw=wgt]
eststo: reg signprotest i.treatment agec income     male
college white if gunhome==0 [pw=wgt]


estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
se(par(`"="("'"')"'"')fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear


eststo: reg recommend i.treatment agec income male
college white if gunhome==1 [pw=wgt]
eststo: reg safefair i.treatment agec income male  college
white if gunhome==1 [pw=wgt]
eststo: reg safeprotest i.treatment agec income     male
college white if gunhome==1 [pw=wgt]
eststo: reg signprotest i.treatment agec income     male
college white if gunhome==1 [pw=wgt]


estout using "C:\Users\aleka\Dropbox\Edgewater Research
files\Fairfax VA Project\data\fairfax_results.txt", style(fixed)
stats(N  r2_a  F  p,  fmt(4  3))  cells("b(star  fmt(3))"
```

```
se(par(`"="("'"')"'"')fmt(2))) starlevels(* 0.10 ** 0.05 *** 0.01)
replace
eststo clear
4869-7010-0591, v. 1
```

FFXCO_12367

## Appendix F: Bibliographical Referenes

References

Chong, D., & Druckman, J. N. (2007). Framing Theory. *Annual Review of Political Science*, *10*(1), 103-126. https://doi.org/doi:10.1146/annurev.polisci.10.072805.103054

Druckman, J., Green, D., Kuklinski, J., & Lupia, A. (Eds.). (2011). *Cambridge Handbook of Experimental Political Science*. Cambridge University Press.

Fazio, R. H. (1990). Multiple Processes by which Attitudes Guide Behavior: The Mode Model as an Integrative Framework. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 23, pp. 75-109). Academic Press. https://doi.org/https://doi.org/10.1016/S0065-2601(08)60318-4

Filindra, A., Collingwood, L., & Kaplan, N. J. (2020). The Emotional Underpinnings of Americans' Support for Gun Control. *Social Science Quarterly*, *101*(5), 2101-2120

Mutz, D. (2011). *Population-Based Survey Experiments*. Princeton University Press.

Saris, W. E., & Sniderman, P. M. (Eds.). (2004). *Studies in Public Opinion: Attitudes, Nonattitudes, Measurement Error, and Change*. Princeton University Press. https://doi.org/doi:10.1515/9780691188386.

Schlozman, K. L., Verba, S., & Brady, H. E. (2012). *The Unheavenly Chorus: Unequal Political Voice and the Broken Promise of American Democracy*. Princeton University Press.

Verba, S., Lehman Schlozman, K., & Brady, H. E. (1995). *Voice and Equality. Civic Voluntarism in American Politics*. Harvard University Press.

# FILINDRA REPORT


# EXHIBIT 3

**FFXCO_12369**

# Technology, Tradition, and "The Terror of the People"

## Darrell A.H. Miller,[*]  Alexandra Filindra[**] & Noah Kaplan[***]

(forthcoming Notre Dame Law Review)

## I.   Introduction

To date, the deadliest mass shooting in America began at 10:05 pm on October 1, 2017 when a 64-year-old gambler and businessman, equipped with over twenty high-powered semiautomatic rifles, opened fire on a public concert from his hotel room on the thirty-second floor of the Mandalay Bay Hotel in Las Vegas, Nevada.

Singer Jason Aldean was just thirty minutes into his set at the Route 91 Harvest country music festival when the bullets began to tear into the 22,000 assembled spectators. Some of the concertgoers thought the rapid crackle of gunfire was part of the show—until people began to drop. Police on the ground frantically radioed to each other, confused both as to the location and the number of shooters.[1]

Terrified citizens leapt over barriers and bleeding bodies, then scurried under vehicles in the parking lot in a frantic search for cover. One mother threw herself over her four-year-old to shield her from the bullets.[2] Others fashioned makeshift gurneys from fencing to try to ferry the wounded to safety.[3] A few tried to grab shotguns from unlocked squad cars, as if they would have been effective in repelling the fire raining down from over 1,000 feet above.[4] One survivor

---

[*] Melvin G. Shimm Professor of Law, Duke Law School.

[**] Associate Professor, Political Science and Psychology, University of Illinois—Chicago.

[***] Clinical Assistant Professor of Political Science, University of Illinois—Chicago. Our thanks to Joseph Blocher, Jake Charles, Eric Ruben, and Andrew Willinger who reviewed drafts of this article. Thanks also to the workshop participants at Northwestern University, Pritzker School of Law for their engagement and suggestions for revision. Thanks to Sydney Colopy for her great research assistance.

[1] Matthew Gafni, *'It's Coming Out the Window!': Listen to Chaotic Las Vegas Shooting Police Tapes*, The East Bay Times (October 2, 2017, 2:59 PM), https://www.eastbaytimes.com/2017/10/02/audio-listen-to-chaos-fear-on-police-radio-traffic-recordings-from-las-vegas-shooting/.

[2] Ashley May, *Las Vegas Shooting: Mom Shielded 4-Year-Old Daughter as Gunman Fired Into the Crowd*, USA Today (Oct. 3, 2017, 3:37 PM), https://www.usatoday.com/story/news/nation-now/2017/10/03/las-vegas-shooting-mom-shielded-4-year-old-daughter-gunman-fired-into-crowd/728166001/.

[3] Eliott C. McLaughlin, *Las Vegas Concertgoers Say Gunfire 'Went On and On and On,'* CNN (Oct. 2, 2017, 4:45 PM), https://www.cnn.com/2017/10/02/us/las-vegas-concert-shooting-scene/index.html.

[4] Matthew Gafni, *'It's Coming Out the Window!': Listen to Chaotic Las Vegas Shooting Police Tapes*, The East Bay Times (October 2, 2017, 2:59 PM), https://www.eastbaytimes.com/2017/10/02/audio-listen-to-chaos-fear-on-police-radio-traffic-recordings-from-las-vegas-shooting/; *see also Note In Las Vegas Gunman's Hotel Room included Details of Bullet Trajectory*, 60 Minutes (October 7, 2017, 5:33 PM), https://www.cbsnews.com/news/las-vegas-gunman-stephen-paddock-note-hotel-room-details-of-bullet-trajectory/.

1

Electronic copy available at: https://ssrn.com/abstract=4521030

reported afterward: "The gunfire never ended, it seemed like it went on and on and on."[5]

Once the firing stopped fifteen minutes later, 58 individuals had been murdered and over 800 injured—over half from gunshots and shrapnel, the others from the stampede.[6] Police found the shooter dead in his room from a self-inflicted gunshot wound. Some of the rifles he used had been outfitted with bump stocks, allowing the weapon to fire as many as 90 rounds in 10 seconds.[7] It's estimated that, before he killed himself, the shooter fired over 1,000 rounds into the crowd.[8] Both federal and state investigators have never been able to isolate a motive for the shooting.

In the six years since Las Vegas, there's been 2600 additional mass shootings,[9] including mass murders in Southerland Springs, Texas; Virginia Beach, Virginia; Thousand Oaks, California; Parkland, Florida; Uvalde, Texas; Highland Park, Illinois; Monterey Park, California; East Lansing, Michigan; Nashville, Tennessee; and Allen, Texas. We are currently on track to have more mass shootings than days this year.[10] The pace is so relentless that some journalists now refer to a "mass shooting" beat to cover the latest act of mayhem.[11]

Hospital beds and burials do not adequately capture the full costs of gun violence in America; survivors pay a psychological toll for years afterward.[12] Nor

---

[5] Eliott C. McLaughlin, *Las Vegas Concertgoers Say Gunfire 'Went On and On and On,'* CNN (Oct. 2, 2017, 4:45 PM), https://www.cnn.com/2017/10/02/us/las-vegas-concert-shooting-scene/index.html.

[6] *Las Vegas Shooting Victims Reach $735m Settlement from MGM Resorts*, BBC (Oct. 3, 2019), https://www.bbc.com/news/world-us-canada-49926469.

[7] Larry Buchanan et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/interactive/2017/10/02/us/vegas-guns.html.

[8] Joseph Lombardo, *LVMPD Preliminary Investigative Report of the 1 October Mass Casualty Shooting*, LAS VEGAS METROPOLITAN POLICE DEPARTMENT (Aug. 3, 2018), https://www.lvmpd.com/en-us/Documents/1-October-FIT-Criminal-Investigative-Report-FINAL_080318.pdf.

[9] GUN VIOLENCE ARCHIVE https://www.gunviolencearchive.org/ (last visited July 25, 2023) (defining a mass shooting as "a minimum of four victims shot, either injured or killed, not including any shooter who may also have been killed or injured in the incident").

[10] *See* Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows*, ABC NEWS (May 8, 2023, 7:24 AM), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874.

[11] Greg Sargent, *A New Type of Reporter Emerges: The 'Mass Shooting Correspondent,'* WASH. POST (Nov. 25, 2022, 7:00 AM), https://www.washingtonpost.com/opinions/2022/11/25/mass-shooting-journalism-new-correspondent/.

[12] Ariel J. Romero, Note, *"Some Days It's Tough Just Getting' Up": How the Current Civil and Criminal Legal Remedies Fail to Protect Mass Shooting Victims*, 24 Chap. L. Rev. 529, 552 (2021) ("In the aftermath of a mass shooting, victims are coming to grips with their new realities: dealing with trauma, grief, depression, PTSD, anxiety, sleep issues, somatic complaints, cognitive issues, suicidal ideation, survivor's guilt, and tending to their physical injuries."). Ariel Romero was herself a survivor of the Las Vegas shooting. *See id.* at 529; *see also* Amy Novotney, *What Happens to the Survivors*, AM. PSYCH. ASS'N MONITOR ON PSYCH. (2018), https://www.apa.org/monitor/2018/09/survivors ("The National Center for PTSD estimates that 28 percent of people who have witnessed a mass shooting develop post-traumatic stress disorder . . . and about a third develop acute stress disorder."); *cf.* Thomas Griffith & Nancy Staudt, *Taxing Guns*, 95 S. CAL. L. REV. 73, 93 (2021) ("Experts estimate that taxpayers incur more than $2.3 billion annually due to gun violence. If we include all the indirect and direct costs . . . the total medical, legal, and social costs associated with gun violence in the United States exceed $100 billion.").

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12371

do these estimates price in the costs to those not directly affected; people who have stopped going to church, to parades, to the movies or to the grocery store for fear that they will be the next victim.[13]

Recent polling confirms the effect unmitigated gun violence is having on American wellbeing and sense of public life.[14] In a survey published in 2023, eighty-four percent of U.S. adults report taking "at least one precaution to protect themselves or their families from the possibility of gun violence"; including 35% who said they've avoided large public gatherings "including music festivals, or crowded bars and clubs"; 23% who have avoided public transportation; 20% who have "changed or considered changing" their child's school; and 15% who have "avoided attending religious services, cultural events or celebrations."[15] A Harvard Youth Poll the same year found that 40 percent of young Americans said they feared being a victim of gun violence or a mass shooting, and close to one third had, in the previous two weeks, "[w]orried about a potential mass shooting when in a public space (such as school/university, mall, office, theater, etc.)."[16]

These numbers are not anomalies. Four years ago, the American Psychological Association reported that nearly one third of all adults "feel they cannot go anywhere without worrying about being a victim of a mass shooting" and an equal number of them "say fear prevents them from going to certain places or events."[17] Approximately a quarter of respondents in the survey admitted to having "chang[ed] how they live their lives because of fear of a mass shooting."[18]

Even as the crisis of American gun violence has grown more acute, the Supreme Court has reconfigured the legal space that policymakers must negotiate to achieve political solutions. On June 23, 2022, the Supreme Court returned to the Second Amendment after a decade-long absence. In *New York State Rifle & Pistol Association, Inc. v. Bruen*,[19] the Court overturned the approach that lower

---

[13] *Cf.* City of Chicago v. Morales, 527 U.S. 41, 115 (1999) (Thomas, J., dissenting) ("There is only about maybe one or two percent of the people in the city causing these problems maybe, but it's keeping 98 percent of us in our houses and off the streets and afraid to shop." (quoting Transcript of Chicago resident Susan Mary Jackson)).

