IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KIMBERLY LAFAVE,             )
GLENN M. TAUBMAN, and    )
ROBERT HOLZHAUER,       )
                             )
      Plaintiffs,         )
                             )
v.                      )     Case No: 1:23-cv-01605-WBP
                             )
THE COUNTY OF FAIRFAX, VIRGINIA, and )
KEVIN DAVIS, in his official   )
capacity as Chief of Police,  )
                             )
      Defendants.       )

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

      Pursuant to Fed.R.Civ.P. 56, Plaintiffs Kimberly LaFave, Glenn M. Taubman, and Robert

Holzhauer, move for summary judgment against Defendants, the County of Fairfax, Virginia,

and its Chief of Police, Kevin Davis.  Plaintiffs seek a judgment on this purely legal question of

constitutional law that Fairfax County's gun ban in parks and public byways violates the Second

Amendment of the United States Constitution.

## I.   INTRODUCTION.

      This is an action to vindicate the right of residents and visitors in the County of Fairfax,

Virginia, to keep and bear arms under the Second Amendment to the United States Constitution,

which guarantees that "the right of the people to keep and bear arms, shall not be infringed."

Plaintiffs also seek relief under the Constitution's Fourteenth Amendment from vaguely-worded

crimes, which Amendment guarantees that no State shall "deprive any person of life, liberty, or

property, without due process of law…."

On September 16, 2020, the Fairfax County Board of Supervisors enacted an ordinance banning any member of the public from bearing firearms in County parks, or at permitted events, or adjacent to such events or events that otherwise should be permitted (the "Ban"). This legislation brazenly violates the Second Amendment.

Less than two years ago, the United States Supreme Court held in *New York State Rifle & Pistol Association, Inc. v. Bruen* that "The Second Amendment's plain text [ ] presumptively guarantees … a right to 'bear' arms in public for self-defense." 597 U.S. 1, 33 (2022). The burden falls on the government to show that a restriction "is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 34. While firearms may be banned in "sensitive places" like schools and courthouses, sensitive places do not include "all places of public congregation that are not isolated from law enforcement…." *Id*. at 31.

Fairfax County bans firearms in its public parks, which consist of 23,632 acres with over 334 miles of trails. The parks include vast amounts of wooded acreage, much of it isolated. Before the Ban's passage, Plaintiffs regularly carried concealed handguns in the parks for self-protection, as lawfully authorized by their Virginia permits. By enacting an ordinance making it a crime to do so, the County deprives Plaintiffs of their Second Amendment rights to carry firearms for self-defense.

The County also bans firearms on public streets and sidewalks that are adjacent to a permitted event, or an event that would otherwise require a permit. In addition to violating the Second Amendment, this provision is vague and fails to give notice of what is prohibited, in violation of the Fourteenth Amendment's due process clause.

Plaintiffs seek summary judgment holding the Ban unconstitutional under the Second and Fourteenth Amendments, and an order enjoining its enforcement.

## II.  UNDISPUTED MATERIAL FACTS

1.      Fairfax County owns and operates or controls public parks consisting of 23,584 acres, 427 parks, and more than 334 miles of trails.  This equates to over 9.3 percent of the land mass of Fairfax County.  Compl. & Ans. ¶ 22.[1] Seventy-nine percent of Fairfax County's households are park users.[2] The parks include vast amounts of wooded acreage, much of it remote and isolated.

2.      In 2022 in Fairfax County, the following crimes were reported to law enforcement: 22 homicides; 162 kidnappings/abductions; 374 sex offenses, and 8,918 assaults victims.  *Fairfax County Police Department Statistical Report Calendar Years 2021 & 2022*, at 6-9 (May 2023).[3]

3.      On September 16, 2020, Fairfax County enacted a complete ban on firearms in County parklands, and within or adjacent to any outdoor public event. Compl. & Ans. ¶ 16. In pertinent part, Code § 6-2-1(A) states:

> The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in the following areas:
>     . . .
> 2.  In any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County. . . .
>
> 4.  In any public street, road, alley, or sidewalk or public right-of-way or any other place of whatever nature that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a permit.

Fairfax County Code § 6-2-1(A).

---

[1] Answer ¶ 22 "refer[s] the Court to" the following website, which makes these statements: https://www.fairfaxcounty.gov/budget/sites/budget/files/assets/documents/fy2021/advertised/volume1/51.pdf.

[2] https://www.fairfaxcounty.gov/budget/sites/budget/files/assets/documents/fy2023/advertised/volume1/51.pdf

[3] https://www.fairfaxcounty.gov/police/sites/police/files/assets/images/helpfulinfo/fcpd%20annual%20statistical%20report%20(2021%20&%202022).pdf

4.      "Violations of Section 6-2-1(A) shall constitute a Class 1 misdemeanor."  *Id*. § 6-2-1(E).

5.      Plaintiff Kimberly LaFave is a paralegal who also has a dog-walking business. She is a member of the Jewish faith. Prior to the Ordinance's enactment, she frequently attended events held by synagogues and Jewish communal organizations in Fairfax County. Due to her general concerns for her own safety, and her specific concern about the wave of anti-Semitism in this country, she has stopped attending such events since the Ordinance's enactment, to protect herself and her family.  Ex. 1 (LaFave Decl.) ¶¶ 1, 8.

