**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **KIMBERLY Y. LAFAVE, et al.** | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | **Case No. 1:23-cv-01605-WBP** |
| | ) | |
| **THE COUNTY OF FAIRFAX, VIRGINIA,** | ) | |
| **and KEVIN DAVIS, in his Official Capacity** | ) | |
| **as Chief of Police** | ) | |
| | ) | |
| *Defendants* | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ **1**

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS.. 1**

**ARGUMENT** ......................................................................................................... **7**

I.   Legal Standard .............................................................................................. 7

II.  The Ordinance Is Constitutional Under the Second Amendment ............................ **10**

    A.   *Bruen*'s Methodology ................................................................... 10

        i.   Plaintiffs' claim that the only relevant historical laws are those "distinctly similar" to the Ordinance is incorrect ............................................................... 12

        ii.  Plaintiffs' suggestion that places must be indoors and protected by comprehensive security to be sensitive is baseless .......................................................... 14

        iii. Plaintiffs' rejection of any laws outside the founding era is baseless.................. 16

    B.   The Parks Restriction is Constitutional Under *Bruen* ............................. 19

        i.   Plaintiffs have not established that the Second Amendment's text protects carrying guns in County parks ...................................................................... 19

        ii.  The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places ............................................... 21

            1.  Defendants' moving brief established that there is a long historical tradition of prohibiting firearms in parks and analogous places......................... 21

            2.  Plaintiffs' effort to dismiss historical prohibitions on firearms in parks is baseless ........................................................................................ 23

            3.  Plaintiffs' criticisms of the Second Circuit's historical analysis in *Antonyuk* are mistaken ................................................................................... 25

        iii. Plaintiffs rely on mistaken or irrelevant caselaw .................................. 30

            1.  Plaintiffs' post-*Bruen* cases are mistaken ..................................... 30

            2.  Plaintiffs' pre-*Bruen* cases are mistaken, irrelevant, or both......................... 31

    C.   The Events Restriction is Constitutional under *Bruen* ................................ 33

III. The Ordinance Does Not Violate Due Process ........................................................ **35**

    A.   Plaintiffs Lack Standing to Bring Their Vagueness Claim ....................... 35

    B.   The Events Restriction Is Not Void for Vagueness ................................. 38

**CONCLUSION** ..................................................................................................... **39**

# TABLE OF AUTHORITIES

## Cases

*Alger v. Commonwealth*,
    590 S.E.2d 563 (Va. 2004) ..................................................................................... 26

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) ............................................................................................. 8

*Andrews v. State*,
    50 Tenn. 165 (1871) ................................................................................................ 29

*Antonyuk v. Chiumento*,
    89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024) ..... *passim*

*Antonyuk v. Hochul*,
    639 F. Supp. 3d 232 (N.D.N.Y. 2022) .................................................................... 30

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ................................................................................ 20

*Bonidy v. U.S. Postal Service*,
    790 F.3d 1121 (10th Cir. 2015) .............................................................................. 15

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ....................................................................................... 32

*Burson v. Freeman*,
    504 U.S. 191 (1992) ................................................................................................ 15

*Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*,
    644 F. Supp. 3d 610 (C.D. Cal. 2022) ...................................................................... 9

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................ 37

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    704 S.E.2d 365 (Va. 2011) ..................................................................................... 32

*Doe v. Bonta*,
    --- F.4th ----, No. 23-55133, 2024 WL 2037144 (9th Cir. May 8, 2024) ........................... 19, 37

*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013) ..................................................................................... 9

*English v. State*,
    35 Tex. 473 (1872) .................................................................................................. 29

*In re Revel AC, Inc.*,
    802 F.3d 558 (3d Cir. 2015) .................................................................................... 31

*Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md.
    Sept. 29, 2023) ............................................................................................. 15, 35, 36

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) (en banc) .................................................................. 39

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ........................................................................................... 9

*Koons v. Att'y Gen. N.J.*,
   No. 23-1900, Dkt. 29 (3d Cir. June 20, 2023) ........................................................ 31

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023)
   .......................................................................................................... 13, 30

*LaFave v. Cnty. of Fairfax*,
   No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (Fairfax Cnty. Cir. Ct. June 23, 2023) ..... 32, 36

*Livingston v. State*,
   3 Tex. App. 74 (Tex. App. 1877) ......................................................................... 34

*Manning v. Caldwell for City of Roanoake*,
   930 F.3d 264 (4th Cir. 2019) ............................................................................. 38

*Martin v. Lloyd*,
   700 F.3d 132 (4th Cir. 2012) ............................................................................. 38

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
   662 F. Supp. 3d 557 (D. Md. 2023), *aff'd*, 91 F.4th 238 (4th Cir. 2024) ................... 37

*Md. Shall Issue, Inc. v. Hogan*,
   353 F. Supp. 3d 400 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020) ................... 36

*Md. Shall Issue, Inc. v. Hogan*,
   971 F.3d 199 (4th Cir. 2020) ......................................................................... 35, 36

*Morris v. U.S. Army Corps of Eng'rs*,
   60 F. Supp. 3d 1120 (D. Idaho 2014) ................................................................... 32

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ...................................................................................... *passim*

*People v. Chairez*,
   104 N.E.3d 1158 (Ill. 2018) ............................................................................... 34

*Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated*, 824 F.3d 919 (9th Cir. 2016) ................................................................................................................ 32

*Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*,
   90 F.4th 217 (4th Cir. 2024) ............................................................................... 9

*Robinson v. Sessions*,
   721 F. App'x 20 (2d Cir. 2018) ........................................................................... 37

*Siegel v. Platkin*,
   653 F. Supp. 3d 136 (D.N.J. 2023) ...................................................................... 30

*Solomon v. Cook County Bd. of Comm'rs*,
   559 F. Supp. 3d 675 (N.D. Ill. 2021) ................................................................... 32

*State v. Huntly*,
   25 N.C. 418 (1843) .................................................................................... 22, 29

*State v. Shelby*,
  2 S.W. 468 (Mo. 1886) ................................................................................................ 29

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..................................................................................................... 35

*United States v. Beasley*,
  No. 8:23-cr-00140, 2023 WL 7839581 (M.D. Fla. Nov. 16, 2023) ........................................ 9

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) .......................................................................................... 9

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019)....................................................................................... 15

*United States v. Fowler*,
  No. 1:23-cr-00165-LMB, 2024 WL 197601 (E.D. Va. Jan. 18, 2024) ................................... 8

*United States v. Hager*,
  721 F.3d 167 (4th Cir. 2013) ........................................................................................ 38

*United States v. Jackson*,
  661 F. Supp. 3d 392 (D. Md. 2023), *appeal docketed*, No. 24-4114 (4th Cir. Feb. 28,
  2024) ................................................................................................................... 14

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) ........................................................................................ 31

*United States v. Masciandaro*,
  648 F. Supp. 2d 779 (E.D. Va. 2009) ........................................................................ 31, 32

*United States v. Perez-Garcia*,
  96 F.4th 1166 (9th Cir. 2024) ....................................................................................... 22

*United States v. Salerno*,
  481 U.S. 739 (1987)...................................................................................................... 8

*United States v. Saunders*,
  828 F.3d 198 (4th Cir. 2016) ........................................................................................ 38

*United States v. Williams*,
  553 U.S. 285 (2008)..................................................................................................... 38

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)...................................................................................................... 8

*Wolford v. Lopez*,
  No. 1:23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023), *appeal docketed*, No. 23-
  16164 (9th Cir. Sept. 8, 2023) ...................................................................................... 31

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ........................................................................................ 37

## Statutes and Rules

2 Edw. 3 ch.3 (1328)........................................................................................... 25, 26

iv

Fairfax County Code § 6-2-1 ...................................................................................... *passim*

**Other Authorities**

"Preface of the Commissioners of 1838," *Revised Code of North Carolina* (1855) ................... 28

1 James Kent, *Commentaries on American Law* (3d ed. 1836)................................................... 27

3 Edward Coke, *Institutes of the Laws of England* (1644) ........................................................ 26

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) .................................................................................................................. 18

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .............................................................................................................. 14, 18

I *Laws of the State of North-Carolina* (1821) ............................................................................ 28

II *Laws of the State of North-Carolina* (1821) ........................................................................... 28

III *Florida Statutes* (1941) ....................................................................................................... 28

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND .................................................................... 16

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)................................................................................................................................... 19

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe ....................................................................... 15

*The Public Laws of the State of Rhode-Island and Providence Plantations* (1798)..................... 27

United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history... 16

William Hawkins, 1 *Pleas of the Crown* (1716)........................................................................ 26

## INTRODUCTION

Plaintiffs ask this Court to invalidate an ordinance that protects Fairfax County residents and visitors from the dangers of gun violence in parks and at public events. As Defendants explained in their own motion for summary judgment, the portions of the ordinance Plaintiffs challenge involve County property enjoyed by millions: its parks welcome over 12 million people every year, including millions of children, and public events on County property enable free speech, free assembly, and community.

Plaintiffs are not entitled to summary judgment. They have neither carried their burden to show that the ordinance's prohibitions implicate the Second Amendment's plain text nor impugned the massive historical record demonstrating that the ordinance is consistent with this nation's tradition of regulating firearms in parks and at public events—including well over one hundred historical laws specifically prohibiting firearms in parks. In their due process challenge, they have established neither standing nor the merits of their vagueness claim. We respectfully submit that this Court should deny Plaintiffs' motion and should grant summary judgment to Defendants.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs' putative statement of undisputed material facts ("Plaintiffs' Statement") contains facts that are disputed, immaterial, or both;[1] contains multiple statements for which Plaintiffs either cite only to the allegations in their Complaint or provide no citation at all; and even persists in misquoting the Ordinance they ask this Court to rule unconstitutional. Defendants respond to Plaintiffs' specific assertions as follows.

1.      Disputed in part. Up-to-date information about County parks is available at https://www.fairfaxcounty.gov/budget/sites/budget/files/Assets/documents/fy2023/adopted/volu

---

[1] Defendants dispute that any of the facts in Plaintiffs' Statement is material, in that even if all of those asserted facts were credited, Defendants would still be entitled to summary judgment.

me1/51.pdf. There are currently 420 County parks covering 23,632 acres. *See id.*; *see also* Baldwin Decl. ¶ 3.[2] The County parks are heavily visited and offer extensive programs, events, amusements, and activities. Baldwin Decl. ¶¶ 5-25, 30-31; *see also* Defendants' Statement of Undisputed Material Facts, Dkt. 45 at 2-12 ("SUMF") ¶¶ 13-23. In addition, Plaintiffs cite no evidence for the assertion that "[t]he parks include vast amounts of wooded acreage, much of it remote and isolated," which is, in any event, not a statement of fact but opinion and argument. Here and throughout Plaintiffs' Statement, Defendants dispute the characterization of County parks or parts of parks as "vast," "remote," "isolated," or as including "remote areas." *See* SUMF ¶ 13 (citing Reply in Supp. of Pls.' Mot. For Prelim. Inj. at 15, Dkt. 26-1) (Fairfax County is an urban-suburban area); *id.* ¶¶ 14-23.

