IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| KIMBERLY LAFAVE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No: 1:23-cv-1605-WBP |
| | ) | |
| THE COUNTY OF FAIRFAX, VIRGINIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs, Kimberly LaFave, Glenn M. Taubman, and Robert Holzhauer respond to the

Motion for Summary Judgment by Defendants, the County of Fairfax, Virginia, and its Chief of

Police, Kevin Davis.

## TABLE OF CONTENTS

**Page**

Table of Contents ........................................................................................................... i

Table of Authorities ..................................................................................................... iii

Introduction ...................................................................................................................1

I.  The County Ignores and Misstates *Bruen*'s Historical Test,
Misrepresents History from the Founding-Era, and Relies on
Irrelevant Practices from Well After the Founding-Era ..................................................5

    A.  The County Provides No Founding-Era History
    Demonstrating Firearms Were Banned in Crowded
    Places, a Conclusion *Bruen* Expressly Rejects ...............................................6

        1.  Both Virginia and North Carolina Included
        a "Terror" Element in Their "Going Armed"
        Laws, Undercutting *Antonyuk*'s Purported
        Founding-Era Analogues ....................................................................6

        2.  Contrary to *Antonyuk*, the Statute of
        Northampton Reprinted in Martin's *Collection*
        Was Not a "Law" Enacted by North Carolina .......................................7

        3.  *Antonyuk* Disregards North Carolina
        Judicial Precedents on the "Terror" Element.........................................8

        4.  Firearms Were Ubiquitous in Public in the
        Founding Era.....................................................................................9

        5.  Late 19th Century Firearms Restrictions
        Unmoored by Founding-Era Analogues Are
        Irrelevant Under *Bruen*, ...................................................................12

        6.  No Restrictions on Peaceable Carry in Parks
        Existed at the Founding, and *Bruen* Excludes
        Consideration of Late 19th Century Restrictions....................................15

        7.  *Antonyuk*'s Reliance on Late 19th Century
        Restrictions on Firearms in "Crowded Places"
        Misrepresents Those Cases, and/or Defies the
        Supreme <u>Court's</u> Rejection of Such Analogues
        in *Bruen*.........................................................................................20

B.  The Right to Bear Arms May Not Be Infringed
Because Some People "Fear" It ........................................................................................21

C. The County's Urban-Suburban Character, and Its
Comparisons to Schools and Private Property Are
Irrelevant .........................................................................................................................23

D. Plaintiffs May Mount a Facial Challenge to the Parks
And Event Restriction.......................................................................................................24

II. Plaintiffs Have Standing to Assert Their Due Process Claims .................................................25

III. The Police Department's Enforcement Policy Memo Has No
Legal Effect on Plaintiffs' Right to Seek Relief from the County's
Unconstitutional Law.......................................................................................................26

IV. The County's Unconstitutional Criminal Law Creates Injury
Redressable by Injunction.......................................................................................................27

Conclusion .........................................................................................................................28

# TABLE OF AUTHORITIES

Page

## CASES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..........................................................1

*Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021) .....................................24

*Andrews v. State*, 50 Tenn. 165 (1871)..........................................................20

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d. Cir. 2023), *cert. pet.*
filed Feb. 20, 2024 (2d Cir. 2023) ..................................................... *passim*

*Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289 (1979)..........................................................27

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ...........................................3, 22

*Bryant v. Woodall*, 1 F4th 280 (4th Cir. 2021) ..................................................................26

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) ..................................................................3

*Carter v. Commonwealth*, 269 Va. 44 (2005)..................................................................21

*Bachellar v. Maryland*, 397 U.S. 564 (1970) ..................................................................22

*United States v. Grace*, 460 U.S. 171 (1983)..................................................................24

*Chapman v. Cal.*, 386 U.S. 18 (1967)..................................................................1,2

*City of Charleston, S.C., v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002)....................23

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..................................................................26

*Cox v. Louisiana*, 379 U.S. 536 (1965) ..................................................................22

*Cutchin v. Roanoke*, 113 Va. 452 (1912)..................................................................26

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..................................................................5, 22

*English v. State*, 35 Tex. 473 (1871)................................................................20

*EQT Prod. Co. v. Wender*, 870 F.3d 322 (4th Cir. 2017) ............................26

*Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. 464, 482 (2020) ............26

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .........................................14

*Hardaway v. Nigrelli,* 639 F.Supp.3d 422 (W.D.N.Y. 2022) ........................11

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,* 565 U.S. 171 (2012) ..........14

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) .....................................25, 27

*Kipke v. Moore*, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .......................25

*Kolender v. Lawson*, 461 U.S. 352 (1983)...................................................24

*Koons v. Plotkin,* 673 F.Supp.3d 515 (D.N.J. 2023) ...........................9-11, 16

*Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3rd Cir. 2024) ...................14

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)....................................3

*Lucas v. Forty-Fourth Gen'l Ass. of State of Colo.,* 377 U.S. 713 (1964) ......................1

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)......................................23

*May v. Bonta*, 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023).....................22, 23

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2019) ............................2-5

*Near v. Minnesota*, 283 U.S. 697 (1931) ....................................................14

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) .....................14

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ................................ *passim*

*People ex rel. Houghton v. Andrews*, 104 N.Y. 570 (1887) ..........................................................18

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..............................................................................14

*State v. Dawson,* 272 N.C. 535 (1968) ........................................................................................8

*State v. Huntly,* 25 N.C. (3 Ired.) 418 (1843)...............................................................................8

*State v. Lancaster*, 895 S.E.2d 337 (N.C. 2023)..........................................................................8

*State v. Shelby*, 90 Mo. 302 (1886)...........................................................................................20

*Steffel v. Thompson*, 415 U.S. 452 (1974) .................................................................................27

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)..........................................................25

*The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012) ...............................27

*Thompson v. Smith*, 155 Va. 367 (1930).....................................................................................26

*Timbs v. Ind.*, 139 S. Ct. 682 (2019) ......................................................................................2, 14

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003)............................................3

United States v. Caputo, 517 F.3d 935 (7th Cir. 2008) ............................................................ 4-5

*United States v. Cortez*, 205 F.Supp.3d 768 (E.D. Va. 2016) .......................................................4

*United States v. Hasson*, 26 F.4th 610 (4th Cir. 2022) ...............................................................26

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) ................................................................5

*Virginia v. Moore*, 553 U.S. 164 (2008)....................................................................................14

*Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) ...............................26

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. CONST., AMEND. I ............................................................................................1

U.S. CONST., AMEND. II ..................................................................................... passim

U.S. CONST., AMEND. IV .......................................................................................14

U.S. CONST., AMEND. V .......................................................................................14

U.S. CONST., AMEND. VI .......................................................................................14

U.S. CONST., AMEND. VIII .....................................................................................14

U.S. CONST., AMEND. XIV ....................................................................... 1, 2, 12, 13

42 U.S.C. § 1983 ...................................................................................................1

Va. Code § 18.2-53.1 ............................................................................................21

Va. Code § 18.2-56.1A ..........................................................................................21

Va. Code § 18.2-56.A1 ..........................................................................................21

Va. Code § 18.2-57 ...............................................................................................21

Va. Code § 18.2-280 .............................................................................................21

Va. Code § 18.2-282 .............................................................................................21

1328 Statute of Northampton ...........................................................................2, 5, 6

## OTHER AUTHORITIES

3 *Autobiography of John Adams* (1961) .....................................................................4

Bartlett, John R., *Records of the Colony of Rhode Island and Providence Plantations,
in New England* (Providence, A.C. Greene & Bros. 1856) ........................................10

Beamish, Anne, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. (2021)............16, 17

