UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KIMBERLY Y. LAFAVE, et al., ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Case No. 1:23-cv-01605-WBP |
| ) | |
| THE COUNTY OF FAIRFAX, VIRGINIA, ) | |
| and KEVIN DAVIS, in his Official Capacity ) | |
| as Chief of Police, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................................... 1

**ARGUMENT** .......................................................................................................................... 2

I. ***UNITED STATES V. RAHIMI* CONFIRMS THAT PLAINTIFFS' CHALLENGES TO THE PARKS RESTRICTION AND THE EVENTS RESTRICTION FAIL** ...... 2

    A. *Rahimi* Confirms that Facial Challenges Like Plaintiffs' Must Surmount a Very High Bar ................................................................................................................ 2

    B. *Rahimi* Confirms Defendants' Approach to Second Amendment Analysis ............... 3

    C. *Rahimi* Confirms that Reconstruction-era Evidence is a Critical Part of the Historical Analysis .................................................................................................................. 6

II. **THE SECOND CIRCUIT'S DECISION IN *ANTONYUK* REMAINS PERSUASIVE AUTHORITY** ............................................................................................................... 9

**CONCLUSION** ..................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*,
  No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) ................................................................ 1, 9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................................................ 6, 7

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) .................................................................................................................... 5

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ................................................................................................................ *passim*

*Perlman v. U.S. Dep't of Just.*,
  380 F.3d 110 (2d Cir. 2004) ....................................................................................................... 9

*Planned Parenthood S. Atl. v. Kerr*,
  95 F.4th 152 (4th Cir. 2024) ....................................................................................................... 9

*Texas v. United States*,
  798 F.3d 1108 (D.C. Cir. 2015) .................................................................................................. 9

*United States v. Herriott*,
  No. 2:23-cr-00037, 2024 WL 3103275 (N.D. Ind. June 24, 2024) ........................................... 10

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ........................................................................................................ *passim*

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................................................................... 2

## INTRODUCTION

On June 21, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024), a Second Amendment challenge to a federal criminal statute disarming individuals subject to domestic violence restraining orders. The Court upheld the law by a vote of 8 to 1, deeming it a continuation of a national tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others." *Id.* at 1902. *Rahimi* emphasized that the Second Amendment "was never thought to sweep indiscriminately," *id.* at 1897, and that its precedents "were not meant to suggest a law trapped in amber," *id.*; *see also id.* at 1897-98 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). Justice Thomas—the author of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)—was the lone dissenter.

Defendants file this submission in response to the Court's invitation for supplemental briefs addressing the impact of *Rahimi* on this case and *Rahimi*'s effect on cases the parties cited, including *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024).

*Rahimi* resoundingly supports Defendants. First, it confirms that Defendants are correct, and Plaintiffs are wrong, about the very high standard applicable to facial challenges. Second, it confirms that the Second Amendment does not require a myopic, divide-and-conquer approach to the historical inquiry, and instead asks whether a challenged regulation is consistent with the principles that underpin our regulatory tradition. It also discards other misreadings of *Bruen* that Plaintiffs and some other litigants have advanced. Third, it confirms that Reconstruction-era evidence is a critical part of the Second Amendment analysis, regardless of whether 1868 or 1791 is the central focus of that analysis—an issue the Court again left unresolved.

1

On all relevant fronts, *Rahimi* either made a government's task in defending against a Second Amendment challenge easier or left it unchanged. Accordingly, although the Court has vacated the Second Circuit's decision in *Antonyuk* and remanded it for reconsideration in light of *Rahimi*, nothing in *Rahimi* casts doubt on any aspect of *Antonyuk* that is relevant to this case. The vacated opinion remains persuasive, as do all the other cases Defendants relied on. Defendants respectfully submit that the grounds for awarding summary judgment to Defendants and denying it to Plaintiffs, which were already strong before *Rahimi*, are now even stronger.

