**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| KIMBERLY LAFAVE, *et al.*,  ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | Case No. 1:23-cv-1605 (WBP) |
| ) | |
| THE COUNTY OF FAIRFAX,  ) | |
| VIRGINIA,  ) | |
| ) | |
| and  ) | |
| ) | |
| KEVIN DAVIS, in his Official Capacity as  ) | |
| Chief of Police,  ) | |
| ) | |
| Defendants.  ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court[1] are the parties' cross-motions for summary judgment. Following

extensive briefing, the parties presented oral argument on their motions on June 7, 2024, and

later provided supplemental briefing and authorities following new precedent from the Supreme

Court and the Fourth Circuit. For the reasons below, Plaintiffs' Motion for Summary Judgment is

DENIED, Defendants' Motion for Summary Judgment is GRANTED, and this action is

DISMISSED WITH PREJUDICE.

---

[1] On April 18, 2024, in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented to the jurisdiction of the undersigned United States magistrate judge conduct all proceedings. United States District Court Judge Claude M. Hilton entered an order of reference on April 19, 2024. (ECF No. 43.)

I.

A.

Defendant the County of Fairfax, Virginia ("County") is an urban-suburban community that maintains 420 parks across 23,632 acres in the County (collectively, the "Parks").[2] (ECF Nos. 45 at ¶ 14 and 58 at ¶ 1.) County Parks receive about 12-16 million visitors each year, a quarter of whom are children. (ECF No. 45 at 4-5 ¶¶ 13-15.) In 2022, over 100,000 individuals under the age of 18 participated in events registered with the County in the Parks, as did over 83,000 in 2023. (*Id.*) These numbers made up most of the over 43,000 registrants for 1,372 different summer camps hosted in County Parks. (*Id.*) In 2023, over 47,000 students participated in 830 school field trips and sports activities in County Parks. (*Id.*)

The Fairfax County Parks Authority ("FCPA") runs several popular amusements in the Parks, including minigolf, a carousel, and a train ride. (*Id.* at 5 ¶ 19.) The FCPA also operates eight golf courses in the Parks, which together generated over $16 million in 2023. (*Id.* ¶ 22.)

Both children and adults participate in many other activities hosted in the Parks, including camping, hiking, and volunteering. (*Id.* ¶¶ 19, 22.) The County also supports several other events in the Parks, including sporting events, church services, fundraising events, an Earth Day celebration, a 4-H Fair, preschool performances, protests, and election-related activities. (*Id.* ¶ 20.)

---

[2] While Plaintiffs and Defendants both included statements of undisputed material facts in their memoranda in support of their motions for summary judgment, only Defendants complied with this Court's Local Rules and the Federal Rules of Civil Procedure, both of which require responses to summary judgment motions to include a "specifically captioned section listing all material facts as to which it is contended that there exist a genuine issue necessary to be litigated[,]" without which the Court may consider facts undisputed. *See* E.D. Va. Local Civ. R. 56(B) and FED. R. CIV. P. 56(e). Thus, Plaintiffs concede to Defendants' statement of undisputed material facts, and the following statement of facts is undisputed unless otherwise indicated.

B.

On September 16, 2020, the County adopted Fairfax County Code § 6-2-1 ("Ordinance"),

which states:

> A. The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in the following areas:
>
> \*        \*        \*
>
> 2. In any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County.
>
> \*        \*        \*
>
> 4. In any public street, road, alley, or sidewalk or public right of way or any other place of whatever nature that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a permit. For purposes of this Section, County-permitted event and event that would otherwise require a County permit include events permitted by an authority or local government entity created or controlled by the Couty in whole or in part.
>
> \*        \*        \*
>
> D. Notice of ordinance
>
> 1. Notice of this ordinance shall be posted . . . (ii) at all entrances of any public park owned or operated by the County . . . and (iv) at all entrances or other appropriate places of ingress and egress to any public street, road, alley, or sidewalk or public right-of-way or any other place of whatever nature that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a permit.

Fairfax County Code § 6-2-1(A). The parties refer to paragraph A.2. of the Ordinance as the

"Parks Restriction" and paragraph A.4. of the Ordinance as the "Events Restriction."

In summary, the Ordinance prohibits firearms in County Parks and in any public place

that is being used by or is next to a County-permitted event. The Ordinance does not restrict the

possession or transportation of firearms at locations or events that take place within the County

in places that are not controlled or owned by the County, including public roadways, which are

controlled by the Virginia Department of Transportation. (ECF No. 45 ¶ 11.) The County

provides guidance about the Events Restriction on its website. (*Id.* ¶ 12.) The County's official

3

enforcement policy mandates, "no sign, no enforcement"—meaning the Ordinance will not be enforced without notice. (*Id.* ¶¶ 4, 6, and 9.) If an officer encounters someone with a firearm and verifies proper signage, he or she should "first seek voluntary compliance" with the Ordinance before "initiating any citation or arrest." (*Id.* ¶ 7.)

Violations of the Ordinance constitute a Class 1 misdemeanor. § 6-2-1(E).

C.

Plaintiffs Kimberly LaFave, Glenn Taubman, and Robert Holzhauer (collectively, "Plaintiffs") live in either Loudon County or in Fairfax County, Virginia. (ECF No. 1 ¶¶ 2-4.) Ms. LaFave is a paralegal and dog business owner (ECF No. 53 at 4), Mr. Taubman is an attorney (ECF No. 53 at 5-6), and Mr. Holzhauer is a long-serving member of the U.S. Army who was honorably discharged with a 100% total disability (ECF No. 53 at 6-7).

Plaintiffs all have valid concealed handgun permits. (ECF No. 53 at 7.) Plaintiffs use the Parks and challenge the Ordinance for restricting their ability to carry firearms in the Parks and at events permitted by or next to events permitted by the County or next to events that should have been permitted by the County.

Fairfax County is organized under the Constitution and laws of the Commonwealth of Virginia, and Kevin Davis serves as the Chief of Police for the Fairfax County Police Department (together, "Defendants"). (*Id.* ¶¶ 5-6.)

II.

A.

On January 29, 2021, Plaintiffs sued Defendants in state court asserting the Ordinance infringed on their rights under the Constitution of Virginia. (ECF No. 45 at 6.) The state court judge denied Plaintiffs' motions for summary judgment and for a preliminary injunction, and the

4

case then ended on September 7, 2023, when Plaintiffs were granted a nonsuit — the Virginia equivalent of a voluntary dismissal without prejudice. (*Id.* at 6-7.)

On November 22, 2023, Plaintiffs filed this civil action challenging the Ordinance under the Second and Fourteenth Amendments of the Constitution of the United States. (ECF No. 1.) That same day, Plaintiffs moved for a preliminary injunction (ECF No. 2), which the district judge denied on January 24, 2024 (ECF No. 33). Plaintiffs and Defendants cross-moved for summary judgment on April 26, 2024, and the Court held a hearing on those motions on June 7, 2024. (ECF Nos. 44, 48, and 55.)

In the first two counts of their three count Complaint, Plaintiffs allege that the Ordinance violates their Second Amendment right to bear arms in the Parks (Count I – the Parks Restriction) and in areas that are "adjacent to" County permitted events or events that should be permitted by the County (Count II – the Events Restriction). (ECF No. 1 ¶¶ 42-51.) Plaintiffs allege that County Parks have "vast acreage" and that both the Parks and areas "adjacent to" County permitted events do not constitute sensitive places. (*Id.* at 45.) Plaintiffs allege that the Parks Restriction and the Events Restriction deprive them of acting in self-defense in the places identified in the Ordinance. (*Id.* at 46.)