[14] Cary Wu, *How Does Gun Violence Affect Americans' Trust in Each Other?*, 91 Soc. Sci. Rsch. 1, 3 (2020) (showing that "higher percentages of nonfatal and fatal gun violence victims lead to lower levels of trust both across and within the U.S." and that producing study to show that "America's gun violence affects not only just those killed, injured, or present during gunfire, but it can also sabotage the social and psychological well-being of all Americans").

[15] Shannon Schumacher et al., *Americans' Experience With Gun-Related Violence, Injuries and Deaths*, KFF (Apr. 11, 2023), https://www.kff.org/report-section/americans-experiences-with-gun-related-violence-injuries-and-deaths-findings/. These forms of social withdrawal are more pronounced in Black and Hispanic communities. More than half (55%) of Black adults have taken these precautions as have about four in ten Hispanic adults (43%).

[16] Harvard Kennedy School: Institute of Politics, *Survey of Young Americans' Attitudes toward Politics and Public Service 45th Edition, March 13-22, 2023*,https://iop.harvard.edu/sites/default/files/2023-05/Harvard%20IOP%20Youth%20Poll%20Spring%202023%20Toplines.pdf.

[17] *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, Am. Psych. Ass'n (Aug. 15, 2019), https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting. When asked about the places they most fear being shot, adults specified "a public event (53%), mall (50%), school or university (42%) or movie theater (38%)." *Id.*

[18] *Id.*

[19] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022).

3

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12372

courts had used to decide Second Amendment disputes, and mandated a new text, history, tradition, and analogy-only approach to Second Amendment cases. As the Court said in *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." To defend the law, "the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate the regulation is consistent with this Nation's historical tradition of firearm regulation."[20]

No longer can policymakers rely on empirical data alone to carry their litigation burden. Now such data must conform to a still-emerging "historical tradition of firearm regulation" to meet constitutional muster. Researchers, legislators, and judges are still trying to sort out what it all means. Some despair that that reams of data, careful experiments, and rigorous statistical analyses no longer have any relevance to the gun debate.[21] Others are less gloomy, but are bewildered how to evaluate the constitutionality of laws designed to keep firearms off commercial airliners, or out of the hands of domestic abusers, within the new parameters the Court has set.[22]

We think that those that claim *Bruen* signals the end of empirically-grounded innovative policy solutions to our gun violence epidemic badly misread the opinion. As Justice Brett Kavanaugh in his concurrence assured us: "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."[23] Especially when policymakers confront "unprecedented social concerns or dramatic technological changes"[24] *Bruen* permits lawmakers to respond with more than the specific regulatory tools of the past. In those cases, judicial officers who review these policies must employ "a more nuanced approach" to the historical record and the tradition that represents.[25]

Empirical studies can still inform meaningful gun policy, but the boundaries that make such studies legally significant are now set by *Bruen*'s text, history and analogy approach. To put it another way, the framework of constitutional rights has always channeled the manner law makes use of empirical data. It is just that now, in the Second Amendment context, those channels are shaped not so much by government interests and notions of fit, but by historical analogs and purpose.

---

[20] *Id.* at 2126.
[21] Chip Brownlee and Jennifer Mascia, *SCOTUS Says People Have a Right to Carry Guns in Public*, THE TRACE (June 23, 2022), https://www.thetrace.org/2022/06/supreme-court-ruling-bruen-new-york/ ("With today's ruling, the six conservative SCOTUS justices are saying that modern-day gun problems are irrelevant when deciding the constitutionality of a law."); Mark Joseph Stern, *Clarence Thomas' Maximalist Second Amendment Ruling Is a Nightmare for Gun Control*, SLATE (June 23, 2022), https://slate.com/news-and-politics/2022/06/supreme-court-new-york-concealed-carry-law-gun-control-bruen.html ("[C]ourts may no longer rely on empirical evidence in upholding gun control laws.").
[22] *Cf.* United States v. Bullock, No. 18-CR-165, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022) ("This Court is not a trained historian. The Justices of the Supreme Court, distinguished as they may be, are not trained historians. We lack both the methodological and substantive knowledge that historians possess.").
[23] *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).
[24] *Id.* at 2132.
[25] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12373**

This article proceeds as follows: Part II discusses the *Bruen* test and its focus on text, history, tradition, and analogs. It argues that *Bruen*, properly read, still allows plenty of options to address modern problems and the risks of modern technology. Part III explores the history of regulation to prevent public terror: in particular, the crime of affray, prohibitions on dangerous and unusual weapons, and the concept of sensitive places. All these regulations share a common feature—the maintenance of public peace and prevention of public fear. Part IV explains how the potential for public terror in the modern era must be understood in relation to the profoundly different technological and social environment in which we currently live. Simply put, reduction of public terror remains a longstanding regulatory object; but the modern capacity for armed individuals to terrorize has so increased as to be different in kind. Part V supplies an original survey experiment to measure the "chilling" effect—the fear—caused by guns in American public life. Part VI links contemporary data on public fear with Part II, and discusses how the "nuanced approach" to analogy endorsed by *Bruen* makes this research relevant to contemporary questions about the right to keep and bear arms. Part VII discusses how judicial selection of a level of generality for historical analogs, such as public terror, cannot come from within the analogical method itself, and offers some guideposts for choosing a level of generality. Part VIII concludes.

## II.   *Bruen* and the Text, History, Tradition and Analogy Approach

In June of 2022, the Supreme Court decided its first major Second Amendment case in over a decade. Two plaintiffs, Brandon Koch and Robert Nash, along with a National Rifle Association affiliate called the New York State Rifle and Pistol Association, filed suit to challenge New York's concealed carry permitting legislation. Some version of New York's law had been in place for nearly a century, and the modern regulation required applicants to demonstrate some need for an unrestricted concealed carry permit different from the self-defense needs of any other individual. New York's law wasn't alone. At one time, over half the states in the nation had some version of New York's "may-issue" law or prohibited concealed carry altogether. However, successful lobbying by gun rights groups over the past thirty-five years had completely reversed the regulatory landscape, so that by 2022, "may issue" jurisdictions like New York were a minority.

In a 6-3 decision authored by Justice Clarence Thomas, the majority struck down New York's permitting law.    But the majority did more than that.    It rejected the analytical approach that lower courts had used since the Court minted the federal right to keep and bear arms in 2008 with *District of Columbia v. Heller*.

*Heller* was the first Supreme Court case in the Second Amendment's 200-year history to hold that the right to keep and bear arms protects a right to keep them for personal purposes—like self-defense—unrelated to membership in an organized militia. Lower courts with crowded dockets and compulsory jurisdiction soon converged on a two-step framework for deciding the Second Amendment issues the Court had left unresolved in *Heller*. Following guidance from the Court itself, the lower courts nearly universally adopted a two-part

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12374**

framework modeled on First Amendment doctrine.[26] The first step of this framework was largely categorical and asked whether the activity or regulation implicated the Second Amendment at all. Convicted felons in possession of firearms and firearms in sensitive places, like schools, were often decided at this step. If the history was unclear, the second step of the framework employed a fairly conventional tailoring approach to decide whether the regulation passed constitutional muster. This second step was typically where governments introduced empirical studies to prove their regulations met the requisite "fit" with the stated governmental interest.[27]

There were detractors of this two-step approach who understood *Heller* to forbid any kind of weighing of interests, even in the form of the conventional tiers of scrutiny. They argued that *Heller* had prescribed a text, history, and tradition-only approach to Second Amendment questions[28]—one more akin to that deployed in Seventh Amendment cases.[29] The *Bruen* majority endorsed this text and tradition centered framework. "Despite the popularity of this two-step approach, it is one step too many,"[30] Justice Thomas wrote. "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."[31] Instead, Justice Thomas argued "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[32]

The Court reiterated the new test this way:

> In keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

[26] *See* United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010) ("Given *Heller*'s focus on "core" Second Amendment conduct and the [Supreme] Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."); United States v. Marzzarella, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("We think [*Heller*'s invocation of First Amendment principles] implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.").

[27] *See e.g.*, Kolbe v. Hogan, 849 F.3d 114, 133 (4th Cir. 2017), *abrogated in part by* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022); United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), *abrogated in part by* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022).

[28] *See, e.g.*, United States v. McGinnis, 956 F.3d 747, 761 (5th Cir. 2020) (Duncan, J., concurring) ("I write separately to reiterate the view that we should retire this [two-part] framework in favor of an approach focused on the Second Amendment's text and history."); Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 703 (6th Cir. 2016) (Batchelder, J., concurring in part); Heller v. District of Columbia, 670 F.3d 1244, 1271, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (*Heller II*).

[29] The Seventh Amendment right to trial by jury in civil cases requires what the Court itself has deemed a "historical" test. *See* Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852, 872 (2013) (discussing the Seventh Amendment historical test); *see also* Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996) (using this nomenclature).

[30] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2127 (2022).

[31] *Id.*

[32] *Id.*

6

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12375

protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.[33]

However, the majority recognized that just as the Second Amendment covers modern arms with no historical equivalent, there are modern regulations that also have no historical equal. In those cases, the courts are to reason by analogy. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[34] Relevantly similar, to the Court, includes "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[35] Analogs need not be a "dead ringer," but "well-established and representative."[36] Particularly where a regulation responds to "unprecedented societal concerns or dramatic technological changes" courts may apply "a more nuanced approach" to the analogical process.[37] This approach ensures, as Justice Brett Kavanaugh wrote, that the "Second Amendment 'is neither a regulatory straightjacket nor a regulatory blank check'";[38] that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."[39]

### III.    Traditional Regulation to Reduce Public Terror

Weapon regulation long has been about preventing death and injury. But just as importantly, it has been about maintaining public peace and reducing public fear.[40] Regulations to preserve the peace are older than the republic, and go back to classical antiquity. Solon of Athens was reported to have fined those who walked about the streets of the city with a sword and armor, unless "in case of exigency."[41] Edward III enacted the Statute of Northampton, which stated:

> [N]o man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor

---

[33] *Id.* at 2126.
[34] *Id.* at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)).
[35] *Id.* at 2133.
[36] *Id.*
[37] *Id.* at 2132.
[38] *Id.* at 2162 (Kavanaugh, J., concurring) (quoting majority).
[39] *Id.* (Kavanaugh, J., concurring).
[40] For an extended discussion, see Joseph Blocher & Reva Siegel, *Guided by History: Protecting the Public Sphere From Weapons Threats Under* Bruen, 98 N.Y.U. L. REV. __, at 8 (forthcoming 2023) (purpose of historical weapons restrictions is "to protect the public peace and thus the freedom of all people to participate in democratic community without terror and intimidation").
[41] 1 JOHN POTTER, THE ANTIQUITIES OF GREECE 182 (2d ed. 1706).

7

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12376

bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.[42]

Lawmakers and legal writers invoked this statute throughout the Tudor and early Stuart period.[43]  In 1602, Elizabeth I issued a writ to "Guardians of the King's peace and the Sheriff of Essex" to arrest "William Fitzwilliam esq." for having violated the "Statute of King Edw. III. against carrying arms against the peace."[44] John Bond's *A Compleat Guide for Justices of the Peace* instructed that "Persons with offensive Weapons in Fairs, Markets or elsewhere in Affray of the King's People, may be arrested by the Sheriff, or other the King's Officers."[45] Robert Gardiner's contemporaneous *Compleat Constable* authorized the seizure and disarmament of those who "Ride or go Armed offensively . . . in fairs or Markets or elsewhere, by Day or by Night in Affray of Her Majesty's Subjects, and Breach of the Peace; or wear or carry any Daggers, Guns or Pistols Charged" and to carry such a person before a justice "to give Surety to keep the Peace."[46]

Going armed to the terror of the people was of such gravity that it would have been a crime even without a specific statutory prohibition. As the King's Bench in *Sir John Knight's Case* stated, bearing arms *in terrorem populi*: "is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects."[47]  William Blackstone cited the Statute of Northampton in his *Commentaries* for the proposition that "the offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."[48] This regulation crossed the Atlantic, and was enacted alongside rights to keep and bear arms in multiple jurisdictions[49]

---

[42] Statute of Northampton, 2 Edw. 3 c. 3 (1328).