6.      Ms. LaFave has used Fairfax County park trails for several years and continues to do so for recreation, dog walking, and other activities.  Many of the trails are in remote areas with few or no people, and have no police presence.  She is aware that serious crimes have been committed against women on the Fairfax County park trails and regularly carried a concealed handgun, for which she has a permit, for self-defense.  *Id.* ¶¶ 4-5.

7.      The trails in the County rarely indicate whose property they are on, and Ms. LaFave almost never sees signs indicating who owns the properties during her frequent trail usage. She knows, for instance, that while both the County and State have parkland in the County, she has no idea where one begins and the other ends.  *Id.* ¶ 5.

8.      The Ban imposed a dilemma upon Ms. LaFave: If she continued to carry a concealed handgun in Fairfax County parks, she faces the threat of arrest and related injuries, but if she foregoes doing so, she will lose her means of security and will be vulnerable to criminal attack. But for the Ordinance, she would continue lawfully to carry a concealed handgun in Fairfax County parks. Since the Ordinance's enactment, she has continued to carry her handgun, but does not know, and cannot predict, if she is "adjacent" to events that should be or are permitted, or if they are on County property. This uncertainty and unpredictability include walking and

4

driving anywhere in the County, which may be through or adjacent to a park or covered event. *Id.* ¶¶ 6-7, 9-15.

9.      Plaintiff Glenn M. Taubman is an attorney and Fairfax County resident of approximately 40 years. Ex. 2 (Taubman Decl) ¶ 1-2.  He has had a Virginia concealed carry permit for nearly fifteen years.  *Id.* ¶ 3. He is an avid cyclist who regularly uses Fairfax County parks and trails. *Id.* ¶¶ 3, 6, 9, 12, 15.

10.      In over 20 years of often visiting remote areas of parks and the trails, often on his bike, Mr. Taubman has never seen a police officer, and rarely even in busier areas where people congregate. While rarely seeing people (such as school classes, Scouts, or other youth groups) on the trails when he rides, Mr. Taubman does see vagrants, homeless, and individuals engaged in gang-like activities in those areas.  The Ordinance deprives him of the ability to defend himself against criminals, even though the County does not provide police to protect the public in these areas.  *Id.* ¶¶ 7-9.

11.      There are dozens, if not hundreds, of places where one can access the County trails that Mr. Taubman rides on, but Mr. Taubman has seen only 3 or 4 signs at access points providing notice of the park gun ban. He thus has no idea whether he is subject to arrest on a trail if he carries a concealed weapon.  *Id.* ¶ 15.

12.      Mr. Taubman is a member of the Jewish faith and active in various synagogues and Jewish communal organizations that have events in County parks.  Despite the wave of anti-Semitic attacks in this country, the Ordinance renders him unable to defend himself and others with his concealed weapon. He also has no idea if events that he wishes to attend are events that are permitted, or should be permitted, that are covered by the Ordinance.  *Id.* ¶ 6.

13.     Mr. Taubman testified against the Ordinance that is the subject of this lawsuit at the

County Board of Supervisors public hearing on September 15, 2020, in which he explained that

he carried a concealed handgun in the parks and added: "Your ordinance will leave us citizens

defenseless in the face of gangs and criminals (who I have personally seen in county parks and

bike trails)." *Id.* ¶ 4.

14.     Before the Ordinance's enactment, Mr. Taubman possessed, carried, and transported

firearms, on his person, in his vehicle, on the public streets, roads, alleys, sidewalks, public

rights-of-way, and other places that are open to the public in Fairfax County.  He continues doing

so even though he is often unaware whether or not such places are being used by, or are adjacent

to, a permitted event or an event that would otherwise require a permit.  The law and the reality

of moving about the County provide no notice or predictability of when he may be adjacent to an

event, and he has no way of avoiding breaking the law even en route to another destination.

When he becomes aware of such event, he must either not carry or possess a firearm or must

endeavor to avoid such locations.   *Id.* ¶¶ 5, 11-14.

15.     Plaintiff Robert Holzhauer, a Fairfax resident since 2004, was a commissioned police

officer for eleven years, and a member of the U.S. Army for 27 years, retiring as a Lieutenant

Colonel with an honorable discharge and a 100% permanent, total disability.  He uses Fairfax

County parks 3-4 days a week, and has done sometimes on a daily basis, minus deployment

periods in Iraq, Yemen, Libya, and Liberia. Ex. 3 (Holzhauer Decl.) ¶¶ 1-2.

16.     Lt. Col. Holzhauer has a concealed carry permit.  When hiking in remote areas of the

Fairfax County parks, he carried a handgun for protection from potential criminals and wild

animals like bears.  His disability creates a particular need to carry a handgun for self-defense, as

he cannot otherwise defend himself.  *Id.* ¶ 3.  When informed of the Ordinance, he discontinued

carrying a handgun in the parks for fear of prosecution.  But for the Ordinance, he would continue carrying a concealed handgun in the parks.  *Id.* ¶ 4.

17.     Because properties owned or controlled by the County rarely have signs indicating that status, Lt. Col. Holzhauer has no practical way of avoiding such locations when he carries his concealed weapon. He also has no way of knowing when he walks or drives with his weapon whether he is at or adjacent to a permitted event or one that should be permitted. Depriving him of his lawful right to defend himself leaves him defenseless, or subject to arrest if he does carry his concealed weapon, regardless of whether he has any way of knowing or predicting that he is in a gun-prohibited area.  *Id.* ¶ 6-13

18.     For years before the Ban's enactment and continuing through today, Plaintiffs LaFave, Taubman, and Holzhauer have had valid concealed handgun permits issued pursuant to Va. Code § 18.2-308.01 *et seq.* Ex. 1 ¶ 5; E2. B ¶ 3; Ex. 3 ¶ 3.