2.   Defendants do not dispute the content of the document Plaintiffs cited, and refer to that document for any statistics. *See*

https://www.fairfaxcounty.gov/police/sites/police/files/assets/images/helpfulinfo/fcpd%20annual %20statistical%20report%20(2021%20&%202022).pdf.

3.   Disputed in part. Plaintiffs inaccurately and incompletely quote the Ordinance Amending Chapter 6 of the Fairfax County Code, Relating to Weapons, as adopted on September 16, 2020, now codified at Fairfax County Code § 6-2-1 (the "Ordinance") in that subsection (4) applies only to "a *County-permitted* event or an event that would otherwise require a *County* permit." *See* Sleight Decl. Ex. 1, Dkt. 47-1 (emphasis added). In addition, the Ordinance is not a

---

[2] The Declaration of Sara Baldwin ("Baldwin Decl.") is at Dkt. 52. The Declaration of Dalton Becker ("Becker Decl.") is at Dkt. 51. The Declaration of Anders Sleight, Esq. ("Sleight Decl.") is at Dkt. 47. The Declaration of Prof. Terence Young is at Dkt. 46 and attaches his Expert Report ("Young Report") as Dkts. 46-1 to 46-5 and additional historical laws as Dkts. 46-6 to 46-7. The Declaration of Prof. Alexandra Filindra is at Dkt. 49 and attaches her Expert Report ("Filindra Report") as Dkt. 49-1.

"complete ban" and has numerous exemptions. *See id.* Defendants respectfully refer the Court to the Ordinance for its complete and accurate contents.

4.      Undisputed.

5.      Undisputed, to the extent that the paragraph simply describes Ms. LaFave's own actions and beliefs.

6.      Disputed in part. Plaintiffs present no evidence for their claim that "serious crimes have been committed against women on the Fairfax County park trails." Defendants do not dispute Ms. LaFave's characterization of her own actions and beliefs, but dispute the characterization of County trails. Instead, the record reflects that trails in the County parks are particularly popular. Baldwin Decl. ¶ 25; *see also supra* ¶ 1.

7.      Disputed in part. Defendants do not dispute Ms. LaFave's characterization of her own actions and beliefs, but dispute that park and trail users generally do not see notices indicating that they are on or entering County parks and notices specifically notifying them of the Ordinance. The FCPA has posted signs at all the parks and on the doors of all park facilities. Baldwin Decl. ¶ 33 & Ex. 4. In addition, Paragraph 7 is not material because Plaintiffs do not bring a claim for lack of notice or vagueness against Fairfax County Code § 6-2-1(A)(2) (the "Parks Restriction"). *See* Compl. ¶¶ 52-59 (limiting due process vagueness claim to § 6-2-1(A)(4) (the "Events Restriction") and the terms "is adjacent to" and "an event that would otherwise require a permit").

8.      Disputed in part. Defendants do not dispute Ms. LaFave's characterization of her own actions and beliefs, but dispute the remainder of the paragraph, including because Plaintiffs have not provided sufficient evidence for the remaining statements. Defendants dispute that individuals such as Ms. LaFave do not know whether a location they are in or driving through is one where they could be arrested or prosecuted for carrying firearms because the Ordinance's

signage requirement and the County's "no signs, no enforcement" policy precludes enforcement without notices. *See* Sleight Decl. Ex. 1, Dkt. 47-1; Becker Decl. ¶¶ 7-26 & Exs. A-C; *see also* Prelim. Inj. Hr'g Tr. ("Tr.") at 27:19-22, Dkt. 38 (statement of Judge Hilton that challenged sections of the Ordinance apply "to very narrow pieces of property"). Ms. LaFave acknowledged in her state court deposition that the County's "no sign, no enforcement" policy resolves any vagueness concerns. Sleight Decl. Ex. 33, Dkt. 47-41 (LaFave Dep. Tr. 90:5-91:9). *See also* SUMF ¶¶ 6-12 (citing Becker Decl. ¶¶ 8-16, 24-26 & Exs. A, C; https://www.fairfaxcounty.gov/topics/facilities-and-locations). Defendants dispute that the Ordinance is a "Ban," which is, in any event, not a statement of fact but opinion and argument. Sleight Decl. Ex. 1, Dkt. 47-1; Becker Decl. ¶¶ 7-26 & Exs. A-C.

9.     Undisputed. Defendants lack knowledge about the nature and duration of Mr. Taubman's concealed carry permit but do not dispute that claim.

10.    Disputed in part. Defendants do not dispute Mr. Taubman's characterization of his own actions and beliefs, but dispute the remainder of the paragraph, including because Plaintiffs have not provided sufficient evidence for the remaining statements. *See also* SUMF ¶¶ 13-23 (citing Baldwin Decl. ¶¶ 5-7, 11-12, 16, 18-20, 22, 30-31; Dkt. 26-1 at 15); Baldwin Decl. ¶¶ 8-10, 23-25.

11.    Disputed in part. Defendants do not dispute Mr. Taubman's characterization of his own actions and beliefs, but dispute the remainder of the paragraph, including because Plaintiffs have not provided sufficient evidence for the remaining statements, and dispute that park and trail users generally do not see notices indicating that they are on or entering County parks and notices specifically notifying them of the Ordinance. *See supra* ¶ 7. In addition, Paragraph 11 is not

material because Plaintiffs do not bring a claim for lack of notice or vagueness against the Parks Restriction. *See id.*

12.     Disputed in part. Defendants do not dispute Mr. Taubman's characterization of his own actions and beliefs, but dispute the remainder of the paragraph, including because Plaintiffs have not provided sufficient evidence for the remaining statements. Defendants dispute that individuals such as Mr. Taubman do not know whether an event is covered by the Ordinance because the Ordinance's signage requirement and the County's "no signs, no enforcement" policy precludes enforcement without notices. *See supra* ¶ 8; *see also* SUMF ¶ 12 (explaining that County website https://www.fairfaxcounty.gov/topics/facilities-and-locations shows the six areas where and authorities from which permits for events can be sought).

13.     Undisputed that Mr. Taubman spoke at the public hearing regarding the Ordinance. Defendants respectfully refer to the video recording of the public hearing for what took place at the hearing. *See* https://video.fairfaxcounty.gov/player/clip/1822?view_id=7&redirect=true.

14.     Disputed in part. Defendants do not dispute Mr. Taubman's characterization of his own actions and beliefs, but dispute the remainder of the paragraph, including because Plaintiffs have not provided sufficient evidence for the remaining statements. Defendants dispute that individuals such as Mr. Taubman do not know whether an event is covered by the Ordinance, whether they are adjacent to an event that is covered, or whether they might be "breaking the law even en route to another destination," because the Ordinance's signage requirement and the County's "no signs, no enforcement" policy precludes enforcement without notices. *See supra* ¶ 8.

15.     Undisputed.

16.     Undisputed, to the extent that the paragraph simply describes Lt. Col. Holzhauer's own actions and beliefs. Defendants dispute the characterization of any areas of County parks as "remote." *See supra* ¶ 1.

17.     Disputed. Defendants dispute that park and trail users generally do not see notices indicating that they are on or entering County parks and notices specifically notifying them of the Ordinance. *See supra* ¶ 7. Defendants also dispute that this is material because Plaintiffs do not bring a claim for lack of notice or vagueness against the Parks Restriction. *See id.* Defendants dispute that individuals such as Lt. Col. Holzhauer do not know whether an event is covered by the Ordinance because the Ordinance's signage requirement and the County's "no signs, no enforcement" policy precludes enforcement without notices. *See supra* ¶ 8; *see also* SUMF ¶ 12. Defendants dispute the remainder of the paragraph because Plaintiffs have not provided sufficient evidence for the remaining statements.

18.     Disputed in part. Defendants dispute the characterization of the Ordinance as a "Ban." *See supra* ¶ 8. Defendants lack knowledge about the nature and duration of Plaintiffs' concealed carry permits but do not dispute those claims.

19.     Disputed in part. Defendants do not dispute that the Ordinance prohibits carrying firearms in parks, subject to exceptions as set out in the Ordinance. Defendants dispute the characterization of the Ordinance as a "Ban." *See supra* ¶ 8. Defendants do not dispute Plaintiffs' characterization of their own actions and beliefs.

20.     Paragraph 20 is a legal argument, improperly included in a statement of undisputed material facts. To the extent a response is required, Defendants respond as follows: Defendants do not dispute that the Ordinance contains a notice requirement and respectfully refer the Court to the text of the Ordinance for that requirement. Defendants dispute that Plaintiffs will risk violating the

Ordinance by using and traveling on public streets and other public places because (a) the Ordinance's signage requirement and the County's "no signs, no enforcement" policy precludes enforcement without notices, *see supra* ¶ 8, and (b) events that take place within the County on property that is not controlled or owned by Fairfax County are not subject to the Ordinance, Becker Decl. ¶¶ 25-26. This includes public roadways, which are instead controlled by the Virginia Department of Transportation. *Id. See also* SUMF ¶¶ 6-12 (citing Becker Decl. ¶¶ 8-16, 24-26 & Exs. A, C; https://www.fairfaxcounty.gov/topics/facilities-and-locations). Defendants dispute the remainder of the paragraph because Plaintiffs have not provided sufficient evidence for the remaining statements.

21.     Paragraph 21 is a legal argument, improperly included in a statement of undisputed material facts. The content and effect of the provisions of Virginia law to which Plaintiffs cite is a pure question of law to which no response is required, although Defendants dispute Plaintiffs' characterization of that law. To the extent that a response is required to the first line of Paragraph 21, Defendants dispute that the Ordinance is a "Ban," *see supra* ¶ 8, and dispute that Plaintiffs have provided sufficient evidence to establish the assertion that County parks are "mostly woodland," *see* SUMF ¶¶ 13-23 (citing Baldwin Decl. ¶¶ 5-7, 11-12, 16, 18-20, 22, 30-31; Dkt. 26-1 at 15); Baldwin Decl. ¶¶ 8-10, 23-25.