Blackmun, Josh & Shapiro, Ilya, *Keeping Pandora's Box Sealed: Privileges or Immunities, The Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States,* 8 GEO. J.L. & PUB. POL'Y 1 (Winter 2010) ..................................................13

Browne, William Hand, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667* (Baltimore, Md. Hist. Soc'y 1885) ........................................10

BSA Shotgun Merit Badge: *See* https://www.scouting.org/merit-badges/shotgun-shooting/ ......................................3

BSA Rifle Shooting Merit Badge: *See* https://www.scouting.org/merit-badges/rifle-shooting/ ..........................................3

Central Park Bd. of Commissioners Mtng. Minutes, April 30, 1958 ...........................................18

Collection of All Such Acts of the General Assembly of Virginia (1794).....................................6

*Collection of Statutes of the Parliament of England in Force in the State of North Carolina* (F. Martin Ed. 1792) ......................................7

Hacker, J. David, Decennial Life Tables for the White Population of the United States, 1790–1900, Hist. Methods (April 2010) ....................................13

Halbrook, Stephen P., *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* (2021).......................................10

Hawkins, *Pleas of the Crown*..........................................................................8

Hening, William Waller, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 174 (New York, R. & W. & G. Bartow 1823)...............................10

*In re Dept. of Public Parks,* 85 N.Y. 459 (1881)........................................18

Iredell, James, *Laws of the State of North-Carolina* (1791) ..........................................7

Kopel, David & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205(2018) ......................................11

List of Fairfax high schools with rifle clubs: https://sites.google.com/site/potomachighschoolrifle/schools.......................................3

Madison, James, 1 Annals of Cong., 439 ..................................................................1

Marbury, Horatio & William A. Crawford, *Digest of the Laws of the State
of Georgia* (Savannah, Seymour, Woolhopter & Stebbins 1802) ...............................11

McCord, David J., *Statutes at Large of South Carolina* (Columbia,
A.S. Johnston 1840) ........................................................................................ 10-11

McGrath, Tim, *James Monroe: A Life* (N.Y.: Dutton, 2020) .........................................4

New York City Planning, *Population Fact Finder,*
https://popfactfinder.planning.nyc.gov/explorer/cities/NYC?compareTo=1,
accessed Jan. 15, 2024. ......................................................................................23

"Preface of the Commissioners of 1838," *Revised Code of North Carolina* (1855) ......................7

Robinson High School Rifle Club: https://www.robinsonrifle.org/wp/about-us/ ..........................3

Shurtleff, Nathaniel B., *Records of the Governor and Company of the Massachusetts
Bay in New England* (Boston, William White Press 1853) ........................................10

Smith, Mark, *Attention Originalists: The Second Amendment Was
Adopted in 1791, Not 1868*, 31 Harv. J.L. & Pub. Pol'y 1 (Fall 2022).......................................14

Trumbell, J. Hammond, *The Public Records of the Colony Connecticut, Prior
to the Union with New Haven Colony* 95 (Hartford, Brown & Parsons 1850)............................10

Trust for Public Land, *The Oldest City Parks*..............................................................15

Tyler, Lyon Gardiner, *Narratives of Early Virginia, 1606–1625,*
(Charles Scribner's Sons, 1907) ..............................................................................9

Walls, Margaret, *Parks & Recreation in the U.S.: Local Park Systems*, Resources
for the Future (June 2009) ...................................................................................16

Webster, Noah, *An American Dictionary of the English Language* (1828) .................................16

https://en.wikipedia.org/wiki/Deborah_Sampson.........................................................4

https://en.wikipedia.org/wiki/Joseph_Plumb_Martin ....................................................4

https://en.wikipedia.org/wiki/Virginia_Thrasher.........................................................3

*World Population Review*, https://worldpopulationreview.com/boroughs/manhattan-population.
Accessed Jan. 15, 2024 ......................................................................................23

# INTRODUCTION

**"The Second Amendment's plain text presumptively guarantees a right to bear arms in public for self-defense."** *New York State Rifle & Pistol Ass'n, Inc., v. Bruen,* **597 U.S. 1, 33 (2022).**

The Supreme Court's holding means exactly what it says. In practice, it means that wherever someone goes in public spaces in America, every law-abiding adult in that space has the presumptive right to bear arms. "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id.* at 70 (citation omitted).

That some—or even all—of the residents of Fairfax County don't want guns in public places is utterly irrelevant to determining whether the right exists. "A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-Fourth Gen'l Ass. of State of Colo.,* 377 U.S. 713, 736 (1964). Plaintiffs bring suit under 42 U.S.C. § 1983, which gives the Fourteenth Amendment its vitality, and is designed for the very purpose at hand: To stymie the "diseased public sentiment" that would use local governments to deny other Americans their most basic civil rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 223 (1970) (Brennan, J., concurring in relevant part). Regardless of how many Fairfax residents believe that certain constitutional rights should not apply in the County, or how strongly they feel, this Court must ensure that those rights are fully available to all who seek to exercise them.

The independent federal courts are the Bill of Rights' guardians. *Chapman v. Cal.*, 386 U.S. 18, 21 and n.4 (1967) (citing James Madison, 1 Annals of Cong., 439). Article III courts "cannot leave to the States the formulation of the authoritative laws, rules, and remedies

designed to protect people from infractions by the States of federally guaranteed rights."
*Chapman*, 386 U.S. at 21.  "Incorporated Bill of Rights guarantees are 'enforced against the
States under the Fourteenth Amendment according to the same standards that protect those
personal rights against federal encroachment.'"  *Timbs v. Ind.*, 139 S.Ct. 682, 687 (2019)
(quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765-77 (2019)).

　　*Bruen* directed that those seeking to restrict firearms situations must find factually
analogous practices and circumstances from the Founding-era demonstrating that the modern
restriction the government seeks is something the American people would have practiced in
1791.  The County does the exact opposite. *It does not accurately cite a single supporting law or
practice from that time.* Instead, the County larders the record with precisely the kind of
"support" the Supreme Court explicitly stated *may not* be used to rationalize such restrictions.
The County invokes the medieval English Statute of Northampton, which *Bruen* says is
irrelevant to determining American law, and didn't even apply to firearms, which had not yet
even been invented. The County misrepresents laws from Virginia and North Carolina
prohibiting the *criminal* use of guns, pretending as if they were general bans. The County points
to administrative regulations for parks from 1858 and beyond that no one voted on, and that
*Bruen* already stated are irrelevant to the analysis.  And so the story goes. The County's entire
historical case depends on inundating the Court with what *Bruen* has already forbidden, or
misrepresenting a handful of cases directed at the criminal use of weapons as applying to the
bearing of arms generally.[1]  This ruse is necessary for the County's case because there is no
escaping the historical fact that firearms were borne in public almost ubiquitously at the time the
Bill of Rights was ratified.

---

[1] The incompatibility of the County's authorities with *Bruen*'s instructions is summarized in Ex.
A hereto.

Repairing to the first refuge of constitutional scoundrels, the County repeatedly invokes "the children," as if that might somehow legitimize its flagrantly unconstitutional Ordinance. *See, e.g.,* Fairfax S.J. at 4-5, 10-12, 24-25, 31. The government has no authority to prevent children from being exposed to legal activities and ideas on the rationale that some adults find those activities and ideas distasteful. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795-804 (2011). The constitutional rights of adults cannot be diminished under the guise of society's interest (whether real or feigned) in protecting children. *See, e.g., United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 222 (2003); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 580-82 (2001) (Kennedy, J., concurring); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 710-11 and n.5 (1977) (Powell, J., concurring).