## ARGUMENT

**I.   *United States v. Rahimi* Confirms that Plaintiffs' Challenges to the Parks Restriction and the Events Restriction Fail**

### A. *Rahimi* Confirms that Facial Challenges Like Plaintiffs' Must Surmount a Very High Bar

Plaintiffs argued that, to prevail in their facial challenge, they merely had to show that the Ordinance is "'overbroad,'" in that "'a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep.'" Pls. Reply 1, Dkt. 63 (citation omitted). They claimed that the Supreme Court's facial challenge standard, as set out in *United States v. Salerno*, 481 U.S. 739 (1987), is no longer good law, or at least does not apply to a Second Amendment challenge like theirs. *See* Pls. Reply 2; Tr. of Oral Arg. 13:19-14:14 (June 7, 2024).

*Rahimi* confirms that Plaintiffs are wrong. The Court explained that a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a [challenger] to 'establish that no set of circumstances exists under which the Act would be valid.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Salerno*, 481 U.S. at 745). Accordingly, a government "need only demonstrate" that the challenged law "is constitutional in *some* of its applications." *Id.* (emphasis added). The Fifth Circuit in *Rahimi* failed to "correctly apply" this standard because it focused on "hypothetical

scenarios" where the challenged law "might raise constitutional concerns" instead of "consider[ing] the circumstances in which [it] was most likely to be constitutional." *Id.* at 1903.

*Rahimi* thus confirmed that the facial challenge standard Defendants set out in their briefs is correct. Far from suggesting that *Salerno* is no longer good law, or is inapplicable to the Second Amendment, or that Rahimi could prevail if he showed that the federal law he challenged were "overbroad," the Supreme Court confirmed that Plaintiffs' facial challenge fails if the Ordinance is constitutional "in some of its applications." *Id.* at 1898; *see also id.* at 1907 (Gorsuch, J., concurring) (quoting *Salerno*); *id.* at 1910 (Gorsuch, J., concurring) (describing the question before the Court as "only whether this [statute] has *any* lawful scope").

There is no question that the Ordinance is constitutional in at least some of its applications. Prohibiting guns in the County's many small playground parks, like Farrington Park and Clemyjontri park, is consistent with the Second Amendment. *See* Defs. Mem. 24-25 & n.17, Dkt. 45; Decl. of Sara Baldwin ¶ 9, Dkt. 52 (linking online park locator); Defs. Reply 12, Dkt. 61. Plaintiffs have never seriously contended otherwise. Thus, Plaintiffs' facial challenge must fail.

### B.  *Rahimi* Confirms Defendants' Approach to Second Amendment Analysis

In upholding the challenged federal law, *Rahimi* provided guidance to courts applying *Bruen*'s historical analysis. It noted that "some courts have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a challenged statute. *Rahimi*, 144 S. Ct. at 1897; *see also id.* at 1925 (Barrett, J., concurring) (explaining that "a challenged regulation need not be an updated model of a historical counterpart" and that "a test that demands overly specific analogues has serious problems"). Rather than look for a "dead ringer" or "historical twin," courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id*. at 1898

3

(emphasis added); *see also id.* at 1912 (Kavanaugh, J., concurring) (explaining that courts' task is to ascertain "the principles embodied in [the Second Amendment's] text"); *id.* at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.").

As Justice Barrett observed in her concurring opinion, one such principle is the "'sensitive places' principle that limits the right to public carry." *Id.* at 1926 (citing *Bruen*, 597 U.S. at 30-31); *see also id.* at 1923 (Kavanaugh, J., concurring) (reiterating *Heller*'s statement that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively constitutional"). As Defendants have demonstrated, the Parks Restriction and the Events Restriction are "consistent with the principles that underpin our regulatory tradition," *id.* at 1898—both the overarching principle that firearms may be prohibited in sensitive places, and with more granular principles, including the principles that prohibitions are permissible in crowded public forums, in places where the presence of guns "spreads 'fear' or 'terror' among the people," *Bruen*, 597 U.S. at 50, in privately-owned landscapes without the owner's permission, and in locations with vulnerable populations, such as children. *See* Defs. Mem. 19-34; Defs. Opp. at 21-29, 32-34, Dkt. 58; Defs. Reply 9-13. Moreover, *Rahimi* confirms that different strands of historical laws should be "[t]aken together" to identify the principles against which modern laws should be judged. *See* 144 S. Ct. at 1901 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be."). Equally, here, the Parks Restriction and the Events Restriction are not identical to the four founding-era traditions Defendants identified—but they do not need to be.