In their third count, Plaintiffs allege that the "adjacent to" provision of the Events Restrictions is unconstitutionally vague and therefore violates their Fourteenth Amendment right to due process (Count III – Due Process Challenge to Events Restriction). (ECF No. 1 ¶¶ 52-59.) They assert that the word "adjacent" is not properly defined in the Ordinance and thus invites arbitrary and discriminatory enforcement. (*Id.* ¶ 55.) Plaintiffs argue also that persons of common intelligence would be unable to discern whether an event is permitted or would otherwise require a permit. (*Id.* ¶ 56.) Fairfax County has complex provisions surrounding

permits, which Plaintiffs believe is beyond the knowledge of an ordinary person. (*Id.*) Plaintiffs assert that these facts make the terms "adjacent to an event that would otherwise require a permit" unconstitutionally vague and in violation of due process. (*Id.* ¶ 59.)

B.

In support of their motion for summary judgment, Defendants provided the following unrebutted, expert evidence from Professor Terence Young, an expert in the history and development of parks in the United States. (ECF Nos. 45 ¶¶ 35-53; 46.)

The development of the American park system and the park movement evolved over decades and centuries in response to existing societal concerns and circumstances. During the early American Republic, cities were necessarily compact, usually about three square miles in area, and densely built. (ECF No. 46-1 ¶ 20.) Despite crowded conditions, most residents could readily retreat to relax in nearby rural areas. (*Id.* ¶¶ 21-22.) Early green spaces within cities, like Boston Common, were multi-purpose utilitarian spaces until the mid-19th century. (*Id.* ¶ 13.) They served multiple functions, including providing temporary grazing land for livestock, housing a town's cemetery, and serving as a practice ground for the local militia. (*Id.*) The utilitarian nature of the early green spaces and its predecessors are distinguishable from today's public parks, which offer more recreational activities to escape urban life.[3] (*Id.* ¶ 15.)

America's tradition of public parks began in the 1850s as increasing numbers of Americans chose to live in cities; some cities more than doubled in population within thirty years. (*Id.* ¶ 20.) As urban populations grew, the rural spaces previously used for retreat became inadequate for the new societal concerns of urbanization. (*Id.*) Many spaces were privately

---

[3] Some of these early, utilitarian green spaces, most famously the Boston Common, survived long enough to be adaptively reused as community parks, thus somewhat resembling modern-day parks. (*Id.* ¶ 15.)

6

owned and were inaccessible to the public, thereby excluding many working individuals from using these spaces. (*Id.* ¶ 22.) To appease the public's desire to escape cities, which had become "unhealthy, impoverished, undemocratic, and crime ridden," localities began to develop municipal parks. (*Id.* ¶ 25.) Rooted in the Romantic Movement, proponents of parks believed that contemplating parks' natural scenery could improve viewers' and society's minds and bodies and, as a result, improve democracy. (*Id.* ¶ 27.) In line with the purpose of parks and their function as a society-improving device, any features or actions in the parks that interfered with the contemplation of natural scenery were excluded from parks, including firearms, which were specifically prohibited. (*Id.* ¶¶ 29-30.)

America's large urban parks embraced firearms prohibitions shortly after these new parks emerged, and localities enacted firearm restrictions and other park rules to maintain order among visitors and to allow nature to reform society. (*Id.* ¶ 30.) The official firearms prohibitions began with Central Park in 1858: "All persons are forbidden . . . To carry fire-arms or throw stones or other missiles within it." (*Id.*) Other localities with large parks embraced the Central Park Commissioners' prohibition on carrying firearms in parks, which rapidly appeared across the United States, including in Brooklyn, Philadelphia, San Francisco, Chicago, and Buffalo. (*Id.* ¶¶ 31, 33.)

In the late 19th and early 20th centuries, America's national parks were created to protect landscapes of natural scenery, and firearms were restricted within those parks, too. (*Id.* ¶ 38.) At roughly the same time, state parks appeared. Like urban and national parks, many states embraced firearm restrictions within their parks to keep the spaces protected for contemplating natural scenery and active play. (*Id.* ¶¶ 52-53.)

Research has revealed well over 100 historical laws prohibiting firearms in federal, state, and local parks. Historical evidence does not support the carrying of firearms for self-defense in urban parks, national parks, or state parks.

III.

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must review cross-motions for summary judgment separately, on their own merits. *CMA CGM S.A. v. Leader Int'l Express Corp.*, 474 F. Supp. 3d 807, 814 (*quoting Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). Ultimately, the Court must decide whether the record evidence presents a genuine issue of material fact such that a trial is required or whether the evidence it is so one-sided that one party must prevail as a matter of law. *Rhoades v. United States Army Corps of Engineers*, No. 3:22-cv-728-HEH, 2023 WL 3981271, at *3 (E.D. Va. June 13, 2023).

A material fact is a fact that may impact the outcome. *Id*. A genuine issue is a fact that is fairly doubted by evidence. *CMA CGM S.A.*, 474 F. Supp. 3d 807, 814. For each motion for summary judgment, the opposing party must identify with specificity the facts with genuine issues for trial. *Id.* When deciding a motion for summary judgment, the Court must view all the facts and draw inferences in favor of the nonmovant.[4] *Id.*

---

[4] On cross-motions for summary judgment, all facts and inferences are drawn in favor of the nonmoving party on each motion. *See Solomon v. Cook Cnty. Bd. of Commissioners*, 559 F. Supp. 3d 675, 686 (N.D. Ill. 2021).

Here, no material facts are in dispute. Rather, the parties dispute how to apply *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, No. 22-915, slip op. at 1 (U.S. June 21, 2024)[5] to the Ordinance to determine its constitutionality.

The parties also dispute whether the Ordinance violates the Fourteenth Amendment's right to due process. (ECF Nos. 45 at 1; 53 at 2.) A law is unconstitutionally vague under the Fourteenth Amendment if a person of ordinary intelligence is not provided a reasonable opportunity to know what is prohibited or if the law enables arbitrary and discriminatory enforcement. *Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 945 (D. Or. 2023) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *Sibley v. Watches*, 460 F. Supp. 3d 302, 316 (W.D.N.Y. 2020). Statutes may be challenged "as-applied" or "facially." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 400 (S.D.N.Y. 2023). A facial challenge is a challenge to a statute in which the plaintiff alleges that the legislation is always unconstitutional, while an "as applied" challenge alleges that a particular application of a statute is unconstitutional. *See id.*

Plaintiffs' constitutional and due process claims assert a facial challenge to the Ordinance. Thus, they "must 'establish that no set of circumstances exists under which the law would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (citations omitted and alteration adopted). Facial challenges are "disfavored for several reasons," including because they require courts to "formulate a rule of constitutional law broader than is required by the precise facts [presented]" and they "threaten to short circuit the democratic process by preventing laws embodying the will

---

[5] Two weeks after oral argument on the parties' cross motions for summary judgment, the Supreme Court decided *United States v. Rahimi*, No. 22-915, slip op. at 1 (U.S. June 21, 2024). At the Court's request, the Parties filed supplemental briefs addressing *Rahimi* and its effect on this case and any authority previously cited by the Parties. (ECF Nos. 68, 69, 70.)

of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (citations omitted).

IV.

A.

The Second Amendment states, in its entirety: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II. As the Fourth Circuit has noted, "[t]his single sentence provides us with a lofty command, but little concrete guidance." *Bianci v. Brown*, No. 21-1255, 2024 WL 3666180, *3 (4th Cir. August 6, 2024).