[43] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters*, 64 Clev. St. L. Rev. 373, 384 (2016) [hereinafter Charles, *Faces, Take Two*]
[44]   https://discovery.nationalarchives.gov.uk/details/r/c79f7b72-f282-4f1c-8bce-e8d7bcea01ae.
For more on this enforcement history, see Jonah Skolnik, *Observations Regarding the Interpretation and Legacy of the Statute of Northampton in Anglo-American Legal History*, SECOND THOUGHTS BLOG (Sept. 17, 2021), https://firearmslaw.duke.edu/2021/09/observations-regarding-the-interpretation-and-legacy-of-the-statute-of-northampton-in-anglo-american-legal-history/#_ftnref5 ("We can see based on these enforcement and jurisprudential documents that the historical and socio-legal context of the Statute of Northampton suggests that the Statute's enforceability was wide-ranging across an array of different types of armed force and intentions.").
[45] *See* Charles, *Faces, Take Two*, *supra* note 43, at 391 (quoting JAMES BOND, A COMPLEAT GUIDE FOR JUSTICES OF PEACE 42 (3d ed., London 1707)).
[46] ROBERT GARDINER, THE COMPLEAT CONSTABLE 18 (1708).
[47] Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB).
[48] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *149.
[49] Charles, *Faces, Take Two*, *supra* note 43, at 379 ("The Statute of Northampton was of such importance that its tenets survived for over 500 years, with states such as Massachusetts, North Carolina, and Virginia recognizing it after the ratification of the Constitution").

8

Electronic copy available at: https://ssrn.com/abstract=4521030

including North Carolina,[50] Virginia,[51] Tennessee,[52] Massachusetts[53] and Maine.[54]

Just as importantly, government officials had a duty to regulate arms in order to preserve the public peace. The Statute of Northampton granted local magistrates "power to execute this act" and permitted investigations and sanctions on local officials who did *not* enforce the law, contrary to their duty.[55] Guidance to local justices of the peace from the 17th to 18th century routinely included injunctions to enforce arms regulations in order to preserve the public peace.[56] Massachusetts' regulation, for instance, authorized arrest of "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[57] Indeed, some regulations were written as to actually criminalize official non-enforcement of these laws.[58]

---

[50] 1792 N.C. Laws 60, ch. 3.  North Carolina's version of the Statute of Northampton is remarkable for essentially being verbatim, right down to the mention of the monarch.

[51] 1786 Va. Acts 33.

[52] 1801 Tenn. Pub. Acts 260, ch. 22 § 6.

[53] 1795 Mass. Acts 436, ch. 2.

[54] 1821 Me. Laws 285, ch. 73 § 1.

[55] Statute of Northampton, 2 Edw. 3 c. 3 (1328) ("And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.").

[56] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11, 19 (2017) ("Legal commentators, both in popular justice of the peace manuals and learned treatises, treated the Statute of Northampton as a foundational principle for enforcing the peace.") (citing, inter alia, GILES JACOB, A LAW GRAMMAR; OR RUDIMENTS OF THE LAW 426 (1744); J.P. GENT, A NEW GUIDE FOR CONSTABLES, HEAD-BOROUGHS, TYTHINGMEN, CHURCHWARDENS 13 (1705), JOSEPH KEBLE, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR EASIER PERFORMANCE OF THEIR DUTY 147, 224 (1683).

[57] Charles, *Faces, Take Two*, supra 49, at 380 (quoting 2 THE PERPETUAL LAWS, OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION TO THE SECOND SESSION OF THE GENERAL COURT, IN 1798 259 (Worcester, Isaiah Thomas 1799)).

[58] See Arizona Territory Revised Statutes, Title 11, § 383 (1901) (approved March 6, 1891) ("[A]ny peace officer who shall fail, neglect or refuse to arrest any such person on his own knowledge of the violation of said section, or upon the information from some credible person, or who shall appoint any person a deputy, not intended to be used in regular service, but as a mere pretext for the purpose of carrying a concealed weapon, shall be guilty of a misdemeanor."); An Act to Preserve the Public Peace and Prevent Crime, No. 96, §§ 5-6 (April 1, 1881), reprinted in ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS 192 (1881) (specifying criminal penalties for, inter alia "non-feasance in office" for justices of the peace and officials who do not enforce weapons laws); Ordinances of the City of Nashville, Ch. 74, § 3 (Dec. 26, 1873) reprinted in ORDINANCES OF THE CITY OF NASHVILLE 232-33 (1875) ("That every police officer who may refuse or neglect to immediately arrest every such person seen with or known to be carrying such deadly weapons, shall be deemed guilty of duty, and upon conviction thereof, shall be dismissed from service"); City of Houston Revised Ordinances § 773 (Nov. 9, 1913), reprinted in REVISED CODE OF ORDINANCES OF THE CITY OF HOUSTON 267 (1914) ("[A]ny police officer of the City of Houston . . . who shall fail or refuse to arrest any person or persons thus unlawfully carrying any of the above mentioned weapons shall be deemed guilty of an offense and as a punishment shall be dismissed from the Police Department of the City of Houston, and shall not be permitted thereafter to serve as a police officer of said city.")*see also* Garner v. State, 50 Tex. Crim. 364, 366, 97 S.W. 98, 100 (1906) ("From this article [Article 342, Pen. Code 1895] it will be seen that it is the duty of the sheriff to arrest a person without warrant, found or reported by

9

Electronic copy available at: https://ssrn.com/abstract=4521030

No less than Justice Thomas, dissenting in *City of Chicago v. Morales,*[59] has recognized this traditional peacekeeping duty of law enforcement. "Police officers are not, and have never been, simply enforcers of the criminal law.   [T]hey have long been vested with the responsibility for preserving the public peace."[60] Part of their "traditional functions" has been to suppress affrays and to keep the public roads, sidewalks, parks and other places free and open to the public.[61]  To constrain this peacekeeping function, out of concern that they may abuse their discretion, according to Justice Thomas, would elevate the rights of the intimidator over the rights of the intimidated.[62]

Although the regulations that Justice Thomas endorsed in *Morales* targeted people—suspected gang members—there's ample history of regulation of public armament for precisely the same purpose—prevention of public fear. Regulations to prevent affrays, prohibitions on "dangerous and unusual weapons," and restricting firearms from "sensitive places" share as a common denominator— their "why"[63]—maintenance of the public peace.[64]

### A.  Affray

Affray at common law was defined as: "a public offense to the terror of the king's subjects . . . so called because it affrighteth and maketh men afraid."[65]

Indeed, the very word "affray" is derived from a French word meaning "to frighten."[66]   The actual elements of affray were a product of the   "complex, context-bound   judgment   that   defined   common   law   jurisprudence."[67]

One version of affray involved an actual violent encounter between "two or more persons in a public place, to the terror of the people."[68]   It was such an

---

some credible person to him as carrying a pistol, and it is then his duty to carry such person before the nearest justice of the peace for trial.").

[59] City of Chicago v. Morales, 527 U.S. 41 (1999).

[60] *Id.* at 106.

[61] *Id.* (Thomas, J., dissenting) (quoting, *inter alia,* J. CROCKER, DUTIES OF SHERIFFS, CORONERS AND CONSTABLES § 48, p. 33 (2d ed. Rev.1871)).

[62] *Id.* at 115 (Thomas, J., dissenting) ("By focusing exclusively on the imagined 'rights' of the [suspected gang members], the Court today has denied our most vulnerable citizens . . . 'freedom of movement.'").

[63] *Bruen,* 142 S. Ct. at 2132 (discussing the metrics for analogies as "how and why the regulations burden a law-abiding citizen's right self-defense").

[64] *See* Blocher & Siegel, supra note 40, at 8.

[65] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 11 (Woodbridge, N.J., 1764).

[66] ROBERT SULLIVAN, A DICTIONARY OF DERIVATIONS 30 (9th ed. 1860).

[67] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 FORDHAM L. REV. 487, 501 (2004).

[68] McClellan v. State, 53 Ala. 640 (1875); Cash v. State, 2 Tenn. 198, 199 (1813) ("[V]iolence . . . committed in a public place, and to the terror of the people . . . is called an affray."); Commonwealth v. Simmons, 29 Ky. 614, 615 (1831) (Affray is "is the fighting of two or more persons, in some public place, to the terror of others"); *see also* 4 BLACKSTONE, supra note 48, at *145 (defining affray as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects").

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12379

obvious "nuisance to the public"[69] that its prohibition didn't require a statutory enactment, but was "a common-law crime of ancient vintage."[70]

Another version of affray did not require actual violence, but the threat of violence occasioned when a person entered public areas with dangerous and unusual armament or offensive weapons in such a way as to cause terror to the people. This was the type of affray identified in 1764, in the justice of the peace manual *Conductor Generalis*: "[I]t seems certain, that in some cases there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and usual weapons, in such a manner as will naturally cause a terror to the people."[71]

There's a long tradition of government adopting controls to prevent both of these types of affray. In the early Tudor period, Henry VII restricted unlawful assemblies in public places because of "the practice for the gentry, who were on bad terms with each other, to go to market at the head of bands of armed retainers."[72] At common law, those who feared attack were supposed "to seek out a justice of the peace and bind the threatening individual with a peace bond."[73]

In an era without a professionalized police force, these peace bonds were a method to prevent breaches of the peace, and could reduce the impulse of individuals to arm themselves preemptively in case of a sudden armed confrontation.[74] Those who armed themselves preemptively could be held over by the authorities and post a bond to ensure that they themselves were not likely to break the peace.[75]

These ex-ante controls to maintain the public peace traveled, sometimes unchanged, to American shores. The colonists adopted regulations on public carry patterned on, or indeed a direct transcription of, the Statute of

---

[69] *Simmons*, 29 Ky. at 615.

[70] Commonwealth v. Nee, 985 N.E.2d 118, 121 (App. Ct. Mass. 2013).

[71] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 11 (1764). James Wilson said something similar, *see* Nelson Lund, *The Second Amendment*, Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1363 (2009) ("[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people.") (quoting 3 JAMES WILSON, WORKS OF THE HONOURABLE JAMES WILSON 79 (BIRD WILSON ED., PHILADELPHIA, BRONSON AND CHAUNCEY 1804)); *see also* ROBERT GARDINER, THE COMPLEAT CONSTABLE 18 (1708).

[72] 2 JAMES F. STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 385 n.9 (London, R. Clay, Sons, & Taylor 1883). Stephen remarked that this law was common sense, as the alternative would be that "assembled bands would probably fight and certainly make peaceable people fear they would fight." *Id.*

[73] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688-1868*, 83 LAW & CONTEMP. PROBS. 73, 82 (2020).

[74] *See id.* at 83 ("Taken together, these broad powers of enforcing the peace were the foundation for community-based law enforcement in an era before the rise of modern police forces.").

[75] *Id.* ("Any justice of the peace or constable had the power to detain, disarm, or imprison individuals traveling armed and then have the offender bound over to the peace."). *See also* Queen v. Soley, (1701), 88 Eng. Rep. 935, 937 (QB) ("If three come out of an ale-house and go armed, it is a riot. Though a man may ride with arms, yet he cannot take two with him to defend himself even though his life is threatened; for he is in the protection of the law, which is sufficient for his defence."). For a discussion of the issuing of "peace warrants," see LAURA EDWARDS: THE PEOPLE AND THEIR PEACE (2009).