19.     Before the Ban, Plaintiffs regularly used the County public parks, and carried firearms for self-defense when doing so.  Since the Ban's enactment, Plaintiffs are forbidden from doing so. But for the Ban, Plaintiffs would again use the County parks while carrying firearms for self-defense. Ex. 1 ¶¶ 5-7; Ex. 2 ¶¶ 3, 5, 8-9; Ex. 3 ¶¶ 3-5.

20.     Notice of the ordinance is required to be posted at all entrances to such places when "being used by or is adjacent to a permitted event or an event that would otherwise require a permit."  § 6-2-1(D)(1).  The County will not know to post such notice for an event that "would otherwise" require a permit.  Plaintiffs will thus risk violating § 6-2-1(A) on a continuing basis merely by using and traveling on public streets and other public places. Ex. 1 ¶¶ 9-10, 12-15; Ex. 2 ¶¶ 5-8, 10-15; Ex. 3 ¶¶ 5-7, 9-13.

21.     In contrast to the nearly 24,000 acres of mostly woodland where Fairfax County bans firearms, the Commonwealth itself limits where firearms may not be carried or possessed to only a narrowly-defined list of specific places: courthouses (Va. Code § 18.2-283.1); the Capitol, Capitol Square, the surrounding area, and Commonwealth buildings and offices where its employees work (§ 18.2-283.2(B)) (*excluding "any state park"* (§ 18.2-283.2(E)(v)) (emphasis added); an air carrier airport terminal (§ 18.2-287.01); and schools (§ 18.2-308.1(B)), with an exemption for permittee ingress or egress in a motor vehicle (§ 18.2-308.1(E)(vii)).

## III.  SUMMARY JUDGMENT STANDARD.

A court should grant summary judgment if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). This review must be done without contradicting the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted). Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to find an issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). Pure issues of law should be

decided on summary judgment, and such legal questions are inappropriate subjects for expert

testimony.  *See, e.g., Sun Young Lee v. Clarendon*, 453 Fed.Appx. 270, 278 (4th Cir. 2011).

## IV. ARGUMENT

### A.  The Park Ban Violates the Second Amendment

"[W]hen the Second Amendment's plain text covers an individual's conduct, the

Constitution presumptively protects that conduct.  To justify its regulation, the government may

not simply posit that the regulation promotes an important interest.  Rather, the government must

demonstrate that the regulation is consistent with this Nation's historical tradition of firearm

regulation."  *Bruen*, 597 U.S. at 17.

### 1.  <u>The Ban Does Not Pass *Bruen*'s Text-History Test.</u>

The Second Amendment guarantees that "the right of the people to keep and bear arms,

shall not be infringed."  Section 6-2-1(A)(2) of the Ordinance states: "The possession, carrying,

or transportation of any firearms, ammunition, or components or combination thereof is

prohibited in … any public park …." As applied to the entire 23,632 acres of Fairfax County

public parks, the Ban infringes on the right to bear arms.

"[T]he plain text of the Second Amendment protects … carrying handguns publicly for

self-defense."  *Bruen*, 597 U.S. at 32.  It "presumptively guarantees … a right to 'bear' arms in

public for self-defense."  *Bruen*, 597 U.S. at 33.

Given that presumption, the burden falls on the County to show that a restriction "is

consistent with this Nation's historical tradition of firearm regulation."  *Id*. at 33-34; *see also

Range v. Attorney General,* 69 F.4th 96, 105 (3d Cir. 2023) (en banc) (*Bruen* held that "historical

restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place

'sensitive' and then ban firearms there.").  The County must meet its burden through analogical

reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Bruen*, 597 U.S. at 30 (emphasis in original).  Because the parks ban addresses a general historical problem that existed since the founding (firearms violence in public—the same problem at issue in *Heller* and *Bruen*, *Bruen*, 597 U.S. at 27) the historical analogue must be "distinctly similar" to the modern regulation.  *Id.* at 26.  The analogue's similarity is measured by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.  Courts may not apply intermediate scrutiny or "means-end scrutiny in the Second Amendment context."  *Id.* at 19.

But "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id*. at 34, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis added).  The Second Amendment was adopted in 1791, and "to the extent later history contradicts what the text says, the text controls. … Thus, post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'"  *Id*. at 36 (citation omitted); *see also Bruen*, 597 U.S. at 66-68 (reliance on territorial laws from 1868-1890 had "several serious flaws even beyond their temporal distance from the founding.").

*Bruen* does recognize limited places and circumstances where firearms may be prohibited, referencing longstanding "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 30 (quoting *Heller*, 554 U.S. at 626).  *Bruen* also observed a handful of other 'sensitive places' from the 18th and 19th centuries where weapons were altogether prohibited, noting legislative assemblies, polling places, and

courthouses.  *Bruen*, 597 U.S. at 30 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 229–236, 244–247 (2018)).

All of the places *Bruen* listed as "sensitive" are buildings, except that "schools" include both school buildings and school yards, including playgrounds and athletic fields.  Further, as the *Sensitive Places* article endorsed in *Bruen* points out, the provision of enhanced security demarks a location as sensitive:

> The government's behavior can demonstrate the true importance of the alleged government interest. Passing a statute declaring some place to be a "gun free zone" does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive.