## ARGUMENT

### I.   Legal Standard

Defendants set out the summary judgment standard in their Memorandum in Support of Motion for Summary Judgment ("Defs. Mem.") 12-13, Dkt. 45, and respectfully refer the Court to that statement. Defendants also explained that Plaintiffs cannot prevail on the facial challenge they have brought unless they "'establish that no set of circumstances exists under which the law would

be valid,' or show that the law lacks 'a plainly legitimate sweep.'" Defs. Mem. 13 (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (alteration adopted).

Plaintiffs, however, maintain that they "may mount a facial challenge to the parks restriction" by invoking a different standard. *See* Mem. in Supp. of Pls.' Mot. for Summ. J ("Pls.' Mem.") 20, Dkt. 53 (capitalization altered). The Ordinance may be "invalidated as overbroad," they say, "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Ams. for Prosperity*, 141 S. Ct. at 2387). But that is not an accurate articulation of the facial-challenge standard applicable to this case. Plaintiffs' error is obvious when the passage they have drawn from is reproduced in full:

> *Normally*, a plaintiff bringing a facial challenge must "establish that no set of circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or show that the law lacks "a plainly legitimate sweep," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). *In the First Amendment context*, however, we have recognized "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

*Ams. for Prosperity*, 141 S. Ct. at 2387 (emphasis added, parenthetical omitted).

Plaintiffs challenge the Parks Restriction under the Second Amendment, not the First; they must proceed, therefore, under the "normal[]" rules for facial challenges, not under the "second type" of challenge applicable in the First Amendment context—which is the one they quoted. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 362-63 (2d Cir. 2023) (applying this normal facial-challenge standard in rejecting Second Amendment challenge to New York law restricting guns in parks), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024); *United States v. Fowler*, No. 1:23-cr-00165-LMB, 2024 WL 197601, at *8 n.19 (E.D. Va. Jan. 18, 2024) (applying *Salerno* standard to post-*Bruen* Second Amendment facial challenge). Courts have repeatedly rejected efforts to import First Amendment overbreadth doctrine into Second Amendment analysis, both before and

after *Bruen*. *See, e.g.*, *Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610, 620 (C.D. Cal. 2022) (rejecting, post-*Bruen*, argument that overbreadth doctrine should apply in Second Amendment context and holding that plaintiffs were unlikely to succeed in facial challenge to city ordinance forbidding carrying guns on city property, including parks, playgrounds, and city government buildings, because they conceded that city could prohibit carrying firearms "on at least some city property"); *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013) ("[T]his Court has rejected … import[ing] the First Amendment overbreadth doctrine to the Second Amendment context."); *see also, e.g.*, *United States v. Chester*, 628 F.3d 673, 688 (4th Cir. 2010) (Davis, J., concurring in the judgment) ("[I]mporting the over-breadth doctrine … into the Second Amendment context would be inappropriate."); *United States v. Beasley*, No. 8:23-cr-00140, 2023 WL 7839581, at *3 (M.D. Fla. Nov. 16, 2023) (rejecting contention that "the overbreadth doctrine ought to extend to the Second Amendment" and stating that "it would be absurd for *Bruen*—a decision rooted in constitutional text, history, and tradition—to expand the overbreadth doctrine to new constitutional rights").[3] This Court should do the same.[4]

Under the correct summary-judgment and facial-challenge standards, *see* Defs. Mem. 12-13, Plaintiffs are not entitled to summary judgment. They have offered only conjecture, unsupported argument, and their own self-serving declarations—and yet even if those declarations

---

[3] The other case Plaintiffs cite, *Kolender v. Lawson*, 461 U.S. 352 (1983), involved First Amendment concerns. *See id.* at 358. It also was decided before the Supreme Court's seminal decision on the facial-challenge standard in *Salerno*, and thus cannot alter the principles articulated in *Salerno*, *Washington State Grange*, and *Americans for Prosperity*.

[4] Separately, Plaintiffs contend that "[p]ure issues of law … are inappropriate subjects for expert testimony," Pls. Mem. 8-9, but do not invoke that contention elsewhere in their brief—thus leaving unclear how they believe it might apply in this case. To be sure, "'opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.'" *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, 90 F.4th 217, 234 (4th Cir. 2024) (citation omitted). None of Defendants' experts provides such inadmissible legal opinion testimony, and Plaintiffs do not argue otherwise.

were credited in full, still Plaintiffs would not be entitled to relief. Applying the relevant legal principles to the undisputed material facts, not only have Plaintiffs failed to show that any part of the Ordinance is unconstitutional, but Defendants have shown that Plaintiffs cannot prevail on their constitutional challenges. Thus, summary judgment should be denied to Plaintiffs and granted to Defendants.

## II.     The Ordinance Is Constitutional Under the Second Amendment

Both the Parks Restriction and the Events Restriction are valid under the Second Amendment. Part II.A summarizes the methodological principles *Bruen* established and explains errors in Plaintiffs' discussion of *Bruen*. Part II.B then applies *Bruen*'s principles to historical laws and undisputed evidence Defendants have presented to show that the Parks Restriction is constitutional, and Part II.C does the same for the Events Restriction.

### A.   *Bruen*'s Methodology

In their initial brief, Defendants set out *Bruen*'s framework for Second Amendment cases and key principles regarding its application, and Defendants respectfully refer the Court to that discussion. *See* Defs. Mem. 14-19.

In short, Defendants explained that *Bruen* requires a party challenging a law first to establish that the Second Amendment's plain text covers the conduct in which they wish to engage; if they carry that burden, the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *See* Defs. Mem. 14-15 & n.6 (citing *Bruen*, 597 U.S. at 24, 44 n.11). In doing so, the government need not identify a "historical twin" to the challenged law; instead, a court should consider analogous historical laws and uphold the challenged law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of armed self-defense" and the burden is "comparably justified." *Id.* at 14 (citing *Bruen*, 597 U.S. at 29-30). Where a challenged law regulates societal conditions

that did not exist at the founding—which include public parks like the County's, *see* Defs. Mem. 21-22, Young Report ¶¶ 13, 15—a more expansive approach to historical analogy is appropriate. *See* Defs. Mem. at 15; *Antonyuk v. Chiumento*, 89 F.4th 271, 359 n.78 (2d Cir. 2023) ("[T]he relative novelty of public parks as institutions … justifies a flexible approach under *Bruen*."), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024). Defendants set out three further principles emerging from *Bruen*'s analysis: (1) even a small number of historical laws can be sufficient to carry a government's burden to show consistency with historical tradition, so long as there is not countervailing historical evidence; (2) because legislatures generally do not legislate to their constitutional limits, the absence of a particular law in a historical period does not mean the people believed that law to be unconstitutional; and (3) historical evidence should be examined as a whole, not piecemeal, in evaluating whether a modern law is consistent with historical tradition. *See* Defs. Mem. 18-19.

Defendants also explained that this Court need not decide what time period is the most important for *Bruen*'s historical analysis—an issue *Bruen* left open—because the relevant public understanding of the right to keep and bear arms was the same in both the founding era and the Reconstruction era. *See* Defs. Mem. 15-16. Specifically, Defendants have presented copious 19th- and early-20th-century laws, *see id.* at 22-25; Parks Table, Sleight Decl. Ex. 18, Dkt. 47-18, which show unambiguously that the people whose representatives enacted those laws understood prohibitions on guns in parks to be entirely consistent with the right to keep and bear arms. Nor do those laws contradict any earlier evidence; Plaintiffs have presented no such contradictory evidence, and, to the contrary, 19th-century and later prohibitions on guns in parks reflect and confirm limitations on the right to keep and bear arms that existed in the founding and earlier periods. *See* Defs. Mem. at 26-31.

Nevertheless, if this Court chooses to address the issue, Defendants explained why it should hold that the Reconstruction era is the primary focus of the historical analysis. *Bruen* gave strong indications that Reconstruction is the correct focus, and that is the approach consistent with originalist theory. *See id.* at 16-17.  And even if this Court decided to address the issue, *and* decided that the founding era is the correct focus, *and* disagreed with Defendants that their founding-era evidence provides sufficient analogues for the Ordinance, it still should recognize that the 19th- and early 20th-century evidence "liquidate[s] [and] settle[s]" the meaning of the right as one that allows for regulations like the Ordinance. *See id.* at 17-18 (quoting *Bruen*, 597 U.S. at 35-36).

Plaintiffs, for their part, spend little time on *Bruen*'s methodology. *See* Pls. Mem. 9-12, 19-20. Still, their analysis contains numerous flaws. As the following subsections explain, Plaintiffs are incorrect about the process of analogizing, incorrect to suggest that only places that are indoors and protected by comprehensive government security can be "sensitive places," and incorrect to claim that only founding-era history is relevant.

### i. Plaintiffs' claim that the only relevant historical laws are those "distinctly similar" to the Ordinance is incorrect

Plaintiffs assert that, because the Ordinance "addresses a general historical problem that existed since the founding (firearms violence in public—the same problem at issue in *Heller* and *Bruen*) the historical analogue must be 'distinctly similar' to the modern regulation." Pls. Mem. 10 (citing *Bruen*, 597 U.S. at 26). This assertion contains multiple errors.

*First*, Plaintiffs define the issue at far too high a level of generality. The challenged portions of the Ordinance do not regulate "firearms violence in public," as a complete (or effective) prohibition on public carry would do. Rather, unlike the laws at issue in *Bruen* and *Heller*, they regulate only in what Judge Hilton referred to as "very narrow pieces of property," *see* Tr. at 27:19-

22—parks and certain public events—and address the risks of physical and non-physical harms of firearms, including intimidation, in those narrow areas.

*Second*, when defined at the correct level of generality, the principle Plaintiffs purport to draw from *Bruen* is inapplicable in this case. They invoke it only with respect to parks. *See* Pls. Mem. 13.[5] Defendants have presented unrebutted evidence that parks, as we understand them today, did not exist at the founding. *See, e.g.*, Young Report ¶¶ 13, 15; *see also* Defs. Mem. 21-22. Accordingly, the problem the County seeks to address—the risk of physical and non-physical harms of firearms in parks—is not one that has existed since the founding, so the premise of *Bruen*'s "distinctly similar" sentence is absent.