Notwithstanding the County's professed concern at what might happen if law-abiding adults carry firearms into parks (or on the streets and sidewalks), children do not crumble into ash upon seeing—or even touching(!)—a firearm. Though it may come as a surprise to the County, the Scouts (whom the County observes often frequent the parks), Fairfax S.J. at 5, actually have merit badges for shooting shotguns and rifles.[2] The County can point to no harm that has befallen them from that in-depth exposure. Perhaps even more shocking to the County, the Fairfax public high schools have *rifle clubs*, in which children not only see, but actually *use* firearms, including .22 caliber rifles.[3] Indeed, Fairfax children witness firearms being carried by

---

[2] BSA Shotgun Merit Badge: *See* https://www.scouting.org/merit-badges/shotgun-shooting/;
BSA Rifle Shooting Merit Badge: *See* https://www.scouting.org/merit-badges/rifle-shooting/.

[3] List of Fairfax high schools with rifle clubs:
https://sites.google.com/site/potomachighschoolrifle/schools; Robinson High School Rifle Club:
https://www.robinsonrifle.org/wp/about-us/ (using both air rifles and .22 caliber rifles). Indeed,
one member of the West Springfield High School Rifle Team won an Olympic Gold Medal for
the United States in 2016. *See* https://en.wikipedia.org/wiki/Virginia_Thrasher.

adults with some regularity; some of those adults are called "police officers," while others (at least in places where the County hasn't banned them), are known as "citizens bearing arms." The County offers no explanation of how so many hundreds of thousands of children have been able to survive these encounters with firearms without harm befalling them.[4]  The County's ban "protects" no one and nothing but the ideological preferences of some of its residents. But the Second Amendment, like the rest of the Bill of Rights, is not subject to popularity contests. No matter how many people in Fairfax wish to render other people (children included) undefended, they have no right to use local government to deprive others of that fundamental choice.

Seeking to bolster a case that fails on the historical merits, the County proffers the testimony of "experts" on the historical development of U.S. parks, and surveying public attitudes in Fairfax towards firearms.  *See, e.g.,* Fairfax S.J. at 8.  While the County is certainly free to introduce historical laws demonstrating prior American practices concerning firearms (indeed, *Bruen* requires that record), experts are unnecessary for this exercise.  Determining what the law is, and how it applies to ordinary facts—like how the public uses parks, sidewalks, and streets—is solely for the legal expert in the courtroom known as a "judge."  *United States v. Cortez*, 205 F.Supp.3d 768, 775-76 (E.D.Va. 2016) (citing *United States v. Caputo*, 517 F.3d

---

[4]American children in the Founding-era were, of course, quite familiar with firearms.  *E.g.,* John Adams wrote that he spent his childhood "above all in shooting, to which Diversion I was addicted to a degree of Ardor which I know not that I ever felt for any other Business, Study or Amusement." 3 *Autobiography of John Adams* 257-61 (1961). https://founders.archives.gov/documents/Adams/01-03-02-0016-0002.  When he was 11 years-old, James Monroe "left for school, carrying his books under one arm with his powder horn under the other and his musket slung across his back." Tim McGrath, *James Monroe: A Life* Kindle loc. 244 (N.Y.: Dutton, 2020). The American Revolution even witnessed children volunteering to fight with firearms, including Joseph Plumb Martin, who joined the Connecticut Militia at age 15, *see* https://en.wikipedia.org/wiki/Joseph_Plumb_Martin; and Deborah Sampson, who fought in the Continental Army at the same age. *See* https://en.wikipedia.org/wiki/Deborah_Sampson.

935, 942 (7th Cir.2008); *United States v. McIver*, 470 F.3d 550, 562 (4th Cir.2006)). The Supreme Court required no experts to discern the Second Amendment's meaning in *Bruen*, or in its predecessors, *District of Columbia v. Heller* or *McDonald v. City of Chicago*. They are no more needed here.

At bottom, public parks, streets, and sidewalks are not sensitive places. If they were, then every public space would be a sensitive place, and the Second Amendment would be a nullity outside of one's home. That is the result Fairfax desires, but the Constitution does not permit it.

**I.  The County Ignores and Misstates *Bruen*'s Historical Test, Misrepresents History from the Founding-Era, and Relies on Irrelevant Practices from Well After the Founding Era.**

*Bruen* held that the Second Amendment presumptively protects conduct covered by its plain text, and the government must demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 17. The Court recognized Founding-era analogues for certain "sensitive places," but such places may not be expanded to include "all places of public congregation that are not isolated from law enforcement…." *Id*. at 30-31.

The County's modern case support to justify the park ban comes primarily from *Antonyuk v. Chiumento*, (S.J. at 15-19, 21-22, 24-27, 31-34) but that court's analysis made critical errors. 89 F.4th 271, 356 (2d. Cir. 2023), *cert. pet.* filed Feb. 20, 2024. Regurgitating *Antonyuk*, the County invokes the 1328 Statute of Northampton for its historical analysis, but *Bruen* expressly stated the Statute "has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. As *Bruen* pointed out, the Statue is irrelevant for many reasons, not least of which is that it wasn't referring to firearms (which wouldn't be invented for another 200 years), and the "arms" referenced was a Middle English term for "armor," not weapons. *Id*.

**A.  The County Provides No Founding-Era History Demonstrating Firearms Were Banned in Crowded Places, a Conclusion *Bruen* Expressly Rejects.**

*Antonyuk* claims that *Bruen* did not address "the more specific prohibitions in the statute such as carriage in fairs and markets," today's "quintessentially crowded places" where *Antonyuk* asserts firearms may be banned without regard to conduct.  89 F.4th at 357 n.74.  But *Bruen* recognized no such reading of the Statute, instead showing that in the 17th and 18th centuries, the Statute was read *not* as applying to be armed in general, but only applying to going armed with evil intent in a manner to terrify others.  *Bruen*, 597 U.S. at 44-45.  Moreover, *Bruen* expressly dismissed the notion that firearms may be banned from crowded places on that basis: "[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally" by the police.  *Id*. at 31.

Some colonies made it an offense to "ride or go armed Offensively," which *Bruen* said "merely codified the existing common-law offense of bearing arms to terrorize the people…."  *Id*. at 47.  A 1786 Virginia statute provided that no person shall "go nor ride armed … in fairs or markets, or in other places, *in terror* of the Country." *Id.* at 49 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794) (emphasis added)).

**1.  Both Virginia and North Carolina Included a "Terror" Element in Their "Going Armed" Laws, Undercutting *Antonyuk*'s Purported Founding-Era Analogues.**

*Antonyuk* claims that "at least two states—Virginia and North Carolina—passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, i.e., the traditional, crowded public forum."  *Antonyuk*, 89 F.4th at 357; *see* Fairfax S.J. at 27.  But even *Antonyuk* acknowledges that "the Virginia statute . . . prohibited *conduct and not simply carriage*, i.e., bearing arms in 'terror' of the county [*sic*]...."  *Id*. at 357 n.74 (cleaned up) (emphasis added).

As of 1791, North Carolina had two "going armed" laws, both originally passed in 1741. One law included a constable's oath to "arrest all Persons as, in your Sight, shall ride or go armed offensively…." James Iredell, *Laws of the State of North-Carolina* 70 (1791). Pl. Ex. 1. The other law provided that "no Slave shall go armed with Gun, Sword, Club, or other Weapon" without a certificate from the master. *Id*. at 93. Hence, it was an offense for a free person to "go armed offensively," i.e., in a manner designed to induce terror in others, but a slave could not "go armed" at all.

## 2. Contrary to *Antonyuk*, the Statute of Northampton Reprinted in Martin's *Collection* Was Not a "Law" Enacted by North Carolina.