4

*Rahimi* also put to rest other mistaken arguments Plaintiffs have advanced. *First*, Plaintiffs have insisted that a modern law addressing a historical problem that "existed since the founding" can only be supported by historical laws that are "distinctly similar" to the modern law. *See, e.g.*, Pls. Mem. 10, Dkt. 53. That argument was never correct, and now *Rahimi* confirms its error: even though domestic abuse has existed since the founding, the Court considered only "whether the [federal restraining-order prohibitor] is '*relevantly* similar' to laws that our tradition is understood to permit," 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29) (emphasis added)—with no mention anywhere of requiring "distinctly similar" laws. *Second*, and similarly, Plaintiffs' claims rest heavily on the supposition that if historical laws forbidding a particular practice did not exist in the relevant historical period (which, according to Plaintiffs, is the founding era), then it must be the case that those laws were considered unconstitutional. *See* Defs. Reply 15-16. Again, that argument was never correct. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) (explaining that absence of particular laws in 18th and 19th centuries "does not mean that anyone thought the States lacked the authority" to pass those laws). *Rahimi* confirms this, by upholding the federal restraining-order prohibitor even though laws specifically disarming domestic abusers did not exist in 1791, or 1868, or indeed until the late 20th century. There is no hint anywhere in the Court's opinion that it believed the absence of such a law historically indicated unconstitutionality. And Justice Barrett, in her concurrence, made the point explicit: she described as "flawed" any "assumption[]" that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring); *see also id.* (explaining that an approach that "forces 21st-century regulations to follow late-18th-century *policy* choices" has "serious problems" (emphasis added)); *id.* at 1905 (Sotomayor, J., concurring) (rejecting dissent's approach, under which "the legislatures

5

of today would be limited not by a distant generation's determination that such a law was unconstitutional, but by a distant generation's failure to consider that such a law might be necessary"). *Third*, Plaintiffs argued that laws that New York unsuccessfully relied on to support its broad public-carry prohibition in *Bruen* could not serve as analogues for other laws. *See, e.g.*, Pls. Opp. 2, Dkt. 60 (claiming that "*Bruen* says" the Statute of Northampton "is irrelevant to determining American law"). *Rahimi* also puts that argument to rest. *Rahimi* twice invoked the Statute of Northampton in discussing the historical basis for the principle it identified. *See* 144 S. Ct. at 1899, 1901.[1] And even more directly, *Rahimi* confirmed that particular historical laws can be salient precursors for one modern law even if they are not for another: "The conclusion that focused regulations like the surety laws are not a historical analogue for a broad prohibitory regime like [the New York law invalidated in *Bruen*] does not mean that they cannot be an appropriate analogue for a narrow one." *Id.* at 1902.

### C. *Rahimi* Confirms that Reconstruction-era Evidence is a Critical Part of the Historical Analysis

Defendants have explained that the most relevant time period for historical analysis is the Reconstruction era. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Bruen*, 597 U.S. at 34 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008) (emphasis omitted)), originalism requires courts to determine the public understanding of the right at the time the Fourteenth Amendment was ratified and incorporated the Second Amendment against the States. *See* Defs. Mem. 15-17; Defs. Opp. 11-12, 16-19; Defs. Reply 7-8. Defendants also explained that, regardless of whether 1791

---

[1] With respect to the application of the "going armed" laws, Defendants have explained that Plaintiffs conceded the prohibition was objective, not subjective, and thus focused on the terrorizing *effect* of public carry; and that, in any event, even if subjective intent to terrorize were required, it is well settled that factfinders may infer that people intend the natural and probable consequences of their actions. *See* Defs. Reply 10 n.2.