A series of Supreme Court cases since 2008 have guided the analysis of the Second Amendment's right to bear arms. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second and Fourteenth Amendments protect the rights of ordinary, law-abiding citizens to possess handguns *inside* the home for self-defense whose exercise does not depend on the citizen's service in the militia. But *Heller* recognized that the right to bear arms was not limitless and expressly recognized that history supported a limit on the right to bear arms in "sensitive spaces," like schools and government buildings, referring to such regulatory measures as "presumptively lawful," while allowing space for other regulations not explicitly identified. *Id.* at 626-27.

Before and after *Heller*, in the Fourth Circuit and in other circuits, courts analyzed Second Amendment challenges to firearm regulations using a two-step interest-balancing framework. The court first asked whether a challenged regulation burdened conduct protected by the Second Amendment. If it did, then the court assessed the regulation's constitutionality using

10

means-end scrutiny. *See Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017 (L), 2024 WL 124290 (4th Cir. Jan. 11, 2024).

In 2022, the Supreme Court decided *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), which effected a "sea change" in Second Amendment law. *Moore*, 86 F.4th at 1041. *Bruen* held that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside* the home. *Bruen*, 597 U.S. at 10. In reaching this conclusion, the Supreme Court also held that the two-step interest-balancing framework that had been used by courts to that point was "one step too many." *Id*. at 19. In its place, the Supreme Court established an analysis centered on the Second Amendment's text and history, explaining that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," at which point the challenged regulation is unconstitutional unless the government can show that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

Like *Heller*, *Bruen* also recognized that the right to bear arms was not limitless. *Id.* at 22. Along with confirming *Heller*'s "sensitive spaces" doctrine, *Bruen* reconfirmed that "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* (quoting *Heller*, 554 U.S. at 626).

On June 21, 2024, the Supreme Court decided *United States v. Rahimi*, No. 22-915, slip op. at 1 (U.S. June 21, 2024), a Second Amendment challenge to a federal statute prohibiting individuals subject to a domestic violence restraining order from possessing a firearm. Using the history and tradition analysis from *Bruen*, the Supreme Court held that an individual's Second Amendment right may be limited if that individual has been found by a court to pose a credible

11

threat to the physical safety of another. *Id.* at 16. In the majority opinion, the Supreme Court

criticized "some courts" for having "misunderstood the methodology of Second Amendment

cases." *Id.* at 7. Specifically, the Supreme Court noted that the Fifth Circuit had erroneously

interpreted *Bruen* to require a "'historical twin' rather than a 'historical analogue.'" *Id.* at 16. The

Supreme Court clarified that "the Second Amendment permits more than just those regulations

identical to ones that could be found in 1791." *Id.* at 7.

B.

While the Supreme Court has not established a test or identified factors for courts to

consider when analyzing the Nation's historical tradition of firearm regulation, *Bruen* provided

some general guidance. *Bruen* held that a modern firearms regulation need not be a "dead ringer

for historical precursors" and will pass constitutional muster so long as it is "analogous enough"

to historical tradition. 597 U.S. at 30. So governments need not identify a "historical *twin*," only

a "well established and representative *analogue*," *id.* (emphasis in original), and "like all

analogical reasoning, determining whether a historical regulation is a proper analogue for a

distinctly modern firearm regulation requires a determination of whether the two regulations are

'relevantly similar.'" *Id.* at 28-29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 HARV. L.

REV. 741, 773 (1993)); *see also Rahimi*, slip op. at 7 ("A court must ascertain whether the new

law is 'relevantly similar' to the laws that our tradition is understood to permit.") (quoting *Bruen*,

597 U.S. at 29).

In applying this analogical, relevantly similar approach, courts should uphold a modern

law if, in comparison to historical regulations, the law imposes a "comparable burden on the

right of armed self-defense" and the burden is "comparatively justified." *Bruen*, 597 U.S. at 29.

But silence in the historical record does not automatically render a modern law unconstitutional

12

under the Second Amendment. *See id.* at 29-30. Instead, courts should consider "how and why" a modern law burdens the right to self-defense. *Id. Bruen* also instructs courts to "use analogies to . . . historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 30 (emphasis in original).

To illustrate the analysis, *Bruen* analogized the "sensitive places" from *Heller* to the New York restriction at issue. *Id.* The Supreme Court found the regulation—a proper-cause requirement for gun licensing applications—did not cover a "sensitive place" because the regulation prevented carry across *all* public spaces in New York. *Id.* at 30-31. *Bruen* held that expanding "sensitive places" to all places of public congregation—not just those isolated from law enforcement—required too broad of an analogy to uphold the regulation. *Id.* at 31. Still, *Bruen* authorizes courts to analogize the historical regulation of "sensitive places" when evaluating the constitutionality of a challenged restriction on the right to bear arms. In other words, courts may ask the question: does the regulation cover a sensitive place consistent with spaces that are historically "sensitive" as applied to the Second Amendment? *Id.* at 30-31.

Historical analysis also is shaped by whether the societal problem addressed by the modern regulation existed in this Nation's history and tradition. *Id.* at 26-27. For instance, in *Heller* the societal issue was gun violence, which the government attempted to mitigate by banning firearms in homes. 554 U.S. at 570. But the societal issue of gun violence has existed since the 18th century, and the historical evidence made clear that the broad gun ban at issue in *Heller* was unconstitutional. *Id.* But *Bruen* also recognized that "cases implicating unprecedented societal concerns . . . may require a more nuanced approach" to the historical inquiry. *Id.* at 27. *See also Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959, at * 37 (E.D. Cal.

Dec. 29, 2023) ("Although the Supreme Court observed that some Second Amendment cases will be 'straightforward' . . . this is not an obviously straightforward case."). If a societal condition did not exist in the relevant period a court is examining, then self-evidently there will be no historical firearms laws addressing that condition in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014). Thus, firearms prohibitions about societal conditions that did not exist at the founding—like with the County's Parks—demand a more expansive approach to historical analogy. *See Antonyuk v. Chiumento*, 89 F.4th 271, 359 n.78 (2d Cir. 2023) ("Though the historical analogues here are 'relatively simple to draw,' the relative novelty of public parks as institutions also justifies a flexible approach under *Bruen*."), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024).[6]

C.

*Bruen* and *Rahimi* both recognize the "ongoing scholarly debate" on whether the most controlling period for the historical analysis is 1791—when the Second Amendment was first adopted as a constraint on the federal government ("Founding Era")—or 1868—when the Fourteenth Amendment made the Second Amendment applicable to state and local governments ("Reconstruction Era"). *Bruen*, 597 U.S. at 37-38 and *Rahimi*, slip op. at n.1. In both cases,

---

[6] On July 2, 2024, the Supreme Court granted the petition for certiorari in *Antonyuk*, vacated the Second Circuit's judgment, and remanded the case to the Second Circuit for further consideration after the Supreme Court's decision in *Rahimi*. *Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024). While this Court recognizes that the Second Circuit's opinion was vacated, the Supreme Court did not decide the case on the merits, and it did not dictate how the Second Circuit should rule on remand. *See, e.g.*, *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) (recognizing that "the issuance of a [grant, vacate, and remand ("GVR")] does not speak to the underling merits of the case"); *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand."). As a result, *Antonyuk* remains persuasive authority.

however, the Supreme Court expressly left that question open. *Bruen*, 597 U.S. at 37-38 and

*Rahimi*, slip op. at n.1.