11

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12380**

Northampton's prohibitions on going armed to the terror of the people.[76] James Davis, an early American printer in North Carolina and himself a justice of the peace,[77] wrote in his 1774 treatise that justices of the peace "upon their own View, or upon Complaint" to arrest "any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, or among any great Concourse of the People."[78] The 1764 *Conductor Generalis* identified affray to include arming oneself with dangerous and unusual weapons, even without a physical altercation; but also restated the common exception that the prohibition did not apply to those actually summoned to enforce the law, as to suppress a riot, or by those whose stature or custom would demonstrate were no risk of breaching the peace or terrorizing the people.[79]

As weapons became more lethal and concealable in the nineteenth century, and as the signs of imminent peace-breaching became more difficult to discern, the demand for regulation to prevent deadly affrays became more urgent, especially in certain areas of the country.[80] A writer in the South Carolina *Edgefield Advertisor* in 1844 wrote: "It is not characteristic of brave nations to carry concealed weapons, nor is it . . . indicative of brave men. Concealed weapons are the insignia of the footpad, the burglar, and the mercenary bravo, and by the man unconscious of wrong and fearless of danger they never should be worn."[81] The Virginia *Martinsburg Gazette* reprinted with approval the sentiment that "public opinion and law" should "put down" the "abominable and murderous practice of carrying deadly weapons," and especially concealed weapons which should be "*prima facie* evidence of indiscriminate design on human life."[82] A Wisconsin newspaper observed that "there may be licentiousness, but no practical freedom" in an environment where "the pistol, the dirk and the bowie knife leap out upon the slightest provocation"; it lamented that "[s]o long as rowdies are allowed to go about armed, so long the rein of ruffianism will last."[83] These pleas did not go unheard, as several states expressly reserved the authority to regulate the

---

[76] Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 NW. U. L. REV. 139, 167 (2021).

[77] Robert N. Elliott, Jr., *Davis, James*, NCPEDIA (1986), https://www.ncpedia.org/biography/davis-james.

[78] JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (1774).

[79] SIR WILLIAM BLACKSTONE, RICHARD BURN & JAMES PARKER, THE CONDUCTOR GENERALIS: OR THE OFFICE, DUTY AND AUTHORITY OF JUSTICES OF THE PEACE 12 (1764).

[80] For a discussion of the regional variation on the topic of public carry in general, and concealed carry in particular, see generally Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. FORUM 121 (2015).

[81] *Carrying Concealed Weapons*, EDGEFIELD ADVERTISER (Edgefield, S.C. Oct. 15, 1840).

[82] *Carrying Deadly Weapons*, MARTINSBURG GAZETTE (Martinsburg, Va. Aug. 24, 1843.).

[83] *Carrying Weapons*, WISCONSIN HERALD AND GRANT COUNTY ADVERTISER (Lancaster, Wis. Dec. 11, 1845).

12

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12381

carrying of weapons in their state constitutions,[84] and passed corresponding legislation.[85]

## B. Dangerous and/or Unusual Weapons[86]

Just as traditional as prohibitions on affray are regulations (including outright prohibition) of going armed with "dangerous and unusual weapons," a regulation that sometimes merged with restrictions on going armed "offensively."[87] William Hawkins considered the wearing of "dangerous and unusual weapons" a type of affray, even without violence because it "will naturally cause a terror to the people."[88]

In 1689, New Jersey prohibited the carrying of "any pocket pistol, skeins, stilettoes, daggers or dirks, or other unusual or unlawful weapons."[89] This colonial regulation was apparently in response to public outcry against the practice of a few who were putting the rest of the colony "in great fear."[90] New Hampshire had a similar regulation, in 1699, permitting the arrest of "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches."[91]  Massachusetts passed a regulation in 1795 permitting the arrest of

---

[84] *See, e.g.*, COLO. CONST. art. II, § 13 (1876) ("The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons."); FLA. CONST. art. I, § 20 (1883) ("The right of the people to keep and bear arms in defense of themselves and of the lawful authority of the State shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."); GA. CONST. art. I, § I, para. 8 (1877) (similar); KY. CONST. § 1 (1850); TENN. CONST. art. I, § 26; MONT. CONST. art. II, § 12

[85] *See e.g.*, 1870 Va. Acts 510 ("If a person habitually carry about his person, hid from common observation, any pistol, dirk, bowie knife, or any weapon of the like kind, he shall be fined fifty dollars, and imprisoned for not more than twelve months in the county or corporation jail. The informer shall have half of such fine."); 1870 S.C. Laws 403 ("They may cause to be arrested all affrayers, rioters, disturbers and breakers of the peace, and all who go armed offensively, to the terror of the people, and such as utter menaces or threatening speeches, or otherwise dangerous and disorderly persons."); 1872 Wis. Sess. Laws 17 ("If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor . . .").

[86] Historical documents use both formulations.  *See* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *149 ("dangerous or unusual"); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. ST. L. REV. 1, 55 n.110 (2012) (comparing HARRY TOULMIN, THE MAGISTRATE'S ASSISTANT 5 (1807) ("dangerous and unusual") with JOHN HAYWOOD, THE DUTY AND AUTHORITY OF JUSTICES OF THE PEACE, IN THE STATE OF TENNESSEE 176 (1810) ("dangerous or unusual")).

[87] WILLIAM LAMBARDE, EIRENARCHA: OR THE OFFICE OF THE JUSTICES OF THE PEACE, IN TWO BOOKES (1588).

[88] 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716).

[89] 1686 N.J. Laws, ch. 9, reprinted in AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289 (2d ed. 1881).

[90] *Id.*

[91] 1699 N.H. Laws 1.

13

Electronic copy available at: https://ssrn.com/abstract=4521030

all who "ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth" pending  sureties against breach of the peace.[92]

An unappreciated aspect of these prohibitions is that one of their purposes seems to be to prevent a norm cascade that leads to a sub-optimal equilibrium,[93] wherein everyone feeling anxious about being insufficiently armed, arms himself with ever more powerful weapons to counter the threat.[94]

The need for authorities to arrest these "small arms races"[95] is implicit in the record from the sixteenth century to the modern day.  William Lambarde, in his 1588 justice of the peace manual recognized the affray caused "without word or blow given: as if a man shall shew himself furnished with armour or weapon, which is not usually worne and borne" because such behavior "will strike a feare onto others that *be not armed as he is*."[96]  Joseph Keble in his influential *An Assistance to the Justice of the Peace for the Easier Performance of Their Duty* reiterated this concern, almost verbatim, a century later.[97]  So did John Ward, in 1769, who described the crime of affray as including the circumstance of a man furnishing himself with "armour or weapons not usually worn" because "it may strike a fear into others unarmed."[98]

This same concern with a fear-induced race to the bottom motivated writers in the 19th century to seek strong regulation of the practice of public arms-bearing.  A writer in the Baltimore *American Republican and Daily Clipper* wrote that "the peaceable citizen wears no dirk, or other dangerous weapon, and hence is unprepared to resist the assault of an armed ruffian; but should no restraint be imposed upon the carrying of deadly weapons, all members will have to arm in self-defense."[99]  Another writer in the *Richmond Daily Whig* wrote similarly, wondering after the acquittal of two for the killing of an unarmed assailant: "Will it not be necessary that everyone should . . . carry concealed weapons so that he may protect his life if, after getting into a difficulty . . . he should find his adversary

---

[92] 1795 Mass. Acts 436, ch. 2.

[93] A norm cascade "occur[s] when societies experience rapid shifts toward new norms."  Cass R. Sunstein, *Social Norms and Social Roles*, 96 COLUM. L. REV. 903, 912 (1996).

[94] This fear of being outgunned has had an undeniable racial cast to it in American history.  When the Ku Klux Klan was prosecuted for terrorism in 1871, their defense counsel argued: "[A]rms had been placed . . . in the hands of the colored race, and they were divided into companies; arms of the best kind, arms against which no squirrel gun would be any protection whatever." PROCEEDINGS IN THE KU KLUX TRIALS AT COLUMBIA, S.C. IN THE UNITED STATES CIRCUIT COURT, NOVEMBER TERM, 1871, at 425 (Ben Pitman & Louis Freeland Post eds., 1872).  *See also* Minority Report, REPORT OF THE JOINT SELECT COMMITTEE TO INQUIRE INTO THE CONDITION OF AFFAIRS IN THE LATE INSURRECTIONARY States, H.R. Rep. No. 42–41, pt. 1, at 439 (1872) (lamenting that Whites were denied ability to form militias, but African Americans "parade in State or Federal uniform, armed cap-a-pie with the most approved weapons").

[95] Guha Krishnamurthi & Peter N. Salib, *Small Arms Races*, 6/3/2022 U. CHI. L. REV. ONLINE 1 (2022).

[96] 2 WILLIAM LAMBARDE, EIRENARCHA: OR THE OFFICE OF THE JUSTICES OF THE PEACE, IN TWO BOOKES, 135 (1588) (emphasis added).

[97] JOSEPH KEBLE, AN ASSISTANCE TO THE JUSTICE OF THE PEACE FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (1683).

[98] 1 JOHN WARD, THE LAW OF JUSTICE OF PEACE AND PARISH OFFICER 6–7 (1769).

[99] *Deadly Weapons*, AMERICAN REPUBLICAN AND DAILY CLIPPER BALTIMORE (Baltimore, Md. Dec. 16, 1846).

14

Electronic copy available at: https://ssrn.com/abstract=4521030

armed[.]"[100]  Yet another writer, in Mississippi, ventured that it would be better to ban all pistols, than to tolerate unregulated reciprocal arming.[101]

In a recent article, Professors Guha Krishnamurthi and Peter N. Salib have recognized the particular risk modern weaponry creates with these these "small arms races."[102]  As they model it:

> It is much better to shoot than be shot. And it is very cheap to prepare oneself to shoot first, should the need arise.  [In these circumstances] response to a mere probability of being shot is to increase readiness, decrease caution, and thereby make oneself more threatening.  Thus, the deadly chain of escalation is triggered.[103]

Legal regimes that fail to place some breaks on this slide—at the very least by offering ex-ante guarantees that arms-bearing persons are trustworthy and peaceable—set up a classic game-theoretical problem, one that "[p]romotes small arms races essentially everywhere: public streets, sports stadiums, bars, and more."[104]  The consequence curtails public liberty, causing persons to avoid going into public areas, or risking escalation by reciprocal arming.[105]

Hence, regulating offensive, dangerous, or unusual weapons is historically justified, not just because unregulated arms-bearing violates social norms, but also because it can help stem the kind of deleterious norm cascade these writers imagine, wherein each person feels he must effectively counter an armed other,[106] or else avoid public places entirely.

## C.  Sensitive Places

Both Justice Thomas in his majority opinion (and Justice Kavanaugh, in his concurrence) reiterated that guns could be restricted from "sensitive places." As Justice Thomas wrote:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether

---

[100] *The Result of Recent Trials for Murder*, RICHMOND DAILY WHIG (Richmond, Va. Nov. 11, 1854).

[101] W.L.C. Hunnicut, *Pistols—Let Them Be Abolished*, THE CLARION (Jackson, Miss. Jan. 23, 1884) ("[Pistols] are dastardly weapons, made for concealment and murder.  Yet no man ought to be blamed for having one so long as any other man may have one.  Let them be abolished, so that no man can have one.").

[102] Guha Krishnamurthi & Peter N. Salib, *Small Arms Races*, 6/3/2022 U. CHI. L. REV. ONLINE 1 (2022).

[103] *Id.*

[104] *Id.* at 8

[105] Noah Levine, Note, *The Spirit of Gun Laws*, 18 DUKE J. CONST. L. & PUB. POL'Y SIDEBAR 241, 262 (2023).