Kopel & Greenlee, 13 CHARLESTON L. REV. at 290.

By contrast, Fairfax County's ban is not limited to buildings, playgrounds, or athletic fields. Instead, it bans the exercise of the right to bear arms for self-defense throughout the 23,632 acres of primarily wooded areas with the least population density in the County, as well as public byways that may encounter gatherings that should be permitted.  But "*Public parks are not sensitive places. They are not buildings. There is no practical means of preventing armed criminals from entering. They are similar to the vast majority of land in the United States, which is outdoors, not indoors.*" *Id.* at 291 (emphasis in original).

Simply being a place where people congregate does not suffice.  "Expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly."  *Bruen*, 597 U.S. at 31. That test "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense …."  *Id.* at 31.

*Bruen* further held that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* The island of Manhattan, one of the most densely populated cities in the world, consists of 14,502.4 acres of land.[4] Fairfax County public parks, which are not densely populated, consist of 23,632 acres of land. And if firearms may not be banned in every public space in a city (which makes Fairfax's ban on firearms on public byways patently unconstitutional), they plainly may not be banned in vast, mostly wooded lands.

### 2. Post-*Bruen* Courts Have Found Park Bans Unconstitutional.

Three post-*Bruen* federal district courts found that plaintiffs are likely to prevail on their claim that public parks are not "sensitive places," and preliminarily enjoined the enforcement of laws banning firearms therein. The decisions extensively detail that valid historical analogues do not exist to uphold the bans.

The first was *Antonyuk v. Hochul*, which found that plaintiffs are likely to prevail on their claim that public parks are not "sensitive places" and preliminarily enjoined New York state's ban on firearms in public parks. 639 F.Supp.3d 232, 322-23 (N.D.N.Y. 2022), *rev'd in relevant part* at 89 F.4th 271, 355-63 (2d Cir. 2023), *cert. pet.* filed Feb. 20, 2024. As explained in detail below, the Second Circuit got it dramatically wrong in reversing that decision and upholding the ban.

The court in *Koons v. Platkin* preliminarily enjoined enforcement of New Jersey's ban on firearms in public parks. 673 F.Supp.3d 515, 642 (D.N.J. 2023), appeal filed (3rd Cir. June 9, 2023). In a lengthy analysis, *id.* at 639-42, the court found that "laws arising in the mid- to late-

---

[4] U.S. Census Bureau, Quick Facts, New York County [Manhattan], New York, showing land area as 22.66 sq. miles (14,502.4 acres).
https://www.census.gov/quickfacts/fact/table/newyorkcountynewyork/PST045221.

19th century do not establish a historical tradition of banning firearms at parks especially since the modern equivalent of parks existed during this nation's founding." *Id*. at 642.[5]  That is what *Bruen* referred to as a "fairly straightforward": "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Bruen*, 597 U.S. at 26.

Similarly, *Wolford v. Lopez*, found that plaintiffs were likely to succeed on the merits, and issued a temporary restraining order against enforcement of Hawaii's ban on firearms in public parks. 2023 WL 5043805 at *24 (D. Haw. Aug. 8, 2023), appeal filed (9th Cir. Sept. 8, 2023).  The *Wolford* court held that the carrying of firearms in parks "is covered by the plain text of the Second Amendment," and the "burden shifts to the State to offer evidence" that the ban "is consistent with this Nation's historical tradition of gun regulation."  *Id*. at *19.  The court analyzed the historical record in detail, finding that no such historical tradition existed.  *Id*. at *19-24.[6]

---

[5] A preliminary injunction was also issued regarding the same New Jersey law in *Siegel v. Platkin*, 653 F.Supp.3d 136, 153 (D.N.J., Jan. 30, 2023) ("Plaintiffs have met their burden at this stage of showing a likelihood of success that the restrictions of Subpart 10 are unconstitutional as to public parks").

[6] *Wolford* refuted in detail a contrary district court in Maryland decision holding that plaintiffs were not likely to succeed on the merits of their challenge to a park ban.  *Id*. at *22-24, analyzing *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, 680 F.Supp.3d 567, 585-8 (D. Md. 2023), appeal filed (4th Cir. July 10, 2023).

**3. The Second Circuit's *Antonyuk* Decision Upholding New York's Firearms Ban In Parks And Public Gatherings Is Untenable Because It Ignores *Bruen's* Plain Language, Makes Significant Historical Errors About Firearms Law In The Founding Era, & Applies Inapplicable Historical Analogues That *Bruen* Has <u>Already Rejected.</u>**

In *Antonyuk v. Chiumento*, the Second Circuit upheld New York's park ban "at least insofar as the regulation prohibits firearms in *urban* parks, though not necessarily as to *rural* parks," despite "doubt that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves." 89 F.4th 271, 356 (2023), *cert. pet.* filed Feb. 20, 2024.[7]  The court also upheld firearms bans in crowded public spaces. 89 F.4th at 374-75. The *Antonyuk* court, however, made critical errors conflicting with *Bruen*'s instructions, as well as other analytical failures rendering its conclusion untenable.