*Third*, and in any event, *Bruen* does not say that historical analogues must be "distinctly similar" to a modern regulation even when addressing a problem that has existed since the founding. *Bruen*'s only use of that phrase—a phrase it did not define—appeared in its statement that if the challenged regulation addresses a problem that has "persisted since the 18th century," the lack of a "distinctly similar" historical regulation would be "relevant evidence" of unconstitutionality. 597 U.S. at 26. To be "relevant evidence" just means that the absence of a "distinctly similar" regulation in history is not *irrelevant* to the Second Amendment inquiry—not, as Plaintiffs appear to suggest, that such an absence *demonstrates* unconstitutionality. After all, *Bruen* concluded that the law challenged in that case addressed a problem it said had persisted since the founding, and still it described its task as "consider[ing] whether 'historical precedent'"

---

[5] Even there, Plaintiffs invoke "distinctly similar" only in an aside to a discussion of an out-of-circuit district court decision. *See id.* at 12-13 (discussing *Koons v. Platkin*, 673 F. Supp. 3d 515, 642 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023)).

… evinces a *comparable* tradition of regulation," *id.* at 27—not a "distinctly similar" tradition of regulation.[6]

### ii. Plaintiffs' suggestion that places must be indoors and protected by comprehensive security to be sensitive is baseless

Plaintiffs assert that "the provision of enhanced security demarks a location as sensitive." Pls. Mem. 11.[7] It is not clear that even Plaintiffs believe the claim this proposition suggests—*i.e.*, that "enhanced security" is *necessary* for a place to be one where a prohibition on firearms is constitutional[8]—since they acknowledge the Supreme Court has established that schools are sensitive places, *id.* at 10, and further that schools "include … school yards, including playgrounds and athletic fields," *id.* at 11. Plaintiffs are surely aware that school buildings (let alone playgrounds and athletic fields) do not routinely have "enhanced security" like metal detectors, either today or in early America.

---

[6] Later passages make equally clear that the task *Bruen* set for itself and the lower courts, even when considering a problem that has persisted since the founding, is to evaluate whether the government's proffered historical traditions are *sufficiently analogous* to its modern law, not whether they are "distinctly similar" to that law. *See, e.g.*, *id.* at 30 (clarifying that the government need identify only "a well-established and representative historical *analogue*, not a historical *twin*"); *id.* at 50 (summarizing conclusion that none of New York's proffered historical regulatory traditions "imposed a substantial burden on public carry *analogous to the burden* created by New York's restrictive licensing regime" (emphasis added)); *see also, e.g.*, *United States v. Jackson*, 661 F. Supp. 3d 392, 408 (D. Md. 2023) (noting that *Bruen* "did not rule that 'the lack of a distinctly similar historical regulation' is dispositive for laws addressing a persistent problem; rather, only that it 'is relevant evidence'" (citation omitted)), *appeal docketed*, No. 24-4114 (4th Cir. Feb. 28, 2024).

[7] Plaintiffs attribute this idea to a journal article by two individuals frequently aligned with gun-rights litigants, which they claim *Bruen* "endorsed." *See* Pl. Mem. 11 (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 290 (2018)). *Bruen* did not endorse that article; rather, it cited specific pages as one of two sources for the historical laws underlying its conclusion that legislative assemblies, polling places, and courthouses are sensitive places. *See* 597 U.S. at 30.

[8] Plaintiffs do not define what they mean by "enhanced security," but their quotation from the article they rely on refers to "protect[ion] by metal detectors and guards." Pls. Mem. 11 (quoting Kopel & Greenlee, 13 Charleston L. Rev. at 290).

Nevertheless, in case Plaintiffs try to press the argument that a government may only prohibit firearms in locations with "enhanced security," that argument fails for multiple reasons. *First*, as noted, it is irreconcilable with the Supreme Court's established view that schools are sensitive places. *See Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) ("[B]ecause *Bruen* conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless."). *Second*, it is irreconcilable with the fact that Supreme Court has also established that "government buildings" and "polling places" are sensitive. Any number of government buildings lack enhanced security—public libraries, community recreation centers, post offices, and so on. *See, e.g.*, *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015) (rejecting challenge to prohibition on firearms in post offices because a post office, as a government building, is a "sensitive place"); *id.* at 1123 (noting that the specific post office at issue "d[id] not regularly employ any security officers"); *id.* at 1133 (Tymkovich, J., concurring in part and dissenting in part) (noting that post office did not have "security … devices"); *see also United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (explaining that "[m]any 'schools' and 'government buildings'—the paradigmatic 'sensitive places' identified in [Heller]—are open to the public, without any form of special security or screening" and referring to "a post office or school" as examples of "an unsecured public building"). Enhanced security is likewise not routinely present at polling places. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.) (describing Tennessee law); *see also*, e.g., Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you

can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's unlawful."). Similarly, as a historical matter, even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security. *See* United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history (noting that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler.... Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off.").

In sum, the Supreme Court's recognition of schools, government buildings, and polling places as "sensitive places" where firearms may be prohibited, coupled with the absence of security in those locations both historically and today, forecloses any argument that enhanced security is a prerequisite to a constitutional firearms prohibition.

### iii.  Plaintiffs' rejection of any laws outside the founding era is baseless

Plaintiffs maintain that a government must identify founding-era laws to prove that a modern law is consistent with this nation's historical tradition of firearm regulation.[9] They claim that "*Bruen* does not countenance restrictions from the time of the Fourteenth Amendment's 1868 adoption that lack any Founding-era analogue to justify modern definitions of 'sensitive places.'"

---

[9] To be clear, even if Plaintiffs' proposition were correct, Defendants here would satisfy it, because they have shown that there are at least four strands of founding-era laws that are analogous to the 19th- and early 20th-century prohibitions on guns in parks and to the Parks Restriction. *See* Defs. Mem. 26-31. But because Plaintiffs are not correct, for the reasons discussed in this section, there is no obligation on Defendants to make that showing.

Pls. Mem. 19. To support this, they assert: "*Bruen* flatly states that … 'the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.'" *Id.* (citing *Bruen*, 597 U.S. at 37).

Plaintiffs' assertion is flatly wrong. They have omitted four crucial words from the beginning of their quote from *Bruen*, which in fact states: "*we have generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." 597 U.S. at 37 (emphasis added). Thus, the Court was explaining that in some cases involving other constitutional rights it had assumed—*but not decided*—that 1791 was the focus for the originalist inquiry. If the Court believed that assumption settled the issue in favor of 1791, it would have said so.

Instead, *Bruen* expressly left the issue of the correct time period open, saying "[w]e need not address this issue today" because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *See id.* at 37-38.[10] In doing so, however, the Court gave strong indications that the Reconstruction era was the more relevant period or—as *Antonyuk* put it—that evidence from Reconstruction is "*at least as* relevant as evidence from the Founding Era regarding the Second Amendment." 89 F.4th at 318 n.27 (emphasis added). For example, in discussing sensitive places restrictions, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of

---

[10] Plaintiffs take another confounding position when they accuse *Antonyuk* of "alter[ing] the Supreme Court's holding" when it said that "*Bruen* 'expressly declined to decide'" the time-period issue. *See* Pls. Mem. 19 (quoting *Antonyuk*, 89 F.4th at 304). It is impossible to say how Plaintiffs believe *Bruen*'s statement that it "need not address" the issue differs from expressly declining to decide the issue. *See also Bruen*, 597 U.S. at 81-83 (Barrett, J., concurring) (describing time-period issue as one of two "methodological points that the Court does not resolve," and as an issue the Court "avoids" because "the lack of support for New York's law in either period makes it unnecessary to choose between" 1791 and 1868).

guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 597 U.S. at 30 (emphasis added).[11] That is an incomprehensible statement if, as Plaintiffs maintain, the Court believed that the 18th century was the only relevant period.[12] Similarly, noting that "[t]he Second Amendment was adopted in 1791; the Fourteenth in 1868," *Bruen* observed that "[h]istorical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years," *id.* at 34—again, an incomprehensible statement if only the period around 1791 were relevant.[13] And, as Defendants have already explained, focusing on the Reconstruction era in a case against a state or local government is both the approach consistent with originalist theory and the answer that counsel for the NRA's New York affiliate gave at oral argument in *Bruen* when asked about the correct time period. *See* Defs. Mem. 17 & n.9.[14] Accordingly, this Court should reject Plaintiffs' unsupported

---

[11] Notably, in the pages of the article and brief the Court cited for that proposition, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 244-47 (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

[12] Indeed, Plaintiffs themselves describe this passage as "*Bruen* … observ[ing] a handful of other 'sensitive places' from the 18th *and 19th centuries* where weapons were altogether prohibited." Pls. Mem. 10 (emphasis added).

[13] *Antonyuk* articulated yet another reason for reaching this conclusion: in *McDonald*, the plurality placed particular emphasis on the Reconstruction-era understanding of the Second Amendment right in determining that it was a "fundamental right" fully applicable to the states, and "[i]t would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305. Plaintiffs say "no such incongruity exists" because the Supreme Court interprets other incorporated rights "[b]y relying on Founding-era understandings." Pls. Mem. 20. But they make the same mistake here as they did throughout this section of their brief: treating "assum[ptions]" in the Court's prior cases, *see Bruen*, 597 U.S. at 37, as if they had definitively and finally resolved the time-period question.

[14] Although the answer from originalist theory is more complicated in a case against the federal government, *Bruen* marked the path on that issue too, by identifying an "ongoing scholarly debate" on whether the analysis should focus on 1791 or 1868 when defining the scope of the right

contentions and—if it decides to reach the issue—should conclude that Reconstruction-era evidence is at least as relevant to the inquiry into this nation's historical tradition of firearms regulation as founding-era evidence.

### B. The Parks Restriction is Constitutional Under *Bruen*

Plaintiffs have not carried their initial burden of establishing that the conduct in which they seek to engage is protected by the Second Amendment's text (Part II.B.i). Even if they had, the longstanding tradition of prohibiting firearms in parks and analogous places demonstrates that the Parks Restriction is constitutional (Part II.B.ii). Plaintiffs' efforts to attack the Second Circuit's persuasive decision refusing to enjoin a prohibition on guns in parks in the wake of *Bruen* are unavailing (Part II.B.ii.2-3), and the cases Plaintiffs rely on are mistaken, irrelevant, or both (Part II.B.iii).