Ignoring the actual North Carolina statute, *Antonyuk* believed it found a "North Carolina statute" that "appears to have prohibited firearm carriage in general at fairs and markets regardless of conduct." 89 F.4th at 357 n.74 (citing *Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, pp. 60–61, ch. 3 (F. Martin Ed. 1792)). *See* Fairfax S.J. 26-27, & Def. Ex. 21. Yet the North Carolina General Assembly did not enact the *Collection* as a whole, or any specific English law therein.

Martin's *Collection* was found to be "utterly unworthy of the talents and industry of the distinguished compiler, omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force, either in the Province, or in the State." "Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855). Pl. Ex. 2. Martin simply reprinted the Statute of Northampton verbatim. Martin, *A Collection*, 60-61; Def. Ex. 21. Its multiple references to "the King" should be a dead giveaway that it was not a statute passed by the legislature of North Carolina. Failing to pick up on that historical error altogether, *Antonyuk*'s only actual quotation from Martin is its incomplete reference to the "North Carolina

law prohibiting 'to go nor ride armed by night nor by day, in fairs, markets'…," 89 F.4th at 357,

leaving out the actual 1791 statute's requirement that one do so "offensively."

### 3. *Antonyuk* Disregards North Carolina Judicial Precedents on the "Terror" Element.

*Antonyuk* also disregards *State v. Huntly*, which stated that the Statute of Northampton

"*did not* create this offence" of "riding or going about armed with unusual and dangerous

weapons, to the terror of the people," "but provided only special penalties and modes of

proceeding for its more effectual suppression…." 25 N.C. (3 Ired.) 418, 420 (1843) (emphasis

added). (The County cites *Huntly*, but ignores its holding. Fairfax S.J. at 27 n.20). *Huntly*

recognized that the offense of an affray was committed "where a man arms himself with

dangerous and unusual weapons in such a manner, as will naturally cause a terror to the

people…." *Id.* at 421 (quoting Hawkins, *Pleas of the Crown*, B. 1, ch. 28, § 1).

*Huntly* further noted the guarantee of the North Carolina bill of rights that "the people

have a right to bear arms for the defence of the State," adding that "the carrying of a gun *per se*

constitutes no offence. For any lawful purpose – either of business or amusement – the citizen is

at perfect liberty to carry his gun." *Id*. at 422–23. However, he may not carry a weapon "to

terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." *Id*.

at 423.

*Huntly* has been consistently reaffirmed. *See State v. Dawson,* 272 N.C. 535, 542

(1968). Most recently, *State v. Lancaster* held that "the elements of the common law

crime of going armed to the terror of the public" means going armed in a public place

"for the purpose of terrifying and alarming the peaceful people," and "in a manner which

would naturally terrify and alarm the peaceful people." 895 S.E.2d 337, 343 (N.C. 2023)

("[i]t is the wicked purpose—and the mischievous result—which essentially constitute

the crime."). No North Carolina law or precedent suggested that arms may be banned in fairs and markets.

*Antonyuk* is thus mistaken when it states that "the Founding-era North Carolina statute prohibited firearms in fairs and markets with no reference to terroristic conduct." *Antonyuk*, 89 F.4th at 376. This purported tradition supposedly "evolved over the years between the Founding and Reconstruction toward the North Carolina model…. Thus, in the context of regulating firearms in discrete, crowded places, the Virginia law's 'terroristic' conduct requirement is the outlier among the national tradition." *Id.* To the contrary, only bearing arms with a terror-inducing intent was a crime. The peaceful, lawful bearing of arms was the permitted norm. *Antonyuk*'s claim that restrictions on the peaceful bearing of arms were "enshrined in the law books" of Virginia and North Carolina is entirely wrong. *Id.* at 360.

### 4. <u>Firearms Were Ubiquitous in Public in the Founding Era.</u>

The inescapable historical fact is that Americans at the time of the Founding had guns everywhere, whether alone or in public congregations, regardless of whether they were in urban or rural areas. The reasons should be familiar to anyone even vaguely familiar with conditions at the time:

> The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from criminals and pirate raids, to curb slave rebellions, and to be ready for a potential foreign invasion.

*Koons v. Plotkin,* 673 F.Supp.3d 515, 628 (D.N.J. 2023) (citations omitted), appeal filed (3rd Cir. May 17, 2023). *Koons* recited the historical record at length:

> Starting in 1619, Virginia's House of Burgesses passed a law requiring "all persons" attending church services on the Sabbath "to beare arms" and bring with them "their pieces, swordes, poulder and shotte." Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606–1625*, at 273 (Charles Scribner's Sons, 1907). Then, in 1632, Virginia's General Assembly enacted a law requiring all men fit to bear

arms to bring their weapons "to the church." 1 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 174 (New York, R. & W. & G. Bartow 1823). A decade later, in 1642, Virginia's legislature enacted another law requiring the "masters of every family [to] bring with them to Church on Sundays one fixed and serviceable gun with sufficient shot and powder." *Id.* at 263. Because of the threat posed against the early colonists by Native Americans—a pernicious problem for the settlers—in 1676, Virginia's governor required "all people be enjoined and required to go armed for their greate[r] security ... in going to churches and court in these times of danger." Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* (2021) at 125 (quoting An Act for the Safeguard and Defence of the County Against the Indians, 28 Car. II, 2). About a hundred years later, in 1755, Virginia passed another law allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches." 6 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 534 (Richmond, Franklin Press 1819).

Virginia was not alone. In 1636, Colonial Massachusetts required citizens to attend public assemblies with "their muskets or other peeces [sic] fit for service, furnished with match, powder, and bullets." 1 Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Boston, William White Press 1853). Rhode Island, in 1639, likewise ordered that no "man shall go two miles from the Towne unarmed, [either] with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 John R. Bartlett, *Records of the Colony of Rhode Island and Providence Plantations, in New England* 94 (Providence, A.C. Greene & Bros. 1856). Like the other colonials, Maryland's colonists were familiar with violence from encounters with the Native Americans, and in 1642, Maryland provided that "noe man able to bear arms to goe to church or Chapell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 William Hand Browne, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (Baltimore, Md. Hist. Soc'y 1885). Connecticut followed step in 1643 by ordering that certain citizens bring muskets, pistols or some "peeces" with powder and shot when attending meetings on the Sabbath or "lecture" days. 1 J. Hammond Trumbell, *The Public Records of the Colony Connecticut, Prior to the Union with New Haven Colony* 95 (Hartford, Brown & Parsons 1850).

Within the decades before the Second Amendment's ratification, South Carolina, in 1740, passed a law requiring "every white male inhabitant of this Province ... who is liable to bear arms in the militia of this Province" who attends "any church or any other public place of divine worship" to "carry with him a gun or a pair of horse pistols ... with at least six charges of gunpowder and ball." 7 David J. McCord, *Statutes at Large of South Carolina* 417–19 (Columbia, A.S. Johnston

1840). This law appears aimed at violence stemming from slave revolts. *See id.* Then, in 1770, Georgia enacted a law requiring "every white male inhabitant of this province ... who is or shall be liable to bear arms in the militia ... and resorting, on any Sunday or other times, to any church, or other place of divine worship" to "carry with him a gun or a pair of pistols." Horatio Marbury & William A. Crawford, *Digest of the Laws of the State of Georgia* 241–42 (Savannah, Seymour, Woolhopter & Stebbins 1802). The law required the churchgoer to bring his weapon "with him to the pew or seat." *Id.*

Given the above, the historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies. *Heller,* 554 U.S. at 606 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack. While public assemblies might conjure the notion that there is "strength in numbers," history reveals that the more crowded the gathering, the greater the risk of attack. To abate that risk, American colonists obligated their citizenry to arm themselves for protection.