6

or 1868 is the central focus of the historical inquiry, Reconstruction-era evidence is critically important to that inquiry. *See* Defs. Mem. 17-18; Defs. Opp. 12, 23-25; Defs. Reply 7; *Bruen*, 597 U.S. at 20 ("[*Heller*] clarified that 'examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification' was 'a critical tool of constitutional interpretation.'" (quoting *Heller*, 554 U.S. at 605) (emphasis omitted) (citation omitted)). Plaintiffs, for their part, claim that relying on 19th-century laws is "impermissible." Pls. Opp. 12.

*Rahimi* did not resolve the issue regarding which time period is key to the historical inquiry: just as it had done in *Bruen*, the Supreme Court expressly left open whether the Reconstruction era or the founding era is the central focus. *See Rahimi*, 144 S. Ct. at 1898 n.1 (declining to resolve "whether courts should primarily rely on the prevailing understanding … in 1868" as establishing the scope of the right against both state and federal governments because resolving it was unnecessary to decide the case); *id.* at 1933 n.2 (Thomas, J., dissenting) (agreeing with majority that resolving this issue was unnecessary in *Rahimi*). Thus, the status on that question remains as it was before *Rahimi* was decided: for the reasons Defendants have explained, if this Court decides to address the time-period question, it should prioritize evidence from the period surrounding 1868. *See* Defs. Mem. 16-17; Defs. Opp. 17-19; Defs. Reply 7.

Nevertheless, *Rahimi*'s analysis removes any doubt that Reconstruction-era evidence is critically important regardless of which time period is key. Accordingly, *Rahimi* puts to rest Plaintiffs' suggestion that the Second Amendment historical analysis requires a cramped examination of historical laws in the few years surrounding 1791 and confirms that the Court should consider the robust evidence from later decades that Americans considered prohibitions on guns in parks to be entirely consistent with the Second Amendment. *Rahimi* did so by resting its

decision *upholding* the challenged law in significant part on laws that were passed between 1836 and 1868. *See Rahimi*, 144 S. Ct. at 1900 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws). It is impossible to reconcile *Rahimi* with Plaintiffs' position that only founding-era historical evidence counts.

Relying on 19th-century evidence is therefore entirely consistent with—indeed, compelled by—the Supreme Court's decisions *even if* the founding era were the most important period for analysis. As Justice Kavanaugh put it, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1924 (Barrett, J., concurring) (confirming that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions" and "provide persuasive evidence of the original meaning" (citation omitted)). Where, as here, there is absolutely no contrary evidence—no 18th- or 19th-century cases, treatises, or other legal materials maintaining that prohibiting firearms in parks would violate the right to bear arms, and no constitutional decisions from any historical period invalidating such a prohibition—the 19th-century understanding presumptively reflects the 18th-century understanding. Accordingly, regardless of which period (founding or Reconstruction) this Court determines to be the most relevant, it should accept that the practice thereafter settled the meaning of the right and demonstrates that the Parks Restriction and Events Restriction are constitutional.

8

## II. The Second Circuit's Decision in *Antonyuk* Remains Persuasive Authority

In *Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024), the Supreme Court granted the petition for certiorari, vacated the judgment of the Second Circuit, and remanded for further consideration in light of *Rahimi*. In doing so, the Court vacated an opinion Defendants cited, *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).