But *Bruen* and *Rahimi* both make clear that the analysis need not be restricted to the

Founding Era—when the Second Amendment was enacted—as Plaintiffs propose here. (ECF

No. 67, 6/7/24 Tr. at 8-9.) Instead, the Supreme Court has favored a more flexible approach that

involves examining "a variety of legal and other sources to determine *the public understanding*

of a legal text in the period after its enactment or ratification." *Bruen*, 597 U.S. at 20 (quoting

*Heller*, 554 U.S. at 605) (emphasis in original). Indeed, the *Bruen* court described the historical

record reviewed in *Heller*, as the "analogous arms-bearing rights in state constitutions that

preceded and immediately followed adoption of the Second Amendment," as well as "how the

Second Amendment was interpreted from immediately after its ratification through the end of the

19th century." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 600-01, 605). And as *Bruen*

notes, only after the ratification of the Second Amendment in 1791 did public-carry restrictions

proliferate. 597 U.S. at 5. Consistent with its reasoning, *Bruen* examined laws spanning over 100

years before and after the Founding Era, going as far back as 1285. *Id.* at 40. *Bruen* also

acknowledged that, "even during Reconstruction[,] the right to keep and bear arms had limits"

and considered regulations well after the Reconstruction Era *Id.* at 60-66. Therefore, in deciding

*Bruen*, the Supreme Court analyzed both Founding Era and Reconstruction Era history and

tradition. Similarly, in *Rahimi*, the Supreme Court analyzed both Founding Era and

Reconstruction Era laws, ultimately finding that this nation's history and tradition *supported* the

federal regulation on firearm possession. Slip op. at 9-16.

The Second and Third Circuits, as well as many district courts, also have evaluated both

time periods and have analogized this nation's history and tradition accordingly. *See Antonyuk*,

89 F.4th at 304-05 ("We therefore agree with the decisions of our sister circuits – emphasizing 'the understanding that prevailed when the States adopted the Fourteenth Amendment' – is, along with the understanding of that right held by the founders in 1791, a relevant consideration.") (citing *Range v. Att'y Gen. U.S. of Am.*, 69 F.4th 96, 112 (3d Cir. 2023) and *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021)). *See also Ezell v. City of Chicago*, 651 F.3d 684, 704-05 (7th Cir. 2011); *Kipke v. Moore*, No. CV GLR-23-1293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023); *Worth v. Harrington*, 666 F. Supp. 3d 902, 918-19 (D. Minn. 2023). Notably, a trend exists of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era. *See Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, 680 F. Supp. 3d 567, 582 (D. Md. 2023) (citing *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023)). Indeed, it was the Fourteenth Amendment— ratified during the Reconstruction Era—that incorporates the Second Amendment's right to bear arms as applicable to the states. *See McDonald*, 561 U.S. at 764. A fact recognized by *Maryland Shall Issue* when it adopted the Eleventh Circuit's reasoning, which considered historical evidence *solely* from the Reconstruction Era in analyzing gun restrictions in public parks. 680 F. Supp. 3d at 583.

V.

A.

Applying the above jurisprudence to the Ordinance, *Bruen* first requires Plaintiffs to establish that the Second Amendment's text presumptively protects the conduct the County seeks to regulate with the Ordinance: carrying guns in County Parks and in or near County permitted events. *Bruen*, 597 U.S. at 32. Defendants argue that Plaintiffs failed to establish their textual burden, claiming that the text of the Second Amendment must specifically allow the conduct the

government seeks to regulate. (ECF No. 45 at 20.) But Defendants read the text of the Second Amendment too narrowly. *Bruen* made clear that the Second Amendment guarantees a general right to public carry for self-defense, 597 U.S. at 33-34, and the Ordinance governs the activity of carrying guns in County Parks and in or near County permitted events, which are public places.[7] (ECF No. 53 at 3 ¶ 1.)

Recently, the Fourth Circuit noted that *Bruen* spent little time on the first step of the analysis because "there was no dispute in that case that the petitioners—'two ordinary, law-abiding, adult citizens'—were among the people protected by the Second Amendment. *United States v. Price*, No. 22-4609, 2024 WL 3665400, at *5 (4th Cir. Aug. 6, 2024). Additionally, the weapons regulated in *Bruen*—handguns—were in common use for self-defense. *Id.* The same is true here, Plaintiffs are three "ordinary, law-abiding, adult citizens" who wish to carry their "concealed handguns" in the Parks for self-protection. (ECF No. 53 at 2.) Therefore, the Second Amendment's "right to keep and bear arms" presumptively guarantees Plaintiffs' right to bear arms in County Parks and in or near County permitted events for self-defense. *See Antonyuk*, 89 F.4th at 355-56 (prohibition on guns in public parks was covered by the Second Amendment) and *Kipke*, 2023 WL 6381503, at *9, 12 (same).

B.

Having determined that the Ordinance regulates conduct protected by the Second Amendment, Defendants bear the burden of showing that "the [Parks Restriction in the Ordinance] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

---

[7] While Defendants dispute how Plaintiffs characterize the Parks, Defendants do not dispute that the Parks are public spaces. (ECF No. 58 ¶ 1.)

In analyzing this issue, it is important to put in context prior Supreme Court decisions. In *Heller*, the Supreme Court addressed the "historically unprecedented nature of the District's ban," *Bruen*, 597 U.S. at 22—prohibiting carrying arms within the home for the purpose of self-defense—which it characterized as a "severe restriction." *Heller*, 554 U.S. at 629. Similarly, *Bruen* involved New York's attempt to define a "sensitive place" as "all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." 597 U.S. at 30. The Supreme Court found New York's definition of sensitive places to be overbroad, in that such a definition would "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 31. *Rahimi* reiterated *Bruen*'s finding and at the same time distinguished the New York law in *Bruen* from the federal law in question:

> New York's law effectively presumed that no citizen had such a [Second Amendment] right [to carry], absent a special need. Section 922(g)(8)(C)(i) does not make the same faulty presumption. To the contrary, it [Section 922(g)(8)(C)(i)] presumes, like the surety laws before it, that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others.

Slip op. at 15.

The Ordinance bears little resemblance to the restrictions in *Heller* and in *Bruen*, as it is not a "severe restriction" or "historically unprecedented." Nor is it a presumptive ban on carrying a firearm, as described by Plaintiffs rhetorically as "bann[ing] firearms in virtually every piece of land [the County] controls, all of which is public property." (ECF No. 63 at 4.) The right to bear arms throughout the County remains, and the Ordinance does not otherwise restrict that right, except within Parks and during events permitted by the County.[8] *See Moore v. Madigan*, 702

---

[8] Attempting to refute the narrow scope of the Ordinance, Plaintiffs also mischaracterize the Events Restriction as prohibiting firearms in "any event *on County property*, or any street or sidewalk that happens to be adjacent to such an event." (ECF No. 60 at n. 5 (emphasis added).)

F.3d 933, 940 (7th Cir. 2012) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places[.]"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (quoting same). The Ordinance's narrow restrictions suggest that the historical analogues rejected in *Heller* and *Bruen* may be more appropriate here. *See Rahimi*, No. 22-915, slip op. at 15-16. As discussed above in Section IV.B., according to *Heller* and *Bruen*, the appropriate focus is how and why the Ordinance burdens the right to bear arms and whether that burden is "relevantly similar" to the analogous history and tradition. *Id.* at 28-29. Moreover, the permissible historical period to review may span from "immediately after [the Second Amendment's] ratification through the end of the 19th century." *Id.* at 20. As authorized by *Bruen* and *Rahimi*, this Court will do the same.

Defendants have satisfied their burden and have provided sufficient historical evidence showing that the Parks Restriction is constitutional under both Founding Era and Reconstruction Era history and tradition. As for the history and tradition from the Reconstruction Era, Defendants have cited over 100 statutes that impose firearm restrictions in parks and, importantly, none of them have been determined to have been unconstitutional. This fact shows that the Ordinance is "'relevantly similar' to the laws that our tradition is understood to permit." *Rahimi*, slip op. at 7 (quoting *Bruen*, 597 U.S. at 29). The Ordinance also is constitutional based on similarly relevant language in the surety statutes from the Founding Era. Finally, the Parks Restriction fits within the constitutionally based sensitive places jurisprudence. *See Kipke, et al., v. Moore, et al*., No. CV GLR-23-1293, 2024 WL 3638025, at * 5 (D. Md. Aug. 2, 2024)

---

Instead, the Ordinance only prohibits firearms in and immediately next to *County permitted* events. (ECF No. 61 at n. 4.)