[106] JOSEPH KEBLE, AN ASSISTANCE TO THE JUSTICE OF THE PEACE FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (1683) (the crime of affray occurs without violence where "a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon other that be not armed as he is."); *see also* Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 FORDHAM URB. L.J. 1727, 1834 (2012) (quoting same).

15

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12384**

prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. . . . We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new and analogous sensitive places* are constitutionally permissible.[107]

The majority did not offer a rationale for why these places are sensitive, nor did it offer a comprehensive list of presumptively sensitive places. Lower courts prior to *Bruen* have only offered the elliptical postulate that it's due to "the people found there" or the "activities that take place there."[108] However, a unifying feature of sensitive places doctrine may be found in thinking of them as necessary to maintain an infrastructure for expression, assembly, participatory democracy, and social life that is free of intimidation and fear.[109] Much as we understand parks, sidewalks, thoroughfares, meeting halls, markets and other public spaces as essential for the flourishing of social life, the free exchange of ideas, and the fostering of public debate essential to a self-governing society,[110] so we can understand both ancient and new forms of sensitive places as demanding protection to serve these functions.[111]

Such a theory of sensitive places would be well established. Starting with the Statute of Northampton, persons were prohibited from carrying guns into "fairs or markets" as well as "in presence of the justices or other ministers."[112] North Carolina adopted a verbatim prohibition.[113] A nearly identical regulation appeared in 1786 in Virginia, prohibiting anyone from going armed "in fairs or markets" or "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms."[114]

---

[107] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2133 (2022). The Court did insist, however, that there are geographical limits to "sensitive place" designations, rejecting that the "the island of Manhattan" could not be designated sensitive "simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134.

[108] United States v. Class, 930 F.3d 460, 465 (D.C. Cir. 2019) (internal quotation marks omitted).

[109] Blocher & Siegel, *supra* note 40, at ___.

[110] Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974) (identifying "open spaces, . . meeting hall[s], park[s], street corner[s], or other public thoroughfare[s] as " the traditional settings where First Amendment values inalterably prevail").

[111] Van Bergen v. State of Minn., 59 F.3d 1541, 1553 (8th Cir. 1995) ("The classic public fora— streets and parks—are traditional gathering places in which public debate and exchange of views take place."); Demmon v. Loudoun Cnty. Pub. Sch., 342 F. Supp. 2d 474, 481 (E.D. Va. 2004) ("The classic public fora are public parks, streets, or meeting halls"). *Cf.* Richard W. Garnett, *Do Churches Matter? Towards an Institutional Understanding of the Religion Clauses,* 53 VILL. L. REV. 273, 274 (2008) ("[F]reedom of expression is not only enjoyed by and through, but also depends on the existence and flourishing of, certain institutions—newspapers, political parties, interest groups, libraries, expressive associations, universities and so on.").

[112] Statute of Northampton, 2 Edw. 3 c. 3 (1328).

[113] FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, 60-61 (Newbern 1792).

[114] An Act forbidding and punishing Affrays, 1786 Va. Laws 33, ch. 21.

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12385

Weapons have long been prohibited from areas of public commerce or celebration, like saloons, stores, ballrooms, festivals and other places of public congregation. In 1870, for instance, Texas prohibited carrying weapons in "a ballroom, social party or other social gathering composed of ladies and gentlemen."[115] The Oklahoma territory had a similar prohibition in the late 1800s, extending to anywhere "persons are assembled . . .  for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly."[116]  Missouri[117] and Arizona had a similar regulation.[118]

Since the early republic, government has regulated arms to maintain free and fair elections—both by way of locational restrictions on arms as well as temporal restrictions. Delaware's 1776 constitution specifically prohibited militias from drilling during an election, or allowing any troops from coming within a mile of a polling place either twenty-four hours before or after an election.[119] Maryland delegates passed a similar regulation in 1776, prohibiting any person from "com[ing] armed" to the election and prohibiting militia musters on election day, so as not "to impede the freely and convenient carrying on such elections."[120]  New York's law of 1787 specified that "all elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment" and even provided for "treble damages to the party grieved."[121] These were not just founding-era measures; the 19th century saw numerous express protection of political gatherings, elections, and similar political processes from weaponry.[122] The  justification for these regulations was ensure that no one

---

[115] An Act Regulating The Right To Keep And Bear Arms, 1870 Tex. Gen. Laws 63, Chap. 46, § 1.

[116] Leander G. Pitman, THE STATUTES OF OKLAHOMA, 1890, at 495-96 (1891).

[117] Carrying Deadly Weapons, etc., Ch. 24, Art. 2, § 1274, THE REVISED STATUTES OF THE STATE OF MISSOURI, Vol. 1 (1879) (prohibiting weapons "in any school room or place where people are assembled for educational, literary or social purposes").

[118] Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16–17 (prohibiting weapons from a "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").

[119] DEL. CONST. art 28 (1776).

[120] PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND, HELD AT THE CITY OF ANNAPOLIS IN 1774, 1775 & 1776, at 185 (1836).

[121] Act of Jan. 26, 1787, ch. 1, 1787 N.Y. Laws 345.

[122] See, e.g., Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336 ("[I]t shall not be lawful for any person in Kent, Queen Anne's or Montgomery counties to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy, or bludgeon "); Ga. Code § 4528 (1873) ("No person in this State is permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to ... any election ground  "); 1895 Tex. Crim. Stat. 93 (carrying arms about elections) ("If any person ... shall carry any gun, pistol, bowieknife or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished  "); Terr. Okla. Stat. ch. 25, art. 47, § 7 (1890) (prohibiting firearms at any "political convention"); Act of Dec. 1, 1869, ch. 22, sec. 2, 1869 Tenn. Pub. Acts 108 (prohibiting dangerous weapons at elections); Act of Mar. 16, 1870, sec. 73, 1870 La. Acts 159 (prohibiting any "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration").

17

Electronic copy available at: https://ssrn.com/abstract=4521030

is deterred by fear from exercising the franchise in the first instance and that ballots are cast as matters of conscience and not from duress or intimidation.[123]

Educational institutions have similarly prevented arms from their environs, in order to protect the essential function of schools as free speech institutions. Harvard University banned guns in the seventeenth century,[124] as did the University of Virginia in its 1825 student rule book.[125] Mississippi imposed criminal penalties on professors of universities who permitted their students to carry concealed weapons.[126] Missouri, Texas, and the Oklahoma territory all prohibited firearms in not only schools but more broadly in places where people assemble for "educational, literary, or social purposes."[127]

In sum, whether through rules like affray, regulations on dangerous, unusual or offensive weapons, or prohibitions on firearms in sensitive places, the tradition of American weapon regulation is geared towards the preservation of the peace and the maintenance of political and public life free from fear.

## IV.    Terror and Technology

While the impulse to regulate weapons to preserve the public peace is old; the technological capacity to terrify the public with weapons is new. In 1791, when the Second Amendment was ratified, a trained soldier could fire approximately four rounds per minute.[128]   With a bump stock, an AR-15 can fire

---

[123] There's also a rich history of regulation of arms in places of public amusement and places of public education.

[124] Allen Rostron, *The Second Amendment on Campus*, 14 GEO. J.L. & PUB. POL'Y 245, 255 (2016) ("[N]oe students shall be suffered to have [a g]un in his or theire chambers or studies, or keeping for theire use anywhere else in the town.") (quoting a copy of the LAWS OF HARVARD COLLEGE 1655, at 10 (1876)).

[125] *Id.* at 257 ("No student shall, within the precincts of the University, introduce, keep, or use any spirituous or vinous liquors, keep or use weapons or arms of any kind or gun-powder.") (quoting ENACTMENTS BY THE RECTOR & VISITORS OF THE UNIVERSITY OF VIRGINIA FOR CONSTITUTING, GOVERNING AND CONDUCTING THAT INSTITUTION 9 (1825)).

[126] 1878 Miss. Laws 176.

[127] Act of Mar. 26, 1879, 1879 Mo. Laws 224 (carrying deadly weapons, etc.); Terr. Okla. Stat. ch 25, art. 47, § 7 (1890) (public buildings and gatherings) (prohibiting "any person, except a peace officer" from bearing any offensive or defensive weapon in "any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes"); Act of Aug. 12, 1870, ch. 46, 1870 Tex. Gen. Laws 68. Missouri's law is noteworthy for two additional reasons: First a prosecutor in St. Aubert Missiour pledged to prosecute its prohibition "without regard to race, color or previous condition of servitude." *Legal Notes—Carrying Concealed Weapons*, Callaway Weekly Gazette (Fulton, Missouri Aug. 9, 1878). Second, the Missouri Supreme Court in *State v. Reando* upheld this "sensitive places" restriction against a state right to keep and bear arms challenge. *See On Carrying Concealed Weapons*, THE STATE JOURNAL (Jefferson City, Mo.), April, 12 1878.

[128] Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEV. STATE L. REV. 1, 47 n.249 (2012) (citing James E. Hicks, *United States Military Shoulder Arms, 1795-1935*, 1 J. AM. MIL. HIST. FOUND. 23, 30 (1937)); David T. Hardy, *The Janus-Faced Second Amendment: Looking Backward to the Renaissance, Forward to the Enlightenment*, 18 GEO. J.L. & PUB. POL'Y 421, 449 (2020) (estimating "about three rounds per minute").

18

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12387**

four hundred rounds a minute.[129]  The effective range of a flintlock circa 1791 was around 175 yards, and it was accurate to only about one hundred.[130]  A modern AR-15 has an effective range of 500 yards; and, if you don't care what you hit, a maximum range of 2800 yards.[131]  Early firearms "lost most of their kinetic energy" at around 50 yards;[132] at 100 yards, a modern assault rifle can still penetrate steel.[133]  It takes as little as four pounds of force to pull the trigger of a modern firearm half an inch,[134] about the same force it takes to open a bottle of beer.[135]  Half an inch between an ordinary day and a terrifying one.

At the same time the technology of weaponry has become exponentially more destructive, there's been an accelerating drive to relax, or even eliminate, the legal and social norms restraining public weaponry.  Over half of the states have now gone to a system of permitless carry, dispensing with any licensing or training whatsoever.  Those states that have gone to permitless carry frequently display a cavalier attitude towards conflict avoidance, de-escalation, or even the basic legal rules that govern lethal force in self-defense,[136] presumably on an assumption that private sellers, criminal law, and gun owner self-interest will provide adequate guidance.

Even when a public carry regime imposes rudimentary knowledge of safe-defense law, relying on ex-post criminal law to manage the problem is a vain hope.

---

[129] Ed Leefeldt, *Stephen Paddock Used a "Bump Stock" to Make His Guns Even Deadlier*, CBS News (Oct. 4, 2017, 5:55 PM), https://www.cbsnews.com/news/bump-fire-stock-ar-15-stephen-paddock-guns-deadlier/.

[130] *Small Arms Across Three Wars*, American Battlefield Trust, https://www.battlefields.org/learn/articles/small-arms-across-three-wars (last visited July 20, 2023).

[131] U.S. Army Special Forces Handbook 116 (2008).

[132] Peter Krenn et al., *Material Culture and Military History: Test-Firing Early Modern Small Arms*, 42 Material History Review 101 (1995); *see also id.* at 102 ("The data reveal that early guns were highly inaccurate and subject to very high drag on the bullets. As well, that the penetrating power of the bullets dropped off dramatically within a relatively short range.").

[133] *Id.* One hundred yards may be an underestimate: a brochure introduced during a hearing on the AR-15 before Congress boasted that "[a]t combat ranges (0-500 yards) the [AR-15] rifle will penetrate both helmet and liner; 13 to 14 1-inch pine boards; 10-gauge steel; or modern body armor." *See also Hearings & Report of the House Subcommittee of Special Investigations of the Committee*, 87th Cong. 2d sess. 1, 3604 (1962) (excerpt from Cooper-MacDonald, Inc. brochure).