**a. The British Statute of Northampton Remains Irrelevant to Interpreting America's Second Amendment.**

In support of its finding that firearms could be banned in parks and public gatherings, *Antonyuk* repeatedly relied on the British Statute of Northampton of 1328. 89 F.4th at 356-57 & n.74, 374, 376 n.107. That reliance directly contravenes the Supreme Court's instructions in *Bruen. Bruen* determined that the Statute "has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41.  The Statute provided that English subjects could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere…." *Id.* at 40 (quoting 2 Edw. 3 c. 3 (1328)).  In the 17th and 18th centuries, the Statute was construed as applying only to going armed with evil intent in a manner to terrify others. *Bruen*, 597 U.S. at

---

[7] As shown herein, the urban-rural parks distinction is not one supported by Founding Era practice. Firearms carried peacefully were permitted in public places as a matter of general right.

44-45.  Indeed, "going armed" referred not to handguns—which would not be invented for another 200 years—but to the wearing of armor (or perhaps carrying lances).  *Id.* at 41.

*Antonyuk* claims that *Bruen* did not address "the more specific prohibitions in the statute such as carriage in fairs and markets," today's "quintessentially crowded places" where firearms supposedly may be banned without regard to conduct.  *Antonyuk*, 89 F.4th at 357 n.74.  But *Bruen* recognized no such reading of the Statute that excluded fairs and markets from the places where arms could be carried.

### b. Both Virginia's and North Carolina's "Going Armed" Laws Included a "Terror" Element, Contrary to *Antonyuk*'s Conclusion That Those States Had General Bans on Public Firearms in the Founding Era.

*Antonyuk* claims that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, i.e., the traditional, crowded public forum."  *Antonyuk*, 89 F.4th at 357.  This is false. While some colonies made it an offense to "ride or go armed Offensively," the term "Offensively," as *Bruen* noted, "merely codified the existing common-law offense of bearing arms to terrorize the people…."  597 U.S. at 47.  For instance, a 1786 Virginia statute provided that no person shall "go nor ride armed … in fairs or markets, or in other places, in terror of the Country." *Id.* at 49 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)). Indeed, *Antonyuk* reluctantly acknowledges that crucial qualification; that "the Virginia statute" "*prohibited **conduct** and not simply carriage*, i.e., bearing arms in 'terror' of the county [*sic*]...."  *Id.* at 357 n.74 (emphasis added).

*Antonyuk*'s claim that North Carolina generally banned firearms in public is also entirely incorrect. *Id.* at 357 and n.74. As of 1791, the year the Second Amendment was ratified, North Carolina had two "going armed" laws, both originally passed in 1741. Taken together, those laws

permitted free individuals to bear arms for self-defense. One law included a constable's oath to "arrest all Persons as, in your Sight, shall ride or go armed offensively…." James Iredell, *Laws of the State of North-Carolina* 70 (1791). Ex. 4. The other law provided that "no Slave shall go armed with Gun, Sword, Club, or other Weapon" without a certificate from the master.  *Id*. at 93. In other words, it was an offense for a free person to "go armed offensively" (which looked to a person's *conduct* bearing arms), while a slave could not "go armed" at all.

### c.  Contrary to *Antonyuk*, the Statute of Northampton Reprinted in Martin's Collection Was Not a "Law" Enacted by North Carolina.

Ignoring the actual state law, *Antonyuk* purported to have found a "North Carolina statute" that "appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct."  89 F.4th at 357 n.74 (citing *Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, pp. 60–61, ch. 3 (F. Martin Ed. 1792)). Ex. 5. In fact, the North Carolina General Assembly did not enact this privately-published book as a law, either in whole or in any of its individual parts.

The only reference to Martin's *Collection* in an official North Carolina code found it to be "utterly unworthy of the talents and industry of the distinguished compiler, omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force, either in the Province, or in the State." "Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855). Ex. 6.

The Martin *Collection* simply reprinted the Statute of Northampton verbatim.  Ex. 5 at 60-61. This is a dead giveaway that it was not a statute passed by North Carolina's legislature, given its multiple references to "the King."  Avoiding that obvious indicator, *Antonyuk*'s only quotation from Martin is its incomplete reference to the "North Carolina law prohibiting 'to go nor ride armed by night nor by day, in fairs, markets'…."  *Antonyuk*, 89 F.4th at 357.  No such

16

North Carolina law existed; *Antonyuk* mistakenly ascribes the Statute of Northampton to the North Carolina legislature, which never enacted it.

### d. *Antonyuk* Disregards North Carolina Judicial Precedents Requiring the "Terror" Element to Render Bearing Arms in Public Illegal.

North Carolina's own judicial precedents demonstrate in detail there was no general ban on bearing firearms in public, only using them in a manner to create "terror." *Antonyuk* disregards these as well. For instance, *State v. Huntly* stated that the Statute of Northampton "did not create this offence" of "riding or going about armed with unusual and dangerous weapons, to the terror of the people," "but provided only special penalties and modes of proceeding for its more effectual suppression…." 25 N.C. (3 Ired.) 418, 420 (1843). *Huntly* recognized that an affray included "where a man arms himself with dangerous and unusual weapons in such a manner, as will naturally cause a terror to the people…." *Id.* at 421 (quoting Hawkins, *Pleas of the Crown*, B. 1, ch. 28, sect. 1).

*Huntly* observed the North Carolina Bill of Rights' guarantee that "the people have a right to bear arms for the defence of the State," adding that "the carrying of a gun *per se* constitutes no offence. For any lawful purpose – either of business or amusement – the citizen is at perfect liberty to carry his gun." *Id*. at 422–23.  However, he may not carry a weapon "to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." *Id*. at 423.