#### i. Plaintiffs have not established that the Second Amendment's text protects carrying guns in County parks

Defendants explained in their opening brief that Plaintiffs must establish at *Bruen*'s first step that the Second Amendment's text protects their proposed conduct—carrying guns in County parks (and at or adjacent to covered events) *specifically*, not just carrying guns in public *generally*. *See* Defs. Mem. 19-20. Defendants respectfully refer the Court to that discussion.[15]

_____

as against both state and federal governments, and then citing two scholars who support focusing on 1868 and none who supports 1791. *See* 597 U.S. at 37-38 (citing Akhil Amar and Kurt Lash); Kurt T. Lash, *Respealing the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022) ("When the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."). This reconciles originalist doctrine with the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

[15] The Ninth Circuit recently used similar reasoning to reject a Second Amendment challenge at *Bruen*'s text step. *See Doe v. Bonta*, --- F.4th ----, No. 23-55133, 2024 WL 2037144, at *5 (9th Cir. May 8, 2024) (stating that "critical inquiry" at text step is "what conduct of the plaintiffs is relevant," and that "*Bruen* itself suggests that the relevant conduct of the plaintiffs is

Plaintiffs' summary judgment brief confirms that they have failed to meet that burden. They make no effort to establish that the Second Amendment's text protects carrying in parks (or at public events) specifically. *See* Pls. Mem. 9. Instead, all they do is invoke *Bruen*'s statement that the Second Amendment protects carrying handguns "publicly" or "in public" for self-defense. *Id.* (quoting *Bruen*, 597 U.S. 32, 33).[16] But, as Defendants have already explained, *see* Defs. Mem. 20, that assertion cannot carry their textual burden because the Ordinance does not prohibit carrying guns in public—unlike the New York law challenged in *Bruen*, a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." 597 U.S. at 60. Instead, the challenged portions of the Ordinance prohibit carrying guns in parks (and at or adjacent to covered public events), and Plaintiffs' burden is to establish that the Second Amendment's text protects carrying guns on those "very narrow pieces of property," Tr. 27:19-22. They have not even attempted to carry that burden. Defendants are entitled to summary judgment for this reason alone. *Cf. Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023) (explaining that if a challenged law does not implicate the Second Amendment's text, the inquiry ends because "the Second Amendment has nothing to say about [it]").

---

'the proposed course of conduct,' *i.e., the conduct the regulation prevents plaintiffs from engaging in*" (emphasis added)).

[16] Nor does Plaintiffs' addition of a reference to the total, combined acreage of all of Fairfax County's parks change the analysis. *See* Pls. Mem. 9. It is undisputed that the County's park system is made up of over 400 individual parks ranging in size from Farrington Park's 0.1 acres up to Huntley Meadows Park's 1,558 acres. *See* Defs. Mem. 6 (¶ 23); Baldwin Decl. ¶ 6; https://www.fairfaxcounty.gov/budget/sites/budget/files/Assets/documents/fy2023/adopted/volume1/51.pdf. Prohibiting carrying guns in those parks is simply not the same thing as prohibiting carrying guns everywhere in public.

### ii. The Parks Restriction is consistent with a long historical tradition of restricting firearms in parks and analogous places

#### 1. Defendants' moving brief established that there is a long historical tradition of prohibiting firearms in parks and analogous places

Even if Plaintiffs had satisfied their textual burden, history soundly defeats their claims. Defendants respectfully refer the Court to the historical discussion in their opening brief. *See* Defs. Mem. 20-31. There, Defendants explained that when public parks emerged as communal spaces for repose and relaxation in the nineteenth century, scores of laws, ordinances, and rules prohibited guns in these new parks. *See* Defs. Mem. 21-25. To date, Defendants have located well over a hundred such prohibitions, typically enacted at or soon after the time of a park's creation—first in New York, for its new Central Park, then in other cities, and then, as they were created, in national and state parks. *See id.* at 22-24; Parks Table, Sleight Decl. Ex. 18, Dkt. 47-18. More specifically, prohibitions were enacted in eight cities in the 1850s, 1860s, and 1870s, eight more cities in the 1880s, 21 more in the 1890s, another 26 in the 1900s, and more throughout the 1910s and 1920s. *See* Defs. Mem. 22; Parks Table, Sleight Decl. Ex. 18, Dkt. 47-18. Even though *Bruen* requires only analogous laws, these laws are historical *twins* to the Parks Restriction—simple regulations, unambiguously prohibiting the possession or carry of firearms in parks.[17] And because the Reconstruction era is the key period for this Court's inquiry, *see* Defs. Mem. 15-18; *supra* Part II.A.iii, these laws alone establish that the Parks Restriction is constitutional under *Bruen*.

Defendants further explained that, even if this Court wishes to look further back in history, the tradition of regulation supporting the Parks Restriction remains strong. *See* Defs. Mem. 26-31.

---

[17] Thus, even if Plaintiffs were correct that Defendants' obligation was to identify "distinctly similar" laws, *but see supra* pp. 13-14, and even if "distinctly similar" means that Defendants must identify historical twins, *but see Bruen*, 597 U.S. at 30 (making clear that the government need not identify a "historical *twin*" or "dead ringer"), Defendants' scores of historical parks laws would still demonstrate that the Parks Restriction is constitutional.

In the time before modern-style parks emerged, there were of course no firearms prohibitions in such parks; the Court should therefore engage in a "more nuanced" inquiry into analogous regulations. *See id.* at 26. That inquiry reveals that the tradition of restricting firearms in places analogous to parks stretches back centuries in our nation's history, taking various regulatory forms over time. *See id.* at 26-31. Specifically, it took the forms of (a) prohibitions on guns in gathering places and public forums, *see id.* at 26-27; (b) prohibitions on going armed "to the terror" of the people, *see id.* at 28-29; (c) prohibitions on carrying firearms in privately-owned landscapes absent express permission from the owner, *see id.* at 29-30; and (d) prohibitions on guns in schools, *see id.* at 30-31.[18] As Defendants explained, these strands of laws demonstrate that the Parks Restriction is rooted in historical tradition because, when compared to the Parks Restriction, each of them involves "comparable burdens" on armed self-defense and each is "comparably justified." *See* Defs. Mem. 26-31. Each of these regulatory traditions, together with the subsequent parks-specific restrictions, constitute an unbroken line of authority establishing that prohibitions on firearms in parks—city and suburban parks, state parks, and national parks—are consistent with our nation's historical tradition of firearm regulation. *See id.* at 21-31; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024) (explaining that under *Bruen*, courts "examine the historical evidence as a whole").

Plaintiffs present, at bottom, just two arguments against this robust historical record. With respect to Defendants' scores of historical laws specifically prohibiting guns in parks, Plaintiffs' only response is that they came too late. *See* Pls. Mem. 19-20.[19] With respect to Defendants' four

---

[18] Plaintiffs acknowledge that "firearms may be banned" in "schools," Pls. Mem. 2; *see also id.* at 10, and that founding-era laws prohibited going armed in public "'in such a manner[] as will cause a terror to the people,'" *id.* at 17 (quoting *State v. Huntly*, 25 N.C. 418, 421 (1843)).

[19] Plaintiffs articulate this position only as part of an effort to criticize the Second Circuit's decision in *Antonyuk*, *see* Pls. Mem. 14, 18-20, in which New York presented (and the Second

strands of founding-era laws, Plaintiffs respond only to one. *See* Pls. Mem. 14-18.[20] On both fronts, Plaintiffs' arguments are mistaken.

### 2. Plaintiffs' effort to dismiss historical prohibitions on firearms in parks is baseless

Defendants have already explained that Reconstruction-era firearms prohibitions provide the most relevant evidence of the original understanding of the Second Amendment as applied to state and local governments. *See supra* Part II.A.iii; *see also* Defs. Mem. 15-17. Even if the founding era were the most important focus, furthermore, the fact that Plaintiffs have identified no contradictory evidence in that era—no caselaw, treatises, or other sources showing that there was a right to carry firearms in parks in that era—confirms that Defendants' scores of 19th-century and later laws expressly prohibiting guns in parks "liquidate[] and settle[]" the meaning of the Second Amendment and that such prohibitions are constitutional. *See supra* p. 12; Defs. Mem. 17-18. These points conclusively refute Plaintiffs' claim, *see* Pls. Mem. 19-20, that *Antonyuk* erred in relying in part on 19th-century laws.

Again, a comparison to *Bruen* is instructive. There, the Court found what it described as "overwhelming evidence of an otherwise enduring American tradition permitting public carry."

---

Circuit considered) just eight prohibitions on guns in parks, *see Antonyuk*, 89 F.4th at 359. Although Plaintiffs are well aware that Defendants rely on a much larger collection of historical laws, *see, e.g.*, Dkt. 18 (Memorandum in Opposition to Motion for Preliminary Injunction); Dkt. 19-18 (Table of Parks Restrictions, as of Jan. 5, 2024); Dkts. 46-1 to 46-5 (Expert Report of Prof. Terence Young, dated Feb. 26, 2024 and disclosed to Plaintiffs on Feb 28, 2024), they have not mentioned that larger group of laws in their brief. Defendants are left to assume that, when they do so, Plaintiffs will respond with the same argument. To the extent that Plaintiffs raise additional arguments in their responsive brief, Defendants will address those arguments in their reply.

[20] Again, Plaintiffs articulate their arguments only as a response to *Antonyuk*, *see* Pls. Mem. 14-18, even though they are well aware of the four strands on which Defendants relied in opposing Plaintiffs' request for a preliminary injunction, *see* Dkt 18 at 13-17. Again, if Plaintiffs raise additional arguments in their responsive brief, Defendants will address those arguments in their reply.

*Bruen*, 597 U.S. at 67. That "overwhelming evidence," in the Court's view, was directly contrary to New York's law, which it said "operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id*. at 60; *see also id.* at 71 (similar). For example, the Court reviewed cases from the early- and mid-19th century and concluded that "these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues." *Id.* at 55. It read surety statutes from the mid-19th century as establishing that "'everyone started out with robust carrying rights.'" *Id.* at 57 (citation omitted).

Together, the cases, statutes, and other evidence the Court canvassed constituted "overwhelming evidence" that law-abiding citizens with ordinary self-defense needs had the right to carry handguns outside the home for that purpose, *see id.* at 67—which New York's law did not permit. And it was in this context that the Court approached the 19th-century laws that operated similarly to New York's (an 1871 Texas law that limited public carry to those with special need for self-defense) or were even stricter (laws, primarily from territories, that completely prohibited carrying handguns in towns, cities, and villages). *See id.* at 64-68. Because these laws contradicted the challengers' "overwhelming" affirmative evidence that individuals with ordinary self-defense needs had a right to carry in public, they could not carry New York's burden to establish consistency with historical tradition. And that is the context in which the Court announced that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66.

Such contradictions are *entirely absent* here. Plaintiffs have presented no evidence that there was *ever* a constitutional right to carry firearms in parks. Without such contradictory

evidence, *Bruen* places no limitation on the "insight into the meaning of the Second Amendment" that late-19th-century evidence—or early 20th-century evidence[21]—can provide.