*Id.* at 628-29.

The County's attempt to analogize to other public legislative assemblies, polling places, and courthouses historically considered "sensitive places" where weapons could be prohibited also fails. Those places were secured, and thus privately-provided defense was unnecessary.

History reveals that those places were considered sensitive places because either government officials met at those locations to perform core government administration (courthouses and legislative assemblies), or the location involved a citizen's fundamental right to participate in the political process (polling places). See generally David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 206, 229–236, 244–247 (2018). The common thread that runs through all these "sensitive" locations is that historically the government provided security at them, and so the need for armed self-defense was reduced. *See Hardaway v. Nigrelli,* 639 F.Supp.3d 422, 440 (W.D.N.Y. 2022) (noting that legislative assemblies and courthouse "are typically secured locations, where uniform lack of firearms is generally a condition of entry").

*Id.*, at 635.

Here, the County's "sensitive places" labeling utterly lacks the key feature that made Founding-era firearms prohibitions permissible: Government-provided security.  *See Bruen,* 597 U.S. at 31 ("[E]xpanding the category of 'sensitive places' simply to all places of public

congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.").[5]  Precisely because it has no Founding-era analogues allowing the general prohibition of firearms where the government does not provide security, the County invokes administrative restrictions not passed by voters from the late 19th Century, even though *Bruen* forbids such reliance.

### 5. Late 19th Century Firearms Restrictions Unmoored by Founding-Era Analogues Are Irrelevant Under *Bruen*.

*Antonyuk* also analogizes to mostly-late 19th century city restrictions on firearms in urban parks. 89 F.4th 360-61. This is impermissible under *Bruen*.  Without any Founding-era analogue, *Bruen* does not countenance reliance upon restrictions at the time of the Fourteenth Amendment's adoption in 1868 and thereafter to define "sensitive places" today.  *See Bruen*, 597 U.S. at 36-37 ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787") (cleaned up).  *Bruen* flatly states that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," and that "the scope of the protection applicable to the Federal Government and States *is pegged* to the public understanding of the right when the Bill of Rights was adopted *in 1791*." *Bruen*, 597 U.S. at 37 (emphasis added).[6]

_____

[5] The County also posits that Plaintiffs could avoid any problems by just not going to the "narrow areas" where the County has chosen to ban guns. S.J. at 20.  By "narrow," the County means all of its parks (10% of the entire County landmass}, any event on County property, or any street or sidewalk that happens to be adjacent to such an event.  The County does not indicate whether it believes that same restriction might permissibly apply to the rights of free speech, religious exercise, assembly, and petitioning the government in those "narrow pieces of property." The County does indeed believe the Second Amendment is a second-class right. More accurately, it doesn't believe it's a right at all.

[6] Oddly, the County argues that a restriction passed around Reconstruction "*within the lifetimes of some who were alive at the founding*" would be constitutional.  Fairfax S.J. at 18 n.10.  A

While *Bruen* noted "an ongoing scholarly debate"[7] on whether the understanding in 1868 defined the scope of the right, the Court stated it "need not address this issue" because the understanding *was the same in 1791 and 1868*. *Bruen*, 597 U.S. at 37-38. *Antonyuk* alters that holding, instead asserting that *Bruen* "expressly declined to decide" whether courts should rely on the understanding in 1868. *Antonyuk*, 89 F.4th at 304. The County repeats the error. S.J. at 15-25.[8]

As Justice Barrett observed: "[I]f 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)." *Bruen*, 597 U.S. at 82 (Barrett, J., concurring). Similarly, a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" to inform the meaning of the First Amendment. *Id.* (quoting *Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. 464, 482 (2020)). *Bruen* thus does not "endorse

---

person who was born in 1771 and thus was 20 when the Second Amendment was ratified in 1791 would have been 97 in 1868. But 20-year-old males in 1790 had a life expectancy of 43 to 48 years. J. David Hacker, Decennial Life Tables for the White Population of the United States, 1790–1900, Hist. Methods (April 2010), 43(2): 45–79. Figure 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2885717/.

[7] There is undoubtedly a debate among scholars as to whether the Second Amendment right as against the States should be evaluated from 1791, or 1868, when the 14th Amendment was ratified. *See, e.g.,* Josh Blackmun & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, The Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States,* 8 GEO. J.L. & PUB. POL'Y 1, 51-65 (Winter 2010). As a legal matter, *Bruen* has settled that question: 1791 is the touchstone. Regardless, there is no doubt that the 14th Amendment's framers understood it to protect liberty by preserving the individual right to self-defense. *Id.* at 56.

[8] Attempting to ignore *Bruen*'s stricture that the Second Amendment's historical locus is in 1791, not 1868, the County points to a colloquy between Justice Thomas and counsel during the *Bruen* oral argument. S.J. at 17. This is novel. Most American lawyers tend to believe that controlling law is found in the Supreme Court's written opinions (in this case, authored by Justice Thomas).

freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.*[9]

*Antonyuk* thought it "incongruous" to recognize the arms right "applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." 89 F.4th at 305. Notwithstanding *Antonyuk*'s claimed sense of incongruity, the Supreme Court consistently relies on Founding-era understandings to interpret the scope of other incorporated Bill of Rights provisions, including the First,[10] Fourth,[11] Fifth,[12] Sixth,[13] and Eighth Amendments.[14] Indeed, the Third Circuit found no difficulty in finding that the Supreme Court meant what it said in *Bruen*, and that 1791 standards govern Second Amendment analysis. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 133-37 (2024).

The County asserts that Plaintiffs presented no evidence that "the public understanding of the right forbade the government to prohibit guns in parks or at public events." S.J. at 15. But the County has the burden backwards: It is always the government's burden to establish

---

[9] *See* Mark Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 31 HARV. J.L. & PUB. POL'Y 1 (Fall 2022).

[10] *E.g.*, *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 182-84 (2012) (Establishment Clause and Free Exercise Clause); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-125 (2011) (freedom of speech); *Near v. Minnesota*, 283 U.S. 697, 713-17 (1931) (freedom of the press).

[11] *E.g.*, *Virginia v. Moore*, 553 U.S. 164, 168-169 (2008) (unreasonable search and seizure).

[12] *See Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019) (Double Jeopardy Clause).

[13] *E.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395-96 (2020) (Jury Trial Clause); *Klopfer v. North Carolina*, 386 U.S. 213, 223-25 (1967) (speedy trial).

[14] *E.g.*, *Timbs v. Indiana*, 139 S. Ct. 682, 687-99 (2019) (Excessive Fines Clause).

Founding-era analogues demonstrating that such restrictions were understood to be permitted. *Bruen*, 597 U.S. at 24.

### 6. No Restrictions on Peaceable Carry in Parks Existed at the Founding, and *Bruen* Excludes Consideration of Late 19th Century Restrictions.