The Supreme Court's grant, vacate, and remand (GVR) order in *Antonyuk* was not a determination on the merits. *See, e.g.*, *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) (recognizing that "the issuance of a GVR does not speak to the underlying merits of the case"); *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand."). The Second Circuit can (and should) reach the same conclusion it reached in its December 2023 opinion on remand. *See, e.g.*, *Perlman v. U.S. Dep't of Just.*, 380 F.3d 110, 111-12 (2d Cir. 2004) (concluding, after GVR for reconsideration in light of a new decision, that the new decision "does not affect the conclusion we previously reached in this case" and it "need not be disturbed"). Nothing in *Rahimi* undermines *Antonyuk*'s reasons for rejecting the challenge to New York's restriction on guns in parks. To the contrary, the fact that *Rahimi* rested in significant part on 19th-century laws defeats any contention that only the period surrounding 1791 is relevant to the historical analysis.

Moreover, it appears unlikely that the Supreme Court's reasons for issuing the GVR had anything to do with the Second Circuit's parks analysis, or its sensitive-places analysis more generally. *Rahimi* is not a sensitive-places case. And of the two "Questions Presented" in the *Antonyuk* petition—"1. Whether the proper historical time period for ascertaining the Second Amendment's original meaning is 1791, rather than 1868; and 2. Whether 'the people' must convince government officials of their 'good moral character' before exercising their Second

9

Amendment right to bear arms in public"—only the first even arguably relates to the Second Circuit's sensitive-places analysis. *See* Pet. for Writ of Cert. at (i), *Antonyuk v. James*, No. 23-910 (U.S. Feb. 20, 2024). That first question, however, is the issue of the correct temporal focus, which *Rahimi* expressly declined to reach. *See Rahimi*, 144 S. Ct. at 1898 n.1. It seems, therefore, that the GVR is likely focused on the petitioners' second question, which concerns the Second Circuit's analysis of New York's carry-licensing scheme and has nothing to do with sensitive places.

More generally, because "*Rahimi* can be seen as a softening of the approach to the Second Amendment taken in *Bruen*," *United States v. Herriott*, No. 2:23-cr-00037, 2024 WL 3103275, at *2 n.1 (N.D. Ind. June 24, 2024)—because "[h]ow else does one explain that the author of *Bruen* is the sole dissenter in *Rahimi*?," *id.*—reconsidering *Antonyuk* in light of *Rahimi* is more likely to strengthen the Second Circuit's analysis in favor of New York than to undermine it. Thus, the analysis in the Second Circuit's *Antonyuk* opinion remains persuasive.

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and enter final judgment in Defendants' favor.

Respectfully submitted,

Date: July 17, 2024

THE COUNTY OF FAIRFAX, VIRGINIA, and the CHIEF OF POLICE, KEVIN DAVIS, in his official capacity

By: */s/ Anders T. Sleight*
*Counsel*

Douglas R. Kay, VSB No. 35468
Thomas W. Repczynski, VSB No. 39967
Anders T. Sleight, VSB No. 84458
OFFIT KURMAN, P.C.
8000 Towers Crescent Drive, Suite 1400
Tysons Corner, Virginia  22182
Telephone:  (703) 745-1800
Facsimile:  (703) 745-1835
dkay@offitkurman.com
trepczynski@offitkurman.com
Anders.sleight@offitkurman.com
*Co-Counsel for Defendants*

Daniel Robinson (VSB No. 78985)
John W. Burton (VSB No. 42223)
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
Telephone: (703) 324-2421
Facsimile: (703) 324-2665
Daniel.Robinson@fairfaxcounty.gov
John.Burton@fairfaxcounty.gov
*Co-Counsel for Defendants*

Janet Carter (admitted *pro hac vice*)
William J. Taylor, Jr. (admitted *pro hac vice*)
EVERYTOWN LAW
450 Lexington Avenue, P.O Box 4184
New York, New York 10163
Telephone: (646) 324-8174
jcarter@everytown.org
wtaylor@everytown.org
*Co-Counsel for Defendants*

11

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

Christopher M. Day
Earl N. "Trey" Mayfield, III
10521 Judicial Drive, Suite 200
Fairfax, VA 22030
(703) 268-5600
cmday@jurisday.com
tmayfield@jurisday.com

/s/ Anders T. Sleight
Anders T. Sleight

4880-9607-1890, v. 1

12