(upholding gun prohibitions on summary judgment as to specific locations, including state parks, based on being analogous to sensitive places *or* aligning with history and tradition).

i.

Discussed below in Section V.B.ii., the record evidence and post-*Bruen* case law establish that modern recreational parks did not exist during the Founding Era. *See, e.g.*, *Kipke*, 2023 WL 6381503, at *9 (distinguishing between the "expansive State and federal park system" and parks from the Founding Era). Since the County Parks covered by the Ordinance are more like Reconstruction Era parks than Founding Era parks, the Court must assess the historical evidence from the Reconstruction Era and determine whether a historical analogue exists to the Ordinance. *See Bruen*, 597 U.S. at 28 ("[U]nprecedented societal concerns or dramatic technological changes may require a more nuanced approach.") This approach should be flexible and should involve examining "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (emphasis in original).

Citing over 116 prohibitions on guns in parks from 1858 to 1936, Defendants have met their burden of showing the Ordinance's congruity with this Nation's history and tradition of regulating firearms in modern parks. (*See* ECF No. 47-18.) Beginning in 1858, regulations in Central Park and in Brooklyn Prospect Park prohibited guns and declared that offenders "shall be deemed guilty of misdemeanor, and be punished, on conviction before the Mayor, Recorder, or any magistrate of the City of New York." (ECF No. 46-1, Exs. 3, 4, and 5.) Next, in 1868, Philadelphia enacted legislation prohibiting firearms in Fairmount Park: "No person shall carry fire arms . . . in the park or within fifty yards thereof[.]" (*Id.* at Ex. 5.) San Francisco followed suit in 1872, legislating that the "carry and especially the discharge of firearms" was prohibited

20

in Golden Gate Park. (*Id.* at Ex. 6.) In 1873, the city of Chicago forbade "[a]ll persons" from "carry[ing] firearms . . . within any one of the public parks. (*Id.* at Ex. 7.) Later, throughout the 1870s, Buffalo, New York; St. Louis, Missouri; Phoenixville, Pennsylvania; and Danville, Illinois, all enacted legislation prohibiting, in some way or another, guns in parks. (*Id.* at 15-17 ¶ 31.) Gun restrictions in parks continued to proliferate in the 1880s and 1890s.[9] (ECF No. 46-1 at 18-19 ¶ 33.) Like the Ordinance here, all these firearm restrictions were adopted by local governments like the County. (*Id.*)

Defendants also provided extensive record evidence that federal parks have had firearm regulations beginning in 1872 and continuing into the 20th century. (*Id.* at 22-24 ¶¶ 38-41.) For example, the National Park Service's uniform code includes legislation restricting firearms in *all* national parks—firearms were prohibited without written permission of the superintendent or custodian. (*Id.* at 25 ¶ 43.) Finally, states began developing their own parks in the early 1900s and they, too, regulated and restricted firearms in the state parks. (*Id.* at 28-29 ¶¶ 52-53.) In sum, "how" the Nation has historically restricted the right to bear arms in public parks aligns with how the Ordinance restricts the right to bear arms—in public parks designed for recreation.

Historical evidence also implies that prohibitions on guns in parks in the 19th century were also enacted for similar reasons as the Ordinance. As Prof. Young explains, the development of the parks themselves came from the desire to retreat from the city, to be in touch with nature, and to cure societal problems. (*Id.* ¶¶ 25-26.) Thus, early modern parks were

---

[9] Between 1886 and 1899 these cities adopted restrictions on guns in parks: Boston, Massachusetts; Reading, Pennsylvania; Saint Paul, Minnesota; Salt Lake City, Utah; Trenton New Jersey; Berlin, Wisconsin; Springfield, Massachusetts; Cincinnati, Ohio; Lynn, Massachusetts; Peoria, Illinois; Spokane, Washington; Pittsburgh, Pennsylvania; Wilmington, Delaware; Rochester, New York; Detroit, Michigan; Kansas City, Missouri; New Haven, Connecticut; and Boulder Colorado. (ECF No. 46-1 at 18-19 ¶ 33.)

designed to provide spaces for passive recreation, not military exercises and displays. (*Id.* ¶ 29.) Some of the passive recreational activities included athletic activities, children's playgrounds, flower gardens, and museums. (ECF No. 56-1 ¶ 32.) Parks became a haven for patrons from the cities that were believed to be filled with disease, poverty, crime, and other societal issues. (*Id.*) Consequently, gun restrictions were part of a larger effort to protect these spaces for the betterment of society. (*Id.* ¶ 33.)

The County's Parks similarly are intended to serve as havens for its residents. The County Parks are used by children and adults for many activities, not limited to school field trips, sports activities, camping, hiking, Earth Day celebrations, election-related activities, protests, and more. (*Id.* ¶¶ 14-22.) These similarities in "why" guns are and were prohibited in parks show that the Ordinance is consistency with the Nation's history and tradition. *See also Antonyuk*, 89 F.4th 271, 357-58 (finding 19th century gun prohibitions created to protect spaces for leisurely activities were analogous to a park's gun prohibition); *Kipke*, 2023 WL 6381503, at *10 (finding the 19th century parks gun restrictions to be "comparably justified by the need for public safety" (reaffirmed on summary judgment by *Kipke*, 2024 WL 3638025)); *Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 587 ("The reasons for these historical restrictions, which appear to be to protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms . . . are comparable to the reason for the prohibitions[.]").

In response, Plaintiffs have presented no treatises, caselaw, or other evidence establishing that, in any era, the public understanding of the right to bear arms forbade the government from prohibiting guns in modern parks. Nor have Plaintiffs demonstrated that any of the over 100 regulations identified by Defendants were overturned. On this score, *Bruen* directs: "'where a governmental practice has been open, widespread, and unchallenged since the early days of the

Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'" 597 U.S. at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). *See also Rahimi*, slip op. at 11 (Kavanaugh, J., concurring) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002) ("a 'universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional'")).

The County has satisfied its burden of proving that the Ordinance reflects this Nation's history and tradition of prohibiting firearms in parks from the Reconstruction Era to the present. *Compare Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 585-88 (citing historical evidence the government provided from 1857 to 1905 to support a gun restriction at parks) *with Springer v. Grisham*, No. 1:23-cv-00781 KWR/LF, 2023 WL 8436312, at 6-7 (D.N.M. Dec. 5, 2023) (ban on firearms in parks was unconstitutional where the government only cited *Maryland Shall Issue* without providing actual laws as historical evidence).

ii.

The Parks Restriction also withstands constitutional muster when compared to the historical burdens on the right to bear arms during the Founding Era. Chiefly, Defendants have shown that the Parks Restriction relates to an unprecedented social issue that did not exist during the Founding Era—the safety, peace, and tranquility afforded by *modern* parks designed to provide recreational refuge. Because this unprecedented social issue did not exist during the Founding Era, *Bruen* requires the Court to conduct a more nuanced analysis of history and tradition. 597 U.S. at 27 ("other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach . . . Although its meaning is fixed .

23

. . the Constitution can, and *must*, apply to circumstances beyond those the Founders specifically anticipated") (emphasis added).