[134] David E. Petzal, *Everything You Need To Know About Trigger Pull For Hunting Rifles*, Field & Stream (Jan. 4, 2022 9:51 AM), https://www.fieldandstream.com/stage-craft-understanding-trigger-pull/ ("For a dangerous-game rifle, or a tactical rifle that will actually be shot tactically, 4 pounds."); National Institute of Justice, Baseline Specifications for Law Enforcement Service Pistols with Security Technology 10 (2016) ("The trigger shall have a reset distance not to exceed 0.50 inches."); *Trigger Mechanics and Trigger Terminology*, Gun Tweaks, https://www.guntweaks.com/trigger-mechanics.html (last visited July 20, 2023) ("Most triggers travel between 1/4" and 1/2" . . .).

[135] *Cf.* Ali Jamnia, Product Design & Development for Engineers 374 (2018) (stating it takes approximately 3 lbs. to twist open a bottle of soda).

[136] Kelly Drane, *The Truth About Permitless Carry*, Giffords Law Center (Feb. 8, 2023), https://giffords.org/lawcenter/report/the-truth-about-permitless-carry/ ("The 25 states with permitless carry laws require zero hours of training—or even require that a person has never held a gun—to carry a loaded firearm in public."); Andrew Ozaki, *Nebraska Gun Rights Advocate Stresses Training After Permitless Concealed Carry Bill Passes*, KETV (Apr. 21, 2023 8:53 AM), https://www.ketv.com/article/nebraska-gun-rights-advocate-stresses-training-permitless-concealed-carry/43661443# (Nebraska's Firearm Owner's Association offering optional training on "basic gun handling . . . use of force and de-escalation").

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12388**

Criminal prosecution—after the firing is over—is not designed to generate an optimal rule system for arms bearing.[137] There's just too much difficulty after the fact in determining who reasonably apprehended imminent bodily harm in circumstances where the difference between a mistake and a murder is half an inch. And the insufficiency of criminal law to manage the upstream effects of public weaponry doesn't factor in the numerous jurisdictions that have enacted increasingly muscular "stand your ground" laws.[138]

## V.   Measuring Terror—Estimating the "Chilling Effects" of Public Carry

The combination of technological innovation, relaxed legal and social regulation of public carry, and America's comparatively high rates of gun violence has a testable impact on social behavior. Two of us conducted a series of survey experiments to measure this effect at the level of public attitudes.[139]

We hypothesized that the presence of armed individuals in public spaces such as parks, fairs, or farmers markets may dampen people's willingness to visit such places—what we call "chilling effects."[140] Furthermore, we expect similar chilling effects to emerge for certain forms of political engagement such as participation in political protests, and even voting, if citizens are made aware that gun carry is allowed in such locations. Therefore, the presence of armed individuals in public spaces can have consequences both for economic interactions and for the citizens' ability to express their right to freedom of speech. These experiments do not measure actual behavior, but by inference, we expect a concordance between attitudes and behavior.

We set out to test the chilling effects hypothesis by fielding a series of six survey experiments as part of a nationally representative online survey conducted

---

[137] Joseph Blocher et al., *Pointing Guns*, 99 TEX. L. REV. 1173, 1188 (2021) ("[D]uring a confrontation, both defensive pointing of a firearm and threatening pointing of a firearm generate reasonable fear in those at whom the gun is pointed.").

[138] Jacob D. Charles, *Securing Gun Rights by Statute: The Right to Keep and Bear Arms Outside the Constitution*, 120 MICH. L. REV. 581, 642 n. 204 (2022) ("[S]ome of the new stand-your-ground laws, like Florida's, permit a person to use deadly force not just in response to an attack that threatens death or great bodily harm, but also to prevent property crimes."); Blocher et al., *supra* note 137, at 1186 ("Florida law . . . contains provisions that (1) create a presumption of the actor's reasonable belief in imminent harm if a person is unlawfully entering the actor's dwelling or vehicle, and (2) confusingly provide 'immunity' from prosecution to persons whom the police conclude after investigation acted in self-defense."). *See also* Mary Anne Franks, *Real Men Advance, Real Women Retreat: Stand Your Ground, Battered Women's Syndrome, and Violence As Male Privilege*, 68 U. MIAMI L. REV. 1099, 1106 (2014) (discussing these laws as representing "a significant departure from the long-held belief that the use of deadly force should not be used to protect mere property"). For a thorough analysis, see Eric Ruben, *Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023).

[139] Data files and related documentation are available at: Filindra, Alexandra, 2023, "TECHNOLOGY, TRADITION, AND "THE TERROR OF THE PEOPLE"-REPLICATION DATA", https://doi.org/10.7910/DVN/1CNBIS, Harvard Dataverse, V1, UNF:6:KyBeNDNaFX0kMGird/E+BA== [fileUNF]

[140] *See* New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964) (private libel litigation by public figures requires a heightened standard to prevent First Amendment chilling effects of common law liability); *see also* Snyder v. Phelps, 562 U.S. 443, 458 (2011) (verdict in civil suit for "outrageous" intentional infliction of emotional distress threatened the "breathing space" needed for First Amendment speech).

20

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12389**

by the survey company YouGov. The survey was fielded in March 2023 and included 2,858 Americans including oversamples for African Americans and Hispanics to allow for subgroup analyses. The survey had an average length of 10 minutes. The data were weighted to match the demographics of the national population. The margin of error for the survey is ±2.7%.[141]

Respondents were randomly assigned to one of two conditions: one condition did not mention firearms, while the other condition included the prompt: "if guns are allowed in public spaces" (or similar tailored to the question). Therefore, the experimental condition makes firearms a salient concern, the way one would expect it to be when an individual observes openly armed people in public places. For each experiment, the dependent variable was coded as a dichotomous variable (0 or 1) and so was the treatment variable. We also coded dichotomous variables for gender, race (White or minority), and gun household. Our analyses present tests of proportions. The figures show percentages.[142]

## A. Study 1: Recommending to a friend with children to visit a local park

In this survey experiment, respondents were randomly assigned to a version of the question that reads: "How likely would you be to recommend to a friend who has children to spend time with them in a public park in your town?" or one that had the same phrasing but at the end added, "if guns are allowed in public spaces." Respondents could choose among five response options ranging from: "very likely, somewhat likely, neither, somewhat unlikely, very unlikely." To show proportions, we dichotomized this variable so that "very/somewhat likely" was coded as "1" and the other three options as "0". We opted to ask about

---

[141] This is YouGov's description of its method:

      YouGov interviewed 2,073 national respondents, who were then matched down to a sample of 2000 to produce the National dataset. The respondents were matched to a sampling frame on gender, age, race, and education. This matched dataset was then combined with two oversamples of Black (431) and Hispanic (358) respondents to produce a national general population sample. In addition, three other datasets consisting of exclusively Black, Hispanic, or White respondents were created from all respondents. These datasets consisted of 701 Black respondents, 643 Hispanic respondents, and 1355 White respondents. The frames were constructed by using different subsets of a politically representative "modeled frame" of US adults, based upon the American Community Survey (ACS) public use microdata file, public voter file records, the 2020 Current Population Survey (CPS) Voting and Registration supplements, the 2020 National Election Pool (NEP) exit poll, and the 2020 CES surveys, including demographics and 2020 presidential vote. These datasets were weighted to the sampling frame using propensity scores. The matched cases and the frame were combined, and a logistic regression was estimated for inclusion in the frame. The propensity score function included age, gender, race/ethnicity (national only), years of education, region, and 2020 Presidential vote choice. The propensity scores were grouped into deciles of the estimated propensity score in the frame and post-stratified according to these deciles. The weights were then post-stratified on 2020 Presidential vote choice, and a four-way stratification of gender, age (4-categories), race (4-categories) (national only), and education (4-categories), to produce the 4 final weights.

[142] The dataset in Stata, along with the dofile (code), and the codebook will be publicly available at: https://dataverse.harvard.edu/.

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12390**

recommending a local park to a friend rather than asking a direct usage question for two reasons. First, not everyone visits parks, therefore people's response to a direct usage question may reflect a variety of personal factors unrelated to the presence of firearms. Second, parks are often used by families with children but not every survey respondent is a parent of young children. Asking about a friend with kids allows us to include every respondent in the experiment.

      Figure 1A shows the proportions of respondents who said "very/somewhat likely" to recommend a park to a friend with children in each of the two conditions. As the figure shows, 61% of people in the control condition said they would be "very/somewhat likely" to recommend a local park, while only 34% did so in the "guns" condition. This represents a decline or "chilling effect" of 27 percentage points and it is statistically significant (p<0.001). Figure 1B shows the effect of the gun treatment by status as a member of a gun-owning household. A total of 35% of respondents in our survey indicated that they live in a gun owning household which is not far from national estimates. According to the Pew Center, 42% of Americans live in gun owning households.[143] Among those who live in non-gun-owning households, 59% said they would be "very/somewhat likely" to recommend a local park to a friend with children, but this drops to 26% when the question includes the gun prompt. This is a chilling effect of 33 percentage points (p<0.001). Among those who live in gun-owning households, we also see a chilling effect, but it is more modest. Specifically, the decline is 13 percentage points (p<0.001).



---

[143] Katherine Schaffer, *Key Facts About Americans and Guns*, PEW RESEARCH CENTER (Sept. 13, 2021) https://www.pewresearch.org/short-reads/2021/09/13/key-facts-about-americans-and-guns/.

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12391**

Figure 1C shows the difference in response patterns by gender. Among men, there is a chilling effect of 20 percentage points and among women it is even larger, at 32 percentage points (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 1D shows, among Whites, the decline from the control to the treatment condition is 27 percentage points, and among people of color it is 25 percentage points. For both groups, the chilling effect is statistically significant (p<0.001).

The results from this survey experiment suggest that when people are made aware that firearms may be carried into public spaces like a public park, they are significantly less willing to recommend public parks to others. Because such a recommendation flows from respondents' personal preferences, from these results we can also extrapolate that they themselves would also be less likely to visit public parks if firearm carry is allowed in such domains.

### B.  Study 2. Safety of open-air and farmers markets

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "in your view, how safe is it for you and your family to go shopping in open-air fairs and markets, including farmers' markets, in your town," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "very safe, somewhat safe, neither safe nor unsafe, somewhat unsafe, very unsafe." The analysis followed the same steps outlined for Study 1 above.

Figure 2A shows the proportions of respondents who said "very/somewhat safe" to shop at an open-air market or farmers market in each of the two conditions. As the figure shows, 79% of people in the control condition said it is "very/somewhat safe" to shop at an open-air market, while only 52% did so in the experimental condition. This represents a decline or "chilling effect" of 27 percentage points and it is statistically significant (p<0.001). Figure 2B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 76% said it is "very/somewhat safe" to shop at a farmers' market, but this drops to 43% when the question includes the gun prompt. This is a chilling effect of 33 percentage points (p<0.001). Among those who live in gun-owning households, we also see a chilling effect, but it is more modest. Specifically, the decline is 14 percentage points (p<0.001).

23

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12392**



Figure 2C shows the difference in response patterns by gender. Among men, there is a chilling effect of 24 percentage points and among women it is even larger at 28 percentage points (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 2D shows, among Whites, the decline from the control to the treatment condition is 25 percentage points, and among people of color it is 29 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

From these results we can extrapolate that if many Americans across groups believe it to be unsafe to shop at an open-air or farmers' market when guns are allowed in such places, a substantial number of people will be reluctant to shop there if people are allowed to carry firearms at such places.

### C. Study 3. Encourage a friend to attend a political protest

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend is thinking of attending a political protest in your town about an issue that is very important to them and wants your opinion. Would you encourage or discourage your friend from attending," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from attending a protest. The analysis followed the same steps outlined for Study 1 above.