*Huntly* has been consistently reaffirmed.  *See State v. Dawson,* 272 N.C. 535, 542, (1968).  Most recently, *State v. Lancaster* held that "the elements of the common law crime of going armed to the terror of the public" including going armed in a public place "for the purpose of terrifying and alarming the peaceful people," and "in a manner which would naturally terrify and alarm the peaceful people." 895 S.E.2d 337, 343 (N.C. 2023).

No North Carolina law or precedent suggested that arms may be banned in fairs and markets.

Antonyuk is thus mistaken when it states that "the Founding-era North Carolina statute prohibited firearms in fairs and markets with no reference to terroristic conduct." *Antonyuk*, 89 F.4th at 376. *Antonyuk* erroneously claims this tradition supposedly "evolved over the years between the Founding and Reconstruction toward the North Carolina model.... Thus, in the context of regulating firearms in discrete, crowded places, the Virginia law's 'terroristic' conduct requirement is the outlier among the national tradition." *Id*. To the contrary, the terror element was the norm. In short, *Antonyuk* cites to no Founding Era history that would support the general banning of firearms in parks and public gatherings.

     **e.** **Antonyuk's Reliance on Late 19th Century Restrictions on Firearms in "Crowded Places" Misrepresents Those Cases, and/or Defies the Supreme Court's Rejection of Such Analogues in *Bruen*.**

*Antonyuk* refers to gun bans at certain confined places of public assembly in three states, statutes passed from 1869 to 1883, and claims that courts upheld them as constitutional. *Antonyuk*, 89 F.4th at 374-75. With one irrelevant exception, the places of assembly were not even issues in the cited cases. *Andrews v. State* upheld a ban on carrying small pistols, but held the law unconstitutional as applied to an army-type revolver. 50 Tenn. 165, 186-87 (1871). *English v. State* upheld convictions for wearing a pistol while intoxicated and for carrying a butcher knife in a religious assembly, also holding such knife not to be a constitutionally-protected "arm." 35 Tex. 473, 475 (1871). *State v. Shelby* addressed carrying concealed arms and carrying while intoxicated. 2 S.W. 468, 468 (Mo. 1886).

*Antonyuk* further relies on territorial laws from Arizona (1889) and Oklahoma (1890). *Antonyuk*, 89 F.4th at 374. It also points to mostly-late 19th century restrictions on firearms in

urban parks. *Antonyuk*, 89 F.4th at 360. But *Bruen* discounted reliance on such laws, explaining that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66. Moreover, as demonstrated, *supra, Antonyuk's* claim that such restrictions were "enshrined in the law books" of Virginia and North Carolina is simply not accurate. *See* 89 F.4th at 360.

### f. *Antonyuk* Defies *Bruen's* Admonition that Late 19th Century Firearms Restrictions Without Founding Era Analogues Are Not Valid Support for Restricting the Presumptive Right to Bear Arms in Public.

*Bruen* does not countenance restrictions from the time of the Fourteenth Amendment's 1868 adoption that lack any Founding-era analogue to justify modern definitions of "sensitive places." *Bruen* flatly states that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," and that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37.

*Bruen* noted "an ongoing scholarly debate" on whether the understanding in 1868 defined the scope of the right, but stated that it "need not address this issue" because the understanding was the same in 1791 and 1868. *Bruen*, 597 U.S. at 38. *Antonyuk* alters the Supreme Court's holding, and instead incorrectly asserts that *Bruen* "expressly declined to decide" whether courts should rely on the understanding in 1868. *Antonyuk*, 89 F.4th at 304.

As Justice Barrett stated in *Bruen*: "But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)." 597 U.S. at 82 (Barrett, J., concurring). Similarly, a practice that "arose in the second half of the 19th century ... cannot by itself establish an early

American tradition" to inform the meaning of the First Amendment. *Id.* (quoting *Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. 464, 482 (2020)).  *Bruen* thus does not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.*[8]

*Antonyuk* also thought it "incongruous" to recognize the arms right "applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305. But no such incongruity exists. That is exactly how the Supreme Court interprets the scope of other incorporated provisions of the Bill of Rights: By relying on Founding-era understandings to construe, among others, the First,[9] Fourth,[10] Fifth,[11] Sixth,[12] and Eighth Amendments.[13]

### g. Plaintiffs May Mount a Facial Challenge to the Parks Restriction.

Facial challenges are recognized "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (First Amendment case). Plaintiffs bring such a challenge here.

---

[8] *See* Mark Smith, "Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868," HARV. J.L. & PUB. POL'Y, No. 31, 1 (Fall 2022).

[9] *E.g.*, *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 182-84 (2012) (Establishment Clause and Free Exercise Clause); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-125 (2011) (freedom of speech); *Near v. Minnesota*, 283 U.S. 697, 713-17 (1931) (freedom of the press).

[10] *E.g.*, *Virginia v. Moore*, 553 U.S. 164, 168-169 (2008).

[11] *Gamble v. United States*, 587 U.S. 678, 684 (2019) (Double Jeopardy Clause).

[12] *E.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395-96 (2020) (Jury Trial Clause); *Klopfer v. North Carolina*, 386 U.S. 213, 223-25 (1967) (right to speedy trial).

[13] *E.g.*, *Timbs v. Indiana*, 139 S. Ct. 682, 687-99 (2019) (Excessive Fines Clause).