### 3. Plaintiffs' criticisms of the Second Circuit's historical analysis in *Antonyuk* are mistaken

Plaintiffs' remaining criticisms of *Antonyuk* focus primarily on the English Statute of Northampton and application of the same or similar statutes in Virginia and North Carolina. They dispute that the Statute of Northampton or its Virginia analogue prohibited carrying arms in "fairs" or "markets" without an additional element that carrying was terrorizing, and they dispute that it applied in North Carolina at all. Pls. Mem. 14-18. Plaintiffs are mistaken on both points.[22]

Originally enacted in 1328, the Statute of Northampton both listed specific places where carrying arms was prohibited—in fairs, in markets, and in the presence of Justices or other Ministers—and also prohibited carrying arms "elsewhere." As quoted in *Bruen*, the Statute of Northampton "provided that, with some exceptions, Englishmen could not … 'go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere[.]'" 597 U.S. at 40 (quoting 2 Edw. 3 ch.3 (1328)). In *Bruen*, New York relied on the latter, most expansive part of the statute—"in no part elsewhere"—rather than the specific-location provisions. *See id*. at 40-41 ("Respondents argue that the prohibition on 'rid[ing]' or 'go[ing] ... armed' was a sweeping restriction on public carry of self-defense weapons that would

---

[21] *Bruen*'s reason for dismissing New York's early-20th-century evidence was the same as for its late-19th-century evidence: it "does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." 597 U.S. at 66 n.28 (emphasis added). Here, again, Defendants' 20th-century parks laws do not contradict any earlier evidence.

[22] To be clear, even if Plaintiffs were correct that founding-era prohibitions on carrying firearms in fairs or markets also required an additional element that carrying was likely to cause fear or terror, that ultimately would not help Plaintiffs because Defendants have separately established that carrying firearms in parks and at public events in Fairfax County *would* cause fear or terror. *See* Defs. Mem. 28-29; Filindra Report ¶¶ 23-24, 31-33.

ultimately be adopted in Colonial America and justify onerous public-carry regulations."). *Bruen* concluded that the Statute, by the 17th and 18th centuries, was understood to prohibit public carry *generally* only where such carry was "'accompanied with such Circumstances as are apt to terrify the People.'" *Id*. at 45 (quoting William Hawkins, 1 *Pleas of the Crown* 136 (1716)). But it did not hold that the Statute also required a "terror" element when one of the specific-location provisions was at issue, because that was not the issue before it.[23] Thus, as *Antonyuk* explained, "though *Bruen* rejected the medieval Northampton statute, it did so within the context in which that statute was offered: as an analogue supporting a carriage ban in public *generally*." 89 F.4th at 357 n.74. *Bruen* did "not address[] the more specific prohibitions in the statute such as carriage in fairs and markets," and therefore the Second Circuit "d[id] not take *Bruen*'s observations regarding the Northampton statute to run contrary to [its] more limited conclusions[.]" *Id.* This Court should conclude the same, and reject Plaintiffs' argument that *Bruen* attached a "terror" element even to the Statute's specific-locations provisions.

Virginia's 1786 statute forbade "go[ing] or rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." Sleight Decl. Ex. 20, Dkt. 47-20.[24] Although research has revealed no caselaw interpreting this statute, standard statutory interpretation principles dictate that the final clause ("in terror of the Country") modifies the last antecedent ("in other places") only. *See, e.g.*, *Alger v. Commonwealth*, 590 S.E.2d 563, 565-66 (Va. 2004)

---

[23] At least one case suggests that there was no such requirement: that of Sir Thomas Figett, who was convicted and imprisoned under the Statute of Northampton after he "went armed under his garments, as well in the Palace, as before the Justices of the Kings Bench." 3 Edward Coke, *Institutes of the Laws of England* 162 (1644), Sleight 2d Decl. Ex. 1. Nothing in Lord Coke's description suggests specific terrorizing; rather, it appears that it was the fact of carrying in the Palace and before the King's Bench (and thus, "in the presence of the Justices or other Ministers," 2 Edw. 3 ch.3) that constituted the offense.

[24] Publications differ over whether the last quoted word was "Country" or "county." We follow *Bruen* in using "Country." *See* 597 U.S. at 49.

("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is 'the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.' Thus a proviso usually is construed to apply to the provision or clause immediately preceding it." (citation omitted)). Accordingly, the Virginia statute is best understood as forbidding carrying arms "in other places, in terror of the Country" *or* "in fairs or markets," *period*.[25] It therefore mirrors the Statute of Northampton.[26]

As for North Carolina, Plaintiffs object that the statute on which *Antonyuk* relied was not a statute passed by the North Carolina legislature. *See* Pls. Mem. 16-17. But its status is clear from the name of the volume *Antonyuk* cited: it was a "Statute[] of the Parliament of England in Force in the State of North Carolina." 89 F.4th at 357. This statute was, as Plaintiffs admit, the Statute of Northampton, reproduced verbatim. *See* Pls. Mem. 16.[27] It was not uncommon for colonies and the early states to continue to follow English statutes.[28] Accordingly, several legislatures

---

[25] Although *Antonyuk* appears to have taken a different view, *see* 89 F.4th at 357 n.74, it did not identify and apply Virginia principles of statutory interpretation in doing so.

[26] As with the Statute of Northampton, *Bruen*'s discussion of the Virginia statute (and conclusion that it incorporated a "terror" element) focused on the use to which New York sought to put it, which was as a *general* carry prohibition, not a specific-location carry prohibition. *See* 597 U.S. at 49-50.

[27] The fact that this was a statute in force in North Carolina, and not one specifically enacted by the North Carolina legislature, is immaterial. That the people of North Carolina accepted application of this English statute evidences their understanding of the scope of their right to keep and bear arms, just as a statute their representatives had passed would have done.

[28] *See, e.g.*, *The Public Laws of the State of Rhode-Island and Providence Plantations* 78 (1798) ("[I]n all cases in which provision is not made, either at common law, or by the statutes aforesaid, the statute laws of England, which have heretofore been introduced into practice in this State, shall continue to be in force, until the General Assembly shall especially provide therefor."), Sleight 2d Decl. Ex. 2; III *Florida Statutes* 3 (1941) (quoting 1829 statute as providing that the "common and statute laws of England which are of a general and not a local nature … are declared to be of force in this state," provided that they are not inconsistent with the Constitution or federal or Florida law), Sleight 2d Decl. Ex. 3; 1 James Kent, *Commentaries on American Law* 473 (3d ed. 1836) ("It is also the established doctrine, that English statutes, passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country."), Sleight 2d Decl. Ex. 4.

27

commissioned individuals or committees to identify the English statutes in force in their state. *See, e.g.*, II *Laws of the State of North-Carolina* 1406 (1821) (reproducing 1817 statute providing that "a committee of three persons be appointed" and "[t]hat it shall be the duty of said commissioners to enumerate and specify those statutes and parts of statutes of Great Britain which are in force within this state"), Sleight 2d Decl. Ex. 5; III *Florida Statutes* 3 (1941) (reproducing 1845 statute providing that "the Governor[] is hereby authorized to appoint some suitable person, to collect and arrange … all the Statutes of Great Britain, of force in this State"), Sleight 2d Decl. Ex. 3.

Plaintiffs assert that the compilation *Antonyuk* cited is unreliable, because the preface to a later legislative publication criticized the compilation for being both under- and over-inclusive. *See* Pls. Mem. 16 (citing "Preface of the Commissioners of 1838," *Revised Code of North Carolina* xiii (1855)); Pls. Mem. Ex. 6, Dkt. 53-6 (exhibiting preface). But the only relevant question is whether the compilation was correct to include the Statute of Northampton, a question the preface's criticism does not answer. Moreover, there is very strong evidence that it *was* correct to include that statute. The same preface explains that, in 1817, the General Assembly appointed a new committee to compile the statutes of Great Britain in force in the state, and the resulting compilation, published in 1821, receives no criticism from the preface's authors. *See* Preface at xiii-xiv. Like the compilation to which *Antonyuk* cited, the 1821 compilation included the Statute of Northampton as one of the statutes in force in North Carolina. *See* I *Laws of the State of North-Carolina* 87 (1821) (listing "2 Edward 3, 1328, Chap. 3"), Sleight 2d Decl. Ex. 6.[29] And ultimately, Plaintiffs' complaints about statutory compilations amount to nothing, because in 1843 the North

---

[29] Notably, the 1845-1847 compilation of English laws in force in Florida also listed the Statute of Northampton as one of the laws in force. *See* III *Florida Statutes* 63 (1941), Sleight 2d Decl. Ex. 3. Although the compilation was never officially approved by the Governor or published, the Foreword to a later statutory volume explained that the compilation "is considered a magnificent work entitled to verity." *Id.* at 3.

Carolina Supreme Court declared that the prohibitions codified in the Statute of Northampton were also offenses at common law in the state. *See State v. Huntly*, 25 N.C. 418, 420-22 (N.C. 1843).[30]

Finally, Plaintiffs criticize *Antonyuk*'s reliance on 19th-century restrictions on firearms in gathering places. *See* Pls. Mem. 18-19. They have no response to three of the statutes (from Tennessee, Texas, and Missouri), and instead shift quickly to quibbling about cases from the Supreme Courts of each state that approved those statutes.[31] As for the 1889 Arizona and 1890 Oklahoma statutes, all they say is that they came too late—relying, once again, on the inapposite proposition that "late-19th-century evidence cannot provide much insight … *when it contradicts earlier evidence*." Pls. Mem. 19 (quoting *Bruen*, 597 U.S. at 66 (emphasis added)). Just as with parks, Plaintiffs have no "earlier evidence" establishing a right to carry guns in crowded gathering-places.

---

[30] Plaintiffs read *Huntly* as confirming that the offense contains a "terror" element, *see* Pls. Mem. 17, but again, that is because the specific offense at issue was carrying *generally*, not carrying in one of the specifically-prohibited locations (such as fairs or markets). The reporter's notes to the decision indicate that Huntly rode armed "upon the public highway" and "upon the premises" of a private individual. *See* 25 N.C. at 419.

[31] Each of those courts spoke with great clarity about the permissibility of restricting guns in places of public assembly. The Texas Supreme Court, for example, wrote:

> [W]e do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the state or federal constitution. We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.

*English v. State*, 35 Tex. 473, 478-79 (1872); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them[.]"); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (inferring constitutionality of prohibition on carrying while intoxicated from constitutionality of sensitive-places prohibition; "The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments. … The statute is designed to promote personal security, and to check and put down lawlessness, and is thus in perfect harmony with the constitution."); *Antonyuk*, 89 F.4th at 358 n.75.