The County erroneously suggests parks "did not exist in the founding era." S.J. at 15. From that incorrect premise, it asserts that prohibitions on firearms from the Reconstruction period and beyond should be used to establish the constitutionality of park firearms bans. *Id.* at 15-25. In fact, numerous U.S. municipalities had parks prior to1791, from Boston Common in 1634 through the National Mall in 1790.[15]

The County argues that prohibitions on firearms in parks in the Reconstruction era and later can establish the constitutionality of the parks ban here. S.J. at 20-25. But the County is wrong to suggest that nothing like parks existed before Reconstruction. *Id.* at 20. The Trust for Public Land lists the "Oldest City Parks," including fifteen that predate 1791, from Boston Common in 1634 and Washington/Marion Squares in Charleston, South Carolina in 1680, through Johnson Square in Savannah, Georgia, in 1733, and the National Mall in 1790.[16]

Despite Boston Common and other "green spaces" being places where people gathered, like the Fairfax parks here, as the County is keen to remind us (SJ. at 9, 21-22), the County argues that they were not like modern parks. S.J. at 15, 20-21. But it provides no evidence that "communal spaces for repose and relaxation" were only invented in the mid-19th century. *Id.*

---

[15] Trust for Public Land, *The Oldest City Parks*, at 5, https://www.tpl.org/wp-content/uploads/2013/12/ccpe-largest-oldest-most-visited-parks-4-2011-update.pdf. (Listing Boston, New Haven, Charleston, Philadelphia, Salem, New York, Newark, Savannah, and Washington, D.C.).

[16] Trust for Public Land, *The Oldest City Parks*, at 5, https://www.tpl.org/wp-content/uploads/2013/12/ccpe-largest-oldest-most-visited-parks-4-2011-update.pdf.

The County itself emphasizes mention of "fairs[17] and markets,"[18] which were crowded places, in the (constitutionally irrelevant) 1328 Statute of Northampton, and in statutes in the Founding period.  *Id.* at 27.  Yet it can cite no Founding-era restrictions on the peaceable carrying of arms for any of these and other "crowded spaces."

"Before parks, seventeenth- and eighteenth-century Boston, New York, and Philadelphia had public urban landscapes with many characteristics of parks…." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 2 (2021).[19]  Residents "found opportunities to gather in taverns, the common, markets, and streets." *Id.* at 3.  No restrictions on the peaceable carrying of firearms existed in such places.  As the following describes, these venues played similar social roles as the Fairfax County parks today.

"The Boston Common, designated as a public open space in 1634, is considered the nation's first city park."  Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE 1 (June 2009);[20] *accord Koons*, 673 F.Supp.3d at 640. Indeed, "the Common was a place for recreation as early as the 1660s."  *Boston Common*, National Park

[17] "Fair.  A stated market in a particular town or city; a stated meeting of buyers and sellers for trade. A fair is annual or more frequent. The privilege of holding fairs is granted by the king or supreme power."  Noah Webster, *An American Dictionary of the English Language* (1828) ("fair").

[18] "Market.  1. A public place in a city or town, where provisions or cattle are exposed to sale; an appointed place for selling and buying at private sale…. 2. A public building in which provisions are exposed to sale; a market-house."  *Id.* ("market").

[19] https://lj.uwpress.org/content/40/2/1.abstract?cited-by=yes&legid=wplj;40/2/1&related-urls=yes&legid=wplj;40/2/1.

[20] https://media.rff.org/archive/files/sharepoint/WorkImages/Download/RFF-BCK-ORRG_Local%20Parks.pdf.

Service (visitor's description "about men and women of Boston enjoying evening strolls on the Common").[21]  It was also a place for children to play and for political meetings to be held:

> Children enjoyed the Common, too, wading in the Frog Pond in summer, and skating and sledding in the winter. Gradually recreational activities began to dominate the Common. The changes in land use mirrored changes in landscape design. The first wide, tree-lined mall added along Tremont Street in 1722 is one reflection of these changes....
>
> Since its inception, activities held on the Common stretched beyond relaxation and recreation to include public assembly. George Washington, John Adams, and General Lafayette celebrated our nation's independence in this space.

*Id.*

The Boston Common was no "gun-free zone" – it was used for militia purposes, including training with firearms.  Beamish, *Before Parks* at 3-6. And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *Id.*

In New York, the Bowling Green was "used for informal ball games, including lawn bowling, paille-maille, bowls, skittles, and ninepins…."  *Id.* at 8.  It was also a place of celebration, such as, in 1713, to "commemorate the new peace treaty between Great Britain and France…."  *Id.*  In 1733, "the city decided to turn the site into a place for genteel strolling…."  *Id.*  "Although the Bowling Green was intended as a place of leisure and to beautify the neighborhood, it was also used for political demonstrations."  *Id.*

In Philadelphia, there were "private pleasure gardens" that "were notable for their lush plantings, plentiful refreshments, extravagant entertainment, and most of all, the mixing of classes…."  *Id.* at 10.  The public State House Garden was created in the mid-1780s.  *Id.* at 10-

---

[21] https://www.nps.gov/places/boston-common-ma.htm.

11.  At the end of the eighteenth century, Centre Square – which previously had been used for activities like horse racing and military training -- became a public pleasure garden.  *Id*. at 11.

The first ever American restriction on the carrying of firearms in parks cited by the County is that of Central Park, adopted in 1858. S.J. at 22.  As the County's own exhibits demonstrate, the park's rules were adopted by a vote of the park commissioners, not by a legislative body.[22]  *Minutes of Proceedings … Central Park* 166 (1858), Young Ex. 2.  The rules also forbade persons "To enter or leave the park except by the gateways."  *Id*.  "The Superintendent may direct that any of the entrances to the Park be closed at any time…."  *Fourth Annual Report* 108 (1861), Young Ex. 3.  The park was thus enclosed, and it was policed by "a force of Park Keepers."  Young Expert Report ¶ 30.  Though *Bruen* speaks in terms of "regulations" of firearms, its discussion of the relevant history in America refers only to the common law and legislation voted on by the people as being relevant to that determination; nowhere does it consider rules issued by unelected administrators relevant to the public understand of the right to bear arms.  *See Bruen*, 597 U.S. at 34, 45-70 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (internal citation omitted) (emphasis added). Even if a post-Founding-era park like Central Park were historically relevant, the County's own evidence suggests that New York treated it like a sensitive place by both restricting entry and providing security. Pl. Ex. 1 (Central Park Bd. of Commissioners Mtng. Minutes, April 30, 1858). That was quite unlike the County's extensive

---

[22] The County does not address at all whether the park commissioners were elected officials, and thus a purported source of the public's understanding of firearms rights.  It appears that City commissioners were simply mayoral appointees.  *See In re Dept. of Public Parks,* 85 N.Y. 459, 461 (1881) (Central Park Commissioners act on the mayor's behalf); *People ex rel. Houghton v. Andrews*, 104 N.Y. 570, 574 (1887) (excise commissioners appointed by mayor, approved by city council).

unenclosed and unpoliced spaces here, ranging in size from small playgrounds to vast wooded tracts, all of which the County refuses to protect. Indeed, the County points to not a single one of its parks that is secured to protect the occupants as was Central Park, rendering the comparison entirely inapposite.

Parks in Brooklyn, Philadelphia, and elsewhere followed patterns similar to Central Park. *E.g.,* Young Exs. 4 & 5. But the parks cited by the County were founded mostly in the late 19th and early 20th centuries, S.J. 22-24, too late to count under *Bruen* in the absence of a Founding-era analogue. Of the 28 states and the District of Columbia where the County states that firearms were prohibited in parks, 24 of the enactments were dated between the 1880s and 1917. S.J. at 22 n.13.

The County recites later rules from periods nowhere near the Founding era that are irrelevant under *Bruen*, and additionally, which were also not outright bans. S.J. at 22-23. Yellowstone rules (1894) and National Park Service rules (1936), respectively, allowed possession of firearms with the superintendent's permission. *Report of the Sec. of the Interior* 662 (1894), Young Ex. 79; *Federal Register*, June 27, 1936, 674, Young Ex. 84. Moreover, they are (again) administrative rules not voted on by the people's representatives, and not legislation demonstrative of the public's understanding. (And when the people's elected congressional representatives did speak on the issue of firearms in national parks, they declared firearms to be legal: "Federal laws should make it clear that the 2d amendment rights of an individual at a [Park] System unit should not be infringed." 54 U.S.C. § 104906(a)(7). In 2009 Congress barred "any regulation that prohibits an individual from possessing a firearm ... in any System unit." (a)(7), (b).).