Prof. Terence Young, who studies the historical geography of the American park movement, provided extensive detail surrounding the development of parks in the 1850s. (ECF No. 46-1 ¶¶ 12, 19-29.) His declaration concludes that the commons or green spaces that existed before the 1850s were different in their purpose and physical attributes from modern parks. (*Id.* ¶¶ 13-20.) For instance, in 1782 in Newburyport, Massachusetts, the town sequestered citizens who had contracted smallpox in "the pest house in the common pasture" in the town center.[10] (*Id.* ¶ 14.) Prof. Young affirmatively states that the "[commons] were not analogs to today's public parks nor were they their predecessors."[11] (*Id.* ¶ 15.)

Plaintiffs seek to rebut Defendants' evidence only by citing websites and articles that challenge the concept of whether modern parks existed during the Founding Era. (ECF No. 60 at 15-16.) Plaintiffs also assert that "[Defendants] provide[] no evidence that 'communal spaces for repose and relaxation' were only invented in the mid-19th century." (*Id.* at 15.) But these self-serving statements disregard the evidence, particularly Prof. Young's testimony, that modern parks were created partly because there were no spaces for relaxation available and that the idea of "passive recreation" derived from Romanticism and urban expansion. (ECF No. 46-1 ¶¶ 19-20, 26-29.) Nor do Plaintiffs provide any admissible evidence in support of their arguments, as required by Rule 56(c)(2) of the Federal Rules of Civil Procedure and the Local Rules. *See* FED. R. CIV. P. 56(c)(2) and E.D. Va. Local Civ. R. 56(B). Thus, Prof. Young's testimony and history

---

[10] The evidence referenced in *Kipke* is nearly identical to the information contained in Prof. Young Declaration. 2023 WL 6381503, at *9 ("Boston Common, for example, 'was used primarily as a pasture, place of execution, and site for the militia to muster and drill.'").

[11] Young testifies that spaces like Boston Common were only adaptively reused as community parks well after the Founding Era. (*Id.* ¶ 15.)

stands unrebutted, including his conclusion that the unprecedented societal issue of the safety and use of modern parks did not exist during the Founding Era, and a more nuanced approach to the Second Amendment analysis of the Ordinance is required. *See, e.g.*, *Mintz v. Chiumento*, No. 123-cv-795MADCFH, 2024 WL 1361047, at * 12 (N.D.N.Y. Mar. 20, 2024) (recognizing that safety at summer camps was an unprecedented social issue that required a nuanced approach). This nuanced approach to analyzing the Founding Era firearm regulations also supports the Parks Restriction because a historical tradition exists of restricting firearms in places where citizens gather in public.

The earliest evidence provided by Defendants is the 1328 Statue of Northampton in England, which stated that "no Man great nor small, of what Condition soever he be . . . go nor ride armed by night nor by day, in Fars, Markets, nor in the presence of the Justices or other Ministers[.]" (ECF No. 47-19.) Also cited in *Bruen* and *Rahimi*, the Statute of Northampton has historical significance because Virginia adopted its language in a 1786 firearm prohibition: "That no Man great nor small, . . . ride armed by night or by day, in fairs or markets, or in other places, in terror of the county." (ECF No. 47-20.) *See also Bruen*, 597 U.S. at 49-50; *Rahimi*, slip op. at 13.

While *Bruen* deemed the Virginia version of the Statute of Northampton dissimilar to "broad prohibitions on all forms of public carry," 597 U.S. at 50, unlike the New York law at issue in *Bruen*, the Parks Restriction narrowly restricts firearms in the Parks; it is not a general prohibition on the public right to carry, which right remains in 90.6 percent of the County.[12]

---

[12] Plaintiffs assert that the total acreage of County Parks is 23,584 which makes up 9.3 percent of the County's land mass. (ECF No. 53 at 3 ¶ 1.) Defendants disputed this fact, stating that the correct acreage is 23,632 which makes up about 9.4 percent of the County's land mass. (ECF No. 58 at 7 ¶ 1.) This factual difference is not material.

North Carolina also adopted a version of the Statute of Northampton in 1792, which prohibited guns in "fairs, markets, [and] in the presence of the King's Justices, or other ministers[.]" (ECF No. 47-21.) In *Antonyuk*, the Second Circuit traced the statutory language from the Statute of Northampton, to the Founding Era Virginia and North Carolina firearm prohibitions, then, to the Reconstruction Era prohibitions on guns in public forums and places of assembly in Texas, Tennessee, and Missouri. 89 F.4th at 357. "This 'long, unbroken line' beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is 'part of the 'immemorial' custom' of this nation." *Id.* at 358-60 (citing *Bruen*, 142 S. Ct. at 2136 and Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 476 2019)). *See also Rahimi*, slip op. at 13 (identifying the four states that "expressly codified prohibitions on going armed" during the Founding era).

The Founding Era history supports the Ordinance in *how* it restricts the use of firearms in gathering spaces like public parks. The *why* behind the Parks Restriction also adheres to history and tradition. The Virginia 1786 Statute prohibited going armed "in other places, in terror of the County." (ECF No. 47-20.) This language evidences that, during the Founding Era, citizens believed a prohibition on armed carry was necessary to prevent terror among Virginia residents —just as Defendants seek to prevent terror among park visitors.[13] *See Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC, 2023 WL 9050959, at *32-34 (E.D. Cal. Dec. 29, 2023) (finding colonial laws showed a history of accepting harsh gun restrictions based on popular opinions on what was

---

[13] The Second Circuit has found the Virginia statute to be supportive even without corresponding evidence of modern-day fear. *See Antonyuk*, 89 F.4th at 355-56 (finding that the statute supported a tradition of prohibiting firearms in urban parks).

frightening or dangerous). The Supreme Court rejected this argument in *Bruen* because New York had not presented "any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people." 597 U.S. at 45. But here, Defendants have provided evidence of community fear in the form of a 2022 survey illustrating the connection between the historical analogue of preventing terror in the community with the current sentiment that the presence of guns in Parks would have "chilling effects" on the County's citizens' use of those spaces. (ECF No. 49-1; ECF No. 45 at 33.)

For these reasons, the County has shown that the Parks Restriction relates to an unprecedented social issue that did not exist during the Founding Era and it has otherwise satisfied its burden of proving that the Ordinance satisfies this Nation's history and tradition from the Founding Era of prohibiting firearms in areas for public gatherings, such as parks.

iii.

The Supreme Court has identified well-settled "sensitive places" where gun prohibitions are consistent with the Second Amendment absent a history and tradition of gun regulation in these places, such as schools, government buildings, legislative assemblies, polling places, and courthouses. *Bruen*, 1 U.S. at 30. The Supreme Court also has expressly permitted courts to evaluate new areas of firearm regulation through the lens of the approved sensitive places doctrine. *Id.* The Supreme Court undertook such an exercise in *Bruen*; although, the Supreme Court ultimately decided that the New York firearm regulation at issue was too broad to be considered a sensitive place—because the regulation applied to all of New York. *Id.* at 31. But the analysis here is much narrower and is distinguishable from *Bruen* in that the spaces regulated

27

are much narrower—County Parks,[14] which are analogous to recognized sensitive spaces. As noted above, the Parks Restriction narrowly restricts firearms in the Parks; it is not a general prohibition on the public right to carry, which right remains in 90.6 percent of the County.