Here, it is important to note that even though protesting government action is a fundamental right of American citizenship, not all citizens are comfortable with this form of political participation. This means that at baseline

24

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12393**

the proportion of people who would encourage a friend to attend a protest is far lower than the proportion of people who would recommend a friend to visit a local park. Therefore, we start out with a much smaller proportion of positive responses (i.e., encourage) and therefore it is more difficult to detect chilling effects. As a result, this question is a hard test for establishing chilling effects.

  Figure 3A shows the proportions of respondents who said "strongly/somewhat encourage" the friend to attend a protest in each of the two conditions. As the figure shows, 37% of people in the control condition said they would "strongly/somewhat encourage" a friend to attend a protest, while only 24% did so in the experimental condition. This represents a decline or "chilling effect" of 13 percentage points and it is statistically significant ($p<0.001$). Figure 3B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 38% said they would "strongly/somewhat encourage" a friend to attend a protest, but this drops to 20% when the question includes the gun prompt. This is a chilling effect of 18 percentage points ($p<0.001$). Among those who live in gun-owning households, we do not see a statistically significant chilling effect as the difference between the two conditions is only -3 percentage points.



Figure 3: Dif. in Proportions -- Friend Safe to Attend Protest

Figure 3C shows the difference in response patterns by gender. Among men, there is a chilling effect of 10 percentage points and among women it is even larger at 15 percentage points. Within each group, the chilling effect is statistically significant ($p<0.01$). The chilling effects persist for both White Americans and people of color. As Figure 3D shows, among Whites, the decline from the control to the treatment condition is 10 percentage points, and among people of color it

25

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12394

is 16 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

As we noted in Study 1, we opted to ask the question about a friend because not everyone is interested to attend political protests or is politically active in any way. If we restricted our sample to only those who are politically engaged, we would not capture the general population. Furthermore, research suggests that when people are asked to advise or recommend an action to third parties, they typically draw from what they would do in a similar situation. As a result, it is safe to extrapolate from these results that Americans will be significantly less likely to exercise their first amendment rights to protest government if people are allowed to bring firearms to such events. This is consistent with the results of another study conducted in 2021.[144] The results show that except for members of gun households, the presence of firearms at protests is likely to produce sizeable chilling effects.

### D.  **Study 4. Encourage a friend to attend a political protest and carry a sign**

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "a friend has decided to attend a political protest in your town about an issue that is very important to them and wants your opinion about whether they should bring a sign or flag. Would you encourage or discourage your friend from bringing a sign or flag," while the other half read the same question but with the phrase "if guns are allowed in public spaces," added to the end of the question. The response options were "strongly encourage, somewhat encourage, neither encourage nor discourage, somewhat discourage, strongly discourage" the friend from carrying a sign or flag to a protest. The analysis followed the same steps outlined for Study 1 above.

The purpose of this experiment was to make it even more difficult to find chilling effects. Carrying a sign at a protest can make the person a target since the sign makes clear their positions. We already know that many Americans are ambivalent about participation in protests, but we expect that the added risk of carrying a sign should suppress willingness to encourage the friend in the control condition. Given that relatively few people are likely to say they would encourage their friend to protest with a sign, because of the added risk, this is a hard case for finding chilling effects.

Figure 4A shows the proportions of respondents who said "strongly/somewhat encourage" the friend to carry a sign to a protest in each of the two conditions. As the figure shows, 31% of people in the control condition said they would "strongly/somewhat encourage" a friend to attend a protest with a sign, while only 22% did so in the experimental condition. This represents a decline or "chilling effect" of 9 percentage points and it is statistically significant (p<0.001). Figure 4B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 31% said they would "strongly/somewhat encourage" a friend to attend a protest, but this drops

---

[144] Alexandra Filindra, *Americans Do Not Want Guns at Protests, This Research Shows*, WASH. POST (Nov. 21, 2021) https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/.

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12395**

to 19% when the question includes the gun prompt. This is a chilling effect of 12 percentage points ($p<0.001$). As expected, given the results of Study 3, among those who live in gun-owning households, we do not see a statistically significant chilling effect as the difference between the two conditions is only -2 percentage points.



Figure 4: Dif. in Proportions -- Safe to Bring Sign to Protest

Figure 4C shows the difference in response patterns by gender. Among men, there is a chilling effect of 4 percentage points which is not statistically significant, and among women it is larger at 13 percentage points and statistically significant. The chilling effects persist for both White Americans and people of color. As Figure 4D shows, among Whites, the decline from the control to the treatment condition is 8 percentage points, and among people of color it is 10 percentage points. Within each group, the chilling effect is statistically significant ($p<0.01$).

Our results show that even in this "hard test" situation where the scenario involves high risk and therefore most people are unlikely to encourage a friend to carry a sign at a protest, the likely presence of firearms at protests produces chilling effects overall and for most subgroups except for men and members of gun-owning households.

### E.  Study 5: Safe to vote if guns are allowed in election centers

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "how safe do you think it will be for you to vote in person in the next presidential election," while the other half read the same question but with the phrase "if guns are allowed in election centers," added to the end of the question. The response options were "very safe, somewhat safe, neither

27

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12396

safe nor unsafe, somewhat unsafe, very unsafe" for the respondent to cast a vote. The analysis followed the same steps outlined for Study 1 above.

The purpose of this experiment was to move beyond the low participation context of protests to the much more prevalent exercise of the right to vote. The right to vote is foundational to democratic politics and any practice that discourages people from exercising it is normatively concerning. We opted to frame the question around the next presidential election both because it is the next major election on the calendar and because participation in presidential elections is significantly higher than in midterm elections or primaries.

Figure 5A shows the proportions of respondents who said "very/somewhat safe" the friend to vote in each of the two conditions. As the figure shows, 79% of people in the control condition said they would feel "very/somewhat safe" to vote in person in the next presidential election, while only 43% did so in the experimental condition. This represents a decline or "chilling effect" of 36 percentage points and it is statistically significant (p<0.001). Figure 5B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 77% said they would feel "very/somewhat safe" to vote in person, but this drops to 34% when the question includes the gun prompt. This is a chilling effect of 43 percentage points (p<0.001). The chilling effect among members of gun-owning households is also sizeable: when told that guns may be present at election booths, perceptions of safety of voting declines by 22 percentage points among this group (p<0.001).



Figure 5: Dif. in Proportions -- Safe to Vote in Person

Figure 5C shows the difference in response patterns by gender. Among men, there is a chilling effect of 30 percentage points and among women it is larger

28

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12397

at 41 percentage points. Within group differences are statistically significant for both groups (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 5D shows, among Whites, the decline from the control to the treatment condition is 36 percentage points, and among people of color it is 35 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).

## F.  **Study 6. Safe to vote using a ballot collection box if armed groups are allowed to patrol near such boxes**

In this survey experiment, half of the respondents were assigned to a version of the question that reads: "how safe do you think it will be for you to vote by dropping off your ballot in a ballot collection box in the next presidential election," while the other half read the same question but with the phrase "if people who are armed are allowed to patrol around such collection boxes," added to the end of the question. This question was motivated by an incident that took place in Arizona during the 2022 midterm election.[145] The response options were "very safe, somewhat safe, neither safe nor unsafe, somewhat unsafe, very unsafe" for the respondent to cast a vote in a collection box. The analysis followed the same steps outlined for Study 1 above.

Figure 6A shows the proportions of respondents who said "very/somewhat safe" to use the ballot collection box in each of the two conditions. As the figure shows, 70% of people in the control condition said they would feel "very/somewhat safe" to vote using a ballot collection box in the next presidential election, while only 42% did so in the experimental condition. This represents a decline or "chilling effect" of 28 percentage points and it is statistically significant (p<0.001). Figure 6B shows the effect of the gun treatment by gun household status. Among those who live in non-gun-owning households, 72% said they would feel "very/somewhat safe" to vote using the ballot collection box, but this drops to 35% when the question includes the gun prompt. This is a chilling effect of 37 percentage points (p<0.001). The chilling effect among members of gun-owning households is smaller but significant at 8 percentage points (p<0.05).

---

[145] Terry Tang, *Judge Orders Armed Group Away From Arizona Ballot Drop Boxes*, AP NEWS (Nov. 1, 2022 10:05 PM), https://apnews.com/article/2022-midterm-elections-arizona-phoenix-5353cfd0774727e6dd03bdbf48c12211. *See also* Arizona All. for Retired Americans v. Clean Elections USA, No. CV-22-01823, 2022 WL 15678694, at *1 (D. Ariz. Oct. 28, 2022), opinion vacated, appeal dismissed, No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023) (noting that in 2022 there were armed and masked "observers" wearing body armor at Mesa, Arizona drop box, but finding no remedy complaint with First Amendment).

29

Electronic copy available at: https://ssrn.com/abstract=4521030

**FFXCO_12398**



Figure 6C shows the difference in response patterns by gender. Among men, there is a chilling effect of 26 percentage points and among women it is somewhat larger at 29 percentage points. Within group differences are statistically significant for both groups (p<0.001). The chilling effects persist for both White Americans and people of color. As Figure 6D shows, among Whites, the decline from the control to the treatment condition is 24 percentage points, and among people of color it is 32 percentage points. Within each group, the chilling effect is statistically significant (p<0.001).[146]

The importance of these experiments is that they document that making the presence of firearms salient to people can change their attitudes about engaging in social and political activities than bring them into contact with large numbers of strangers. Although we do not measure behavior, we can infer that when individuals are directly confronted with the presence of openly armed individuals in public spaces, the firearms will be a salient influence on their behavior as well.[147]

## VI.    Analogs, Empirics, and the "Nuanced Approach"

---

[146] *See generally* Alexandra Filindra, *Americans Do Not Want Guns at Protests, This Research Shows*, WASH. POST (Nov. 21, 2021), https://www.washingtonpost.com/politics/2021/11/21/americans-do-not-want-guns-protests-this-research-shows/.

[147] It is also true that other factors may induce fear and dissuade people from engaging in similar activities. For example, people may not want to visit a local park if they are told that it is frequented by drug addicts or gang members. The goal of these experiments is not to determine the *relative* chilling effects of open gun carry, but to establish that chilling effects should be expected to occur. Future work can isolate the chilling effects of open gun carry relative to other factors that can produce affray.

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12399

Neither the Second Amendment nor *Bruen* render policymakers incapable of addressing the public fear caused by modern firearms and firearm violence. Nor does *Bruen* render irrelevant the type of experimental evidence we've summarized in part V. As mentioned above, the *Bruen* majority recognizes that a process of examining analogs to modern societal and technical challenges will require a "more nuanced approach" to tradition. That "nuanced approach" implicates changing the level of generality at which historical regulations are examined when compared to modern technology and modern problems.

As one district court judge wrote, "[c]omparisons to historical antecedents that share only broad commonalities may be most compelling in cases involving regulations that were 'unimaginable at the founding' or that involve 'unprecedented societal concerns.'"[148] In these cases, "courts may properly weigh evidence of such historical antecedents against the other available evidence in any given case."[149] To do otherwise would to be strike down regulations simply because "they 'happened [not] to exist in the founding era,'"[150] and contradict *Bruen*'s own injunction that "'the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'"[151]

For example, since the 1990s federal law has taken guns out of the hands of those convicted of domestic violence[152] or those under a domestic violence restraining orders.[153] One will search in vain for any specific Founding-era regulation that resembles this kind of law. Far more likely, one will find laws that ignore, sanction or even *immunize* the physical battery of household members.[154] Nevertheless, there is ample historical tradition of keeping firearms out of the hands of those deemed intemperate or dangerous. At that level of generality, a prohibition such as that in U.S.C. § 922(g)(8) is perfectly compatible with longstanding American traditions.[155] In this context, rather than a clumsy and offensive attempt to suggest that categorical disarmament of Native Americans, African-Americans, or Catholics is akin to disarmament of domestic abusers, a court may reason that the "why" of these historical regulations was to prevent dangerous people from possessing arms and that empirical data—rather than bigotry—can furnish evidence of who, in fact, is dangerous.