The Ban implicates a constitutional right and imposes criminal penalties. As the Supreme

Court has explained:

> First . . . we permit a facial challenge if a law reaches "a substantial amount of
> constitutionally protected conduct." Second, where a statute imposes criminal
> penalties, the standard of certainty is higher. This concern has, at times, led us to
> invalidate a criminal statute on its face even when it could conceivably have had
> some valid application.

*Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (citation omitted). The Ordinance here may

be facially challenged.  It bans plainly constitutional conduct – bearing arms for self-defense,

which is protected by the Second Amendment –and enforces the Ban with criminal penalties.

### 4.  Using The Analytical Framework Later Adopted in *Bruen,* Pre-*Bruen* Courts Found Park Bans Unconstitutional Under *Heller*'s Standard.

Following the Supreme Court's 2008 decision in *Heller*, and using the mode of analysis

later adopted in *Bruen,* several state and federal courts found that park gun bans violate the right

to bear arms.

While decided under the state of Delaware's own constitutional guarantee, *Bridgeville*

*Rifle & Pistol Club v. Small*, likewise concurred with *Heller,* holding that "the core right to bear

arms for self-defense is a traditional or pre-existing right—i.e., a right that existed even before

being codified."  176 A.3d 632, 650 (Del. 2017). The *Bridgeville* court held a ban on firearms in

public parks with acreage almost identical to that of Fairfax County to be unconstitutional,

observing:

> Nor is [the parks gun ban] limited to what might legitimately be characterized as a
> "sensitive" place supported by evidence buttressing the designation of certain
> areas as such places. Rather, this ban applies to *all* 23,000 acres of Parks and
> 18,000 acres of Forests – spanning an area almost the size of the entire District of
> Columbia at issue in *Heller* and four times the size of the City of Wilmington –
> and to every segment of the population.

*Id*. at 654.

Similarly, in *DiGiacinto v. Rector & Visitors of George Mason University*, the Virginia Supreme Court found the Virginia Constitution's arms guarantee "co-extensive with the rights provided by the Second Amendment" as explained in *Heller*. 281 Va. 127, 133 (2011). "*Unlike a public street or park*, a university traditionally has not been open to the general public," and the restriction at issue "is tailored, *restricting weapons only in those places where people congregate and are most vulnerable* – inside campus buildings and at campus events. *Individuals may still carry or possess weapons on the open grounds* ...." *Id*. at 136 (emphasis added).

In *Solomon v. Cook County Board of Commissioners*, the court held a ban on carrying firearms by gun permit holders on the 70,000 acres of the Forest Preserve District of Cook County ("FPDCC) to be constitutionally overbroad. 559 F.Supp.3d 675, 679 (N.D. Ill. 2021). The government defendants could not show that the 70,000 acres, which was more than 11% of the land in the county, was a "sensitive place." *Id*. at 693. In rejecting the government's purported safety rational for the ban, the *Solomon* court further noted, "the government has shown little threat to public safety in the FPDCC, and even less involving concealed firearms, and none by CCL [concealed carry license] holders." *Id*. at 702-03.

Similarly, in *Morris v. U.S. Army Corps of Engineers*, the court invalidated a gun ban in recreation areas administered by the Army Corps of Engineers as violating of the right to bear arms. 60 F.Supp.3d 1120, 1123 (D. Idaho 2014). Unlike the "sensitive place" analysis for "facilities like 'schools and government buildings,'" the ban imposed by the Corps applies to outdoor parks," rendering the ban unconstitutional. *Id*. at 1124.

The entire 23,632 acres of Fairfax County public parks do not constitute a "sensitive place" where firearms may be banned.[14]  That is particularly true given that open carry of firearms and concealed carry of firearms with a permit are permitted in Virginia's crowded urban areas under the Commonwealth's regulatory scheme, which allowance the Second Amendment requires, as *Bruen* noted with respect to bearing arms in Manhattan.

### B.  The Ban on Possession of a Firearm at an Event That Would Otherwise Require a Permit or Adjacent Area Thereto Violates the Second Amendment.

The Ordinance bans firearms at "an event that would otherwise require a permit" or adjacent area thereto.  § 6-2-1(A)(4).  The Second Amendment "presumptively guarantees … a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33.  The County cannot show that its restriction "is consistent with this Nation's historical tradition of firearm regulation."  *Id*. at 33-34.

No way exists for an individual to know that an activity requires a permit but has none, which presumably only the County could determine after the fact.  The ban chills Plaintiffs' exercise of the right to bear arms and leaves them vulnerable to arrest for inadvertent violations.

Considering the very kind of "adjacency" gun prohibition like that Fairfax enacted here, the Illinois Supreme Court held that a ban on possession of a firearm within 1000 feet of a public park violates the right to bear arms, and explained further:

> Aside from the sheer number of locations and public areas that would qualify under the law, . . . the most troubling aspect is the lack of any notification where the 1000–foot restriction zone starts and where it would end. Innocent behavior could swiftly be transformed into culpable conduct if an individual unknowingly crosses into a firearm restriction zone. The result could create a chilling effect on the Second Amendment when an otherwise law-abiding individual may

---

[14] *See also, e.g., United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) ("even if Daingerfield Island is not a sensitive place, ... 36 C.F.R. § 2.4(b) still passes constitutional muster under the intermediate scrutiny standard."), abrogated by *Bruen*, 142 S. Ct. at 2129 ("Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt.").

inadvertently violate the 1000–foot firearm-restricted zones by just turning a
street corner.

*People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill. 2018).  A similar threat faces Plaintiffs here, who
would have no notice of "an event that would otherwise require a permit" or an adjacent area
thereto.