### iii.   Plaintiffs rely on mistaken or irrelevant caselaw

In their opening brief, Defendants explained that four well-reasoned decisions since *Bruen* have upheld restrictions on guns in parks. *See* Defs. Mem. 31-32 (discussing *Antonyuk*, *Maryland Shall Issue*, *Kipke*, and *We the Patriots*). Plaintiffs' criticisms of *Antonyuk* are mistaken, for the reasons just discussed. *See supra* pp. 22-29. Of the remaining three cases, Plaintiffs mention one in passing in a footnote about a different case, *see* Pls. Mem. 13 n.6, and completely ignore the other two—even though Defendants also relied on them at the preliminary injunction stage, *see* Dkt. 18 at 20.[32] Instead of engaging with those decisions, Plaintiffs rely on a jumble of pre- and post-*Bruen* cases, none of which is persuasive.

### 1.   Plaintiffs' post-*Bruen* cases are mistaken

Plaintiffs cite three district court opinions that preliminarily enjoined restrictions on guns in parks, *see* Pl. Mem. 12-13, but they are not persuasive. *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), was vacated in relevant part by the Second Circuit because its application of *Bruen* was incorrect. *See Antonyuk*, 89 F.4th at 355-63. *Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023), incorrectly concluded that founding-era green spaces were "areas that today would be considered parks," *id.* at 640-41; *but see supra* pp. 10-11, 13, incorrectly disregarded 19th- and 20th-century parks restrictions, *see* 673 F. Supp. 3d at 642; *but see* supra Part II.A.iii, and relied on the misguided (and now vacated) *Antonyuk* district court decision, *see* 673 F. Supp. 3d at 642.[33] Indeed, the Third Circuit stayed the

---

[32] Plaintiffs purport (incorrectly, *see infra* pp. 36-37) to find support from one of the two cases for their standing argument, but ignore its analysis upholding Maryland's prohibition on guns in parks under the Second Amendment. *See* Pls. Mem. 25 (discussing *Kipke*).

[33] *Siegel v. Platkin*, 653 F. Supp. 3d 136 (D.N.J. 2023), which Plaintiffs mention in a footnote, *see* Pl. Mem. 12 n.6, was a temporary restraining order decision by the same district court judge.

injunction pending appeal in relevant part, *see Koons v. Att'y Gen. N.J.*, No. 23-1900, Dkt. 29 (3d Cir. June 20, 2023), indicating that the State "has made a strong showing that it is likely to succeed on the merits" of that appeal, *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (alteration adopted). *Wolford v. Lopez*, No. 1:23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023), *appeal docketed*, No. 23-16164 (9th Cir. Sept. 8, 2023), despite correctly observing that "parks around 1791 were not comparable to modern parks," *id.* at *21, then incorrectly concluded that the state's Reconstruction-era and later restrictions were insufficient in number and coverage, *see id.* at *21-24; *but see supra* pp.16-18, 21-24, and relied on the vacated *Antonyuk* decision, *see* 2023 WL 5043805, at *24. This Court should not follow these mistaken cases.

### 2. Plaintiffs' pre-*Bruen* cases are mistaken, irrelevant, or both

Plaintiffs devote considerable space to arguing that pre-*Bruen* caselaw supports their claims. *See* Pl. Mem. 21-23 (citing state court and district court decisions). They are mistaken. Before *Bruen*, this Court would have looked to *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), for applicable principles.[34] There, the Fourth Circuit upheld a federal parks restriction under intermediate scrutiny—observing, among other things, that the government has a "substantial interest" in providing for the safety of those who use national parks, and that "Daingerfield Island is a national park area where large numbers of people, including children, congregate for recreation." *Id.* at 473. The County's Parks Restriction easily would have satisfied

---

[34] *Masciandaro* rejected a challenge to a federal prohibition on possessing loaded firearms in motor vehicles in national park areas, brought by a defendant who had a gun in his car in a parking lot in Daingerfield Island, a national park area near Fairfax County. *See* 638 F.3d at 459-60. In the district court, Judge Ellis concluded that the government should prevail under *Heller*'s "sensitive places" doctrine as well as under intermediate scrutiny, observing that "National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities." *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009). The Fourth Circuit declined to decide the sensitive-places issue and affirmed under intermediate scrutiny. *See* 638 F.3d at 472-74.

*Masciandaro*'s standard, and Plaintiffs' reliance on non-binding Virginia,[35] Delaware,[36] and out-of-circuit district court decisions[37] is baseless. To the extent that they concern the "sensitive places" doctrine, none is as persuasive or relevant as Judge Ellis's decision in this district in *Masciandaro*, 648 F. Supp. 2d at 790.

\*     \*     \*

In sum, Plaintiffs have not established that the Parks Restriction violates the Second Amendment.[38] Instead, Defendants have established that the Parks Restriction is consistent with this nation's historical tradition of firearms regulation, including well over one hundred historical

[35] *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365 (Va. 2011), *upheld* a law prohibiting guns on specified parts of George Mason's campus and "while attending sporting, entertainment, or educational events" on campus—under the Second Amendment and the state constitution. *See id.* at 367, 370. Plaintiffs claim that dictum suggests the Virginia Supreme Court would not have deemed parks sensitive places had that issue been presented, because parks are "open to the general public." Pl. Mot. 14 (quoting 704 S. E. 2d at 370). That argument has already failed in their state-court action. *See LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203, at \*18 (Fairfax Cnty. Cir. Ct. June 23, 2023) (Sleight Decl. Ex. 14, Dkt. 47-14) ("[T]he *DiGiacinto* court left open the argument on that issue[.]"). In any event, any suggestion that a place "open to the general public" cannot be sensitive did not survive *Bruen*'s endorsement of courthouses and polling places as sensitive places. *See* 597 U.S. at 30.

[36] *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), applied Delaware's constitutional right, which is "intentionally broader than the Second Amendment." *Id.* at 636 (citation omitted).

[37] *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675 (N.D. Ill. 2021), held that the "record" Cook County presented failed to demonstrate that all of its forest preserve land was a "sensitive place," *id.* at 698, on a very different record than the County presents here. And *Morris v. U.S. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120 (D. Idaho 2014), premised its mistaken analysis on a panel decision that the Ninth Circuit subsequently overturned en banc. *See id.* at 1122-25 (citing *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *vacated*, 824 F.3d 919 (9th Cir. 2016)).

[38] Even more so, Plaintiffs have failed to establish that "no set of circumstances exists" under which the Parks Restriction "would be valid," or that it "lacks a plainly legitimate sweep." *See supra* pp. 8-9 (explaining facial challenge standard). As Defendants explained in their initial brief, to satisfy that standard, Plaintiffs would have to establish that prohibiting firearms is unconstitutional even in playground parks like Farrington Park and Clemyjontri Park, and even on the County's golf courses where the County acts as proprietor and market participant. *See* Defs. Mem. 24-25. Plaintiffs' motion for summary judgment does not even try to make that showing.

laws specifically prohibiting firearms in parks. Not only were parks restrictions numerous, but research has not revealed *any* instance of a court invalidating them. In other words, they "were not merely adopted by legislative bodies in the respective cities in which they applied—they were apparently accepted without any constitutional objection by anyone." *Antonyuk*, 89 F.4th at 359; *see also Bruen*, 597 U.S. at 30 (finding it "settled" that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). This Court should deny summary judgment to Plaintiffs and grant summary judgment to Defendants on the Parks Restriction.

### C.   The Events Restriction is Constitutional under *Bruen*

Plaintiffs' Second Amendment challenge to the Events Restriction likewise fails. As Defendants explained in their moving brief, just as with the Parks Restriction, Plaintiffs have not demonstrated that the Second Amendment's text covers the specific conduct they wish to engage in and claim the Events Restriction prohibits. *See* Defs. Mem. at 32. Even if they had, the Events Restriction also sits comfortably within this nation's historical tradition of firearm regulation. *See id.* at 32-34.[39]

The Events Restriction is relevantly similar to the "public assembly," "public gathering," and "to the terror of the people" laws cited in Defendants' opening brief and further discussed above. *See* Defs. Mem. at 26-29, 32-33; *supra* pp. 25-29; Filindra Report ¶¶ 25-30, 34-42

---

[39] The scope of Plaintiffs' Second Amendment challenge to the Events Restriction is not entirely clear. The Complaint appears to limit Plaintiffs' objection to the prohibition on guns in the areas "adjacent to" a permitted event or to an event that requires a permit. *See* Compl. ¶¶ 47-51. Plaintiffs' summary judgment brief, however, frames the challenge somewhat differently, as against the prohibition "at 'an event that would otherwise require a permit' or the adjacent area thereto." *See* Pls. Mem. at 23. Regardless, the challenge fails, and the Events Restriction is constitutional in its entirety, for the reasons set out in Defendants' moving brief and in this Section.

(concluding, based on survey of area residents, that the potential presence of guns at open-air farmers' markets and political protests in Fairfax County, "produces 'chilling effects,' that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe"). It is analogous to historical laws restricting guns at gathering places that implicate heightened tensions or political activity: election grounds and legislative meetings. *See* Defs. Mem. at 33. And even if Plaintiffs could somehow establish that an area adjacent to an event was not itself sensitive—which they cannot—there is also a robust historical tradition of prohibiting firearms not only within an area of particular sensitivity, but around it. *See* Defs. Mem. at 33-34 (citing cases); Parks Table, Sleight Decl. Ex. 18, Dkt. 47-18, rows 5, 16-17, 19, 29; *see also Livingston v. State*, 3 Tex. App. 74, 75 (Tex. App. 1877) (upholding conviction "for carrying a gun during the hours the polls were open, within a distance of one-half a mile of a place of election").

Plaintiffs have no response to this robust historical record. Instead, they argue that uncertainty about restriction's scope somehow "chills [their] exercise of the right to bear arms and leaves them vulnerable to arrest for inadvertent violations." Pls. Mem. at 23. But, as discussed below in connection with Plaintiffs' similar vagueness challenge, the Ordinance's notice requirement and the County's "no sign, no enforcement" policy fully address any purported fear of "inadvertent violations" and any plausible claim of "chill." *See infra* Part III; § 6-2-1(D)(1); Becker Decl. ¶¶ 10-26 & Ex. C. That same requirement and policy also distinguish the Ordinance from the law at issue in *People v. Chairez* (cited in Pls. Mem. at 23-24), where the court noted that "the most troubling aspect [of the law] is the lack of any notification where the 1000-foot restriction zone starts and where it could end." 104 N.E.3d 1158, 1176 (Ill. 2018). Here, by

contrast, Plaintiffs are subject to penalties only if the event or area at issue is marked by appropriate signage. *See infra* Part III.B.[40]

## III.    The Ordinance Does Not Violate Due Process

Plaintiffs claim that the portion of the Events Restriction applying to "an event that would otherwise require a County permit," or to an area "adjacent" to such an event, is unconstitutionally vague. Pls. Mem. 24-25.[41] Their motion fails on this point both because Plaintiffs lack standing and because the challenged portion of the Ordinance is not unconstitutionally vague.