The various regulations cited by the County were set by administrative officials, not legislatures; no record of enforcement exists; and none were subjected to judicial scrutiny.  For instance, Virginia's 1936 park rules (S.J. at 23) were set by a commission, not by the General Assembly, had no criminal penalty, and were illegal from their inception.  Virginia Attorney General Opinion 02-074 held that "[i]t is solely within the discretion of the General Assembly to add parks to the list of places where concealed handguns is prohibited," and that the department is "without authority to prohibit, within state parks, the carrying of concealed handguns by holders of valid permits."  2002 WL 31311963 at *3 (Sept. 9, 2002).  The Department of Conservation and Recreation accordingly repealed the regulation.  19 Va. Regs. 1338 (Jan. 13, 2003).[23]

7. ***Antonyuk*'s Reliance on Late 19th Century Restrictions on Firearms in "Crowded Places" Misrepresents Those Cases, and/or Defies the Supreme Court's Rejection of Such Analogues in *Bruen*.**

*Antonyuk* refers to gun bans at certain confined places of public assembly in three states, statutes passed from 1869 to 1883, and claims that courts upheld them as constitutional. 89 F.4th at 374-75. With one irrelevant exception, the places of assembly were not even issues in the cited cases. *Andrews v. State* upheld a ban on carrying small pistols, but held the law unconstitutional as applied to an army-type revolver. 50 Tenn. 165, 186-87 (1871). *English v. State* upheld convictions for wearing a pistol while intoxicated and for carrying a butcher knife in a religious assembly, also holding such knife not to be a constitutionally-protected "arm." 35 Tex. 473, 475 (1871). *State v. Shelby* addressed carrying concealed arms and carrying while intoxicated. 2 S.W. 468, 468 (Mo. 1886).

---

[23] https://register.dls.virginia.gov/vol19/iss09/v19i09.pdf.

*Antonyuk* further relies on territorial laws from Arizona (1889) and Oklahoma (1890). 89 F.4th at 374. It also points to mostly-late 19th century restrictions on firearms in urban parks. 89 F.4th at 360. But *Bruen* discounted reliance on such laws, explaining that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66. Moreover, as demonstrated, *supra*, *Antonyuk*'s claim that such restrictions were "enshrined in the law books" of Virginia and North Carolina is simply false. *See* 89 F.4th at 360.

## B. The Right to Bear Arms May Not Be Infringed Because Some People "Fear" It.

The County claims to have "provided substantial evidence that carrying firearms in County parks would 'spread [] fear" or "terror" among the people' of Fairfax County."  S.J. at 11, 28-29. In fact, the County's evidence shows no such thing; instead it merely purports to show that for some significant portion of Fairfax residents "the potential presence of guns in Fairfax County Parks 'induces feelings of less safety among most people in the local population . . . and may drive people to visit such spaces less.'" *Id.* (citing Filandra Decl. ¶¶ 23-24).[24]  This isn't terror; it's simply a social preference.

More to the point, the "terror" referenced in *Bruen*'s discussion refers to objectively threatening behavior by the person wielding the weapon, not the subjective preferences of members of the public as to what the law ought to be.  Inducing terror with firearms is explicitly illegal in the Commonwealth.  Virginia has multiple statutes criminalizing the threatening use of firearms in public places.  *See, e.g.*, Va. Code §§ 18.2-53.1 ("Use or display of a firearm in committing a felony"); 18.2-56.1A, A1 ("Reckless handling of firearms); 18.2-57 ("Assault")

---

[24] The County did not produce a survey indicating whether Fairfax residents were more or less likely to frequent parks where gangs, drug addicts, and homeless people are present, or whether a disinclination to share those public spaces with such people might be described as "terror."

(*see also Carter v. Commonwealth*, 269 Va. 44, 47 (2005) ("one would be guilty of assault if he menacingly points at another with a gun, apparently loaded, yet not in fact because a well-founded apprehension was created) (cleaned up); 18.2-280 ("Willfully discharging firearms in public places"); 18.2-282 ("Pointing, holding, or brandishing firearm"). Wishing the Second Amendment didn't exist isn't "terror," and even if it was, it would be irrelevant. One group of people's feelings cannot extinguish the rest of the population's rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

The County seeks here to exercise an unconstitutional heckler's veto of the right to bear arms. *See Brown*, 564 U.S. at 795-804; *cf. Bachellar v. Maryland*, 397 U.S. 564 (1970) ("it is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers") (cleaned up). "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise." *Cox v. Louisiana*, 379 U.S. 536, 551 (1965).[25] Many Fairfax residents may dislike the Second Amendment, but they do have to abide it.

---

[25] Plaintiffs wish to continue carrying their firearms concealed pursuant to their permits. *See Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) ("Some weapons do not terrify the public (such as well-concealed weapons), and so if the statute was (as it may have been) intended to protect the public from being frightened or intimidated by the brandishing of weapons, it could not have applied to all weapons or all carriage of weapons."). In all events, "CCW permit holders [like Plaintiffs here] are among the most responsible, reliable law-abiding citizens. They have been through a vigorous vetting and training process following their application to carry a concealed handgun." *May v. Bonta*, 2023 WL 8946212 at *4 (C.D. Cal. Dec. 20, 2023), appeal filed, No. 23-4356 (9th Cir. Dec. 23, 2023).

### C. The County's Urban-Suburban Character, and Its Comparisons to Schools and Private Property Are Irrelevant.

The County repeatedly invokes the fact that Fairfax is an urban-suburban area. S.J. at 4, 21, 24 n.16, 27, 31. This is both true, and irrelevant. The Supreme Court has been crystal clear that population density and congestion have no bearing on where the right to bear arms may be exercised. *Bruen*, 597 U.S. at 29-31. The Second Amendment, like the rest of the Bill of Rights, does not exist exclusively in rural areas.[26] The right to bear arms in public places is the default rule. The sensitive-places exception analyzes the specific place from which firearms are to be excluded, not the demographic features of the government that owns the location.

The County also argues that parks are like schools where children congregate. S.J. at 30-31. This analogy fails; schools are restricted spaces that are not only securable and supervised by authorized adults, but also are not public spaces for everyone else. By contrast, "Parks ... are frequented by adults and children, and by people in good health and poor. If public parks were similar enough to schools to qualify as a 'sensitive place' by analogy, nearly any place could be categorized as sensitive ...." *May*, 2023 WL 8946212 at *13. Children are ubiquitous. Indeed, nearly 20% of Manhattan, the most densely populated city in America,[27] consists of children.[28] If Manhattan is not a sensitive place, then neither are the Fairfax parks, streets, and sidewalks.

---

[26] The County's "we are a suburb" argument is just a subterfuge for subjecting the Second Amendment to popular whims.

[27] *World Population Review*, https://worldpopulationreview.com/boroughs/manhattan-population. Accessed Jan. 15, 2024.

[28] *See* New York City Planning, *Population Fact Finder,* https://popfactfinder.planning.nyc.gov/explorer/cities/NYC?compareTo=1, accessed Jan. 15, 2024.

Under the County's logic, the constitutional rights of adults evaporate when children draw near. This is not the law.