About 4 million children visited County Parks in 2023. (ECF No. 52 ¶ 5.) Over 43,000 of the 4 million children registered for summer camps at the Parks. (*Id.* ¶ 12.) Summer camps have many of the same characteristics as schools, a well settled sensitive places. Summer camps have the same purpose of providing education and socialization to children and protecting children in those spaces. *See Mintz*, 2024 WL 1361047, at *17 and *We the Patriots USA, Inc. v. Grisham*, No. 1:23-CV-00773-DHU-LF, 2023 WL 6377288, at *3 (D.N.M. Sept. 29, 2023) (finding playgrounds to be an analogous sensitive place to schools). The County also operates three preschools in County Parks, expressly making them sensitive places. *See Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 584 (finding childcare facilities to be sensitive places because they are tasked with providing education and protecting children) and *Heller*, 554 U.S. at 626-27 (listing schools as a longstanding sensitive place for valid prohibitions on firearms). Additionally, over 43,000 students participated in school trips to the Parks, reinforcing that the Parks are used as a space to educate and protect children. (*Id.* ¶ 19.)

Plaintiffs respond that the Parks cannot be considered sensitive spaces because, historically, sensitive spaces have enhanced security and a "practical means of preventing armed criminals from entering." (ECF No. 53 at 11.) The caselaw directly refutes Plaintiffs' argument

---

[14] *Rahimi* also distinguished the federal statute at issue in that case from the blanket New York ban at issue in *Bruen* to find the federal statute constitutional. Slip op., at 15. The surety laws, according to the majority opinion in *Rahimi*, presumed that individuals had the right to carry. *Id.* No such presumption existed in the New York restriction at issue in *Bruen*. *Id.* The Ordinance at issue more closely resembles the statute in *Rahimi* because the Ordinance presumes that County residents have the right to carry in public, and it restricts that right in a narrow way.

and it is otherwise unpersuasive because many recognized sensitive spaces lack enhanced security. (ECF No. 58 at 14-16.)

For these reasons, the County's Parks are analogous to schools and other sensitive places, satisfying constitutional muster for the Parks Restriction, regardless of analogues to the Nation's history and tradition of gun regulation.

C.

i.

Plaintiffs also have challenged the constitutionality of a portion of the Events Restriction. The Event Restriction prohibits firearms in "any public street, road, alley, or sidewalk or public right-of-way or any other place of whatever nature that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a permit." Fairfax County Code § 6-2-1(A)(4). But Plaintiffs challenge the Events Restriction only as much as it applies to an area "adjacent to a permitted event" or "adjacent to . . . an event that would otherwise require a permit." (ECF No. 1 at 10, ¶¶ 49-50, and 13, ¶ 1(B); ECF No. 48 ¶ 1(B), removing "is being used by" from its challenge and stating "[a]n area adjacent to an event does not constitute a sensitive place . . . .") Plaintiffs therefore do not challenge the Events Restriction prohibition on firearms within a County permitted event or within an event that requires a permit, but instead only the prohibition on firearms in the area "adjacent" either to a County permitted event or to an event that requires a permit.

ii.

As described by the County in its statement of undisputed material facts, the Events Restriction is narrow. A County website describe the process for obtaining a permit at the five types of County facilities for which a permit subject to the Events Restriction can be sought: (1)

29

the County's main and regional government centers, (2) the County's public libraries, (3) County parks, (4) County community centers, fields, and gyms, and (5) "all other Facility Use Requests." (ECF No. 45 at 4, ¶ 12.) Events that take place within the County on property that is not controlled or owned by the County are not subject to the Ordinance, including any events on public roadways, which are controlled by the Virginia Department of Transportation ("VDOT"). (ECF No. 45 at 4, ¶ 11.) So, for example, if a 5k race or a community street fair is held on a public roadway, it is not subject to the Ordinance because VDOT would have issued the permit, not the County. (*Id.*)

Plaintiffs have not challenged the County's statement of undisputed material facts. So, in determining the parties' cross-motions for summary judgment, the Court assumes Plaintiffs admit the County's facts. E.D. Va. Local Civ. R. 56(B). Thus, the generalized concerns identified by Plaintiffs in their summary judgment papers about unknowingly stumbling into a restricted area are unfounded.[15]

iii.

Contextually, Plaintiffs' narrow challenge to the Events Restriction and the limited scope of the Events Restriction are sharp contrasts, as discussed above with respect to the Parks Restriction, to the statute at issue in *Bruen*, which effectively prohibited most New Yorkers from possessing any firearm. The Events Restriction does nothing of the kind. Instead, it applies only to events requiring permits in buildings, parks, and recreation and community centers owned and

---

[15] The Court notes that Plaintiffs' briefing has many statements that overstate the scope of the Ordinance. Just as one example, the first paragraph of Plaintiffs' memorandum in support of their motion for summary judgment purports to frame this case as a "purely legal question of constitutional law that Fairfax County's gun ban in parks and public byways violates the Second Amendment of the United States Constitution." (ECF No. 53 at 1.) This over statement of the case is untethered from the Events Restriction at issue.

run by the County. This limited restriction fits neatly within this country's history and tradition of firearm regulation and is relevantly similar to the "public assembly," "public gathering," and "to the terror of the people" laws cited in the discussion of the Parks Restriction.

The parties have spent far less time discussing the constitutionality of the Events Restriction. (*See* ECF No. 61 at 19-20 (discussing how Plaintiffs do not mention the merits of their challenge to the Events Restriction).) Instead, the parties effectively incorporate and adopt their arguments from the Parks Restriction. Because this Court finds that analysis relevantly similar to the Events Restriction, it will not be rehashed here except to note that the County has identified a robust historical tradition of prohibiting firearms not only within an area of sensitivity, but adjacent to it. *See, e.g.*, *Maryland Shall Issue*, 680 F. Supp. 3d at 589 (noting historical tradition supporting so-called "buffer zones"); *United States v. Allam*, 677 F. Supp. 3d 545, 576-78 (E.D. Tex. 2023) (same), *appeal docketed*, No. 24-40065 (5th Cir. Feb. 1, 2024); *United States v. Walter*, No. 3:20-cv-00039, 2023 WL 3020321, at *7 (D. V.I. Apr. 20, 2023); ECF No. 47-18,  rows r, 16-17, 19, 20 (prohibitions in Philadelphia, Pittsburg, Reading, PA, Trenton, NJ, and St. Paul, MN, including prohibitions within 50 or 100 yards of the parks).

The County also has identified a Tennessee statute (1870) and Missouri Statute (1873), each banning firearms in places including "any fair, race course, or other public assembly of the people" and "any place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering[.]" (ECF No. 45 at n. 21.) This additional history and tradition shows a pattern across the nation's history of regulating crowded spaces and protecting civilians who may be in those spaces. *See Antonyuk*, 89 F.4th 271, 356 (recognizing this Nation's history of regulating firearms in "quintessentially crowded" places).

Plaintiffs have provided no countervailing history and tradition with respect to their "adjacent to" or "otherwise require a permit" challenges to the Events Restriction.

For these reasons, the Events Restriction does not violate the Second Amendment.

D.

Finally, Plaintiffs challenge the same portions of the Events Restriction on the ground that it violates their Fourteenth Amendment right to due process. Plaintiffs contend that the portion of the Events Restriction that prohibits firearms at "an event that would otherwise require a County permit" or to an area "adjacent" to such an event is unconstitutionally vague. Because a person of ordinary intelligence has a reasonable opportunity to understand what is prohibited by the Ordinance, the Events Restriction is not unconstitutionally vague.

i.

Due Process requires that an enactment's prohibition be clearly defined, and if not clearly defined, the enactment may be void for vagueness. *See Grayned v. City of Rockford*, 408 U.S. 104, 113-14 (1972). A law is unconstitutionally vague if a person of ordinary intelligence has not been provided a reasonable opportunity to know what is prohibited. *Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 945 (D. Or. 2023) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). A statute also may be void for vagueness if it authorizes or encourages arbitrary and discriminatory enforcement. *See Sibley v. Watches*, 460 F. Supp. 3d 302, 316 (W.D.N.Y. 2020).