In a similar fashion, one can see that the purpose of regulations of affray, dangerous and unusual weapons, and weapons in sensitive places share as their

---

[148] United States v. Padgett, No. 21-cr-00107, 2023 WL 2986935, at *7 (D. Alaska Apr. 18, 2023)
[149] *Id.* (quoting *Bruen*, at ___).
[150] *Id.* (quoting *Bruen*, at ___).
[151] *Id.* (quoting *Bruen*, at ___).
[152] 28 U.S.C. 922(g)(9).
[153] 28 U.S.C. § 922(g)(8).
[154] State v. Black, 60 N.C. 262, 267 (1864) ("[T]he law permits [the husband] to use towards his wife such a degree of force as is necessary to control an unruly temper and make her behave herself; and unless some permanent injury be inflicted, or there be an excess of violence"; *see generally* Reva B. Siegel, *"The Rule of Love": Wife Beating As Prerogative and Privacy*, 105 YALE L.J. 2117, 2122-25 (1996) (documenting how it wasn't until the 1870s in America that idea of a husband's right to "chastisement" began to formally fade); Camille Carey, *Domestic Violence Torts: Righting A Civil Wrong*, 62 U. KAN. L. REV. 695, 696 (2014) ("The common law doctrines of chastisement, coverture, and spousal immunity historically shielded abusers from tort liability for domestic violence").
[155] *But see* United States v. Rahimi, 61 F.4th 443, 461 (5th Cir. 2023) (striking down § 922(g)(8) on Second Amendment grounds), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023)

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12400

"why" the prevention of public fear and maintenance of public peace. Having identified a purpose for these regulations, empirical data can demonstrate—as we have attempted to do in part V—how contemporary problems, attitudes, or technology create the type of hazard that these historical regulations was designed to prevent.

In addition, the "nuanced approach" can help account for the vastly different technological environment we live in today compared to the 1700s. "Sensitive places" have long included places where officers of the government work or are present, or where the mechanisms of democracy, like elections and campaigning, take place, as well as other places of public commerce, amusement and congregation.

But regulations to protect these "sensitive places"—as, for example the location where a current or former President or other public official is speaking— must be attuned to the vastly more powerful nature of modern weapons. Designating the 100 yards surrounding an official address a "sensitive place," free from firearms, could fail its primary function if a modern rifle can fire 500 yards. Consequently, the "nuanced approach" could permit a regulatory buffer to protect these channels of democracy, even if the buffer's precise contours are calibrated by the empirical reality of modern armament, rather than by technological relics.[156]

## VII.   The "Nuanced Approach" and Levels of Generality

Of course, the foregoing discussion presumes that preventing fear and protection of public life and peace is the right level of generality to assess a historical analog. That proposition is not self-evident. *Bruen* recognizes that historical regulations must be construed at a higher level of generality given "dramatic" changes in modern technology and "unprecedented" problems with gun violence,[157] but it offers little guidance about the level of generality to select. It simply says that analogs are neither a regulatory "blank check" nor a "straightjacket,"[158] and that courts can look to the "why" and "how" of historical regulation.[159] But that's not answering the level of generality question so much as restating it.

The "why" of historical regulation could be understood at numerous levels of generality. A historical law to prevent persons from carrying firearms for hunting except during certain seasons, and not upon enclosed grounds, could be understood as designed to deter poaching; to protect private property; to prevent environmental damage; or to disrupt training for armed insurrection.[160]

---

[156] We recognize that there's spatial limits to this kind of "nuanced approach." As the Court mentioned, the entire isle of Manhattan cannot be designated "sensitive."  New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2134 (2022).

[157] New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2134 (2022).

[158] *Id.* at ____.

[159] *Id.* at 2133.

[160] *Compare* VT. CONST. of 1777, ch. I, § 15. ("That the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands (not enclosed;) and, in like manner, to fish in all beatable and other waters, not private property, under proper regulations, to be hereafter made and provided by the General Assembly.") *with* 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *412 (speculating that purpose of British game laws was to prevent "popular insurrections and resistance to the government").

32

Electronic copy available at: https://ssrn.com/abstract=4521030

The "how" of a historical regulation could equally be understood at multiple levels of generality. A regulation on "Bowie knives" could be understood as regulation of one type of fixed-edge knife popular in the 19th century; a regulation of any knife of a certain length; a regulation on concealable edged weapons; or a regulation on any kind of concealable weapon.[161]

There's nothing internal to *Bruen* or its traditionalism that specifies, much less justifies, choosing a particular level of generality, under any approach, nuanced or not. Instead, one must justify a level of generality by reference to some other object or goal. We suggest a few below. None of these approaches are exclusionary; and some may reinforce the other.

## A. Equilibrium Adjustment

One way to choose a level of generality is by reference to what's sometimes called "equilibrium adjustment."[162] In these circumstances, courts must respond to changing social context or technology with "compensating adjustments"[163] to restore the distribution of rights and regulation to a stipulated status-quo-ante.[164] When done according to originalist methods, this exercise is simply an effort to recover the balance that was struck by American traditions at some point in the past.[165]

So, for example, as weapons become more lethal at longer ranges, to the extent they still remain covered as a Second Amendment "arm," the concept of a "sensitive place" must correspondingly become more supple. Otherwise, the traditional balance between the right to keep and bear arms and the need to protect polling places or public officials, for example, becomes unbalanced.

Similarly, to the extent that carrying firearms becomes more socially acceptable and constitutionally covered, modern analogs to sureties, training, virtue and other guarantees that the arms-bearer will keep the peace and not terrorize the people must be understood at a higher level of generality.[166]

---

[161] *Cf.* Joseph Blocher, *Bans*, 129 YALE L.J. 308, 312 (2019) ("The question of how to describe a law—whether as a ban, a regulation, or merely an incidental burden—surfaces throughout constitutional law. And yet the Constitution does not always identify the baseline or denominator against which that impact should be measured.").

[162] *See generally* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 HARV. L. REV. 476 (2011)

[163] *See generally* Ernest A. Young, *Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments*, 46 WM. & MARY L. REV. 1733 (2005).

[164] *See* Darrell A.H. Miller, *Second Amendment Equilibria*, 116 NW. U. L. REV. 239, 246-255 (2021) (discussing possibilities for describing the ex-ante position); *see also* Joseph Blocher & Eric Ruben, *Originalism By Analogy*, 133 YALE L. J. __ (forthcoming 2023) (discussing "symmetrical levels of generality").

[165] *See* New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2131 (2022) ("It is [the] balance—struck by the traditions of the American people—that demands our unqualified deference.").

[166] *See* Miller, *Second Amendment Equilibria*, supra note 164, at 259-60 ("[L]icenses that require a gun owner to demonstrate she has training, or that require periodic license review and renewal, or that require some indicia of virtue or judgment, are attempts to restore the prior set of conditions that permitted arms bearing only among those people unlikely to breach the peace or inflict unjustified violence").

33

Electronic copy available at: https://ssrn.com/abstract=4521030

Here again, once the purpose of these historical regulations is identified, modern empirical data can help confirm that contemporary regulations are structured to accomplish that traditional purpose.

## B.  Institutional Capacity and Deference

Another way to address the level of generality issue is to recognize, as Judge Frank Easterbrook has, that to select a level of generality is to exercise power, one that may be better reposed in an another actor.[167]  In such a situation, courts may choose levels of generality that are less judge-empowering and more deferential to the political branches.  This selection would simply instantiate the proposition from Justice Scalia that the Court should select a level of generality for rights at the most specific level possible,[168] leaving sufficient room for democratically accountable political actors with access to empirical data to operate.

## C.  Constitutional Conflict

Another way to select a level of generality is to manage conflicts between constitutional interests.  The entire discussion of "sensitive places," recognizes that schools, elections, churches, and public parks are institutions providing public goods enabled by other kinds of constitutional rights, both state and federal.[169]

A "nuanced approach" to analogs after *Bruen* recognizes that the modern sports stadium may not strictly be a "fair," but that it serves a similar type of social and public purpose that can be empirically demonstrated. If the function of regulations on guns in "fairs and markets" is to preserve a space for social and expressive life and to enable that aspect of public life to proceed without terror, then it is important to establish empirically that unregulated public firearms are having a deleterious effect on public association and assembly in these spaces.

The challenge of adjudicating these kinds of rights trade-offs is what's often referred to as the "incommensurability" problem.  By what unit do you measure one group's interest in free speech versus another group's interest in armed self-defense?  As Justice Scalia once noted, judging incommensurate interests "is more like judging whether a particular line is longer than a particular rock is heavy."[170]

In this case, empirical research can measure the increase or reduction of interests on both sides of this equation.  For example, data could establish that gun owners, who presumably possess arms for self-defense, may *also* experience "chill";

---

[167] Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 372 (1992) ("Unless it is possible to find an answer that adequately differentiates judicial from political action, the judge should allow political and private actors to proceed on their way      ").

[168] Michael H. v. Gerald D., 491 U.S. 110, 127 n.6 (1989) (Scalia, J., dissenting).

[169] For a full discussion, *see* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 466 (2019) ("⌈P⌉laces are sensitive because they are the locus of the production of other kinds of public goods protected by other kinds of constitutional rights, and that the protection of the character of these types of institutions justifies limits on private firearms.").

[170] Bendix Autolite Corp. v. Midwesco Enterprises, Inc., 486 U.S. 888, 897 (1988).

Electronic copy available at: https://ssrn.com/abstract=4521030

that data may help gauge the degree to which the exercise of one right inhibits the exercise of another. The object would be to provide a common unit with which to determine an optimal level of protection. Or, at the very least, ensure that entire costs or benefits of public arms bearing is accounted for and transparent.

### D.  Reason-Giving

Finally, the role morality of judges exercising judicial review may guide the selection of a level of generality. The Hamiltonian chestnut is that the judicial branch only has judgment.[171] That's true, and in a society of over 330 million people, Supreme Court decisions by five individuals that govern the lives of all those people must be intelligible. Americans may understand that guns aren't permitted on commercial airliners because of the risk of injury; they may trust that this fits into a long tradition of restricting dangerous weapons from congested areas, like fairs and markets. They are perhaps less likely to accept that guns can be banned from planes because jet planes are the twenty-first century equivalent to a horse and carriage.[172]

Levels of generality that generate absurd or abstruse reasoning, or that sound untethered from any kind of lived experience of an average citizen, may degrade the already wavering confidence the American people have in the Supreme Court as a reason-giving institution of authority.[173]

## VIII.    Conclusion

There's no reason to believe that *Bruen* has consigned the Second Amendment to an empirically unmoored, untestable, fact-free future. Nor should we despair that the Second Amendment acts as an insuperable barrier to creative policy prescription designed to stanch America's exceptional gun violence problem.

We've argued here how historical regulations, understood at an appropriate level of generality, can provide space for the kind of innovative, testable empirical projects necessary to inform intelligible gun policies—policies that are popular, effective, and that can fit within the longstanding tradition of accommodating both gun regulation and gun rights in the United States.

---

[171] THE FEDERALIST NO. 78 (Alexander Hamilton).

[172] *Cf.* Frederick Schauer, *Deliberating About Deliberation*, 90 MICH. L. REV. 1187, 1199 (1992) ("Judges sometimes say 'it won't write,' meaning that there are some reasons that will not stand the test of public explanation.").

[173] Domenico Montanaro, *There's a Toxic Brew of Mistrust Toward U.S. Institutions. It's Got Real Consequences*, NPR MORNING EDITION (May 3, 2023 5:01 AM) (reporting that 62% of survey participants had "not very much or no confidence in the Supreme Court").

4872-1988-6249, v. 5

Electronic copy available at: https://ssrn.com/abstract=4521030

FFXCO_12404