### C.  The Ban on Possession of a Firearm at an Event That Would Otherwise Require a Permit or Adjacent Area is Vague and Violates Due Process

Section 6-2-1(A) prohibits firearm possession at "an event that would otherwise require a
permit" or an "adjacent" area. Individuals have no way to know whether an event requires a
permit, but has none.  Presumably, the County would not know either and, if the event is brought
to its attention, would have to determine whether it needs a permit after the fact.  It would thus
not be able to erect signs in advance.  These scenarios render § 6-2-1(A)(4) unconstitutionally
vague.

The Fourteenth Amendment declares: "No State … shall deprive any person of life,
liberty, or property, without due process of law …."  "To survive a vagueness challenge, a statute
must give a person of ordinary intelligence adequate notice of what conduct is prohibited and
must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning
v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc).

While less clarity is required for civil statutes, "if criminal penalties may be imposed for
violations of a law, a stricter standard is applied in reviewing the statute for vagueness." *Id*. at
272-73.  Further, "the question of a statute's vagueness is a purely legal issue that does not
require additional fact-finding." *Id*. at 272.  That is the case here.

Plaintiffs have no way to know of the existence of an event that requires a permit but has
none.  Nor would the County, which would thus not be able to post signage.  Such undefined

standard allows arbitrary and discriminatory enforcement.  Police have no expertise in determining that something is "an event that would otherwise require a permit" or adjacent area thereto, and would be expected to enforce the ordinance without any guiding standards.

Finally, the provision has no scienter requirement, and "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea....*" *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) (quoting *Colautti v. Franklin*, 439 U.S. 379, 395 & n.13 (1979) (abrogated on other grounds).  The provision is thus "a trap for those who act in good faith." *Colautti*, 439 U.S. at 395. As such, § 6-2-1(A)(4) is unconstitutionally vague.

### D.  Plaintiffs Have Standing to Bring Their Second Amendment and Due Process Claims.

As Plaintiffs here face the threat of criminal prosecution, they have standing to bring their Second Amendment and due process claims.  For instance, in *Kipke v. Moore*,  the plaintiff alleged a wish to carry a handgun at a proscribed location, and thus "adequately alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.'" 2023 WL 6381503 at *15 (D. Md. Sept. 29, 2023), (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).   Like the County here, the *Kipke* defendants "suggest[ed] that no individual has ever been prosecuted under the statute," but "they have also failed to disavow prosecution, and Kipke's desired conduct is barred by the statute's plain language." *Id*. at *15.

"Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted).  "Separately, there is an ongoing injury in fact if plaintiffs make a 'sufficient showing of self-censorship, which occurs when a claimant is chilled

from exercising his right to free expression.'" *Id*. at 288 (citation omitted).  Similar injury applies to the extent Plaintiffs here are chilled from exercising their right to bear arms.

Plaintiffs also have standing to pursue their vagueness claims.  The Fourth Circuit has explicitly held that a vague provision does not become constitutional "merely because there is some conduct that clearly falls within the provision's grasp." *United States v. Hasson*, 26 F.4th 610, 617 (4th Cir. 2022) (citation omitted), *cert. denied*, 143 S. Ct. 310 (2022).  Likewise, in *City of Chicago v. Morales,* the Supreme Court held that "[w]hen vagueness permeates the text of [a criminal] law" "that contains no mens rea requirement, . . . and infringes on constitutionally protected rights," "it is subject to facial attack." 527 U.S. 41, 55 (1999) (plurality op.). The Ban meets that criteria.

## V.  CONCLUSION

WHEREFORE, Plaintiffs pray that the Court:

1.  Declare that the that the following two provisions of the Fairfax County Code infringe on the right of the people to keep and bear arms guaranteed by the Second Amendment to the United States Constitution, and are void:

(A)  Section 6-2-1(A)(2), which provides in pertinent part: "The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in … any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County."

(B)  Section 6-2-1(A)(4), which provides in relevant part: "The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in … any public street, road, alley, or sidewalk or public right-of-way or any other place of

whatever nature that is open to the public and . . . is adjacent to a permitted event or an event that would otherwise require a permit."

2.  Declare that the following portion of § 6-2-1(A)(4) of the Fairfax County Code is vague and violates the due process clause of the Fourteenth Amendment: "The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in … any public street, road, alley, or sidewalk or public right-of-way or any other place of whatever nature that is open to the public and is being used by or is adjacent to . . . an event that would otherwise require a permit."

3.  Enter an injunction permanently enjoining the County of Fairfax, Chief of Police Kevin Davis, and their agents, officers, and employees from enforcing the aforementioned provisions of § 6-2-1(A)(2) & (4) of the Fairfax County Code; and

4.  Award Plaintiffs their costs, attorney fees, and provide such other relief as is appropriate.

<div style="margin-left: 40%;">

Respectfully Submitted,

Kimberly LaFave
Glenn M. Taubman
Robert Holzhauer,
    Plaintiffs

</div>

By Counsel


_____/s/_____
Stephen P. Halbrook
protell@aol.com
Va. Bar No. 18075
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276

_____/s/_____
Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Va. Bar No. 41691
10521 Judicial Drive, Suite 200
Fairfax, VA 22030
(703) 268-5600

**<u>Certificate of Service</u>**

I certify that the foregoing was served via ECF on all registered counsel in this case on April 26, 2024.

_____/s/_____
Trey Mayfield