### A.  Plaintiffs Lack Standing to Bring Their Vagueness Claim

To establish standing, Plaintiffs must prove that they are or will be injured by each portion of the Ordinance they challenge. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A threat of prosecution can constitute the requisite injury-in-fact, but only if such threat is "credible," *id.* at 159, meaning it is not "imaginary or speculative," *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2020) (cleaned up).

As Defendants explained in their moving brief, *see* Defs. Mem. 35-36, Plaintiffs have not established a credible threat of prosecution under the portions of the Events Restriction they challenge as vague. They assert that they possess, carry, and transport firearms in public areas

---

[40] Plaintiffs also lack standing to challenge the Events Restriction for the reasons discussed in Defendants' opening brief. *See* Defs. Mem. at 34 n.31; *Antonyuk*, 89 F.4th at 376-79 (holding that Second Amendment challenge to prohibition on firearms at "any gathering of individuals to collectively express their constitutional rights to protest or assemble" failed on justiciability grounds because—just like in this case—plaintiffs did not demonstrate that they had attended any covered "gathering" while armed, were dissuaded from doing so, or had plans to do so in the future). And, as explained below, *see infra* pp. 36-37, the decision in *Kipke*, 2023 WL 6381503, at *15 (cited in Pls. Mem. at 25), does not change that analysis.

[41] Plaintiffs do not raise a due process challenge to the aspect of the Events Restriction that applies to County-permitted events or areas adjacent to County-permitted events. *See* Compl. ¶¶ 52-59. But if even Plaintiffs had challenged the Events Restriction in its entirety, their challenge would fail for the reasons set out in this Section.

without knowing whether these areas are being used by events that would otherwise require a permit, or are adjacent to such areas. Holzhauer Decl. ¶ 5; Taubman Decl. ¶ 5; LaFave Decl. ¶ 7; *see* Dkt. 1-1 (Nov. 22, 2023 LaFave Decl.) ¶ 5. But they have offered no evidence to support a credible threat of prosecution for such conduct—such as that the County has enforced or threatened enforcement in such areas when there is no notice of the prohibitions. *See* Defs. Mem. 35; *see also Md. Shall Issue*, 971 F.3d at 218; *Md. Shall Issue, Inc. v. Hogan*, 353 F. Supp. 3d 400, 419 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020). Indeed, the evidence shows that the County expressly *precludes* enforcement of the Ordinance in the manner Plaintiffs say they fear—as the state court found in Plaintiffs' near-identical case. *See* Defs. Mem. 35-36 (quoting *LaFave*, 2023 Va. Cir. LEXIS 203, at *4-5 (Sleight Decl. Ex. 14, Dkt. 47-14)); Becker Decl. ¶¶ 10-24 (describing police officers' training in this policy); *id*. Ex. C (CSM provisions establishing policy). The Fourth Circuit has relied on similar official guidance to find that other plaintiffs faced no credible threat of prosecution, and thus lacked standing to pursue their pre-enforcement facial vagueness challenge. *See Md. Shall Issue*, 971 F.3d at 218 (relying on State Police FAQ). Under that binding and directly applicable precedent, this Court should do the same.

Plaintiffs rely on *Kipke* to support their standing theory. *See* Pls. Mem. 25. In *Kipke*, the district court found that an individual had standing to challenge Maryland's restriction on firearms near public demonstrations based on her statement that, but for her fear prosecution, she would carry a handgun at such demonstrations *and remain there after a law enforcement officer ordered her to leave.* 2023 WL 6381503, at *15. Those additional facts—missing in this case—are the difference between merely disagreeing with a law and facing a credible threat of enforcement under it. Plaintiffs here, by contrast, do not claim that they wish to carry firearms into an event where posted signs indicate that doing so is forbidden, let alone stay there if a police officer told

them to leave—which, given the Defendants' enforcement policy, is the only circumstance under which they could face a threat of prosecution.

Plaintiffs also suggest that they are injured "to the extent [that they] … are chilled from exercising their right to bear arms." Pls. Mem. 26. But the law is clear that "allegations of subjective chill" or "self-inflicted injuries" do not suffice to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *see Doe*, 2024 WL 2037144, at *5 (concluding that "neither plaintiffs' subjective fears of possible future harm nor their choice to refrain from exercising their Second Amendment rights is a concrete injury"); *Robinson v. Sessions*, 721 F. App'x 20, 23 n.2 (2d Cir. 2018) ("Since the appellants fail to demonstrate that they have been or will imminently be subject to the challenged conduct, their unsubstantiated fears of a speculative harm or a 'chill' on Second Amendment activity are insufficient to confer standing.").[42] And in any event, Plaintiffs' declarations belie any argument that uncertainty about where the Events Restriction applies somehow "chills" them from carrying guns in particular locations. *See* Holzhauer Decl. ¶ 5 (stating that he "continue[s]" to "possess[], carr[y], and transport[] firearms ... on the public streets, roads, alleys, sidewalks, public rights-of-way, and other places that are open to the public in Fairfax County" just as he did "[b]efore the Ordinance's enactment" when "unaware that such places are being used by or are adjacent to a permitted event or an event that

---

[42] Plaintiffs attempt to rely on First Amendment caselaw in support of this argument, *see* Pls. Mem. at 25-26, but the Fourth Circuit has declined to "import substantive First Amendment principles wholesale into Second Amendment jurisprudence." *Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013) (declining invitation to import prior restraint theory into Second Amendment context); *see also supra* pp. 8-9. And, even in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]" *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 662 F. Supp. 3d 557, 571 (D. Md. 2023), *aff'd*, 91 F.4th 238 (4th Cir. 2024).

would otherwise require a permit"); Taubman Decl. ¶ 5 (same); Nov. 22, 2023 LaFave Decl. ¶ 5 (same); *see also* LaFave Decl. ¶ 7.

### B.  The Events Restriction Is Not Void for Vagueness

Plaintiffs' due process challenge also fails on the merits. As Defendants explained in their moving brief, *see* Defs. Mem. 36, under the Due Process Clause, a law is impermissibly vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).[43] Moreover, a court must construe a challenged law, "if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quotation marks omitted); *see also* Defs. Mem. 36-37 n.34 (explaining that Virginia law also embraces constitutional avoidance). In doing so, the court examines the law "as a whole," as well as "'any limiting construction that a state court or enforcement agency has proffered.'" *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012) (citation omitted).

Under the undisputed facts of this case, Plaintiffs cannot establish a violation of due process. Contrary to their assertion, *see* Pls. Mem. 24-25, neither Plaintiffs nor law enforcement need to guess whether a given event is subject to the Ordinance. As Defendants have explained, *see* Defs. Mem. 37-38, they will know with complete certainty because the Ordinance and the

---

[43] Plaintiffs cite *Manning v. Caldwell for City of Roanoake*, 930 F.3d 264, 272-73 (4th Cir. 2019), for the proposition that criminal statutes are reviewed under a "stricter" vagueness standard than civil laws. Pls. Mem. 24. Even so, *Manning* makes clear that the core inquiry is the same in both contexts, asking whether a statute provides "a standard of conduct by which persons can determine whether they are violating the statute" and "minimal guidelines to govern law enforcement." *Manning*, 930 F.3d at 274 (cleaned up). And while a scienter requirement "tends to defeat vagueness challenges to criminal statutes," it is not necessary to do so. *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) (cleaned up).

CSM establish that the Events Restriction applies only when notice of the Ordinance is posted. The Ordinance itself makes this clear, by mandating that "[n]otice of this ordinance *shall be posted*" at entrances or places of ingress to places being used by or adjacent to covered events, *see* § 6-2-1(D)(1)(iv) (emphasis added), and even if there were any doubt about the clarity of this language, legislative history would eliminate it, *see* Defs. Mem. 37 n.35. The Command Staff Memorandum reinforces that requirement by instructing police officers that the Ordinance applies and can be enforced only where appropriate signage is posted. Becker Decl. ¶ 21 & Ex. C; *see, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 148-49 (4th Cir. 2017) (en banc) (deferring to limiting constructions in Attorney General opinion and Maryland State Police advisory in rejecting vagueness challenge to state firearms law). Accordingly, a person of ordinary intelligence knows precisely what is prohibited: carrying in locations where signs give notice of the Ordinance and state that firearms are forbidden there. *See also* Sleight Decl. Ex. 33, Dkt. 47-41 (LaFave Dep. Tr. 90:5-91:9). Plaintiffs' due process claims thus have no merit.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and enter final judgment in Defendants' favor.

Respectfully submitted,

Date: May 10, 2024

THE COUNTY OF FAIRFAX, VIRGINIA,
and the CHIEF OF POLICE, KEVIN DAVIS, in his
official capacity

By: *s/ Anders T. Sleight*
*Counsel*

Douglas R. Kay, VSB No. 35468
Thomas W. Repczynski, VSB No. 39967
Anders T. Sleight, VSB No. 84458
OFFIT KURMAN, P.C.
8000 Towers Crescent Drive, Suite 1400
Tysons Corner, Virginia  22182
Telephone:  (703) 745-1800
Facsimile:  (703) 745-1835
dkay@offitkurman.com
trepczynski@offitkurman.com
Anders.sleight@offitkurman.com
*Co-Counsel for Defendants*

Daniel Robinson (VSB No. 78985)
John W. Burton (VSB No. 42223)
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
Telephone: (703) 324-2421
Facsimile: (703) 324-2665
Daniel.Robinson@fairfaxcounty.gov
John.Burton@fairfaxcounty.gov
*Co-Counsel for Defendants*

Janet Carter (admitted *pro hac vice*)
William J. Taylor, Jr. (admitted *pro hac vice*)
EVERYTOWN LAW
450 Lexington Avenue, P.O Box 4184
New York, New York 10163
Telephone: (646) 324-8174
jcarter@everytown.org
wtaylor@everytown.org
*Co-Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2024, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

        Stephen P. Halbrook
        3925 Chain Bridge Road, Suite 403
        Fairfax, VA 22030
        (703) 352-7276
        protell@aol.com


        Christopher M. Day
        Earl N. "Trey" Mayfield, III
        10521 Judicial Drive, Suite 200
        Fairfax, VA 22030
        (703) 268-5600
        cmday@jurisday.com
        tmayfield@jurisday.com

                                */s/* Anders T. Sleight
                                Anders T. Sleight