The County argues that hunting and trespass laws involving enclosed private property are analogues for the ban. S.J. at 29. This is silly. Violations of the Fourteenth Amendment and its incorporated Bill of Rights provisions require state action. *See, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930-32 (1982). Private landowners are free to determine who may be on their property, and under what conditions. *See, e.g., City of Charleston, S.C., v. A Fisherman's Best, Inc.*, 310 F.3d 155, 176 (4th Cir. 2002). That includes their right, of their own accord, to exclude firearms. *See, e.g., May*, 2023 WL 8946212 at *16 ("private property owners have a right to forbid concealed carry on their property"). Parks, however, are public property open to the public, where the Bill of Rights applies. *Cf United States v. Grace*, 460 U.S. 171, 177 (1983) (parks, streets, and sidewalks are traditional public forums).

Even *Antonyuk* rejects analogous reasoning on this point. The "proffered analogues [comparing exclusions of firearms on private land to such exclusions on public lands] were explicitly motivated by a substantially different reason (deterring unlicensed hunting) than the restricted location regulation (preventing gun violence)." 89 F.4th at 385-86. Moreover, "the proffered analogues ... appear to have created a presumption against carriage only on private property not open to the public." *Id*.

**D. Plaintiffs May Mount a Facial Challenge to the Parks and Event Restriction.**

The County argues that that Plaintiffs may not mount a facial challenge here because they cannot show the ban to be invalid in all circumstances. S.J. at 13, 24-25. However, facial challenges are recognized "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep." *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (First Amendment case).

As here, facial challenges are appropriate where a law implicates a constitutional right and imposes criminal penalties, even when the law could conceivably have had some valid application. The Supreme Court has held:

> First . . . we permit a facial challenge if a law reaches "a substantial amount of constitutionally protected conduct." Second, where a statute imposes criminal penalties, the standard of certainty is higher. This concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application.

*Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (citation omitted.):

Here, while the County might conceivably ban firearms at a park or an event with restricted access and security (if it chose to write a narrowly tailored ordinance to that effect), it cannot use the same law to ban the bearing of arms by someone hiking in a park or merely passing by an event (adjacent) or riding on a bike trail. *See id*.

## II.  Plaintiffs Have Standing To Assert Their Due Process Claims.

The County argues that Plaintiffs are not threatened with prosecution and thus lack standing to bring their due process claims.  S.J. at 34-36. The same issue was resolved against the government in *Kipke v. Moore*, in which the plaintiff alleged a wish to carry a handgun at a proscribed location, and thus "adequately alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.'"  2023 WL 6381503 at *15 (D. Md. Sept. 29, 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Like the County here, the *Kipke* defendants "suggest[ed] that no individual has ever been prosecuted under the statute," but "they have also failed to disavow prosecution, and Kipke's desired conduct is barred by the statute's plain language."  *Id*. at *15.  "Threat of

prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted). As explained in Part IV, *infra*, no threat of arrest is required when a constitutional violation with a criminal penalty is posed.

"Separately, there is an ongoing injury in fact if plaintiffs make a 'sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id*. at 288 (citation omitted). Similar injury is ongoing here, where Plaintiffs are chilled from exercising their right to bear arms in public places.

The County also argues that that Plaintiffs may not mount a facial challenge to the Ban on vagueness grounds because they cannot show the ban to be invalid in all circumstances. S.J. at 34-36. The Fourth Circuit rejects that argument. "[O]ur *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *See United States v. Hasson*, 26 F.4th 610, 617 (4th Cir. 2022) (emphasis in original) (citation omitted), cert. denied, 143 S. Ct. 310 (2022). Where a criminal law lacking a *mens rea* requirement "infringe[s] on constitutionally protected rights" and "vagueness permeates the text of such a law, it is subject to facial attack." *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality op.).

## III. The Police Department's Enforcement Policy Memo Has No Legal Effect on Plaintiffs's Right to Seek Relief from the County's Unconstitutional Law.

The County asserts that the Chief of Police's issuance of a memorandum (the "CSM") stating that the Ordinance will be enforced only at places where there is signage stating that a permitted event, even though the Ordinance contains no such limiting language. Opp. at 3-4, 35-38. Virginia law renders that argument unsustainable. Municipal officials have no authority to amend legislation to their own liking or convenience. "No officer may substitute his discretion

in the place of the law, which alone expresses the will and policy of the State." *Cutchin v. Roanoke*, 113 Va. 452, 474 (1912); *accord, Thompson v. Smith*, 155 Va. 367, 379-80 (1930). Nor does a policy memo asserting that it will sometimes not enforce its criminal law diminish Plaintiffs' right to challenge a law that creates an ongoing constitutional injury. As the Fourth Circuit has explained, "Unofficial and non-binding statements such as these do not and cannot override the plain text of the statutes when it comes to establishing a credible threat of enforcement." *Bryant v. Woodall*, 1 F.4th 280, 288-89 (2021) (cleaned up) (quoting *EQT Prod. Co. v. Wender*, 870 F.3d 322, 331 (4th Cir. 2017)); *see also Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012), (holding a formal policy of non-enforcement that "d[id] not carry the binding force of law" was insufficient to defeat standing). Nor does that defeat the reality of enforcement; the fact that an arresting officer saw a sign somewhere at an event, or somewhere near a park, does not demonstrate that any member of the public saw it. This is nowhere more true than with respect to trails in County parks, with limitless points for ingress.

## IV. The County's Unconstitutional Criminal Law Creates Injury Redressable by Injunction.

The County wrongly asserts Plaintiffs must establish a credible threat of prosecution to bring suit. S.J. at 34-36. The Fourth Circuit holds otherwise. "[T]here is a sufficiently imminent injury in fact if plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Kenny*, 885 F.3d at 288 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "It is not necessary that a plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his

constitutional rights." *Kenny,* 885 F.3d at 288 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (cleaned up)).  Plaintiffs have alleged that they are deterred from bringing their firearms into parks, and they have no way of knowing if and when they are violating the Ban when traversing Fairfax's byways while armed.

## CONCLUSION

Fairfax has banned firearms in the most public, non-sensitive, unsecured place imaginable: parklands.  It has also banned firearms in or adjacent to public gatherings, again, without regard to whether those places have any security, without any predictability by arms-bearing members of the public who may be in such locations, and by depriving even people who are traveling adjacent to such locations of their right to bear arms.  None of this is remotely lawful under *Bruen*.  The County is attempting to accomplish by semantic ruses what the Second Amendment forbids: Banning guns in public places. The Court should issue summary judgment declaring the Fairfax Ordinance unconstitutional, and enjoin its enforcement.

The Supreme Court's "sensitive places" analysis is required to determine the rare public locations in which the government may ban firearms.  If Fairfax County wishes to ban firearms in a particular place, it must show that each specific location, and not broad swaths of public property without discernment, is such a "sensitive place."  If the County wishes to pass an ordinance limiting gun bans to sensitive places, and, consistent with *Bruen*, provides objective criteria for determining what constitutes a sensitive place, it may do so.  But instead of following the constitutional requirement that it make careful exceptions to the rule, the County has eliminated the right to bear arms entirely for massive areas of the County, including streets, sidewalks, trails, and parkland. The exception has swallowed the rule, and the Ordinance is unconstitutional on its face.

Respectfully Submitted,

Kimberly LaFave
Glenn M. Taubman
Robert Holzhauer,

Plaintiffs


By Counsel


_____/s/_____
Stephen P. Halbrook
protell@aol.com
Va. Bar No. 18075
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276


_____/s/_____
Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Va. Bar No. 41691
10521 Judicial Drive, Suite 200
Fairfax, VA 22030
(703) 268-5600


## CERTIFICATE OF SERVICE

I certify that the foregoing document was served on all counsel of record via ECF on May 10, 2024.


_____/s/_____
Trey Mayfield