Statutes may be challenged as void for vagueness "as-applied" or "facially." *Goldstein*, 680 F. Supp. 3d at 400. A facial challenge depends solely on the language of the statute and requires the movant to demonstrate that "no set of circumstances exists under which the Act would be valid." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Courts are to

proceed with caution when evaluating facial attacks on statutes, so as not to unnecessarily interfere with a state regulatory program. *Goldstein*, 680 F. Supp. 3d at 400-01 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)). To that end, a strong presumption exists that lawfully enacted statutes are valid. *Koons*, 673 F. Supp. 3d 515, 571 (quoting *Amaya v. New Jersey*, 766 F. Supp. 2d 533, 538 (D.N.J. 2011) (citing *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983))).

ii.

As a threshold issue, the County contends that Plaintiffs have no Article III[16] standing to challenge the Events Restriction because they have failed to demonstrate a credible threat of prosecution. (ECF No. 45 at 34-36.) To establish Article III standing, Plaintiffs must have (1) suffered an injury in fact, (2) that is traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016). Plaintiffs have Article III standing for the reasons below.

First, Plaintiffs have established their injury in fact—a credible threat that they may be arrested—because they intend to carry firearms in County Parks and at events or adjacent to events that require a County permit. (ECF No. 53 at 7 ¶¶ 18-19.) *See Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 577 (plaintiff's credible threat of enforcement may serve as an injury in fact) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Second, Plaintiffs have sufficiently stated their reasons for engaging in conduct traceable to the Ordinance, and they otherwise possess valid licenses to carry firearms in public. (*Id.* at 4-7 ¶¶ 5-17.) Because Plaintiffs have alleged that they intend to continue to engage in conduct prohibited by the Ordinance, a credible threat exists

---

[16] Article III limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1.

33

that they could be prosecuted for their conduct. Finally, Plaintiffs' injury may be redressed by a ruling that the Ordinance is unenforceable, which would allow them to carry firearms in the County's Parks and at or near County events that require a permit. For these reasons, Plaintiffs have standing to assert their Fourteenth Amendment due process claim. *See Maryland Shall Issue, Inc.*, 680 F. Supp. 3d at 579-80 (finding standing to challenge gun restriction that prohibited carrying firearms in public parks and within 100 yards of a public assembly).

iii.

Plaintiffs bring a facial challenge to the Events Restriction of the Ordinance alleging it is unconstitutionally vague under the Due Process clause of the Fourteenth Amendment. (ECF No. 53 at 23-25.) Plaintiffs assert that the portion of the Events Restriction that bans firearms at "an event that would otherwise require a permit or adjacent area thereto" is unconstitutionally vague because they cannot decipher whether an activity requires a permit or not. (*Id.* at 23.) In other words, according to Plaintiffs, the Ordinance fails to put them on notice of when they are violating the Events Restriction. Defendants maintain that the Ordinance is constitutional when examined alongside the County's guidance about permitted events and the requirement that the Events Restriction applies only when notice of the Ordinance has been posted. (ECF No. 58 at 38-39.)

Because the County has provided publicly available information about prohibited conduct under the Events Restriction, because guidelines have been adopted to avoid arbitrary enforcement of the Events Restriction by law enforcement, and because the Ordinance's notice requirement prevents arbitrary enforcement, the Court concludes that the Events Restriction is not unconstitutionally vague in violation of the Due Process Clause.

To guide citizens on the permitting requirements for public use of County property, the County maintains a website with links that identifies "six areas where and authorities from which permits for events can be sought." (ECF No. 45 at 4 ¶ 12.) *See Koons*, 673 F. Supp. 3d at 661 (courts must consider "any limiting construction that a state court or enforcement agency has proffered") (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n. 5 (1982)). This website and these links are available for Plaintiffs use to identify the areas where County permits are required for public use subject to the Ordinance. *See Koons*, 673 F. Supp. 3d at 662 (state's proffered interpretation of a "holster" put citizens on notice of potential violations). The County has also provided guidance and training to police officers, so law enforcement knows when and how to enforce the Ordinance, which safeguards citizens from any possible arbitrary enforcement. (ECF No. 58 at 38-39.) *See Gazzola v. Hochul*, 645 F. Supp. 3d 37, 66-67 (N.D.N.Y. 2022), *aff'd*, 88 F.4th 186 (2d Cir. 2023), *cert. denied*, No. 23-995, 2024 WL 3014531 (U.S. June 17, 2024) (finding that an employee training program that provided guidance in assessing security plans for firearms dealers did not suggest arbitrary enforcement). *See also Koons*, 673 F. Supp. 3d at 662 ("The State's interpretation contains *explicit standards* for law enforcement officers, judges, and juries to follow that will eliminate arbitrary or discriminatory enforcement." (emphasis added)).

Finally, and most consistent with the principles of due process, the Ordinance contains the following notice requirement: "notice of this ordinance shall be posted . . . at all entrances or other appropriate places . . . that is open to the public and is being used by or is adjacent to a permitted event or event that would otherwise require a permit."[17] § 6-2-1(D)(1)(iv). Notices

---

[17] Though not relevant to the Fourteenth Amendment analysis, the County's notice requirement adheres to this nation's history and tradition of firearm regulation. Prof. Young's declaration

such as this one are enough to notify a person with ordinary intelligence that firearms are prohibited in the areas with posted notice and areas next to it. *See Second Amend. Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:21-cv-0116-B, 2023 WL 7490149, at * 10 (N.D. Tex. Nov. 13, 2023) (finding a person of ordinary intelligence could decipher which firearms applied to the statute based on "surface area that allows the weapon to be fired from the shoulder" even if the surface area had no "quantifiable measurement"). Finally, Plaintiffs and other ordinary citizens will know with complete certainty that an event is subject to the Ordinance because the Ordinance and the Fairfax County law enforcement manual establish that the Events Restriction applies only when notice of the Ordinance is posted, which safeguards citizens from any possible arbitrary enforcement. (ECF No. 58 at 38-39.)

Because sufficient safeguards and guidance exists for enforcing the Events Restriction in the Ordinance, it is unlikely that inadequate notice *or* arbitrary enforcement of the Ordinance will occur. *See Koons*, 673 F. Supp. 3d at 571-72 (a statute's built-in procedural mechanisms eliminated arbitrary enforcement). Thus, the Court concludes that the Events Restriction does not violate the Due Process Clause of the Fourteenth Amendment.

VI.

For all these reasons, Defendants' Motion for Summary Judgment (ECF No. 44) is GRANTED, and Plaintiffs' Motion for Summary Judgment (ECF No. 48) is DENIED. The

---

states that the Central Park firearms prohibition was "posted in conspicuous locations" to inform visitors of the rule. (ECF No. 46 at 14 ¶ 30.) In 1868, Pennsylvania's state legislature also enacted a prohibition on guns in Fairmont Park with the following, additional restriction related to adjacent property: "no person shall carry fire arms or shoot birds in the park or within fifty yards thereof." (*Id.* at 74.) Pennsylvania's historical prohibition on guns in its parks is similar to the Ordinance, and it resembles the Ordinance's fifty-yard "adjacent to" provision. (*See* ECF No. 47-1 (prohibiting firearms in areas next to County-permitted events).) The Ordinance's procedural protections confirm that it adheres to history and tradition, as well as other modern-day Second Amendment limitations.

Ordinance, Fairfax County Code § 6-2-1, is constitutional under the Second and Fourteenth Amendments. Consequently, Judgment will enter in favor of Defendants.

IT IS SO ORDERED.

Entered this 23rd day of August 2024.

William B. Porter
United States Magistrate Judge

Alexandria, Virginia